**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| Plaintiff, *Pro Se*, | § | **Case No.** 4:26-cv-00950-P |
| v. | § | |
| | § | Related Case No. 4:26-cv-00381-O |
| **JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., and J.P. MORGAN SECURITIES LLC,** | § | FINRA Case No. 24-01208<br>EEOC Charge No. 450-2024-04743<br>AAA Case No. 01-26-0000-7215 |
| Defendants. | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR PARTIAL FINDINGS OF FACT UNDER RULE 56(g)**

**PRELIMINARY STATEMENT**

Three FINRA arbitrators received sworn testimony and the parties' exhibits and made express findings on the U5 dispute (addressed in captioned Related Cases): after JPMS learned Plaintiff was contemplating leaving for a competitor, JPMS:

(1) *began investigating reasons to terminate Claimant so as to make it more difficult for Claimant to go work with a competitor;*

(2) *[had] been found to have done this in the past,*

(3) *the [mis]conduct "may be a pattern," and*

(4) *one of the primary reasons [for the U5 timing] was to hinder Claimant's ability to transfer his book of business to a competitor. Award at 4.*

The Panel found the filed Form U5 inaccurate and ordered the reason changed to Voluntary, the explanation deleted and left blank, and the termination date changed to October 28, 2023. The Award also contains adverse determinations: no defamation finding as to JPMS' custodial and filing duties, a recognized right to terminate during the notice period, denied

damages, and prompt reemployment noted. Award at 4–5, 7. The related federal action confirmed the Award and entered judgment. App. 0009–0027.

Against JPMS, preclusion is requested only for the four U5 determinations the Panel actually and necessarily decided to grant the correction: the filed U5 was inaccurate; the reason is Voluntary; the explanation is blank; and the termination date is October 28, 2023. JPM Bank and JPMC did not appear in the FINRA arbitration and were not adjudicated there. As to them, the Award is evidence of the adjudication; the independent Bates record supplies the entity-by-entity proof.

By 2023 Plaintiff was an Executive Director and Gold Producer running a $973 million client book, with risk-adjusted revenue up approximately 14%, a peer review describing "an outstanding year," and an opening memorandum recording no notable conduct or performance history apart from the pending matters; he is male, a dual United States-Brazilian citizen, and a 100% service-connected disabled Army veteran. UMFs 5–13.

The dated record then contains five separation formulations:

(i) the October 17 performance/audit routing;

(ii) the October 20 Global Security expense matter, closed NOT supported November 29;

(iii) Stainback's October 26 manager-raised ERC ticket, 28 minutes and 50 seconds after Plaintiff's PTO/personal-sick email on the confirmed normalization;

(iv) the December 1 recorded call's Code of Conduct and anti-harassment rationale; and

(v) the December 22 U5's Discharged/inappropriate-behavior formulation, which the Panel adjudicated inaccurate. UMFs 35–55, 77, 81–88, 113.

Hitchcock's conflicting Thursday/Friday source accounts, Cohen's pre-interview termination forecast, the competitor-knowledge and book-allocation records, the U5 hold, and approvals obtained after the NOT-supported close frame the pretext showing. UMFs 52–53, 60–79.

The relief is tiered: affirmative judgment on Counts II–XIII; judgment on independently established claim parts under Rule 56(a); Rule 56(g) findings establishing the documentary record; and an award of the damages the record fixes without genuine dispute.

Plaintiff asks for damages on this Motion. The record supports approximately $10.7 million to $18 million in economic damages: Plantiff's highly regarded economic damages expert's unrebutted schedules calculate a $22,719,882 present value of but-for earnings against a $12,035,470 present value of mitigating earnings — approximately $10,684,412 in net economic loss — and $29,993,659 under the supported additional-investor scenario, approximately $17,958,189 net. App. 0896–0908.

Plaintiff requests judgment awarding economic damages of not less than $10,684,412 on the counts establishing the Merrill withdrawal and lost-earnings injury, together with the $15,410.96 notice-pay award on Count XII; any greater or additional amount remains for trial. These figures are economic lost-earnings calculations and do not constitute or include exemplary damages; Plaintiff expressly preserves all additional compensatory, statutory, equitable, exemplary, prejudgment-interest, post-judgment-interest, and other relief legally available.

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT .......... i**

**I. UNDISPUTED MATERIAL FACTS .......... 1**

A. Parties, Entities, and Actor Attribution .......... 1

B. Plaintiff's Background, Qualification, and Protected Status .......... 2

C. Objective Performance and Economic Stakes .......... 3

D. Disability, Leave, and FMLA Sequence .......... 4

E. Resignation and Competitor Sequence (October 24-28, 2023) .......... 7

F. Post-Meeting Contact with the ERC and Intake Sequence .......... 9

G. Career-and-Performance Track, Global Security Investigation, and ER Investigation (October 17-November 30, 2023) .......... 10

H. Book-Allocation Records and the December 1 Termination Call .......... 16

I. The U5 Sequence and the Six-Letter Objection Series .......... 22

J. ER Investigation-File Contents and Post-Termination Review .......... 24

K. December 21, 2023 Communications and Post-Termination Communications .......... 26

L. Manager Testimony on Compensation Structure and Post-Termination Book Reassignments .......... 28

M. Post-Termination Communications with Plaintiff's Third-Party Support Staff .......... 28

N. Causation, Damages, and Mitigation .......... 29

O. The Award and Confirmation .......... 31

P. Related-Proceeding Context and Notice-Period Record .......... 32

**II. RULE 56 STANDARD AND EVIDENTIARY PREMISE .......... 33**

**III. ARGUMENT .......... 33**

A. JPM Bank Was Plaintiff's Employer; JPMC Administered Process; JPMS Filed the U5 .......... 33

B. The Confirmed Award Preclusively Fixes U5 Falsity Against JPMS .......... 33

C. The Contemporaneous Record: Chronology of the Stated Reason for Separation .......... 34

**COUNT II** - SEX DISCRIMINATION .......... 37

**COUNT III** - SEX-BASED HOSTILE WORK ENVIRONMENT .......... 38

**COUNT IV** - NATIONAL-ORIGIN DISCRIMINATION .......... 39

**COUNT V** - DISABILITY DISCRIMINATION .......... 39

**COUNT VI** - FAILURE TO ACCOMMODATE .......... 40

**COUNT VII** - TCHRA RETALIATION .......... 41

**COUNT VIII** - FMLA INTERFERENCE .......... 42

**COUNT IX** - FMLA RETALIATION ... 43
**COUNT X** - TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS ... 44
**COUNT XI** - FRAUD AND FRAUDULENT NONDISCLOSURE ... 45
**COUNT XII** - BREACH OF CONTRACT AND ALTERNATIVE QUANTUM MERUIT ... 46
**COUNT XIII** - CIVIL CONSPIRACY ... 48
D. Alternative Relief Under Rule 56(g) ... 48
**IV. CONCLUSION ... 49**

## TABLE OF AUTHORITIES

### Cases

*Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136 (Tex. 2019) ....................................48

*Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755 (Tex. 2018) ......................... 37-39, 41

*Amberson v. McAllen*, 73 F.4th 348 (5th Cir. 2023)....................................................................33

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213 (Tex. 2019) ...........................................................................................................................45

*Bravo v. Dall. Indep. Sch. Dist.*, No. 25-10982 (5th Cir. June 1, 2026).......................................39

*Campos v. Steves & Sons, Inc.*, 10 F.4th 515 (5th Cir. 2021)......................................................42

*Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909 (Tex. 2013) ..................................44

*EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444 (5th Cir. 2013) (en banc)...................................38

*EEOC v. LHC Grp., Inc.*, 773 F.3d 688 (5th Cir. 2014)..............................................................39

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573 (Tex. 2001)...................... 45-46

*Feist v. Louisiana*, 730 F.3d 450 (5th Cir. 2013)..........................................................................40

*Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724 (Tex. 2018).................................................47

*Mozingo v. Oil States Energy, Inc.*, 661 F. App'x 828 (5th Cir. 2016) (*per curiam*)...................43

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)........................................ 38-39

*Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796 (Tex. 1994)..............................................33

*Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46 (Tex. 2021).........................................................41

*Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000) ....................................................46

*Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299 (Tex. 2009)......................................................47

*Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942 (Tex. 1990)..............................46

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001) ....................................................44

### Statutes and Rules

FED. R. CIV. P. 56 ......................................................................... 33, 37-40, 42-46, 48-50

FED. R. EVID. 801(D)(2), 901(A).................................................................................................33

FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2615 ........................................................ 42-43

FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2617(C)(2)....................43

FAMILY AND MEDICAL LEAVE ACT REGULATIONS, 29 C.F.R. § 825.110(C)(3)....................42

FAMILY AND MEDICAL LEAVE ACT REGULATIONS, 29 C.F.R. § 825.300(B)–(E)....................42

TEX. LAB. CODE § 21.051....................37-39

TEX. LAB. CODE § 21.055....................41

TEX. LAB. CODE § 21.125....................37

TEX. LAB. CODE § 21.128....................40

**FINRA Materials**

FINRA Regulatory Notice 10-39....................23

# I. UNDISPUTED MATERIAL FACTS

***Parties, Entities, and Actor Attribution***

**UMF 1.** JPMorgan Chase Bank, N.A. ("JPM Bank") identified itself as Plaintiff's employer in its position statement to the Equal Employment Opportunity Commission ("EEOC"); the Human Resources ("HR") workflow lists JPM Bank as "Legal Employer"; pay statements and the 2023 W-2 identify JPM Bank; and JPMS described JPM Bank as Plaintiff's former employer. App. 0028-0070, 0366-0368 (CX131-1; JPMS00021375), 0517-0529, 0532-0547, 0797-0853 (JPMS000145-54).

**UMF 2.** JPMS sponsored Plaintiff's securities registrations and filed the Form U5, the Uniform Termination Notice for Securities Industry Registration that a FINRA member firm must file when a registered person's association ends. JPMC Employee Relations ("ER") and HR personnel administered the investigation and termination process. Private Bank managers controlled and approved the employment termination. App. 0075-0080, 0128-0131, 0778-0796 (CX163-1-2; CX165-1; CX166-1; CX033-1-2; CX035-1-3; CX036-1).

**UMF 3.** JPMC's staffing in Plaintiff's region is documented in its own personnel record: 2,400 J.P. Morgan employees in Tarrant County. App. 0797-0853 (JPMS_00013944-45).

**UMF 4.** The actors referenced below include JPM Bank management, JPMC HR/ER, JPMC Global Security, JPMC Legal, and JPMS Registration personnel. The cited records identify their roles in the investigation, termination, and U5 process. App. 0129-0131, 0778-0796, 0928-0942, 0974-0992.

***Plaintiff's Background, Qualification, and Protected Status***

**UMF 5.** Plaintiff is an Eagle Scout; graduated with honors from the United States Military Academy at West Point; served as a Captain in the United States Army; deployed in support of Operation Enduring Freedom; and received the Bronze Star Medal. Five years of Army Officer Evaluation Reports are in the record. App. 0001-0008 (2013-06-

06_JB_Bronze_Star_Medal.pdf; BIERING_0001806-1811); App. 0071-0074 (BIERING_0000023, 0000041-42), 0663-0714 (F01-F02).

**UMF 6.** Plaintiff began employment with JPM Bank on May 23, 2016. In 2023 he was a full-time salaried-exempt Executive Director, Grade 604, at the Downtown Fort Worth branch. App. 0028-0070, 0530-0531, 0549-0566 (CX011; BIERING_0000450, 453), 0685-0696 (CX058; JPMS000745), 0797-0853 (JPMS000145-54, JPMS000821-22).

**UMF 7.** Plaintiff entered JPM Bank through the Military Officer Executive Development Program and progressed to Executive Director. App. 0028-0070, 0530-0531, 0549-0566 (CX011; BIERING_0000450, 453), 0685-0696 (CX058; JPMS000745), 0797-0853 (JPMS000821-22).

**UMF 8.** The "inappropriate behavior" October 27, 2023 investigation-opening memorandum states: "Besides that other investigation, Subject has no notable conduct or performance history." It records performance-review ratings of O/S/S in 2022 and S/S/O in 2021. App. 0129-0131 (CX172-3; JPMS00029315).

**UMF 9.** On October 3, 2023, Plaintiff requested peer feedback from the employee later designated in the ER file as the Employee Raising Complaint. The feedback was provided October 10 and marked as shared with the employee and manager. She wrote: "Josh has had an outstanding year, winning new business and managing his current book"; "Josh has been a very hands-on mentor, and I have firsthand witnessed his mentorship"; and "Overall, Josh Biering has been an excellent mentor to work under, and it has been a privilege to be on his team." App. 0320-0341 (CX228-3-6; JPMS_00029378-81).

**UMF 10.** Plaintiff is male and a dual United States-Brazilian citizen. His U.S. Department of Veterans Affairs ("VA") record documents service-connected anxiety with panic attacks more than weekly, chronic sleep impairment, and occupational impairment during significant stress, together with attention-deficit/hyperactivity disorder; the record states a 100% combined service-connected rating. The U.S. Department of Education separately approved total-and-permanent-disability discharge of federal student loan debt based on

the VA's determination of unemployability from service-connected disability. App. 0001-0008, 0071-0074, 0663-0714 (BIERING_0000023, 0000026, 0000041-42).

***Objective Performance and Economic Stakes***

**UMF 11.** At 10:50:10 p.m. CST on September 27, 2023, Plaintiff emailed Stewart a message titled "2023 Self Assessment JB draft" with the 2023 year-end assessment attached and wrote, "In advance of our Review/Meeting tomorrow." The email stated that Plaintiff was considering sharing it with J.T. Aughinbaugh and Kyle Hitchcock; it does not identify either as a recipient. App. 0315-0319 (CX225-1; JPMS_00029333; 2023_JPM_Self_Assessment_Biering.docx; BIERING_0000095-99).

**UMF 12.** The native October 2023 Banker Scorecard reported Plaintiff as a Gold Producer, with $4.821 million in Total Book Revenue and $4.417 million in Total Risk-Adjusted Revenue, compared to $3.871 million YTD 2022. The reported year-over-year increase was approximately $546,000, or 14%. The native workbook included New Client Growth metrics, including 8 under "# of 2023 New DMs*" at Summary!J103 and 31 Total Net New Points at Summary!BR111; the first produced formatted version of the October scorecard did not include those metrics. App. 0281-0357 (CX007 native workbook; formatted V.01a, CX007-2; JPMS_00029316; native CX007 workbook, Summary!J103 and Summary!BR111).

**UMF 13.** Plaintiff's September 27, 2023 draft self-assessment reported $5.433 million in annualized risk-adjusted revenue, a $973 million Total Client Position book across 51 decision-maker relationships, and $3.622 million in risk-adjusted-revenue growth. The draft further stated that Plaintiff's growth represented 21.34% of the seventeen-advisor Fort Worth Single Coverage Team's overall revenue growth. The produced transmittal identifies Stewart as the recipient. App. 0315-0319 (CX225-1-2; JPMS_00029333, JPMS_00029335; BIERING_0000095-99).

**UMF 14.** The Merrill Lynch recruiting relationship predated the October 17, 2023 Career & Performance record. Merrill advisor Michael Parrelly testified that serious discussions were already underway, that he wanted Plaintiff to join his team, and that Chris Miller, Merrill's North Texas market executive, held hiring authority and wanted to hire Plaintiff. Merrill's November 8, 2023 Private Briefing scheduled a full morning with Miller, Parrelly, and platform specialists; the staged recruiting records include a $2.75 million package described as 250% of trailing-twelve-month production. App. 0359-0363 (BIERING_0001329-49; CX094; CX099; CX101), 0719-0724 (Parrelly Hr'g Test. ZOOM0020; CX097; BIERING_0001405-10).

***Disability, Leave, and FMLA Sequence***

**UMF 15.** On May 1, 2023, Plaintiff emailed Registration Disclosure Review with copies to management and compliance, stated that he had a "100% Service Connected Disability Rating," and supplied disability documentation. The responsive internal chain asked whether "this individual's Service-Connected Disability qualifies" for the requested treatment. JPMS Registration later revisited the same student-loan Form U4 disclosures on June 16, 2023, recording: "Student loan compromise. Remove disclosures. DRP filed in Error since the full student loan balances were forgiven." App. 0616-0623 (Ex. AB; CX067-CX068); App. 0629-0659 (Ex. AC; CX070; JPMS_00000295).

**UMF 16.** JPMorgan's investigation file records Stewart as stating that Plaintiff disclosed personal problems in May 2023; Stewart supplied Employee Assistance Program ("EAP") and Leave Management information, encouraged their use, contacted Stainback about the disclosed issues, and knew Plaintiff later contacted the EAP. App. 0928-0942 (U.5-005-008; CX188-51-54; JPMS_00029201-04).

**UMF 17.** On September 4, 2023, Plaintiff told Stewart he was disappointed that he could not get "this level of support from market." Stewart responded, "You want a shovel to keep

going or you good?" and later wrote that he hoped Plaintiff's market-support criticism was not serious. App. 0143-0280 (JPMS00024105).

**UMF 18.** On September 7, 2023, Plaintiff texted Stewart: "I don't like the emotional state I'm in. We need to figure something out"; "I can't help but think conversations are being had behind the scenes and I don't like it"; and "I don't know if this is the right place for me." Stewart replied, "Of course. I tried to call you." Plaintiff's later exit-survey narrative states that HR supplied FMLA and short-term-medical-leave information the next day. App. 0144 (CX025-1; BIERING_0001779); App. 0663-0714 (JPMS00024145-46).

**UMF 19.** On September 10, 2023, Plaintiff asked Stewart whether they could position him as out for two to three weeks in late September or early October, explained that it would not be "official," and stated that he would work from home some while exploring "unplugging options." Plaintiff states that he sought that approach for optics-related reasons because EAP/FMLA information indicated he could not contact clients while on FMLA, and he had an approximately $600 million client pipeline requiring relationship maintenance. Plaintiff also said he could instead take time off "the good old fashion way." Stewart responded that employees might "raise an eye brow" about an option unavailable to them and said he would research it. App. 0143-0280 (2023-09-10_Text_JB_and_B._Stewart_Time_Off_and_Optic_Concerns.pdf); Biering Decl. ¶¶ 6-8.

**UMF 20.** Plaintiff used EAP's provided vendor, Spring Health, for therapy in August and September 2023. Plaintiff's later exit-survey narrative states that, on September 14, he asked Stainback for the local EAP contact, was connected to John Tuttle, and was pressed about FMLA or medical leave. App. 0147-0280 (BIERING_0001781; CX188-78-80; JPMS_00029228-30), 0663-0714 (JPMS00024145-46); Biering Decl. ¶ 7.

**UMF 21.** Plaintiff's later exit-survey narrative states that Aughinbaugh told him on September 26, 2023 that FMLA or short-term leave was not the right move and that Plaintiff reengaged Stainback on October 6 concerning FMLA options. In his later Sanchez interview, Aughinbaugh denied making that statement, denied awareness of a leave, absence, or

accommodation request, described Plaintiff as "paranoid" and "erratic/intense/aggressive," and said he and Stewart had encouraged use of firm resources. These are conflicting attributed accounts. App. 0147-0280 (BIERING_0001781; CX188-78-80; JPMS_00029228-30), 0663-0714 (JPMS00024145-46), 0928-0942 (U.5-011, U.5-013; CX188-57, CX188-59; JPMS_00029207, JPMS_00029209); Biering Decl. ¶ 8.

**UMF 22.** JPM Bank payroll identifies continuous regular salary throughout the twelve-month period and records 68 sick hours and 56 vacation hours used. The Human Capital Management record states "FT Mon-Fri (40/5) 8 hr days," and Plaintiff was salaried-exempt. Plaintiff's worksite was Downtown Fort Worth; JPMorgan reported 2,400 employees in Tarrant County; and HR, ER, and management records for Plaintiff were centrally maintained. App. 0685-0696 (CX058; JPMS000745), 0798-0832 (CX203; JPMS000119-153; JPMS000807; JPMS_00013944-45).

***Resignation and Competitor Sequence (October 24-28, 2023)***

**UMF 23.** On October 24, 2023, Plaintiff met with Kyle Hitchcock, Fort Worth Head of Investments and Advice. Hitchcock testified that Plaintiff expressed an "interest or intent to resign." App. 0735-0750 (Hitchcock Direct, p. 6, lines 7-9; native Zoom recording controls).

**UMF 24.** Later on October 24, Plaintiff met with Aughinbaugh and Stewart after texting Stewart at 12:47 p.m. to speak at 1:00 p.m. Stewart's ER interview records that Plaintiff asked whether he should resign and that the discussion did not concern insubordination. Aughinbaugh's ER interview likewise records Plaintiff asking whether he needed to resign and disclosing that he was a veteran with an anxiety disability. Aughinbaugh stated that this was the first time he had heard that disclosure and that neither he nor Stewart asked for more information. Aughinbaugh's account further states that a Global Security investigation was already underway at the time of that meeting. App. 0928-0942 (U.5-008, U.5-013-014; CX188-54, CX188-59-60; JPMS_00029204, JPMS_00029209-10).

**UMF 25.** On October 24, 2023, Stewart wrote Stainback: "And yet another Update. Josh just approached me asking if he should resign." Stainback responded that she was in a calibration session. Stewart then wrote that he had told Plaintiff they would try again when "J.T. is present." App. 0082-0083 (CX214-1; JPMS_00029354).

**UMF 26.** Approximately 29 minutes after Stewart reported that Plaintiff had approached him about whether he should resign, ER Case HRC0202694 was opened. The ticket identifies Stainback as both the person for whom the case was opened and the person who opened it; states that it arose from "a concern raised by a manager"; describes potential inappropriate behavior by Plaintiff and "his female analyst"; and records that Hitchcock had informed Stainback. App. 0133-0135 (CX122; JPMS001303-05). Later UMFs address the date conflict between that ticket and Hitchcock's account of when he first learned the allegation.

**UMF 27.** On October 27, 2023, Plaintiff was physically at Merrill Lynch completing onboarding steps. App. 0358-0364 (BIERING_0001329-49).

**UMF 28.** That afternoon, while Plaintiff was still at Merrill Lynch, Stewart placed Plaintiff on paid involuntary administrative leave without disclosing any allegation. Plaintiff contemporaneously texted Stainback for information and received no substantive response. App. 0143-0280 (BIERING_0001781); Biering Decl. ¶¶ 9, 11.

**UMF 29.** On Saturday, October 28, 2023 at 9:45 a.m., Plaintiff submitted his formal written resignation by email to Stewart, Aughinbaugh, Hitchcock, and additional J.P. Morgan leadership, including Chilian and Agather, and separately through the HR system. The email objected to the unexplained administrative leave. Plaintiff states that he copied leadership after local management's response to the leave notice led him to believe the issue had not been appropriately escalated. App. 0369 (CX132; JPMS00021505).

**UMF 30.** The HR workflow reflected "Approved Resignation," an October 26 last-worked date, and a projected December 26, 2023 notice-period end. App. 0366-0368 (CX131; JPMS00021375-77).

***Post-Meeting Contact with the ERC and Intake Sequence***

**UMF 31.** Hitchcock later stated that, because the ERC worked closely with Plaintiff and because Hitchcock perceived Plaintiff as "paranoid," he checked on the ERC after the October 24 meeting. App. 0735-0750 (Hitchcock Direct, pp. 6-7, 12), 0924-0942 (CX188-49-50; JPMS_00029199-200).

**UMF 32.** Hitchcock testified that the ERC stared at him, that the October 24 interaction was "very awkward," and that there was "no material" communication. The later harassment or assault allegation was not disclosed during that check. App. 0735-0750 (Hitchcock Direct, pp. 6-7, 12), 0924-0942 (CX188-49-50; JPMS_00029199-200).

**UMF 33.** Hitchcock testified that, in 2023, he saw the ERC every day, spoke with her a couple of times each week, knew personal-life information about her, and considered himself her mentor. He further testified that their relationship developed in part through shared Christian faith and her request for faith-based mentorship. In her later Sanchez interview, the ERC stated that Hitchcock had told her she seemed "off" for two months, that she had not told anyone at work while deciding whether to report, that her husband knew of the planned report and drove her to meet Hitchcock, and that before speaking with Hitchcock and Jacobs she had not disclosed her experience to another employee. App. 0735-0750 (Hitchcock testimony at 21-22, 27-29; native recording controls), 0928-0942 (U.5-009; CX188-55; JPMS_00029205).

***Career-and-Performance Track, Global Security Investigation, and ER Investigation (October 17-November 30, 2023)***

**UMF 34.** The expense issue began with already-submitted corporate-card and expense-report activity. On October 17, 2023 at 4:24:41 p.m., Stewart opened HR case HRC0151920 as a "Career & Performance" request and asked for help reviewing Plaintiff's corporate-card and spending activity, stating that he had seen expense-report totals and transactions that concerned him. On October 18 at 6:54:49 p.m., HR Answers routed Stewart to Accounts

Payable, AskGSS, and the Code reporting channel. App. 0113-0116 (CX182; JPMS000729-32).

**UMF 35.** After Stewart reported that Plaintiff had approached him about whether he should resign, ER Partner Beth Wilson wrote Stainback that she was "quite surprised this case has received this much attention already, much faster than I ever expected." Wilson referred to "time sensitivity" and stated that she would ensure the performance case was documented so that, if there was a plausible explanation for Plaintiff's expenses, management could "fall back on performance." Stainback replied, "Things have escalated this week." App. 0118-0119 (CX186-1-2; JPMS00026884-85).

***Global Security Expense Investigation***

**UMF 36.** The internal referral records show that Stainback, not Stewart, submitted the October 20, 2023 web referral that sent the expense issue to Global Security. Global Security recorded receipt of the referral on October 20 and assigned Investigator VP Nadia Muraira on October 23. App. 0112-0127, 0974-0992 (Dkt. 22-2, PageID 1001-07; CX183; JPMS000836-37).

**UMF 37.** On October 23, 2023, Muraira contacted Stewart, scheduled a discussion, and requested supporting records; Stewart sent four receipt files that day. App. 0974-0992 (JPMS_00024862, JPMS_00024867-68, JPMS_00024878-80).

**UMF 38.** Muraira later told Travel Services that Stewart had supplied a "vague weekly expense report" concerning approved purchases he believed were personal, and she requested detailed data, receipts, invoices, expense reports, authorized purchases, and other information. App. 0974-0992 (CX184-1; JPMS00024952).

**UMF 39.** On October 25, Stewart sent Muraira a formal email titled "Expense Report Concerns 1662283" identifying the challenged expenses in ranked order and asking for further investigation; Stainback then added the referenced expense reports and receipts to the chain. App. 0974-0992 (CX187-1-3; JPMS00025211-13).

**UMF 40.** Muraira interviewed Plaintiff by telephone on November 15. Plaintiff denied falsification, fraud, theft, and abuse and addressed the challenged outings. Global Security then compared Plaintiff's expense reports with peers Keith Wiley and Ben Stewart, found "similar patterns" of expense activity, found "no extreme differences," and recorded that the expense reports were "fairly consistent for at least 12 months." App. 0112-0127 (JPMS_00025339-41).

**UMF 41.** On November 16, Global Security recorded that Stainback believed HR "had enough reason to term Josh" but wanted Global Security to complete its investigation into the potential falsification issue before management proceeded with termination. Global Security also recorded that it lacked access to the potential business clients needed to validate falsification and that Stainback would confer with Stewart and management to determine whether any substantiating evidence existed. App. 0112-0127 (JPMS_00025341).

**UMF 42.** On November 17, 2023, Plaintiff supplied the requested expense-policy and comparator response. His later exit-survey narrative states that he attempted the agreed November 20 follow-up call but the number was no longer active or in service; his December 24 email states, "Weird that Nadia's number was disconnected when I tried following up with her." These records establish that Plaintiff made the assertion; the cited source set contains no contemporaneous telephone record independently establishing the line's status. App. 0974-0992 (JPMS00025331; JPMS00024148; CX044, JPMS00025358; CX045, JPMS00022153-54).

**UMF 43.** By November 20, 2023, the ER log recorded Stainback stating that the Global Security matter "did not result in a found violation" and set a November 27 next-steps meeting. The next ER entry attached Stainback's November 20 email stating that an employee such as Plaintiff needed approval to stay or lodge with clients. App. 0084-0110 (CX120-3, CX120-21; JPMS001278, JPMS001296).

**UMF 44.** Global Security's November 29 file states that there was "no evidence to support" Theft from Firm/Expense Reimbursement, records the disposition "Allegations NOT supported," and states "Case RTC 11292023." The November 30 document was the separate ER Recommendation for Termination. App. 0112-0127 (CX031, CX036; JPMS00025338, JPMS00028733-34), 0129-0131 (CX172; JPMS00029313-15).

***Employee Relations Conduct Investigation***

**UMF 45.** CX122 displays ER Case HRC0202694 as "Opened: 2023-10-26 01:34:46" from "a concern raised by a manager," describing potential inappropriate behavior by Plaintiff and "his female analyst." It identifies Stainback as both the person for whom the case was opened and the person who opened it. App. 0133-0135 (CX122; JPMS001303-05).

**UMF 46.** CX020 displays Plaintiff's October 26 email to Stewart at 1:05:56 p.m. CDT, stating that he hoped to take a personal or sick day the next day. App. 0925-0927 (CX20-2; JPMS_00021218; Related Case Dkt. 24-3, PageID 1335).

**UMF 47.** Plaintiff's confirmed common-time normalization treats the email as 18:05:56 UTC and CX122's ticket value as 18:34:46 UTC, or 1:34:46 p.m. CDT. The ticket followed the email by 28 minutes and 50 seconds. CX122's produced report displays 01:34:46 without a field-level timezone; the normalization is Plaintiff's confirmed record interpretation. App. 0133-0135 (CX122-1; JPMS001303; Related Case Dkt. 23-2, PageID 1146), 0925-0927 (CX20-2; JPMS_00021218); CX189-3 (JPMS000794).

**UMF 48.** The PTO and out-of-office thread displays Stewart's October 27, 2023 8:11:59 a.m. reply, "Thank you for letting me know Josh," to Plaintiff's October 26 1:05:56 p.m. request to take a personal or sick day on October 27. App. 0925-0927 (CX20-1-2; JPMS_00021217-18).

**UMF 49.** On October 27, 2023, JPMC HR employee Michelle Velasquez escalated the intake, wrote of a "very serious allegation of sexual assault by the male subject towards a female employee," recommended paid administrative leave, and copied Linda Padilla. The prior

manager-raised ticket described alleged advances by Plaintiff toward "his female analyst." App. 0133-0140 (CX122; JPMS001303-05; CX123; JPMS00023374).

**UMF 50.** Jacobs and record-identified Global Security or Threat Management partner Christopher Magee conducted the first substantive ERC interview by telephone on October 27, 2023 at approximately 2:44 p.m. Jacobs testified that it was a cold call, that the ERC was driving and pulled over, and that the interviewers did not know she was in the car. App. 0084-0110 (CX120), 0725-0734 (Jacobs examination, ZOOM0015).

**UMF 51.** Jacobs testified that static or words he "didn't hear perfectly" led him to use Magee's raw notes to supplement his own and that a later follow-up was not a second substantive interview. Neither Jacobs nor Magee traveled to Fort Worth for a substantive in-person interview, and the substantive ERC interview was not conducted by video. App. 0084-0110 (CX120), 0725-0734 (Jacobs examination, ZOOM0015).

**UMF 52.** Hitchcock's hearing testimony placed his substantive meeting with the ERC two days after the October 24 check, on Thursday, October 26, but provides no meeting time. App. 0735-0750 at 7-12 (native recording controls).

**UMF 53.** Hitchcock's January 12 ER-review summary instead states that the ERC asked Thursday to meet the following day, that they met Friday, October 27, and that he called Stainback afterward. The Thursday ticket conflicts with the Friday-and-afterward account; without a time for the Thursday meeting, the cited record does not establish whether that meeting preceded the ticket. App. 0133-0135 (CX122; JPMS001303-05), 0924-0942 (CX188-49-50; JPMS_00029199-200), 0735-0750 at 7-12 (native recording controls).

**UMF 54.** CX122 described Plaintiff in relation to "his female analyst"; the October 27 escalation used "the male subject" and "a female employee"; the formal file designated Plaintiff as Subject and the woman as Employee Raising Complaint; and only Plaintiff received a disciplinary disposition. The closing memorandum states: "Subject denied the physical allegations that ERC credibly detailed." App. 0129-0131 (CX172; JPMS_00029313-15), 0133-0135 (CX122), 0663-0714, 0725-0734.

**UMF 55.** In separate Sanchez interviews, Stewart used the phrase "When Joshua resigned" when discussing client reassignment, and Aughinbaugh stated, "In Joshua's situation, he resigned," adding that management did not tell clients Plaintiff was terminated. These are attributed management characterizations. App. 0081-0111, 0128-0131, 0663-0714 (JPMS00024145), 0928-0942 (U.5-005, U.5-011; CX188-51, CX188-57; JPMS_00029201, JPMS_00029207).

**UMF 56.** The ER investigation record reflects that Jacobs and Stewart asked the ERC whether she wished to take administrative leave, and that the ERC received EAP outreach, took paid leave, worked remotely, received repeated well-being contacts, and was later reassigned to Dallas. App. 0627-0628 (CX141-1; JPMS00027085), 0129-0131 (CX172-1, -3), 0718-0750 (Stainback Cross, 18.04a.ii-011-013, -017).

**UMF 57.** The October 28, 2023 chain contains executive-level statements that "we have her back" and that the ERC was "fully supported by all of us." App. 0627-0628 (CX141-1).

**UMF 58.** JPM Bank's position statement acknowledges that the Dallas Head of Investments and Advice dated and later married a JPMorgan coworker. Plaintiff's sworn charge identifies two comparator tracks: (a) the female coworker in Plaintiff's matter as non-disabled and of a different national origin, engaging in the same actions, and not disciplined; and (b) the Dallas senior peer as white, non-veteran, and non-disabled to Plaintiff's knowledge, afforded time to report an inter-office relationship with a junior partner, retained, and promoted to Dallas Head of Investments and Advice. App. 0001-0008, 0028-0070 (Position Statement at 8), 0071-0074 (sworn charge, BIERING_0000259-60).

**UMF 59.** The produced mutual-message record contains a June 8, 2023 message stating, "Oh please I know you have Brazilian drama in you." App. 0715-0717 (JPMS_00022199-200). The statement is offered for its words and place in the underlying interpersonal record, not as a managerial admission or by itself as proof of the ultimate employment motive.

***Book-Allocation Records and the December 1 Termination Call***

**UMF 60.** At 10:30 p.m. on October 27, 2023, Cohen, Head of HR, U.S. Private Bank, forwarded the opening memorandum and wrote: "FYI - hoping to wrap early next week with a term." ER did not interview Plaintiff until November 7, 2023. App. 0661-0662 (CX130-1; JPMS00021517).

**UMF 61.** Cohen testified that she thought termination was the likely outcome. She acknowledged that the screenshots she associated with the opening stage were not physically on the opening memorandum, could not identify the exact date on which she saw them, and confirmed that the unredacted opening memorandum was a bullet-point summary. App. 0725-0734 (Ex. S.1, Cohen hearing excerpt, ZOOM0008 pp. 5-11).

**UMF 62.** Jacobs first contacted Plaintiff on November 2, 2023 with a "Confidential Investigation" invitation. The November 2-6 chain records Plaintiff's efforts to confirm and reschedule, including his November 3 report that Jacobs's telephone number offered no voicemail option. Jacobs scheduled the November 7 interview for 2:30 p.m. Eastern, or 1:30 p.m. Central, and later confirmed that he spoke with Plaintiff from 2:30 to 3:20 p.m. Plaintiff requested counsel's participation; Jacobs did not permit counsel to join. App. 0001-0008 (Biering Decl. ¶ 14), 0725-0734, 0943-0973 (CX152, CX155; JPMS00023429, JPMS00023489-93).

**UMF 63.** On November 8, 2023 at 11:44 a.m., Jacobs wrote Muraira and Stainback that the ER investigation "is concluded," that he was closing it to disposition, and that he wanted Global Security's status "so that we can disposition simultaneously." App. 0725-0734, 0943-0973 (CX156; JPMS_00029150).

**UMF 64.** On November 13, 2023, Plaintiff identified approaching-holiday, income, and prospective-employer effects; Jacobs replied that the investigation "remains open." On November 20, Plaintiff reported redirected Movius calls, requested privacy guidance, and identified competitor and job-offer consequences. App. 0725-0734, 0943-0973 (CX157, CX159; JPMS00023511, JPMS00023536).

**UMF 65.** On November 21, 2023, Plaintiff asked for timing; Jacobs replied that the investigation "continues to remain open." Plaintiff followed up again on November 24, and the cited November 20 and 24 record contains no substantive Jacobs reply. On November 28, Plaintiff again requested status and identified claimed client-contact delay. App. 0725-0734, 0943-0973 (CX160, CX162, CX164; JPMS00023542, JPMS00023573, JPMS00023588).

**UMF 66.** On November 29, 2023, Plaintiff requested the initiator, supporting facts, management-review status, and next milestones. Jacobs replied that ER investigations were confidential and hoped an outcome might be communicated "within the next week." Plaintiff asked when he could review the information; on November 30 he asked when his rights to respond to and review the facts, evidence, and findings would be communicated. The cited record contains no substantive answer before the December 1 termination. App. 0725-0734, 0943-0973 (CX171; JPMS00023616).

**UMF 67.** On October 28, 2023, Cohen identified Plaintiff's likely move to Merrill or Morgan Stanley: "we should make sure we amend the u4 asap as he likely just cleared their background." Seven minutes later, Stainback directed Registration not to file the U5 "until further notice so we can finalize wording before they file." App. 0625-0628 (CX140-1, CX141-1-2; JPMS00027083, JPMS00027085-86).

**UMF 68.** On October 29, 2023, Stewart requested from Wang "some sort of excel file with every client relationship that is in Josh Biering's book" because "[j]osh resigned over the weekend and we need to immediately start working on who will take over"; and separately Stewart directed Wang to "work through the revenue benefits and drags in his book as we have the opportunity to move some of these back to Partner Coverage." App. 0605-0606 (CX144-1-2; JPMS00028663-64).

**UMF 69.** On November 2, 2023, Wang furnished Stewart via Teams direct chat a table titled "2022 FY / 2023 Run Rate / YoY" reporting 2022 revenue and 2023 run-rate revenue for each of the fourteen advisors on Stewart's Fort Worth Single Coverage team. The table

reported Plaintiff at $4,634,827 2022 FY, $5,348,513 2023 Run Rate, and +15% YoY; the team total was $23,678,501 2022 FY, $25,217,794 2023 Run Rate, and +7% YoY. Plaintiff alone contributed approximately 21% of the team's 2023 run-rate revenue and, per Plaintiff's Sept. 27, 2023 self-assessment, 21.34% of the seventeen-advisor Fort Worth Single Coverage Team's overall revenue growth. App. 0607-0608 (CX218; JPMS_00029368-69); see UMFs 12-13.

| Banker | 2022 FY | 2023 Run Rate | YoY |
|---|---|---|---|
| Ben Stewart Jr. | $3,062,852 | $2,943,646 | −4% |
| Jason McMillan | $3,326,520 | $3,458,838 | +4% |
| Joseph Monty | $2,976,888 | $3,051,318 | +3% |
| **Joshua D Biering** | **$4,634,827** | **$5,348,513** | **+15%** |
| Keith Wiley | $2,257,137 | $2,565,112 | +14% |
| *(10 additional advisors)* | ... | ... | ... |
| **Grand Total (team)** | **$23,678,501** | **$25,217,794** | **+7%** |

**UMF 70.** On November 9, 2023, while ER remained open, its record stated: "Subject resigned from the firm so the term code once processed will note Misconduct Later Determined." App. 0084-0110 (CX120-3; JPMS001278).

**UMF 71.** On November 16, 2023, Jacobs asked whether resignation and garden leave affected incentive compensation; Stainback replied: "Josh is in for zero IC." App. 0111 (CX158; JPMS00023525).

**UMF 72.** On November 29, 2023, Jacobs routed the draft RFT to Aughinbaugh and Stewart at 7:38:04 p.m., required each to reply "I approve," and directed them not to process or communicate the termination in meJPMC until he returned a signed RFT. Muraira's Global Security NOT-supported close is timestamped 7:41:42 p.m., 3 minutes 38 seconds after the RFT was routed. App. 0778-0779 (CX163-1-2; JPMS00023586-87), 0112-0127 (JPMS00025338).

**UMF 73.** Aughinbaugh's "I approve" is timestamped 7:42:04 p.m., 22 seconds after the Global Security close, and Stewart's "I approve" is timestamped 7:44:08 p.m., 2 minutes 26 seconds after that close. Manager copies render Jacobs's original email as 1:38 p.m.; the produced messages share a common export clock that fixes their relative order. App. 0780-0782 (CX165-1; JPMS00023590; CX166-1; JPMS00023591-92), 0112-0127 (JPMS00025338).

**UMF 74.** On November 30, 2023, Jacobs signed the RFT "On behalf of Ben Stewart," recommending termination. The closing memorandum states that HR Legal reviewed the RFT, the manager and next-level manager approved, and termination was set for December 1, 2023. App. 0129-0131 (CX172-1-3; JPMS00029313-15), 0786-0792 (CX036-1; JPMS00028729).

**UMF 75.** On November 8, 2023, Jacobs wrote that the ER sexual-harassment investigation was "concluded" and requested Global Security's status "so that we can disposition simultaneously." On November 9, the ER work note stated that the case was "ok to move to disposition in accordance with the GS matter." On November 16, Stainback told Global Security that HR had enough reason to terminate but wanted the potential-falsification investigation completed first. On November 29, Jacobs routed the draft RFT before Global Security transmitted its NOT-supported close, and both manager approvals followed that close. Jacobs signed the RFT November 30; Plaintiff was terminated December 1. App. 0084-0110 (CX120), 0112-0127 (JPMS_00025338-41), 0778-0782 (CX163, CX165, CX166).

**UMF 76.** On October 30, 2023, in a chain culminating with attachment "Biering Book Analysis.xlsx," Wang wrote Stewart, "I've split Josh's book into 3 categories," with categorized allocation to single-coverage advisors and partner-coverage recipients. App. 0605-0606 (CX144; JPMS_00028663-64).

**UMF 77.** On November 30, 2023, the day before the December 1 termination call, the Stewart-Wang Teams direct chat pre-identified the specific recipients: "SC Flows

$50MM+: Keith, Will, Joe"; "PC Flows $200MM+: Tye, Marcus, Jake"; "New Hire Tier 5+: Regan." At 8:56 p.m., Stewart wrote, "Can we connect in the morning just to triple look at all the josh transitions." App. 0604-0609 (JPMS_00029374); see also App. 0607-0608 (CX218; JPMS_00029368).

**UMF 78.** On December 1, 2023, Stewart and Aughinbaugh communicated the termination by recorded call. The staged recording and unofficial transcript reflect that Plaintiff's employment was terminated effective December 1, 2023 following the ER investigation, based on Code of Conduct and anti-harassment policies. Plaintiff asked on the same call about reviewing and rebutting the underlying reports and about the timing and language of the U5. App. 0365-0373 (K.11a Unofficial Transcript; 12.11c Native Audio Reference; K.11b Stewart email coordinating the Dec. 1 call).

**UMF 79.** On December 1, 2023, JPMS Compliance Registration requested the Global Security investigation "in regard to the dismissal" and received the unsupported finding. When Registration asked why the unsupported Global Security matter was absent, Jacobs stated that the termination rested solely on his ER investigation. App. 0125-0127 (CX32-1, CX34-1; JPMS000600), 0365-0373, 0793-0796 (CX032-1-2; JPMS00025353, 25356; CX033-1-2; JPMS00023680-81).

***The U5 Sequence and the Six-Letter Objection Series***

**UMF 80.** On October 31, 2023, Registration lead Greg Thompson responded to Stainback's notice of Plaintiff's voluntary resignation, projected December 26 term date, and instruction to hold the U5. Thompson explained that his team did not process ordinary voluntary terminations and that a termination or open investigation would route the matter to Registration. App. 0777-0796 (JPMS_00029331).

**UMF 81.** Thompson later asked Jacobs, with Legal copied, for a conduct summary so Registration could develop accurate U5 language; Jacobs supplied the narrative used in the filing. App. 0783-0785 (CX035-1-3; JPMS000597-99).

**UMF 82.** Between December 6 and December 21, 2023, Plaintiff and counsel repeatedly demanded voluntary U5 treatment and objected in writing to a discharge classification. The pre-filing objection series consists of six discrete communications: December 6, 2023; December 12, 2023; December 13, 2023; December 19, 2023; December 20, 2023; and December 21, 2023. App. 0076-0080 (CX001), 0375-0394 (CX038-CX043).

**Dec. 6, 2023** — Iacuone → JPMS Registration — Initial demand: voluntary U5; correct termination date. App. 0375–0379 (CX038; JPMS_21629).

**Dec. 12, 2023** — Iacuone → JPMS Registration — Second demand; policy specificity. App. 0380–0382 (CX039; JPMS_21624).

**Dec. 13, 2023** — Iacuone → Tidwell-Neal (JPMC Legal) — Third demand; FINRA Regulatory Notice 10-39 citation. App. 0383–0384 (CX040; JPMS_21627).

**Dec. 19, 2023** — Biering → Cohen and others — Fourth communication; pre-filing objection direct from Plaintiff. App. 0385–0386 (CX041; JPMS_21641).

**Dec. 20, 2023** — Iacuone → JPMS Registration — Fifth demand; final voluntary request. App. 0387–0391 (CX042; JPMS_21645).

**Dec. 21, 2023** — Iacuone ↔ Tidwell-Neal — Sixth demand; final rejection of proposed discharge language. App. 0392–0394 (CX043).

**UMF 83.** On December 21, 2023, Tidwell-Neal supplied the final intended U5 language. On December 22, 2023, JPMS filed "Discharged" with that language, electronically signed by Thompson as accurate and complete. App. 0075-0080, 0374-0413, 0777-0796.

**UMF 84.** The December 22, 2023 Form U5 was filed as "Discharged" for "inappropriate behavior," stated that the matter was unrelated to securities sales or customer complaints, and did not identify a violated firm policy. App. 0076-0080 (CX001).

**UMF 85.** JPMS Registration lead Greg Thompson electronically signed the December 22, 2023 Form U5 on behalf of JPMS. App. 0076-0080 (CX001), 0783-0785 (CX035-1-3; JPMS000597-99).

**UMF 86.** Thompson testified that Registration was responsible for an accurate and complete U5, was not a rubber stamp, and would supply no termination explanation if Box 3 were marked voluntary. He agreed that a resignation is a voluntary termination in U5 parlance

and distinguished a discharge as involuntary. App. 0725-0734 (Ex. S.1, Thompson hearing excerpts, ZOOM0004 pp. 15-29); App. 0076-0080 (CX001).

**UMF 87.** Form U5 Box 3 separately records the reason the association ended. The filed form selected "Discharged" and supplied an explanation; Thompson testified that selecting "Voluntary" would require no termination explanation. App. 0076-0080 (CX001-1; JPMS00021766); App. 0718-0750 (Thompson testimony).

**UMF 88.** Form U5 Question 7B asks whether the individual currently is, or at termination was, under internal review for fraud, wrongful taking of property, or violations of investment-related statutes, regulations, rules, or industry standards. Question 7F asks whether the individual resigned, was discharged, or was permitted to resign after allegations of specified investment-related violations, "fraud or the wrongful taking of property," or specified investment-related supervisory failure. App. 0076-0080 (CX001-2, JPMS00021767; CX001-4, JPMS00021769).

**UMF 89.** The filed Form U5 selected No for Question 7B and for each Question 7F category. The Global Security matter was labeled "Theft from Firm/Expense Reimbursement" and potential falsification, but closed "Allegations NOT supported" before the December 1 termination and December 22 U5 filing. App. 0076-0080 (CX001-2, JPMS00021767; CX001-4, JPMS00021769), 0112-0127.

**UMF 90.** Thompson testified that Cohen and Stainback had nothing to do with the U5. The produced October 28, 2023 email chain contains Cohen's direction to Registration to act "asap" and Stainback's direction to hold the U5 "so we can finalize wording." App. 0725-0734 (Thompson hearing testimony); App. 0625-0628 (CX140-CX141).

***ER Investigation-File Contents and Post-Termination Review***

**UMF 91.** The ER file records a November 7, 2023 interview of Plaintiff conducted by Jacobs and record-identified Global Security or Threat Management partner Christopher Magee. App. 0084-0110 (CX120), 0129-0131 (CX172).

**UMF 92.** Jacobs testified separately about the October 27 ERC interview: it was a cold call while she was driving; she pulled over; the interviewers did not know she was in the car; and static or uncertainty about words prompted Jacobs to use Magee's raw notes. App. 0725-0734 (Jacobs examination, selected ZOOM0015 excerpt; native recording controls).

**UMF 93.** On December 21, 2023, Plaintiff delivered 183 pages of mutual text messages between himself and the ERC. The ER investigator did not reopen the concluded termination investigation to review those messages before the December 22 U5 filing. JPMS's September 16, 2025 Prehearing Brief characterizes the underlying management-employee interaction as an "inherent power dynamic between Claimant and the ERC" that led JPMorgan to sustain the investigation. App. 0084-0110 (CX120 Investigation File), 0374-0413, 0517-0529 (2025-09-16 Respondents' Prehearing Brief), 0783-0785 (CX035).

**UMF 94.** Stewart's later ER interview states that Plaintiff "did not share a draft" containing the September 22 dashboard bullet concerning $3.622 million and 21.34% of team revenue growth. CX225-1 displays Plaintiff's September 27, 2023 email to Stewart, titled "2023 Self Assessment JB draft," with the draft attached; the email states that Plaintiff was considering sharing it with J.T. and Kyle. App. 0315-0319 (CX225-1; JPMS_00029333), 0924-0942 (CX188-54; JPMS_00029204).

**UMF 95.** Stewart's January 16 Sanchez interview states: "Joshua did not request in advance or tell Ben that he was taking personal days on 10/25, 10/26 or 10/27." The produced thread separately displays Plaintiff's October 26 1:05:56 p.m. personal-or-sick-day request and Stewart's October 27 8:11:59 a.m. reply, "Thank you for letting me know Josh." App. 0925-0942 (U.5-008; CX188-54; JPMS_00029204; CX20-1-2; JPMS_00021217-18).

**UMF 96.** Stewart's ER interview records that Plaintiff asked on September 10 to take time off and characterize it as delayed paternity leave; Stewart said paternity leave was unavailable then and reiterated Leave Management. The produced September 10 text displays Plaintiff's request for two to three weeks away and Stewart's response that others might "raise an eye brow" about an option unavailable to them. App. 0143-0280 (2023-09-

10_Text_JB_and_B._Stewart_Time_Off_and_Optic_Concerns.pdf), 0924-0942 (CX188-53-54; JPMS_00029203-04).

**UMF 97.** Stewart told Sanchez that he recalled Plaintiff texting on August 25, 2023, "I quit and I am out" and "send me whatever form I need to fill out to quit"; Stewart said he tried to call without a response and followed up the next morning. This proposition establishes Stewart's later account, not independent authentication of the quoted texts. App. 0928-0942 (U.5-007; CX188-53; JPMS_00029203).

**UMF 98.** The staged post-termination review file contains the January 30, 2024 ER disposition: "As such, the involuntary termination of Joshua Biering is the appropriate outcome." A parallel disposition record states "the involuntary termination outcome will stay." App. 0147-0280 (CX188-67-71; JPMS_00029217-21), 0081-0111 (JPMS_00026385).

***December 21, 2023 Communications and Post-Termination Communications***

**UMF 99.** The produced message at JPMS00025397 is dated December 21, 2023, while the termination and U5 process remained active. In that message, the ERC requested prayers from Hitchcock, a senior Fort Worth Private Bank leader, and Hitchcock's wife. Hitchcock testified that he, his wife, the ERC, and the ERC's husband then participated in a telephone prayer call lasting approximately five to ten minutes. App. 0735-0750 (Hitchcock testimony at 27-29; JPMS00025397; native recording controls).

**UMF 100.** On December 21, 2023 at 7:16 p.m., Peter C. Chilian wrote Aughinbaugh, Stainback, and Agather, copying Hitchcock and Stewart: "This is very serious. Outright threats. Stephanie, so you know who in security I can notify?" App. 0567-0594 (JPMS_00025406).

**UMF 101.** On December 21, 2023, Plaintiff emailed Cohen, counsel, and JPMC Legal invoking FMLA, disability, accommodation, and mistreatment concerns and identifying himself as

a service-connected disabled veteran. App. 0147-0280 (CX188-67-71), 0374-0413, 0567-0594 (JPMS_00021741-45).

**UMF 102.** At 11:08 p.m. on December 21, 2023, Cohen forwarded Plaintiff's disability, FMLA, and accommodation complaint to business, Legal, HR, and Stainback, called Plaintiff "unhinged," and proposed working with security "to put out a BOLO with Josh's photo." JPMS filed the discharge U5 the next day. App. 0075-0080, 0567-0594 (JPMS00021741; duplicate JPMS00021747).

**UMF 103.** On January 24, 2024, Private Bank advisor Austin M. Barr emailed Aughinbaugh that a member of a longstanding client family was worried Plaintiff was "going to do something rash," using the phrase "this lunatic." Aughinbaugh forwarded the email that day to Magee, Stainback, and Sanchez, copying Agather, Chilian, Warren, Hitchcock, and Stewart, and wrote: "I hate that this has turned into a daily update, but felt I should escalate this note as well." Barr subsequently inherited relationships from that client family from Plaintiff's book. App. 0577-0578 (CX194; JPMS_00026121), 0604-0609 (BIERING_0001145-1166).

***Manager Testimony on Compensation Structure and Post-Termination Book Reassignments***

**UMF 104.** Aughinbaugh testified that his Fort Worth Market Manager role included responsibility for revenue, revenue growth, the profit-and-loss statement, personnel, regulatory and compliance matters, risk management, and real estate. He further testified that all managers were charged with growing revenue, that loss of Plaintiff's clients would reduce office revenue, and that failure to replace those clients would ultimately affect his compensation. App. 0725-0734 (Aughinbaugh hearing testimony at 2:44-3:41, 31:06, 31:33, 31:49).

**UMF 105.** Advisor Austin Barr subsequently inherited relationships originating with a longstanding client family from Plaintiff's book. App. 0604-0609 (BIERING_0001145-1166 existing book list). Aughinbaugh separately testified that former clients from

Plaintiff's book were reassigned to Hitchcock, to himself, and "to senior, more experienced advisors who may have had contact with the clients." App. 0725-0734 (Aughinbaugh hearing testimony).

***Post-Termination Communications with Plaintiff's Third-Party Support Staff***

**UMF 106.** On or about March 1, 2024, the ERC sent an unsolicited text to Plaintiff's senior client service associate, then transitioning from JPMorgan to Raymond James, seeking information about Plaintiff's departure and attempting to dissuade the associate from continuing to work for Plaintiff. JPMS later described the communication in motion practice in those terms. App. 0595-0603 (JPMS_00023291; JPMS_00023237).

***Causation, Damages, and Mitigation***

**UMF 107.** Parrelly testified that Plaintiff had an oral Merrill offer, that a written offer would follow final U5 review, and that with a clean U5 Plaintiff would have joined him as a partner. Parrelly also testified that Miller called the discharge issue a non-starter, tried to obtain an exception, and that the offer was pulled when the discharge issue arose. App. 0725-0734 (Parrelly Hr'g Test. ZOOM0020).

**UMF 108.** On December 1, 2023, Plaintiff wrote contemporaneously that Merrill had just pulled the offer after he disclosed what the U5 might say. App. 0364 (CX178; BIERING_0005050). The Merrill-side testimony in UMFs 14 and 107 supplies the third-party evidence concerning hiring authority, the clean-U5 condition, the attempted exception, and withdrawal.

**UMF 109.** After Merrill Lynch rescinded its offer, Plaintiff continued seeking comparable employment in the financial-services industry, including interviews or hiring discussions with RBC, Texas Capital, UBS, Morgan Stanley, and Goldman Sachs. Plaintiff also engaged Bill Willis as a corporate recruiter. Those opportunities did not result in employment after the firms considered JPMS's U5 disclosure. App. 0896-0908 (damages

and mitigation records); see also App. 0610-0614 (recruiting/compliance communications).

**UMF 110.** The cited third-party records include a November 2, 2023 third-party text stating, "Why were you even fired?!?!" and RBC recruiting and compliance-review communications. App. 0595-0603, 0611-0614 (CX107; BIERING_0001581-85).

**UMF 111.** On November 28, 2023 at 4:18:28 p.m., a third party texted Plaintiff: "lol. When you gonna tell us where you moving and why you were going to get canned?" After Plaintiff asked who said that, the response was: "All your peeps man. What you mean? Is it not true?" Plaintiff then asked: "My peeps?! Like JPMorgan people?" App. 0596 (CX113; JPMS_00022339; full third-party text export).

**UMF 112.** The same third-party thread contains a second pre-termination communication the next morning. On November 29 at 8:21:06 a.m., the third party wrote: "Meeting your replacement today." Plaintiff replied, "You too?!?" and the third party identified the meeting location in the produced, redacted thread. App. 0595-0603 (third-party full text export, Nov. 29, 2023, source-export p. 37).

**UMF 113.** Aughinbaugh was questioned under oath about pre-termination communications with the client business identified in the thread. He testified that, during Plaintiff's garden leave, Fort Worth personnel probably were meeting with that client, but he personally did not tell the client that Plaintiff was "canned" and was not aware anyone on the Fort Worth team did so. After the November 28-29 text thread was shown, the Chairperson summarized the point: "So nobody either knew or should have been telling a client that Mr. Biering was going to get canned." Aughinbaugh answered: "Correct." App. 0751-0757 (Aughinbaugh Cross, ZOOM0033, pp. 14-20; source recording controls).

**UMF 114.** The post-termination personnel-file communications record documents Plaintiff's request for the personnel file and JPM Bank's denial. App. 0374-0413 (T.06a Biering Request for Personnel File Dec. 2023); App. 0374-0413 (T.06b JPM Personnel File Denial Dec. 22, 2023).

**UMF 115.** A client principal's sworn declaration (redacted) documents lost client relationships within Plaintiff's book following the U5 filing. App. 0854-0856 (Client Decl. (redacted); CX212; BIERING_0005195-96, executed Sept. 5, 2025). The pre-termination book allocation identifies the declarant's family relationships as part of Plaintiff's existing book. App. 0604-0609 (BIERING_0001145-1166).

**UMF 116.** Michael Spindler provided damages testimony at the underlying hearing. The cited record contains no JPMS rebuttal expert. Spindler's schedules calculate a $22,719,882 present value of but-for earnings, a $12,035,470 present value of mitigating earnings, and a $29,993,659 present value of but-for earnings assuming additional identified investors, approximately $10.68 million and $17.96 million in net economic loss after mitigation. These are economic lost-earnings calculations and do not include exemplary damages. App. 0896-0908.

***The Award and Confirmation***

**UMF 117.** The Award states that the December 22, 2023 U5 was inaccurate and orders its reason changed to "Voluntary," its explanation deleted and left blank, and its termination date changed to October 28, 2023. It states that a primary reason for the U5's timing was to hinder transfer of Plaintiff's book; that an investigation began after competitor notice to make competitor employment harder; and that the Panel was concerned this "may be a pattern of conduct." App. 0009-0016 (Award at 3-5).

**UMF 118.** The Award denied all other submitted relief, rejected the submitted defamation claim, stated JPMS was within its rights to terminate Plaintiff during the notice period, denied damages, and noted mitigation. The Award made no determination concerning JPM Bank or JPMC. The earlier statutory-discrimination and negligent-investigation claims were removed from the FINRA proceeding as a FINRA-mandated condition of proceeding, and the operative pleading considered by the Panel contained only nonstatutory theories against JPMS. App. 0009-0016; 0017.

**UMF 119.** This Court's related case, No. 4:26-cv-00381-O, confirmed the Award and entered judgment on July 31, 2026. App. 0017-0027.

***Related-Proceeding Context and Notice-Period Record***

**UMF 120.** In 2018, JPMS filed five reportable Form U4 disclosures relating to federal student loans. In a 2023 internal Compliance and Legal chain, Compliance acknowledged that the entries had been "filed in error" and directed their removal. App. 0629-0659 (CX070; JPMS_00000295); App. 0725-0734 (Thompson hearing testimony; TX-01 excerpt).

**UMF 121.** JPMorgan's Notice Period Policy - U.S. (effective June 20, 2023) states that throughout the notice period the employee remains employed, may not work for or perform services for another employer or be self-employed, remains bound by duties of loyalty, confidentiality, non-solicitation, and no-hire, and must remain reasonably available for transition. JPM Bank's October 28 HR workflow recorded Approved Resignation and projected a December 26, 2023 notice-period end. App. 0366-0368 (CX131; JPMS00021375-77), 0759-0763 (CX016-3; JPMS000833).

**UMF 122.** A November 20, 2023 employment-verification compensation letter records Plaintiff's salary as $225,000.00. App. 0530-0531 (CX208; BIERING_0000917).

**UMF 123.** JPM Bank's final-pay records show paid administrative leave from November 1 through December 1, 2023, a "Return to Work Date: 12/2/2023(term)" entry, payment of the November 30 pay-period amounts and a December 15, 2023 accrued-vacation payout, and identify no salary payment for any period after December 1, 2023. App. 0847-0851 (JPMS000707-10; JPMS000807).

**UMF 124.** JPMorgan's related payroll case was closed December 27, 2023 with the notations "Employee is not overpaid" and "This was not an Overpayment." App. 0852-0853 (JPMS000669-70).

## II. RULE 56 STANDARD AND EVIDENTIARY PREMISE

Summary judgment is proper when no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is material if it could affect the outcome under governing law and genuine if a reasonable factfinder could resolve it for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the record in the light most favorable to the nonmovant, but it does not weigh evidence or resolve credibility disputes. *Id.* at 249, 255.

A party may show that a fact cannot be genuinely disputed by citing documents, electronically stored information, declarations, admissions, testimony, and other record materials. FED. R. CIV. P. 56(c)(1)(A). The cited materials need not be admissible in their present form if they can be presented in admissible form at trial. FED. R. CIV. P. 56(c)(2). The record cited here includes Bates-labeled records, party communications, business records, sworn hearing testimony, declarations, official filings, and tribunal records, admissible or capable of presentation in admissible form through party admissions, business-record foundations, testimony, authentication, or other trial proof. FED. R. EVID. 801(d)(2), 803(6), 901(a), 902(11).

Where intent or motive is at issue, the record is considered as a whole. A prima facie case combined with evidence permitting rejection of an employer's stated explanation may support an inference of intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–49 (2000).

Plaintiff seeks judgment under Rule 56(a) on claims and claim components established without genuine dispute. If an ultimate issue remains for trial, Rule 56(g) permits the Court to identify material facts that are not genuinely disputed and treat them as established in the case. FED. R. CIV. P. 56(g).

Attribution is actor-by-actor, function-by-function, and entity-by-entity. The employee designated in the investigation file as the "Employee Raising Complaint" is referred to as the ERC. The comparator identified in Plaintiff's sworn charge is referred to as John Doe.

## III. ARGUMENT

***JPM Bank Was Plaintiff's Employer; JPMC Administered Process; JPMS Filed the U5***

JPM Bank's own EEOC position statement says it employed and terminated Plaintiff; the HR system names it "Legal Employer"; pay statements and the W-2 identify it; and JPMS distinguished JPM Bank as employer. UMFs 1–2. JPM Bank is the employer for Counts II–IX; JPMC ER/HR administered the process; Private Bank managers approved; JPMS Registration developed the explanation and filed the U5. UMFs 60–90.

***The Confirmed Award Preclusively Fixes U5 Falsity Against JPMS***

Issue preclusion applies when an identical, essential issue was actually litigated and decided in a fair proceeding. *Amberson v. McAllen*, 73 F.4th 348, 350–51 & n.1 (5th Cir. 2023); *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994). The FINRA Panel Award, on the record before it, adjudicated the December 22, 2023 Form U5 inaccurate and ordered correction to reason "Voluntary," a blank explanation, and a termination date of October 28, 2023. The related case confirmed the Award and entered judgment on July 31, 2026. **UMFs 117**, 119. Against JPMS, the four U5 determinations actually and necessarily decided by the Panel are foreclosed from relitigation. Preclusion runs only to JPMS; JPM Bank and JPMC did not appear before the Panel, and no Award language is treated as preclusive against them. The independent Bates record supplies the entity-by-entity proof of Bank and JPMC conduct.

***The Contemporaneous Record: Chronology of the Stated Reason for Separation***

The five dated tracks or separation formulations fixed in the Preliminary Statement and UMFs 34–54, 78, 83–90 — the October 17 performance fallback ER wrote management could

"fall back on" (UMFs 34–35, 67); the expense routing closed NOT supported November 29 (UMFs 34–44); the October 26–27 ERC intake and sexual-assault escalation (UMFs 45–55); the December 1 recorded-call Code of Conduct rationale (UMF 78); and the December 22 unparticularized U5 (UMFs 83–85) — are analyzed here by actor, date, and source record against the dated sequence Defendants created:

**Sept. 4–Oct. 17 — Notice baseline.** Plaintiff raised market-support concerns, disclosed an adverse emotional state, received FMLA/leave information, requested an unofficial two-to-three-week absence, renewed HR/FMLA contact, and received October 10 praise from the later-designated ERC. UMFs 9, 17–22.

**Oct. 24 — Resignation, disability, routing.** Hitchcock heard Plaintiff express interest in resigning. Plaintiff met with Aughinbaugh and Stewart; their later ER accounts record resignation questions and disclosure of an anxiety disability. Stewart notified Stainback. Hitchcock checked on the ERC, who disclosed no allegation. UMFs 23–25, 31–32.

**Oct. 26–27 — PTO, ticket, source conflict.** Plaintiff's 1:05:56 p.m. CDT personal/sick-day email preceded Stainback's manager-raised ERC ticket by 28 minutes and 50 seconds. Hitchcock's unclocked Thursday account conflicts with his later account placing the meeting Friday and the call to Stainback afterward. The October 27 escalation stated "sexual assault by the male subject towards a female employee." UMFs 45–54.

**Oct. 27 — Pre-interview termination forecast.** Cohen wrote that she was "hoping to wrap early next week with a term" and later testified that termination was the likely outcome. She could not place the screenshots on the opening memorandum or date them. Plaintiff was interviewed November 7. UMFs 60–61, 91.

**Oct. 27–Nov. 8 — Interviews and conclusion.** The ERC's substantive interview was a cold call while she was driving; Jacobs supplemented his notes with Magee's raw notes. No substantive in-person or video interview occurred. Jacobs contacted Plaintiff November 2, interviewed him November 7, and wrote at 11:44 a.m. November 8 that the investigation "is concluded," awaiting Global Security "so that we can disposition simultaneously." UMFs 50–51, 62–63, 91–92.

**Nov. 13–21 — Investigation status.** Jacobs told Plaintiff on November 13 that the investigation "remains open" and on November 21 that it "continues to remain open."

Stainback told Global Security on November 16 that HR had enough reason to terminate but wanted the falsification issue completed first. UMFs 41, 64–65.

**Nov. 29–30 — Close, approvals, RFT.** Jacobs gave no substantive answer to Plaintiff's requests to review and respond to the facts, evidence, and findings. On November 29, Jacobs routed the draft RFT at 7:38:04 p.m.; Global Security closed the expense allegations NOT supported at 7:41:42 p.m.; Aughinbaugh approved at 7:42:04 p.m.; Stewart approved at 7:44:08 p.m. Jacobs signed the RFT November 30. UMFs 43–44, 66, 72–75.

**Oct. 28–Dec. 1 — Competitor, book, U5.** Cohen identified Merrill or Morgan Stanley and directed the U4 amendment "asap." Stainback directed Registration to hold the U5 "so we can finalize wording." Stewart requested every client relationship and the book's revenue benefits and drags; Wang categorized the book for reassignment. UMFs 67–69, 76–77. The December 1 termination call cited the Code of Conduct and anti-harassment policy. Registration received the NOT-supported Global Security file; Jacobs stated that termination rested solely on the ER investigation. UMFs 78–79.

**Dec. 6–22 and after — Objections, filing, correction.** Six pre-filing demands sought voluntary U5 treatment. Plaintiff delivered 183 pages of mutual messages on December 21; the investigation was not reopened before filing. UMFs 82, 93. That day, Plaintiff invoked disability, FMLA, accommodation, and mistreatment. Cohen called him "unhinged" and proposed a photo BOLO. On December 22, JPMS filed Discharged for "inappropriate behavior" without identifying a policy. UMFs 83–84, 101–102. Box 3 stated Discharged with an explanation; Questions 7B and 7F were answered No after Global Security closed the theft/expense allegations NOT supported. The Panel ordered Voluntary, a blank explanation, and October 28, and found the filed U5 inaccurate. UMFs 86–89, 117.

The dated sequence supplies the record basis for the inferences below and the common factual bridge for the individual counts; the claim-specific sections identify which events bear on each element and do not attribute JPMS acts to JPM Bank or JPMC merely because the entities are affiliated. If the Court reserves motive, Rule 56(g) permits the objective dated events to be established.

**COUNT II — SEX DISCRIMINATION**

*TEX. LAB. CODE §§ 21.051, 21.125*

**Elements.** Plaintiff must establish: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) sex as a motivating factor. Tex. Lab. Code §§ 21.051, 21.125(a); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781–82 (Tex. 2018).

**Application.** Plaintiff is male and qualified; JPM Bank placed him on involuntary leave and terminated him. The same-incident female coworker identified in the sworn charge allegedly engaged in the mutual conduct but was not disciplined; the Dallas male peer is not offered as a sex comparator. The sex-specific intake language ("his female analyst," "male subject," "female employee"), Subject/ERC designations, differential treatment, one-sided discipline, pre-interview forecast, and shifting reasons support the motivating-factor and pretext inferences. UMFs 10, 27–28, 45–58, 60–90. The process also supplies the sex-stereotype evidence recognized in *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 454–60 (5th Cir. 2013) (en banc), and the falsity evidence relevant under *Reeves*.

**Relief requested.** Enter summary judgment for Plaintiff against JPM Bank on Count II. Alternatively, establish the protected-status, qualification, adverse-action, intake-language, differential-treatment, and decision-chronology predicates under Rules 56(a) and 56(g).

**COUNT III — SEX-BASED HOSTILE WORK ENVIRONMENT**

*TEX. LAB. CODE § 21.051*

**Elements.** (1) Membership in a protected class; (2) unwelcome harassment; (3) based on sex; (4) sufficiently severe or pervasive to affect a term, condition, or privilege of employment; (5) employer liability. *Alamo Heights*, 544 S.W.3d at 771–79.

**Application.** Plaintiff relies on the sex-specific intake and escalation language, Subject/ERC designations, one-sided investigation, different leave/remote-work/reassignment/EAP/executive support, removal from the workplace without disclosure of the allegation, loss of client coverage, book reassignment, termination, and regulatory publication. UMFs 27–28, 45–56, 67–90. Those documented events are offered to satisfy the based-on-sex, severity/pervasiveness, interference, and employer-liability requirements; Rule 56(g) separately permits the words, dates, actors, and employment consequences to be fixed if motive remains disputed.

**Relief requested.** Enter summary judgment for Plaintiff against JPM Bank on Count III. Alternatively, establish under Rule 56(a) and Rule 56(g) the sex-based characterization, management circulation, direct employer involvement, materially adverse employment consequences, and one-sided Subject/ERC treatment.

## COUNT IV — NATIONAL-ORIGIN DISCRIMINATION

*TEX. LAB. CODE § 21.051*

**Elements.** (1) Protected status; (2) qualification; (3) adverse employment action; (4) national origin as a motivating factor, including via comparator evidence or express stereotype.

**Application.** Plaintiff's Brazilian national origin, qualification, involuntary leave, and termination are documented. Hitchcock's Thursday hearing account and later Friday-and-afterward summary create an objective source conflict without fixing the order of an unclocked Thursday meeting. The sworn charge identifies the same-incident female coworker as of a different national origin and undisciplined; the mutual-message record contains "Oh please I know you have Brazilian drama in you." UMFs 10, 27–28, 45–59, 78. Plaintiff offers that message as national-origin content in the underlying relationship record, not as a managerial admission or standalone

proof of causation. The comparator record, one-sided discipline, routing sequence, pre-interview forecast, and shifting reasons support the motivating-factor inference. *Alamo Heights*, 544 S.W.3d at 781–82; *Reeves*, 530 U.S. at 147–49; *Bravo v. Dall. Indep. Sch. Dist.*, No. 25-10982, slip op. at 2–4 (5th Cir. June 1, 2026).

**Relief requested.** Enter summary judgment for Plaintiff against JPM Bank on Count IV if the Court concludes the combined record leaves no genuine dispute as to motivating factor. Alternatively, enter Rule 56(a) judgment on protected status, qualification, and adverse employment action, and establish the comparator treatment, the June 8 national-origin message, the complaint-routing sequence, the pre-interview termination forecast, and the successive stated reasons under Rule 56(g).

## COUNT V — DISABILITY DISCRIMINATION

*TEX. LAB. CODE § 21.051*

**Elements.** (1) Qualifying disability (or record-of or regarded-as); (2) qualification; (3) adverse employment action; (4) causal connection to disability. *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694–97 (5th Cir. 2014).

**Application.** The VA record documents actual and record-of disability; Plaintiff was qualified; the Bank received disability information in May; Stewart knew of EAP/leave contacts; Stainback handled EAP/FMLA; and Aughinbaugh and Stewart received the October 24 anxiety-disability disclosure. Hitchcock's pre-termination “paranoid” characterization followed that meeting; Cohen's post-termination, pre-U5 “unhinged”/BOLO response and the later “lunatic” message bear on continuing state of mind. Involuntary leave and termination are Bank actions; the December 22 U5 is separately attributed to JPMS. UMFs 10, 15–24, 27–28, 31–32, 78, 100–103. Qualification, knowledge, impairment-linked characterizations, timing, pre-interview forecast,

shifting reasons, the NOT-supported expense close, and the non-disabled comparators support the disability nexus. *LHC Grp.*, 773 F.3d at 697; *Bravo*, slip op. at 2–4.

**Relief requested.** Enter summary judgment for Plaintiff against JPM Bank on Count V. Alternatively, establish actual and record-of disability, qualification, employer knowledge, adverse action, and the actor-specific impairment-characterization chronology under Rule 56(a) and Rule 56(g).

## COUNT VI — FAILURE TO PROVIDE A REASONABLE ACCOMMODATION

*TEX. LAB. CODE § 21.128*

**Elements.** (1) Disability; (2) qualification; (3) the employer knew of the disability and a requested reasonable accommodation; (4) failure to make a good-faith effort to accommodate. Tex. Lab. Code § 21.128; *Feist v. Louisiana*, 730 F.3d 450, 452–54 (5th Cir. 2013).

**Application.** The dated September 7–October 6 communications — the emotional-state disclosure, the September 10 request to be positioned out for two to three weeks, Stewart's nonapproval and optics response, the October 6 availability email, and the reengagement of Stainback — document the request and response. JPM Bank maintained leave, EAP, Spring Health, remote-work, and reassignment programs, and extended remote work, reassignment, and paid leave to the ERC in the same period. UMFs 15–24, 56. The comparative accommodation record and the absence of any documented interactive process support the failure-to-accommodate showing.

**Relief requested.** Enter summary judgment for Plaintiff against JPM Bank on Count VI. Alternatively, establish the request chronology, the response, and the operational availability of the requested accommodations under Rules 56(a) and 56(g).

## COUNT VII — RETALIATION UNDER THE TCHRA

*TEX. LAB. CODE § 21.055*

**Elements.** (1) Protected activity (opposition to a discriminatory practice, or making/filing a charge or complaint, or participating in a proceeding under Chapter 21); (2) materially adverse action; (3) employer knowledge of the protected activity; (4) but-for causation. Tex. Lab. Code § 21.055; *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781–90 (Tex. 2018); *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 58–60 (Tex. 2021).

**Scope of protected activity.** *Lara* holds that a request for a disability accommodation is not, standing alone, opposition to a discriminatory practice under § 21.055. *Id.* at 58–60. Accommodation requests are protected under Count VI, and FMLA requests are protected under Counts VIII–IX; neither, without more, satisfies § 21.055. Count VII is therefore limited to communications that expressly opposed a Chapter 21-prohibited practice.

**Application.** *Lara* excludes a stand-alone accommodation request from Chapter 21 opposition, so Plaintiff does not base Count VII on the September/October leave communications alone. The December 21 complaint expressly invoked disability discrimination, FMLA, accommodation failures, and mistreatment; it reached Cohen, counsel, and JPMC Legal, drew the same-night "unhinged"/BOLO response, and was followed the next day by JPMS's discharge U5 over six objections. UMFs 82–83, 100–102. The complaint language, recipient knowledge, six objections, same-night escalation, and next-day publication are fixed; whether the complaint is Chapter 21 opposition and which employer defendant legally answers for the JPMS filing remain legal attribution questions. On Plaintiff's theory, the sequence establishes knowledge, materially adverse action, and but-for causation.

**Relief requested.** Enter summary judgment for Plaintiff on Count VII against the responsible employer defendant. Alternatively, establish the December 21 protected complaint, recipient knowledge, the same-night escalation, six pre-filing objections, and next-day U5 publication under Rule 56(a) and Rule 56(g).

## COUNT VIII — FMLA INTERFERENCE

*29 U.S.C. § 2615(A)(1)*

**Elements.** (1) Eligibility; (2) covered employer; (3) entitlement to leave; (4) sufficient notice to trigger the employer's inquiry; (5) denial or interference; and (6) prejudice. *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 526–29 (5th Cir. 2021). Once the employer has enough information, 29 C.F.R. § 825.300(b)–(e) expressly requires eligibility notice, a rights-and-responsibilities notice, and a designation notice, and provides that a notice failure may constitute interference when it causes harm.

**Application.** Plaintiff had more than twelve months of service, was salaried-exempt, and the HCM record states FT Mon-Fri (40/5) 8 hr days; absent an accurate actual-hours record, 29 C.F.R. § 825.110(c)(3) places on the employer the burden of showing fewer than 1,250 hours, but that burden alone does not establish entitlement or prejudice. The Fort Worth worksite, 2,400-employee Tarrant County record, and centralized HR/ER administration support coverage. The VA/treatment record documents anxiety, recurrent panic attacks, chronic sleep impairment, therapy, and occupational impairment, but an entitlement ruling still requires proof of statutory incapacity, continuing treatment, and need for leave. HR supplied FMLA information; EAP discussed leave; Plaintiff reengaged Stainback October 6; and the September 10 request drew nonapproval and an optics response. The cited Appendix does not independently establish the absence of every required FMLA notice. Plaintiff therefore seeks a categorical notice-failure ruling

only to the extent supported by the declaration and cited notice record. Any interference or prejudice ruling likewise depends on proof of the notice failure and concrete harm. UMFs 3, 6, 17–22. The established service, coverage, medical history, leave communications, request/response, and chronology remain proper Rule 56(a)/(g) predicates. *Campos*, 10 F.4th at 526–29.

**Relief requested.** Enter summary judgment on Count VIII only to the extent supported by the cited entitlement and notice record. Alternatively, establish service, coverage, the medical record, leave communications, the September 10 request and response, and the dated employment chronology under Rules 56(a) and 56(g).

### COUNT IX — FMLA RETALIATION

*29 U.S.C. § 2615(a)(2)*

**Elements.** (1) Protected FMLA activity; (2) materially adverse action; (3) knowledge; (4) causal link.

**Application.** UMFs 17–21 document the leave/FMLA communications; UMFs 16–24 actor knowledge; and UMFs 27–28, 60, 70, 72–78 the involuntary leave, pre-interview forecast, misconduct coding, approvals, and termination, while Global Security separately closed the expense allegations NOT supported. Those facts support protected activity, knowledge, adverse action, and causation. *Campos*, 10 F.4th at 527. The three-year limitations period and any willfulness determination remain governed by 29 U.S.C. § 2617(c)(2) and the cited record; Plaintiff does not seek a categorical notice-compliance or willfulness finding beyond that record. *Mozingo v. Oil States Energy, Inc.*, 661 F. App'x 828, 830 (5th Cir. 2016) (*per curiam*).

**Relief requested.** Enter summary judgment for Plaintiff against JPM Bank on Count IX to the extent established by the cited record. Alternatively, establish the protected communications, actor knowledge, adverse actions, and dated decision chronology under Rules 56(a) and 56(g).

### COUNT X — TORTIOUS INTERFERENCE WITH THE MERRILL BUSINESS RELATIONSHIP

*GOVERNING TEXAS LAW*

**Elements.** (1) Reasonable probability of a prospective relationship; (2) intentional interference; (3) independently tortious or unlawful conduct; (4) proximate cause; (5) actual loss. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

**Application.** The Merrill evidence shows serious recruiting before October 17, Miller's hiring authority and desire to hire Plaintiff, an oral offer awaiting final U5 review, partnership with Parrelly on a clean U5, a November 8 Private Briefing, and $2.75 million recruiting economics. UMFs 14, 107–108. Competitor knowledge, the U5 wording hold, revenue/book allocation, and pre-termination recipient planning supply interference evidence. UMFs 67–69, 76–77. The November 28 "going to get canned"/"all your peeps" and November 29 "Meeting your replacement today" messages establish the narrative and timing, not its source; Aughinbaugh denied personally supplying it. UMFs 111–113. Plaintiff relies on Count XI fraud/nondisclosure and, where legally sufficient and attributable, Counts V–IX as independently tortious predicates — not FINRA accuracy duties alone. Parrelly's testimony that the discharge issue was a non-starter, Miller sought an exception, and the offer was pulled supplies third-party causation and actual loss; Spindler's unrebutted schedules quantify it. UMFs 107–108, 116.

**Relief requested.** Enter summary judgment against JPM Bank and JPMC on Count X. At minimum, enter Rule 56(a) judgment that a reasonable probability of the Merrill relationship

existed, Miller had hiring authority, Plaintiff had an oral offer conditioned on a clean U5, the discharge issue caused withdrawal despite an attempted exception, and Plaintiff suffered actual loss; establish the remaining chronology under Rule 56(g). Award economic damages of not less than $10,684,412 per the unrebutted schedules (UMF 116), or alternatively establish the schedule values under Rules 56(a) and 56(g).

**COUNT XI — FRAUD AND FRAUDULENT NONDISCLOSURE**

*GOVERNING TEXAS LAW*

**Elements.** Fraud requires (1) a material representation; (2) falsity; (3) knowledge of falsity or a reckless positive assertion; (4) intent that the representation be acted upon; (5) actual and justifiable reliance; and (6) injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). Fraudulent nondisclosure requires (1) deliberate nondisclosure of material facts; (2) a duty to disclose; (3) intent that the plaintiff act or refrain from acting; (4) the plaintiff's ignorance of the facts and lack of an equal opportunity to discover them; (5) actual and justifiable reliance; and (6) injury. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019). A duty can arise when a party voluntarily speaks and must disclose the whole truth, makes a partial disclosure that creates a false impression, or learns that an earlier representation has become misleading. *Id.*

**Application.** JPM Bank's October 28 HR workflow stated Approved Resignation, an October 26 last-worked date, and a projected December 26 notice-period end while notice-period restrictions remained in force. At the same time, the internal record contained the October 27 expected-term forecast, October 28 U5 wording hold, October 29 book-allocation directive, and later Misconduct Later Determined coding. UMFs 29–30, 60–70, 76–77, 121. Plaintiff contends those partial disclosures created a duty to disclose the whole truth; the contemporaneous conflict

supports falsity/scienter; and he relied by complying with notice-period restrictions and continuing the Merrill transition without equal access to the concealed termination/U5/book decisions. Parrelly's testimony supplies the clean-U5 condition, attempted exception, and withdrawal; Thompson's testimony fixes the practical consequence that a voluntary Box 3 termination carries no explanation without attributing JPMS's filing to JPM Bank or JPMC. UMFs 86, 107–116. *Ernst & Young* and *Bombardier* supply the reliance, duty, intent, and injury standards; *Turner* addresses falsity by omission and juxtaposition.

**Relief requested.** Enter summary judgment against JPM Bank and JPMC on Count XI. Alternatively, establish the Approved Resignation representation, notice-period restrictions, concurrent concealed decisions, duty-creating partial disclosures, Plaintiff's reliance conduct, Merrill clean-U5 condition, and resulting withdrawal under Rule 56(a) and Rule 56(g). Award the economic damages established by the unrebutted schedules (UMF 116) for the withdrawal-based injury.

## COUNT XII — BREACH OF CONTRACT; ALTERNATIVE QUANTUM MERUIT

*GOVERNING TEXAS LAW*

**Elements.** Breach of contract requires (1) a valid contract; (2) performance or tendered performance; (3) breach; and (4) damages. Quantum meruit, in the alternative, requires valuable services furnished for the defendant, accepted and used by it, under circumstances reasonably notifying the defendant that compensation was expected. *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990).

**Application.** The notice-period obligation is written, accepted, and definite: JPMorgan's Notice Period Policy keeps the employee employed, restricted, and available through the notice period, and JPM Bank's HR workflow applied it to Plaintiff as a sixty-day period projecting a

December 26, 2023 notice-period end. UMFs 30, 121. Plaintiff performed — he remained bound by the loyalty, non-solicitation, and availability restrictions and complied with them. JPM Bank ended pay at the December 1, 2023 termination; the November 20, 2023 compensation letter records a $225,000.00 salary; the final-pay records identify no salary payment for any period after December 1; and JPMorgan's own payroll case closed with the notation that Plaintiff "is not overpaid." UMFs 122–124. The unpaid December 2–26 balance computes to $15,410.96 — twenty-five days at the recorded salary. The at-will and early-termination language preserved the power to terminate; it did not erase the accrued pay obligation for the services and restrictions already accepted. *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302–04 (Tex. 2009). The Award's recognition that JPMS could terminate during the notice period adjudicated nothing against JPM Bank or JPMC — neither appeared there — and termination authority is distinct from the payment obligation already accrued. UMF 118. In the alternative, quantum meruit reaches the services, continued availability, and originated client relationships Defendants accepted and retained outside any enforceable notice-pay contract: Stewart's October 29 demand for "every client relationship that is in Josh Biering's book," the three-category book allocation, and the post-separation reassignment of Plaintiff's originated relationships to other advisors. UMFs 68–69, 76–77, 105; *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732–33 (Tex. 2018).

Count XII is one discrete component of Plaintiff's damages case; it is not a measure or cap on Plaintiff's overall loss. The unpaid notice-period compensation is independently recoverable on the contract theory. Plaintiff's separate economic-loss evidence reflects approximately $10.68 million to $17.96 million in net lost earnings after mitigation, before any exemplary damages or other recoverable relief. UMF 116; App. 0896–0908.

**Relief requested.** Enter summary judgment against JPM Bank and JPMC on Count XII and award $15,410.96 on the written notice-pay claim or, alternatively, the value established under quantum meruit. At minimum, establish under Rules 56(a) and 56(g) the policy language, the projected December 26, 2023 end date, the $225,000.00 recorded salary, the December 1, 2023 cessation of pay, the closed not-overpaid payroll case, and the $15,410.96 computation. UMFs 30, 121–124.

## COUNT XIII — CIVIL CONSPIRACY

*GOVERNING TEXAS LAW*

**Elements.** (1) Two or more persons; (2) meeting of minds on the object or course; (3) unlawful overt act; (4) damages. *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140–43 (Tex. 2019).

**Application.** The record identifies distinct Private Bank managers, JPMC ER/HR and Legal personnel, Global Security, and JPMS Registration. ER required Bank-manager approvals; both managers approved; HR Legal reviewed; Registration requested the files; ER supplied the narrative; Legal participated in wording; and JPMS filed over six written objections. UMFs 72–90. Competitor knowledge, the U5 hold, immediate book allocation, approvals, narrative transmission, and filing support Plaintiff's claimed common course to terminate Plaintiff, control the regulatory account, capture the book, and impede the competitor transition. UMFs 67–90, 104–108, 117. Counts X, XI, and XII supply the alleged independently tortious or unlawful acts; Merrill withdrawal, client-book loss, unpaid notice-period compensation, and compensation loss supply injury. UMFs 107–116, 122–124.

**Relief requested.** Enter summary judgment against all Defendants on Count XIII. Alternatively, establish the distinct actors, approvals, cross-functional communications, common-

course chronology, narrative development, overt acts, and injuries under Rule 56(a) and Rule 56(g). Award the established damages jointly and severally as the law provides.

### D. Alternative Relief Under Rule 56(g)

If ultimate intent, motive, reliance, entitlement, or agreement remains for trial, Rule 56(g) still permits the Court to establish objective matters not genuinely disputed.

The accompanying Proposed Order enumerates the requested findings with UMF pins: entity roles and approvals; protected status, disability documentation, and knowledge; performance; leave chronology; the October 24–27 resignation/ERC/PTO-ticket sequence and source conflict; comparator and June 8 message; pre-interview forecast, coding, and interview method; competitor knowledge, U5 hold, and book allocation; Global Security close and November 29 timestamps; U5 mechanics, objections, December 21 complaint, and December 22 filing; unreviewed texts; pre-termination market narrative and Merrill withdrawal; the notice-period pay record; the unrebutted damages schedules; and the Award and confirmation. UMFs 1–124 as specified in the Proposed Order.

Each requested finding is limited to objective words, dates, actors, timestamps, records, or adjudicated determinations and preserves genuinely disputed motive, intent, reliance, entitlement, and agreement questions.

## IV. CONCLUSION

The record supports judgment on matters fixed beyond genuine dispute and, at minimum, a Rule 56(g) order establishing the objective documentary chronology. The requested alternatives are not concessions.

First, enter judgment that JPM Bank was Plaintiff's employer for Counts II–IX; preclude JPMS from relitigating the four U5 correction determinations; and enter judgment for Plaintiff on

Counts II–XIII as set out above, including the $15,410.96 notice-pay award on Count XII, and award economic damages of not less than $10,684,412 — up to $17,958,189 under the additional-investor scenario — per the unrebutted Spindler schedules (UMF 116).

Alternatively, enter Rule 56(a) judgment on each claim part established by the cited record, including the Merrill, FMLA, and notice-pay predicates. A categorical FMLA notice-failure ruling is requested only to the extent supported by the declaration and cited notice record.

Additionally or alternatively, enter the requested Rule 56(g) findings so the objective documentary chronology is not relitigated.

Count I remains pleaded and is not presented; Plaintiff affirmatively presents Counts II–XIII and asks for damages on this Motion: the $15,410.96 notice-pay award and economic damages of not less than $10,684,412 per the unrebutted schedules (App. 0896–0908), exclusive of exemplary damages. Any amount the Court does not fix on this Motion remains for trial, and Plaintiff expressly preserves all additional compensatory, statutory, equitable, exemplary, prejudgment-interest, post-judgment-interest, and other relief legally available on the claims ultimately established.

Respectfully Submitted,

Joshua David Sappi Biering

**JOSHUA DAVID SAPPI BIERING**
Plaintiff, *Pro Se*
4635 Washburn Avenue
Fort Worth, Texas 76107
(682) 218-6738
jdsb@bierfam.com