# PLAINTIFF'S APPENDIX IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## VOLUME 2 OF 4

## INDEX


| APP. | DESCRIPTION |
|---|---|
| **0281-0357** | Performance Scorecards, Self-Assessment, and Peer-Review Feedback |
| **0358-0364** | Merrill Recruiting Records |
| **0365-0373** | Resignation Workflow, Notice-Period, and Termination-Call Records |
| **0374-0413** | Pre- and Post-Filing Demand and Objection Correspondence |
| **0414-0516** | FINRA Pleading and Claim-Narrowing Records |
| **0517-0529** | JPMS FINRA Prehearing Brief |
| **0530-0531** | Compensation Records |
| **0532-0547** | Form W-2 and Payroll Records |
| **0548-0566** | Personnel and Employment Records |
| **0567-0594** | Complaint-Routing, BOLO, Security, and Closure Records |
| **0595-0603** | Third-Party and Client Communications |
| **0604-0609** | Client-Book Allocation and Fort Worth Finance Records |


Relied-upon passages are highlighted and bracketed in the margin. Each page carries a consecutive record label at the top right (App. NNNN).

# Performance Scorecards, Self-Assessment, and Peer-Review Feedback

**App. 0282-0357**

October 2023 Banker Scorecard, September 27 self-assessment, and October 10 peer-review feedback.

**Ba**

Summary
Client Summary
Revenue Trend
Revenue by Month
Current YTD Revenue
Revenue By Product Variance
Assets
Net New Clients (as of Sep'23)
Net New Clients (Q4'23)
Flows (as of Sep'23)
Flows (Q4'23)
Flows - Transparency Details (as of Sep'23)
Flows - Transparency Details (Q4'23)
Transferred Out Flows (as of Sep'23)
Transferred Out
Negative SVA
Lending
RAR Asset Incentive
Referrals

Exhibit

CX7

App. 0283

**October 2023 Banker Scorecard** Glossary | Facility RAR Details | Client Level Details | Team Scorecard | Market Scorecard | JPMC INTE

**Joshua Biering**

**Region:** US SOUTH REGION (SC) **Peer Group:** US SC Banker - ED/MD
**Market:** US FORT WORTH (SC) **Book Size:** >$3.0MM

| | A | Risk Adj. Rev 33% | B Flows 33% | C Total Pts 33% | | |
|---|---|---|---|---|---|---|
| Metric Results | 546 | 14.10% | 67.24 | 31 | | PY Q4 Pass |
| Tier | | Gold | Silver | Silver | Gold | Q1 Pass |
| Gold Breakpoint | | 8.90% | 76.1 | 34 | | Q3 Pass |

Revenue is calendar year, NNC, and Flows are both Q4'22 + Sept. YTD. **Risk Adjusted Rev is dominant factor (33.34%).**

## Revenue ($K)

A

| | YTD 2023 | YTD 2022 | Variance $ | Variance % |
|---|---|---|---|---|
| Annuity | 2,031 | 1,954 | 76 | 4% |
| Total Transactional | 450 | 22 | 428 | 1923% |
| Placement Fees | 280 | 385 | -104 | -27% |
| **Total Investments** | **2,761** | **2,361** | **400** | **17%** |
| Trust and Estates | 417 | 393 | 24 | 6% |
| Lending | 837 | 875 | -38 | -4% |
| Mortgage | 339 | 286 | 53 | 19% |
| Deposits | 462 | 552 | -91 | -16% |
| Custody and Other | 4 | 5 | -1 | -21% |
| **Total Book Revenue** | 4,821 | **4,473** | **347** | **8%** |
| Risk & Capital Charges | -482 | -714 | 232 | 33% |
| Asset Incentive | 79 | 112 | -33 | -30% |
| **Total Risk Adj. Revenue** | 4,417 | 3,871 | **546** | **14%** |

## Flows ($MM) - 4Q'22 + Sept.YTD

| | Total | New DMs | Existing | Transfers |
|---|---|---|---|---|
| Investment Management | 19 | 13 | 8 | -2 |
| Client Directed Alternatives | 21 | 0 | 21 | - |
| Client Directed Mutual Funds (ex Cash) | -8 | -2 | -6 | 0 |
| IRS Annuity (Non Mgd) | - | - | - | - |
| **Total LTI** | **32** | **12** | **22** | **-2** |
| Trust and Estates | 0 | - | 0 | - |
| **Total Investments** | **32** | **12** | **22** | **-2** |
| Lending | -2 | 13 | -11 | -5 |
| Mortgages | 9 | 6 | 4 | 0 |
| **Total Credit** | **7** | **19** | **-7** | **-5** |
| Deposits | 1 | 5 | -4 | 0 |
| All Other Cash | 14 | 13 | 7 | -7 |
| **Total Banking** | **15** | **18** | **3** | **-7** |
| **Total Investment, Banking and Credit** | **54** | **49** | **18** | **-13** |
| Other Flows** | 34 | 7 | 28 | 0 |
| **Total Book Flows** | **88** | **55** | **45** | **-13** |

**Other Flows represents Unapproved MF, PE & HF FI Clients, and CDs/Individual Securities/Margin/OTC Deriv./Structured Products in Brokerage, Custody, or T&E non-Mgd accounts

## Lending Summary

| | | SVA + EML/PLC | SVA + Non-EML/PLC | SVA - Loan SROE (8 to 10%) | SVA - Loan SROE (<8%) | Total |
|---|---|---|---|---|---|---|
| Lending Balances ($M) | Current Month | 67 | 10 | 4 | 4 | **85** |
| | O/(U) vs Dec'22 | 48 | -32 | -13 | -9 | **-5** |
| Lending RAR (inc. Asset Incentive) ($K) | CYTD | 318 | 110 | 29 | -23 | **434** |
| | O/(U) vs PYTD | 233 | -49 | -21 | -2 | **161** |
| ***Memo*** : Negative SVA | CYTD | -16 | 0 | -16 | -25 | **-57** |
| | O/(U) vs PYTD | -15 | 0 | 17 | 143 | **145** |

## Flows ($MM) and New Clients by Type - 4Q'22 + Sept.YTD

B

| | Inv | Banking | Credit | IB&C Total | Total Flows | GNC + Bonus | Total Pts |
|---|---|---|---|---|---|---|---|
| New DMs[1] | 12 | 18 | 19 | 49 | 55 | 9 | 9 |
| Existing DMs[2] | 22 | 3 | -7 | 18 | 45 | 23 | 23 |
| Transferred In DMs[3] | -2 | -7 | -5 | -13 | -13 | - | -1 |
| **Total Book Impact** | **32** | **15** | **7** | **54** | **88** | **32** | **31** |
| (-) Pre Transferred In[3] | -1 | -8 | -3 | -12 | -12 | | |
| (-) Post Transferred In (Neg. Flows)[3] | -1 | 0 | -2 | -2 | -2 | | |
| **Total Metric** | **34** | **22** | **12** | **67** | **102** | | |
| *Pre Transferred Out[3]* | - | *-5* | - | *-5* | *-5* | | |
| *Post Transferred Out[3]* | | - | *0* | *1* | *1* | *1* | |
| ***Total Transferred Out Impact[3]*** | **-** | ***-4*** | ***1*** | ***-3*** | ***-3*** | | |
| Referral Flows | - | - | - | - | - | | |
| Count of Referrals | | | | | - | | |

[1] DMs you have onboarded since 09/30/2023; [2] DMs in your book as of 09/30/2023

[3] DMs transferred in/out of your book since 09/30/2023. Pre = activity prior to transfer. Post = activity after transfer.

## AUS / Credit Ratio

| | No Lending | <2 (0 bps) | 2-3 (25 bps) | 3-4 (35 bps) | 4-5 (45 bps) | 5-6 (55 bps) | 6-7 (65 bps) | 7+ (75 bps) |
|---|---|---|---|---|---|---|---|---|
| # of DMs | 15 | 2 | 2 | 2 | 1 | 1 | 1 | 16 |
| % of DMs | 38% | 5% | 5% | 5% | 3% | 3% | 3% | 40% |

## DMs by Asset Tier

| | Total | >$5MM | $2-5MM | <$2MM >12 mos. | <$2MM 6-12 mos. | <$2MM <6 mos. |
|---|---|---|---|---|---|---|
| # of 2023 New DMs* | 8 | 1 | 1 | - | 2 | 4 |
| # of DMs* | 50 | 36 | 4 | 3 | 3 | 4 |
| CM Bal | 949 | 927 | 12 | 3 | 4 | 3 |
| Median CM Bal | 14 | 22 | 3 | 2 | 1 | 1 |
| YTD Average Bal | 913 | 895 | 10 | 4 | 3 | 1 |
| CYTD RAR | 4,417 | 4,320 | 48 | 31 | 14 | 4 |
| Median CYTD RAR | 56 | 91 | 9 | 13 | 2 | 0 |
| Yield | 0.58% | 0.58% | 0.60% | 0.92% | 0.51% | 0.58% |

*Clients with non-zero current month Balance or Revenue and where the DM ECI or BAC_CD does not contain "D"

Clients with zero current month Balance and Revenue but YTD Revenue will be in the "<$2MM" Tier

## NNCs - 4Q'22 + Sept.YTD

C

| | Client Pts | Bonus Pts | Total Pts | Flows Total | Flows Median | Risk Adj. Rev (Annual.) Total | Risk Adj. Rev (Annual.) Median |
|---|---|---|---|---|---|---|---|
| Brand New $25MM | - | - | - | - | - | - | - |
| Threshold New $25MM | - | - | - | - | - | - | - |
| Existing $25MM Bonus | - | - | - | - | - | - | - |
| Brand New $5MM | 2 | 6 | 8 | 47 | 23 | 108 | 54 |
| Threshold New $5MM | 2 | - | 2 | 8 | 4 | 63 | 32 |
| Existing $5MM Bonus | - | 22 | 22 | 512 | 28 | 2,426 | 149 |
| **Gross New** | **4** | **28** | **32** | **567** | **N/A** | **2,597** | **N/A** |
| Lost | -1 | - | -1 | 2 | 2 | 16 | 16 |
| **Total Net New Points** | **3** | **28** | **31** | **569** | **N/A** | **2,613** | **N/A** |

App. 0284

**October 2023 Banker Scorecard**

JPMC INTERNAL USE ONLY

**Joshua Biering**

**Client Summary**

Assets in $MM and Revenue in $K (Sorted by "YTD-2023")

| | | | Total Risk Adj. Revenue | | | | | Balances | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Client Sort | FY 2022 | YTD-2022 | YTD-2023 | O(U) | %O(U) | Inv. Mgmt | Client Directed | Brokerage | Lending | Mortgage | Deposits | Trust and Estates | Custody | Client Assets + Credit | Avg Client Assets + Credit | Ann Net Yield (bps) |
| **Existing Book** | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 1 | 400.5 | 320.9 | 686.4 | 365.6 | 113.9% | 31.7 | 3.3 | 14.2 | 21.2 | 15.2 | 0.4 | - | 4.4 | 90.4 | 91 | 0.90% |
| [REDACTED] | [REDACTED] | 2 | 372.1 | 313.3 | 300.7 | (12.6) | -4.0% | 28.5 | 4.2 | 27.1 | 7.2 | - | 2.3 | - | - | 69.4 | 70 | 0.51% |
| [REDACTED] | [REDACTED] | 3 | 233.7 | 204.4 | 196.8 | (7.6) | -3.7% | 26.5 | 9.6 | 6.8 | 0.0 | 1.4 | 2.9 | 22.2 | - | 69.2 | 59 | 0.40% |
| [REDACTED] | [REDACTED] | 4 | 225.4 | 193.9 | 190.6 | (3.3) | -1.7% | 7.3 | 4.6 | 19.6 | - | - | 0.5 | - | - | 32.1 | 31 | 0.73% |
| [REDACTED] | [REDACTED] | 5 | 164.1 | 141.6 | 190.4 | 48.8 | 34.5% | 8.5 | 1.8 | 6.4 | 5.5 | 1.6 | 2.2 | - | - | 26.1 | 26 | 0.89% |
| [REDACTED] | [REDACTED] | 6 | 220.5 | 181.6 | 184.6 | 3.0 | 1.7% | - | - | - | - | 0.4 | 0.0 | 13.2 | - | 13.7 | 14 | 1.63% |
| [REDACTED] | [REDACTED] | 7 | 184.6 | 166.4 | 182.0 | 15.6 | 9.4% | 19.4 | 0.3 | 8.2 | 10.4 | 2.7 | 0.1 | - | - | 41.1 | 42 | 0.52% |
| [REDACTED] | [REDACTED] | 8 | 194.6 | 166.3 | 172.6 | 6.4 | 3.8% | 14.6 | 1.4 | 6.2 | 0.3 | 7.2 | 0.5 | 2.9 | - | 33.1 | 30 | 0.69% |
| [REDACTED] | [REDACTED] | 9 | 180.9 | 147.0 | 167.9 | 20.9 | 14.2% | 8.5 | 0.8 | 0.0 | - | - | 1.4 | 13.1 | - | 23.8 | 26 | 0.79% |
| [REDACTED] | [REDACTED] | 10 | 172.8 | 145.8 | 137.3 | (8.5) | -5.8% | 16.7 | 0.9 | 0.9 | 3.3 | 3.0 | 0.3 | 3.3 | - | 28.4 | 29 | 0.56% |
| [REDACTED] | [REDACTED] | 11 | 193.0 | 170.1 | 133.8 | (36.3) | -21.3% | 14.9 | 3.1 | 25.3 | - | 0.6 | 8.1 | - | - | 52.1 | 51 | 0.32% |
| [REDACTED] | [REDACTED] | 12 | 176.6 | 107.0 | 129.2 | 22.2 | 20.8% | 24.0 | 12.4 | 5.6 | 0.1 | 0.2 | 0.3 | - | - | 42.7 | 46 | 0.33% |
| [REDACTED] | [REDACTED] | 13 | 185.9 | 161.3 | 124.1 | (37.2) | -23.1% | 25.4 | 2.2 | 3.7 | 0.7 | 0.5 | 0.8 | - | - | 33.3 | 30 | 0.49% |
| [REDACTED] | [REDACTED] | 14 | 150.6 | 125.4 | 123.7 | (1.6) | -1.3% | 15.1 | 0.1 | 3.4 | - | - | 0.1 | 6.7 | - | 25.5 | 26 | 0.57% |
| [REDACTED] | [REDACTED] | 15 | 129.1 | 106.9 | 121.4 | 14.5 | 13.5% | 12.6 | 3.0 | 1.2 | 0.5 | 3.4 | 1.3 | - | - | 21.9 | 24 | 0.61% |
| [REDACTED] | [REDACTED] | 16 | 91.8 | 71.3 | 118.3 | 47.0 | 65.9% | 9.1 | 2.4 | 4.4 | 1.8 | 3.3 | 0.4 | - | - | 21.3 | 21 | 0.69% |
| [REDACTED] | [REDACTED] | 17 | 139.1 | 119.0 | 99.2 | (19.8) | -16.6% | 13.5 | 2.4 | 5.6 | - | 0.5 | 0.1 | - | - | 21.9 | 23 | 0.53% |
| [REDACTED] | [REDACTED] | 18 | 101.2 | 86.2 | 92.9 | 6.7 | 7.7% | 8.3 | 1.3 | 5.9 | 3.6 | 0.9 | 0.1 | - | - | 20.2 | 17 | 0.64% |
| [REDACTED] | [REDACTED] | 19 | 1.9 | 0.2 | 90.1 | 89.9 | 44,094.7% | 10.2 | 4.9 | - | 15.5 | 5.0 | 0.2 | - | - | 35.7 | 23 | 0.47% |
| [REDACTED] | [REDACTED] | 20 | 102.7 | 85.6 | 88.4 | 2.8 | 3.2% | 16.1 | 6.7 | 0.4 | - | - | 0.6 | - | - | 23.7 | 24 | 0.44% |
| [REDACTED] | [REDACTED] | 21 | 98.9 | 82.3 | 85.8 | 3.5 | 4.2% | 10.9 | 1.1 | 0.2 | - | 1.3 | 0.9 | - | - | 14.5 | 15 | 0.69% |
| [REDACTED] | [REDACTED] | 22 | 82.3 | 67.3 | 78.4 | 11.1 | 16.5% | 11.4 | 0.1 | 0.3 | 0.9 | 1.4 | 0.3 | - | - | 14.5 | 14 | 0.65% |
| [REDACTED] | [REDACTED] | 23 | 116.6 | 99.5 | 77.4 | (22.1) | -22.2% | 6.3 | 5.4 | 0.2 | 0.8 | 0.3 | 3.3 | - | - | 16.2 | 15 | 0.61% |
| [REDACTED] | [REDACTED] | 24 | 65.3 | 54.3 | 74.0 | 19.7 | 36.2% | 1.8 | 0.6 | 0.3 | 1.5 | - | 1.9 | - | 0.0 | 6.2 | 9 | 0.95% |
| [REDACTED] | [REDACTED] | 25 | 33.2 | 26.8 | 59.0 | 32.2 | 120.3% | 4.3 | 0.2 | 0.8 | 1.7 | 2.5 | 0.1 | - | - | 9.5 | 10 | 0.74% |
| [REDACTED] | [REDACTED] | 26 | 78.2 | 67.5 | 53.0 | (14.4) | -21.4% | 8.3 | 1.4 | 0.0 | 7.9 | 1.4 | 0.1 | - | - | 19.1 | 18 | 0.35% |

**CX7-3**

**App. 0285**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | 27 | 59.1 | 48.8 | 52.9 | 4.1 | 8.4% | 4.2 | 4.9 | 20.3 | - | 0.9 | 2.4 | - | - | 32.6 | 32 | |
| [REDACTED] | [REDACTED] | 28 | 33.0 | 26.3 | 43.2 | 16.8 | 63.8% | 3.2 | 0.5 | 0.3 | - | 0.9 | 0.1 | - | - | 5.0 | 5 | 1.11% |
| [REDACTED] | [REDACTED] | 29 | 55.5 | 47.9 | 43.1 | (4.8) | -10.1% | 4.8 | 1.3 | 20.7 | - | 0.2 | 0.2 | - | - | 27.3 | 27 | 0.19% |
| [REDACTED] | [REDACTED] | 30 | 45.2 | 37.7 | 37.0 | (0.7) | -2.0% | 3.7 | 0.6 | 1.8 | - | - | 0.5 | - | - | 6.6 | 7 | 0.63% |
| [REDACTED] | [REDACTED] | 31 | 46.3 | 39.0 | 37.0 | (2.1) | -5.3% | 5.6 | 0.5 | 0.8 | - | - | 0.2 | - | - | 7.1 | 7 | 0.60% |
| [REDACTED] | [REDACTED] | 32 | 41.0 | 33.7 | 35.8 | 2.1 | 6.2% | 2.0 | 1.6 | 4.5 | 0.7 | 1.5 | 0.3 | - | - | 10.6 | 10 | 0.43% |
| [REDACTED] | [REDACTED] | 33 | 50.2 | 43.4 | 35.7 | (7.7) | -17.7% | 1.6 | 2.0 | 0.6 | 1.0 | - | 0.1 | - | - | 5.3 | 6 | 0.76% |
| [REDACTED] | [REDACTED] | 34 | 36.7 | 31.5 | 31.0 | (0.5) | -1.4% | 3.7 | 0.5 | 0.8 | - | 1.4 | 0.2 | - | - | 6.6 | 6 | 0.64% |
| [REDACTED] | [REDACTED] | 35 | 27.8 | 21.7 | 30.9 | 9.2 | 42.3% | 2.1 | 0.9 | 0.7 | 1.4 | 1.2 | 0.2 | - | - | 6.4 | 7 | 0.53% |
| [REDACTED] | [REDACTED] | 36 | 32.8 | 27.5 | 27.3 | (0.2) | -0.8% | 3.2 | - | - | 0.5 | - | 0.0 | - | - | 3.7 | 4 | 0.88% |
| [REDACTED] | [REDACTED] | 37 | 19.0 | 15.6 | 17.7 | 2.1 | 13.3% | 1.5 | - | - | 0.3 | - | - | - | - | 1.9 | 2 | 1.12% |
| [REDACTED] | [REDACTED] | 38 | - | - | 15.8 | 15.8 | 100.0% | 2.3 | 6.6 | 3.5 | - | - | 0.9 | - | - | 13.3 | 4 | 0.46% |
| [REDACTED] | [REDACTED] | 39 | 69.9 | 66.7 | 12.8 | (53.8) | -80.7% | 1.1 | 0.4 | 0.1 | - | - | 0.0 | - | - | 1.6 | 2 | 0.73% |
| [REDACTED] | [REDACTED] | 40 | 3.8 | 3.0 | 10.3 | 7.3 | 241.7% | - | 0.3 | 0.6 | - | 0.4 | 1.3 | - | - | 2.6 | 2 | 0.82% |
| [REDACTED] | [REDACTED] | 41 | 0.4 | 0.1 | 10.2 | 10.2 | 18,615.9% | 0.7 | 0.9 | 0.2 | - | - | 0.2 | - | - | 2.0 | 1 | 0.82% |
| [REDACTED] | [REDACTED] | 42 | 16.3 | 14.1 | 7.9 | (6.2) | -43.7% | - | 0.9 | 1.3 | - | - | 0.7 | - | 0.0 | 3.0 | 4 | 0.26% |
| [REDACTED] | [REDACTED] | 43 | - | - | 3.4 | 3.4 | 100.0% | 1.1 | - | - | - | - | - | - | - | 1.1 | 0 | 1.11% |
| [REDACTED] | [REDACTED] | 44 | - | - | 2.5 | 2.5 | 100.0% | 0.7 | 1.4 | 0.0 | - | - | 0.4 | - | - | 2.4 | 1 | 0.52% |
| [REDACTED] | [REDACTED] | 45 | - | - | 2.4 | 2.4 | 100.0% | - | 0.0 | 0.1 | - | 0.7 | 0.1 | - | - | 1.0 | 1 | 0.30% |
| [REDACTED] | [REDACTED] | 46 | - | - | 1.4 | 1.4 | 100.0% | - | 0.4 | 0.0 | - | - | 0.8 | - | - | 1.2 | 1 | 0.19% |
| [REDACTED] | [REDACTED] | 47 | - | - | 0.4 | 0.4 | 100.0% | - | 0.8 | - | - | - | 0.0 | - | - | 0.8 | 0 | 0.21% |
| [REDACTED] | [REDACTED] | 48 | - | - | 0.2 | 0.2 | 100.0% | - | - | 0.0 | - | - | 1.1 | - | - | 1.1 | 0 | 0.14% |
| [REDACTED] | [REDACTED] | 49 | 2.2 | 2.2 | 0.2 | (1.9) | -89.6% | - | 0.0 | - | - | - | 0.0 | - | - | 0.0 | 0 | 2.25% |
| [REDACTED] | [REDACTED] | 50 | - | - | 0.2 | 0.2 | 100.0% | - | 0.2 | - | - | - | 0.0 | - | - | 0.2 | 0 | 0.37% |
| | | Total | 4,634.8 | 3,870.9 | 4,417.3 | 546.4 | 14.1% | 395.7 | 99.1 | 203.0 | 86.8 | 60.0 | 38.7 | 61.4 | 4.4 | 949.1 | 913 | 0.58% |
| | | Grand Total | 4,634.8 | 3,870.9 | 4,417.3 | 546.4 | 14.1% | 395.7 | 99.1 | 203.0 | 86.8 | 60.0 | 38.7 | 61.4 | 4.4 | 949.1 | 913 | 0.58% |

**October 2023 Banker Scorecard** JPMC I

**Joshua Biering**

**Revenue Trend ($K)**

| | PY1 | PY2 | PY3 | PY4 | PY5 | PY6 | PY7 | PY8 | PY9 | PY10 | PY11 | PY12 | PYTD | PYFY | CY1 | CY2 | CY3 | CY4 | CY5 | CY6 | CY7 | CY8 | CY9 | CY10 | CY11 | CY12 | CYTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Investment Management | 190 | 175 | 176 | 179 | 154 | 158 | 147 | 170 | 154 | 132 | 157 | 163 | 1,636 | 1,955 | 153 | 164 | 159 | 172 | 161 | 164 | 175 | 191 | 171 | 158 | - | - | 1,668 |
| Global Access | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | - | 0 |
| Client Directed Fund | 7 | 5 | 5 | 5 | 5 | 5 | 5 | 6 | 6 | 5 | 5 | 6 | 53 | 64 | 8 | 9 | 9 | 9 | 9 | 10 | 9 | 9 | 9 | 10 | - | - | 92 |
| Private Equity - Management Fee | 14 | 14 | 14 | 15 | 15 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 143 | 170 | 13 | 12 | 13 | 13 | 15 | 15 | 15 | 15 | 16 | 16 | - | - | 142 |
| Hedge Funds - Management Fee | 3 | 7 | 9 | 9 | 9 | 9 | 9 | 9 | 8 | 8 | 8 | 9 | 81 | 99 | 8 | 8 | 8 | 8 | 9 | 9 | 10 | 10 | 10 | 10 | - | - | 88 |
| Global Access - Management Fee | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 41 | 49 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | - | - | 40 |
| Other | - | - | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | - | - | 1 |
| Specialty Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Annuity** | **218** | **206** | **209** | **212** | **186** | **191** | **180** | **203** | **186** | **164** | **188** | **196** | **1,954** | **2,339** | **186** | **197** | **193** | **207** | **198** | **202** | **213** | **229** | **210** | **197** | **-** | **-** | **2,031** |
| Equity Trading | (0) | 0 | 2 | 0 | 2 | 0 | 3 | (8) | 2 | 0 | (0) | 4 | 2 | 5 | 0 | 1 | 1 | 1 | 10 | 2 | 1 | 1 | 1 | 1 | - | - | 19 |
| Equity Syndicates | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equity Structured Notes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equity Structured Products | - | 1 | 4 | 2 | - | 3 | 3 | - | 3 | 1 | - | 1 | 16 | 17 | - | - | 2 | - | - | 1 | 1 | - | 5 | 1 | - | - | 11 |
| Equity Hedging | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 300 | - | - | - | - | 100 | - | - | 14 | - | - | - | 414 |
| Fixed Income | 0 | - | 2 | 0 | 0 | 0 | 0 | - | 1 | - | 1 | - | 3 | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | - | 0 | 2 | - | - | 5 |
| Emerging Markets | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | 0 |
| Fixed Income Syndicates | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Foreign Exchange | 0 | 0 | 0 | 0 | - | 0 | 0 | 0 | 0 | 1 | - | 0 | 2 | 2 | - | - | 0 | - | 0 | 0 | - | - | 0 | 0 | - | - | 1 |
| FICC Structures / Derivatives | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Global Access | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Transactional** | **0** | **1** | **8** | **2** | **2** | **3** | **6** | **(8)** | **5** | **2** | **1** | **5** | **22** | **28** | **303** | **1** | **3** | **2** | **11** | **103** | **3** | **1** | **20** | **4** | **-** | **-** | **450** |
| Private Equity - Placement Fee | 2 | 2 | 2 | 19 | - | 50 | 45 | - | 40 | 25 | - | 41 | 185 | 227 | - | - | 27 | 40 | 50 | - | 41 | 70 | 0 | 17 | - | - | 245 |
| Hedge Funds - Placement Fee | 62 | 55 | 78 | - | - | - | - | - | - | 5 | - | 26 | 199 | 226 | - | - | - | - | 13 | 19 | 4 | - | - | - | - | - | 36 |
| Global Access - Placement Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Placement Fees** | **64** | **57** | **81** | **19** | **-** | **50** | **45** | **-** | **40** | **30** | **-** | **67** | **385** | **452** | **-** | **-** | **27** | **40** | **63** | **19** | **45** | **70** | **0** | **17** | **-** | **-** | **280** |
| **Total Investments** | **282** | **264** | **297** | **233** | **189** | **244** | **231** | **195** | **231** | **196** | **189** | **268** | **2,361** | **2,819** | **489** | **199** | **222** | **248** | **272** | **324** | **260** | **300** | **229** | **218** | **-** | **-** | **2,761** |
| Lending | 83 | 79 | 86 | 79 | 97 | 96 | 96 | 90 | 83 | 87 | 90 | 115 | 875 | 1,081 | 100 | 86 | 80 | 80 | 86 | 88 | 85 | 78 | 75 | 78 | - | - | 837 |
| Mortgages | 29 | 24 | 26 | 26 | 29 | 29 | 30 | 32 | 30 | 31 | 30 | 32 | 286 | 347 | 34 | 31 | 34 | 33 | 34 | 34 | 35 | 35 | 34 | 37 | - | - | 339 |
| Deposits | 64 | 53 | 58 | 56 | 71 | 59 | 50 | 48 | 45 | 48 | 47 | 43 | 552 | 643 | 52 | 39 | 44 | 44 | 45 | 44 | 46 | 46 | 50 | 51 | - | - | 462 |
| Trust and Estates | 46 | 42 | 26 | 39 | 41 | 41 | 46 | 41 | 40 | 31 | 41 | 41 | 393 | 475 | 42 | 43 | 35 | 38 | 40 | 41 | 51 | 41 | 40 | 46 | - | - | 417 |

| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Custody and Other | - | - | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 5 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | | | | |
| **Total Non Investments** | **221** | **197** | **198** | **200** | **238** | **225** | **222** | **214** | **199** | **197** | **209** | **231** | **2,112** | **2,551** | **228** | **198** | **194** | **196** | **205** | **208** | **217** | **200** | **200** | **214** | **-** | **-** | **2,059** |
| **Total Revenue** | **504** | **461** | **495** | **433** | **426** | **469** | **453** | **409** | **430** | **393** | **398** | **499** | **4,473** | **5,370** | **717** | **397** | **416** | **443** | **477** | **532** | **477** | **500** | **429** | **432** | **-** | **-** | **4,821** |
| Risk & Capital Charges | (71) | (64) | (70) | (67) | (82) | (76) | (76) | (73) | (67) | (69) | (70) | (88) | (714) | (872) | (81) | (42) | (53) | (52) | (58) | (59) | (48) | (30) | (29) | (30) | - | - | (482) |
| Asset Incentive | 14 | 12 | 14 | 12 | 11 | 11 | 11 | 10 | 8 | 9 | 10 | 15 | 112 | 137 | 8 | 10 | 10 | 9 | 10 | 9 | 8 | 5 | 4 | 4 | - | - | 79 |
| **Total Risk Ajusted Revenue** | **448** | **410** | **439** | **378** | **355** | **405** | **387** | **345** | **371** | **334** | **338** | **426** | **3,871** | **4,635** | **644** | **365** | **374** | **401** | **429** | **482** | **438** | **475** | **405** | **406** | **-** | **-** | **4,417** |
| **Total Risk Ajusted Revenue 2022** | | | | | | | | | | | | | | | **448** | **410** | **439** | **378** | **355** | **405** | **387** | **345** | **371** | **334** | **338** | **426** | **3,871** |
| **2023 O/(U) than 2022 ($)** | | | | | | | | | | | | | | | **196** | **(45)** | **(66)** | **23** | **73** | **77** | **50** | **130** | **34** | **72** | **-** | **-** | **546** |
| **2023 O/(U) than 2022 (%)** | | | | | | | | | | | | | | | **44%** | **-11%** | **-15%** | **6%** | **21%** | **19%** | **13%** | **38%** | **9%** | **22%** | | | **14%** |

**App. 0288**

**October 2023 Banker Scorecard** JPM

**Joshua Biering**

**Revenue by Month ($K)**

(Sorted by "YTD-2023")

| | | | 2022 | | | | | | | | | | | | 2023 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Client Sort | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD-2022 | YTD-2023 | %O/(U) |
| **Existing Book** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | 0.0 | 0.0 | - | - | - | 0.2 | 100% |
| [REDACTED] | [REDACTED] | 2 | 1.9 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | - | - | 2.2 | 0.2 | -90% |
| [REDACTED] | [REDACTED] | 3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | 0.2 | - | - | - | 0.2 | 100% |
| [REDACTED] | [REDACTED] | 4 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.2 | 0.2 | 0.1 | - | - | - | 0.4 | 100% |
| [REDACTED] | [REDACTED] | 5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | - | - | - | 1.4 | 100% |
| [REDACTED] | [REDACTED] | 6 | - | - | - | - | - | - | - | - | - | - | - | - | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.4 | 0.2 | 0.2 | 0.2 | 0.2 | - | - | - | 2.4 | 100% |
| [REDACTED] | [REDACTED] | 7 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | 0.9 | 1.5 | - | - | - | 2.5 | 100% |
| [REDACTED] | [REDACTED] | 8 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.5 | 1.9 | 1.1 | - | - | - | 3.4 | 100% |
| [REDACTED] | [REDACTED] | 9 | 2.0 | 2.1 | 1.7 | 1.5 | 1.3 | 1.0 | 0.9 | 1.5 | 1.1 | 1.0 | 1.1 | 1.1 | 1.6 | 0.7 | 0.5 | 0.6 | 0.8 | 0.8 | 0.7 | 0.8 | 0.8 | 0.6 | - | - | 14.1 | 7.9 | -44% |
| [REDACTED] | [REDACTED] | 10 | - | - | - | - | - | - | - | - | - | 0.1 | 0.2 | 0.1 | 0.2 | 0.1 | 0.1 | 0.2 | 0.8 | 4.4 | 1.6 | 1.0 | 1.1 | 0.7 | - | - | 0.1 | 10.2 | 18616% |
| [REDACTED] | [REDACTED] | 11 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 | 0.7 | 0.7 | 0.7 | 0.5 | 0.3 | 0.3 | 0.3 | 1.0 | 1.0 | 1.8 | 1.2 | 1.5 | 1.2 | 1.1 | 1.0 | - | - | 3.0 | 10.3 | 242% |
| [REDACTED] | [REDACTED] | 12 | 14.5 | 10.4 | 10.6 | 11.2 | 8.1 | 3.9 | 2.2 | 2.3 | 2.1 | 1.4 | 1.7 | 1.5 | 1.5 | 1.5 | 1.2 | 1.3 | 1.0 | 1.2 | 1.2 | 1.5 | 1.3 | 1.1 | - | - | 66.7 | 12.8 | -81% |
| [REDACTED] | [REDACTED] | 13 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.2 | 0.6 | 1.4 | 13.7 | - | - | - | 15.8 | 100% |
| [REDACTED] | [REDACTED] | 14 | 1.5 | 1.3 | 1.4 | 1.6 | 1.6 | 1.7 | 1.6 | 1.8 | 1.6 | 1.5 | 1.7 | 1.7 | 1.7 | 1.8 | 1.7 | 1.8 | 1.8 | 1.7 | 1.9 | 1.9 | 1.8 | 1.7 | - | - | 15.6 | 17.7 | 13% |
| [REDACTED] | [REDACTED] | 15 | 3.2 | 2.8 | 2.9 | 2.9 | 2.9 | 2.9 | 2.5 | 2.8 | 2.5 | 2.3 | 2.6 | 2.7 | 2.6 | 2.7 | 2.6 | 2.7 | 2.8 | 2.7 | 2.9 | 2.9 | 2.8 | 2.6 | - | - | 27.5 | 27.3 | -1% |
| [REDACTED] | [REDACTED] | 16 | 2.3 | 1.7 | 1.4 | 1.8 | 2.0 | 2.4 | 2.2 | 2.3 | 2.6 | 3.1 | 2.9 | 3.1 | 2.7 | 3.6 | 3.1 | 2.7 | 2.5 | 2.4 | 3.5 | 3.5 | 3.5 | 3.4 | - | - | 21.7 | 30.9 | 42% |
| [REDACTED] | [REDACTED] | 17 | 3.4 | 3.8 | 6.4 | 2.7 | 2.5 | 2.7 | 2.4 | 2.8 | 2.6 | 2.2 | 2.6 | 2.7 | 2.5 | 4.3 | 3.4 | 3.1 | 3.0 | 2.8 | 3.2 | 3.0 | 2.9 | 3.0 | - | - | 31.5 | 31.0 | -1% |
| [REDACTED] | [REDACTED] | 18 | 5.3 | 3.8 | 5.0 | 4.9 | 4.0 | 4.1 | 4.3 | 4.8 | 3.8 | 3.3 | 3.3 | 3.5 | 4.5 | 3.7 | 3.4 | 3.3 | 3.2 | 3.6 | 3.5 | 3.9 | 3.5 | 3.0 | - | - | 43.4 | 35.7 | -18% |
| [REDACTED] | [REDACTED] | 19 | 3.7 | 3.3 | 3.6 | 3.6 | 3.5 | 3.4 | 3.4 | 3.3 | 3.0 | 3.1 | 3.8 | 3.5 | 3.5 | 3.4 | 3.4 | 3.4 | 3.4 | 3.5 | 3.6 | 3.7 | 4.4 | 3.7 | - | - | 33.7 | 35.8 | 6% |
| [REDACTED] | [REDACTED] | 20 | 4.4 | 4.0 | 4.1 | 4.3 | 4.1 | 3.8 | 3.5 | 3.8 | 3.7 | 3.3 | 3.6 | 3.7 | 3.8 | 3.7 | 3.5 | 3.6 | 3.7 | 3.8 | 4.0 | 3.9 | 3.6 | 3.4 | - | - | 39.0 | 37.0 | -5% |
| [REDACTED] | [REDACTED] | 21 | 4.6 | 4.0 | 3.9 | 3.9 | 3.5 | 3.6 | 3.4 | 3.6 | 3.6 | 3.5 | 3.6 | 3.8 | 4.0 | 3.8 | 4.0 | 3.9 | 3.7 | 3.3 | 3.4 | 3.8 | 3.6 | 3.6 | - | - | 37.7 | 37.0 | -2% |
| [REDACTED] | [REDACTED] | 22 | 4.0 | 11.8 | 3.4 | 3.2 | 3.2 | 3.3 | 8.2 | 3.6 | 3.4 | 3.8 | 4.2 | 3.3 | 3.0 | 4.5 | 3.8 | 4.0 | 5.7 | 4.6 | 4.8 | 4.4 | 4.4 | 4.0 | - | - | 47.9 | 43.1 | -10% |
| [REDACTED] | [REDACTED] | 23 | 2.7 | 2.4 | 2.4 | 2.6 | 2.2 | 2.2 | 2.5 | 2.9 | 3.3 | 3.0 | 3.3 | 3.4 | 3.3 | 3.3 | 3.2 | 3.3 | 8.5 | 3.5 | 2.4 | 9.5 | 3.3 | 2.9 | - | - | 26.3 | 43.2 | 64% |
| [REDACTED] | [REDACTED] | 24 | 3.1 | 2.7 | 4.1 | 5.6 | 4.9 | 5.7 | 5.6 | 5.3 | 6.4 | 5.3 | 4.7 | 5.7 | 4.7 | 5.0 | 5.9 | 4.9 | 5.1 | 6.0 | 5.2 | 5.3 | 6.0 | 4.8 | - | - | 48.8 | 52.9 | 8% |
| [REDACTED] | [REDACTED] | 25 | 7.3 | 6.3 | 6.0 | 6.5 | 5.5 | 5.5 | 6.1 | 9.6 | 8.0 | 6.6 | 5.4 | 5.4 | 6.4 | 4.9 | 5.3 | 5.1 | 5.3 | 5.1 | 5.1 | 5.5 | 5.1 | 5.2 | - | - | 67.5 | 53.0 | -21% |
| [REDACTED] | [REDACTED] | 26 | 1.7 | 3.1 | 3.3 | 3.5 | 2.9 | 3.5 | 2.4 | 1.9 | 2.0 | 2.4 | 2.7 | 3.7 | 32.2 | 2.0 | 1.8 | 2.4 | 2.4 | 2.6 | 3.7 | 4.1 | 3.9 | 3.8 | - | - | 26.8 | 59.0 | 120% |
| [REDACTED] | [REDACTED] | 27 | 4.9 | 4.1 | 4.6 | 4.4 | 4.7 | 4.6 | 8.1 | 6.9 | 5.8 | 6.3 | 5.5 | 5.5 | 7.2 | 6.6 | 7.9 | 8.5 | 8.6 | 7.7 | 8.1 | 8.1 | 6.1 | 5.3 | - | - | 54.3 | 74.0 | 36% |
| [REDACTED] | [REDACTED] | 28 | 12.1 | 10.8 | 11.7 | 11.1 | 9.5 | 8.7 | 8.5 | 9.4 | 8.6 | 9.0 | 8.3 | 8.7 | 7.8 | 6.4 | 6.3 | 6.3 | 7.4 | 7.5 | 7.7 | 8.0 | 9.6 | 10.4 | - | - | 99.5 | 77.4 | -22% |

**App. 0289**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | 29 | 7.4 | 6.7 | 6.9 | 7.1 | 6.2 | 6.7 | 6.1 | 7.3 | 6.7 | 6.1 | 7.3 | 7.8 | 7.4 | 7.9 | 7.8 | 8.5 | 8.6 | 7.9 | 7.0 | 8.0 | 7.6 | 7.7 | - | | | | |
| [REDACTED] | [REDACTED] | 30 | 9.0 | 8.2 | 8.6 | 8.6 | 7.9 | 8.2 | 7.8 | 8.6 | 8.0 | 7.4 | 8.1 | 8.4 | 8.4 | 8.7 | 8.6 | 8.6 | 8.7 | 8.5 | 8.9 | 8.8 | 8.6 | 8.1 | - | - | 82.3 | 85.8 | 4% |
| [REDACTED] | [REDACTED] | 31 | 9.3 | 8.8 | 8.8 | 8.9 | 8.2 | 8.6 | 8.2 | 9.0 | 8.4 | 7.5 | 8.5 | 8.6 | 8.4 | 8.7 | 8.2 | 8.4 | 8.8 | 9.0 | 9.7 | 9.3 | 9.1 | 8.7 | - | - | 85.6 | 88.4 | 3% |
| [REDACTED] | [REDACTED] | 32 | - | - | - | - | - | - | - | - | - | 0.2 | 0.2 | 1.6 | 3.5 | 23.2 | 3.4 | 3.6 | 4.0 | 5.9 | 12.4 | 11.7 | 11.1 | 11.2 | - | - | 0.2 | 90.1 | 44095% |
| [REDACTED] | [REDACTED] | 33 | 7.7 | 6.5 | 6.4 | 6.3 | 7.3 | 7.3 | 7.2 | 7.4 | 12.1 | 18.2 | 7.2 | 7.8 | 7.3 | 7.2 | 7.0 | 12.0 | 7.0 | 9.2 | 9.9 | 13.9 | 9.4 | 10.0 | - | - | 86.2 | 92.9 | 8% |
| [REDACTED] | [REDACTED] | 34 | 21.1 | 11.0 | 10.5 | 10.8 | 9.1 | 15.9 | 9.5 | 11.1 | 11.1 | 8.8 | 10.3 | 9.8 | 8.8 | 9.2 | 8.8 | 9.2 | 10.3 | 9.1 | 9.2 | 15.4 | 10.8 | 8.4 | - | - | 119.0 | 99.2 | -17% |
| [REDACTED] | [REDACTED] | 35 | 4.5 | 11.8 | 6.2 | 5.7 | 6.3 | 6.5 | 8.5 | 7.9 | 6.5 | 7.4 | 8.6 | 11.9 | 22.9 | 7.9 | 15.5 | 9.1 | 8.8 | 9.6 | 14.3 | 10.1 | 10.7 | 9.5 | - | - | 71.3 | 118.3 | 66% |
| [REDACTED] | [REDACTED] | 36 | 6.9 | 9.3 | 9.7 | 9.8 | 14.3 | 11.8 | 11.1 | 12.1 | 10.9 | 11.1 | 10.9 | 11.3 | 11.0 | 11.9 | 12.6 | 12.0 | 12.0 | 12.3 | 13.2 | 13.2 | 11.8 | 11.3 | - | - | 106.9 | 121.4 | 14% |
| [REDACTED] | [REDACTED] | 37 | 14.1 | 13.3 | 13.0 | 13.5 | 11.7 | 12.7 | 11.6 | 13.1 | 11.7 | 10.7 | 12.1 | 13.1 | 11.8 | 12.9 | 11.8 | 12.2 | 12.5 | 12.2 | 12.8 | 13.0 | 12.4 | 12.1 | - | - | 125.4 | 123.7 | -1% |
| [REDACTED] | [REDACTED] | 38 | 23.7 | 20.4 | 22.0 | 16.9 | 13.4 | 13.9 | 12.6 | 14.6 | 12.9 | 10.9 | 12.5 | 12.2 | 11.6 | 12.0 | 12.5 | 10.9 | 12.4 | 12.2 | 13.5 | 13.6 | 12.4 | 13.1 | - | - | 161.3 | 124.1 | -23% |
| [REDACTED] | [REDACTED] | 39 | 11.4 | 11.2 | 10.8 | 11.0 | 10.5 | 10.5 | 9.9 | 10.7 | 11.7 | 9.3 | 9.6 | 60.0 | 13.0 | 12.6 | 15.2 | 15.1 | 8.9 | 15.7 | 12.4 | 12.8 | 12.1 | 11.4 | - | - | 107.0 | 129.2 | 21% |
| [REDACTED] | [REDACTED] | 40 | 19.2 | 17.9 | 27.3 | 18.8 | 16.1 | 15.9 | 15.8 | 16.0 | 12.8 | 10.4 | 10.7 | 12.2 | 15.6 | 13.7 | 13.3 | 13.8 | 11.8 | 12.4 | 13.7 | 13.0 | 13.7 | 12.9 | - | - | 170.1 | 133.8 | -21% |
| [REDACTED] | [REDACTED] | 41 | 15.2 | 13.8 | 24.5 | 14.5 | 13.9 | 13.8 | 12.8 | 13.8 | 11.4 | 12.2 | 13.3 | 13.8 | 12.0 | 14.2 | 13.7 | 13.8 | 14.0 | 13.6 | 14.4 | 14.6 | 13.7 | 13.3 | - | - | 145.8 | 137.3 | -6% |
| [REDACTED] | [REDACTED] | 42 | 15.7 | 15.0 | 15.2 | 15.5 | 14.6 | 14.6 | 13.9 | 14.3 | 13.6 | 14.6 | 19.1 | 14.9 | 13.7 | 15.6 | 15.1 | 17.3 | 18.0 | 17.4 | 17.4 | 19.4 | 17.3 | 16.6 | - | - | 147.0 | 167.9 | 14% |
| [REDACTED] | [REDACTED] | 43 | 16.5 | 25.5 | 15.6 | 15.7 | 13.7 | 25.2 | 13.7 | 15.0 | 12.5 | 12.8 | 13.9 | 14.5 | 13.5 | 14.1 | 13.5 | 14.0 | 28.9 | 14.1 | 15.0 | 15.1 | 28.2 | 16.1 | - | - | 166.3 | 172.6 | 4% |
| [REDACTED] | [REDACTED] | 44 | 23.8 | 16.2 | 26.1 | 16.4 | 8.2 | 21.6 | 20.9 | 9.7 | 9.0 | 14.6 | 8.9 | 9.3 | 8.9 | 16.6 | 18.2 | 17.3 | 19.5 | 16.2 | 17.9 | 29.7 | 19.6 | 18.2 | - | - | 166.4 | 182.0 | 9% |
| [REDACTED] | [REDACTED] | 45 | 22.9 | 19.6 | 4.7 | 17.3 | 21.3 | 19.4 | 26.2 | 20.1 | 18.7 | 11.4 | 20.0 | 19.0 | 21.7 | 20.9 | 15.1 | 17.2 | 18.6 | 20.4 | 14.6 | 19.2 | 18.6 | 18.2 | - | - | 181.6 | 184.6 | 2% |
| [REDACTED] | [REDACTED] | 46 | 12.7 | 10.8 | 26.4 | 11.7 | 12.5 | 12.2 | 23.9 | 11.0 | 10.6 | 9.8 | 10.9 | 11.6 | 13.5 | 10.7 | 11.5 | 22.6 | 13.4 | 13.2 | 25.8 | 52.7 | 13.7 | 13.5 | - | - | 141.6 | 190.4 | 34% |
| [REDACTED] | [REDACTED] | 47 | 16.0 | 12.5 | 25.6 | 13.1 | 19.6 | 22.5 | 29.6 | 14.1 | 28.7 | 12.2 | 12.6 | 18.9 | 12.0 | 10.8 | 11.5 | 14.8 | 26.4 | 27.6 | 41.3 | 17.4 | 12.0 | 16.6 | - | - | 193.9 | 190.6 | -2% |
| [REDACTED] | [REDACTED] | 48 | 41.6 | 46.9 | 16.0 | 15.3 | 16.7 | 13.6 | 13.4 | 14.2 | 14.5 | 12.1 | 13.9 | 15.5 | 15.7 | 15.0 | 15.2 | 15.8 | 31.1 | 14.2 | 32.5 | 16.7 | 16.8 | 23.8 | - | - | 204.4 | 196.8 | -4% |
| [REDACTED] | [REDACTED] | 49 | 36.5 | 17.8 | 19.1 | 38.3 | 29.0 | 50.4 | 23.5 | 22.7 | 42.8 | 33.2 | 22.9 | 35.8 | 23.3 | 18.9 | 41.2 | 50.1 | 39.8 | 22.5 | 23.2 | 33.6 | 23.6 | 24.4 | - | - | 313.3 | 300.7 | -4% |
| [REDACTED] | [REDACTED] | 50 | 29.6 | 27.8 | 58.9 | 27.2 | 28.5 | 30.2 | 33.3 | 22.9 | 31.3 | 31.1 | 35.2 | 44.4 | 286.4 | 29.2 | 31.5 | 31.7 | 33.4 | 130.2 | 30.4 | 36.4 | 38.1 | 39.3 | - | - | 320.9 | 686.4 | 114% |
| | | **Total** | 447.5 | 409.6 | 439.1 | 378.0 | 355.3 | 404.7 | 387.5 | 345.1 | 370.6 | 333.5 | 338.0 | 425.9 | 644.0 | 364.5 | 373.5 | 400.8 | 428.6 | 482.0 | 437.7 | 475.3 | 404.9 | 406.0 | - | - | 3,870.9 | 4,417.3 | 14% |
| | | **Grand Total** | 447.5 | 409.6 | 439.1 | 378.0 | 355.3 | 404.7 | 387.5 | 345.1 | 370.6 | 333.5 | 338.0 | 425.9 | 644.0 | 364.5 | 373.5 | 400.8 | 428.6 | 482.0 | 437.7 | 475.3 | 404.9 | 406.0 | - | - | 3,870.9 | 4,417.3 | 14% |

**App. 0290**

**October 2023 Banker Scorecard**

**Joshua Biering**

**Revenue by Product CYTD ($K)**

(Sorted by "Total Revenue")

| | | Annuity | | | | | | Brokerage Transactional | | | | | | | | | | | Placement Fees | | | | Credit | | | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | IM | CDI | HF | PE | Other | GAP | EQ Trding | EQ Syn | EQ Deriv | FI | FI EM Mrkts | FI Synd | FX | FXCR Struct /Der | Global Access | Other | IM Trans | PE | HF | GAP | Total Investm | Mortg | Lending | Deposits | T&E | Custody /Other | Total Revenue | Risk & Cap Charge | Total Risk Adj Rev |
| **Existing Book** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 99 | 2 | 8 | 7 | - | 3 | 0 | - | 356 | - | - | - | - | - | - | - | - | - | - | - | 474 | 120 | 228 | 8 | - | 4 | 834 | (147) | 686 |
| [REDACTED] | [REDACTED] | 96 | 4 | 5 | 43 | - | 6 | - | - | - | 0 | - | - | - | - | - | - | - | 67 | - | - | 222 | - | 72 | 32 | - | - | 326 | (25) | 301 |
| [REDACTED] | [REDACTED] | 47 | 3 | 3 | 13 | - | 0 | - | - | - | - | - | - | - | - | - | - | - | 61 | - | - | 127 | 8 | 64 | 34 | - | - | 233 | (42) | 190 |
| [REDACTED] | [REDACTED] | 76 | 0 | 4 | 8 | - | 0 | 0 | - | 3 | 0 | - | - | - | - | - | - | - | 2 | - | - | 94 | 16 | 88 | 4 | - | - | 202 | (20) | 182 |
| [REDACTED] | [REDACTED] | 70 | 4 | 23 | - | 1 | - | 10 | - | - | - | - | - | - | - | - | - | - | - | 8 | - | 115 | 7 | 14 | 39 | 25 | - | 201 | (4) | 197 |
| [REDACTED] | [REDACTED] | 40 | 3 | 20 | 38 | - | 9 | - | - | - | - | - | - | 0 | - | - | - | - | 57 | 15 | - | 181 | - | - | 9 | - | - | 191 | - | 191 |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - | 0 | 184 | - | 185 | - | 185 |
| [REDACTED] | [REDACTED] | 70 | 2 | 2 | 10 | - | 3 | 0 | - | 14 | - | - | - | - | - | - | - | - | 15 | - | - | 115 | 18 | 0 | 8 | 32 | - | 173 | (0) | 173 |
| [REDACTED] | [REDACTED] | 37 | 4 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 41 | - | - | 23 | 104 | - | 168 | - | 168 |
| [REDACTED] | [REDACTED] | 76 | 0 | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 79 | 21 | 31 | 4 | 16 | - | 150 | (13) | 137 |
| [REDACTED] | [REDACTED] | 45 | 2 | 2 | 3 | - | 0 | 2 | - | 14 | - | - | - | - | - | - | - | - | 7 | 4 | - | 80 | 8 | 37 | 14 | - | - | 140 | (22) | 118 |
| [REDACTED] | [REDACTED] | 67 | 5 | 1 | - | - | - | 1 | - | 2 | 3 | - | - | - | - | - | - | - | - | - | - | 80 | 6 | - | 48 | - | - | 134 | - | 134 |
| [REDACTED] | [REDACTED] | 16 | 5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 22 | 26 | 81 | 3 | - | - | 132 | (42) | 90 |
| [REDACTED] | [REDACTED] | 91 | 17 | 8 | 4 | - | 3 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | 122 | 1 | - | 6 | - | - | 129 | - | 129 |
| [REDACTED] | [REDACTED] | 92 | 2 | - | - | - | - | 1 | - | - | - | - | - | 0 | - | - | - | - | - | - | - | 95 | 4 | 8 | 17 | - | - | 125 | (1) | 124 |
| [REDACTED] | [REDACTED] | 64 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 65 | - | - | 2 | 57 | - | 124 | - | 124 |
| [REDACTED] | [REDACTED] | 60 | 2 | - | - | - | 2 | 0 | - | - | - | - | - | 0 | - | - | - | - | - | - | - | 64 | 25 | 9 | 24 | - | - | 123 | (2) | 121 |
| [REDACTED] | [REDACTED] | 44 | 0 | 1 | 2 | - | 3 | 0 | - | 0 | 1 | - | - | - | - | - | - | - | 9 | - | - | 61 | 5 | 27 | 7 | - | - | 101 | (8) | 93 |
| [REDACTED] | [REDACTED] | 63 | 1 | 4 | 11 | - | 2 | 0 | - | 2 | 0 | - | - | - | - | - | - | - | 7 | - | - | 91 | 4 | 0 | 4 | - | - | 99 | (0) | 99 |
| [REDACTED] | [REDACTED] | 24 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 25 | - | 27 | 38 | - | - | 90 | (16) | 74 |
| [REDACTED] | [REDACTED] | 75 | 6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 82 | - | - | 7 | - | - | 88 | - | 88 |
| [REDACTED] | [REDACTED] | 54 | 1 | - | - | - | 3 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 57 | 11 | 1 | 16 | - | - | 86 | (0) | 86 |
| [REDACTED] | [REDACTED] | 59 | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 59 | 5 | 11 | 4 | - | - | 80 | (1) | 78 |
| [REDACTED] | [REDACTED] | 34 | 6 | - | - | - | 1 | - | - | - | - | - | - | 1 | - | - | - | - | - | - | - | 41 | 3 | 8 | 27 | - | - | 78 | (1) | 77 |
| [REDACTED] | [REDACTED] | 12 | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 14 | 8 | 52 | 3 | - | - | 76 | (23) | 53 |
| [REDACTED] | [REDACTED] | 18 | 0 | - | - | - | - | - | - | 29 | - | - | - | - | - | - | - | - | - | - | - | 48 | 2 | 20 | 2 | - | - | 72 | (13) | 59 |
| [REDACTED] | [REDACTED] | 27 | 9 | - | - | - | - | 0 | - | 3 | - | 0 | - | - | - | - | - | - | - | - | - | 39 | 7 | - | 6 | - | - | 53 | - | 53 |
| [REDACTED] | [REDACTED] | 15 | 0 | 1 | - | - | 0 | 0 | - | - | - | - | - | - | - | - | - | - | 6 | 5 | - | 28 | 8 | 5 | 4 | - | - | 44 | (1) | 43 |
| [REDACTED] | [REDACTED] | 8 | 0 | - | - | - | - | 1 | - | - | 0 | - | - | 0 | - | - | - | - | - | - | - | 9 | 10 | 18 | 7 | - | - | 43 | (12) | 31 |
| [REDACTED] | [REDACTED] | 30 | 0 | 2 | 3 | - | 2 | - | - | - | - | - | - | - | - | - | - | - | 1 | - | - | 38 | 1 | - | 4 | - | - | 43 | - | 43 |
| [REDACTED] | [REDACTED] | 11 | 1 | - | - | - | - | 0 | - | - | 1 | - | - | - | - | - | - | - | - | - | - | 13 | 12 | 12 | 4 | - | - | 42 | (6) | 36 |
| [REDACTED] | [REDACTED] | 16 | 1 | 1 | - | - | 3 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 20 | - | 10 | 7 | - | - | 38 | (2) | 36 |

**App. 0291**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | 26 | 1 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 26 | - | - | 11 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [REDACTED] | [REDACTED] | 32 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 32 | - | - | 5 | - | - | 37 | - | 37 |
| [REDACTED] | [REDACTED] | 25 | 0 | 1 | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 26 | 0 | - | 5 | - | - | 31 | - | 31 |
| [REDACTED] | [REDACTED] | 20 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20 | - | 7 | 1 | - | - | 28 | (1) | 27 |
| [REDACTED] | [REDACTED] | 13 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 13 | - | 5 | 0 | - | - | 18 | (0) | 18 |
| [REDACTED] | [REDACTED] | - | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12 | - | - | 14 | - | - | 2 | - | - | 16 | - | 16 |
| [REDACTED] | [REDACTED] | 11 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12 | - | - | 1 | - | - | 13 | - | 13 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 1 | - | 9 | - | - | 10 | - | 10 |
| [REDACTED] | [REDACTED] | 2 | 1 | 0 | - | - | - | 1 | - | - | - | - | - | - | - | - | - | - | - | 4 | - | 8 | - | - | 2 | - | - | 10 | - | 10 |
| [REDACTED] | [REDACTED] | - | 2 | 0 | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2 | - | - | 6 | - | - | 8 | - | 8 |
| [REDACTED] | [REDACTED] | 3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3 | - | - | (0) | - | - | 3 | - | 3 |
| [REDACTED] | [REDACTED] | 1 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - | - | 2 | - | - | 3 | - | 3 |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 1 | - | 1 | - | - | 2 | - | 2 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - | - | 1 | - | - | 1 | - | 1 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 0 | - | - | 0 | - | 0 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 0 | - | - | 0 | - | 0 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 0 | - | - | 0 | - | 0 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 0 | - | - | 0 | - | 0 |
| | **Total** | 1,668 | 92 | 88 | 142 | 1 | 40 | 19 | - | 424 | 5 | 0 | - | 1 | - | - | - | - | 245 | 36 | - | 2,761 | 339 | 837 | 462 | 417 | 4 | 4,821 | (403) | 4,417 |
| | **Grand Total** | 1,668 | 92 | 88 | 142 | 1 | 40 | 19 | - | 424 | 5 | 0 | - | 1 | - | - | - | - | 245 | 36 | - | 2,761 | 339 | 837 | 462 | 417 | 4 | 4,821 | (403) | 4,417 |

App. 0292

**October 2023 Banker Scorecard**

JPMC INTERNAL U

**Joshua Biering**

**Revenue by Product Variance ($K)**

(Sorted by "Total Revenue")

| | | Annuity | | | | | | Brokerage Transactional | | | | | | | | | | | Placement Fees | | | | Credit | | | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | IM | CDI | HF | PE | Other | GAP | EQ Trding | EQ Syn | EQ Deriv. | FI | FI EM Mrkts | FI Synd | FX | FXCR Struct /Der | Global Access | Other | IM Trans. | PE | HF | GAP | Total Investm | Mortg. | Lending | Dep. | T&E | Custody/ Other | Total Revenue | Risk & Capital Charges | Total Risk Adj Revenue |
| **Existing Book** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | (11) | (1) | 0 | (1) | - | 1 | 6 | - | 356 | - | - | - | - | - | - | - | - | - | (26) | - | 324 | (0) | (9) | (0) | - | 1 | 315 | 50 | 366 |
| [REDACTED] | [REDACTED] | 16 | 5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 22 | 26 | 81 | 3 | - | - | 132 | (42) | 90 |
| [REDACTED] | [REDACTED] | 0 | 3 | 0 | 1 | - | 0 | (0) | - | - | - | - | - | - | - | - | - | - | 49 | (15) | - | 38 | (0) | 27 | (1) | - | 0 | 64 | (15) | 49 |
| [REDACTED] | [REDACTED] | 11 | 2 | 0 | 1 | - | 0 | 2 | - | 14 | - | - | - | - | - | - | - | - | 7 | (2) | - | 36 | 2 | (7) | 3 | - | - | 33 | 14 | 47 |
| [REDACTED] | [REDACTED] | 17 | (1) | 8 | 0 | - | (1) | (1) | - | - | - | - | - | - | - | - | - | - | - | - | - | 23 | 0 | - | (1) | - | - | 22 | - | 22 |
| [REDACTED] | [REDACTED] | 8 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 9 | - | 3 | 9 | - | - | 21 | (1) | 20 |
| [REDACTED] | [REDACTED] | 19 | 4 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 23 | (1) | - | 1 | (3) | 0 | 21 | - | 21 |
| [REDACTED] | [REDACTED] | - | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12 | - | - | 14 | - | - | 2 | - | - | 16 | - | 16 |
| [REDACTED] | [REDACTED] | 8 | 0 | - | - | - | - | (0) | - | 29 | - | - | - | - | - | - | - | - | - | - | - | 37 | 0 | (21) | (1) | - | (0) | 15 | 17 | 32 |
| [REDACTED] | [REDACTED] | 2 | (0) | 1 | - | - | 0 | (0) | - | - | - | - | - | - | - | - | - | - | 6 | 5 | - | 13 | - | (2) | 2 | - | - | 13 | 4 | 17 |
| [REDACTED] | [REDACTED] | (3) | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | (3) | 5 | 9 | 0 | - | 0 | 12 | (1) | 11 |
| [REDACTED] | [REDACTED] | 2 | 1 | 0 | - | - | - | 1 | - | - | - | - | - | - | - | - | - | - | - | 4 | - | 8 | - | - | 2 | - | - | 10 | - | 10 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 1 | - | 6 | - | - | 7 | - | 7 |
| [REDACTED] | [REDACTED] | (3) | 0 | (0) | (1) | - | 0 | 0 | - | 14 | - | - | - | - | - | - | - | - | 6 | (10) | - | 6 | 1 | (1) | (0) | (0) | - | 6 | 1 | 6 |
| [REDACTED] | [REDACTED] | (0) | 0 | - | - | - | - | 1 | - | - | 0 | - | - | 0 | - | - | - | - | - | - | - | 0 | 4 | (1) | 2 | - | 0 | 5 | 4 | 9 |
| [REDACTED] | [REDACTED] | 3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3 | - | - | (0) | - | - | 3 | - | 3 |
| [REDACTED] | [REDACTED] | 2 | 0 | 1 | 1 | - | (0) | 0 | - | 0 | 1 | - | - | - | - | - | - | - | (2) | (5) | - | (3) | (0) | 8 | (2) | - | - | 3 | 3 | 7 |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0) | - | 0 | 3 | - | 3 | - | 3 |
| [REDACTED] | [REDACTED] | 5 | 1 | - | - | - | - | 0 | - | (2) | (0) | 0 | - | - | - | - | - | - | - | - | - | 4 | 2 | (3) | (0) | - | 0 | 3 | 1 | 4 |
| [REDACTED] | [REDACTED] | (0) | 1 | - | - | - | - | (0) | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 2 | - | - | 3 | - | 3 |
| [REDACTED] | [REDACTED] | 1 | 1 | - | - | - | (0) | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | (0) | (2) | 5 | - | - | 3 | 1 | 3 |
| [REDACTED] | [REDACTED] | 1 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - | - | 2 | - | - | 3 | - | 3 |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | 1 | - | 1 | - | - | 2 | - | 2 |
| [REDACTED] | [REDACTED] | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | 2 | 0 | - | - | 2 | (0) | 2 |
| [REDACTED] | [REDACTED] | (1) | 0 | - | - | - | - | 0 | - | - | 1 | - | - | - | - | - | - | - | - | - | - | 1 | (0) | 1 | 1 | - | - | 2 | 0 | 2 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - | - | 1 | - | - | 1 | - | 1 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 0 | - | - | 0 | - | 0 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 0 | - | - | 0 | - | 0 |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | - | - | 0 | - | - | 0 | - | 0 |
| [REDACTED] | [REDACTED] | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - | (1) | (0) | - | - | (0) | 0 | (0) |
| [REDACTED] | [REDACTED] | (0) | 0 | 0 | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | (3) | - | (3) | 0 | - | 3 | - | - | (0) | - | (0) |
| [REDACTED] | [REDACTED] | (1) | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | (1) | - | - | (0) | - | - | (1) | - | (1) |

CX7-11

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | (0) | 0 | - | (2) | - | - | (0) | - | - | - | - | - | - | - | - | - | - | - | - | - | (2) | - | - | 0 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [REDACTED] | [REDACTED] | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0 | (2) | - | (0) | - | - | (2) | - | (2) |
| [REDACTED] | [REDACTED] | (3) | 0 | - | - | - | - | (0) | - | - | - | - | - | - | - | - | - | - | - | - | - | (3) | - | - | 1 | - | 0 | (2) | - | (2) |
| [REDACTED] | [REDACTED] | 5 | 3 | (6) | (10) | - | 1 | - | - | - | - | - | - | 0 | - | - | - | - | 12 | 5 | - | 9 | - | - | (12) | - | - | (3) | - | (3) |
| [REDACTED] | [REDACTED] | 1 | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3 | 6 | 10 | (22) | - | (2) | (5) | (10) | (14) |
| [REDACTED] | [REDACTED] | 7 | 0 | (0) | (1) | - | 0 | (0) | - | - | - | - | - | (0) | - | - | - | - | (4) | (8) | - | (6) | (0) | - | 1 | - | - | (5) | - | (5) |
| [REDACTED] | [REDACTED] | - | 2 | 0 | - | - | 0 | - | - | - | - | - | - | - | - | - | - | - | - | (1) | - | 1 | - | - | (7) | - | - | (6) | - | (6) |
| [REDACTED] | [REDACTED] | (4) | (0) | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (10) | - | (14) | (0) | 3 | (0) | 2 | - | (10) | 1 | (9) |
| [REDACTED] | [REDACTED] | (6) | 4 | 3 | - | 0 | - | 8 | - | - | - | - | - | (0) | - | - | - | - | - | (48) | - | (39) | 5 | (12) | 9 | 22 | - | (15) | 7 | (8) |
| [REDACTED] | [REDACTED] | 9 | (0) | 0 | 2 | - | 0 | (0) | - | (1) | 0 | - | - | (0) | - | - | - | - | (29) | (20) | - | (39) | 3 | 17 | (1) | - | - | (21) | 36 | 16 |
| [REDACTED] | [REDACTED] | 3 | 0 | - | - | - | (1) | 0 | - | - | - | - | - | 0 | - | - | - | - | - | - | - | 2 | 10 | (41) | 7 | - | 0 | (21) | 36 | 14 |
| [REDACTED] | [REDACTED] | 1 | 6 | - | - | - | (0) | - | - | - | - | - | - | (0) | - | - | - | - | - | - | - | 6 | (1) | (1) | (28) | - | - | (23) | 1 | (22) |
| [REDACTED] | [REDACTED] | (11) | 1 | (1) | (1) | - | (0) | (0) | - | 0 | 0 | - | - | - | - | - | - | - | 2 | (10) | - | (20) | - | (13) | 1 | - | - | (32) | 12 | (20) |
| [REDACTED] | [REDACTED] | 11 | 1 | 0 | 10 | - | (0) | (0) | - | - | 0 | - | - | - | - | - | - | - | 0 | (17) | - | 5 | - | (21) | (17) | - | - | (33) | 20 | (13) |
| [REDACTED] | [REDACTED] | (2) | 1 | (1) | - | - | (1) | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | (3) | (5) | (25) | (2) | - | - | (34) | 27 | (8) |
| [REDACTED] | [REDACTED] | (5) | 3 | 0 | - | - | - | (1) | - | (3) | 1 | - | - | - | - | - | - | - | - | (4) | - | (9) | (0) | - | (27) | - | - | (36) | - | (36) |
| [REDACTED] | [REDACTED] | 2 | 1 | - | - | - | - | 1 | - | - | - | - | - | 0 | - | - | - | - | - | - | - | 4 | (2) | (15) | (32) | - | - | (45) | 8 | (37) |
| [REDACTED] | [REDACTED] | (51) | (2) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (53) | - | (24) | (1) | - | - | (78) | 24 | (54) |
| **Total** | | 33 | 39 | 6 | (1) | 0 | (1) | 17 | - | 409 | 2 | 0 | - | (1) | - | - | - | - | 59 | (164) | - | 400 | 53 | (38) | (91) | 24 | (1) | 347 | 199 | 546 |
| **Grand Total** | | 33 | 39 | 6 | (1) | 0 | (1) | 17 | - | 409 | 2 | 0 | - | (1) | - | - | - | - | 59 | (164) | - | 400 | 53 | (38) | (91) | 24 | (1) | 347 | 199 | 546 |

October 2023
Banker
Joshua Biering

**Assets ($MM)**
(Sorted by "Current Month Total Assets")

| | | | Current Month Assets | | | | | | | | | December-2022 Assets | | | | | | | | | Variances vs Dec-2022 O/(U) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Client Sort | AUM | Brkrg | Dep | Cust. | T&E Non Mgd | Oth | Lending | Mortg | Total Assets | AUM | Brokrg | Dep | Cust | T&E Non Mgd | Oth | Lending | Mortg | Total Assets | AUM | Brokrg | Dep | Cust | T&E Non Mgd | Oth | Lending | Mortg | Total Assets |
| **Existing Book** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 1 | 0 | - | 0 | - | - | - | - | - | 0 | 0 | - | 0 | - | - | - | - | - | 0 | 0 | - | 0 | - | - | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 2 | 0 | - | 0 | - | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - | 0 | - | 0 | - | - | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 3 | 1 | - | 0 | - | - | - | - | - | 1 | - | - | - | - | - | - | - | - | - | 1 | - | 0 | - | - | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 4 | 0 | 0 | 0 | - | - | - | - | 1 | 1 | - | - | - | - | - | - | - | - | - | 0 | 0 | 0 | - | - | - | - | 1 | 1 |
| [REDACTED] | [REDACTED] | 5 | - | 0 | 1 | - | - | - | - | - | 1 | - | - | - | - | - | - | - | - | - | - | 0 | 1 | - | - | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 6 | 1 | - | - | - | - | - | - | - | 1 | - | - | - | - | - | - | - | - | - | 1 | - | - | - | - | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 7 | 0 | 0 | 1 | - | - | - | - | - | 1 | - | - | - | - | - | - | - | - | - | 0 | 0 | 1 | - | - | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 8 | 2 | 0 | 0 | - | - | - | - | - | 2 | 4 | 0 | 0 | - | - | - | - | - | 4 | (3) | (0) | 0 | - | - | - | - | - | (3) |
| [REDACTED] | [REDACTED] | 9 | 2 | - | - | - | - | - | 0 | - | 2 | 2 | - | - | - | - | - | 0 | - | 2 | (0) | - | - | - | - | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 10 | 2 | 0 | 0 | - | - | - | - | - | 2 | 0 | - | 0 | - | - | - | - | - | 0 | 1 | 0 | 0 | - | - | - | - | - | 2 |
| [REDACTED] | [REDACTED] | 11 | 2 | 0 | 0 | - | - | - | - | - | 2 | - | - | - | - | - | - | - | - | - | 2 | 0 | 0 | - | - | - | - | - | 2 |
| [REDACTED] | [REDACTED] | 12 | 0 | 1 | 1 | - | - | - | - | 0 | 3 | - | 0 | 0 | - | - | - | - | - | 0 | 0 | 1 | 1 | - | - | - | - | 0 | 2 |
| [REDACTED] | [REDACTED] | 13 | 1 | 1 | 1 | 0 | - | - | - | - | 3 | 0 | 2 | 1 | 0 | - | - | - | - | 3 | 1 | (1) | (0) | 0 | - | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 14 | 3 | - | 0 | - | - | - | 0 | - | 4 | 3 | - | 0 | - | - | - | 0 | - | 4 | 0 | - | (0) | - | - | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 15 | 4 | 0 | 0 | - | - | - | - | 1 | 5 | 2 | 0 | 0 | - | - | - | 1 | 1 | 4 | 1 | 0 | (0) | - | - | - | (1) | - | 1 |
| [REDACTED] | [REDACTED] | 16 | 4 | 1 | 0 | - | - | - | 1 | - | 5 | 3 | 1 | 1 | - | - | - | 1 | - | 6 | 0 | (0) | (1) | - | - | - | - | - | (1) |
| [REDACTED] | [REDACTED] | 17 | 2 | 0 | 2 | 0 | - | - | 1 | - | 6 | 5 | 1 | 2 | 0 | - | - | 1 | - | 9 | (3) | (1) | 0 | - | - | - | 0 | - | (3) |
| [REDACTED] | [REDACTED] | 18 | 3 | 1 | 0 | - | - | - | 1 | 1 | 6 | 2 | 2 | 0 | - | - | - | 1 | 1 | 7 | 1 | (1) | (0) | - | - | - | 0 | (0) | (0) |
| [REDACTED] | [REDACTED] | 19 | 4 | 1 | 0 | - | - | - | - | 1 | 7 | 4 | 1 | 0 | - | - | - | - | - | 5 | (0) | 0 | 0 | - | - | - | - | 1 | 2 |
| [REDACTED] | [REDACTED] | 20 | 4 | 2 | 1 | - | - | - | - | - | 7 | 4 | 2 | 1 | - | - | - | - | - | 7 | (0) | 0 | (0) | - | - | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 21 | 6 | 1 | 0 | - | - | - | - | - | 7 | 6 | 1 | 0 | - | - | - | - | - | 8 | (0) | (0) | (0) | - | - | - | - | - | (1) |
| [REDACTED] | [REDACTED] | 22 | 4 | 1 | 0 | - | - | - | 2 | 2 | 9 | 2 | 3 | 0 | - | - | - | 3 | 2 | 11 | 2 | (3) | 0 | - | - | - | (1) | (0) | (2) |
| [REDACTED] | [REDACTED] | 23 | 4 | 5 | 0 | - | - | - | 1 | 1 | 11 | 2 | 5 | 0 | - | - | - | 1 | 1 | 10 | 2 | (1) | 0 | - | - | - | (0) | (0) | 1 |
| [REDACTED] | [REDACTED] | 24 | 9 | 3 | 1 | - | - | - | - | - | 13 | - | - | - | - | - | - | - | - | - | 9 | 3 | 1 | - | - | - | - | - | 13 |
| [REDACTED] | [REDACTED] | 25 | 13 | - | 0 | - | 0 | - | - | 0 | 14 | 12 | - | 0 | - | 0 | - | - | 0 | 12 | 1 | - | 0 | - | 0 | - | - | (0) | 1 |
| [REDACTED] | [REDACTED] | 26 | 12 | 0 | 0 | - | - | - | 1 | 1 | 14 | 11 | 0 | 0 | - | - | - | 1 | - | 13 | 0 | 0 | 0 | - | - | - | (0) | 1 | 2 |
| [REDACTED] | [REDACTED] | 27 | 12 | 0 | 1 | - | - | - | - | 1 | 15 | 12 | 0 | 1 | - | - | - | 0 | 1 | 14 | 0 | (0) | 0 | - | - | - | (0) | (0) | 0 |
| [REDACTED] | [REDACTED] | 28 | 12 | 0 | 3 | - | - | - | 1 | 0 | 16 | 6 | 0 | 4 | - | - | - | 1 | 0 | 11 | 5 | 0 | (1) | - | - | - | - | (0) | 5 |
| [REDACTED] | [REDACTED] | 29 | 10 | 0 | 0 | - | - | - | 8 | 1 | 19 | 7 | 1 | 2 | - | - | - | 7 | 1 | 18 | 2 | (1) | (2) | - | - | - | 1 | (0) | 1 |
| [REDACTED] | [REDACTED] | 30 | 10 | 6 | 0 | - | - | - | 4 | 1 | 20 | 9 | 2 | 1 | - | - | - | 2 | 1 | 14 | 1 | 4 | (1) | - | - | - | 2 | (0) | 6 |
| [REDACTED] | [REDACTED] | 31 | 11 | 4 | 0 | - | - | - | 2 | 3 | 21 | 9 | 4 | 2 | - | - | - | 5 | 1 | 20 | 3 | 0 | (2) | - | - | - | (3) | 3 | 1 |
| [REDACTED] | [REDACTED] | 32 | 16 | 1 | 1 | - | - | - | 0 | 3 | 22 | 15 | 1 | 2 | - | - | - | - | 3 | 22 | 0 | 0 | (0) | - | - | - | 0 | (0) | 0 |

**App. 0295**

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | 33 | 16 | 6 | 0 | - | - | - | - | 0 | 22 | 15 | 6 | 0 | - | - | - | 0 | 0 | 23 | 1 | (0) | (0) | - | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [REDACTED] | [REDACTED] | 34 | 23 | 0 | 1 | - | - | - | - | - | 24 | 23 | 0 | 0 | - | - | - | - | - | 23 | 0 | (0) | 0 | - | - | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 35 | 22 | 0 | 1 | - | 0 | - | - | - | 24 | 20 | 0 | 1 | - | 1 | - | - | - | 21 | 3 | 0 | 1 | - | (0) | - | - | - | 3 |
| [REDACTED] | [REDACTED] | 36 | 22 | 3 | 0 | - | - | - | - | - | 25 | 21 | 3 | 0 | - | - | - | - | - | 25 | 0 | 0 | (0) | - | - | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 37 | 10 | 6 | 2 | - | - | - | 6 | 2 | 26 | 9 | 4 | 2 | - | - | - | 6 | 2 | 23 | 2 | 3 | (0) | - | - | - | (0) | (0) | 3 |
| [REDACTED] | [REDACTED] | 38 | 6 | 21 | 0 | - | - | - | - | 0 | 27 | 6 | 18 | 0 | - | - | - | - | 0 | 25 | 0 | 2 | 0 | - | - | - | - | (0) | 3 |
| [REDACTED] | [REDACTED] | 39 | 21 | 1 | 0 | - | - | - | 3 | 3 | 28 | 21 | 1 | 0 | - | - | - | 3 | 3 | 28 | (0) | (0) | (0) | - | - | - | 0 | (0) | (0) |
| [REDACTED] | [REDACTED] | 40 | 12 | 20 | 1 | - | - | - | - | - | 32 | 12 | 17 | 0 | - | - | - | - | - | 30 | (0) | 2 | 0 | - | - | - | - | - | 2 |
| [REDACTED] | [REDACTED] | 41 | 9 | 20 | 2 | - | - | - | - | 1 | 33 | 11 | 19 | 0 | - | - | - | - | 1 | 31 | (2) | 1 | 2 | - | - | - | - | (0) | 2 |
| [REDACTED] | [REDACTED] | 42 | 19 | 6 | 0 | - | 0 | - | 0 | 7 | 33 | 19 | 7 | 0 | - | 0 | - | - | 2 | 28 | 0 | (0) | 0 | - | - | - | 0 | 5 | 5 |
| [REDACTED] | [REDACTED] | 43 | 28 | 4 | 1 | - | - | - | 1 | 1 | 33 | 20 | 2 | 1 | - | - | - | 1 | 1 | 25 | 7 | 2 | (1) | - | - | - | - | (0) | 9 |
| [REDACTED] | [REDACTED] | 44 | 15 | - | 0 | - | - | - | 15 | 5 | 36 | 5 | - | 0 | - | - | - | 1 | 5 | 11 | 10 | - | 0 | - | - | - | 14 | - | 25 |
| [REDACTED] | [REDACTED] | 45 | 20 | 8 | 0 | - | - | - | 10 | 3 | 41 | 19 | 4 | 0 | - | - | - | 10 | 3 | 36 | 0 | 4 | 0 | - | - | - | 0 | (0) | 5 |
| [REDACTED] | [REDACTED] | 46 | 36 | 6 | 0 | - | - | - | 0 | 0 | 43 | 41 | 5 | 0 | - | - | - | - | 0 | 46 | (4) | 1 | 0 | - | - | - | 0 | (0) | (3) |
| [REDACTED] | [REDACTED] | 47 | 18 | 25 | 8 | - | - | - | - | 1 | 52 | 18 | 26 | 4 | - | - | - | - | 1 | 48 | 0 | (1) | 5 | - | - | - | - | (0) | 4 |
| [REDACTED] | [REDACTED] | 48 | 36 | 7 | 3 | - | 22 | - | 0 | 1 | 69 | 26 | 6 | 2 | - | 13 | - | 2 | 1 | 50 | 10 | 1 | 0 | - | 9 | - | (1) | 1 | 19 |
| [REDACTED] | [REDACTED] | 49 | 33 | 27 | 2 | - | - | - | 7 | - | 69 | 33 | 23 | 1 | - | - | - | 9 | - | 67 | 0 | 4 | 1 | - | - | - | (2) | - | 3 |
| [REDACTED] | [REDACTED] | 50 | 35 | 14 | 0 | 4 | - | - | 21 | 15 | 90 | 35 | 42 | 0 | 5 | - | - | 34 | 16 | 132 | (0) | (28) | 0 | (0) | - | - | (13) | (1) | (42) |
| | | **Total** | 534 | 203 | 39 | 4 | 23 | - | 87 | 60 | 949 | 477 | 210 | 33 | 5 | 14 | - | 91 | 49 | 878 | 57 | (7) | 5 | (0) | 9 | - | (4) | 11 | 71 |
| | | **Grand Total** | 534 | 203 | 39 | 4 | 23 | - | 87 | 60 | 949 | 477 | 210 | 33 | 5 | 14 | - | 91 | 49 | 878 | 57 | (7) | 5 | (0) | 9 | - | (4) | 11 | 71 |

**October 2023 Banker Scorecard**

JPMC INTERNAL USE ONLY

**Joshua Biering**

**Net New Clients as of Sep'23**

Assets in $MM and Revenue in $K

| | | | Client Points | | | | Risk Adj. Revenue | | | Assets | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Month | New Client | Bonus | Total Pts | Classification | 2022 YTD | 2023 YTD | O(U) | Dec-2022 | Oct-2023 | O(U) |
| **Brand New $5MM** | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | Dec 22 | 1 | 5 | 6 | 5MM | - | 79 | 79 | 11 | 33 | 22 |
| [REDACTED] | [REDACTED] | Aug 23 | 1 | 1 | 2 | 5MM | - | 2 | 2 | - | 13 | 13 |
| **Threshold New $5MM** | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | May 23 | 1 | - | 1 | 5MM | 13 | 7 | (6) | 3 | 3 | 0 |
| [REDACTED] | [REDACTED] | Jun 23 | 1 | - | 1 | 5MM | 23 | 40 | 17 | 4 | 5 | 1 |
| **Existing $5MM Bonus** | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 160 | 121 | (39) | 48 | 52 | 4 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 31 | 32 | 1 | 10 | 11 | 1 |
| [REDACTED] | [REDACTED] | | | 2 | 2 | 5MM | 280 | 276 | (4) | 67 | 72 | 5 |
| [REDACTED] | [REDACTED] | | | 2 | 2 | 5MM | 68 | 83 | 15 | 14 | 20 | 6 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 44 | 48 | 5 | 31 | 33 | 2 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 153 | 157 | 3 | 28 | 31 | 3 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 115 | 112 | (3) | 25 | 26 | 1 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 152 | 164 | 12 | 36 | 42 | 6 |
| [REDACTED] | [REDACTED] | | | 2 | 2 | 5MM | 150 | 111 | (39) | 25 | 33 | 8 |
| [REDACTED] | [REDACTED] | | | 4 | 4 | 5MM | 192 | 173 | (19) | 50 | 74 | 24 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 91 | 67 | (24) | 11 | 16 | 5 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 132 | 177 | 45 | 23 | 26 | 3 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 132 | 151 | 19 | 21 | 24 | 4 |
| [REDACTED] | [REDACTED] | | | 2 | 2 | 5MM | 64 | 109 | 45 | 20 | 22 | 2 |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 44 | 39 | (5) | 25 | 28 | 3 |
| | | **Gross New** | 4 | 28 | 32 | | | | | | | |
| **Lost** | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | Oct 22 | (1) | - | (1) | 5MM | 65 | 12 | (54) | 4 | 2 | (3) |

App. 0297

**October 2023 Banker Scorecard** JPMC INTERNAL USE ONLY

**Joshua Biering**

**Net New Clients Q4'23**

Assets in $MM and Revenue in $K

| | | | Client Points | | | | Risk Adj. Revenue | | | Assets | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Month | New Client | Bonus | Total Pts | Classification | 2022 YTD | 2023 YTD | O(U) | Dec-2022 | Oct-2023 | O(U) |
| **Existing $5MM Bonus** | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 321 | 686 | 366 | 132 | 90 | (42) |
| [REDACTED] | [REDACTED] | | | 1 | 1 | 5MM | 0 | 90 | 90 | 11 | 36 | 25 |
| | | **Gross New** | - | 2 | 2 | | | | | | | |

**App. 0298**

**October 2023 Banker Scorecard**

**Joshua Biering**

**Flows ($MM) as of Sep'23**

(Sorted by "Total Flows")

| | | | Total Flows - 4Q'22 + Sept.YTD | | | | | | | | | | | | | Investments, Banking & Credit Flows - 4Q'22 + Sept.YTD | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Client Sort | Sep-2022 | Aum Ex T&E | T&E Mgd | T&E Non Mgd | Brokrg | Deposits | Custody/ Other | IRS Annuity Non Mgd | Lending | Mortg | Total Flows | Mkt Change/Other | Sep-2023 | Inv Mgmt | Brokrg Alts | CDI (ex.Cash) | IRS Annuity Non Mgd | Total LTI | T&E Mgd | Total Inv. | Deposits | Other Cash | Total Banking | Lending | Mortgage | Total Credit | Total IB&C Flows |
| **New DMs** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 1 | 29 | (2) | - | - | (0) | 2 | - | - | - | (0) | (0) | 5 | 33 | - | - | (2) | - | (2) | - | (2) | 2 | (1) | 1 | - | (0) | (0) | (1) |
| [REDACTED] | [REDACTED] | 2 | - | 0 | - | - | (0) | 0 | - | - | - | - | 0 | 0 | 0 | - | - | - | - | - | - | - | 0 | 0 | 0 | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 3 | - | 0 | - | - | 0 | 0 | - | - | - | 1 | 1 | 0 | 1 | - | - | 0 | - | 0 | - | 0 | 0 | 0 | 0 | - | 1 | 1 | 1 |
| [REDACTED] | [REDACTED] | 4 | - | - | - | - | - | 1 | - | - | - | - | 1 | 0 | 1 | - | - | - | - | - | - | - | 1 | - | 1 | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 5 | - | 0 | - | - | (0) | 1 | - | - | - | - | 1 | 0 | 1 | - | - | 0 | - | 0 | - | 0 | 1 | 0 | 1 | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 6 | - | 1 | - | - | - | - | - | - | - | - | 1 | (0) | 1 | 1 | - | - | - | 1 | - | 1 | - | - | - | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 7 | - | 2 | - | - | 0 | 0 | - | - | - | - | 2 | 0 | 2 | 1 | 0 | 0 | - | 1 | - | 1 | 0 | 1 | 1 | - | - | - | 2 |
| [REDACTED] | [REDACTED] | 8 | - | 2 | - | - | 0 | 1 | - | - | - | - | 2 | (0) | 2 | 1 | - | - | - | 1 | - | 1 | 1 | 1 | 2 | - | - | - | 2 |
| [REDACTED] | [REDACTED] | 9 | - | 7 | - | - | 6 | 1 | - | - | - | - | 14 | (0) | 13 | 0 | - | - | - | 0 | - | 0 | 1 | 7 | 7 | - | - | - | 8 |
| [REDACTED] | [REDACTED] | 10 | - | 15 | - | - | (0) | 0 | - | - | 13 | 5 | 33 | (0) | 33 | 11 | - | 0 | - | 11 | - | 11 | 0 | 5 | 5 | 13 | 5 | 18 | 33 |
| | | **Total** | 29 | 25 | - | - | 6 | 5 | - | - | 13 | 6 | 55 | 5 | 89 | 13 | 0 | (2) | - | 12 | - | 12 | 5 | 13 | 18 | 13 | 6 | 19 | 49 |
| **Existing Book** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 11 | 91 | (2) | - | - | (0) | 0 | (0) | - | (8) | (0) | (11) | 9 | 90 | (1) | - | 0 | - | (1) | - | (1) | 0 | (1) | (1) | (8) | (0) | (9) | (10) |
| [REDACTED] | [REDACTED] | 12 | 23 | 2 | - | - | (1) | (8) | - | - | 1 | (0) | (5) | 0 | 18 | 1 | - | - | - | 1 | - | 1 | (8) | 1 | (7) | 1 | (0) | 1 | (5) |
| [REDACTED] | [REDACTED] | 13 | 45 | (5) | - | - | 2 | (0) | - | - | - | - | (3) | 2 | 44 | 5 | 3 | (5) | - | 2 | - | 2 | (0) | (6) | (6) | - | - | - | (4) |
| [REDACTED] | [REDACTED] | 14 | 24 | (2) | - | - | 0 | (0) | - | - | (1) | - | (3) | 1 | 22 | (3) | 1 | 0 | - | (3) | - | (3) | (0) | 1 | 1 | (1) | - | (1) | (3) |
| [REDACTED] | [REDACTED] | 15 | 9 | (2) | - | - | (1) | (0) | - | - | 1 | - | (3) | 1 | 7 | (0) | - | - | - | (0) | - | (0) | (0) | (2) | (3) | 1 | - | 1 | (3) |
| [REDACTED] | [REDACTED] | 16 | 7 | 1 | - | - | (1) | (0) | - | - | - | (1) | (2) | 0 | 6 | (1) | - | - | - | (1) | - | (1) | (0) | 0 | 0 | - | (1) | (1) | (1) |
| [REDACTED] | [REDACTED] | 17 | 7 | (1) | - | - | (0) | 0 | - | - | - | - | (1) | 1 | 7 | (1) | - | 0 | - | (1) | - | (1) | 0 | (0) | (0) | - | - | - | (1) |
| [REDACTED] | [REDACTED] | 18 | 24 | (0) | (0) | - | (0) | 0 | - | - | - | - | (0) | 3 | 26 | (0) | - | 0 | - | (0) | (0) | (0) | 0 | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 19 | 27 | (1) | 0 | - | 0 | 0 | - | - | 1 | (0) | (0) | 2 | 29 | (2) | - | (0) | - | (2) | 0 | (2) | 0 | 1 | 1 | 1 | (0) | 1 | (0) |
| [REDACTED] | [REDACTED] | 20 | 14 | 0 | - | - | (0) | 0 | - | - | (0) | (0) | (0) | 1 | 15 | (0) | - | - | - | (0) | - | (0) | 0 | 0 | 0 | (0) | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 21 | 9 | 2 | - | - | (1) | (0) | - | - | (1) | (0) | (0) | 1 | 10 | 2 | - | - | - | 2 | - | 2 | (0) | 0 | (0) | (1) | (0) | (1) | 1 |
| [REDACTED] | [REDACTED] | 22 | 22 | 0 | - | - | (1) | 0 | - | - | - | - | (0) | 2 | 24 | (0) | - | (1) | - | (1) | - | (1) | 0 | 1 | 1 | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 23 | 6 | (0) | - | - | (0) | (0) | - | - | 0 | (0) | (0) | 0 | 6 | (0) | - | - | - | (0) | - | (0) | (0) | (1) | (1) | 0 | (0) | 0 | (1) |
| [REDACTED] | [REDACTED] | 24 | 7 | 0 | - | - | (0) | (0) | - | - | - | - | (0) | 0 | 7 | (0) | - | (0) | - | (0) | - | (0) | (0) | 0 | 0 | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 25 | 3 | - | - | - | - | 0 | - | - | - | - | 0 | 0 | 4 | - | - | - | - | - | - | - | 0 | - | 0 | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 26 | 2 | - | - | - | - | - | - | - | 0 | - | 0 | 0 | 2 | - | - | - | - | - | - | - | - | - | - | 0 | - | 0 | 0 |

**CX7-17**

App. 0299

| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | 27 | 0 | 0 | - | - | (0) | 0 | - | - | - | - | 0 | 0 | 0 | - | - | - | - | - | - | - | 0 | - | | | | | |
| [REDACTED] | [REDACTED] | 28 | 48 | (1) | - | - | (4) | 5 | - | - | - | (0) | 0 | 5 | 52 | (1) | - | (0) | - | (1) | - | (1) | 5 | (2) | 3 | - | (0) | (0) | 2 |
| [REDACTED] | [REDACTED] | 29 | 12 | - | 0 | 0 | - | 0 | - | - | - | (0) | 0 | 1 | 14 | - | - | - | - | - | 0 | 0 | 0 | - | 0 | - | (0) | (0) | 0 |
| [REDACTED] | [REDACTED] | 30 | 4 | 1 | - | - | 0 | (0) | - | - | (1) | - | 0 | 1 | 5 | 1 | 1 | (0) | - | 1 | - | 1 | (0) | 0 | 0 | (1) | - | (1) | 0 |
| [REDACTED] | [REDACTED] | 31 | 27 | (1) | (0) | (0) | 1 | (0) | - | - | 0 | (0) | 0 | 4 | 31 | (1) | 1 | (0) | - | (0) | (0) | (0) | (0) | 1 | 1 | 0 | (0) | 0 | 1 |
| [REDACTED] | [REDACTED] | 32 | 5 | 0 | - | - | 0 | 0 | - | - | - | - | 0 | 1 | 6 | - | - | 0 | - | 0 | - | 0 | 0 | 0 | 0 | - | - | - | 0 |
| [REDACTED] | [REDACTED] | 33 | 12 | (0) | - | - | 0 | (0) | - | - | 0 | 1 | 1 | 2 | 14 | (1) | - | 0 | - | (1) | - | (1) | (0) | 0 | (0) | 0 | 1 | 1 | 1 |
| [REDACTED] | [REDACTED] | 34 | 9 | 1 | - | - | (1) | 0 | - | - | 0 | (0) | 1 | 1 | 11 | 1 | - | 0 | - | 1 | - | 1 | 0 | 1 | 1 | 0 | (0) | 0 | 2 |
| [REDACTED] | [REDACTED] | 35 | 3 | 1 | - | - | 0 | 0 | - | - | - | - | 1 | (0) | 3 | - | - | - | - | - | - | - | 0 | 1 | 1 | - | - | - | 1 |
| [REDACTED] | [REDACTED] | 36 | 23 | 2 | - | - | (0) | 0 | - | - | - | (0) | 1 | 4 | 28 | 1 | 0 | - | - | 1 | - | 1 | 0 | 0 | 0 | - | (0) | (0) | 1 |
| [REDACTED] | [REDACTED] | 37 | 1 | 0 | - | - | 1 | 0 | - | - | - | 0 | 2 | 0 | 2 | - | - | 0 | - | 0 | - | 0 | 0 | 0 | 1 | - | 0 | 0 | 1 |
| [REDACTED] | [REDACTED] | 38 | 31 | 0 | - | - | 3 | 0 | - | - | - | - | 3 | (2) | 32 | (1) | 4 | - | - | 3 | - | 3 | 0 | (0) | (0) | - | - | - | 3 |
| [REDACTED] | [REDACTED] | 39 | 64 | (2) | - | - | 6 | 1 | - | - | (1) | - | 4 | 4 | 72 | 2 | 6 | - | - | 8 | - | 8 | 1 | (4) | (3) | (1) | - | (1) | 3 |
| [REDACTED] | [REDACTED] | 40 | 20 | 1 | - | - | 2 | (1) | - | - | 1 | (0) | 4 | 1 | 26 | (0) | 3 | 0 | - | 2 | - | 2 | (1) | 1 | 1 | 1 | (0) | 1 | 4 |
| [REDACTED] | [REDACTED] | 41 | 35 | (1) | - | - | 5 | (0) | - | - | 1 | (0) | 4 | 3 | 42 | (1) | 1 | - | - | (0) | - | (0) | (0) | (1) | (1) | 1 | (0) | 1 | (1) |
| [REDACTED] | [REDACTED] | 42 | 11 | 5 | - | - | (0) | (0) | - | - | - | (0) | 4 | 1 | 16 | (0) | - | 0 | - | (0) | - | (0) | (0) | 5 | 5 | - | (0) | (0) | 4 |
| [REDACTED] | [REDACTED] | 43 | 24 | 4 | - | - | 2 | (1) | - | - | - | (0) | 5 | 4 | 33 | 3 | - | 0 | - | 3 | - | 3 | (1) | 2 | 1 | - | (0) | (0) | 3 |
| [REDACTED] | [REDACTED] | 44 | 15 | 4 | - | - | 2 | (0) | - | - | (3) | 2 | 5 | 2 | 22 | 2 | 1 | 0 | - | 3 | - | 3 | (0) | 1 | 1 | (3) | 2 | (0) | 4 |
| [REDACTED] | [REDACTED] | 45 | 13 | (0) | - | - | 5 | (1) | - | - | 2 | (0) | 6 | 1 | 20 | (0) | 1 | - | - | 0 | - | 0 | (1) | 0 | (1) | 2 | (0) | 2 | 2 |
| [REDACTED] | [REDACTED] | 46 | 16 | 7 | (0) | 0 | (0) | 0 | - | - | - | - | 7 | 1 | 24 | 6 | - | 0 | - | 6 | (0) | 5 | 0 | 1 | 1 | - | - | - | 6 |
| [REDACTED] | [REDACTED] | 47 | 51 | 7 | - | 18 | (1) | 1 | - | - | (2) | 1 | 24 | (1) | 74 | (1) | 2 | 0 | - | 1 | - | 1 | 1 | 7 | 7 | (2) | 1 | (1) | 7 |
| | | **Total** | 744 | 22 | (0) | 18 | 16 | (4) | (0) | - | (11) | 4 | 45 | 55 | 845 | 8 | 21 | (6) | - | 22 | (0) | 22 | (4) | 7 | 3 | (11) | 4 | (7) | 18 |
| **Transferred In** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 48 | 10 | (8) | - | - | (0) | 0 | - | - | - | - | (8) | 0 | 2 | (1) | - | - | - | (1) | - | (1) | 0 | (7) | (7) | - | - | - | (8) |
| [REDACTED] | [REDACTED] | 49 | 25 | (0) | - | - | (0) | 0 | - | - | (5) | (0) | (5) | 2 | 23 | (1) | - | 0 | - | (1) | - | (1) | 0 | (0) | (0) | (5) | (0) | (5) | (5) |
| [REDACTED] | [REDACTED] | 50 | - | 1 | - | - | (0) | 0 | - | - | - | - | 1 | 0 | 1 | - | - | - | - | - | - | - | 0 | 1 | 1 | - | - | - | 1 |
| | | **Total** | 35 | (8) | - | - | (0) | 0 | - | - | (5) | (0) | (13) | 3 | 25 | (2) | - | 0 | - | (2) | - | (2) | 0 | (7) | (7) | (5) | (0) | (5) | (13) |
| | | **Grand Total** | 808 | 39 | (0) | 18 | 22 | 1 | (0) | - | (2) | 9 | 88 | 63 | 959 | 19 | 21 | (8) | - | 32 | (0) | 32 | 1 | 14 | 15 | (2) | 9 | 7 | 54 |

App. 0300

**October 2023 Banker Scorecard**

**Joshua Biering**

**Flows ($MM) Q4'23**

(Sorted by "Total Flows")

| | | | Total Flows - Q4'23 | | | | | | | | | | | | | Investments, Banking & Credit Flows - Q4'23 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Client Sort | Sep-2023 | Aum Ex T&E | T&E Mgd | T&E Non Mgd | Brokrg | Deposits | Custody/ Other | IRS Annuity Non Mgd | Lending | Mortg | Total Flows | Mkt Change/Other | Sep-2023 | Inv Mgmt | Brokrg Alts | CDI (ex.Cash) | IRS Annuity Non Mgd | Total LTI | T&E Mgd | Total Inv. | Deposits | Other Cash | Total Banking | Lending | Mortgage | Total Credit | Total IB&C Flows |
| **Existing Book** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | 1 | 72 | (0) | - | - | (0) | (0) | - | - | (1) | - | (1) | (1) | 69 | 0 | - | - | - | 0 | - | 0 | (0) | (0) | (0) | (1) | - | (1) | (1) |
| [REDACTED] | [REDACTED] | 2 | 74 | (1) | - | - | (0) | (0) | - | - | - | (0) | (1) | (4) | 69 | (0) | - | 0 | - | (0) | - | (0) | (0) | (1) | (1) | - | (0) | (0) | (1) |
| [REDACTED] | [REDACTED] | 3 | 44 | (1) | - | - | 0 | 0 | - | - | - | - | (1) | (0) | 43 | (0) | - | (0) | - | (0) | - | (0) | 0 | (0) | (0) | - | - | - | (1) |
| [REDACTED] | [REDACTED] | 4 | 7 | (0) | - | - | (0) | 0 | - | - | (0) | - | (0) | (0) | 6 | (0) | - | - | - | (0) | - | (0) | 0 | (0) | 0 | (0) | - | (0) | (0) |
| [REDACTED] | [REDACTED] | 5 | 6 | (0) | - | - | (0) | (0) | - | - | - | - | (0) | (0) | 5 | - | - | - | - | - | - | - | (0) | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 6 | 22 | 0 | - | - | 0 | (1) | - | - | (0) | (0) | (0) | (0) | 21 | (0) | - | - | - | (0) | - | (0) | (1) | 0 | (0) | (0) | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 7 | 7 | (0) | - | - | (0) | (0) | - | - | - | - | (0) | (0) | 7 | (0) | - | 0 | - | (0) | - | (0) | (0) | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 8 | 24 | (0) | (0) | 0 | (0) | 0 | - | - | - | - | (0) | (0) | 24 | (0) | - | - | - | (0) | (0) | (0) | 0 | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 9 | 42 | (0) | - | - | (0) | (0) | - | - | (0) | (0) | (0) | (1) | 41 | (0) | - | - | - | (0) | - | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 10 | 32 | (0) | - | - | 0 | 0 | - | - | - | - | (0) | 0 | 32 | - | - | - | - | - | - | - | 0 | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 11 | 23 | (0) | - | - | (0) | (0) | - | - | - | (0) | (0) | (0) | 22 | (0) | - | (0) | - | (0) | - | (0) | (0) | (0) | (0) | - | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 12 | 29 | (0) | - | - | 0 | (0) | - | - | (0) | (0) | (0) | (0) | 28 | (0) | - | (0) | - | (0) | - | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 13 | 11 | 1 | - | - | (1) | (0) | - | - | 0 | (0) | (0) | (0) | 11 | - | - | (0) | - | (0) | - | (0) | (0) | 0 | (0) | 0 | (0) | 0 | (0) |
| [REDACTED] | [REDACTED] | 14 | 2 | (0) | - | - | (0) | (0) | - | - | - | - | (0) | (0) | 2 | - | - | - | - | - | - | - | (0) | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 15 | 20 | (0) | - | - | (0) | (0) | - | - | - | (0) | (0) | (0) | 20 | - | - | - | - | - | - | - | (0) | (0) | (0) | - | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 16 | 15 | (0) | - | - | (0) | (0) | - | - | - | (0) | (0) | (0) | 15 | 0 | - | - | - | 0 | - | 0 | (0) | (0) | (0) | - | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 17 | 3 | (0) | - | - | (0) | (0) | - | - | - | - | (0) | (0) | 3 | - | - | - | - | - | - | - | (0) | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 18 | 7 | 0 | - | - | 0 | (0) | - | - | - | - | (0) | (0) | 7 | - | - | 0 | - | 0 | - | 0 | (0) | 0 | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 19 | 24 | 0 | - | - | (0) | (0) | - | - | - | - | (0) | (0) | 24 | (0) | - | 0 | - | 0 | - | 0 | (0) | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 20 | 33 | 0 | - | - | (0) | (0) | - | - | - | (0) | (0) | (1) | 33 | - | - | 0 | - | 0 | - | 0 | (0) | 0 | (0) | - | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 21 | 10 | (0) | - | - | (0) | (0) | - | - | - | (0) | (0) | (0) | 9 | (0) | - | - | - | (0) | - | (0) | (0) | - | (0) | - | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 22 | 28 | (0) | - | - | (0) | (0) | - | - | - | (0) | (0) | (1) | 27 | 0 | - | - | - | 0 | - | 0 | (0) | (0) | (0) | - | (0) | (0) | (0) |
| [REDACTED] | [REDACTED] | 23 | 13 | 2 | - | - | (2) | (0) | - | - | - | - | (0) | (0) | 13 | 2 | 1 | - | - | 3 | - | 3 | (0) | 0 | 0 | - | - | - | 3 |
| [REDACTED] | [REDACTED] | 24 | 2 | (0) | - | - | 0 | 0 | - | - | - | - | (0) | 0 | 2 | - | - | - | - | - | - | - | 0 | (0) | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 25 | 2 | 0 | - | - | (0) | (0) | - | - | - | - | (0) | 0 | 2 | (0) | - | - | - | (0) | - | (0) | (0) | 0 | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 26 | 4 | - | - | - | - | (0) | - | - | - | - | (0) | (0) | 4 | - | - | - | - | - | - | - | (0) | - | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 27 | 0 | 0 | - | - | (0) | (0) | - | - | - | - | (0) | 0 | 0 | - | - | - | - | - | - | - | (0) | - | (0) | - | - | - | (0) |
| [REDACTED] | [REDACTED] | 28 | 1 | - | - | - | - | - | - | - | - | - | - | (0) | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | 29 | 2 | - | - | - | - | - | - | - | - | - | - | (0) | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | 30 | 1 | 0 | - | - | (0) | - | - | - | - | - | - | 0 | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | 31 | 0 | 0 | - | - | (0) | - | - | - | - | - | - | 0 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | 32 | 6 | 1 | - | - | (1) | 0 | - | - | - | (0) | 0 | (0) | 6 | - | - | - | - | - | - | - | 0 | (0) | 0 | - | (0) | (0) | 0 |

**App. 0301**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | 33 | 1 | - | - | - | - | 0 | - | - | - | - | 0 | (0) | 1 |
| [REDACTED] | [REDACTED] | 34 | 22 | (0) | - | - | 0 | (0) | - | - | - | - | 0 | (0) | 22 |
| [REDACTED] | [REDACTED] | 35 | 26 | 0 | - | - | (0) | 0 | - | - | - | - | 0 | (0) | 25 |
| [REDACTED] | [REDACTED] | 36 | 1 | - | - | - | (0) | 0 | - | - | - | - | 0 | 0 | 1 |
| [REDACTED] | [REDACTED] | 37 | 16 | 0 | - | - | (0) | 0 | - | - | - | (0) | 0 | (0) | 16 |
| [REDACTED] | [REDACTED] | 38 | 1 | 0 | - | - | (0) | 0 | - | - | - | - | 0 | (0) | 1 |
| [REDACTED] | [REDACTED] | 39 | 52 | 1 | - | - | (0) | (0) | - | - | - | (0) | 0 | (0) | 52 |
| [REDACTED] | [REDACTED] | 40 | 14 | - | 0 | 0 | - | (0) | - | - | - | (0) | 0 | (0) | 14 |
| [REDACTED] | [REDACTED] | 41 | 5 | 0 | - | - | (0) | 0 | - | - | - | - | 0 | (0) | 5 |
| [REDACTED] | [REDACTED] | 42 | 14 | (0) | - | - | 0 | 0 | - | - | 0 | (0) | 0 | (0) | 14 |
| [REDACTED] | [REDACTED] | 43 | 26 | (0) | - | - | (0) | 1 | - | - | (0) | (0) | 0 | (0) | 26 |
| [REDACTED] | [REDACTED] | 44 | 2 | (0) | - | - | 0 | 0 | - | - | - | - | 0 | 0 | 3 |
| [REDACTED] | [REDACTED] | 45 | 18 | (0) | - | - | (0) | (0) | - | - | 1 | (0) | 1 | 0 | 19 |
| [REDACTED] | [REDACTED] | 46 | 33 | 1 | - | - | 0 | (0) | - | - | - | (0) | 1 | (1) | 33 |
| [REDACTED] | [REDACTED] | 47 | 6 | (0) | - | - | 0 | 0 | - | - | - | 1 | 1 | (0) | 7 |
| [REDACTED] | [REDACTED] | 48 | 90 | (0) | - | - | (0) | 0 | (0) | - | 2 | (0) | 2 | (1) | 90 |
| [REDACTED] | [REDACTED] | 49 | 33 | (0) | - | - | (0) | (0) | - | - | 3 | - | 3 | (0) | 36 |
| [REDACTED] | [REDACTED] | 50 | 31 | (0) | (0) | - | (1) | (0) | - | - | - | 5 | 4 | (2) | 33 |
| | | **Total** | 959 | 0 | 0 | 0 | (5) | (1) | (0) | - | 4 | 7 | 5 | (15) | 949 |
| | | **Grand Total** | 959 | 0 | 0 | 0 | (5) | (1) | (0) | - | 4 | 7 | 5 | (15) | 949 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | - | - | - | - | - | - | - | 0 | - | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 34 | (0) | - | (0) | - | (0) | - | (0) | (0) | (0) | (0) | - | - | - | (0) |
| 35 | 0 | - | 0 | - | 0 | - | 0 | 0 | 0 | 0 | - | - | - | 0 |
| 36 | - | - | - | - | - | - | - | 0 | (0) | 0 | - | - | - | 0 |
| 37 | 0 | - | (0) | - | 0 | - | 0 | 0 | - | 0 | - | (0) | (0) | 0 |
| 38 | - | - | - | - | - | - | - | 0 | (0) | 0 | - | - | - | 0 |
| 39 | - | - | 0 | - | 0 | - | 0 | (0) | 1 | 0 | - | (0) | (0) | 0 |
| 40 | - | - | - | - | - | 0 | 0 | (0) | - | (0) | - | (0) | (0) | 0 |
| 41 | 0 | - | - | - | 0 | - | 0 | 0 | (0) | 0 | - | - | - | 0 |
| 42 | - | - | (0) | - | (0) | - | (0) | 0 | (0) | (0) | 0 | (0) | 0 | 0 |
| 43 | - | - | 0 | - | 0 | - | 0 | 1 | (0) | 0 | (0) | (0) | (0) | 0 |
| 44 | - | - | 0 | - | 0 | - | 0 | 0 | 0 | 0 | - | - | - | 0 |
| 45 | (0) | - | - | - | (0) | - | (0) | (0) | - | (0) | 1 | (0) | 1 | 1 |
| 46 | 1 | - | 0 | - | 1 | - | 1 | (0) | 0 | (0) | - | (0) | (0) | 1 |
| 47 | (0) | - | (0) | - | (0) | - | (0) | 0 | (0) | (0) | - | 1 | 1 | 1 |
| 48 | (0) | - | (0) | - | (0) | - | (0) | 0 | (0) | (0) | 2 | (0) | 2 | 2 |
| 49 | 0 | - | - | - | 0 | - | 0 | (0) | (0) | (0) | 3 | - | 3 | 3 |
| 50 | (0) | - | 0 | - | (0) | (0) | (0) | (0) | (1) | (1) | - | 5 | 5 | 4 |
| **Total** | 1 | 1 | (0) | - | 2 | 0 | 2 | (1) | (4) | (5) | 4 | 7 | 11 | 8 |
| **Grand Total** | 1 | 1 | (0) | - | 2 | 0 | 2 | (1) | (4) | (5) | 4 | 7 | 11 | 8 |

App. 0302

**October 2023 Banker Scorecard**

**Joshua Biering**

JPMC INTERNAL USE ONLY

**Flows by Month as of Sep'23**

| | | | 2022 | | | 2023 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Transfer Month | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Total Book Impact | (-) Pre Transferred In | (-) Post Transferred In (Neg. Flows) | Total Metric | Pre Transferred Out | Post Transferred Out | Total Transferred Out Impact |
| **New DMs** | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | | (396,222) | (461,416) | 107,749 | (112,782) | (123,601) | (80,123) | (7,972) | 59,708 | (111,271) | 40,808 | 76,819 | (17,389) | (1,025,693) | - | - | (1,025,693) | - | - | - |
| [REDACTED] | [REDACTED] | | 108,299 | 16,599 | 154,276 | (14,584) | 32,044 | 400,234 | 749,195 | 845,021 | (250,805) | (162,998) | 18,361 | 53,203 | 1,948,846 | - | - | 1,948,846 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | 776,477 | 1 | 601,823 | (200,000) | (160,554) | 58,959 | (44,521) | 1,032,186 | - | - | 1,032,186 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | 929,971 | (13,401) | (53,321) | (1,911) | (60,822) | 50,438 | 2,328 | (12,061) | (10,161) | 831,060 | - | - | 831,060 | - | - | - |
| [REDACTED] | [REDACTED] | | 3,000,000 | 161,793 | 7,992,349 | (170,798) | (35,559) | (16,562) | 172,644 | 4,987,440 | 14,811,616 | 2,842,487 | (182,407) | (195,237) | 33,367,764 | - | - | 33,367,764 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | 259,959 | 925,956 | 0 | 1,185,915 | - | - | 1,185,915 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | 1,363,225 | 5,665,081 | 574,320 | 7,602,626 | - | - | 7,602,626 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | - | 200,450 | (26) | 200,424 | - | - | 200,424 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | - | 947,919 | 1,491,445 | 2,439,364 | - | - | 2,439,364 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | - | - | 1,003,574 | 1,003,574 | - | - | 1,003,574 | - | - | - |
| **Total New DMs** | | | 2,712,077 | (283,025) | 8,254,374 | 631,808 | (140,517) | 1,026,705 | 911,957 | 6,433,169 | 14,299,979 | 4,185,254 | 7,699,077 | 2,855,208 | 48,586,065 | - | - | 48,586,065 | - | - | - |
| **Existing DMs** | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | | (834,599) | (36,586) | 2,099,242 | (1,217,244) | 548,294 | (198,497) | (814,542) | (5,179) | 971,299 | (17,566) | 1,430,441 | 309,219 | 2,234,281 | - | - | 2,234,281 | - | - | - |
| [REDACTED] | [REDACTED] | | (52,353) | (29,849) | 210,395 | (315,890) | 423,811 | (50,236) | (100,508) | (184,567) | (74,406) | (10,779) | 190,186 | (30,338) | (24,534) | - | - | (24,534) | - | - | - |
| [REDACTED] | [REDACTED] | | (269,061) | 77,379 | 16,040 | (433,909) | (68,899) | 3,959 | 85,098 | 201,456 | (75,168) | (96,135) | (222,227) | 47,550 | (733,918) | - | - | (733,918) | - | - | - |
| [REDACTED] | [REDACTED] | | 96,654 | 66,069 | (50,276) | 345,984 | 115,990 | 166,416 | 545,960 | 2,133,961 | (2,089,206) | 418,736 | 183,219 | (1,007,471) | 926,037 | - | - | 926,037 | - | - | - |
| [REDACTED] | [REDACTED] | | 124,165 | (53,889) | 4,142 | (187,398) | 155,932 | 107,248 | (141,222) | (100,494) | (88,556) | (41,451) | (47,008) | (118,560) | (387,091) | - | - | (387,091) | - | - | - |
| [REDACTED] | [REDACTED] | | (1,087,094) | (1,155,016) | (283,677) | (1,709,298) | 699,648 | 383,730 | (53,750) | 213,188 | (438,471) | 929,020 | 201,963 | (870,351) | (3,170,107) | - | - | (3,170,107) | - | - | - |
| [REDACTED] | [REDACTED] | | 342,123 | 804,787 | (520,804) | (302,618) | (28,163) | (118,602) | (139,673) | (157,112) | 359,406 | 56,252 | 1,926 | 1,636,261 | 1,933,785 | - | - | 1,933,785 | - | - | - |
| [REDACTED] | [REDACTED] | | 649,783 | (881,563) | 860,312 | (152,685) | (120,830) | 477,969 | 846,627 | 1,285,985 | 787,057 | (1,108,739) | 371,126 | 384,836 | 3,399,879 | - | - | 3,399,879 | - | - | - |
| [REDACTED] | [REDACTED] | | 501,839 | (126,305) | 242,236 | (625,439) | (68,239) | (170,986) | 129,701 | (123,896) | 1,845,401 | 88,313 | 111,927 | (6,386) | 1,798,168 | - | - | 1,798,168 | - | - | - |
| [REDACTED] | [REDACTED] | | 178,382 | 41,313 | (227,945) | 105,251 | 501,252 | (774,961) | (19,056) | 840,710 | 1,656,301 | 957,770 | (129,907) | (251,128) | 2,877,983 | - | - | 2,877,983 | - | - | - |
| [REDACTED] | [REDACTED] | | 102,867 | 10,214 | (82,167) | (36,582) | (144,311) | (9,014) | (24,623) | (15,190) | 350,339 | 9,056 | (29,915) | (59,085) | 71,589 | - | - | 71,589 | - | - | - |
| [REDACTED] | [REDACTED] | | (123,995) | (123,309) | (28,340) | (26,170) | 151,836 | 988,255 | (112,091) | 316,870 | (108,276) | 186,116 | 567,433 | (294,406) | 1,393,924 | - | - | 1,393,924 | - | - | - |
| [REDACTED] | [REDACTED] | | (48,081) | 135,757 | (41,890) | 1,156,494 | (13,515) | (132,123) | (38,000) | (43,099) | (51,801) | (39,213) | 38,506 | (38,943) | 884,093 | - | - | 884,093 | - | - | - |
| [REDACTED] | [REDACTED] | | (1,386,977) | (13,371) | 1,530,855 | 611,445 | (211,177) | 39,654 | (427,213) | (59,019) | (1,770,751) | (280,338) | (115,973) | (1,911,612) | (3,994,477) | - | - | (3,994,477) | - | - | - |
| [REDACTED] | [REDACTED] | | (294,228) | (144,940) | (138,961) | (139,996) | (52,312) | (124,637) | (5,641) | 843,105 | (119,167) | (155,836) | (99,543) | 1,762,368 | 1,330,212 | - | - | 1,330,212 | - | - | - |
| [REDACTED] | [REDACTED] | | (11,039) | (7,143) | (9,715) | (162,839) | (46,242) | (13,532) | (17,200) | (23,435) | (14,367) | (5,089) | (11,781) | (49,583) | (371,965) | - | - | (371,965) | - | - | - |

App. 0303

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | | 380,456 | (271,022) | (270,143) | 41,898 | 35,050 | 618,166 | (554,056) | (378,436) | 89,187 | (248,028) | 181,578 | (261,827) | (637,178) | - | - | (6[illegible] | [illegible] | [illegible] | [illegible] |
| [REDACTED] | [REDACTED] | | (91,217) | (678,180) | (361,065) | (267,079) | 82,750 | 2,435,876 | (127,899) | (87,920) | (87,400) | (82,301) | 916,779 | 1,658,707 | 3,311,050 | - | - | 3,311,050 | - | - | - |
| [REDACTED] | [REDACTED] | | 155,467 | 224,323 | (263,400) | 384,773 | (220,613) | 551,022 | 75,091 | 76,254 | (71,951) | (64,988) | 55,658 | (210,083) | 691,552 | - | - | 691,552 | - | - | - |
| [REDACTED] | [REDACTED] | | (5,824,367) | 869,579 | (31,805) | (38,137) | (40,245) | (41,611) | (40,182) | (43,457) | (58,418) | (45,279) | (51,776) | (50,938) | (5,396,635) | - | - | (5,396,635) | - | - | - |
| [REDACTED] | [REDACTED] | | 374,069 | 118,184 | (341,965) | (420,288) | (715,060) | 1,431,534 | (531,530) | (61,458) | 370,050 | (1,336,918) | 119,087 | (167,454) | (1,161,750) | - | - | (1,161,750) | - | - | - |
| [REDACTED] | [REDACTED] | | (1,627,597) | (559,632) | (770,291) | (519,964) | (1,007,267) | (207,228) | 1,383,656 | 599,445 | 5,243,039 | (902,428) | (360,025) | 5,332,112 | 6,603,821 | - | - | 6,603,821 | - | - | - |
| [REDACTED] | [REDACTED] | | 2,431,219 | 3,125,668 | 1,118,498 | (24,386,206) | 1,628,397 | 4,126,837 | 1,157,171 | 2,616,696 | (8,082,949) | 3,499,902 | 3,714,107 | (1,332,518) | (10,383,178) | - | - | (10,383,178) | - | - | - |
| [REDACTED] | [REDACTED] | | 214,544 | (209,542) | 187,877 | 292,901 | 4,862 | 662,728 | (123,442) | (97,006) | (228,505) | 10,589 | (232,026) | (3,050,359) | (2,567,379) | - | - | (2,567,379) | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | 12,500 | - | - | - | - | - | - | - | - | - | 12,500 | - | - | 12,500 | - | - | - |
| [REDACTED] | [REDACTED] | | 48,342 | 25,306 | 182,835 | (566,240) | (47,790) | (106,850) | 5,846,388 | 74,358 | 82,219 | (32,031) | 204,897 | (1,298,120) | 4,413,315 | - | - | 4,413,315 | - | - | - |
| [REDACTED] | [REDACTED] | | (288,552) | 285,923 | 1,794,532 | 3,249,917 | (374,968) | (517,534) | (605,651) | 18,584 | (644,253) | 352,649 | 1,871,571 | (981,064) | 4,161,156 | - | - | 4,161,156 | - | - | - |
| [REDACTED] | [REDACTED] | | (6,631) | 40,962 | (11,028) | 25,490 | (522,789) | 113,364 | (59,559) | 782,024 | (8,712) | (130,093) | 451,423 | (188,556) | 485,896 | - | - | 485,896 | - | - | - |
| [REDACTED] | [REDACTED] | | 5,839,972 | (2,005,746) | (9,597) | (717,965) | 6,461,462 | (719,300) | 568,183 | (230,777) | (1,420,347) | (566,771) | (215,093) | (520,124) | 6,463,899 | - | - | 6,463,899 | - | - | - |
| [REDACTED] | [REDACTED] | | 1,500,313 | (65,975) | 1,533,964 | (986,009) | (174,148) | 488,180 | (57,541) | 489,201 | 737,054 | (81,460) | 63,849 | 343,953 | 3,791,381 | - | - | 3,791,381 | - | - | - |
| [REDACTED] | [REDACTED] | | (10,850) | (10,589) | (59,084) | 212,338 | 676,830 | (365,630) | (117,149) | (110,095) | (33,062) | 160,455 | (125,654) | (16,723) | 200,786 | - | - | 200,786 | - | - | - |
| [REDACTED] | [REDACTED] | | 107,943 | 78,405 | (705,860) | 111,652 | 27,085 | 55,347 | 68,653 | 108,779 | 11,808 | 86,387 | 103,044 | 73,474 | 126,718 | - | - | 126,718 | - | - | - |
| [REDACTED] | [REDACTED] | | (11) | (221) | (116) | - | (105) | (143) | 2,700 | - | - | - | - | 15,000 | 17,104 | - | - | 17,104 | - | - | - |
| [REDACTED] | [REDACTED] | | (1,692) | (1,961) | 1,229 | (3,367) | (4,739) | 37,700 | (9,360) | (3,367) | (644) | (3,559) | (8,715) | (299) | 1,227 | - | - | 1,227 | - | - | - |
| [REDACTED] | [REDACTED] | | 20,126 | (37,944) | 8,658 | (44,708) | (38,133) | 39,693 | (253,754) | 35,081 | (63,368) | (23,858) | (59,531) | 16,838 | (400,901) | - | - | (400,901) | - | - | - |
| [REDACTED] | [REDACTED] | | (962,477) | (129,414) | 199,249 | 306,563 | (697,157) | (170,346) | (34,963) | (871,790) | 526,665 | (52,955) | (297,681) | 763,227 | (1,421,078) | - | - | (1,421,078) | - | - | - |
| [REDACTED] | [REDACTED] | | 1,384,643 | (156,540) | (93,436) | (35,797) | (45,893) | (45,056) | (252,234) | 521,491 | (51,253) | 79,938 | 68,388 | (8,454) | 1,365,800 | - | - | 1,365,800 | - | - | - |
| **Total Existing DMs** | | | 1,532,088 | (794,868) | 5,701,001 | (26,451,119) | 6,870,604 | 8,961,391 | 6,048,390 | 8,560,891 | (2,551,204) | 1,509,370 | 8,840,254 | (380,835) | 17,845,963 | - | - | 17,845,963 | - | - | - |
| **Transferred In DMs** | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | Apr '23 | (4,570,061) | (120,947) | (327,393) | (329,776) | 2,137,416 | (392,553) | (425,771) | 163,015 | 1,365,524 | 163,726 | (2,669,648) | (264,979) | (5,271,447) | (3,603,314) | (1,668,133) | - | - | - | - |
| [REDACTED] | [REDACTED] | Feb '23 | - | - | - | - | - | - | - | - | - | - | 924,458 | (112,261) | 812,197 | - | - | 812,197 | - | - | - |
| [REDACTED] | [REDACTED] | Mar '23 | (5,500,000) | (190,000) | (73,040) | (629,760) | (1,755,792) | (172,010) | 24,870 | (18,530) | 25,200 | 191,300 | 3,250 | (363,100) | (8,457,612) | (8,148,592) | (309,020) | - | - | - | - |
| **Total Transferred In DMs** | | | (10,070,061) | (310,947) | (400,433) | (959,536) | 381,624 | (564,563) | (400,901) | 144,485 | 1,390,724 | 355,026 | (1,741,940) | (740,339) | (12,916,862) | (11,751,906) | (1,977,153) | 812,197 | - | - | - |
| **Total Metric** | | | (5,825,896) | (1,388,840) | 13,554,942 | (26,778,848) | 7,111,711 | 9,423,534 | 6,559,447 | 15,138,545 | 13,139,498 | 6,049,650 | 14,797,391 | 1,734,033 | 53,515,166 | (11,751,906) | (1,977,153) | 67,244,225 | - | - | - |
| **Transferred Out DMs** | | | | | | | | | | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | Jun '23 | (2,053) | 614 | 3,906 | (4,972) | (58) | 6,278 | (1,939) | (1,645) | 6,991 | (1,535) | 2,544 | 2,428 | - | - | - | - | 132 | 10,428 | 10,560 |
| [REDACTED] | [REDACTED] | Aug '23 | (4,146,148) | (25,542) | (58,198) | (490,277) | (29,419) | (38,556) | (28,412) | 69,344 | (79,603) | (8,921) | (24,821) | (0) | - | - | - | - | (4,835,733) | (24,822) | (4,860,554) |
| [REDACTED] | [REDACTED] | Sep '23 | - | - | - | - | - | - | - | - | - | - | 100,000 | 1,243,046 | - | - | - | - | 100,000 | 1,243,046 | 1,343,046 |
| [REDACTED] | [REDACTED] | Sep '23 | - | - | - | - | - | - | - | - | - | - | 10,000 | 4,321 | - | - | - | - | 10,000 | 4,321 | 14,321 |
| **Total Transferred Out DMs** | | | (4,148,201) | (24,928) | (54,291) | (495,250) | (29,476) | (32,278) | (30,351) | 67,700 | (72,612) | (10,456) | 87,723 | 1,249,795 | - | - | - | - | (4,725,600) | 1,232,973 | (3,492,627) |

App. 0304

**October 2023 Banker Scorecard**

**Joshua Biering**

| Flows by Month ($MM) Q4'23 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2023 | | | | | | | | | | |
| DM ECI | DM Name | Transfer Month | Oct | Nov | Dec | Total Book Impact | (-) Pre Transferred In | (-) Post Transferred In (Neg. Flows) | Total Metric | Pre Transferred Out | Post Transferred Out | Total Transferred Out Impact |
| **Existing DMs** | | | | | | | | | | | | |
| [REDACTED] | [REDACTED] | | 240,000 | - | - | 240,000 | - | - | 240,000 | - | - | - |
| [REDACTED] | [REDACTED] | | (376,327) | - | - | (376,327) | - | - | (376,327) | - | - | - |
| [REDACTED] | [REDACTED] | | (78,240) | - | - | (78,240) | - | - | (78,240) | - | - | - |
| [REDACTED] | [REDACTED] | | (88,174) | - | - | (88,174) | - | - | (88,174) | - | - | - |
| [REDACTED] | [REDACTED] | | (194,846) | - | - | (194,846) | - | - | (194,846) | - | - | - |
| [REDACTED] | [REDACTED] | | (86,850) | - | - | (86,850) | - | - | (86,850) | - | - | - |
| [REDACTED] | [REDACTED] | | (45,902) | - | - | (45,902) | - | - | (45,902) | - | - | - |
| [REDACTED] | [REDACTED] | | (1,485,113) | - | - | (1,485,113) | - | - | (1,485,113) | - | - | - |
| [REDACTED] | [REDACTED] | | (134,399) | - | - | (134,399) | - | - | (134,399) | - | - | - |
| [REDACTED] | [REDACTED] | | (270,046) | - | - | (270,046) | - | - | (270,046) | - | - | - |
| [REDACTED] | [REDACTED] | | (8,240) | - | - | (8,240) | - | - | (8,240) | - | - | - |
| [REDACTED] | [REDACTED] | | (75,708) | - | - | (75,708) | - | - | (75,708) | - | - | - |
| [REDACTED] | [REDACTED] | | (6,852) | - | - | (6,852) | - | - | (6,852) | - | - | - |
| [REDACTED] | [REDACTED] | | 416,869 | - | - | 416,869 | - | - | 416,869 | - | - | - |
| [REDACTED] | [REDACTED] | | (39,766) | - | - | (39,766) | - | - | (39,766) | - | - | - |
| [REDACTED] | [REDACTED] | | (677,973) | - | - | (677,973) | - | - | (677,973) | - | - | - |
| [REDACTED] | [REDACTED] | | 3,503,158 | - | - | 3,503,158 | - | - | 3,503,158 | - | - | - |
| [REDACTED] | [REDACTED] | | 61,946 | - | - | 61,946 | - | - | 61,946 | - | - | - |
| [REDACTED] | [REDACTED] | | (327,886) | - | - | (327,886) | - | - | (327,886) | - | - | - |
| [REDACTED] | [REDACTED] | | 583,022 | - | - | 583,022 | - | - | 583,022 | - | - | - |
| [REDACTED] | [REDACTED] | | (229,965) | - | - | (229,965) | - | - | (229,965) | - | - | - |
| [REDACTED] | [REDACTED] | | 319,427 | - | - | 319,427 | - | - | 319,427 | - | - | - |
| [REDACTED] | [REDACTED] | | 853,728 | - | - | 853,728 | - | - | 853,728 | - | - | - |
| [REDACTED] | [REDACTED] | | 1,513 | - | - | 1,513 | - | - | 1,513 | - | - | - |
| [REDACTED] | [REDACTED] | | (1,140,418) | - | - | (1,140,418) | - | - | (1,140,418) | - | - | - |
| [REDACTED] | [REDACTED] | | 1,582,354 | - | - | 1,582,354 | - | - | 1,582,354 | - | - | - |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | | (495,910) | - | - | (495,910) | - | - | (495,910) | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | | 106,513 | - | - | 106,513 | - | - | 106,513 | - | - | - |
| [REDACTED] | [REDACTED] | | 120,647 | - | - | 120,647 | - | - | 120,647 | - | - | - |
| [REDACTED] | [REDACTED] | | 370,326 | - | - | 370,326 | - | - | 370,326 | - | - | - |
| [REDACTED] | [REDACTED] | | 236,423 | - | - | 236,423 | - | - | 236,423 | - | - | - |
| [REDACTED] | [REDACTED] | | (352,149) | - | - | (352,149) | - | - | (352,149) | - | - | - |
| [REDACTED] | [REDACTED] | | (396,635) | - | - | (396,635) | - | - | (396,635) | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | | 1,097,003 | - | - | 1,097,003 | - | - | 1,097,003 | - | - | - |
| [REDACTED] | [REDACTED] | | 2,828 | - | - | 2,828 | - | - | 2,828 | - | - | - |
| [REDACTED] | [REDACTED] | | 210,362 | - | - | 210,362 | - | - | 210,362 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | | (3,853) | - | - | (3,853) | - | - | (3,853) | - | - | - |
| [REDACTED] | [REDACTED] | | (137,650) | - | - | (137,650) | - | - | (137,650) | - | - | - |
| [REDACTED] | [REDACTED] | | 2,539,291 | - | - | 2,539,291 | - | - | 2,539,291 | - | - | - |
| [REDACTED] | [REDACTED] | | - | - | - | - | - | - | - | - | - | - |
| [REDACTED] | [REDACTED] | | 2,748,843 | - | - | 2,748,843 | - | - | 2,748,843 | - | - | - |
| [REDACTED] | [REDACTED] | | (6) | - | - | (6) | - | - | (6) | - | - | - |
| [REDACTED] | [REDACTED] | | (5,461) | - | - | (5,461) | - | - | (5,461) | - | - | - |
| [REDACTED] | [REDACTED] | | 73,991 | - | - | 73,991 | - | - | 73,991 | - | - | - |
| [REDACTED] | [REDACTED] | | (119,569) | - | - | (119,569) | - | - | (119,569) | - | - | - |
| [REDACTED] | [REDACTED] | | (440,343) | - | - | (440,343) | - | - | (440,343) | - | - | - |
| [REDACTED] | [REDACTED] | | (39,249) | - | - | (39,249) | - | - | (39,249) | - | - | - |
| | | **Total Existing DMs** | 7,810,713 | - | - | 7,810,713 | - | - | 7,810,713 | - | - | - |
| | | **Total Metric** | 7,810,713 | - | - | 7,810,713 | - | - | 7,810,713 | - | - | - |

App. 0306

**October 2023 Banker Scorecard** JPMC INTERNAL USE ONLY

**Joshua Biering**

**Client Summary - Transferred Out Flows as of Sep'23**

Assets in $MM and Revenue in $K (Sorted by "YTD-2023")

| | | | | Total Flows | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Banker | Client Sort | LT Invst | Trust and Estate | Lending | Mortgage | Banking | Total IB&C | Other Flows | TotalFlows | NNC |
| [REDACTED] | [REDACTED] | Boitmann | 1 | - | - | - | 0.9 | 0.4 | 1.3 | - | 1.3 | |
| [REDACTED] | [REDACTED] | Boitmann | 2 | - | - | - | - | 0.0 | 0.0 | - | 0.0 | |
| [REDACTED] | [REDACTED] | Bator | 3 | - | - | - | - | 0.0 | 0.0 | - | 0.0 | |
| [REDACTED] | [REDACTED] | Stewart Jr. | 4 | - | - | - | - | (4.9) | (4.9) | - | (4.9) | Lost 5MM |
| | | | **Total** | - | - | - | 0.9 | (4.4) | (3.5) | - | (3.5) | |

No Data Available

App. 0308

**October 2023 Banker Scorecard** JPMC INTERNAL USE ONLY

**Joshua Biering**

**Negative SVA ($K)**

| | | 2023 YTD | | | 2022 YTD | | | Total Neg. SVA Variance | |
|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Loan SROE 8%-10% | Loan SROE <8% | Total Neg. SVA | Loan SROE 8%-10% | Loan SROE <8% | Total Neg. SVA | $ | % |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -954.25% |
| [REDACTED] | [REDACTED] | - | - | - | - | (0) | (0) | 0 | 100.00% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -87.20% |
| [REDACTED] | [REDACTED] | - | - | - | - | (0) | (0) | 0 | 100.00% |
| [REDACTED] | [REDACTED] | - | (5) | (5) | - | (3) | (3) | (2) | -79.63% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -62.80% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | - | - | (0) | -100.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | (9) | (9) | 9 | 100.00% |
| [REDACTED] | [REDACTED] | - | (4) | (4) | - | (2) | (2) | (2) | -141.74% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -538.05% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -346.55% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | - | - | (0) | -100.00% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -14,532.65% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | 0 | 98.72% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -273.38% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | 0 | 59.13% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | (1) | (0) | (1) | 0 | 44.19% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | (11) | (0) | (11) | 11 | 99.99% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | 0 | 97.02% |
| [REDACTED] | [REDACTED] | - | (7) | (7) | - | (3) | (3) | (4) | -125.33% |
| [REDACTED] | [REDACTED] | - | (2) | (2) | - | (1) | (1) | (1) | -117.36% |
| [REDACTED] | [REDACTED] | - | (1) | (1) | (0) | (5) | (5) | 4 | 76.61% |
| [REDACTED] | [REDACTED] | (5) | - | (5) | (40) | (0) | (40) | 35 | 86.30% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -62.17% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | 0 | 98.56% |
| [REDACTED] | [REDACTED] | (7) | (0) | (7) | (5) | (0) | (5) | (3) | -58.36% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (1) | (1) | 1 | 99.97% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -91.97% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | 0 | 17.10% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | - | - | - | - | (0) | (0) | 0 | 100.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | (0) | (0) | 0 | 100.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | (10) | (10) | 10 | 100.00% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | - | - | (0) | -100.00% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | - | - | (0) | -100.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | (0) | (0) | 0 | 100.00% |
| [REDACTED] | [REDACTED] | - | (1) | (1) | - | (1) | (1) | 0 | 8.50% |
| [REDACTED] | [REDACTED] | - | (0) | (0) | - | (0) | (0) | (0) | -1,023.32% |
| | | (13) | (21) | (34) | (57) | (37) | (93) | 59 | 63.56% |

**October 2023 Banker Scorecard**

**Joshua Biering**

**Lending Detail ($K)**

| | | 2023 YTD | | | | | 2022 YTD | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SVA + | | SVA - | | Total RAR | SVA + | | SVA - | | Total RAR | Total RAR Variance | |
| DM ECI | DM Name | EML/PLC | Non-EML/PLC | Loan SROE8%-10% | Loan SROE<8% | 2023 YTD | EML/PLC | Non-EML/PLC | Loan SROE 8%-10% | Loan SROE <8% | 2022 YTD | $ | % |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | 18 | 0 | - | (1) | 17 | 9 | - | (0) | 4 | 13 | 4 | 32.22% |
| [REDACTED] | [REDACTED] | 0 | - | - | - | 0 | - | 1 | - | - | 1 | (1) | -86.71% |
| [REDACTED] | [REDACTED] | - | 6 | - | - | 6 | - | 5 | - | - | 5 | 1 | 15.75% |
| [REDACTED] | [REDACTED] | 28 | 19 | - | - | 47 | 22 | 34 | - | (8) | 48 | (1) | -1.91% |
| [REDACTED] | [REDACTED] | 27 | - | - | (7) | 19 | (1) | - | - | 9 | 8 | 12 | 148.81% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | 2 | - | 2 | (2) | -100.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | 6 | 1 | - | - | 7 | - | 12 | - | - | 12 | (4) | -36.50% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | 0 | - | - | - | 0 | - | 1 | - | 0 | 1 | (1) | -57.48% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | 68 | 0 | - | - | 68 | 15 | - | - | - | 15 | 53 | 346.68% |
| [REDACTED] | [REDACTED] | 7 | - | - | 0 | 7 | 7 | - | 6 | 2 | 14 | (7) | -51.01% |
| [REDACTED] | [REDACTED] | 8 | - | - | - | 8 | - | - | 13 | - | 13 | (5) | -41.33% |
| [REDACTED] | [REDACTED] | 10 | - | - | - | 10 | 2 | - | - | - | 2 | 8 | 346.58% |
| [REDACTED] | [REDACTED] | 29 | - | - | - | 29 | 28 | - | - | - | 28 | 0 | 1.73% |
| [REDACTED] | [REDACTED] | 10 | - | - | (5) | 5 | - | - | - | 2 | 2 | 3 | 124.57% |
| [REDACTED] | [REDACTED] | 3 | (0) | - | 7 | 10 | 1 | 13 | (0) | - | 14 | (4) | -29.33% |
| [REDACTED] | [REDACTED] | 116 | - | (35) | - | 81 | - | 39 | - | - | 39 | 42 | 107.91% |
| [REDACTED] | [REDACTED] | - | 11 | - | - | 11 | - | 9 | - | - | 9 | 2 | 19.80% |
| [REDACTED] | [REDACTED] | 5 | - | - | - | 5 | 3 | - | - | - | 3 | 2 | 66.49% |
| [REDACTED] | [REDACTED] | 7 | - | - | - | 7 | 6 | - | - | 0 | 6 | 0 | 2.69% |
| [REDACTED] | [REDACTED] | 11 | - | 10 | - | 22 | 2 | - | 8 | - | 10 | 11 | 111.60% |
| [REDACTED] | [REDACTED] | 4 | - | - | - | 4 | 3 | - | - | (0) | 3 | 2 | 65.81% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | 15 | (0) | - | - | 15 | 7 | 1 | (0) | - | 8 | 7 | 89.06% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [REDACTED] | [REDACTED] | 6 | - | - | - | 6 | 7 | - | - | - | [illegible] | [illegible] | [illegible] |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | 10 | 30 | - | - | 39 | - | - | - | - | - | 39 | 100.00% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| [REDACTED] | [REDACTED] | 1 | - | - | - | 1 | 2 | - | - | 1 | 3 | (2) | -62.32% |
| [REDACTED] | [REDACTED] | 11 | - | - | (3) | 8 | - | - | - | 6 | 6 | 2 | 33.47% |
| [REDACTED] | [REDACTED] | - | - | - | - | - | - | - | - | - | - | - | 0.00% |
| | | 402 | 67 | (25) | (10) | 434 | 115 | 115 | 29 | 15 | 273 | 161 | 59.00% |

**App. 0312**

**October 2023 Banker Scorecard**

**Joshua Biering**

**Asset Incentive**

| | | Client Assets ($MM) | | | | | | Credit excl. EML/PLC (Factored Balances) ($MM) | | | | Asset Incentive ($K) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DM ECI | DM Name | Investments | Trusts and Estates | Brokerage | Deposits | Custody and Other | Total | Non-EML/PLC | Mortgages (50%) | ided Commitments ( | Total | Ratio | AUS/Credit Ratio | Asset Incentive (bps | 2023 | 2022 | Var $ | Var % |
| [REDACTED] | [REDACTED] | 4 | - | 2 | 1 | - | 7 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 6 | - | 1 | 0 | - | 7 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 1 | - | 1 | 1 | 0 | 3 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 12 | - | 20 | 1 | - | 32 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 2 | - | 0 | 0 | - | 2 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 9 | 13 | 0 | 1 | - | 24 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 2 | - | 0 | 0 | - | 2 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 2 | - | 0 | 0 | - | 2 | - | - | - | | | | | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 2 | - | - | - | - | 2 | - | - | - | - | 0.00 | <2 (0bps) | 0 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 3 | - | - | 0 | - | 3 | - | - | - | - | 0.00 | <2 (0bps) | 0 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 15 | - | - | 0 | - | 15 | 5 | 3 | - | 8 | 1.96 | >=2 to <3 | 25 | 4.24 | 0.00 | 4.24 | 100.00% |
| [REDACTED] | [REDACTED] | 2 | - | 0 | 2 | 0 | 5 | 2 | - | - | 2 | 2.97 | >=2 to <3 | 25 | 6.48 | 5.35 | 1.13 | 21.02% |
| [REDACTED] | [REDACTED] | 10 | - | 0 | 0 | - | 10 | 2 | 1 | - | 3 | 3.10 | >=3 to <4 | 35 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 10 | - | 6 | 2 | - | 19 | 4 | 1 | - | 5 | 3.96 | >=3 to <4 | 35 | 11.99 | 10.27 | 1.71 | 16.67% |
| [REDACTED] | [REDACTED] | 4 | - | 1 | 0 | - | 5 | - | 1 | - | 1 | 4.35 | >=4 to <5 | 45 | 0.34 | 0.00 | 0.34 | 100.00% |
| [REDACTED] | [REDACTED] | 4 | - | 5 | 0 | - | 8 | 1 | 1 | - | 1 | 5.93 | >=5 to <6 | 55 | 3.21 | 3.32 | (0.11) | -3.23% |
| [REDACTED] | [REDACTED] | 3 | - | 1 | 0 | - | 4 | - | 1 | - | 1 | 6.73 | >=6 to <7 | 65 | 0.86 | 2.20 | (1.34) | -60.87% |
| [REDACTED] | [REDACTED] | 35 | - | 14 | 0 | 4 | 54 | - | 8 | - | 8 | 7.12 | >=7+ | 75 | 20.95 | 2.22 | 18.72 | 842.48% |
| [REDACTED] | [REDACTED] | 18 | 3 | 1 | 0 | - | 22 | 1 | 1 | - | 3 | 8.30 | >=7+ | 75 | 0.10 | 10.04 | (9.94) | -98.99% |
| [REDACTED] | [REDACTED] | 16 | 3 | 6 | 0 | - | 26 | - | 3 | - | 3 | 8.67 | >=7+ | 75 | 0.00 | 0.49 | (0.49) | -100.00% |
| [REDACTED] | [REDACTED] | 4 | - | 0 | 0 | - | 4 | - | 0 | - | 0 | 8.95 | >=7+ | 75 | 0.00 | 1.09 | (1.09) | -100.00% |
| [REDACTED] | [REDACTED] | 11 | - | 4 | 0 | - | 16 | - | 2 | - | 2 | 9.81 | >=7+ | 75 | 6.53 | 7.03 | (0.50) | -7.04% |
| [REDACTED] | [REDACTED] | 16 | - | 1 | 1 | - | 18 | - | 2 | - | 2 | 10.55 | >=7+ | 75 | 0.00 | 12.86 | (12.86) | -100.00% |
| [REDACTED] | [REDACTED] | 12 | - | 0 | 0 | - | 12 | - | 1 | - | 1 | 17.46 | >=7+ | 75 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 12 | - | 0 | 1 | - | 13 | - | 1 | - | 1 | 19.53 | >=7+ | 75 | 0.00 | 0.75 | (0.75) | -100.00% |
| [REDACTED] | [REDACTED] | 20 | - | 8 | 0 | - | 28 | - | 1 | - | 1 | 20.97 | >=7+ | 75 | 0.00 | 1.88 | (1.88) | -100.00% |
| [REDACTED] | [REDACTED] | 33 | - | 27 | 2 | - | 62 | 2 | - | - | 2 | 26.78 | >=7+ | 75 | 16.75 | 23.67 | (6.92) | -29.24% |
| [REDACTED] | [REDACTED] | 4 | - | 1 | 0 | - | 5 | - | 0 | - | 0 | 31.70 | >=7+ | 75 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 10 | - | 6 | 0 | - | 16 | - | 0 | - | 0 | 34.48 | >=7+ | 75 | 3.73 | 7.45 | (3.72) | -49.92% |
| [REDACTED] | [REDACTED] | - | 13 | - | 0 | - | 13 | - | 0 | - | 0 | 59.76 | >=7+ | 75 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 9 | - | 20 | 2 | - | 32 | - | 0 | - | 0 | 71.40 | >=7+ | 75 | 0.00 | 1.31 | (1.31) | -100.00% |
| [REDACTED] | [REDACTED] | 16 | - | 6 | 0 | - | 21 | 0 | 0 | - | 0 | 87.21 | >=7+ | 75 | 0.00 | 0.90 | (0.90) | -100.00% |
| [REDACTED] | [REDACTED] | 36 | 22 | 7 | 3 | - | 68 | - | 1 | - | 1 | 100.31 | >=7+ | 75 | 1.86 | 3.48 | (1.61) | -46.45% |
| [REDACTED] | [REDACTED] | 12 | - | 0 | 3 | - | 15 | - | 0 | - | 0 | 113.11 | >=7+ | 75 | 0.00 | 1.49 | (1.49) | -100.00% |
| [REDACTED] | [REDACTED] | 28 | - | 4 | 1 | - | 32 | 0 | 0 | - | 0 | 120.67 | >=7+ | 75 | 0.75 | 10.17 | (9.42) | -92.62% |
| [REDACTED] | [REDACTED] | 18 | - | 25 | 8 | - | 51 | - | 0 | - | 0 | 172.45 | >=7+ | 75 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 6 | - | 21 | 0 | - | 27 | - | 0 | - | 0 | 320.17 | >=7+ | 75 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 36 | - | 6 | 0 | - | 42 | 0 | 0 | - | 0 | 347.03 | >=7+ | 75 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 15 | 7 | 3 | 0 | - | 25 | 0 | - | - | 0 | 2660.91 | >=7+ | 75 | 0.00 | 0.00 | 0.00 | 0.00% |
| [REDACTED] | [REDACTED] | 4 | - | 1 | 0 | - | 4 | 0 | - | - | 0 | 13321.64 | >=7+ | 75 | 0.85 | 5.79 | (4.94) | -85.35% |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 460 | 61 | 198 | 34 | 4 | 759 | 18 | 28 | - | 46 | | | 7 |

No Data Available

Message

App. 0315

**From:** Biering, Josh [josh.biering@jpmorgan.com]
**Sent:** 9/27/2023 10:50:10 PM
**To:** Stewart, Ben [ben.stewart@jpmorgan.com]
**Subject:** 2023 Self Assessment JB draft
**Attachments:** 2023 Self Assessment JB draft.docx

In advance of our Review/Meeting tomorrow – just wanted to circulate a rough draft I've been working on for my YE Review. Lots of content here- so no rush, but did want to share and considering sharing to J.T. and Kyle in advance of potential talent review discussions.

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

Exhibit
CX225

| EMPLOYEE SELF ASSESSMENT | | | |
|---|---|---|---|
| EMPLOYEE NAME | Josh Biering | EMPLOYEE SID | I662283 |
| MANAGER NAME | Ben Stewart Jr. | | |
| PERFORMANCE YEAR | **2023** | | |

**PERFORMANCE DIMENSIONS**

***Business Results***: *Deliver the goals of your team, business/function and the company*

As of August 2023 Scorecard:

- 2023 Risk Adjusted Revenue Annualized: $5.433MM (14.4% YoY Growth)
  - Per 9/22/2023 Business Management dashboard; $3.622MM RAR Growth accounts for 21.34% of the 17- Advisor Fort Worth Single Coverage Team's overall revenue growth.
  - 14% YoY Revenue Growth compared to FW Market's 8% Revenue Growth, South Region and USPB's 6% Revenue growth
- $65.05MM IB&C Flows
  - IB&C Metric Flows adjusted for LOC paydown from PRiSM proceeds ($35MM) is **$100.05MM**
- 31 Client Points
  - +3 Points instead of 3 points for M*** J**** Jr. DM (Due to Dec 2022 accounting of CHAM G[Redacted] Position)
  - + 8 Points instead of 0 for M[Redacted] C**by DM which does not account for PRiSM; adjusted Points: **44 New Client Points**

**First year as Executive Director Banker, in a challenging/competitive peer group of ED/MD >$3.0MM Revenue Book Size, overall ranking of GOLD**

- Lead Team of one first year Analyst and one offshore Analyst partner to manage $973MM TCP Book of Business with 51 Decision Makers/relationships; 9 of which are brand new DM/relationships to the Fort Worth Private Bank Team
- Navigated request for liquidation of $48MM JPMorgan IM Portfolio and paydown of $35MM Classic LOC when client concerned with liquidity and market volatility. Navigated client anxiety to explore better solutions, and delivered a $35MM monetization of concentrated stock and paydown of LOC. Resulted in $350k+ one-time brokerage revenue while maintaining IM portfolio intact, and concerting $50MM Classic LOCs to PLC- resulting in 2023 YoY RAR improvement of 93%.
- Individually identified, sourced, and won Private Bank business of CEO/Founder and Executive Leadership Team of a $2.5BB Dental Rollup company with 600 dental practices across the U.S. Resulted in $38MM of Brand New IB&C (self-sourced/ not seeded) Flows and $130k+ of brand new revenue.
- Initially introduced to Commercial Building Product Company/Owner in Southlake, TX by Commercial Bank Partner D[Redacted]. After initial meeting/introduction, won $20MM of new assets/business from Charles Schwab 3 months later. Prospect turned client will result in xLOB growth with significant upside to come from business distributions and Trust needs.
- Initially introduced to CEO/Founder and CFO of a popular electrolyte powdered beverage company by Commercial Bank partner Da[Redacted]y M*[Redacted] at a Commercial Bank closing dinner. After establishing relationship and continued dialogue- won $5MM of brand new assets from CFO and CFO's mother. Positioned to add value and displace multi-generational family relationship/incumbent from future liquidity from CEO and other early founders.
- Praised for stellar white glove service by client who decided to leverage JPMorgan Brokerage account for liquidity needs and short term liquidity management with $6MM of assets. Resulted in $6MM of new business to Private Bank. A[Redacted] LLC
- Individually identified, sourced and won Private Bank business for CFO/co-founder of $1.5BB Fort Worth Oil and Gas exploration company. $100MM+ liquidity event expected Q2 2024 in which JPMorgan PB is front runner for proceeds and IM
- D[Redacted] G*[Redacted]onsidered raising cash from JPM IM portfolio to acquire $4MM new land/future home. Navigated discussion to delivery better solution which involved custody services to win assets from RIA and use assets as collateral to convert LOC to larger, less expensive PLC. Resulted in $2MM of PLC flows, $4MM of custody/other, and $3.5MM future mortgage.
- J[Redacted]L[Redacted] called, asking to raise $7.5MM from JPM IM portfolio to acquire new dream home in Park City, UT. After modelling multiple scenarios, highlighting punitive tax consequences, client chose $5MM mortgage, $4MM 1031 Exchange Fund Investment, $1.5MM Brk B PRISM for mortgage down payment, while maintaining JPM portfolio. HOT Q4 pipelines.
- Tasked with rebuilding sensitive relationship (T[Redacted], K[Redacted] and Bi[Redacted]B[Redacted]) after JPMorgan required client to exit $20MM account in 2015 because Private Bank no longer allowed insurance company accounts. Client frustrated and sent all assets to Northern Trust. Due to white glove service and proactive outreach- established trust and won $4MM back in time deposits and cash with verbal indication that Private Bank positioned to win more than $15MM+ back from Northern Trust in 2024.

***Client / Customer / Stakeholder:** Identify and deliver appropriate solutions that address the needs of clients/customers/ stakeholders*

- $2.5BB Dental Rollup Company prospect, with $0 JPMorgan Private Bank relationship initially, requested a lending solution program to monetize their private stock. Introduced Lending Advisor, Credit Executive and Region Head to opportunity. Partnered with Commercial Bank and CIB to get Credit and Lending Team comfortable with a natural secondary market in the event of default. Established a $10MM, revolving, advisory LOC against private stock. Praised by prospect as the only firm that could deliver on the request. Custom and unique lending solution across USPB won $40MM of new PB business with HOT opportunities ($300MM+) in 2024.
- Following prospect pitch to new client and his family office, introduced EBA as Region Head and an extension of the broader coverage team. Facilitated email from CEO Jamie Dimon to prospect/client. Praised by Client during their meeting with the CIB for the great job I was doing and for my "hustle". I was not present during the CIB's pitch to dental company.
- Won $15MM PLC debt with SOFR + 60bps while incumbent, UBS, has a Classic LOC equivalent (70% LV on equities) priced at SOFR + 60 bps. Initially denied rate discount by lending team and asked to pitch SOFR + 1.00% PLC to unseed UBS' SOFR plus 60bps LOC. Client declined initial pitch and returned with lower lending value PLC after receiving lower rate approval. Despite lower lending value, won client's trust and business from UBS.
- Client initially declined commercial aircraft loan term sheet for $5.04MM due to personal guarantee requirement and Commercial Bank could not facilitate. Educated client and leadership on benefits of a personal guarantee and terms, particularly in this credit environment. Won aircraft loan after much deliberation with equipment financing team and client while First Horizon delivered term sheet with similar terms that excluded a personal guarantee
- Brand new prospects unknowingly triggered AML/KYC flags which required full market review/forum and approval from USPB CEO due to legacy commercial settlement with DOJ for alleged Medicare fraud. Prepared in depth business case with mitigating factors and facilitated leadership call prior to hospital trip for delivery of baby. Closely partnered with Commercial Bank, CIB, Reputational Risk Forum, and leadership to gain support and approval. Praised by EBA, Region Head, for persistence and preparation to win approval and business.
- Proactively engaged newly acquired GlobalShares leadership to present opportunities without incentive. Presented four viable GlobalShares opportunities to internal team and clients to deliver better experience than experience with incumbent transfer agent. Identifying client/prospects' commercial need and benefit of formalizing a capital table management solution-introduced GlobalShares and won mandate from Company on behalf of Global Shares. Recognized by JPMorgan Chase WorkPlace CEO for proactiveness and win. Foundation for $2.5BB+ equity management solutions.
- In addition to winning $40MM+ PRISM transaction, presented several concentrated stock opportunities to Strategic Equity Solutions Team. Won additional $1.4MM PRISM on BrkB as solution for mortgage down payment while mitigating capital gains. Pitched $5MM PRISM on Accenture stock to M Redacted S Redacted and $10MM BrkB PRISM to former B Redacted General Counsel as a creative solution to receive a step up in basis on $0 Basis BrkB for Estate Planning.
- Partnered with JPMorgan's Zorch Account Executive to introduce prospect's retail/hat company to the Zorch platform in order to approve and use JPMorgan's logo on prospect's hats. Prospect very appreciative of the additional effort which resulted in a new client and $2MM of new business with significant upside via CRE loans, mortgages, lending and IM. Resulted in introduction to CEO of multi billion dollar Infrastructure/defense services company originally headquartered in California but now HQ'd in client's office in Southlake. Briefly connected with California Managing Director CCBSI coverage for background.
- Continue to maintain strong x LOB partnerships with CB, CIB and BB partners.
  - Maintain connectivity with GHHN CB group and CB partner to stay active with City of Arlington
  - Introduced JPMorgan CCBSI Energy Team to prospect/client P Redacted t E Redacted Partners. CCBSI and CIB in active discussion to lead $300MM RPL and potentially underwrite/issue High Yield and access to capital markets.
  - Introduced D Redacted to large XLOB client for modular home design/construction business. Also introduced same partner to large portfolio holding company based out of Southlake for lending request.
  - Introduced Commercial Bank's Disruptive Tech and Commerce group to consumer retail brand start up and an additional pure prospect based out of Fort Worth that has been identified and recognized as top innovative FW company.
  - Introduced and won 2 large 401k opportunities (local dental practice/family ran and NMOHM/501c3.
  - Strong partnership with Southlake based BB as we cover CRE, $250MM+ client.
- Coordinated and Joined multiple, extensive and lengthy Trust & Estate Planning meetings with R Redacted *I Redacted and W Redacted Resulted in $5MM of new Investment Management from RIA, Fidelity, and Morgan Stanley with identified opportunities to consolidate more Trust assets ($10MM) from RIA, targeting 2024. Additionally- coordinated complex estate settlement upon client's wife passing away in Summer 2023.
- Converted more than 15 legacy, below target ROE Classic Lines of Credit to PLCs (more than $50MM of LOC exposure). Understanding the backlog and resources required to maintain Unsecured Lines of Credit originally in place for the 2nd generation J Redacted Family, encouraged clients to close Unsecured Credit Facilities and established more sustainable HELOCs which significantly freed up Lending Team and Underwriting resources.

***Teamwork and Leadership:*** *Foster a collaborative and inclusive environment that supports growth and development*

- Serve as the Fort Worth Market's subject matter expert in working with Public Company Executives and navigating Restricted Stock transactions, reporting and nuisances. Lead contact and co-lead Senior Banker/ Executive Director on G*H* relationship while mentoring and educating newer Analysts and Advisers how to properly coordinate and prepare/facilitate restricted stock trades during open windows. The entire relationship generates more than $2.5MM revenue for the FW PB across multiple advisers.
- Educated and mentored newer hire SC Advisors how to potentially approach and deliver JPMorgan's value proposition for larger prospects of the FW Office. 1 is a public company regional bank board member and the second is the cofounder of a large, Southlake, TX based infrastructure company that went public via SPAC. Introduced Advisors to GlobalShares call and helped draft prospecting email specifically tailored to Restricted Stock and Public Company Executive services.
- Identified wealth transfer opportunity for $100MM client that has used 100% of her remaining lifetime exemption. Worked directly with CPA and Estate Planning Attorney to provide updates on PLR ruling to port late husband's lifetime exemption and also won mandate/funded a $10MM GRAT in which JPMorgan named as Agent for Trustee (not an IB&C Flow but $15k annual revenue).
  - Complex GRAT not a perfect fit for existing GRAT Calculator and modeling. Personally developed complex modelling to deliver recommendation to freeze GRAT after 4 months given 40% gross return and $3MM wealth transfer. Swapped volatile concentrated stock with cash/CDs/CTAX to yield 6% conservatively for annuity payments. Displayed deep understanding of complex Estate Planning structure and identified opportunity independently.
- Given the large recap event from dental rollup company in early 2024- identified pre transaction planning opportunity to fund DAFs with private stock prior to transaction once a LOI is secured. Coordinated discussion with Family Office CFO and CPA, NPT and Wealth Advisor to discuss nuisances and mechanics of funding DAFs with approx.. $20MM private stock
- Partnered closely with Wealth Strategist, Consultants, Chase Bankers and local FW coverage team to prepare a customizable lunch/learn framework to educate entry level prospect employees/staff on financial literacy and additional topics. Solely designed to build stronger goodwill and bonds with executives of companies. Mentoring/empowering junior Analyst and Associate to take ownership of preparation.
- Led Fort Worth office in banking pilot campaign to attract/retain new business via $3k promotion offer. Resulted in more than 5 new relationships with primary banking and introduced concept to Dental company executives to their top shareholders. Executive Team emailed their top 30 shareholders (all qualified SC PB clients with more than $20MM+ assets each). Seeded SC Associate with more than 15 relationships with significant upside and flows. In Q3, tied to more than $5MM+ IB&C flows and more than $20MM TCP flows.
- Identified/sourced/closed/seeded $4MM of new business for junior Associate from prospect who sold staffing business.
- Praised by EBA/Region Head Team for continued engagement and leadership with the NMOHM relationship, in which EBA is on the National Advisory Council.
  - Coordinated special hard hat tour of the construction site of the NMOHM and focused attendance on a development opportunity for Summer Analysts/Associates and full time Analysts in both Fort Worth and Dallas. Coordinated special appearance of the Board Chairwoman/NFL Team Executive Vice President- whose family is a large, Billion dollar prospect of EBA/Dallas.
  - Lead xLOB banker and relationship manager for the 501c3. Asked to take out regional bank's $90MM Credit Facility given our relationship and service/commitment. Coordinated discussions with senior leaders, 23 Wall, Head of Mortgage/Lending, Commercial Bank and Business Bank. Encouraged NMOHM to keep their deal in place.
- Established strong relationship with existing Mayor, former city of Arlington Mayor and $100MM Foundation Executive Director to consider JPMorgan for their Foundation needs. Navigated complex scenario and great 'at bat' for team.
- Introduced Billion dollar relationship/client's newly established family office to Family Office Initiative and Global Head of Custody and Team. Identified 2 qualified clients to participate in technology pilot program for family office reporting.
- High energy and motivation to explore creative business solutions led to inspiration for Managing Director Investment Specialist to pitch JPMorgan Custody Services to $400MM Foundation/Endowment. In active discussions/consideration.
- Established and have grown strong relationship with difficult CRE professional client that has multiple banking relationships. Closed CVLI loan and in active discussion for $35MM CRE loan. Delivered Term Sheet for refinance of a $30MM CRE loan but given low rate first lien at BoA, did not make sense for client. Praised by client for hustle/effort and creative solutions.
- Identified more than 5 insurance opportunities that included policy considerations of more than $20MM+ in conjunction with client reviews that involve estate planning. Praised by Region Insurance Team Lead for a 'top producer/partner' for insurance.
- Recognized by Offshore Analyst Leadership as a Banker who has best practices in incorporating offshore partner. Groomed offshore partner that historically had consistently less than 40% utilization to fully productive. Asked to share best practices on national Analyst manager Zoom.
- Spearheaded paperless initiative by encouraging use of centralized print shop during end of Analyst manager tenure. Optimized resources after identifying time Analysts spend on binding and stress on local printers.
- Coordinated Houston visit with Analyst partner to visit with Service Coverage Team.

- Worked very closely with the JPMorgan CB and IB on prospecting a Defense Services Contracting Company out of Denton, TX Looped in on $650MM liquidity event expected in 2024 and continue to stay engaged and prospect with CB

***Additional Comments:***

Board Member [redacted] North Texas- very involved and engaged with the DFW community. Identified prospects through this community and continue to network. Directly involved with non profit events- culminating Gala at AT&T Stadium. Participated in [redacted]. Significant community and business leaders now focused and committed to [redacted]

West Point Society Of North Texas- Perot's ranch at Circle T and Vice Chairman of Hillwood.
VETS BRG and Mentor/Advocate for Military Pathways Program.

Participated and garnered MLT budget/$s to sponsor [redacted] VIP event. Directly tied to success and new business.

# Feedback for Joshua Biering between October 01, 2020 and November 18, 2025

## Feedback Requested

### Requested Details

Provided By
[redacted]

Requested By
Joshua Biering

Date Requested
October 18, 2023

Feedback Provided Date
October 25, 2023

Visibility
Feedback shared with Employee and Manager

Message

### Questionnaire

What I did well?

I have worked with Josh for a few years now, he is always friendly & easy to work with. He has been a faithful & trustworthy employee that demonstrates he cares about his job & his clients. He has been quick to respond to requests when additional information is needed. He collaborates with colleagues to ensure effective working relationships in order to accomplish the client's needs.

What can I do better or more effectively?

Josh can utilitize our internal systems to check on status inquiries instead of sending emails to request a status update for AO/KYC tickets.

---

### Requested Details

Provided By
William [redacted]

Requested By
Joshua Biering

Date Requested

Feedback Provided Date

Exhibit
CX228



Strictly Private & Confidential: For JPMC Internal Use Only.

October 16, 2023

October 19, 2023

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh is a go-getter and a driver of business results for our Fort Worth team. Although we do not share client relationships, it is clear that Josh undoubtedly puts the client first and strives to provide creative and sound advice. He brings high-energy to the office and excels at leveraging his experience and knowledge in the industry to win new business.

What can I do better or more effectively?

Josh has a unique opportunity to share his resident knowledge of JPM with newer team members. He should continue to find ways to connect and mentor the less experienced bankers in our market as our office expands.

---

**Requested Details**

Provided By

Shannon [redacted]

Requested By

Joshua Biering

Date Requested

October 03, 2023

Feedback Provided Date

October 11, 2023

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh is a great partner on the team he has a wealth of knowledge and understands very complex clients and their cash flow/balance sheet. His clients have continued to trusted him and understand that he has the best interest at heart. All of his clients that I have worked with tend to lean on him for his knowledge and expertise, which tells me that he is establish himself as a true banker and trusted member of the clients financial team. Josh not only has a great working relationship with his clients also had has a great working relationship with his extended partners, myself included. Josh does a great job of jumping in and helping when needed and assisting us to help get the

---



Strictly Private & Confidential: For JPMC Internal Use Only.

mortgages over the finish line and he is constantly thinking of the mortgage platform when discussing solutions for his clients. He does a great job of continuing to integrate mortgages into the conversation with his clients, even though rates are high. He does a good job of finding creative ways for his clients to use the mortgage platform. Josh has killed it this year on the mortgage side and I look forward to his continued success in the mortgage team.

What can I do better or more effectively?

Going forward, I'd like to see Josh continue to press the mortgage product and continue doing what he's doing. He does a great job and will certainly be lead the Fort Worth Team on the Mortgage Platform offering.

---

**Requested Details**

Provided By
[redacted]

Requested By
Joshua Biering

Date Requested
October 03, 2023

Feedback Provided Date
October 10, 2023

Visibility
Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh has had an outstanding year, winning new business and managing his current book. I have organized several qualitative wins for Josh below into categories that I believe to be noteworthy.

Execution:

- Josh does not take "no" for an answer, and his persistence in each endeavor is recognized/appreciated by each client that Josh goes to bat for. Ultimately, I have seen where this has built a profound level of trust that clients grow in Josh to feel that their wishes are being met as much as possible.
- Josh has taken the time to learn exactly what each process looks like on the operating end of client requests and tasks, though this is not something required by his level of tenure/title. Because of his drive to learn these



Strictly Private & Confidential: For JPMC Internal Use Only

processes, he is able to predict/foresee any potential hangups in each process - allowing for timely and successful execution of everything from AO, CRF, Mortgages, Credit requests, the RSU DRS process, etc etc...
  - Knowing that Josh knows each process has allowed analysts like myself to trust him for guidance while ramping up in the role.

Client Relationships:

- Something Josh often mentions is that we get to choose who we work with in terms of client/banker relationships. Seeing the relationship aspect of the banking piece as a critical element, Josh is able to build strong relationships with those he onboards, and makes it a priority to "click" with each client.
  - Josh has a unique style in which he forms friendships with his clients, transcending beyond the basic banking/business needs that they have. This leads to a level of trust which both allows clients to feel free bringing up a variety of topics/questions/concerns to Josh, and also allows Josh to gain a clearer overall picture of each client – resulting in better holistic financial advice.

Mentorship:

- Josh has been a very hands-on mentor, and I have firsthand witnessed his mentorship to two India offshore analysts, our summer intern, and have heard from past analysts who worked with Josh about how they were mentored by him – in addition to myself.
- Speaking for myself, Josh has looped me into almost every single client email, a multitude of client meetings, and almost all internal meetings. Though this is stylistically a different approach to other Bankers, it has been tremendously helpful in allowing me to gain exposure to a wide variety of functions within the industry. Knowing that I am welcomed to listen into client calls/be a part of emails and meetings has given me confidence to reach out to clients directly, knowing that I am trusted and supported in doing so.
  - In addition, his team has been looped into all client/internal communication, so Josh has held team members/Analysts to the standard of full awareness of all ongoing cases – whether or not there is an action item. Though this can be challenging with a high volume of emails, I have (as a result) gotten to know almost every client in Josh's book/what is going on in their lives. Allowing me/the Analyst to have a pulse for each client/what is ongoing in

their lives has helped me understand the proposals and recommendations that Josh is making to each of them.

- It is a privilege for Analysts to join client meetings as it allows them insight as to whether they want to become a Banker/insight as to what Bankers talk about with clients and types of recommendations that they make. Josh does a fantastic job of helping Analysts gain an understanding of the Banking role by encouraging participation in client meetings.
  - I have gotten various perspectives on this and heard a number of people in this office raise the concern that they do not feel prepared to become an Advisor/Banker given that they have only focused on Analyst/support duties thus far. Josh's hands-on approach has allowed me to truly see what days in the life of a Banker look like, providing an abundance of clarity as to what this job that I am training for truly entails.

Teamwork

- Josh has worked to include various team members in prospecting/client projects, including assisting a SC Associate in onboarding a client that Josh was acquainted with, as well as looping in a different SC Associate to onboard group of top shareholders at a successful Dental company. Additionally, Josh has worked together with various Business and Commercial bankers in sharing referrals and growing the greater JPM business.

What can I do better or more effectively?

Patience:

- Though Josh does a fantastic job with his clients in regards to showing urgency and persistence, I see where he gets frustrated by others' perceived lack of urgency/care towards client requests. Josh can continue to grow in patience with others who are not often working tangentially with his team, and who have a multitude of other action items on their team's plate.

Communication:

- Josh and I have discussed this already and I believe we are now headed in the right direction, but I have asked Josh to slow down in explaining new/complex ideas and action items. I believe this is largely a result of the



Strictly Private & Confidential: For JPMC Internal Use Only.

extreme speed to which our team moves, paired with Josh's ability to think and process quickly, but it can be difficult at times to 'keep up' with everything going on.

- Pushback on this is typically to go ask someone else, but often the types of questions initially that come up are contextual in nature, and I have asked him to be patient with me when asking clarifying questions (help me help you) to limit error.

- Early on, it was difficult for me to identify what exactly I was expected to run with vs what Josh planned to run with. I feel like we have grown exponentially in this area/in our communication, and have a much better understanding of what tasks Josh is expecting me to run with, even with that list continuing to evolve over time.

Overall, Josh Biering has been an excellent mentor to work under, and it has been a privilege to be on his team/learn from the variety of complex client needs that he solves.

---

**Requested Details**

Provided By
Lyndon [redacted]

Requested By
Joshua Biering

Date Requested
October 03, 2023

Feedback Provided Date
October 10, 2023

Visibility
Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh is an effective and passionate advisor and cares deeply about his clients. He is very diligent in delivering a large organization to solve client problems and issues. He moves quickly (sometimes too quickly) to address their issues and provide solutions.

What can I do better or more effectively?

Josh can improve by taking the time to sit down and plan client interactions with fellow team members and seek other input for how best to deliver the firm. He has

---



Strictly Private & Confidential: For JPMC Internal Use Only.

great ideas; planning and diligence will only enhance his brand.

Remember we are playing a team game and we are all in this together, thru good and bad.

---

**Requested Details**

Provided By
Mauricio [redacted]

Requested By
Joshua Biering

Date Requested
October 03, 2023

Feedback Provided Date
October 12, 2023

Visibility
Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh is a banker who possesses many of the qualities of the highest and best performers in the office. His work commitment and ambition is on par with most young analysts at the office. He challenges and pushes everyone at the office to do their very best for the client. He proactively thinks of ways to improve the relationship and portfolio of the client. Josh is someone that will get things done no matter what. By pushing himself daily to his very best, he shows other how they can succeed and sharpen their craft as bankers. Even as a banker, he is one the most knowledgeable people on the floor.

What can I do better or more effectively?

Josh can continue to learn to communicate more effectively on what, how, and when things need to be done. When things are unclear or frequently going wrong, it is good to stop to communicate and receive expectations on the situation. By setting a timeline rather than a rush, banker, analysts, and investors can reduce errors, improve quality of product/service, and reduce stress by all parties.

Josh can do better in understanding the capacity and work of others. This will allow him to be more intentional with his time and others. It will also lead to a more efficient work environment that can produce timely and quality results.



Strictly Private & Confidential: For JPMC Internal Use Only.

**Requested Details**

Provided By
Jacob [redacted]

Requested By
Joshua Biering

Date Requested
October 03, 2023

Feedback Provided Date
October 18, 2023

Visibility
Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh works hard to meet metric goals by providing excellent advice and service to his clients and prospects. He is an active prospector and innovates within his current client base to bring about client-first activity. His work ethic allows for productive client/prospect activity as well as a growing expertise in all matter of advice. For investments, he is actively pursuing OTC derivative transactions that meet his client's goals. For estate planning he is mindful of estate planning and freezing techniques (GRATs, spousal trusts) that bring significant results to bear for his clients and the firm. He is a valuable member of the team and I am thankful to be included on many of his relationships.

What can I do better or more effectively?

In this business, there are times to sprint and times to jog in order to properly meet the needs of his growing client book and his growing family. We are all pursuing this balance that will only come through some trial and error in this regard.

---

**Requested Details**

Provided By
Ethan [redacted]

Requested By
Joshua Biering

Date Requested
October 03, 2023

Feedback Provided Date
October 10, 2023

Visibility
Feedback shared with Employee and Manager

Message



Strictly Private & Confidential: For JPMC Internal Use Only.

**Questionnaire**

What I did well?

Josh is extremely helpful providing information wherever available and is consistently engaged with both client and the Global Shares team throughout the process. Overall Josh positions himself as a valuable partner.

What can I do better or more effectively?

No clear flaws identified in process or conversations - will be happy to partner with Josh in the future.

---

**Requested Details**

Provided By

Daniel [redacted]

Requested By

Joshua Biering

Date Requested

October 03, 2023

Feedback Provided Date

October 09, 2023

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

- Josh is a great partner who looks for opportunities to get others involved, in order to holistically help clients.
- Josh is very thoughtful when thinking through solutions that can help clients. He is always thinking about, and discussing, different methods that can help a client, and not just banking solutions.
- He is quick to involve any contact that can add value and is always looking to add to his network.
- The way he thinks through deals and client needs is helping me to get better and more thoughtful as I look to do the same. I have enjoyed partnering with Josh and look forward to continuing to do so!

What can I do better or more effectively?

---

**Requested Details**

Provided By

Requested By



Strictly Private & Confidential: For JPMC Internal Use Only

Mark [redacted]

Joshua Biering

Date Requested

October 03, 2023

Feedback Provided Date

October 09, 2023

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh brings a lot of passion and energy to the business. I appreciate Josh's hunger to continue to win, and bring in new business. Josh doesn't take roadblocks at face value, and is always thinking of creative solution to help drive business, and help our clients accomplish what they're looking for. He makes me a better investor by encouraging me to think outside the box. Lastly, Josh leverages the firm (internal PB partners, CB, etc) as well or better than other banker i've worked with.

What can I do better or more effectively?

Josh's business runs a million miles a minute. While it is part of the reason he's been successful, it can impede true growth over the long run. I think it's important to keep in mind that "slowing down" doesn't mean someone is any less hungry, or is getting lazy. But it allows for more of a sustainable business (for both Josh and his partners) over time. Slowing down allows for less self-induced stress, and allows for better partnerships across various teams (analysts, investors, lenders, onboarding, service, etc.).

---

**Requested Details**

Provided By

Shay Boitmann

Requested By

Joshua Biering

Date Requested

October 03, 2023

Feedback Provided Date

October 17, 2023

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?



Strictly Private & Confidential: For JPMC Internal Use Only

I've had the opportunity to recently partner with Josh on the MI Redacted prospect relationship. In the short amount of time working together it is already apparent that he will do anything within his power to get the job done for the clients he supports.

As it relates to servicing our current clients' and prospects' ongoing relationships, Josh does an excellent job thinking across JPM's LOB to bring in thoughtful partners to further enhance and grow his & our firm's asset size & retention with clients. He does this in a way I've seen very few bankers match.

Josh has a pragmatic way of communicating with clients and has the ability to get his point across without too much additional fluff. He is straightforward in asking for the business and has done a great job enforcing credibility across his network through creative problem solving with high financial acumen for large opportunities. As an example, our mortgage lender has made several comments that Josh does the job better than some of her peers in how easily he conveys the lending story.

What can I do better or more effectively?

Josh works incredibly hard on a daily basis to ensure nothing gets left on the table-whether it be communication to clients, servicing issues, plan implementation or more creative programs he has in the works.

With the amount of continuous ideas Josh is working on at one time it can become difficult to follow along on where we are in the sequence when asked to jump in on a task. This is something our team has started to work on more effectively in scheduling weekly meetings to ensure we are all on the same page for service, task & communicating one cohesive message to the individuals we support.

---

**Requested Details**

Provided By
Carmen [redacted]

Requested By
Joshua Biering

Date Requested
October 03, 2023

Feedback Provided Date
October 23, 2023

Visibility
Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

It has been a great experience working with Josh this year. He brings an ambitious energy to the team. He is hard working and is focused on delivering for his clients. I admire Josh's efficiency and concentration, which I try to mirror in my own day-to-day routine. I appreciate Josh's transparency and his immediate feedback. His partnership is very much appreciated, and I look forward to learning more from him in the future.

What can I do better or more effectively?

As we go into the new year and our support team begins to settle into their roles, I look forward to joining more of the Team Biering meetings. I think Josh gives fresh perspectives on our products, and I would like to be more a part of the thought process behind each proposal. I also would like to see Josh take more of a mentor approach with his support team. I believe he has a lot to offer and could mature his leadership skills by taking on a coaching role as well.

---

**Requested Details**

Provided By

Chloe [redacted]

Requested By

Joshua Biering

Date Requested

October 03, 2023

Feedback Provided Date

October 10, 2023

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

In my interactions with Josh in an in person client experience have always been positive. I think Josh does a great job in knowing his clients and being attentive to their needs. I have not been around him or JP Morgan long to see his development nor how he has work to build his book; however, when I have see him pursue a prospect from the other side of the SC desk, I have been impressed by the knowledge he brings to the client calls and the prep work he puts in for the meetings. I also have witnessed him reaching out to his resources around the office which shows if he doesn't know something, which seems to be rare, he does know who does know and makes sure he gets them connected to his clients. I did have the pleasure of helping his set up a meeting in Dallas for one of his bigger clients, and the level of care, knowledge, and professionalism he - and [redacted] - brought to the whole experience was very impressive. Recently, I have had the opportunity to him agree to help and support the newer bankers and the bankers with smaller books. He taking the time out of his day to pay if forward is exactly what our Fort Worth SC team and JP Morgan is all about.

---

Lastly, I do appreciate his humor on the desk and his willingness to work to break the ice with any and everyone. In this line of work, it can be stressful and fasted pace, but I think he does a good job of bring humor into the office in appropriate, and maybe some inappropriate times, but it seems to be something we all need.

What can I do better or more effectively?

I do not believe I have worked with Josh long enough to provide in depth feedback in particular areas of growth, but I will say it is always a good idea to evaluate to see if the amount of pressure one puts on them self is not transfer, in full force, to others around you. As I said above, I think Josh is very committed to his clients and JP Morgan which can be shown in his dedication to a longer work day or a more intense approach to his clients; however, that level of commitment cannot always be expected for everyone he works with. Sometimes a certain client needs our extended time which can chip into our personal time; however, it cannot always be that way for everyone. Also, I do not know his client book, so I might be off in saying, his phone conversation could be more appropriately handled. However, I believe he knows his clients well and if they appreciate course language or tangent type stories, then that is no necessarily an area of improvement. Last thing, I have observe Josh talking across the office to others regarding different topics, most of all of them being work/client related, and those types of conversations need to happen; however, I think it would be more appropriate and professional if he were to walk over or call them over and talk to the person on a one on one basis. Though it might seem to be more efficient to talk across the SC desk into the investment desk, I think it can be distracting to others and the person he is trying to communicate with may not realize he needs them so repeated calls can make it less efficient than what was first planned.

---

**Requested Details**

| Provided By | Requested By |
| --- | --- |
| Hugh [redacted] | Joshua Biering |
| Date Requested | Feedback Provided Date |
| October 03, 2023 | October 03, 2023 |
| Visibility | Message |
| Feedback shared with Employee and Manager | |

**Questionnaire**

What I did well?

Josh has been incredible to work with since day 1, and he has been a huge advocate for Global Shares. His willingness to share our story with colleagues across various lines



Strictly Private & Confidential: For JPMC Internal Use Only.

of business has lead both directly and indirectly to new client logos being added to our portfolio.

His knowledge of his clients and target market is second to none, and my team and I very much look forward to continuing to work with Josh.

Keep up the good work Sir.

What can I do better or more effectively?

---

## Requested Details

Provided By
James [redacted]

Requested By
Joshua Biering

Date Requested
October 03, 2023

Feedback Provided Date
October 06, 2023

Visibility
Feedback shared with Employee and Manager

Message

## Questionnaire

What I did well?

Josh delivers all that the bank has to offer to his clients. He works diligently to deepen existing relationships and to develop new ones. Josh has exhibited a very good comprehension of various wealth advisory strategies and when to strategically apply them to the client's circumstances to accomplish the client's goals. He also conveys the bank's value proposition that demonstrates that the fees the client are being charged are reasonable considering the services being delivered and does not lead with a request for a discount.

What can I do better or more effectively?

Josh has several clients that we now have all or almost all of the client's wallet share or where their net worth has significantly decreased since wealth advisory was introduced to the client. In those situations, Josh should steer the client more to the client's tax and legal advisors when changes need to be made to their estate plans or leverage our trust team to review their plans/documents and answer their questions so I can focus my time on larger clients/prospects to grow the market. Josh can sometimes be a bit



Strictly Private & Confidential: For JPMC Internal Use Only.

short with teammates (as we all can from time to time considering our high stress jobs). He might want to focus on better communication with ITMs to help foster a positive work environment and help develop and mentor junior ITMs.

---

**Requested Details**

Provided By
Mitchell [redacted]

Date Requested
October 03, 2023

Visibility
Feedback shared with Employee and Manager

Requested By
Joshua Biering

Feedback Provided Date
October 04, 2023

Message

**Questionnaire**

What I did well?

Josh is by far the hardest working Banker that I partner with. Josh does an incredible job at fighting for the best outcome for his clients. He cares deeply about finding the best solution and will push myself, and other internal partners, to think as creative as possible. Josh generates the largest volume of custom credit solutions in the single coverage team. He does a great job at engaging me early and often, which allows his clients to come to me directly on credit needs. In partnering with Josh, we were able to execute a $10mm private stock loan, which has led to a greater than $300mm investment management opportunity. The deal would not have been completed without Josh's persistence. Other transactions that I have worked on with Josh are a $15mm CRE loan, a couple unsecured credit facilities, and numerous repricing efforts. I think Josh is a fantastic Banker who will always fight for the best outcome for his clients.

What can I do better or more effectively?

My feedback for Josh is to take more time off. Even when Josh is OOO, he is still heavily engaged in his email. It is important for longevity to take time off and come back fresh.

---

**Requested Details**

Provided By
Brooke [redacted]

Date Requested
October 04, 2022

Requested By
Joshua Biering

Feedback Provided Date
November 16, 2022



Strictly Private & Confidential: For JPMC Internal Use Only.

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh is one of the best bankers in the biz - he is a go-getter and is very hungry to win new business. He is not afraid to go after significant opportunities, pull out all the stops and engage senior leaders to win business. He is all over client relationships, communicates clearly internally/externally and is very organized in his approach. Combined with my role on investments, I am confident our clients are very well covered. He knows everything from banking to lending to estate planning, and provides valuable advice to clients - often going the extra mile for clients when other bankers would just give up. More bankers need to be like Josh!

Josh has significantly increased his visibility and is a valuable leader on our team. He is very dedicated to his role as Analyst Manager and has made a great impact on our local team's younger talent. In addition, he continues to use his voice to express important thoughts, opinions and feedback, which is critical. Keep it up.

What can I do better or more effectively?

I really don't have any constructive feedback for Josh. Take more time off! Continue to grow & serve as a leader - I think a lot of opportunities/doors will open for you.

---

**Requested Details**

Provided By

Patrick [redacted]

Requested By

Joshua Biering

Date Requested

October 04, 2022

Feedback Provided Date

November 14, 2022

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Client Focus/Execution - Josh does a great job promptly following up on client requests and putting their needs first. He is organized to ensures tasks don't slip through the cracks. In addition, he prepares extensively for client meetings.

---



Strictly Private & Confidential: For JPMC Internal Use Only.

Resourceful - Josh uses all resources available to meet a client need or win a prospect. Recently, I worked with Josh on pitching a large prospect, and he utilized partners from the commercial bank, investment bank, and other departments to gather intel and strengthen his toolkit when pitching the prospect. He offered many solutions on our PB platform (credit, mortgage, investments, wealth planning, etc) to showcase our wide capabilities.

Involvement - As analyst manager, Josh helps the analysts identify opportunities to get involved through work and the community. For example, Josh gave me the opportunity to get involved with [redacted] and the Analyst Digital Roundtable.

What can I do better or more effectively?

More of a suggestion, but I recommend setting up quarterly or some scheduled meeting cadence with the analysts. As analyst manager, it will enable to you to gather more regular feedback.

---

**Requested Details**

| | |
|---|---|
| Provided By | Requested By |
| Vincent [redacted] | Joshua Biering |
| Date Requested | Feedback Provided Date |
| October 04, 2022 | October 14, 2022 |
| Visibility | Message |
| Feedback shared with Employee and Manager | |

**Questionnaire**

What I did well?

Josh does a good job of communicating deadlines and explaining the why behind the work he requests. I've learned a lot from Josh about how to make the client experience seamless and positive. He also has a pleasant disposition, which is a nice change of pace in such a high-intensity role. Josh has been approachable as an analyst manager and I genuinely believe he does what he can to help out the analyst class. I appreciate his willingness to let me interact with his clients despite my youth in the firm.

What can I do better or more effectively?

I'm coming from a place of bias here, but I think Josh has the leverage to lobby on behalf of partner coverage juniors. The work load divide is fairly significant, especially with the new analysts added to single coverage. There's probably plenty I don't understand behind the scenes, but it would be nice to have him push hard for additional coverage on this side of the office.

---

**Requested Details**

Provided By

Richard [redacted]

Requested By

Joshua Biering

Date Requested

October 04, 2022

Feedback Provided Date

October 06, 2022

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

Josh has done a good job serving in the analyst manager capacity this year. He is communicative and keeps everyone in the loop to what is going on and what is expected of them. He holds the analysts to high standards and is available when we have something on our mind to discuss.

I appreciate the time Josh dedicates to the analysts outside of his day-to-day and it is very apparent that he cares deeply about the analyst population.

What can I do better or more effectively?

Finding time to schedule individual time with the analysts would be beneficial to development and providing feedback. Everyone has incredibly busy schedules and Josh has been clear that he is available if we need to schedule time. However, I think having a consistent time to sit down in a private setting and discuss things that are going on would be beneficial in a more frequent fashion then bi-annually.

**Requested Details**

Provided By

Mitchell [redacted]

Requested By

Joshua Biering

Date Requested

October 04, 2022

Feedback Provided Date

October 05, 2022

Visibility

Feedback shared with Employee and Manager

Message

**Questionnaire**

What I did well?

I have had the opportunity to partner with Josh on several client relationships. Josh has been a fantastic partner that I have greatly enjoyed working with. In my opinion, his



Strictly Private & Confidential: For JPMC Internal Use Only.

CONFIDENTIAL 

business development skills are fantastic and does a great job at putting the client first. Josh is one of the best that I have seen in terms of navigating the firm and finding ways to turn "No's" into a "Yes". I have seen that done several times on difficult credit, derivative, onboarding, investment asks. He asks a lot of his peers but does a great job at giving those same people responsibility to take on outsized roles, which is great for development. I think Josh is on an amazing track to be very successful within JPMorgan. He has juggled a lot this year with being the Analyst Manager and has done a great job

What can I do better or more effectively?

Josh has a large workload with being Analyst Manager and a full client load. I would encourage Josh that it is OK to say "no" to some internal roles every now and then to free up time so he isnt too busy. It doesnt help that he also has a newborn at home!

---

**Requested Details**

Provided By
Mark [redacted]

Requested By
Joshua Biering

Date Requested
October 05, 2021

Feedback Provided Date
October 31, 2021

Visibility
Feedback shared with Employee and Manager

Message
Please provide YE feedback.

**Questionnaire**

What I did well?

Josh does a fantastic job being an advocate for his clients. [redacted] Josh continues to be a leader for all things G Redacted and continues to help the newer team members come up to speed on a very complicated client, whether he directly covers the client or not. From my perspective, it doesn't seem as if we've skipped a beat since Randal's retirement.The respect his client's have for him, says everything you need to know about how well Josh serves our clients.

What can I do better?

Not much here, I've really enjoyed getting to work with Josh

---

**Requested Details**

Provided By
Ben Stewart Jr.

Requested By
Joshua Biering

Date Requested
October 05, 2021

Feedback Provided Date
October 15, 2021

Visibility
Feedback shared with Employee and

Message



Strictly Private & Confidential: For JPMC Internal Use Only

CONFIDENTIAL 

Manager

Please provide YE feedback.

**Questionnaire**

What I did well?

You have done a great job of searching for new business in the community we serve. You have also continued to be a go to resource for the goosehead relationship. You have been a banker who is never afraid to push across hesitations internally to get your clients what they deserve. I wish there were more bankers that fought as hard as you do for their clients. You have handled RR clients with delicacy and care and prevented any of them from considering alternatives after his retirement. You have stepped into a new challenge of analyst manager and shown that you want to fight for this team to grow.

What can I do better?

As analyst manager, i would continue to work on ways to improve your partnership. This is a new challenge for our market but yourself and Allison will do great things in this role. As we evaluate ourselves during this time of year, i would also advise you to evaluate your partnership with each other. As a banker, I would encourage you to reach out to SC team members and form partnerships within our office to further prospecting, knowledge sharing, and culture growth. Speak up in group settings. There is overwhelming value in having your voice known in our Fort Worth office. You've got great ideas, and its time for the whole office to learn from them.

---

**Requested Details**

| Provided By | Requested By |
|---|---|
| Brooke [redacted] | Joshua Biering |
| **Date Requested** | **Feedback Provided Date** |
| October 05, 2021 | October 29, 2021 |
| **Visibility** | **Message** |
| Feedback shared with Employee and Manager | Please provide YE feedback. |

**Questionnaire**

What I did well?

Josh is a great partner on the team and very enjoyable to work with. He is a go-getter and hungry to succeed. He helps the team stay organized and focused on outstanding tasks so nothing slips through the cracks.

Josh is very knowledgeable of the JPM platform and speaks very well to all of our offerings from banking to lending to estate planning.

---



Strictly Private & Confidential: For JPMC Internal Use Only

Client is always first. He does a great job managing relationships and thinking outside the box – presenting all options / creative solutions available to client and going above and beyond to obtain unique products or improved pricing. He does this better than any other Banker I work with.

What can I do better?

Stretching to think of something here. Remember to keep the full team in the loop when you have meaningful meetings/convos with clients we share and we're not involved.

---

**Requested Details**

Provided By

Sarah [redacted]

Requested By

Joshua Biering

Date Requested

October 05, 2021

Feedback Provided Date

October 27, 2021

Visibility

Feedback shared with Employee and Manager

Message

Please provide YE feedback.

**Questionnaire**

What I did well?

Moreso than other bankers, Josh does a great job of empowering his analyst once trust is established, and gives them meaningful tasks to complete with direct client interaction. Josh collaborates closely not only with team members across the floor but also leverages his vast network throughout the broader firm, bringing in colleagues from other lines of business to provide well thought-out solutions for his clients' complex problems. Josh has already begun making a positive impact as analyst manager, and is very well-suited for this leadership role.

What can I do better?

N/A

---

**Requested Details**

Provided By

Lyndon Westerberg

Requested By

Joshua Biering



Strictly Private & Confidential: For JPMC Internal Use Only.

Date Requested
October 05, 2021

Feedback Provided Date
October 15, 2021

Visibility
Feedback shared with Employee and Manager

Message
Please provide YE feedback.

**Questionnaire**

What I did well?

Josh is very well organized in his approach to client coverage and is working hard with prospects to expand his book. He is easy to work with and a good communicator. Josh does a great job in providing direction and purpose to each client meeting.

What can I do better?

Josh can continue to deepen his investment dialogue and enhance the holistic dialogue with his clients. I look forward to do more prospecting with Josh in 2022.



Strictly Private & Confidential: For JPMC Internal Use Only.

Message

App. 0342

**From:** Aughinbaugh, John T [john.t.aughinbaugh@jpmorgan.com]
**Sent:** 8/23/2023 1:34:06 PM
**To:** Wiginton, Phillip B [phillip.b.wiginton@chase.com]; Biering, Josh [josh.biering@jpmorgan.com]; Ogle, Daniel M [daniel.m.ogle@chase.com]
**CC:** Stewart, Ben [ben.stewart@jpmorgan.com]; Hitchcock, Kyle E [kyle.e.hitchcock@jpmorgan.com]; Team Biering [Team_Biering@jpmorgan.com]; Roberts, Mark M [mark.m.roberts@jpmorgan.com]
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Awesome work (as always)!!!! Thank you Daniel and Josh!

**J.T. Aughinbaugh** | Managing Director | **J.P. Morgan** | 420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4463 | john.t.aughinbaugh@jpmorgan.com | jpmorgan.com/privatebank

**J.P. Morgan Securities LLC** | **JPMorgan Chase Bank, N.A.**

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

**From:** Wiginton, Phillip B (CB, USA) <phillip.b.wiginton@chase.com>
**Sent:** Wednesday, August 23, 2023 7:48 AM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>; Ogle, Daniel M (CB, USA) <daniel.m.ogle@chase.com>
**Cc:** Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>; Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>; Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>; Team Biering <Team_Biering@jpmorgan.com>; Roberts, Mark M (WM, USA) <mark.m.roberts@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

That's fantastic! Congrats on a big win! Love the partnership and glad it's leading to success!

**Phillip B. Wiginton** | Market Executive | **Commercial Banking** | 420 Throckmorton Street, 4th Floor | Fort Worth, TX 76102 | Office: 214 965 2193 | Cell: 713 305 7071 | SMS/Text: 214 336 9638 | phillip.b.wiginton@chase.com | jpmorganchase.com/commercial

**Executive Assistant**: Marilyn Ramos | T: 214-965-2021 | Marilyn.m.ramos@jpmorgan.com

CHASE

**From:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Sent:** Wednesday, August 23, 2023 7:02 AM
**To:** Ogle, Daniel M (CB, USA) <daniel.m.ogle@chase.com>
**Cc:** Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>; Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>; Wiginton, Phillip B (CB, USA) <phillip.b.wiginton@chase.com>; Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>; Team Biering <Team_Biering@jpmorgan.com>; Roberts, Mark M (WM, USA) <mark.m.roberts@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Daniel-

Exhibit
CX109

Just wanted to update the broader group and say thank you again for your amazing partnership!

We successfully onboarded the M[redacted] Family and just received $12MM from C[redacted] S[redacted] with a trajectory to receive significantly more within next 12-18 months.

Thanks again!

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** Garren, Belen M (CB, USA) <belen.m.garren@chase.com>
**Sent:** Friday, June 23, 2023 8:28 PM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>; Ogle, Daniel M (CB, USA) <daniel.m.ogle@chase.com>
**Cc:** Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>; Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>; Wiginton, Phillip B (CB, USA) <phillip.b.wiginton@chase.com>; Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>; Team Biering <Team_Biering@jpmorgan.com>; Chilian, Peter C (WM, USA) <peter.c.chilian@jpmorgan.com>; Gordillo, Diego M (CB, USA) <diego.m.gordillo@chase.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Just love this partnership!!!

Thank you so much, Daniel and greatly appreciate you raising, Josh!

Fort Worth is on Fire!

**Belen Garren** | Region Manager | Middle Market Banking & Specialized Industries | **Commercial Banking** | 1900 Akard St, Floor 03| Dallas, TX 75201 | T: 817 657 4227 | belen.m.garren@chase.com | jpmorganchase.com/commercial

**Executive Assistant**: Kara Harrell | T: 817-884-4629 | kara.harrell@chase.com

J.P. Morgan Securities, LLC

App. 0344

**From:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Date:** Friday, Jun 23, 2023 at 12:38 PM
**To:** Ogle, Daniel M (CB, USA) <daniel.m.ogle@chase.com>
**Cc:** Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>, Garren, Belen M (CB, USA) <belen.m.garren@chase.com>, Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>, Wiginton, Phillip B (CB, USA) <phillip.b.wiginton@chase.com>, Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>, Team Biering <Team_Biering@jpmorgan.com>
**Subject:** FW: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Daniel-

Just wanted to send a quick note to say thank you for the introduction and referral to M[redacted] M[redacted]! We have had several productive follow up meetings and are officially onboarding the M[redacted] Family to the Private Bank!

Incredibly thankful for your partnership and looking forward to continue growing our business together!

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** Biering, Josh (WM, USA)
**Sent:** Friday, June 23, 2023 11:12 AM
**To:** M[redacted] M[redacted]
**Cc:** Team Biering <Team_Biering@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

M[redacted]-

Great chatting with you. As discussed- here is a list of the information we'll need to start the Private Bank Onboarding for you and your family. Given our high level discussion on estate planning considerations, let's get out to River Crest CC in mid-July for a follow up discussion- I'll be sure to include J[redacted] and M[redacted] (they are great golfers as well and available if you want to discuss Estate Planning and/or Lending). How does your travel schedule look then?

I'll send a follow up encrypted email immediately following this email so you can send me the information securely.

To start- we'll open the following:

- M[redacted] M[redacted] individual checking
  - Debit Card
- M[redacted] and V[redacted] Joint Checking, Savings Brokerage
  - Debit Cards and Checks
- M[redacted] M[redacted] individual checking
  - Debit Card/Checks
- J[redacted] M[redacted] individual checking
  - Debit Card/ Checks
- L[redacted] Trust Checking/Brokerage Account

Documents/Information Needed:

- M[redacted] M[redacted] Information (received)
- V[redacted] M[redacted]
  - DL
  - SSN
  - Email
  - Cell Phone #
- M[redacted] M[redacted]
  - DL
  - SSN
  - Email
  - Cell Phone #
- J[redacted] M[redacted]
  - DL
  - SSN
  - Email
  - Cell Phone #
- L[redacted] Trust
  - Trust Agreement
  - Tax ID (most often Grantor SSN- you or V[redacted]?)
- C[redacted] S[redacted] recent Statements (different then the positions report you provided) – not immediately needed for onboarding, but will need if we decide to proceed with funding and a relationship. Attached is an example of how we approach portfolio construction/allocation. Ton of detail to unpack here- but our Advisory Fee Schedule is on page 23. Let's discuss further post onboarding.
  - As discussed, starting out with a $6MM Portfolio will easily allow us to set up a Zero cost, portfolio line of credit at SOFR plus 1.45%
- 401k (I'll send you a follow up, separate email to request this information to bifurcate personal from business)
- Umbrella Policy Introductions- In a follow up email I'll introduce you to 2 separate, highly capable insurance contacts- H[redacted] and G[redacted] Insurance (M[redacted] C[redacted] Agency- I want to introduce you and M[redacted] to the C[redacted] Brothers).

Thank you for the opportunity- I look forward to working with you and your family!

Josh

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

App. 0346

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** M[redacted] M[redacted]
**Sent:** Thursday, June 22, 2023 6:06 PM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Cc:** Team Biering <Team_Biering@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

I just uploaded it on the other application. I can take a call tomorrow on my cell [redacted] from 10-11:30 or Monday 11-2.

Thank You

[redacted]

M[redacted] M[redacted]

[redacted]

**Trust. Passion. Partnership. Continuous Improvement.**

**ONE STOP SHOP.** 24/7 online ordering, shipment tracking, and account access.

**GUARANTEED QUALITY.** Superior, high-quality products that are designed to last.

**FAST & EASY SHIPPING.** Free, same-day shipping that delivers orders in 1-3 business days*. *View shipping policies for more details

**CONSTANT SUPPORT.** Technical Support Team with extensive product knowledge.

---

**From:** Biering, Josh <josh.biering@jpmorgan.com>
**Sent:** Thursday, June 22, 2023 1:57 PM
**To:** M[redacted] M[redacted]
**Cc:** Team Biering <Team_Biering@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

M[redacted]-

Received the Balance Sheet- thank you!

I'm having a hard time deciphering the "all positions" document you sent over- it looks like some of the formatting was distorted once the document was converted to PDF. Any chance you have recent statements you can shoot over? That will also allow us to run a detailed analysis and proposal for you.

If you want to move forward with onboarding- happy to discuss next steps over a quick call and to request initial onboarding information (driver's license, SSN, etc). Would love to extend the Private Bank relationship to the broader M[redacted] family- I trust you will find beneficial and helpful.

Lots of things we can connect on ranging from banking, investments, credit and estate planning.

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

**From:** M[redacted] M[redacted]
**Sent:** Wednesday, June 21, 2023 6:18 PM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Hi Josh,
I just updated our balance sheet. Do you have a place where I can upload it?

Thank You

[redacted]

**M[redacted] M[redacted]**

[redacted]

**Trust. Passion. Partnership. Continuous Improvement.**

ONE STOP SHOP.
24/7 online ordering, shipment tracking, and account access.

GUARANTEED QUALITY.
Superior, high-quality products that are designed to last.

FAST & EASY SHIPPING.
Free, same-day shipping that delivers orders in 1-3 business days*.
*View shipping policies for more details.

CONSTANT SUPPORT.
Technical Support Team with extensive product knowledge.

App. 0348

**From:** Biering, Josh <josh.biering@jpmorgan.com>
**Sent:** Friday, June 9, 2023 2:14 PM
**To:** M[redacted] M[redacted]
**Subject:** Re: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

M[redacted]

Great round yesterday- we will need to do it again soon! We need to have you guys out at River Crest. Naturally - K[redacted] is already bragging to the entire office...

Enjoy celebrating M[redacted] 25th and let me know how my team can be helpful. Have a great weekend!

JB

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 212 3096 | M: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** Biering, Josh (WM, USA)
**Sent:** Tuesday, June 6, 2023 7:00:21 AM
**To:** M[redacted] M[redacted]
**Cc:** Wyss, James O (WM, USA) <james.o.wyss@jpmorgan.com>; Saltzstein, Mitchell R (WM, USA) <mitchell.r.saltzstein@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

M[redacted]-

I'll give you a call later this morning- but we have a few options, pending you and your son's availability :

Option 1:
Golf River Crest Country Club, Wednesday, 6/7 (course is preparing for their renowned member guest- Crestival- so course will be in awesome shape)

Option 2: Keep original date, Thursday, 6/8- and I can get us on H[redacted] C[redacted] C[redacted] in Las Colinas, or will be more than happy to treat at Dallas Cowboys or Texas Rangers Golf Club.

I look forward to visiting with you all!

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Sent:** Saturday, June 03, 2023 10:27 AM
**To:** M[redacted] M[redacted]
**Cc:** Wyss, James O (WM, USA) <james.o.wyss@jpmorgan.com>; Saltzstein, Mitchell R (WM, USA) <mitchell.r.saltzstein@jpmorgan.com>
**Subject:** Re: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

M[redacted]-

I overlooked that RCCC's member guest "Crestival" will begin next Thursday. Any chance we can flex to golf Wednesday 6/7 instead?

We will still celebrate your son's birthday accordingly!

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 212 3096 | M: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** Biering, Josh (WM, USA)
**Sent:** Thursday, June 1, 2023 6:11:15 AM
**To:** M[redacted] M[redacted]
**Cc:** Wyss, James O (WM, USA) <james.o.wyss@jpmorgan.com>; Saltzstein, Mitchell R (WM, USA) <mitchell.r.saltzstein@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Perfect!

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan

PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** M[redacted] M[redacted]
**Sent:** Wednesday, May 31, 2023 5:51 PM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Cc:** Wyss, James O (WM, USA) <james.o.wyss@jpmorgan.com>; Saltzstein, Mitchell R (WM, USA)

<mitchell.r.saltzstein@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

App. 0351

Thanks, I will see if my son can join since that is his birthday :)

Thank You

[redacted]

M[redacted] M[redacted]

[redacted]

**Trust. Passion. Partnership. Continuous Improvement.**




**From:** Biering, Josh <josh.biering@jpmorgan.com>
**Sent:** Wednesday, May 31, 2023 3:59 PM
**To:** M[redacted] M[redacted]
**Cc:** Wyss, James O <james.o.wyss@jpmorgan.com>; Saltzstein, Mitchell R <mitchell.r.saltzstein@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Good deal- just shot an invite for the 8th. Feel free to bring a guest if you'd like!

From JPMorgan Private Bank:

Mitch Saltzstein – Lending Specialist
Jim Wyss- Wealth Advisor (Trusts & Estates expert)

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through

a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

**From:** M[redacted] M[redacted]
**Sent:** Wednesday, May 31, 2023 3:07 PM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Sounds great!

Thank You

[redacted]

M[redacted] M[redacted]

[redacted]

**Trust. Passion. Partnership. Continuous Improvement.**




**From:** Biering, Josh <josh.biering@jpmorgan.com>
**Sent:** Wednesday, May 31, 2023 1:52 PM
**To:** M[redacted]e M[redacted]
**Subject:** RE: [EXTERNAL]RE: JPMorgan Private Bank Next Steps

M[redacted]-

How about Thursday, 6/8? If your schedule allows it, I'd be happy to host you for a golf round at River Crest CC in Fort Worth. I can also introduce you to my Trusts & Estates Expert/Partner J[redacted]h W[redacted]. Alternatively, happy to swing by your office.

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan
PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** M[redacted] M[redacted]
**Sent:** Wednesday, May 31, 2023 11:27 AM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Subject:** [EXTERNAL]RE: JPMorgan Private Bank Next Steps

Hi Josh,
I am in town June 6 to the 13th. Let's try and meet up on one of those days to discuss then next steps.

Thank You

[redacted] M[redacted] M[redacted]

**Trust. Passion. Partnership. Continuous Improvement.**

**ONE STOP SHOP.** 24/7 online ordering, shipment tracking, and account access.

**GUARANTEED QUALITY.** Superior, high-quality products that are designed to last.

**FAST & EASY SHIPPING.** Free, same-day shipping that delivers orders in 1-3 business days*. *View shipping policies for more details.

**CONSTANT SUPPORT.** Technical Support Team with extensive product knowledge.

---

**From:** Biering, Josh <josh.biering@jpmorgan.com>
**Sent:** Wednesday, May 31, 2023 7:05 AM
**To:** M[redacted] M[redacted]
**Cc:** Ogle, Daniel M <daniel.m.ogle@chase.com>
**Subject:** RE: JPMorgan Private Bank Next Steps

M[redacted]

I hope you and your family had a wonderful Memorial Day Weekend! I'm sorry I missed you at the Colonial- I trust you had a great time!

Please let me know if there is anything I can be doing for you and your family- look forward to visiting soon.

Many thanks,

Josh

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com



J.P.Morgan

PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** Biering, Josh (WM, USA)
**Sent:** Monday, April 10, 2023 7:24 AM
**To:** [redacted]
**Cc:** Ogle, Daniel M (CB, USA) <daniel.m.ogle@chase.com>; Saltzstein, Mitchell R (WM, USA) <mitchell.r.saltzstein@jpmorgan.com>; Team Biering <Team_Biering@jpmorgan.com>; Wyss, James O (WM, USA) <james.o.wyss@jpmorgan.com>
**Subject:** RE: JPMorgan Private Bank Next Steps

Good Morning M[redacted],

I hope you and your family had a wonderful weekend[redacted]ust wanted to shoot you a quick follow up note- would love to schedule some time to introduce you to my partner, J[redacted] W[redacted] who works with several of our clients and prospective clients as they navigate complex Estate Planning considerations. I have attached his bio for your reference.

Let me know when you have some availability- depending how in depth you want to go, we can earmark 60-90 minutes. We can always host over a round of golf as well, as those tend to be way more enjoyable…

Lastly- I have also included some additional case studies and thought leadership that you might find interesting.

Looking forward to connecting soon,

JB

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan

PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important

information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.



**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

---

**From:** Biering, Josh (WM, USA)
**Sent:** Tuesday, April 04, 2023 3:31 PM
**To:** [redacted]
**Cc:** Ogle, Daniel M (CB, USA) <daniel.m.ogle@chase.com>; Saltzstein, Mitchell R (WM, USA) <mitchell.r.saltzstein@jpmorgan.com>; Team Biering <Team_Biering@jpmorgan.com>
**Subject:** JPMorgan Private Bank Next Steps

M[redacted]

Great to meet you this afternoon and thank you for your time. As discussed, we'd be happy to schedule a follow on meeting to dive in deeper regarding your Estate Plan. The JPMorgan Private Bank has several thought pieces related to Trusts & Estates, but the attached "2023 Planning Essentials" is a quick summary of points to consider in the near term.

From a Private Bank onboarding perspective, we will need additional information that I have outlined below and also included in our Account Opening guide, attached. Please provide a copy of your most recent Personal Financial Statement when you get a chance. This will give us a better understanding of your family's financial picture and will help us tailor our solutions and recommendations to your family specifically. Lastly- if you have a copy of any draft or existing Estate Planning documents, we'd be happy to review in advance of our next meeting.

I understand gathering all of the information below can be quite cumbersome, so we appreciate your diligence in advance! Feel free to send any information, such as your PFS, as you come across it and we can begin to sharpen our pencils…

Onboarding:

- Individuals
  - Confirmation if you'd like to open individual accounts or joint? We typically recommend clients start with a checking, savings and a brokerage account. After a deeper review of your current asset allocation, we can have a more specific discussion related to investment strategy and allocation
  - Full legal name
  - Date of Birth
  - Contact information
    - Preferred email
    - Mobile #
  - Physical legal address
  - SSN
  - Copy of Photo ID
- Any existing statements for current financial service providers- I believe you mentioned C[redacted] S[redacted] and a S[redacted] affiliate/partner
- Trusts & Estates- let's discuss
- Entities- let's discuss

Thank you and look forward to starting a relationship with you and your family. Please do not hesitate to reach out with any additional questions.

Many thanks,

Josh

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P.Morgan

PRIVATE BANK

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If

you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# Merrill Recruiting Records

**App. 0359-0364**

Merrill Lynch recruiting thread, pro forma, and related communications.

App. 0359

Text message
10/31/2023 10:22:08 AM

Josh.

Chris Miller here. Can you chat 11:15 for next steps.

Thanks

Chris

10/31/2023 10:23:12 AM

Yessir

10/31/2023 10:36:06 AM

Ok

10/31/2023 12:51:59 PM

Received a missed call. Wasn't sure if it was a butt dial

10/31/2023 1:45:44 PM

I called earlier. We are good.

11/3/2023 9:21:55 AM

Good morning.

11/3/2023 9:22:22 AM

Finishing briefing line up for next week. Any updates from JPM by chance?

11/3/2023 9:22:52 AM

No updates- but my attorney has been putting out feelers. His gut is they are stalling and we should hear something early next week

11/3/2023 9:23:15 AM

Did I owe you any numbers or anything prior to our briefing

11/3/2023 9:23:50 AM

Jpm counsel did affirm with my attorney they would be in touch in advance of any formal u5 filings to discuss language if applicable.

11/3/2023 10:09:50 AM

Ok.

Can you scan some analytics and production. On your practice.

Exhibit
CX94

11/3/2023 10:10:34 AM

Yes

11/3/2023 10:10:55 AM

Can I share a scorecard via email?

11/3/2023 10:13:16 AM

Yes. As long as it does not have client names. No client data. Only practice management data

11/3/2023 3:11:38 PM

Chris- I hate to ask. But would you have any flexibility to visit Tuesday morning or anytime Monday? I may need to attend to some family matters at our current scheduled time for Tuesday working lunch.

11/3/2023 3:40:42 PM

Hey. No worries. Can I get back to you this weekend. Going to to move the speakers.

11/3/2023 3:40:50 PM

And will confirm.

11/3/2023 3:41:14 PM

Yes no problem. If I can be on the road by 1:30pm I'm all set! Thank you and again sorry for the headache.

11/5/2023 8:18:08 PM

Hi Josh. Would weds at 9 am work?

11/5/2023 8:18:48 PM

Could not move our speakers on Tuesday.

11/5/2023 8:40:45 PM

Yessir that works for me- thank you for your flexibility

11/8/2023 8:52:49 AM

No excuse for this- but my eta is 9:04

11/8/2023 8:53:29 AM

Ok. No worries

11/14/2023 9:14:58 AM

Good morning, Chris-

Do you have a few minutes for a call this afternoon or later this week?

11/14/2023 9:17:42 AM

I do. How would 11:30

11/14/2023 9:18:07 AM

I'm tied up from 11-1- can do after 1?

11/14/2023 9:18:53 AM

1:30. Works.

11/14/2023 9:19:12 AM

Ok perfect- call you then!

11/14/2023 9:19:34 AM

Thx brother

11/28/2023 10:28:41 AM

Hi Josh

Any update on u-5.

Hope you are well

Chris

11/28/2023 10:30:19 AM

Morning Chris- nothing yet. Today is the thirty day mark. I have a call with my attorney at 2:30pm and can give you a call after?

11/28/2023 10:30:34 AM

Yes.

11/28/2023 10:30:42 AM

Thank you

11/28/2023 2:31:49 PM

Hey there Chris- no rush just calling you following my discussion with counsel.

11/30/2023 10:48:40 AM

I think I will get all our pending clarity by tomorrow after my 11am call if not sooner.

11/30/2023 11:17:59 AM

Liked "I think I will get all our pending clarity by tomo…"

12/1/2023 11:09:23 AM

Can I call you?

12/1/2023 3:01:57 PM

I spoke too soon. But not sure if this matters at this point. No reference of harassment will be a finding or mentioned. It'll be failure to disclose workplace relationship. Non securities related.

12/1/2023 3:32:45 PM

Understood.

12/6/2023 5:08:15 PM

With your permission- I have approval from my attorney to share with you the letter we sent to JPM today

12/6/2023 5:16:30 PM

I would prefer to chat about it and not be in discovery given there is no Attorney privilege here

12/6/2023 5:28:21 PM

Understood- available whenever.

**Annual Compensation Package - $2,750,000 (250% of T-12)**

$33,333 Salary for months 1-2
$1,500,000 in a 5 Year Salary
$1,216,667 in Long Term Cash - Contingent Compensation (5 Year Cliff Vest)

$78,384 **43,870** is in Long Term Cash - Contingent Compensation (3 Year Annual Vest) and **34,514** in lump sum cash

| Advisor Profile | | | |
|---|---|---|---|
| Prior Firm A/L | | $200,000,000 | |
| Prior Firm T-12 | | $1,100,000 | |
| **Minimum Performance Standards** | | | |
| | NNAL (%) | NNAL ($) | HH |
| Year 1 | 20% | 40M | 5 |
| Year 2 | 40% | 80M | 5 |
| Year 3 | 60% | 120M | 5 |
| Year 4 | 80% | 160M | 5 |
| Year 5 | 100% | 200M | 5 |

**Retention Award - $330,000 (30% of prior firm T-12) ***

* NOTE: The Retention Award is based off 20% of the incoming FA's Year 5 production and is variable.
This example shows the FA producing 150% of their prior firm production in Year 5.

- Each year, the recruit is expected to exceed the minimum standards for gross new household credits and net new assets and liabilities to be continue to participate in their deal.
- HH credit breakdown: 1 credit for $250K - $2.49mm, 2 credits for $2.5mm - $9.9mm, 3 credits for $10mm - $24.9mm and 4 credits for $25mm+
- The net new assets and liabilities performance standards are based on a % of assets and liabilities as documented at time of hire.

## Total Program Package - $3,158,384

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Projected NNAL (%) | 50% | 75% | 100% | 125% | 150% | |
| Projected NNAL ($M) | 100.0 | 150.0 | 200.0 | 250.0 | 300.0 | |
| Projected T12 | 550,000 | 825,000 | 1,100,000 | 1,375,000 | 1,650,000 | |
| Retention Award (%) | | | | | 20% | |
| Retention Award ($) | | | | | $330,000 | |
| Salary | $300,000 | $300,000 | $300,000 | $300,000 | $300,000 | $1,500,000 |
| Long Term Cash | $243,333 | $243,333 | $243,333 | $243,333 | $243,333 | $1,216,667 |
| Matched Deferred Comp | $78,384 | | | | | $78,384 |
| Retention Award | | | | | $330,000 | $330,000 |
| **Yearly Program Compensation** | **$621,717** | **$543,333** | **$543,333** | **$543,333** | **$873,333** | **$3,125,051** |

Retention Award is paid in the form of: 100% Long Term Cash (5 Year Cliff Vest)

5yr cliff

Exhibit
CX101

BIERING_0005146



CONFIDENTIAL

iMessage
12/1/2023 11:16:40 AM

App. 0364

I'm terminated effective today.

That's interesting. I thought you terminated a few weeks ago? What about your U5?

Exactly. I don't know. My attorney is calling JPM attorney at 2:30

Please send your new contact information again. I messed it up trying to update.

Josh Biering.vcf

👍

Merrill Lynch just pulled their offer too

Today?

Yes. After I shared what the u5 might say.

I'm so sorry

12/7/2023 7:32:06 AM

PDF
Biering Demand re Correct U5 Marking.pdf

12/7/2023 9:52:52 AM

Hopefully you can get a satisfactory resolution. That would be best for all concerned.

I hope so. It's been clear no meaningful firm will entertain a hire with any "termination" box marked- regardless of the supporting narrative.

12/15/2023 9:38:21 PM

Just checking in on you my friend. Hope you are doing well.

RR

12/16/2023 9:52:22 AM

Honestly not doing the greatest. Very nasty what JPMorgan is trying to do and claiming

So sorry.

Me too

Exhibit
CX178

# Resignation Workflow, Notice-Period, and Termination-Call Records

**App. 0366-0373**

HR resignation approval, resignation email, and December 1 termination-call coordination.

App. 0366

Message

**From:** JPMorgan Chase & Co. Human Resources [eino.fa.sender.2@workflow.mail.us2.cloud.oracle.com]
**Sent:** 10/28/2023 2:39:46 PM
**To:** josh.biering@jpmorgan.com
**Subject:** Approved: Resignation for Joshua Biering, I662283 (2023-12-26) (US)

the new me jpmc

Voluntary Termination

# Joshua Biering

SID I662283

Reason Dissatisfied with Work Conditions

Effective 26-Dec-2023

Your resignation was processed. You will receive an email from jpmcesm@servicenow.jpmchase.com with a link to tools and next steps for leaving the company.

If you did not initiate this change (directly or by request), please speak with your manager.

## Termination Details

| | |
|---|---|
| Legal Employer | JPMorgan Chase Bank, National Association |
| Notification Date | 2023-10-28 |
| Termination Date | 2023-12-26 |
| Last Day Worked | 2023-10-26 |
| Post JPMC Employment Plans | Unknown |
| Notice Period | Exceeds by 0 days |

Exhibit
CX131

## Approvers

| | |
|---|---|
| Approved by **Workflow System** | 28-Oct-2023 10:39 AM |
| Submitted by **Joshua Biering** | 28-Oct-2023 10:39 AM |

**Immediate action is required. This request must be fully approved within 60 calendar days or the transaction will automatically expire.**

View this notification in me@jpmc

J.P.MORGAN CHASE & CO.

App. 0369

# Josh Biering Resignation

Josh Biering <josh.biering@gmail.com>
Sat 10/28/2023 9:45 AM

To:John.T.Aughinbaugh@jpmorgan.com <John.T.Aughinbaugh@jpmorgan.com>;ben.stewart@jpmorgan.com <ben.stewart@jpmorgan.com>;kyle.e.hitchcock@jpmorgan.com <kyle.e.hitchcock@jpmorgan.com>
Cc:Peter.C.Chilian@jpmorgan.com <Peter.C.Chilian@jpmorgan.com>;Elaine.Agather@jpmorgan.com <Elaine.Agather@jpmorgan.com>

Dear Leadership Team-

I am writing to inform you of my formal resignation via email in addition to my submission via me@jpmc. It has been an absolute honor and privilege to have worked at JPMorgan and I thank you all for the opportunity over the last eight years. I will always have a place in my heart for the great teammates and clients I have met along the way- truly such a special place.

It comes with a solemn feeling- but after several months of consideration- I feel this is the best move for me both personally and professionally. I wish you all the best of luck and excited for our paths to cross again in the future.

With gratitude,

Josh Biering
912-308-5781 (m)
josh.biering@gmail.com

Exhibit
CX132

Message

App. 0370

**From**: Stewart, Ben [ben.stewart@jpmorgan.com]
**Sent**: 12/1/2023 5:34:57 PM
**To**: Geller, Jeremy R [jeremy.r.geller@jpmorgan.com]
**CC**: Aughinbaugh, John T [john.t.aughinbaugh@jpmorgan.com]
**Subject**: Banker Departure

Jeremy,

Wanted to keep you in the loop here. Today, we notified Josh Biering (ED, SC Banker) that he was terminated for misconduct with respect to our Code of Conduct and Anti-Harassment policy. I know you have been kept in the loop thus far but given the 3 different situations around this I wanted to let you know where we stand.

J.T. and I called to touch base earlier but were glad to hear you were enjoying some time away. Feel free to give us a shout if you'd like to discuss further details.

Thanks,

---

**Ben Stewart Jr.**, CFP® | Executive Director | Market Team Lead | **J.P. Morgan Private Bank** |
420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4003 | M: 817 845 9676 |
ben.stewart@jpmorgan.com | privatebank.jpmorgan.com

**Client Service Team**: 877 576 2874

Click here to see the JPMorgan Chase Privacy Policy: https://www.jpmorgan.com/pages/privacy

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail)**. For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT AND INSURANCE PRODUCTS: • NOT A DEPOSIT • NOT FDIC INSURED • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • MAY LOSE VALUE**

**JPMorgan Chase Bank, N.A.** and its affiliates (collectively "JPMCB") offer investment products, which may include bank-managed accounts and custody, as part of its trust and fiduciary services. Other investment products and services, such as brokerage and advisory accounts, are offered through **J.P. Morgan Securities LLC** ("JPMS"), a member of FINRA and SIPC. Annuities and insurance products are made available through Chase Insurance Agency, Inc. ("CIA"), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS and CIA are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states.

Exhibit
CX174

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT K.11c

## K.11c-001 – K.11c-002

**Description:** Native audio file reference (Original000619.M4R / CX-173) for the December 1, 2023 termination call recording.

**Relevance:** Preserves the native audio evidence of the termination event for panel/court review.

**Source:** CX-173 (Original000619.M4R)

**Petition Ref:** Dkt. 11 ¶¶ 76–82; App. A p. 10 (“Termination”)

**Disclosures:** None — reproduced as produced, no added markings

**Filing Status:** Confidential – privileged

# NATIVE DOCUMENT PLACEHOLDER

## Please review the native document Original000619.M4R

Exhibit

CX173

# NATIVE AUDIO EXHIBIT REFERENCE

*Exhibit K.11c – Native Audio Slip Sheet*

| | |
|---|---|
| **Title:** | Dec. 1, 2023 Termination Call – Native Audio (m4a) |
| **File name:** | BIERING_0005051 - BIERING_0005051.m4a |
| **Size:** | 2,696,778 bytes (~ 2.57 MB) |
| **SHA-256:** | de4efeca9bb7ad08197f0d5ff4e8e6599040d1500d9f3189b280e7b833b21055 |
| **Duration:** | (not extracted) |

### Source path (Claimant's record)

C:\Users\JDSB\repos\jb_v_jpm_local_v2\matter\workspace\02 - Trial-Record\Transcripts-Audio\BIERING_0005051 - BIERING_0005051.m4a

### Preservation path (this matter)

+00.00 - USDCNT_5thCirc_AAA\90_Exhibits\FIX EXHIBIT STAMPS ONLY_TERMINATION_CALL_SOURCE_PACKET_20260424_1516\standalone_termination_call_native_and_transcript\BIERING_0005051 - BIERING_0005051.m4a

### Court native-media copy

Included on the USB/native-media drive provided to the Court.

### Related exhibits in this packet

• K.11 (this exhibit, transcript of the call – pp. 2+)
• S.1 – FINRA hearing transcript excerpts
• S.2 – Unofficial hearing transcript (court-formatted)
• N.1 p. 51 – EEOC disclosure that the call was recorded
• N.3 p. 6 – EEOC reply re: availability of recording

### JPM's corresponding native reference

CX173_JPMS_24350_12.1.23 Recording.pdf – JPM's native slip sheet for file 'Original000619.M4R'

### Chain of custody

Recording made Dec. 1, 2023 by Claimant during the termination call. Preserved continuously since that date. Copy at the Preservation path was verified by SHA-256 on 2026-04-24 (see manifest.json in the source-packet folder).

### Notice

A PDF cannot carry native audio in a way that survives normal legal e-filing. The native m4a is held at the Preservation path above and is included on the USB/native-media drive provided to the Court. The same native file is available in unaltered form on request (and in the SEALED packet when applicable).

# Pre- and Post-Filing Demand and Objection Correspondence

**App. 0375-0413**

The six-letter U5 objection series and related post-termination correspondence.

App. 0375

Rogge Dunn GROUP

500 N. AKARD ST., SUITE 1900
DALLAS, TEXAS 75201-6629
(214) 888-5000 • FAX (214) 220-3833

TRIAL ATTORNEYS

**JOSHUA J. IACUONE**
**PARTNER**

BOARD CERTIFIED
TEXAS BD. OF LEGAL SPECIALIZATION:
* LABOR & EMPLOYMENT LAW

WRITER'S DIRECT DIAL: (214) 239-2763

WRITER'S E-MAIL: iacuone@roggedunngroup.com

December 6, 2023

Rachel Tidwell-Neal
Assistant General Counsel
10 S. Dearborn
6th Floor
Chicago, IL 60603

**Re: Our File Name: Biering/JPMS**

Rachel:

This is a follow-up to our many calls and conversations regarding my client Joshua Biering CRD # 6883842 ("Biering"). I appreciate you taking the time. I also note that, while not the purpose of this letter, we have repeatedly asked – and from the very get-go once finally told the subject of investigation – for the chance to submit definitive proof rebutting any allegations against Biering ***prior to*** the conclusion of any investigations, as we believe JPMS does not have all of the dispositive evidence, but JPMS inexplicably refused.

As discussed on many prior occasions, Biering demands that JPMS mark Biering's U5 in the correct and honest way, which is a "voluntary" termination.

We've been told that JPMS could likely mark Biering's U5 as an involuntary "discharge" and provide the narrative of the same. This would be incorrect both factually and legally and constitute U5 "weaponization" with defamation, disparagement, and tortious interference with Biering's business relationships.

We've also been told that, while not final, JPMS does not intend (correctly) to mark question 7F on Biering's U5. Accordingly, and as discussed more below, even though Biering did not know he was under an investigation when he resigned, and certainly not under investigation

7746/0002/Correspondence/Biering Demand re U5

Exhibit
CX38

for any issues reportable under 7F, then the **only** accurate marking of Biering's U5 is as a "**voluntary**" resignation.[1]

Biering demands that JPMS do the right thing, not weaponize his U5, and accurately mark his U5.

Below are undisputed facts and ***binding legal precedent and authority***:

On October 24, 2023, Biering had a conversation with both his manager Ben Stewart, and his Market Manager, John T. "J.T." Aughinbaugh, about his desire to resign and part ways because of various disagreements with Aughinbaugh, Stewart and management, with which Biering had long professed his frustration and disillusionment. Following that discussion, on Friday, October 27, at 2:35pm CST, Stewart contacted Biering to "call me at the office as soon as possible." Per Stewart's discussion with Mark Roberts, Investment Specialist, Stewart confirmed he was aware of Biering's interview and meeting with Competitor Firm, Merrill Lynch, at 3:00pm CST.

Following Biering's meeting with Merrill Lynch, Biering called Stewart and was told by Stewart that he was being put on a paid administrative leave and that there were ***no further details that could be shared*** at this time. JPMS told Biering ***nothing*** about why he was put on leave, and Biering suspected it was because management knew he was resigning, joining a competitor, and management wanted to retain his significant book of business. Biering specifically asked for a contact number to inquire further, but Stewart did not provide any contact information and Biering reached out to Human Resources contact, Stephanie Stainbeck, but did not receive a response, given it was late afternoon on a Friday.

As a result, Biering's disillusionment was cemented due to management's retaliation, and Biering submitted his resignation formally via me@JPMC (HR system) and via email on Saturday, October 28, at 9:45am CST. Again, at this time, there was no discussion or disclosure to him that he was being investigated for anything.[2] Biering resigned as he had planned to do for months given his frustration with new JPMS management, which he believed was in the best interests of his clients and personal mental health.

While on mandatory garden leave ***because he resigned*** (i.e., if Biering terminated there would be no garden leave), JPMS sent other financial advisors to call on Biering's clients. These financial advisors defamed Biering to his clients by falsely stating that Biering had been ***fired*** by JPMS. Again, this is further proof that this issue was clearly set in motion by management to try and smear Biering, steal his clients and AUM, and ultimately weaponize his U5 with defamation to retain this business.

Amazingly then, on December 1, 2023, or ***33 days after*** Biering undisputedly resigned and was placed on mandatory garden leave, JPMS called Biering and purportedly "terminated"

---

[1] All Question 7 subparts should be answered "no" as, again, Biering did not know he was under investigation when he resigned, and even if he had, the investigation did not encompass "investment-related statutes, regulations, rules or industry standards of conduct; fraud or the wrongful taking of property; or failure to supervise in connection with investment-related statutes, regulations, rules or industry standards of conduct."

[2] Biering only knew of the subject matter and scope of inquiry after I contacted you about same, which was well after Biering's resignation.

Biering. This is factually and legally false. And JPMS clearly knows (as a federal court already found two weeks ago in the *Luckett* decision) – and intends for – the devastating result on Biering's future job prospects if JPMS wrongfully marks Biering's U5.

Obviously, JPMS may exercise its right to move the final date of Biering's employment forward at its option, but, under prevailing law, Biering's termination *must* be reported on his U5 and other regulatory filings as a voluntary resignation. *See, e.g. Natsource v. Paribello*, 151 F. Supp. 465 (S.D.N.Y. 2001); *Davila v. Lockwood*, 933 S.W.2d 628 (Tex. App. 1996); *Methodist Hospital v. Halat*, 415 S.W.3d 517 (Tex. App. – Houston [1st Dist.] 2013, no pet.). The *Paribello* federal district court held that, even while ultimately finding for the financial firm on an injunction issue, the financial firm may not terminate an employee who has already resigned and is simply on mandatory garden leave:

> Paribello argues that subsection 7.2 should apply rather than 7.1, because Natsource terminated Paribello when it instructed him to leave the trading floor, such that Paribello should only be restricted from working for a competitor for one month following his termination date. *See* Def.'s Memo at 12. Paribello is unlikely to succeed on his argument that Natsource's conduct constituted a termination of Paribello's employment, because Paribello resigned prior to Natsource's instruction to leave the trading floor, and Natsource reasonably changed his duties, given the circumstances of his resignation.
>
> Paribello advised Natsource of his resignation on two occasions. First, Paribello resigned, effective immediately, on June 28, 2001. *See* Touchstone Dec. at ¶ 7, Def.'s Memo at 9. According to Paribello, he did not realize at the time that his contract required a 30–day notice of termination. *See id.* After realizing that night that he was required to give a 30–day notice of termination prior to resigning, Paribello reported to work the next day and had his lawyer send an official letter purporting to constitute 30–days' notice of his resignation. *See* Paribello Ltr, Def.'s ***478** Memo at 9. Between these two notices of resignation, Natsource asked Paribello to leave the trading floor and Natsource premises, and told him that he would be informed of his employment status. ***Because Paribello had already resigned prior to Natsource asking him to leave the trading floor, Paribello terminated the employment first.*** Once he terminated his employment, Natsource reasonably altered his employment duties given the circumstances surrounding his resignation. Therefore, the Court will preliminarily enjoin Paribello from violating subsection 7.1 of the agreement, ***which applies under the circumstances, as Paribello terminated the employment.***

*Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 477–78 (S.D.N.Y. 2001) (emphasis added). This is exactly what happened here: Biering resigned and he terminated his employment, and later JPMS "altered" his employment to move up his last day.

Should JPMS seek to report his termination in any other manner, Biering reserves the right to seek damages before a FINRA arbitration panel under the precedent set forth in the *Paribello* line of cases, which given the devastating result on Biering's career will run into the tens of

millions of dollars given his production and young age. Indeed, JPMS is ***well-aware*** of this issue, as a federal court just **two months ago** upheld an expungement for an ex-JPMS FA from termination to voluntary resignation, and awarded $1.4 million dollars in damages resulting therefrom:

> On June 19, 2017, Chase terminated Luckett's employment. [*Id.* at 132]. Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5. [*Id.* at 127]. JPMS filed Luckett's Form U5 as required. [DE 9-2]. Under the "Termination Explanation" section, JPMS stated Luckett was terminated for: "Non-securities related. [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy. In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies." [DE 16-5 at 297-98]. JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct." [*Id.* at 300].
>
> Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum. [DE 9-1]. He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies. [*Id.* at 69-71]. … The Award found JPMS liable to Luckett for ***$1.4 million in compensatory damages***. [*Id.*]. The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable." [*Id.*]. The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.'" [*Id.*]. The Award specified that the Panel recommended expungement "based on the ***defamatory nature of the information***" contained in the Form U5. [*Id.*]. …
>
> Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing. [*Id.* at 604-05]. This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers. …
>
> Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision . . . [about] mov[ing] forward." [ DE 21-4 at 617]. JPMS was ***likely to know of this practice*** as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel

> could conclude that JPMS knew of the ***prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects***.
>
> The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. … Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

*JPMS v. Luckett*, C.A. No. 3:22-CV-137-RGJ (W.D. KY Sept. 14, 2023) (emphasis added).

If JPMS attempts this career hampering U5 weaponization yet again, and even after being warned and rebuked by a FINRA Panel and federal court, Biering will also ask for ***significant*** punitive damages as punishment for this unseemly business practice to retain AUM. JPMS cannot feign ignorance after *Luckett* and *Paribello*, will be doing this intentionally and knowing it is wrong simply to punish Biering and steal his AUM. Frankly, it is clear that this is JPMS's "playbook" to retain the significant book of business of an FA it fears will soon depart.

***Fair Warning***: unless JPMS does the right thing, like Luckett, Biering will hold JPMS to account. We hope it won't come to that, and JPMS will correctly mark Biering's U5 as a "voluntary" resignation with no Question 7 parts answered "yes".

Of course, I'm always available to discuss should you have any questions.

Regards,

Joshua J. Iacuone

cc: w/enc. w/o enc. no enc. Rogge Dunn (our firm)

cc: w/enc. w/o enc. no enc. Tina Vanderburg, Paralegal (our firm)

7746/0002/Correspondence/Biering Demand re U5

Rogge Dunn GROUP

500 N. AKARD ST., SUITE 1900
DALLAS, TEXAS 75201-6629
(214) 888-5000 • FAX (214) 220-3833

TRIAL ATTORNEYS

**JOSHUA J. IACUONE**
**PARTNER**

BOARD CERTIFIED
TEXAS BD. OF LEGAL SPECIALIZATION:
* LABOR & EMPLOYMENT LAW

WRITER'S DIRECT DIAL: (214) 239-2763

WRITER'S E-MAIL: iacuone@roggedunngroup.com

December 12, 2023

Rachel Tidwell-Neal
Assistant General Counsel
10 S. Dearborn
6th Floor
Chicago, IL 60603

**Re: Our File Name: Biering/JPMS**

Rachel:

This is a follow-up to our initial letter regarding my client, Joshua Biering CRD # 6883842 ("Biering"), that was sent on Wednesday, December 6, 2023, and we formally request an update no later than Wednesday, December 13, 2023, close of business on JPMS' decision to correctly mark Biering's Form U5 as a "voluntary" termination and to mark all relevant boxes under Section 7 of the Form U5 as "No".

Biering **voluntarily** resigned on two separate occasions, honoring his notice period, while JPMS illegitimately, modified the terms of Biering's employment on December 1, 2023, during his broad and non-specific contractual obligation to "sit out" for 60 days. Biering honored the "sit out" period, which many Advisors do not, and JPMS used that against him to illegitimately – and in violation of law and authority – then claim to terminate him 33 days later. Coincidentally, the termination came only after contacted all of Biering's clients with newly assigned Advisors, who advised Biering's departure was conveyed that he was "terminated" and "canned." It is clear that JPMS engineered this after realizing Biering was going to (and did) resign, and this is only more evident by the pipeline of Biering's business opportunities, which he indicated more than $400 million of AUM anticipated for 2024.

It is factually undisputed that Biering shared his disillusionment with management on multiple occasions, well before the week of October 23, 2023. It is also undisputed that Biering implicitly gave verbal notice to Aughinbaugh and Stewart on October 24, 2023, and formally

submitted his **resignation** notice via the online HR channels and email to his leadership team on October 28, 2023.

If JPMS marked Biering's U5 as JPMS "discharg[ing]" him, then that would be not only factually and legally incorrect, but the height of bad faith, as JPMS' ***own*** Terms and Conditions of Biering's employment contract signed February 18, 2016, confirms that Biering is "an 'at-will'" employee … which means that **either you** [Biering] or Chase **can end your employment at any time, for any or no reason**" which is exactly what Biering did - - submitted his resignation to **end his employment**, 33 days before Aughinbaugh and Stewart allegedly and illegitimately terminated Biering on December 1, 2023.

As a FINRA Member, JPMS cannot disregard the law, the facts, and FINRA's guidance, which we have clearly and unambiguously provided. Further expanding upon the binding legal precedent, in our letter on December 6, 2023, we highlight yet another relevant arbitration award (one of several), that FINRA arbitration panels have recently awarded to Advisors who fell victim to U5 weaponization and defamation.

Notably, on June 2, 2022, a FINRA Arbitration panel ruled in favor of Claimant, Sean D. Caston vs. Ameriprise Financial Services, LLC, FINRA Case Number: 21-01175:

> "The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Sean D. Caston's (CRD Number 2009118) Form U5 filed by Ameriprise Financial Services, LLC (CRD Number 6363) on April 27, 2021 and maintained by the Central Registration Depository ("CRD"). **The Reason for Termination shall be changed to "Voluntary."**

In an appeal by the firm, American Trust Investor Services, Inc filed a motion on March 18, 2023 with the Central District Court of California, Case No. 2:23-cv-02044, to contest the punitive damages that the FINRA arbitration panel awarded arising out of a successful expungement for mismarking an Advisor as terminated who actually resigned. The Arbitration panel recognized Caston's resignation email that he submitted "via e-mail days before he was terminated" as the voluntary resignation, not the failed attempt of American Trust to terminate Caston following his resignation. These facts are almost identical to the situation here.

Finally, and importantly, JPMS must abide by *FINRA 4530 Reporting Requirements; Supplementary Material; .01 Reporting of Firms' Conclusions of Violations.*[1] Despite JPMS' internal investigation being flawed, inadequate, biased, and as it failed to consider all facts and material witnesses, JPMS is bound by FINRA guidance regarding **reportable** violations:

> FINRA expects a member to report ***only*** conduct that has widespread or potential widespread impact to the member, its customers, or markets, or conduct that arises from a material failure of the member's systems, policies or practices ***involving*** numerous customers, multiple errors or significant dollar amounts.

Under no possible interpretation, is JPMS' investigation related to these issues ***in any way***.

---

[1] https://www.finra.org/rules-guidance/rulebooks/finra-rules/4530

Linking FINRA rules to legal and binding precedent, *Michael A. Tilkey vs. Allstate Insurance Company*, filed and ruled in the Court of Appeals, Fourth Appellate District Division one of California on October 26, 2020, the Court's decision affirms that "**the scope of FINRA's authority is not unlimited**" and clearly outlines the sandbox that FINRA and member firms should only report and be concerned with **business** or **commercial** related conduct, specifically, **securities** or **compliance related**:

> "Thus, the absolute privilege extends to communications required by FINRA, i.e., fraud- and securities-related information and other information covered by its rules. However, the communication of Tilkey's termination here did not regard improper ***business*** activities…"

I trust JPMS will do the right thing, and JPMS' will follow the law, facts, and rules, which would be to do as follows:

1- Biering "voluntarily" resigned his at-will employment due to his dissatisfaction with the toxic work environment, thus, Section 3 of Biering's U5 should correctly indicate a "Voluntary Resignation" with no narrative;[2]

2- All relevant boxes within Section 7 of FINRA Form U5 should be marked "No".

Of course, I'm always available to discuss should you have any questions.

Regards,

Joshua J. Iacuone

cc: [w/enc.] w/o enc. no enc. Rogge Dunn (our firm)

cc: [w/enc.] w/o enc. no enc. Tina Vanderburg, Paralegal (our firm)

---

[2] Reference resignation submitted by Biering via me@JPMC that was formally accepted on 10/26/2023 and the resignation email sent to Aughinbaugh, Stewart, Hitchcock, Chillian, and Agather on 10/26/2023..

7746/0002/Correspondence/Biering Demand re U5 Supplemental 12 12 23 Letter

FW: Biering/JPMS - Proposed U5 Mismarking. URGENT.



Josh Iacuone <iacuone@roggedunngroup.com>
Wed 12/13/2023 10:18 AM
To:'Josh Biering' <josh.biering@gmail.com>

2 attachments (533 KB)
Biering Demand re Correct U5 Marking Supplement 12.12.2023.pdf; Biering Demand re Correct U5 Marking.pdf;

Sent

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

---

**From:** Josh Iacuone
**Sent:** Wednesday, December 13, 2023 10:15 AM
**To:** 'rachel.l.tidwell-neal@jpmchase.com' <rachel.l.tidwell-neal@jpmchase.com>; 'Cara.Aber@jpmorgan.com' <Cara.Aber@jpmorgan.com>; 'haley.anderson@jpmchse.com' <haley.anderson@jpmchse.com>; 'justin.lubeley@chase.com' <justin.lubeley@chase.com>; 'Julian.H.Liau@jpmorgan.com' <Julian.H.Liau@jpmorgan.com>; 'Lisa.E.Waters@jpmorgan.com' <Lisa.E.Waters@jpmorgan.com>
**Subject:** Biering/JPMS - Proposed U5 Mismarking. URGENT.
**Importance:** High

JPMS Legal Team:

Today I received the following from Ms. Tidwell-Neal as the proposed language for Mr. Biering's U5 marked as discharged:

**"During Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."**

This is a rank mismarking, and intended to harm Mr. Biering. JPMS is proposing this marking and language after we've provided uncontroverted legal authority and guidance (attached letter) that Mr. Biering resigned first, and was simply on garden leave, which we believe in itself violates FINRA Rules, but in any event JPMS can<u>not</u> "discharge" him 33 days after he's ***already resigned***. The only appropriate marking is "voluntary".

Moreover, we provided guidance in the attached letters, and JPMS does not dispute, that the purported investigation does not involve anything to do with the Q7 issues, i.e., nothing related to regulatory, customers, etc., which FINRA has repeatedly made clear in the attached authority is what is to be disclosed in a U5. We further note that in the proposed narrative, which is completely inappropriate as Q3 must be marked "voluntary" with provides for ***no narrative***, JPMS concedes that there was a "notice period", ***triggered by his resigning***.

Despite repeated requests, which ***is hereby demanded again***, for any persuasive legal authority to counter the dispositive authority in the attached letter, none has been provided. The only legitimate and

Exhibit
CX40

allowable marking for Mr. Biering's U5 is "voluntary", and he undisputedly was not under any investigation implicated by Q7.



It is clear what JPMS is doing. And JPMS cannot now claim that it is doing it unknowingly. To be clear, if JPMS does not mark Mr. Biering's U5 correctly, then **fair warning** it will be responsible for the significant damages to Mr. Biering's career, including punitive damages as a result of JPMS' knowing and intentional actions to harm Mr. Biering.

JPMS can and should change course and mark Mr. Biering's U5 appropriately as mandated by legal authority and FINRA guidance.

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

Message

App. 0385

**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 12/19/2023 10:57:21 PM
**To:** Josh Iacuone [iacuone@roggedunngroup.com]; Tidwell-Neal, Rachel L [rachel.l.tidwell-neal@jpmchase.com]
**CC:** Cohen, Jena B [jena.b.cohen@jpmorgan.com]
**Subject:** Re: Biering/JPMS - Friday Docs

I just checked my FinPro and got off the phone with FINRA- they have not received any disclosures or reports yet.

They also were kind enough to remind me that FINRA's operating schedule is closed Monday, December 25th and closes early on Friday, December 29th at 1pm CST.

The contact I spoke with informed me that any filings must be filed before 5pm CST on Tuesday, 12/26 for licenses, disclosures, forms, etc and they reopen this department on Tuesday, Jan 2nd.

I think JPM is aware of this window and also the time it takes to interview and diligence prospective employers... as well as transfer licenses assuming it is not marked in a defamatory or false manner... This leaves me without an income through December and the Holidays- which I find to be a little unethical and cruel... and arguably, contradicts the JPM Code of Conduct and How "we" do Business.

---

**From:** Josh Iacuone <iacuone@roggedunngroup.com>
**Sent:** Tuesday, December 19, 2023 12:25 PM
**To:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** 'Josh Biering' <josh.biering@gmail.com>; Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Subject:** RE: Biering/JPMS - Friday Docs

Rachel:

Did I miss something? Did you intend to respond to my 2 letters re: U5 and appropriate marking?

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

---

**From:** Josh Iacuone
**Sent:** Tuesday, December 19, 2023 8:26 AM
**To:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** 'Josh Biering' <josh.biering@gmail.com>; Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Subject:** Biering/JPMS - Friday Docs

Rachel:

Attached is all I received, which is the Notice Period Policy.

I didn't get a response to my letters re: U5 correct marking.

Joshua J. Iacuone

Exhibit
CX41

**Rogge Dunn Group, P.C.**
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Fax: 214-220-3833
Tel: 214-888-5000
DD: 214-239-2763
Cell: 214-274-8393

BOARD CERTIFIED
Texas Board of Legal Specialization
LABOR AND EMPLOYMENT LAW

App. 0387

JOSHUA J. IACUONE
PARTNER

BOARD CERTIFIED
TEXAS BD. OF LEGAL SPECIALIZATION:
* LABOR & EMPLOYMENT LAW

WRITER'S DIRECT DIAL: (214) 239-2763
WRITER'S E-MAIL: iacuone@roggedunngroup.com

Rogge Dunn GROUP

500 N. AKARD ST., SUITE 1900
DALLAS, TEXAS 75201-6629
(214) 888-5000 • FAX (214) 220-3833

TRIAL ATTORNEYS

December 20, 2023

Rachel Tidwell-Neal
Assistant General Counsel
10 S. Dearborn
6th Floor
Chicago, IL 60603

**Re: <u>Our File Name: Biering/JPMS</u>**

Rachel:

This is a follow-up to your email dated December 19, 2023 at 8:15 p.m. CST ("Email") regarding my client, Joshua Biering CRD # 6883842 ("Biering"), in which JPMS is refusing to correctly mark Biering's Form U5 as a "voluntary" termination. I also note you've provided no case law or FINRA guidance at all to rebut the overwhelming authority I've provided mandating a "voluntary" termination.

**A. <u>The Email is Incorrect Factually and Legally</u>**

The Email states:

> Josh,
>
> I have had a chance to review your letters.
>
> First, without going point by point, I disagree with your characterizations of our telephone conversations as well as your characterization of certain "undisputed" facts. Specifically, your clients own emails contradict the notion that he was unaware he was under investigation at the time he submitted his resignation.
>
> Second, I disagree that the various cases you cite require JPM to file a voluntary U5 for Mr. Biering. Mr. Biering was placed on administrative leave pending the results of an

7746/0002/Correspondence/Biering Demand re U5 Supplemental 12 20 23 Letter

Exhibit
CX42

investigation and the following day submitted his intent to resign effective 12/26. Following the conclusion of the investigation, he was terminated immediately, on 12/1, as a result of that investigation. This is not a situation where Mr. Biering's resignation date was simply moved forward, as you suggest.

Finally, it is disingenuous to suggest that there is any nefarious intent in failing to file the U5 to date (well before the 30-day deadline) when had repeated conversations, both before and after the termination, in which you specifically requested that JPM not rush to file the U5. Had Mr. Biering's served out the entire notice period, his termination date would have been 12/26, after the U5 will be filed under the current circumstances.

I have provided you a draft of the language we intend to file and an opportunity to comment. If you do not have any comments, we will file as drafted.

Regards,
Rachel

JPMS' factual and legal/regulatory position is incorrect.

First, your statement that Biering's "own emails contradict the notion that he was unaware he was under investigation at the time he submitted his resignation" is **false**. Biering was told – and ***only*** told – prior to his resignation that he was being put on a involuntary paid administrative leave. He was **not** told there was an investigation. He was certainly **not** told the scope of the investigation. If anything, the timing, and decision to contact Biering immediately before his scheduled meeting with a competitor, Merrill Lynch, on a day Biering took as paid time office[1], to maliciously 'inform' Biering late on a Friday afternoon, in which no contacts were available to provide answers on a weekend. Indisputably, these actions are certainly in violation of JPMorgan's own "Code of Conduct" and "How We Do Business" principles. Surely the fact that Biering requested a meeting with Aughinbaugh and Stewart on Tuesday, October 24, 2023, to discuss his dissatisfaction in the workplace, accelerated the plan that JPMS devised to tarnish and hinder his protected rights and discretion for career mobility and to act in the best interest of his clients.

Indeed, as JPMS now admits, the ultimate investigation had nothing to do with anything related to information FINRA wants or expects to be marked on a form U5. In fact, when Biering initially asked management and later HR for the basis of the administrative leave, he was told repeatedly that ***would not be disclosed to him***. It was not until I was engaged and spoke to you on October 31, 2023 that an investigation/scope was disclosed. Furthermore, a formal, written notification regarding an investigation (no information or details) was only sent to Biering by the JPMS investigator, Jonathan Jacobs, on Thursday, November 2, 2023 at 3:13 p.m. CST.

I have repeatedly offered and requested to provide definitive proof regarding this and other issues related to the sham investigation, but – and what proves it's a sham – JPMS doesn't want this evidence and won't consider it.[2]

---

[1] Biering emailed his manager, Ben Stewart, that he was taking a "personal day" and that he also logged his "day off" in the HR time away/reporting systems.

[2] For instance, just a few weeks before his resignation and "administrative leave" meeting, Biering expressed his frustration to his manager Ben Stewart, and that he wanted to resign:

Second, you are wrong both factually and legally regarding the timing and manner of Biering's resignation, why he stayed an employee, and that his resignation date was simply "moved up" by JPMS. Biering's October 28, 2023 resignation letter actually says:

Dear Leadership Team-

I am writing to inform you of my formal resignation via email in addition to my submission via me@jpmc. It has been an absolute honor and privilege to have worked at JPMorgan and I thank you all for the opportunity over the last eight years. I will always have a place in my heart for the great teammates and clients I have met along the way- truly such a special place.

It comes with a solemn feeling- but after several months of consideration- I feel this is the best move for me both personally and professionally. I wish you all the best of luck and excited for our paths to cross again in the future.

This letter could be no more unequivocal that Biering had fully resigned as an employee, would no longer interact with JPMS, and was moving on from JPMS ***as of that date***. Furthermore, JPMS' ***own internal reporting*** dispositively disproves JPMS' new position in your Email to justify mismarking Biering's U5 so as to damage his career and steam his AUM:

Your resignation was processed. You will receive an email from jpmcesm@servicenow.jpmchase.com with a link to tools and next steps for leaving the company.

If you did not initiate this change (directly or by request), please speak with your manager.

**Termination Details**

| | |
|---|---|
| Legal Employer | JPMorgan Chase Bank, National Association |
| Notification Date | 2023-10-28 |
| Termination Date | 2023-12-26 |
| Last Day Worked | 2023-10-26 |
| Post JPMC Employment Plans | Unknown |
| Notice Period | Exceeds by 0 days |

______________________________




7746/0002/Correspondence/Biering Demand re U5 Supplemental 12 20 23 Letter

JPMS' own records show that:

1. Biering's resignation "***was processed***" on 10/28/23;
2. He provided the mandatory Notice Period, not one day more; and most importantly;
3. His "Last Day ***Worked***" (past tense) at JPMS was 10/26/28.

These facts are ***exactly*** on "all fours" with the multitude of cases I provided to you, and for which JPMS has presented zero – as there is none – FINRA authority or legal authority to the contrary. Biering resigned, it was processed, he was done working at JPMS *in toto*, and simply honoring his garden leave, when 33 days later JPMS magically "terminated" him early. That's what happened. Biering resigned and JPMS simply moved up his last day.

Finally, I don't quite track what you're saying in the Email's final point. What I repeatedly asked was if JPMS is going to conduct an investigation that it allow Biering to provide evidence and proof, which we have, to clear his name and establish the foregoing unassailable facts. That has been repeatedly rejected by JPMS.

As a FINRA Member, JPMS cannot disregard the law, the facts, and FINRA's guidance, which we have clearly and unambiguously provided.

Again, JPMS is on notice that if it improperly marks Biering's U5 it will do so knowingly, with conscious indifference, and resulting in ***damages to Biering*** in the tens of millions of dollars.

**B. JPMS' Incorrect Proposed Marking of U5**

I again implore JPMS to follow the law and FINRA guidance and properly mark Biering's U5 as "voluntary".

Should JPMS persist in refusing to correctly mark Biering's U5 on Q3[3], then without waiving and to the contrary expressly insisting on a "voluntary" termination for Q3, JPMS should at a minimum mark Q3 as "Other" considering Biering was purportedly "discharged" after he'd already resigned, which was processed by JPMS, he was no longer working for JPMS for 33 days, and he was simply serving out the terms outlined in the Notice Period/garden leave.[4] Further, if JPMS insists on its draft incorrect marking[5], then JPMS should at a minimum change the explanation as follows (in red):

> "After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Garden Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

Please call me if you have any questions at all. I don't want there to be any confusion before the U5 is marked, which is crucial and of monumental importance to Biering's career.

---

[3] JPMS has stated it will not negatively mark Q7.

[4] JPMS refused to provide a copy of these Terms until multiple requests were made by Biering to his leadership, head of HR, the investigator(s) and the "askHR" channels.

[5] The correct Q3 making of "voluntary" does not allow for an explanation.

7746/0002/Correspondence/Biering Demand re U5 Supplemental 12 20 23 Letter

Regards,

Joshua J. Iacuone

# Fw: [EXTERNAL]Biering/JPMS - Iacuone Response re U5. IMPORTANT





**From:** Josh Iacuone iacuone@roggedunngroup.com
**To:** 'Josh Biering' josh.biering@gmail.com
**Date:** Thu, Dec 21, 2023, 3:47 PM

---

[redacted]

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

---

**From:** Josh Iacuone
**Sent:** Thursday, December 21, 2023 2:39 PM
**To:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: [EXTERNAL]Biering/JPMS - Iacuone Response re U5. IMPORTANT

Rachel:

Again, Mr. Biering is demanding and has demanded repeatedly that JPMS correctly mark his U5 as "Voluntary". JPMS is refusing to do so.

JPMS is apparently going to mismark his U5 as "Discharged" with the below language tomorrow.

We again demand that the U5 be marked correctly as "Voluntary".

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

---

**From:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Sent:** Thursday, December 21, 2023 9:48 AM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>
**Subject:** RE: [EXTERNAL]Biering/JPMS - Iacuone Response re U5. IMPORTANT

Exhibit
**CX43**

Josh,

Again, your characterizations of JPM's actions and position continue to be inaccurate. The cases [App. 0393 stamp covers text] on your version of events which we do not agree are accurate. The cases are not on point, nor do they suggest that JPM is not permitted to terminate a current employee for misconduct discovered while the employee was serving out a notice period.

I have reviewed your proposed U5 language. We would consider the following modification:

**After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.**

The U5 will need to be finalized by 12pm ET tomorrow, Friday, December 22, 2023. If I don't hear from you by then, we will file the above language.

Regards,
Rachel

---

**From:** Josh Iacuone <iacuone@roggedunngroup.com>
**Sent:** Wednesday, December 20, 2023 3:38 PM
**To:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Subject:** [EXTERNAL]Biering/JPMS - Iacuone Response re U5. IMPORTANT
**Importance:** High

Rachel:

Please see attached response to your email of yesterday.

Joshua J. Iacuone
**Rogge Dunn Group, P.C.**
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Fax: 214-220-3833
Tel: 214-888-5000
DD: 214-239-2763
Cell: 214-274-8393

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

---

Message

**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 1/2/2024 4:01:06 AM
**To:** De Leon, Chase [chase.deleon@jpmorgan.com]; Cohen, Jena B [jena.b.cohen@jpmorgan.com]; jonathan.jacobs@jpmchase.com; Muraira, Nadia [nadia.muraira@jpmchase.com]
**CC:** Tidwell-Neal, Rachel L [rachel.l.tidwell-neal@jpmchase.com]; Josh Iacuone [iacuone@roggedunngroup.com]
**Subject:** Re: [EXTERNAL]Re: Follow Up
**Attachments:** Exit Survey _ Follow up Response _ Biering (I662283)_12.27.2023.pdf; Human Resources - Equal Opportunity, Anti-Discrimination and Anti-Harassment Policy Summary (Firmwide).pdf; Biering_VA Disability Letter_redacted_July 2016_Redacted.pdf

Per your request- here are just a select few details/highlights of the past 12 months.

My biggest disappointment and facts that are driving my stress/anxiety/inability to sleep is I haven't gotten to review the findings or facts that were used to terminate me. I have been without an income and/or my employee sponsored health insurance since 12/1/2023 and originally counted on those resources through 12/26/2023- which is when my notice period was originally set to expire. Furthermore, I have had a dark cloud of uncertainty looming over me as I have no idea where I'll be able to get a job in the near term to support my family or obligations.

I have been replaying the questions the Employee Relations investigator asked me over/over (in which I answered 100% truthfully), but it doesn't make sense. The questions were structured and premeditated to deliver a guilty verdict. If a thorough and unbiased investigation was conducted, then surely all of the facts (i.e. text messages I provided) or witnesses/prior actions and behaviors would be taken into account. The same exact examples of an improper investigation took place in the case study/law that we provided in our letters- Allstate vs. Tilkey.

I have had zero write ups or negative reports over my employment with JPM that lasted 8 years- or quite frankly, throughout my entire professional career- 9 years of Military Service before joining JPMorgan. I am not perfect by any means but I 100% strive to be a man of character- and would never participate in any activities unbecoming or unwelcome. **I should not be punished for my tenacity and grit to hold others accountable and drive business results when those very characteristics/traits are highlighted as desirable in JPMorgan's own "How We Do Business Principles".** Is it a coincidence that I was denied copies of my Personnel File and/or copies of the insight 360 feedback I received for 2023 from all of my peers- several of which are female peers- including Kellyann??

- The attached timeline/events are just a small sample of the toxic culture. And don't get me wrong, I empathize with J.T. as he was taking on a new role- and certainly could have tailored my approach to give him more grace at times, but doesn't change the fact I was **strategically dealt with to retain business** and it does not make his behavior/actions (nor the actions/behaviors or Kyle and Ben) toward me okay. I'm held accountable to the standards of a Code of Conduct and policies that I haven't had a chance to review or rebut- but as you'll see from the information I provided, there are countless examples in which management have violated the same Code of Conduct- but I'm the one that has fell victim to retaliation, harassment, and outright malicious/cruel behavior. Where is the equitable recourse?
- JPMorgan business policies contradict themselves, don't they? I'm an at will employee, and can resign, for any reason at any time. Which indicates **voluntary resignation**. But that was not in JPMorgan's favor. Just a quick search on Advisor Hub or google will show how the broader sentiment across Financial Services is to NOT HIRE advisors with a "discharged termination" on their U5s- despite the narrative.
  - "Let's hit him with a bogus expense policy investigation, that'll for sure accomplish our goal" .... "Wait, that's too obvious...." "Let's hit him where it hurts, let get Kellyann on board...." Surely the facts speak for themselves?
  - Just google "U5 weaponization" and you'll see how it's a very common practice unfortunately...
- I reviewed, extensively, the JPMorgan "Equal Opportunity, Anti-Discrimination and Anti-Harassment Policy Summary"- show me the section that I violated? I can infer based on the loaded questions I was asked by the

Exhibit
CX190

investigator.. which I can only assume he was coached beforehand on what/how to ask to deliver the desired verdict... which achieved the result of asset and business retention.

Bottom line: Kellyann and I had a consensual relationship that developed, mainly as we leaned on each other as a support system for a variety of issues, particularly marital issues. We even talked about leaving our Spouses for each other and what that would look like... As Kellyann started sharing with her confidants the guilt she felt for the feelings she started developing for me, she shared with me she felt like she needed to 'come clean' with her Husband, which, as evident by the text messages I shared, I was 100% supportive the entire time, and all I asked was for a "heads up."

Given the JPMorgan Policy towards reporting workplace relationships as to prevent any Conflicts of Interest, our plans, that we constantly visited were: 1- Me leaving the firm, which I had planned to do or 2- Requesting new analyst coverage assignments so Kellyann and I would no longer work on the same team or same area, per the guidelines. (*How is this different from the relationship example where the newly appointed Dallas Head of Investments and Advice, albeit now married to his former ANALYST after reporting the relationship to management as required by the policies... The fact is the only difference is that I expressed my desire to leave, on countless occasions, and management feared the business that would undoubtedly follow me to my next firm- which I hoped to be Merrill Lynch

Those are the facts. And I hope my name can be rightfully cleaned.

As to the U5... Merrill Lynch, Morgan Stanley and UBS have all passed on me because of their stance "it's not worth the trouble to take on any discharged U5s.... hard no due to compliance... despite how badly we want you".. Furthermore, as I come across former clients that I was close to within the Community and receive comments like "oh, I didn't think you would be staying in the industry" only further serves as evidence that foul play has certainly taken place.

It's just very sad and unfortunate that I'll have to fall victim to the red tape and system that appears to be "guilty until proven innocent"... but if you want to prove your innocence, you'll have to undergo a very stressful, expensive, and uncertain timeline for next 24 months.

Losing hope/faith,

Josh Biering

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 11:55 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Hello Joshua,

I have tried to call you on your mobile number ending in 5781, however, my call was routed to voice mail. I have left a voice mail as well to advise that I have associated your Exit Survey case to the existing case that is being reviewed. I'll be glad to help in any way I can. May I know if you have questions about the Exit Survey case that I can assist with?

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC I EMEA I LATAM I NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 12:46 PM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

Can you call me

Regards,

JB

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 11:03:40 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Hello Joshua,

I appreciate the response. Seeing that the Exit Survey case that I was assigned to is a duplicate to an existing one, it would be advisable to send it to Ms. Cohen to ensure we have only one case being reviewed.

I shall note the Exit Survey case as a duplicate and associate it to the existing one that is currently being reviewed so as to avoid confusion among the relevant partners handling the case. Please feel free to reply to this email should you have questions on the Exit Survey. Thank you for your partnership and happy holidays!

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:56 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

no not yet, i will send it to you both.

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:54 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Thank you for confirming. May I know if the details in the follow up response have been shared to Ms. Jena Cohen?

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:51 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

They are connected, but my follow up response is going to be incredibly detailed, with more examples and instances since my initial report to the employee relations hotline was cut short. I will also be including legal code, exhibits and examples.

I will hope to have this submitted in the next few hours.

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:49 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Hello Joshua,

I appreciate the response. Since you mentioned that you are currently working with one of our HR Business advisors, may I confirm if the allegation of retaliation shared in the Exit Survey is related to the Conduct Hotline Report you have sent regarding the wrongful termination allegation previously raised to HR? The reason I asked is to determine whether the Exit Survey may need to be associated to the existing case that is currently being looked into in response to the Code Hotline Report opened in 12/07/23. The latter is currently being reviewed and if the Exit Survey has the same concerns, it would help to just have one ongoing investigation on the matter.

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:42 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

I would prefer not

Regards,

JB

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:40:36 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Hello Joshua,

Thank you for your response. I do see that Ms. Cohen is an HR Business Advisor and I do see an open case on the Subject of the exit survey. May I call you on your mobile number ending in 5781 so I can confirm if the open case is related to the exit survey response? This will take less than 5 minutes. Thank you!

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:36 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** [EXTERNAL]Re: Follow Up

Chase- thank you for following up.

I am in the process of typing out a very long and detailed response. I appreciate your patience.

I'm not sure the relevance of this information, but I also have been in active dialogue with Jena Cohen. Should I include her as well on these communications>

Many thanks,

Josh

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:34 AM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** RE: Follow Up

Hello Joshua,

Good day! I wish to follow up on the email below to obtain additional information in order to refer your case to the appropriate group within Employee Relations. Please respond to this email and provide a brief description of the incident/s that took place by answering the question below. Thank you!

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC I EMEA I LATAM I NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

**From:** De Leon, Chase (HR, PHL)
**Sent:** Tuesday, December 26, 2023 12:43 PM
**To:** josh.biering@gmail.com
**Subject:** Follow Up

Hello Joshua,

My name is Chase De Leon and I am from the JP Morgan Chase Employee Relations Intake Team. I received your Exit Survey response for an initial assessment regarding the allegations of retaliation by the newly appointed manager, J.T. Aughinbaugh . I am reaching out to obtain additional information so we can route your inquiry to the appropriate group within Employee Relations.

Please do respond to this email and provide a brief description of the incident/s that took place by answering the questions below.

*1. In your Exit Survey response, you have shared that you have been consistently humiliated and retaliated against by the above newly appointed manager for protected activities. Please provide more details about your concerns*
*– What were the protected activities involved and please also provide the date/time, and what happened in the incident/s of retaliation.*

Once I receive your detailed response, the case will be assigned to an ER partner who will lead the investigation and communicate with you moving forward. Thank you for your partnership.

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC I EMEA I LATAM I NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If

you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 11:55 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Hello Joshua,

I have tried to call you on your mobile number ending in 5781, however, my call was routed to voice mail. I have left a voice mail as well to advise that I have associated your Exit Survey case to the existing case that is being reviewed. I'll be glad to help in any way I can. May I know if you have questions about the Exit Survey case that I can assist with?

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 12:46 PM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

Can you call me

Regards,

JB

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 11:03:40 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Hello Joshua,

I appreciate the response. Seeing that the Exit Survey case that I was assigned to is a duplicate to an existing one, it would be advisable to send it to Ms. Cohen to ensure we have only one case being reviewed.

I shall note the Exit Survey case as a duplicate and associate it to the existing one that is currently being reviewed so as to avoid confusion among the relevant partners handling the case. Please feel free to reply to this email should you have questions on the Exit Survey. Thank you for your partnership and happy holidays!

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:56 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

no not yet, i will send it to you both.

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:54 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Thank you for confirming. May I know if the details in the follow up response have been shared to Ms. Jena Cohen?

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:51 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

They are connected, but my follow up response is going to be incredibly detailed, with more examples and instances since my initial report to the employee relations hotline was cut short. I will also be including legal code, exhibits and examples.

I will hope to have this submitted in the next few hours.

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:49 AM

**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up



Hello Joshua,

I appreciate the response. Since you mentioned that you are currently working with one of our HR Business advisors, may I confirm if the allegation of retaliation shared in the Exit Survey is related to the Conduct Hotline Report you have sent regarding the wrongful termination allegation previously raised to HR? The reason I asked is to determine whether the Exit Survey may need to be associated to the existing case that is currently being looked into in response to the Code Hotline Report opened in 12/07/23. The latter is currently being reviewed and if the Exit Survey has the same concerns, it would help to just have one ongoing investigation on the matter.

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:42 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Follow Up

I would prefer not

Regards,

JB

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:40:36 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Follow Up

Hello Joshua,

Thank you for your response. I do see that Ms. Cohen is an HR Business Advisor and I do see an open case on the Subject of the exit survey. May I call you on your mobile number ending in 5781 so I can confirm if the open case is related to the exit survey response? This will take less than 5 minutes. Thank you!

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, December 27, 2023 11:36 AM
**To:** De Leon, Chase (HR, PHL) <chase.deleon@jpmorgan.com>
**Subject:** [EXTERNAL]Re: Follow Up

Chase- thank you for following up.

I am in the process of typing out a very long and detailed response. I appreciate your patience.

I'm not sure the relevance of this information, but I also have been in active dialogue with Jena Cohen. Should I include her as well on these communications>

Many thanks,

Josh

---

**From:** De Leon, Chase <chase.deleon@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 10:34 AM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** RE: Follow Up

Hello Joshua,

Good day! I wish to follow up on the email below to obtain additional information in order to refer your case to the appropriate group within Employee Relations. Please respond to this email and provide a brief description of the incident/s that took place by answering the question below. Thank you!

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC I EMEA I LATAM I NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

---

**From:** De Leon, Chase (HR, PHL)
**Sent:** Tuesday, December 26, 2023 12:43 PM
**To:** josh.biering@gmail.com
**Subject:** Follow Up

Hello Joshua,

My name is Chase De Leon and I am from the JP Morgan Chase Employee Relations Intake Team. I received your Exit Survey response for an initial assessment regarding the allegations of retaliation by the newly appointed manager, J.T. Aughinbaugh . I am reaching out to obtain additional information so we can route your inquiry to the appropriate group within Employee Relations.

Please do respond to this email and provide a brief description of the incident/s that took place by answering the questions below.

App. 0405

*1. In your Exit Survey response, you have shared that you have been consistently humiliated and retaliated against by the above newly appointed manager for protected activities. Please provide more details concerns*

*– What were the protected activities involved and please also provide the date/time, and what happened in the incident/s of retaliation.*

Once I receive your detailed response, the case will be assigned to an ER partner who will lead the investigation and communicate with you moving forward. Thank you for your partnership.

Warm Regards,

**Chase De Leon** | Employee Relations | Human Resources | JPMorgan Chase | JPMorgan Chase & Co Tower |
Email: chase.deleon@jpmchase.com

**Find answers faster!** Check out **HR Help & Support** for answers to top HR questions: **APAC** I **EMEA** I **LATAM** I **NAMR**

- For general HR help and resources, visit **me@jpmc**.
- **Need further assistance?** Use the **HR Answers app** to submit your question.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Message

App. 0406

**From:** Sanchez, Julie [julie.sanchez@jpmchase.com]
**Sent:** 1/26/2024 6:43:41 PM
**To:** Press, Patrick [patrick.press@chase.com]
**CC:** Sebastian, Nancy R [nancy.r.sebastian@jpmorgan.com]
**Subject:** RE: Update on Sensitive/High Priority/TOH case : EC_NA_1207234613

Pat,
I was waiting for the "green light" from GS as they were working on redirecting emails. However, that was not completed yesterday so the plan was for me to wait until today.

GS called a meeting about an hour or so ago as there were additional texts from Joshua to relatives of our employees in addition to a text Joshua sent to an employee referencing a gun (both Josh and the employee are ex-military). Legal also

**Redacted - Privilege**

I've been asked (and agree) to pause with my communication to Josh at this time.

I will provide any updates moving forward as I receive them.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Sent:** Friday, January 26, 2024 12:33 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>
**Subject:** RE: Update on Sensitive/High Priority/TOH case : EC_NA_1207234613

Julie: Just checking in. How did your conversation with Joshua go?

**Pat Press** | He/Him/His (Why?) | Global Employee Relations | **JPMorgan Chase & Co.** | 201 N. Walnut Street, Mail Code DE1-1053, Wilmington, DE 19801 | T: 302.282.3859

For HR help and resources, visit me@jpmc.

**From:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Sent:** Thursday, January 25, 2024 8:34 AM
**To:** Press, Patrick (HR, USA) <patrick.press@chase.com>; Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>
**Cc:** Williams, Tara S (HR, USA) <tara.s.williams@jpmchase.com>; Ginzburg, Natalie (HR, USA) <natalie.ginzburg@jpmorgan.com>
**Subject:** RE: Update on Sensitive/High Priority/TOH case : EC_NA_1207234613

Agreed. I will provide an update once I communicate my findings to Joshua.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Sent:** Thursday, January 25, 2024 7:29 AM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>; Sebastian, Nancy R (HR, USA)

Exhibit
CX197

<nancy.r.sebastian@jpmorgan.com>
**Cc:** Williams, Tara S (HR, USA) <tara.s.williams@jpmchase.com>; Ginzburg, Natalie (HR, USA) <natalie.ginzburg@jpmorgan.com>
**Subject:** RE: Update on Sensitive/High Priority/TOH case : EC_NA_1207234613



OK, perfect. That makes me feel better. Thank you.

**Pat Press** | He/Him/His (Why?) | Global Employee Relations | **JPMorgan Chase & Co.** | 201 N. Walnut Street, Mail Code DE1-1053, Wilmington, DE 19801 | T: 302.282.3859

For HR help and resources, visit me@jpmc.

---

**From:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Sent:** Thursday, January 25, 2024 8:23 AM
**To:** Press, Patrick (HR, USA) <patrick.press@chase.com>; Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>
**Cc:** Williams, Tara S (HR, USA) <tara.s.williams@jpmchase.com>; Ginzburg, Natalie (HR, USA) <natalie.ginzburg@jpmorgan.com>
**Subject:** RE: Update on Sensitive/High Priority/TOH case : EC_NA_1207234613

Good Morning,
Yes, the ERC in the initial case is in the same building as Joshua's new work location. From what I was told, she is currently working from home, and is going to be relocating to a different office beginning next week. My understanding is that TM has spoken to her, and she is aware of EAP as a resource.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Sent:** Thursday, January 25, 2024 7:18 AM
**To:** Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>; Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Williams, Tara S (HR, USA) <tara.s.williams@jpmchase.com>; Ginzburg, Natalie (HR, USA) <natalie.ginzburg@jpmorgan.com>
**Subject:** RE: Update on Sensitive/High Priority/TOH case : EC_NA_1207234613

Nancy and Julie:

One more question on this case after reading the initiating ICM case...is the victim from the first case in the JPMC work location that is adjacent Joshua's new work location at his new company? If so, has threat management (or EAP) talked to her to make her aware and given her a safety briefing?

**Pat Press** | He/Him/His (Why?) | Global Employee Relations | **JPMorgan Chase & Co.** | 201 N. Walnut Street, Mail Code DE1-1053, Wilmington, DE 19801 | T: 302.282.3859

For HR help and resources, visit me@jpmc.

---

**From:** Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>
**Sent:** Wednesday, January 24, 2024 6:05 PM
**To:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Cc:** Williams, Tara S (HR, USA) <tara.s.williams@jpmchase.com>; Ginzburg, Natalie (HR, USA) <natalie.ginzburg@jpmorgan.com>; Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** Update on Sensitive/High Priority/TOH case : EC_NA_1207234613

Hi Pat,
I wanted to provide a quick update on one of the cases from the sensitive/high priority case list. Julie Sanchez who is handling the ERC's termination dispute will be providing a closing update to the ERC tomorrow and we anticipate that the ERC may fire off a few emails after that (fyi, *ERC previously emailed Jamie*). So, we wanted to make you aware.

- Former AWM employee Joshua Biering disputed his involuntary termination (*which was the outcome of EC_NA_1026230312).* He also claimed Retaliation and Inappropriate Conduct. Allegations are not supported.
- Redacted - Privilege
- Joshua was recently hired by an investment banking company called Raymond James. Unfortunately, their office is in the same building where his former JPMC team is located and there is some temporary overlap of work as some of his former clients continue to be in touch with him.
- An off-duty police officer reporting in a suit will sit in the conference room with direct line of site to the entrance. The assignment will begin tomorrow and we will reassess the assignment on a bi-weekly basis. There is also an ID card reader that will prevent unwanted visitors from accessing the JPMC workspace.
-
- Redacted - Privilege

Please let us know if you have any questions on this matter.
Regards,
Nancy

**From:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 16, 2024 10:27 AM
**To:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Cc:** Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Good Morning,
I am not sure how much you are aware of this case (EC_NA_1207234613), so following is a summary:

- I was assigned this case on Friday, 12/8/23
  - ERC Joshua Biering contacted the Code Hotline expressing his disagreement with his involuntary termination (*which was the outcome of EC_NA_1026230312)*
    - At that time, Joshua claimed that the investigation conducted in EC_NA_1026230312 was because his manager Subject Ben Stewart and one-up manager Subject J.T. Aughinbaugh retaliated against him for raising concerns about the workplace on 10/24/23
    - Joshua claimed that he was in a consensual, non-sexual relationship with Kelly Ann Kimball (ERC in EC_NA_1026230312)
    - Joshua stated that he was placed on an administrative leave on 10/27/23, that he resigned on 10/28/23, and was notified on 12/1/23 that he was being terminated for violating the Code of Conduct
  - Redacted - Privilege

- Before EC_NA_1026230312 was opened, there was a GSI investigation (EC_NA_1020239740) pending in which Joshua was the Subject. In the GSI investigation, Joshua discl[...] attorney who was communicating to Rachel
- I interviewed the ERP Jonathan Jacobs who conducted the investigation in EC_NA_1026230312 on Thursday, 12/21
  - Jonathan shared that Subjects Ben and J.T. did not share their own opinions during the investigation and did not influence Jonathan in any way as to the outcome of his investigation. Jonathan told me that HRBA Stephanie had reported the allegations to ER after Kelly Ann confided in her mentor Kyle Hitchcock, and Kyle told his HRBA Stephanie about it
  - Jonathan explained that the main issue was because there was a power dynamic between Executive Director Joshua and Analyst Kelly Ann. Though Kelly Ann did not technically report to Joshua, the majority of her work (over 90%) was Joshua's book of business and he had direct impact on her work/performance feedback
  - Jonathan further explained that the outcome of the investigation (sexual harassment allegation was supported) was communicated to Joshua because though he resigned, he was still on garden leave

- At that point, I was planning to interview Kyle and Kelly Ann before Subjects Ben and J.T. after I returned from vacation. I believe Kelly Ann and Ben were also out-of-the-office
  - Right before going on vacation, Nancy made me aware of emails that Joshua was sending to a large distribution (similar to below) that she was informed about
- Upon returning from vacation on 1/8/24, Nancy made me aware of numerous emails Joshua had continued to send to a large distribution
- I spoke to Joshua on Tuesday, 1/9, he had the same allegations as he originally reported to the Code, and he shared additional concerns that were not initially reported when he contacted the Code Hotline in early December. Joshua is now using words such as discrimination based on disability and harassment, and has added additional Subjects (Elaine Agather, Peter Chilian, Kyle Hitchcock, and Keith Wiley)

I have prioritized this case, and am aiming to complete all interviews this week. I sent attached email to Joshua this morning after I read the email he sent to a wider distribution over the weekend on Sunday.

Please let me know if you have additional questions. I have also added Nancy and Rachel to this email reply in the event they have anything to add.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Sanchez, Julie (HR, USA)
**Sent:** Tuesday, January 16, 2024 8:28 AM
**To:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Good Morning,
Yes, I sure can. I am jumping into a Workplace Intervention meeting in about 5 minutes as I have a case to present; however, I will send to you shortly after.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Sent:** Tuesday, January 16, 2024 6:11 AM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** FW: [EXTERNAL]Re: Your concerns

Julie: Given that this note from Mr. Biering got such broad circulation, could you just give me a quick status on his case so I can answer any questions that come my way, please?

**Pat Press** | He/Him/His (Why?) | Global Employee Relations | **JPMorgan Chase & Co.** | 201 N. Walnut Street, Mail Code DE1-1053, Wilmington, DE 19801 | T: 302.282.3859

For HR help and resources, visit **me@jpmc**.

---

**From:** Leopold, Robin <robin.leopold@jpmchase.com>
**Sent:** Monday, January 15, 2024 11:49 AM
**To:** Press, Patrick (HR, USA) <patrick.press@chase.com>
**Subject:** FW: [EXTERNAL]Re: Your concerns

---

**From:** Dimon, Jamie <jamie.dimon@jpmchase.com>
**Sent:** Monday, January 15, 2024 4:22 AM
**To:** Leopold, Robin <robin.leopold@jpmchase.com>
**Subject:** FW: [EXTERNAL]Re: Your concerns

---

**From:** Josh Biering <josh.biering@gmail.com>
**Date:** Sunday, Jan 14, 2024 at 10:50 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>, Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>, Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>, Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>, Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>, Josh Iacuone <iacuone@roggedunngroup.com>, Agather, Elaine (WM, USA) <Elaine.Agather@jpmorgan.com>, Chilian, Peter C (WM, USA) <peter.c.chilian@jpmorgan.com>, Muraira, Nadia <nadia.muraira@jpmchase.com>, Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>, dave.frame@jpmorgan.com <dave.frame@jpmorgan.com>, Dimon, Jamie <jamie.dimon@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

Let me guess. The findings will be inconclusive.

I am very glad that JPMorgan reports record earnings.

“Our game plan. We get rid of top producers right before we need to compensate them accordingly. Too easy “

The Fort Worth office is nothing but TOXIC.

Terribly inconsistent and very contradictory to your own policies.

Regards,

JB



**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Thursday, January 11, 2024 5:25:18 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Joshua,
I have had the chance to review the attachments you sent to me, and do not need to call you again as the information you provided answers the questions I had asked you when we spoke a couple of days ago. Thank you for sending the details.

I will look into the concerns you raised, and will circle back to you soon.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Sanchez, Julie (HR, USA)
**Sent:** Thursday, January 11, 2024 8:52 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

As you requested, I am confirming receipt of this email and the one you sent with several attachments (the date stamp on that email is 6:22pm which is 1 minute before the one you sent below).

As mentioned in my email yesterday (below), I will email you after I have had the chance to read through the attachments in your email.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, January 10, 2024 6:23 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

I just sent you an email with attachments- and I appreciate your "email of record" below.

Can you please confirm receipt of the email with several attachments as I have had trouble sending out attachments when the files are too large.

Many thanks,

Josh

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Wednesday, January 10, 2024 6:12 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Joshua,
As follow up to our call yesterday, you had mentioned that you had written a detailed timeline and would email it to me. You also requested to reschedule our conversation to another day, that you would like the call to be recorded and/or have a 3rd person join, and that you wanted to speak to your attorney to discuss how you wanted to proceed. I let you know that I do not record my calls, that I do not consent to being recorded, and that I do not typically receive requests to have a 3rd person join.

You and I also spoke about me calling you tomorrow (Thursday, 1/11) at 7:30am CT. At this point, I have not received the timeline from you and do not know if you have had time to speak to your attorney about next steps. As such, I will not call you tomorrow; however, please email me the timeline and after I have had a chance to read through that I will email you to reschedule.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Sanchez, Julie (HR, USA)
**Sent:** Tuesday, January 09, 2024 4:28 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Great; I can call you right now.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, January 09, 2024 4:08 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

yes, I am.

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 9, 2024 3:48 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

I am available at 4:30CT this afternoon; does that work?

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, January 09, 2024 3:01 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** [EXTERNAL]Re: Your concerns

Thank you for reaching out. Are you available at 4:15pm CST?

Regards,

JB

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 9, 2024 1:52:55 PM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** Your concerns

Joshua,
I work on the Employee Relations team at JPMorgan Chase. I am contacting you regarding concerns you have raised.

Please let me know which day(s)/time(s) work best for you to speak. I tried to call you at the number we have on file (912-308-5781); however, I was unable to reach you.

Best regards,
Julie Sanchez

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# FINRA Pleading and Claim-Narrowing Records

**App. 0415-0516**

Second Amended Statement of Claim; statutory-claims letters; reconsideration denial.

**FINRA DISPUTE RESOLUTION**

| | | |
|---|---|---|
| **In the Matter of** | § | |
| **Arbitration between** | § | |
| | § | |
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| | § | |
| **Claimant,** | § | |
| | § | |
| **- and -** | § | **FINRA No. 24-01208** |
| | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | |
| **JPMORGAN CHASE & CO., and** | § | |
| **JPMORGAN CHASE BANK, N.A.,** | § | |
| | § | |
| **Respondents.** | § | |

**SECOND AMENDED STATEMENT OF CLAIM**

Claimant Joshua David Sappi Biering ("Claimant" or "Biering") submits the following Second Amended Statement of Claim ("SOC" or this "Pleading") seeking no less than $10 million[1] against J.P. Morgan Securities LLC ("JPMS"), JPMorgan Chase & Co. ("JPMorgan Chase"), JPMorgan Chase Bank, N.A. ("Chase Bank") (collectively, "J.P. Morgan, "JPM," or Respondents") and, in support thereof, respectfully states as follows:

**EXECUTIVE SUMMARY: WHAT THIS ARBITRATION IS ABOUT**

1. Biering is a proud Brazilian American, honorably discharged U.S. Army Captain, West Point graduate, Bronze Star Medal recipient, and most recently, an accomplished financial advisor (hereinafter, "FA"). Biering has consistently received stellar marks and distinguished recognition throughout his 15-year professional career.

---

[1] The exact amount Claimant seeks is to be determined through evidence and discovery presented during Arbitration.

2. Biering is also a well-respected registered representative and financial advisor with a long and successful track record of dedication to his clients and leadership within the firm. Biering worked for JPM for eight years. Biering ultimately wanted to retire at JPM but was forced to leave after months of wrongful treatment, lack of support, and discrimination from management.

3. This abrupt and dramatic deterioration in Biering's treatment can be traced to two primary causes:

- **A toxic work environment created by new leadership**, led by John Aughinbaugh ("Aughinbaugh") and Kyle Hitchcock ("Hitchcock"), who consistently ignored Biering's request for support.
- **Biering's well-known dissatisfaction and his repeated pleas for support**, which were ignored by management, ultimately leading to his resignation.

4. JPM's actions reflect a clear pattern of wrongful treatment and deliberate misconduct. From fostering a toxic work environment, retaliating against Biering's resignation, and fabricating claims of misconduct, to continuing a campaign of defamation, JPM's objective was to retain Biering's business while damaging his professional reputation. Despite Biering's years of exemplary service, JPM sought to remove him from the firm in a manner that would discredit him and protect JPM's interests. This Arbitration[2] seeks to hold JPM accountable for its actions and the harm caused to Biering's career and reputation. This, in fact, is what this Arbitration is all about.

5. Biering **resigned** from J.P. Morgan on October 28, 2023. Following his **resignation**, Biering was required to honor a 60-day notice period (hereinafter, the "Garden Leave"). Garden Leave is just that – Biering no longer had any job duties, no longer had access to

[2] This "Arbitration" or "Action" refers to FINRA No. 24-01208.

JPM's systems, and could no longer perform any job functions – he was to sit at home. During Garden Leave, Biering certainly could not execute any trades or professional services for clients, which is the very purpose of his FINRA license, and for JPM holding his license. Biering honored the Garden Leave.[3] However, on December 1, 2023, or nearly five weeks after Biering already resigned from JPM and could no longer perform any duties (including as a registered advisor) for JPM, JPM informed Biering that he was "*terminated*" for violating JPM's "*anti-harassment policy*." This purported termination not only made zero sense—as Biering was on a Garden Leave that was triggered by his **voluntary resignation**—but it was clearly engineered in direct retaliation to Biering's concerns raised to his management several months before his ultimate **resignation**, with the goal of smearing Biering with other firms and clients.

6. Moreover, after learning that Biering planned to leave JPM, JPM initiated a witch hunt in hopes of uncovering wrongful conduct that could support JPM's premeditated, illegitimate termination of Biering. Specifically, ***after Biering already resigned***, JPM informed Biering's counsel that it was conducting an investigation into Biering's friendship with a female colleague and into his submitted, yet approved weeks prior, expense reports.

7. Biering's demise was planned for months before the suspect investigation "concluded." Within days of Biering's resignation, former colleagues texted Biering asking him, "why were you even fired?!" As if JPM's sham investigation/witch hunt during Biering's Garden Leave was not enough, JPM further directed its FAs to contact Biering's clients and smear his name. Specifically, during the Garden Leave, JPM's FAs falsely informed Biering's clients that he

---

[3] Biering maintains that this Garden Leave (or "sit out" period) was incredibly broad, non-specific, and improper. Biering requested a copy of the terms and conditions of his Garden Leave several times but did not receive a copy of the terms until weeks later. In addition, JPM FAs often ignored it. However, Biering desired to leave J.P. Morgan on good terms and to ensure a smooth transition for his clients, so he nonetheless chose to honor it.

had been fired. It is without question that JPM hoped that its FAs' defamatory statements to clients would allow JPM to steal Biering's clients and substantial assets under management ("AUM").

8. JPM's defamation of Biering did not stop there. On December 22, 2023, shortly after JPM's attempted improper "termination" of Biering, and after repeated demands from Biering and his counsel to tell the truth, JPM intentionally mismarked Biering's U5 to indicate that he was "Discharged, (*i.e.*, fired), rather than the truth that Biering's departure was "Voluntary" (*i.e.*, resigned). Even worse, JPM gave the following explanation in support:

> **Reason for Termination:** Discharged
>
> **Termination Explanation:**
> If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

9. Had JPM correctly marked Biering's U5 as "Voluntary," there would have been no "*Termination Explanation*" or any other "explanation" regarding his departure, as there were no regulatory or compliance issues in question. JPM knew this. Instead, JPM distorted Biering's clear resignation and his decision to honor Garden Leave into a "Discharge," knowing this would trigger the U5 rules, requiring JPM to provide a "Termination Explanation," which JPM weaponized to defame Biering.

10. JPM's deliberate and malicious weaponization of Biering's U5 was beyond egregious. By honoring his Garden Leave (unlike many FAs), Biering became vulnerable to JPM's tactics to tarnish his reputation and retain his clients. Indeed, JPM knew that Biering's pipeline of business opportunities indicated more than $600 million in anticipated AUM for 2024. The false U5 disclosure was a strategic move to prevent Biering from transitioning clients and furthering his career elsewhere.

11. JPM's defamatory actions, particularly the weaponization of Biering's U5, have inflicted catastrophic damage on Biering's career. As a direct consequence of these false disclosures and tortious interference with his business, Biering lost job offers from two major firms, and several other firms stopped considering him for employment. Additionally, prominent clients and prospective clients distanced themselves from Biering, unwilling to associate with someone purportedly "terminated for inappropriate behavior," further compounding the financial and reputational damage caused by JPM's deceitful actions.

12. As a result of JPM's intentional and wrongful conduct, Biering had no choice but to file this Arbitration and seek to hold JPM accountable.

## FACTS

### A. Biering's Career Before, During, and After West Point

13. Biering's long-established professional career—spanning over 15 years—consisted of exemplary performance and unblemished evaluations. A sudden shift in his character and behavior simply does not add up. How does such a drastic change occur? For someone who earned a 4.0 GPA in high school, achieved the rank of Eagle Scout, was accepted into the prestigious United States Military Academy at West Point (where only the top candidates are admitted), and served as a decorated officer during five years in the U.S. Army, including active combat, such a shift seems highly improbable.

14. After graduating from West Point, Biering served honorably in the United States Army, completing a tour in Afghanistan in support of Operation Enduring Freedom. He was awarded the Bronze Star Medal for his service as a Route Clearance Platoon Leader. Throughout his military career, Biering consistently received exemplary marks in his annual Officer Evaluation

Reports. Upon his honorable discharge, Biering had achieved the rank of Captain and was later deemed a 100% service-connected, disabled Veteran by the Department of Veterans Affairs.

**B. Biering's Professional Success at JPM**

15. Biering joined JPM in May 2016 through its prestigious Military Officer Executive Development Program. Throughout his eight-year tenure, he quickly distinguished himself as a top performer. Biering's consistent, high-level contributions earned him rapid promotions, advancing from Associate to Vice President, and ultimately to Executive Director.[4] Biering's year-end performance reviews and documented peer feedback consistently highlighted his leadership, work ethic, and ability to drive results across the firm.

16. By August 2023, Biering was managing a substantial book of business that generated $5.4 million in annual revenue, representing a 14% year-over-year growth, significantly outpacing the Fort Worth market's growth of 8% and the broader U.S. Private Bank's 6% growth. Biering's performance was continually highlighted in the firm's internal weekly finance reports circulated widely along with his Banker Scorecard, published monthly. In fact, Biering was recognized as a "gold" producer on the national U.S. Private Bank Town Hall on **October 23, 2024**. A brief snapshot of Biering's scorecard and respective metrics are as follows:

| | A | Risk Adj. Rev 33% | B | Flows 33% | C | Total Pts 33% | Overall |
|---|---|---|---|---|---|---|---|
| Metric Results | 455 | 14.4% | | 65.05 | | 31 | |
| Tier | | Gold | | Silver | | Silver | Gold |
| Gold Breakpoint | | 8.5% | | 72.1 | | 38 | |

18. As an Executive Director Biering managed nearly $1 billion in total client asset and credit positions across 51 key relationships. He played a critical role in driving revenue growth for the broader Fort Worth office, personally contributing to 21.34% of the overall revenue generated

4 JPM's corporate titles, in ascending order, are Analyst, Associate, Vice President, Executive Director, and Managing Director.

by his peers, emphasizing the imbalance of support resources. This further underscored his value to the firm and his ability to deliver results, making Biering a vital contributor to JPM's overall success in Fort Worth and the Central Region.

19. In addition to his client-focused work, Biering played a pivotal role as a leader and mentor within JPM. He took an active role in mentoring junior colleagues, including analysts and associates, providing guidance on how to approach and manage relationships with high-net-worth clients, such as public company executives. For instance, Biering led efforts to train and mentor newly hired FAs, equipping them with tailored prospecting strategies to successfully engage larger prospects. His leadership extended beyond his immediate team, as he worked across JPM's global teams to facilitate cross-functional partnerships. Notably, Biering led the integration of an offshore partner, which significantly improved the offshore resource utilization metrics for the Fort Worth office, further demonstrating his leadership capabilities.

20. JPM required FAs to maintain a "pipeline" of anticipated new business opportunities, which was reviewed monthly by management. Biering excelled in this area, consistently building a strong pipeline of prospective deals. In mid to late 2024, he had several "hot" opportunities expected to close, including two major transactions. One involved a $3.5 billion dental rollup (hereinafter, "XYZ Dental")[5] and the other an estimated $1.5 billion Fort Worth-based oil and gas exploration company (hereinafter, "XYZ Energy Partners").[6]

21. Biering successfully negotiated a $10 million private stock secured line of credit for XYZ Dental's CEO, despite internal resistance and political hurdles. Biering's ability to push

---

[5] To preserve confidentiality, "XYZ Dental" serves as a pseudonym for the client at issue. "Dr. XYZ, XYZ President, XYZ Dr., serve as pseudonyms for key stakeholders, clients, and prospects.

[6] To preserve confidentiality, "XYZ Energy Partners" serves as a pseudonym for the clients at issue. "Smith" serves as an alias to preserve confidentiality, in addition to "XYZ Energy CEO" for the second co-founder.

through these obstacles and deliver for his clients demonstrated his dedication to their success. XYZ Dental's President text to Biering is definitive proof of these accolades:

> 1/13/2024 10:08:53 AM
>
> As I've told every person including JPM people. Josh is the only financial person I've ever felt actually goes to bat for his clients.

22. As a result, Biering not only secured the loyalty of top executives at XYZ Dental but also received high-value referrals from their leadership team.

23. In addition to XYZ Dental, Biering had also secured a significant opportunity with XYZ Energy Partners, a Fort Worth-based oil and gas company. This "hot" pipeline entry was closely reviewed by JPMorgan's management and involved over $400 million in new AUM from XYZ's two co-founders. Biering was instrumental in positioning XYZ Energy Partners for its eventual sale, introducing a $150 million lending deal to his investment bank colleagues and successfully securing the business of both co-founders. The sale of XYZ Energy Partners to a pair of public companies closed on September 20, 2024, following a public announcement on July 29, 2024.

24. On the very morning that Biering informed JPM of his intention to resign, the CEO of XYZ Energy emailed Biering onboarding information to open personal Private Bank accounts. Suspiciously, a Senior Managing Director, whom Biering had introduced to the relationship in a supporting role as an investment specialist, intercepted the email, even though it was directly addressed to Biering. This unusual intervention strongly suggests that JPM was already plotting to terminate Biering, with the intent to retain control over his clients, despite Biering not having officially resigned at this point. The timing and nature of this intervention indicate that JPM was working to secure the client relationship before Biering could transition it elsewhere.

25. Biering's relationship with XYZ Energy Partners' co-founder, "Smith," began before Biering's time at JPM, as both Biering and Smith were West Point graduates from the same tight-knit community. Their shared background, combined with the professional successes Biering delivered for Smith at JPM, led Smith to fully intend to follow Biering to Merrill Lynch. In fact, Smith even attended a veteran charity gala in November 2022 as Biering's guest, along with Biering's soon-to-be Merrill Lynch partner. Leading up to XYZ Energy Partners' liquidity event, Biering sent investment proposals to Smith, reinforcing their strong professional relationship. However, on September 24, 2024, Smith called to inform Biering that he had chosen Goldman Sachs instead. Smith hinted that uncertainty surrounding Biering's sudden departure, questions about his stability, and concerns about Raymond James'[7] ability to handle complex clients—compared to firms like Merrill Lynch or Goldman Sachs—were key factors in his decision. This highlights the significant disruption caused by JPM's actions on Biering's long-standing professional relationships and trajectory.

## C. JPM Scrambles to Retain Biering's Business

26. JPM's actions were driven by a calculated motive to retain the business that Biering had developed while simultaneously attempting to tarnish his professional reputation to ease the transition.

27. JPM's sudden change n treatment toward Biering coincided with Biering's increasingly vocal dissatisfaction with management and his plans to resign. This pretextual motive became apparent as JPM scrambled to retain the high-value AUM Biering was cultivating. JPM's actions—ranging from a sudden investigation into fabricated misconduct to defamation via false

[7] Raymond James is Biering's new firm, which he joined after two other offers were pulled as a direct result of JPM's defamatory statements on Biering's U5.

U5 disclosures—reveal a coordinated effort to block Biering from taking clients with him so that JPM could retain control over Biering's business for its own benefit.

**D. <u>The Shift? A Toxic Work Environment and Unaddressed Pleas for Help</u>**

28. As leadership changed in the Fort Worth office, the work environment became increasingly toxic, driven by the indifference and hostile management of newly appointed leaders, Aughinbaugh and Hitchcock. Despite multiple requests from Biering for support, these pleas went unaddressed. The work environment deteriorated to the point where it became intolerable for many employees. The alarming turnover of key personnel following Biering's departure—combined with the toxic culture perpetuated by new leadership—further reflects the dysfunction JPM allowed to take over the office.

29. After Biering's resignation, a drove of FAs left the Fort Worth office, further highlighting the severity of the toxic work environment. Despite being fully aware of these ongoing issues, JPM failed to take meaningful action and instead retaliated against those, like Biering, who voiced legitimate concerns. Upon information and belief, the Fort Worth office ranked dead last in the 2022 U.S. JPM Private Bank Employee Opinion Results Survey.

**E. <u>Biering's Internal Turmoil:</u> To Stay or Resign? . . . RESIGN**

30. The escalating dysfunction within the Fort Worth office, combined with the increasingly toxic work environment, put Biering in a precarious position. On the one hand, his success as a FA and his long-standing relationships with high-net-worth clients made it difficult to leave a firm where he had built a reputation as a top performer. On the other hand, the unbearable work conditions under the leadership of Aughinbaugh and Hitchcock, along with the lack of support from management, pushed him toward resignation.

31. In the months leading up to his **resignation**, Biering made several attempts to address the hostile work environment and sought support from both his immediate managers, Stewart, and Aughinbaugh. Despite his proactive efforts to mitigate the issues, including flagging critical concerns regarding the growing toxicity, no action was taken by management despite conversations and text messages between Biering and Stewart. Instead, Biering was met with indifference and, at times, outright reprimand for "failing to align" with the new leadership's vision for the office.

32. Biering's internal conflict reached a tipping point in October 2023. On October 19, 2023, after months of frustration and feeling trapped in an increasingly hostile environment, Biering decided to depart JPM. Despite his high hopes for a future with JPM, he had reached a breaking point. It was clear that the firm he had once been proud to work for was no longer a place where he could thrive.

33. On October 24, 2023, during a meeting with Aughinbaugh and Stewart, Biering inquired about his **resignation** options, expressing his dilemma of feeling trapped between staying and enduring the toxic work environment or leaving, despite having earned incentive compensation due in January 2024.[8] During this conversation, Aughinbaugh reprimanded Biering, accusing him of insubordination and "*failing to align with the Fort Worth office's cultures and values.*" It became evident that management was not interested in addressing the root causes of Biering's dissatisfaction but was instead focused on undermining him.

34. In the following days, Biering submitted his plans for time away in JPM's HR system (hereinafter, me@JPMC) and also emailed Stewart, marking his intent to take paid time

---

[8] Biering provided a draft of his 2023 Performance Review Self-Assessment to not forfeit his earned compensation. Biering's request for incentive compensation was also later denied by JPMorgan's Head of Human Resources.

off on October 26 and 27, 2023. During this period, Biering met with Merrill Lynch's complex manager (C. Miller) and the Merrill Lynch FAs Biering planned to join (also former JPM Fort Worth colleagues) to discuss Biering's next steps now that Biering signed onboarding documents. Biering finalized his plans to join Merrill Lynch on October 27, 2023.

35. Ultimately, on October 28, 2023, after careful consideration, Biering submitted his resignation to formalize his discussion with Aughinbaugh and Stewart. Despite his efforts to make things work and his long-standing commitment to the firm, it was no longer feasible for him to stay. The work environment had become untenable, and management's refusal to provide the support he needed left him with no choice but to leave. Biering's resignation triggered the commencement of the 60-day Garden Leave period, during which time his access to the firm's systems and clients was revoked.

36. Throughout this period, it became increasingly evident that JPM's leadership viewed Biering's potential departure as a significant threat to the firm's profitability. This perception fueled their pretextual actions in the following months, including the fabricated misconduct investigation and the ultimate defamatory actions surrounding his U5 marking, aimed at discrediting him and impeding his ability to transition his business to a new firm.

**F. <u>JPM's "Investigations" (*i.e.*, Witch Hunt) of Biering</u>**

37. On or about November 1, 2023, Biering learned that JPM had (conveniently) begun an investigation into Biering regarding "two separate issues": (1) an alleged violation of JPM's "anti-harassment policy",[9] and (2) an alleged violation of JPM's "expense report policy." This was the first time that Biering learned he was being investigated for anything. Thus, at the time that

[9] At JPMS's urging FINRA has not allowed Biering to assert his statutory employment discrimination claims, which allege disparate treatment for the same behavior. Given JPM's refusal to agree to have Biering's claims on these issues heard before this Panel, JPM should be disallowed from attempting to smear Biering on these same issues.

Biering resigned from JPM, Biering clearly was not under investigation.[10] Instead, Biering learned, ***after he resigned***, that JPM tried to find anything that would "stick" to end Biering's career in wealth management.

(1) Fabricated Investigation of Biering Expense Report(s)

38. On October 20, 2023, Biering's manager, Stewart, allegedly "*noticed suspicious expenses*" incurred by Biering. This investigation was entirely fabricated after the fact.[11] Indeed, Biering's expenses were submitted and immediately approved on October 2, 2023, in the same manner he had followed for the previous seven years and in line with the Fort Worth's standard operating procedures regarding expense reports. This demonstrates a clear attempt by JPM to retroactively manufacture a ***pretext for termination***, especially after Biering had raised concerns regarding lack of support, a toxic work environment, and his internal turmoil of staying versus resigning.

(2) Alleged Violation of "Anti-Harassment Policy"

39. While now irrelevant to the claims in this Arbitration, as demanded by JPM and as a result of JPM's refusal to allow Biering to arbitrate his allegations of disparate treatment in the FINRA forum, suffice it to say, Biering denies any "inappropriate behavior" in connection with

---

[10] To the extent JPM claims that Biering was already under investigation (and especially for any specific reason) when he resigned, Biering was certainly not informed of it (despite his repeated requests for information regarding the purpose of his administrative leave), and it did not relate to any customer or regulatory issues.

[11] Despite the fabricated expense policy investigation (aka witch hunt), Biering answered the JPMorgan Investigator, Nadia Muraira ("Muraira"), fully and truthfully. In fact, after Mr. Biering emailed Muraira examples of systemic expense policy violations and abuse from broader leadership, Muraira's phone number was *mysteriously* disconnected, and she was no longer reachable. JPM claims they did not pursue the investigation further due to client considerations, but the ***truth***, shows JPM got caught red handed with ***pretextual motives***.

his consensual and reciprocated involvement with a female colleague. In any event, JPM's marking of "Discharged" on Biering's U5 is knowingly false and defamatory.

**G. JPM Attempts to Baselessly "Terminate" Biering**

40. On December 1, 2023, Aughinbaugh and Stewart informed Biering that he had been "*terminated*" for violating *JPMorgan's Code of Conduct*. These allegations came as a complete shock to Biering, as he had never been subject to any disciplinary action during his nearly eight years with the firm or even in his ***entire professional career***. Moreover, the allegations were entirely unfounded, as there was no evidence to support the claims of misconduct.

41. As an initial matter, JPM's attempted "termination" of Biering was not only invalid but it makes no logical sense. Had Biering not already "voluntarily" resigned, there would have been no Garden Leave. And, had Biering not honored the Garden Leave (unlike most FAs), then Biering would have already been working elsewhere on the date that JPM claims it terminated him. Put simply, ***JPM could not have terminated Biering because Biering already resigned***.

42. Clearly, JPM's purported "termination" of Biering and the fabricated reasons in support of same were engineered once JPM learned that Biering was resigning. It is without question that JPM used Biering's mandatory Garden Leave against him to conduct a sham investigation and to smear his name, steal his clients and AUM, and, ultimately, weaponize his U5 in an effort to retain Biering's business.

**H. JPM's Campaign of Defamation and Weaponization of Biering's U5**

(1) Immediate Verbal Defamation: The Rumor Mill Begins

43. Upon Biering's resignation from JPM, JPMorgan's internal communications quickly spread false rumors that Biering had been fired. These rumors rapidly damaged Biering's reputation, with both colleagues and clients adopting the false narrative. On November 2, 2023—

only four days after Biering voluntarily resigned—Biering's former executive assistant texted him, stating, "Why in the hell were you even fired???" This confusion was a direct result of internal messaging by JPM management, deliberately framing Biering's departure as a termination rather than a resignation.

44. The speed at which false rumors spread—well before any purported investigation concluded—contradicts JPM's claims of a fair and impartial process. Every indicator, from the internal communications to the final U5 marking, points to the fact that the "investigation" was nothing more than a formality to justify a premeditated decision: to remove Biering from the firm and end Biering's career in wealth management[12] – while smearing his reputation in the process

(2) <u>Client Reactions to Defamatory Messaging</u>

45. Biering and XYZ Dental's President are close friends. Text messages exchanged between Biering and XYZ Dental's President establish that XYZ Dental's President fully intended to follow Biering to his new firm. However, this changed after JPM's campaign of defamation reached the shores of XYZ Dental's headquarters. In various subsequent conversations between Biering and XYZ Dental's President, it became evident that JPM had been actively defaming Biering to prevent his clients from following him to his new firm. These calculated actions were designed to damage Biering's professional relationships, thereby harming his business and reputation while protecting JPM's financial interests.

46. JPM cannot seriously dispute that it was not the cause of XYZ Dental's decision not to follow Biering to his new firm. After only eight months into the 2023 fiscal year, Biering onboarded $40 million of Dr. XYZ's business with a clear path to at least $250 million by 2024

---

[12] Indeed, U5 defamation is a common tactic in the industry, used to hinder FA transitions and retain their production f/b/o the firm's profits and bottom line.

year-end.[13] As evident by the multitude of texts from XYZ Dental, Dr. XYZ appreciated Biering's "hustle" and, as a result, Biering thought Dr. XYZ would be one of the first to join Biering at his new firm. This was not the case. Dr. XYZ, along with other top shareholders Biering had already made clients at JPM, expressed concerns regarding the defamatory statements they heard from JPM and, as a result, declined to join Biering at his new firm.

(3) JPM's FAs' Defamation

47. During the Garden Leave, J.P. Morgan directed other FAs to call on Biering's clients and smear his name. Specifically, J.P. Morgan's FAs defamed Biering to his clients by stating that Biering had been *fired*. This statement was false. Clearly, given that Biering was on Garden Leave—which was *solely* triggered because Biering *resigned*—Biering was not and could not have been fired.

(4) U5 Mismarking and Written Defamation

48. JPM formalized its campaign of defamation in writing by deliberately mismarking Biering's U5. Despite his voluntary resignation, JPM falsely marked him as "discharged" for "inappropriate behavior," a categorization that has caused significant harm to Biering's professional standing. The marking was not only inaccurate but also maliciously timed to coincide with Biering's departure, creating long-lasting reputational damage within the financial industry. A brief timeline of JPM's written campaign of defamation is as follows:

- **December 6, 2023**: Biering's counsel demanded that JPM correctly mark Biering's U5 to reflect that his departure from JPM was voluntary. In support, Biering's counsel outlined and quoted case law involving analogous facts to those at issue here (*i.e.*, a purported termination following a resignation).

[13] Upon completion of discovery, the Dr. XYZ investment proposal along with Biering's pipeline entries support the vast business tied to the XYZ Dental relationship.

- **<u>December 12, 2023</u>** - Biering's counsel *again* demanded that JPM indicate on Biering's U5 that his termination was "voluntary" and provide no narrative in connection with same. In support, Biering's counsel presented even more case law supporting Biering's position.

- **<u>December 13, 2023</u>** - JPM's in-house counsel, Rachel Tidwell-Neal, informed Biering's counsel that JPM intended to mark Biering's U5 to indicate that Biering was "Discharged," with the following explanation:

  > *"During Notice Period, RR [registered representative] was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."*

  Almost immediately, Biering's counsel responded that this would be a "rank mismarking" and was therefore clearly intended to harm Biering. Specifically, Biering's counsel reminded JPM that Biering had provided uncontroverted legal authority and guidance establishing that JPM could not have fired Biering because he already *<u>resigned</u>*. Biering's counsel further put JPM on actual notice that, if JPM proceeded to mismark Biering's U5, Biering would sustain significant damages, for which JPM would be responsible. JPM proceeded anyway with the false and defamatory U5 marking.

- **<u>December 19, 2023</u>** – Ms. Tidwell-Neal provided a brief response to Biering's counsel (which, notably, failed to cite any legal authority supporting JPM's positions). She asserted that JPMorgan maintained its stance that Biering was "immediately" terminated following the conclusion of JPM's investigation, justifying its refusal to mark Biering's U5 as a "voluntary" termination. However, her response raised several glaring inconsistencies.

  First, she incorrectly claimed that Biering was aware of the investigation the day before his resignation, when in reality Biering had been contemplating resignation for several months. Additionally, she asserted that Biering was terminated "*immediately*" after the investigation concluded. This contention from JPM is false and misleading, as it ignores the actual timeline of events. On November 28, 2023, JPM *conveniently* sent a "JPM bus" of FA replacements to XYZ Dental's headquarters to inform Dr. XYZ that they "appreciated his business" and, as such, decided to increase a private stock secured line of credit exclusively for Dr. XYZ. Then, on December 1, 2023, *only three days later*, JPM purportedly "terminated" Biering (after he had already ***<u>resigned</u>***). By delaying making the

phone call to purportedly "terminate" Biering, JPM strategically waited to ensure that all necessary client outreach was completed, positioning itself as the "white knight" riding in to double Dr. XYZ's private stock line from $10 million to $20 million – a loan that Biering had fought tooth and nail to secure, expending all his political capital and working relentlessly, with limited leadership support. This maneuver was a blatant attempt by JPM to seize control of the situation, saving face while masking its true intentions to retain the business Biering had cultivated.

- **December 20, 2023** – Biering's counsel outlined and disputed the clearly erroneous statements in Ms. Tidwell-Neal's correspondence. As set forth above, Biering *resigned* from JPM on October 28, 2023. A few short days prior, on October 24, Biering met with Aughinbaugh and Stewart to discuss his resignation options. Then, on October 26 and October 27, Biering took PTO. Despite that Stewart knew that Biering was taking PTO and meeting with a competitor, Stewart called Biering late on a Friday afternoon and informed Biering that he was being placed on administrative leave. However, when pressed, Stewart refused to explain why Biering was being placed on administrative leave, and Biering was *not* told that he was under "investigation." Instead, Biering believed that JPM was retaliating against him for expressing his plans to resign. Given JPM's calculated decision to maliciously inform Biering late on a Friday afternoon of his administrative leave, with zero context or ability to reach out to HR before the weekend, Biering knew that he had no choice but to immediately resign.

- **December 20, 2023** – On the same day, and only after JPM refused to make the correct marking of "voluntary" on Biering's U5, to attempt to limit the damage of JPM's false and defamatory "discharged" marking, Biering's counsel provided a redline to JPM's proposed narrative for Biering's U5 with changes that, at a *minimum*, should be made:

> "After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Garden Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

Biering's counsel then implored JPM to follow FINRA's guidance and the uncontroverted case law presented in Biering's demand letters.

- **<u>December 22, 2023</u>** – JPM proceeded to not only intentionally mismark Biering's U5 but further did not implement all the redlined changes from Biering's counsel (which were solely intended to ameliorate the damage to Biering's career by refusing the factually correct marking of "voluntary"). First, JPM marked that Biering was "Discharged":

> **Reason for Termination:** Discharged

JPM then provided the following explanation for Biering's purported "Discharge":

> **Reason for Termination:** Discharged
>
> **Termination Explanation:**
> If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

49. To date, JPM has refused to change and correct the language on Biering's U5 to reflect that his departure from JPM was, in fact, voluntary. JPM slightly changed its tone from violation of "anti-harassment" policies to "inappropriate behavior" (which was strategically timed for prospective employers to pass on Biering). This discrepancy between JPMorgan's actions and their stated justification underscores that the investigation was used as a cover for a termination that was predetermined, long after critical client transitions were completed.

## I. <u>JPM's Loose Interpretation of Disclosure Reporting</u>

50. Further exacerbating the situation, JPM *loosely* interpreted disclosure requirements on Biering's Form U4, marking it with multiple bankruptcies/compromises related to student loan discharges.[14] This loose interpretation of regulatory requirements further demonstrates JPM's

---

[14] JPM filed *five* separate student loan discharges on Biering's U4 as bankruptcies/compromises. JPM has since admitted these disclosures were erroneous. There is also a customer complaint that JPM denied after an investigation of same. Biering is in the process of getting this baseless complaint expunged. JPMorgan, more than one year later, has since admitted these disclosures were erroneous. FINRA does not have a process in place to remove or expunge the bankruptcy or compromises disclosures. At the behest of Claimant's Counsel, FINRA consolidated the five disclosures into a single disclosure as "archived" on Biering's Form U4 (which still unfortunately appears and is accessible by prospective employers).

consistent pattern of harming Biering's professional record through misrepresentation. These false disclosures, combined with the defamatory U5 marking, paint a clear picture of JPM's malicious intent to sabotage Biering's career.

51. The underlying motive behind Biering's termination was not about upholding ethical standards, but about retaining business and revenue tied to his portfolio. The fabricated investigation and pretextual termination were clear attempts to prevent the transition of clients and protect JPM's bottom line, exposing the company's selective enforcement of policies when it serves *JPM's* financial interests.[15]

**J. Biering's Job Search and Raymond James' Confidence in Biering**

(1) Rescinded Job Offers

52. After JPM, through Aughinbaugh and Stewart, purportedly terminated Biering on December 1, 2023, Biering contacted Merrill Lynch to provide an update. Merrill Lynch immediately halted the onboarding process and rescinded Biering's offer, citing that they could not hire him with "Discharged" listed on his U5 as the reason for termination, despite that they considered him to be a "first round draft pick." This was a significant loss, as the deal Merrill Lynch offered Biering was highly favorable. For example, Merrill Lynch offered credit for new AUM and loan positions, such as mortgages and outstanding lines of credit, towards the asset hurdles in Biering's compensation structure. In addition, many of Biering's clients required complex banking and lending solutions that only larger institutions like Merrill Lynch could offer. Since joining Raymond James in January 2024, Biering can trace over $500,000 in lost production

[15] Just one recent example (amongst a sea of many) is as follows: a JPM Fort Worth FINRA licensed investment professional was terminated on July 22, 2024, after admitting to forging a client's initials on private equity subscription documents. This is a clear and severe violation of FINRA regulations. Despite the gravity of this offense, Aughinbaugh, a key figure in Biering's termination, fought to retain this individual, even escalating her case to the CEO of JPM's Private Bank, Dave Frame, in an attempt to avoid her termination.

in just six months, primarily due to the limited banking and lending options available at Raymond James (which are otherwise available at Merrill Lynch).

53. Similarly, before JPM finalized the language on Biering's U5, Texas Capital also withdrew its interest in hiring him. The uncertainty surrounding JPM's imminent U5 disclosures along with the five separate "bankruptcies and discharges" on Biering's U4 made Texas Capital view Biering as a high-risk candidate, leading Texas Capital to rescind its offer.

54. Biering also interviewed with Morgan Stanley, UBS, and RBC, but their reactions were similar once they learned of JPM's false U5 disclosures. Morgan Stanley referred to Biering as a "walking Advisor Hub news article waiting to happen," and UBS did not even follow up with him. RBC, despite multiple interviews, became suspicious when Biering was unable to provide more details regarding the "inappropriate behavior" referenced on his U5. Since JPM refused to provide Biering with information regarding the allegations, RBC ultimately deemed the risk of hiring Biering too high.

(2) Raymond James Takes a Chance on Biering

55. Ultimately, Raymond James agreed to hire Biering, though his interview process was much more intensive than the standard process for most FAs. This heightened scrutiny stemmed from JPM's defamatory markings on Biering's U5, which cast significant doubt on Biering's professional standing and made potential employers wary.

56. In addition to the increased scrutiny, Biering's employment offer from Raymond James was considerably less favorable than those offered to other FAs or his initial offer from Merrill Lynch. Whereas most FAs receive asset bonuses upfront before onboarding, Biering was only offered a salary for two years—less than half of what he earned at JPMorgan. His asset bonuses would only be paid once client assets transitioned and, unlike Merrill Lynch, Raymond

James did not provide credit for loan positions or compensate him for unvested deferred compensation.

57. Despite Raymond James' willingness to take a chance on Biering, JPM's false and defamatory U5 markings have made his transition to Raymond James more difficult. After joining Raymond James, Biering received several email inquiries from state regulators questioning the bankruptcy and compromise disclosures on his U4, as well as JPM's "Discharged" U5 marking and termination explanation. These false and suspicious markings, including the reference to "inappropriate behavior," painted Biering in a false light both within his new firm and in the eyes of his new management.

### K. Ongoing Detriment to Biering

58. Initially, several of Biering's prominent clients intended to transfer their business to him at Raymond James. Biering relied on these client transitions to achieve the asset goals necessary to even approach the financial upside that had been offered by Merrill Lynch. However, once these clients became aware that Biering had been purportedly "Discharged" for "inappropriate behavior," many decided not to follow him, significantly impacting his ability to grow his business at Raymond James.

59. For the clients who have decided to join Biering at Raymond James, JPM continued to interfere. Specifically, JPM rejected line of credit payoff letters and ACAT transfer forms without legitimate cause, frustrating both Biering and his clients. These delays caused some clients to incur higher interest costs on their lines of credit, further eroding trust in Biering's competency and Raymond James' capabilities. Furthermore, upon information and belief, JPM instructed its derivatives team to delay responses to Biering's inquiries regarding upcoming transactions,

allowing the incumbent JPMorgan FA time to "save the relationship." These actions are improper and clearly designed to sabotage Biering's business.

60. In response to these ongoing obstacles, JP Morgan Private Bank's Head of HR, Jena Cohen, instructed Biering to communicate directly with Aughinbaugh regarding any client transition issues. As a result, on August 16, 2024, Biering sent a letter to Aughinbaugh documenting JPMorgan's continued attempts to interfere with and discredit his business efforts. This letter has not stopped JPM's interference.

## LEGAL CLAIMS/CAUSES OF ACTION

61. Based on the activities and actions described herein, Biering asserts the following claims and causes of action, in the alternative, if necessary, for affirmative recovery against J.P. Morgan, and seeks damages therefor.

## COUNT 1: DEFAMATION/DEFAMATION *PER SE* AND VIOLATION OF FINRA RULES

62. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

63. During Biering's Garden Leave, J.P. Morgan started a campaign of defamation and disparagement against Biering. Specifically, JPM directed its FAs to contact Biering's clients and tell them that Biering was fired.[16]

64. Moreover, despite repeated requests from Biering and his counsel to tell the truth, J.P. Morgan submitted a U5 that had knowing falsehoods. Specifically, J.P. Morgan intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's

[16] Notably, even JPM's attempted illegitimate termination of Biering had not yet occurred. Clearly, JPM wanted assurances from its remaining FAs that Biering's clients were "secured" even before it "concluded" its sham investigation.

departure from JPM was "Voluntary." J.P. Morgan further published a narrative that informed the whole public that Biering was "terminated for inappropriate behavior."

65. All of the foregoing statements are patently false and misleading. Such statements further constitute defamation *per se* because they impart fraudulent and/or dishonest characteristics, conduct, and/or practices on Biering. That language not only violated FINRA's mandate against "overly broad or misleading narratives" but intentionally was left vague to cause reasonable readers to assume nefarious behavior.[17]

66. Further, JPM's defamatory statements, including those regarding the circumstances of Biering's departure from JPM, were designed to prevent clients from transitioning their business to Biering's new firm, in direct violation of FINRA Regulatory Notice 19-10. By filing misleading and false information about Biering, JPM further violated FINRA Rule 1122, which provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

67. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

---

[17] To that end, even if JPM could convince the Panel that Biering was "discharged," JPM's disclosures on Biering's U5 are nonetheless defamatory. *See Turner v. KTRK Television, Inc.* 38 S.W.3d 103, 115 (Tex. 2000) (noting that the "gist" of a publication as a whole, when construed in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it, can be false and defamatory). Indeed, "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Id.*

68. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages in an amount to be determined by the Panel.

## COUNT 2: BUSINESS DISPARAGEMENT

69. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

70. J.P Morgan has published disparaging statements concerning, among other things, Biering's integrity and/or business practices. The disparaging statements published by JPM and directed at Biering are false. Such publications are without justification, excuse, or privilege, and they are intended to interfere with the economic interests of Biering.

71. JPM published such falsehoods maliciously, intentionally, and with actual awareness that such statements would cause harm to Biering, or with reckless disregard for the truth or falsity of such statements and the harm that Biering would suffer as a result.

72. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

73. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 3: TORTIOUS INTERFERENCE

74. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

75. Upon Biering's departure from J.P. Morgan, JPM started a campaign of defamation and disparagement against Biering, which tortiously interfered with Biering's previous, current, and prospective business relations with clients. JPM tortiously interfered with such relations with the goal of preventing Biering's clients from transitioning to his new firm.

76. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

77. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

**COUNT 4: UNFAIR COMPETITION**

78. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

79. JPM's defamatory statements about Biering to his clients and on his U5, which have caused Biering to use clients, constitute unfair competition.

80. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

81. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

**COUNT 5: WRONGFUL DISCHARGE**

82. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

83. Biering was employed by J.P. Morgan. Biering hoped to retire and end his career at J.P. Morgan. However, Biering was forced to leave after months of wrongful treatment, lack of support, and discrimination from management. For the reasons set forth herein, no reasonable person could have continued to work for JPM in the intolerable, harassing, discriminatory, and hostile environment that JPM created (and even continued after Biering's constructive discharge).

84. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

**COUNT 6: WEAPONIZATION OF U5**

85. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

86. FINRA and Panels of Arbitrators have recognized that using the marking of a U5 as a weapon is completely improper. A firm's failure to honestly and accurately mark a U5 is not only wrong but it is actionable by the FA who is affected. Indeed, using the marking of a U5 as a weapon is a serious violation of FINRA Rules and Guidance. For example, in a NASD arbitration, a FA was awarded $625,000 in actual damages, plus $1,250,000 in punitive damages and attorney's fees because his U4 and U5 were improperly marked with defamatory statements. *See Ulrich v. Wharton Whitaker & Eaton Vance Distributors* (NASD).

87. J.P Morgan is well aware of the ramifications and penalties for mismarking a U5. Indeed, just months ago, a FINRA Panel found[18] that JPM defamed an ex-FA by mismarking the

[18] *See* Ex. A, Award from *Michael C. Nolan v. J.P. Morgan Securities, LLC*, Case No. 23-00446 (April 10, 2024).

FA's U5, and the Panel awarded punitive damages against JPM and expunged JPM's false and defamatory U5 marking to "voluntary."[19]

88. Further, just a few months ago, JPM lost a second appeal in New York claiming (insultingly) that the FINRA Panel[20] committed "manifest disregard of the law" after awarding an ex-FA $2.6 million for U5 defamation and ordering expungement of the FA's U5. Indeed, the appellate court found that the FINRA Panel was "justif[ied]" in finding that JPM defamed the ex-FA by mismarking the U5.[21]

89. In 2022, another FINRA Panel again found[22] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel further awarded $1.4 million in damages to the FA's reputation and expunged JPM's false and defamatory U5 marking to reflect the true facts. Again, the FA was vindicated in his belief that (*like here*): "[JPM's] assertions on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing clients to remain."[23] Amazingly, JPM appealed this FINRA Panel's carefully considered Award, which a Kentucky federal court denied, noting that JPM knew full-well the benefits to JPM of defaming a departing FA:

> [JPMS] was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude

---

19 Eerily similar to JPM's actions here, FA Nolan wrote on BrokerCheck in response to JPM's mismarking: "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage by reputation." *See* Ex. B.

20 *See* Ex. C, Award from *Liet Han v. J.P. Morgan Securities, LLC*, Case No. 18-02978 (July 7, 2023).

21 *See* Ex. D, *Han v. J.P. Morgan Sec., LLC*, 227 A.D.3d 469, 470 (N.Y. App. Div. 2024).

22 *See* Ex. E, Award from *Dustin B. Luckett*, Case No. 19-03075 (February 4, 2022).

23 *See* Ex. F, Kelly, Bruce, *J.P. Morgan loses $1.4 million defamation case to adviser*, INVESTMENTNEWS (Feb. 11, 2022), https://www.investmentnews.com/industry-news/news/j-p-morgan-loses-1-4-million-defamation-case-to-adviser-finra-arbitration-217212

> that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. . . .[24]
>
> [R]ozema testified that Merrill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [Id. at 604-05].

90. In 2018, another FINRA Panel granted expungement (and an award of $28,867 in attorneys' fees) against JPM and for the ex-FA because of JPM's "false and defamatory" marking of the FA's U5.[25]

91. It is JPM's business practice to smear departing FA's so that JPM can unfairly compete for business. JPM knows that a negative marking of a U5 can be highly detrimental to a FA's career, if not career-killing. FINRA Panels are allowed to, and should, punish firms that abuse their power as the sole arbiter in marking a U5. Recently, a FINRA Panel awarded $3,149,656 in compensatory damages, and – more importantly - ***$7,500,000 in punitive damages*** (as well as $496,753 in attorneys' fees and expungement of the false information in the U5) against UBS for "weaponizing" and falsely marking an ex-FA's U5.[26] UBS, like JPM, had no respect for the FINRA Panel's authority, and kept the Award in limbo for years trying fruitlessly to vacate it, before finally in 2022 (after exhausting and losing all appeals) wiring $14.1 million to the ex-FA for the

---

[24] *See* Ex. G, *J.P. Morgan Sec. LLC v. Luckett,* No. 3:22-CV-137-RGJ, 2023 WL 6050230, at *5 (W.D. Ky. Sept. 15, 2023).

[25] *See* Ex. H, Award from *Rose Mascarenhas v. J.P. Morgan Sec., LLC*, Case No. 18-01879 (May 10, 2019).

[26] *See* Ex. I, Award from *Mark Munizzi v. UBS Fin. Servs. Inc.*, Case No. 18-02179 (December 11, 2019).

defamation and punitive damages.[27] The ex-FA lamented that UBS's defamatory U5 made him "unemployable."

92. JPM's false, inaccurate, and misleading marking of Biering's U5 violates FINRA Rules. JPM's actions not only damaged Biering but also misled the public.

93. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

94. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 7: BREACH OF CONTRACT

95. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

96. When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

97. In connection with same, Biering and J.P. Morgan entered into an agreement whereby JPM promised to pay Biering's fees incurred in obtaining the requested expungement.

98. Biering has fully performed under the parties' agreement. JPM, however, has reneged on its promise and refused to pay Biering's fees. JPM has therefore breached the parties' contract.

---

[27] *See* Ex. J, Rosen, Miriam, *UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award*, AdvisorHub (Apr. 19, 2022), https://www.advisorhub.com/ubs-wires-14-1m-to-ex-compliance-officer-capping-off-battle-over-defamation-award/

99. As a direct and proximate result of JPM's breach of contract, Biering has suffered damages. Biering seeks such damages from JPM.

**<u>COUNT 8:</u> PROMISSORY ESTOPPEL**

100. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein. In the alternative to his breach of contract claim (*i.e.*, Count 7 herein), Biering asserts this promissory estoppel claim.

101. When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

102. In connection with same, J.P. Morgan promised that it would pay Biering's attorney's fees incurred in obtaining an expungement of the customer complaint at issue.

103. J.P. Morgan knew, or should have known, that Biering would rely on J.P. Morgan's promise to pay Biering's attorney's fees.

104. Biering instituted a separate arbitration to expunge the customer complaint at issue and incurred attorney's fees as a result of (at least in part) and in reliance on JPM's promise to pay such attorney's fees.

105. As a direct and proximate result of this reliance, Biering has been injured by JPM's conduct. Injustice can be avoided only by enforcement of the promise made by JPM to pay Biering's attorney's fees incurred in obtaining the requested expungement of the customer complaint at issue. Biering seeks enforcement of such promise made by JPM by an order requiring payment of such attorney's fees.

**<u>COUNT 9:</u> QUANTUM MERUIT AND UNJUST ENRICHMENT**

106. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

107. Biering rendered valuable services to JPM, from which JPM benefitted. For example, Biering was instrumental in bringing XYZ Dental's business to JPM. Yet, Biering received zero compensation for his successful efforts.

108. By JPM's actions, JPM has been unjustly enriched to the detriment of Biering.

109. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

**<u>COUNT 10:</u> ILLEGAL FORFEITURE OF EARNED COMPENSATION**

110. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

111. JPM unilaterally forfeited Biering's <u>vested</u> right to earned compensation, in violation of Texas and New York law. In so doing, JPM conveniently ignored that it has recently recognized Biering as a "gold" producer relative to his peers.

112. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

**<u>COUNT 11:</u> FORFEITURE OF DEFERRED COMPENSATION**
**(VIOLATION OF ERISA)**

113. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

114. J.P. Morgan appears to have unilaterally forfeited deferred compensation pursuant to a plan that affects Biering's compensation. Such forfeiture violates ERISA laws, as ERISA prohibits forfeiture of an employee's deferred compensation.

115. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

**COUNT 12: VIOLATION OF TEXAS AND/OR NEW YORK LABOR AND WAGE LAWS**

116. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

117. Commissions, deferred compensation, and other payments due and owing to Biering cannot be unilaterally altered by JPM to prevent Biering from receiving earned income, and doing so constitutes a violation of Texas and/or New York labor and wage laws.

118. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

**ALTER EGO AND/OR PIERCING THE CORPORATE VEIL**

119. JPMorgan Chase and Chase Bank are jointly and severally liable for all wrongful conduct alleged herein that is or could be attributed to JPMS.

120. JPMS and Chase Bank are both subsidiaries of JPMorgan. In fact, JPMS and Chase Bank are subject to JPMorgan's Code of Conduct, which JPM claims Biering purportedly violated:

> The Code of Conduct ("Code") sets forth the expectation that employees conduct themselves with integrity, at all times. It provides employees with the principles to help govern their conduct with clients, customers, suppliers, vendors, shareholders, fellow employees, regulators, markets, and the communities in which we operate. The Code applies to the employees and directors of JPMorgan Chase & Co. ("firm" or "JPMorganChase") and its direct and indirect subsidiaries.

121. Upon information and belief, in mismarking Biering's U5, JPMS relied upon information and evidence purportedly obtained during an investigation performed by and/or at the direction of JPMorgan Chase and/or Chase Bank. As such, JPMS will undoubtedly rely upon such

evidence and/or present testimony from representatives or employees of JPMorgan Chase and/or Chase Bank to defend against Biering's claims in this Arbitration.

122. To prevent the use of corporate fiction as an unfair device to inflict injustice upon Biering and to achieve equity, the separate corporate identities of JPMS, JPMorgan Chase, and Chase Bank must be disregarded, and Respondents should be treated as one and the same with respect to Biering's claims in this Arbitration.

## ATTORNEYS' FEES

123. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

124. JPM's wrongful conduct required Biering to incur attorney's fees to prosecute this Action. Biering therefore seeks recovery of his reasonable and necessary attorney's fees from JPM.

## PUNITIVE DAMAGES

125. Claimant realleges and incorporates by reference all of the proceeding paragraphs of this Statement of Claim as if fully alleged herein.

126. As a consequence of the willful and malicious nature of J.P. Morgan's wrongful conduct, Biering is entitled to punitive damages.

127. J.P. Morgan has engaged in a *pattern* of intentionally mismarking and publishing defamatory statements on FAs' U5s. As set forth above, FINRA Panels have repeatedly hit JPM with sizeable damages awards and ordered expungement of JPM's false U5 markings. Yet JPM has not learned. Instead, it remains JPM's business practice to smear departing FAs so that JPM can unfairly compete for business.

128. Even worse, here JPM received *repeated* requests from Biering and his counsel to correctly mark Biering's U5. JPM was even given a plethora of legal authority in support. But JPM

ignored all of it. Put simply, JPM had the opportunity to do the right thing but instead *knowingly* and *intentionally* mismarked Biering's U5 in an effort to harm Biering. Punishing this kind of intentional wrongful conduct is the very purpose of punitive damages. Biering therefore requests an award of punitive damages in an amount to be determined by the Panel.

## EXPUNGEMENT

129. Claimant respectfully requests that the Panel enter an order requiring FINRA to expunge all defamatory statements from Claimant's U5 and the registration records maintained by the Central Registration Depository ("CRD") for Claimant, including:

(1) In Section 3 of Biering's U5, replace "Discharged" with "Voluntary"; and

(2) In Section 3 of Biering's U5, delete the "Termination Explanation" in Section 3 in its entirety and instead leave it blank.

130. The defamatory statements at issue were published in Biering's CRD.

131. Biering specifically requests that a substitute Form U5 be filed that reflects the requested expungement.

## REQUEST FOR RELIEF, DAMAGES, AND AWARD

132. Claimant requests damages against JPM to compensate for the wrongs, claims, and causes of action describe herein and Claimant's actual damages, including:

(a) Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;

(b) Expungement as set forth herein;

(c) Specific performance of JPM's promise to pay Claimant's attorney's fees in connection with expungement of the customer complaint referenced herein (or, alternatively, damages due to JPM's failure to perform such promise);

(d) Lost or forfeited deferred compensation;

(e) Reasonable attorney's fees incurred in the prosecution of Claimant's claims in this Action;

(f) Statutory penalties and damages;

(g) Liquidated damages;

(h) Punitive damages;

(i) Damages to Claimant's reputation;

(j) Past lost earnings;

(k) Future lost earnings;

(l) Consequential damages;

(m) Mental anguish and emotional distress damages;

(n) Future lost earning capacity;

(o) The highest pre- and post-judgment interest permitted by law on all damages;

(p) FINRA forum and other fees; and

(q) Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

## REPRESENTATION BY COUNSEL AND REPRESENTATIVE'S CURRENT ADDRESS

133. Claimant is represented in this Action by Joshua J. Iacuone, Anna Olin Richardson, and the law firm of Iacuone McAllister Potter PLLC, 4925 Greenville Ave., Suite 700, Dallas, Texas 75206; (214) 960-2832; josh@imcplaw.com; anna@imcplaw.com

## VENUE

134. Claimant worked for JPM in Texas and was working in Fort Worth, Texas when all or part of JPM's wrongful conduct occurred. Therefore, this matter should be heard in Texas.

## AMOUNT IN DISPUTE AND AMOUNT REQUESTED FOR DAMAGES, AWARD, AND RELIEF

135. Claimant's damages are continuing and cannot be determined with precision until near the final arbitration hearing. However, based on the information currently available, Claimant's best estimate of Claimant's damages and the amount in dispute is approximately at least more than $10 million. Claimant will update Claimant's damages by letter the Friday before the final arbitration hearing begins and/or with testimony and damages spreadsheets presented during the final arbitration hearing.

## RESERVATION OF RIGHTS

136. The investigation of J.P. Morgan's improper acts is continuing. Discovery has not yet started in this Action and the extent of JPM's wrongdoings, actions and inactions are not fully known. Accordingly, the right to plead additional causes of action, claims, and relief is hereby fully reserved.

Respectfully submitted,

**IACUONE MCALLISTER POTTER PLLC**

By: */s/ Joshua J. Iacuone*
Joshua J. Iacuone
Texas State Bar No. 24036818
Anna Olin Richardson
Texas State Bar No. 24102947
4925 Greenville Ave., Ste. 700
Dallas, Texas 75206
Telephone: (214) 960-2832
Email: josh@imcplaw.com
anna@imcplaw.com

**ATTORNEYS FOR CLAIMANT**

**CERTIFICATE OF SERVICE**

This pleading is being served upon all counsel of record in the DR Portal on the date recorded therein, and all other interested persons as set-forth herein.

*/s/ Joshua J. Iacuone*
Joshua J. Iacuone

EXHIBIT A



# Award
# FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

Claimant
Michael C. Nolan

vs.

Respondent
J.P. Morgan Securities, LLC

Case Number: 23-00446

Hearing Site: Philadelphia, Pennsylvania

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

The evidentiary hearing was conducted partially by videoconference.

## REPRESENTATION OF PARTIES

For Claimant Michael C. Nolan ("Claimant"): Todd Gutfleisch, Esq., Harris St. Laurent & Wechsler LLP, New York, New York.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Kevin B. Leblang, Esq., and Amelia B. Munger, Esq., Kramer Levin Naftalis & Frankel LLP, New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: February 21, 2023.
Amended Statement of Claim filed on or about: March 22, 2023.
Claimant signed the Submission Agreement: February 19, 2023.

Statement of Answer filed by Respondent on or about: May 19, 2023.
Respondent signed the Submission Agreement: May 19, 2023.

## CASE SUMMARY

In the Statement of Claim, as amended, Claimant asserted the following causes of action: defamation; tortious interference with prospective contractual relations; violation of FINRA Rule 1122; advancement/indemnification; and injunctive relief.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Amended Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, as amended, Claimant requested expungement of the defamatory language on Claimant's Form U5 and the filing of a substitute Form U5 stating that his employment termination was "voluntary"; and: (1) in box 7F "no" answers to all questions, and (2) in the box 7B DRP, question 5B ("How was the internal review concluded") that there was "no violation of internal policies"; compensatory and punitive damages in the amount of $10,000,000.00; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

In the Statement of Answer, Respondent requested that the Amended Statement of Claim be dismissed in its entirety; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

At the hearing, Claimant requested: $5,174,324.00 in compensatory damages; $1,000,000.00 in additional damages for emotional distress; $555,000.00 in legal fees, including fees/costs incurred during Respondent's internal investigation, through the end of this hearing; and up to 10 times the amount of compensatory damages in punitive damages.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On January 3, 2024, Claimant filed a Motion for Sanctions ("Motion"). On January 10, 2024, Respondent filed a response opposing Claimant's Motion. On January 12, 2024, Claimant filed a reply in further support of the Motion. On January 16, 2024, the Chairperson heard oral arguments on the Motion, as well as a previously filed Claimant's Motion to Compel. By Order dated January 16, 2024, the Chairperson, on behalf of the panel, denied Claimant's Motion for Sanctions in its entirety.

The evidentiary hearings were conducted in-person on February 26-29, 2024, and by videoconference on April 2-3, 2024.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $250,000.00 in compensatory damages, which includes the claim for advancement/indemnification.

2. The Panel recommends the expungement of all references to Occurrence Numbers 2244047 and 2244048 from the registration records maintained by the Central Registration Depository ("CRD") for Michael C. Nolan (CRD Number 1082281). Any "Yes" answers should be changed to "No," as applicable.

FINRA Dispute Resolution Services


The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Michael C. Nolan must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

3. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

**Filing Fees**
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,300.00 |

**The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 3,850.00 |
| Member Process Fee | =$ 7,050.00 |

**Postponement Fees**
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| March 1 and 4, 2024, postponement requested by Respondent | =$ 1,575.00 |
| Total Postponement Fees | =$ 1,575.00 |

The Panel has assessed the total postponement fees to Respondent.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Four (4) pre-hearing sessions with a single Arbitrator @ $450.00/session | | | =$ 1,800.00 |
| Pre-Hearing Conferences: | August 30, 2023 | 1 session | |
| | November 29, 2023 | 1 session | |
| | January 16, 2024 | 1 session | |
| | February 8, 2024 | 1 session | |

| | |
|---|---|
| One (1) pre-hearing session with the Panel @ $1,575.00/session | =$ 1,575.00 |

FINRA Dispute Resolution Services



| | | | |
|---|---|---|---|
| Pre-Hearing Conference: | June 27, 2023 | 1 session | |
| Twelve (12) hearing sessions @ $1,575.00/session | | | =$ 18,900.00 |
| Hearings: | February 26, 2024 | 2 sessions | |
| | February 27, 2024 | 2 sessions | |
| | February 28, 2024 | 2 sessions | |
| | February 29, 2024 | 2 sessions | |
| | April 2, 2024 | 2 sessions | |
| | April 3, 2024 | 2 sessions | |
| Total Hearing Session Fees | | | =$ 22,275.00 |

The Panel has assessed $11,137.50 of the hearing session fees to Claimant.

The Panel has assessed $11,137.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Peter George Erdely | - | Public Arbitrator, Presiding Chairperson |
| Paul J. Leis | - | Public Arbitrator |
| Edward Turner Borer | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

***Peter George Erdely*** — **04/08/2024**

Peter George Erdely
Public Arbitrator, Presiding Chairperson
Signature Date

***Paul J. Leis*** — **04/09/2024**

Paul J. Leis
Public Arbitrator
Signature Date

***Edward Turner Borer*** — **04/08/2024**

Edward Turner Borer
Non-Public Arbitrator
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 10, 2024
Date of Service (For FINRA Dispute Resolution Services use only)

EXHIBIT B

App. 0458

S&P 500 Earnings
(https://www.advisorhub.com/wall-street-is-sending-a-bullish-signal-for-sp-500-earnings/)

(https://www.advisorhub.com)

(https://www.advisorhub.com)

- News
- Deals & Comp(/deals-and-comps/)
- Breakaway Center(/breakaway-center/)
- Asset Management(https://www.advisorhub.com/asset-manager/)
- Events(https://www.advisorhub.events/)
- Rankings
- More

NEWS

# Ex-J.P. Morgan Broker Clears Record of 'Defamatory' Allegations, Wins $250K in Damages

by Karmen Alexander (https://www.advisorhub.com/team/karmen-alexander/) April 11, 2024

(/#linkedin) (/#x) (/#facebook) (/#email)



*Michael Nolan, who can now clear his record of defamatory allegations written on his U5 form by J.P. Morgan.*



J.P. Morgan Securities was ordered to pay $250,000 in damages to a New York City broker over claims that the bank defamed him in a regulatory filing when he left the firm in 2022, according to a Financial Industry Regulatory Authority arbitration award finalized on Wednesday.

The arbitrators also ruled that Michael C. Nolan, who managed $1 billion in client assets (https://www.advisorhub.com/rbc-nets-billion-dollar-father-son-team-from-j-p-morgan-in-nyc/) when he moved to RBC Wealth Management-U.S., could clear his record of the defamatory allegations.

J.P. Morgan in a U5 filing had accused Nolan of a swath of potential violations, including sharing material nonpublic information with a customer, failing to properly disclose an outside business activity and using an unapproved channel to communicate with clients. The allegations appeared in an "employment separation after allegations" disclosure on his public BrokerCheck report.

Those claims, which Nolan denied, interfered with his ability to prospect customers at RBC and also violated Finra Rule 1122 prohibiting the filing of misleading information, Nolan argued, according to the award.

Submit a Tip (/submittip/)

The arbitrators ordered his record be revised to identify his departure as "voluntary" and note there was "no violation of internal policies," according to the settlement. The panel did not provide a reason for their decision as is customary unless both parties request an explained award.

A J.P. Morgan spokesperson declined to comment.

The $250,000 is far less than the total damages that Nolan had sought. He requested more than $6.7 million in compensatory damages and legal fees, including $1 million due to emotional distress, and punitive damages equal to 10 times the compensatory damage claim.

"The fact that there was any form of a monetary award in a claim primarily seeking expungement goes to show that the panel thought there was at least some level of wrongdoing on behalf of the company," said Nolan's lawyer, Todd Gutfleisch of Harris St. Laurent & Wechsler in New York.

Nolan did not respond to a request for comment sent through social media. "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage my reputation," he had written in a comment appended to the BrokerCheck disclosure.

At RBC, Nolan runs an eponymous team with his son, Brian M. Nolan, and two client associates, according to their website. He splits time between New York and Bryn Mawr, Pennsylvania, according to his LinkedIn.

The elder Nolan started his career in 1983 with Goldman Sachs, moved in 1984 to Morgan Stanley and seven years later joined J.P. Morgan's Bear Stearns predecessor, according to his BrokerCheck report.

Nolan is required to have the expungement approved by Finra's Credentialing, Registration, Education and Disclosure Department before it is effective. The panel split the $22,275 in hearing session fees evenly between J.P. Morgan and Nolan.

**Tags:** *Arbitration (https://www.advisorhub.com/tag/arbitration/)* *Finra (https://www.advisorhub.com/tag/finra/)* *JP Morgan (https://www.advisorhub.com/tag/jp-morgan/)* *RBC (https://www.advisorhub.com/tag/rbc/)*

**Like this article? Let AdvisorHub come to you! SIGN UP**

## COMMENTS (5)

**on Apr 11 2024, Herb R (https://www.advisorhub.com/author/) says:**

For anyone looking to change firms (and for all the right reasons) brace yourself for the potential of this kind of attack on the way out. The very individuals who are recruiting in advisors with red carpet treatment, will often seek to crush good advisors who are recruited out.
So much for the Golden Rule…

Reply to Herb R

**on Apr 11 2024, Retiring soon (https://www.advisorhub.com/author/) says:**

Your point is particularly salient as it relates to advisor moves between UBS and Morgan Stanley. Both firms withdrew from the Broker Protocol agreement and now regularly try to sue each other out of existence for daring to take the other's advisors. The hypocrisy of such actions is glaring but continues unabated. Why anyone would go to either firm knowing it would amount to indentured servitude is beyond the rest of us.

Reply to Retiring soon

**on Apr 11 2024, stuart pankin (https://www.advisorhub.com/author/) says:**

Because both of those are the highest gross per advisor firms, not chumps looking for a check. Your sister Minnie Mouse was looking for you.

Reply to stuart pankin

**on Apr 11 2024, Lou Mannheim (https://www.advisorhub.com/author/) says:**

Anyone that moves and takes a check was obviously motivated to move by the amount of the check. The firms all do and offer the same thing. Is it really any different for the client from firm to firm? We can remove "chump" from that last comment and just say everyone is moving for the check. If you were not getting a check, would you move? The grass isn't greener. All of these wire houses are going to change your comp every year and tell you who you can't do business with anymore (account minimums).

Reply to Lou Mannheim

**on Apr 12 2024, Advhub (https://www.advisorhub.com/author/) says:**

If you, as you say, are the highest gross per advisor. The highest grossing advisor would realizes they are lowest Net advisor.
At this point in their career, they should realize the Firm needs them, more than them needing the Firm.

Reply to Advhub

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

**Name ***

**Email ***

**Website**

Post Comment

## Related News



## Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-m broker/)**

May 28, 2024

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

## Creating More Scale and Efficiency in Your Practice



(https://www.advisorhub.com)

Search AdvisorHub

**Topics**

**Deals & Comp(/deals-comps/)**

**Breakaway Center(/breakaway-center/)**

**AdvisorHub RIA(/resource_type/ria-resource-center/)**

**More**

**About Us(/about-us/)**

Careers(/careers/) Contact Us(/contact-us/)

Advertise(/advertise-2nd-level/)

EXHIBIT C App. 0465

**Award**
**FINRA Dispute Resolution Services**

---

In the Matter of the Arbitration Between:

Claimant
Liet Han

vs.

Respondent
J.P. Morgan Securities, LLC

Case Number: 18-02978

Hearing Site: New York, New York

---

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

## REPRESENTATION OF PARTIES

For Claimant Liet Han: Blaine H. Bortnick, Esq., and James W. Halter, Esq., Rasco Klock Perez & Nieto, LLC, New York, New York.

For Respondent J.P. Morgan Securities, LLC: Jeffrey S. Dunlap, Esq., and Michael J. Charlillo, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: August 23, 2018.
Liet Han signed the Submission Agreement: August 1, 2018.

Statement of Answer filed by Respondent on or about: November 19, 2018.
J.P. Morgan Securities, LLC signed the Submission Agreement: November 19, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: wrongful termination; breach of contract; unjust enrichment and quantum meruit; severance; and defamation.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested compensatory damages in an amount equal to at least $5,000,000.00; interest; attorneys' fees; costs; expungement of his Form U5; and any such other and further relief as the Panel deems just, proper, and appropriate.

In the Statement of Answer, Respondent requested that the Panel dismiss or deny all claims and award Respondent all costs incurred in having to defend this action, as well as any other relief in favor of Respondent and against Claimant that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

An Arbitrator has provided an explanation of the decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The majority of the Panel finds that Respondent is liable for and shall pay to Claimant the sum of $2,500,000.00 in compensatory damages.

2. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Liet Han's (CRD Number 2691353) Form U5 filed by J.P. Morgan Securities LLC (CRD Number 79) on January 5, 2018 and maintained by the Central Registration Depository ("CRD"). The Reason for Termination shall be changed to "Other" and The Termination Explanation shall be deleted in its entirety and replaced with the following language: "J.P. Morgan Securities LLC or its affiliate exercised its right to terminate the Registered Representative as an At-Will employee." This directive shall apply to all references to the Reason for Termination and Termination Explanation.

   The Panel further recommends the expungement of all references to Occurrence Number 1964100 from the registration records maintained by the CRD for Liet Han. Any "Yes" answers should be changed to "No," as applicable.

   The above recommendations are made with the understanding that the registration records are not automatically amended. Liet Han must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

App. 0467

3. Any and all claims for relief not specifically addressed herein, including any requests for and attorneys' fees, are denied.

## Dissenting Arbitrator's Opinion

The majority ignores the law and the facts, and inappropriately treats the Claimant as a victim, in order to "compensate" the Claimant at the expense of Respondent for a situation that was entirely of the Claimant's making. The Claimant ignored years of training and instructions as a registered representative and a member of the financial services industry, which training included specific and repeated admonitions against the exact behavior he and his wife engaged in on July 3 and July 5, 2017, with the last anti-money laundering training having been taken by Claimant only 24 days prior. Nonetheless, the Claimant and his wife orchestrated an attempt to deposit over $15,000 in cash without complying with the requirement to make a currency transaction report (CTR) for cash transactions over $10,000, an offense that the undisputed record shows is known as unlawful financial "structuring," the first step in the serious crime of money-laundering.

I find the testimony by Claimant and his wife to be incredible, implausible, self-serving and false. The Claimant asserted that all of the trainings in anti-money laundering that included anti-structuring training specifically, Respondent's code of conduct that included anti-structuring, and his own procedure manual that prohibited structuring and his position as an experienced member of the financial industry slipped his mind as he sent his wife to the teller with more than $15,000 in cash to deposit. He testified that his mind kept slipping even when his wife informed him that the teller said that "a form" would be required because of the large cash deposit. Rather than Claimant simply going to the teller and completing the CTR, he and his wife "pulled-back" the cash and deposited an amount under $10,000 in order to avoid the "form," with Claimant depositing on the next business day the exact balance that was pulled back. A "pull-back" the undisputed record showed, is a red flag for unlawful structuring. Yet despite the years of multiple anti-structuring trainings and his deliberate actions on July 3, 2017, to avoid filing the CTR the Claimant testified repeatedly that he was in shock and a fog because he "did not understand" what were the easily foreseeable consequences of his actions.

The Claimant asserts that a written statement in his own handwriting, provided to the Respondent's investigators, admitting that he and his wife structured the transaction "not to look suspicious" and because his wife did not want to be on the CTR, was not his statement because the incriminating portion was "dictated" by the investigator, notwithstanding that the Claimant certified twice on the document that it was the truth. I find that Claimant wrote that statement not, as he contends, because it was "dictated" to him by anyone, but rather because has was faced with evidence that he could not refute and told the truth because he did not yet have enough time to concoct a story with his wife.

During the hearing the Claimant repeatedly tried to shift all responsibility to his wife, which of course his wife was glad to accept considering the millions of dollars in compensation being requested, yet in his handwritten statement he repeatedly uses the pronoun "we" when admitting the unlawful structuring, he again repeatedly used the pronoun "we" in a statement provided to FINRA during a subsequent FINRA investigation wherein he was represented by counsel and which investigation also found that he engaged in unlawful structuring, and he again used the pronoun "we" when trying to explain the circumstances surrounding the transaction in a letter he sent to prospective employers. In addition, the Claimant falsely stated

in the Statement of Claim that his prior record was "spotless," while the evidence clearly showed that he previously received a warning and letter of education for other rules violations, with respect to which he also claims to be a victim and for which he also placed the blame on others.

I find that the only objective evaluation of the Claimant's and his wife's testimony compels the conclusion that they were simply untrue, and that despite the Claimant's assertions of ignorance, absent-mindedness, self-serving excuses and denials of his own statements and trying to foist all of the blame on his wife (this coming from a sophisticated Claimant who kept reminding the Panel that he handled a $147 million book of business for Respondent), the facts speak for themselves: the Claimant and his wife pulled back from the teller their $15,000+ cash transaction at the very moment they were confronted with what the Claimant surely knew was the need to file a CTR, and then immediately structured their cash transaction to avoid the CTR. Importantly, while both the Claimant and his wife maintained during the hearing that the teller only said that a "form" was needed, did not say "CTR" and gave no other information, and despite Claimant's assertion that he had forgotten all of his training, the Claimant apparently remembered enough to know that the deposit needed to be under $10,000 to avoid the CTR, and they deposited approximately $9,700, pulling back $6,000.

I find that Respondent had ample cause to terminate the Claimant, even if the Claimant was not an at-will employee (which he was). I also find that Respondent was unquestionably required to accurately report the reason for the termination, which it did, and I also find that the language reported by Respondent on Claimant's CRD was the least damaging it could have been under the circumstances, even using the term "allegedly."

All of the above being said, no evidence was presented, nor was it suggested by Respondent, that this particular offense of structuring was the first step in a money-laundering scheme. However, the majority seems not to understand, or deliberately chooses to ignore, that the lack of evidence as to actual money-laundering is irrelevant to whether the Claimant engaged in unlawful structuring to avoid a CTR. It is undisputed that the Bank Secrecy Act, the Claimant's repeated anti-money laundering training, repeated training on Respondent's code of conduct, and the Claimant's registered representative manual, all made crystal clear that structuring of *personal* financial transactions, *no matter what the source of fund*s, in order to avoid a CTR was prohibited and a ground for termination.

And yet, the majority has inexplicably decided to effectively nullify the Bank Secrecy Act, discard the specific and mandatory conditions that governed Claimant's employment, and proclaim that the law, Respondent's code of conduct and the Claimant's own procedure manual did not apply to the Claimant. They are giving license to registered representatives to illegally structure transactions, are rendering employer and FINRA investigations meaningless, with the majority's only requirement for doing so being offered self-serving and theatrical stories created after the fact. They are punishing the Respondent for complying with the law and rewarding the Claimant enormously for ignoring it. There is not a scintilla of credible evidence in this record that Respondent did anything untoward, unlawful, improper or wrong that would justify Respondent having to "compensate" Claimant in any respect. In fact, there is no dispute that the Claimant was a high earner for Respondent, and that Respondent had every incentive to retain Claimant if it felt it was able to do so. All of the steps Respondent took were entirely the result of Claimant and his wife's deliberate and unlawful actions on July 3 and July 5, 2017. Nevertheless, the majority has decided to award an unconscionable $2,500,000 to the Claimant

for "compensation." One can only look incredulously at this record and ask "compensation for Respondent having done what"?

I dissent from the award of any monetary compensation to Claimant.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

**Filing Fees**

FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,000.00 |

**The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the event giving rise to the dispute. Accordingly, as a party, Respondent J.P. Morgan Securities, LLC is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 3,025.00 |
| Member Process Fee | =$ 6,175.00 |

**Postponement Fees**

Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| November 18-22, 2019, postponement requested by the parties | =$ 1,400.00 |
| February 8-14, 2022, postponement requested by the parties | Waived |
| Total Postponement Fees | =$ 1,400.00 |

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees to Respondent.

**Hearing Session Fees and Assessments**

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | | | =$ 450.00 |
| Pre-Hearing Conference: | October 7, 2019 | 1 session | |
| | | | |
| Four (4) pre-hearing sessions with the Panel @ $1,400.00/session | | | =$ 5,600.00 |
| Pre-Hearing Conferences: | January 23, 2019 | 1 session | |
| | May 5, 2020 | 1 session | |
| | March 2, 2021 | 1 session | |

| | | | |
|---|---|---|---|
| | October 27, 2022 | 1 session | |
| Four (4) hearing sessions @ $1,400.00/session | | | =$ 5,600.00 |
| Hearings: | June 12, 2023 | 2 sessions | |
| | June 13, 2023 | 1 session | |
| | June 14, 2023 | 1 session | |
| Total Hearing Session Fees | | | =$ 11,650.00 |

The Panel has assessed $2,800.00 of the hearing session fees to Claimant.

The Panel has assessed $8,850.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Mitchell Regenbogen | - | Public Arbitrator, Presiding Chairperson |
| Linda J. Baer | - | Public Arbitrator |
| Sean F. Monahan | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

***Linda J. Baer*** — **06/26/2023**

Linda J. Baer — Signature Date
Public Arbitrator

***Sean F. Monahan*** — **06/26/2023**

Sean F. Monahan — Signature Date
Non-Public Arbitrator

**Concurring In-Part, Dissenting In-Part Arbitrator's Signature**
Arbitrator dissented on the award for compensatory damages

***Mitchell Regenbogen*** — **07/06/2023**

Mitchell Regenbogen — Signature Date
Public Arbitrator, Presiding Chairperson

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

July 07, 2023
Date of Service (For FINRA Dispute Resolution Services use only)

EXHIBIT D

App. 0472

227 A.D.3d 469
Supreme Court, Appellate Division,
First Department, New York.

In the Matter of Liet HAN, Petitioner–Respondent,
v.
J.P. MORGAN SECURITIES, LLC, Respondent–Appellant,
Financial Regulatory Authority, Inc., Respondent.

2249–, 2250
|
Index No. 653456/23
|
Case Nos. 2023-05480, 2023-06156
|
Entered: May 9, 2024

**Synopsis**
**Background:** Petitioner filed petition against respondent to confirm arbitration award in favor of petition, and respondent filed notice of cross-petition to vacate award. The Supreme Court, New York County, Andrea Masley, J., 2023 WL 6462923, issued initial judgment granting petitioner's petition, denying respondent's notice of cross-petition and motion for stay, and issued subsequent judgment in favor of petitioner and against respondent in the amount of $2,590,550, representing amount arbitrator awarded petitioner plus interest. Respondent appealed both judgments.

**Holdings:** The Supreme Court, Appellate Division, held that:

[1] trial court had jurisdiction over petitioner's petition;

[2] respondent was not entitled to stay or adjournment pending availability of arbitration record or to leave to file supplemental memorandum under statute granting parties 90 days to apply to vacate or modify an arbitration award, or under the Federal Arbitration Act (FAA);

[3] trial court did not improvidently exercise its discretion in denying respondent's motion for stay; and

[4] trial court did not err in rejecting arguments that arbitration panel manifestly disregarded law by apparently applying New Jersey law to petitioner's defamation claim.

Appeal of initial judgment dismissed, and subsequent judgment affirmed.

West Headnotes (4)

[1] **Alternative Dispute Resolution** Application or petition

Trial court had jurisdiction over petitioner's petition against respondent to confirm an arbitration award in favor of petitioner and against respondent in the amount of $2,500,000, even though respondent's cross-petition to vacate the award was not procedurally proper; after petitioner commenced the proceeding, respondent could oppose the award either by a motion to vacate or modify the award, or by objecting to the award in opposition to an application to confirm the award. N.Y. CPLR §§ 304(a), 7510, 7511.

[2] **Alternative Dispute Resolution** Proceedings

Respondent was not entitled to a stay or adjournment pending availability of the arbitration record or to leave to file a supplemental memorandum under statute granting parties 90 days to make an application to vacate or modify an arbitration award, or under the provision of the Federal Arbitration Act (FAA) providing a three-month window to move to vacate the award, in proceeding on petitioner's timely petition against respondent to confirm the arbitration award in petitioner's favor; statutes merely established limitations periods for motions to vacate or modify arbitration awards. 9 U.S.C.A. § 12; N.Y. CPLR § 7511.

App. 0473

[3] **Alternative Dispute Resolution** 🔑 Proceedings

Trial court did not improvidently exercise its discretion in denying respondent's motion for a stay pending availability of the arbitration record, in proceeding on petitioner's petition against respondent to confirm the $2,500,000 arbitration award in petitioner's favor; respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration to its opposition to the petition to confirm, as the arbitration record was received six days before respondent filed its brief in opposition to the petition.

[4] **Alternative Dispute Resolution** 🔑 Error of judgment or mistake of law

Trial court did not err in rejecting respondent's arguments that the arbitration panel manifestly disregarded the law by apparently applying New Jersey law to petitioner's defamation claim against respondent, as would support vacatur of the arbitration award, in proceeding on petitioner's petition against respondent to confirm the $2,500,000 award in favor of petitioner; while the arbitration agreement contained a choice-of-law provision choosing New York law, the provision did not dictate the substantive defamation law to be applied so unambiguously as to make the apparent application of New Jersey law an egregious impropriety, the panel did not provide an explanation for its award, and petitioner's defamation claim was a justifiable ground for the decision.

**Attorneys and Law Firms**

****47** Orrick, Herrington & Sutcliffe LLP, New York (Daniel A. Rubens of counsel), for appellant.

Rasco Klock Perez & Nieto, LLC, New York (Blaine Bortnick of counsel), for respondent.

Manzanet–Daniels, J.P., Singh, Kapnick, Gesmer, Rodriguez, JJ.

**Opinion**

***469** Judgment, Supreme Court, New York County (Andrea Masley, J.), entered November 29, 2023, in favor of petitioner and against respondent in the amount of $2,590,550, unanimously affirmed, with costs. Appeal from order, same court and Justice, entered October 2, 2023, which granted petitioner's petition to confirm an arbitration award and denied respondent's notice of cross-petition to vacate the award and motion for a stay and for leave to file a supplemental memorandum, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

**[1]** Regardless of any procedural deficiencies in respondent's cross-petition to vacate the arbitration award (CPLR 402), the court had jurisdiction over the proceeding and could either confirm or vacate the award (*see* CPLR 304[a], 7510, 7511). After petitioner commenced the proceeding, respondent could oppose the award "either by motion ... to vacate or modify the award ... or by objecting to the award in opposition to an application to confirm the award" (*Matter of Pine St. Assoc., L.P. v. Southridge Partners, L.P.,* 107 A.D.3d 95, 100, 965 N.Y.S.2d 15 [1st Dept. 2013]). Although the court found the cross-petition was not procedurally proper, it nonetheless proceeded to review the merits of the petition to confirm the award.

**[2]** Respondent has not shown that the court improvidently exercised its discretion in declining its request for a stay or ****48** adjournment of the proceeding to confirm the arbitration award pending the availability of the arbitration record and denying respondent leave to file a supplemental memorandum (*see Pena–Vazquez v. Beharry,* 82 A.D.3d 649, 649, 919 N.Y.S.2d 336 [1st Dept. 2011]; *see also Matter of Steven B.*, 6 N.Y.3d 888, 889, 817 N.Y.S.2d 599, 850 N.E.2d 646 [2006]; *Marquez v. 171 Tenants Corp.,* 220 A.D.3d 575, 576, 198 N.Y.S.3d 324 [1st Dept. 2023]). Respondent points out that CPLR 7511 grants a party 90 days to make an application to vacate or modify an arbitration award, and the Federal Arbitration Act (FAA) likewise provides a three-month window to move to vacate (9 USC § 12). However, respondent cites no authority for treating these statutory limitations periods as entitling it to a stay of a court's consideration of a timely petition.

**[3]** Respondent also fails to demonstrate that the court improvidently exercised its discretion in denying its request

Han v. J.P. Morgan Securities, LLC, 227 A.D.3d 469 (2024)
212 N.Y.S.3d 46, 2024 N.Y. Slip Op. 02594



for a stay ***470** under these circumstances, when the arbitration record was received six days before it filed its brief in opposition to the petition to confirm. Thus, respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration.

**[4]** On this record, respondent has not shown that the court erred in confirming the award and rejecting its arguments that the arbitration panel showed a "manifest disregard of the law" (*Matter of Nexia Health Tech., Inc. v. Miratech, Inc.,* 176 A.D.3d 589, 590–591, 110 N.Y.S.3d 420 [1st Dept. 2019]). The New York choice-of-law provision in the parties' arbitration agreement did not dictate the substantive defamation law to be applied so unambiguously as to make the arbitration majority's apparent application of New Jersey law to petitioner's claim an "egregious impropriety on the part of the arbitrators" (*id.* at 591, 110 N.Y.S.3d 42 did not provide an explanation for its award, and because petitioner's defamation claim was a "justifiable ground for the decision," respondent's manifest-disregard arguments as to petitioner's other claims are unpersuasive (*see Tullett Prebon Fin. Servs. v. BGC Fin., L.P.,* 111 A.D.3d 480, 481–482, 975 N.Y.S.2d 18 [1st Dept. 2013], *lv denied* 22 N.Y.3d 864, 2014 WL 1243636 [2014]).

We have considered respondent's remaining arguments and find them unavailing.

**All Citations**

227 A.D.3d 469, 212 N.Y.S.3d 46, 2024 N.Y. Slip Op. 02594

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Award**
**FINRA Dispute Resolution Services**

---

In the Matter of the Arbitration Between:

Claimant
Dustin B. Luckett

vs.

Respondents
J.P. Morgan Securities, LLC and
Todd G. Fannin

Case Number: 19-03075

Hearing Site: Louisville, Kentucky

---

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Person

## REPRESENTATION OF PARTIES

For Claimant Dustin B. Luckett ("Claimant"): Michael A. Valenti, Esq. and Hayden A. Holbrook, Esq., Valenti Hanley PLLC, Louisville, Kentucky.

For Respondents J.P. Morgan Securities, LLC ("JPMS") and Todd G. Fannin ("Fannin"), hereinafter collectively referred to as "Respondents": Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: October 11, 2019.
Claimant signed the Submission Agreement: September 17, 2019.

Statement of Answer filed on or about: January 10, 2020.
JPMS signed the Submission Agreement: January 9, 2020.
Fannin signed the Submission Agreement: January 8, 2020.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by JPMS, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory and asserted the following causes of action: invasion of privacy: false light, tortious interference with prospective business expectancies, and breach of implied covenant of good faith and fair dealing. The causes of action related to events occurring after the conclusion of Claimant's employment with JPMS.

Unless specifically admitted in the Statement of Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested an award of compensatory damages in excess of $4,200,000.00, the specific amount to be determined by the Panel; an award of punitive damages in an amount subject to the discretion of the Panel; expungement and/or modification of the Form U5 filed by JPMS; an award of his costs, including his reasonable attorney fees; and any further legal or equitable relief to which Claimant may be entitled.

In the Statement of Answer, Respondents requested that all claims be denied in their entirety and that all costs be assessed against Claimant.

At the hearing and in Claimant's Itemization of Damages exhibit, Claimant requested damages of $5,585,353.00, exclusive of interest and costs, including compensatory damages of $3,689,015.00, punitive damages of $500,000.00, and attorneys' fees of $1,396,338.00. Alternatively, Claimant requested damages of $4,402,769.00 exclusive of interest and costs, including compensatory damages of $2,802,077.00, punitive damages of $500,000.00, and attorneys' fees of $1,100,692.00. Claimant withdrew the request for attorneys' fees on the record.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On the record at the hearing, Respondents moved to dismiss Claimant's claim with respect to diminution in value of Claimant's 401K plan ("Motion"), asserting that it was brought against the wrong party and not subject to FINRA jurisdiction. The Panel denied the Motion on the record at the hearing.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. JPMS is liable for and shall pay to Claimant the sum of $1,400,000.00 in compensatory damages.

2. JPMS is liable for and shall pay to Claimant the sum of $600.00 in costs as reimbursement for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

3. The Panel recommends the expungement of the Termination Explanation in Section 3 of Dustin Blake Luckett's (CRD Number 5126374) Form U5 filed by J.P. Morgan Securities

LLC on June 29, 2017 and maintained by CRD. The Reason for Termination shall remain the same and the Termination Explanation shall be replaced with the following language: "Non-investment related. After a dispute about a clerical process, RR became disillusioned with the company's atmosphere requiring separation of his at-will employment." This directive shall apply to all references to the Termination Explanation.

The Panel further recommends the expungement of all references to Occurrence Number 1940121 from the registration records maintained by the CRD for Dustin Blake Luckett. Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Dustin Blake Luckett must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

4. Claimant's claims against Fannin are denied.

5. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

**Filing Fees**
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 2,000.00 |

**The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, JPMS is assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 3,025.00 |
| Member Process Fee | =$ | 6,175.00 |

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | | =$ | 450.00 |
| Pre-Hearing Conference: July 27, 2021 | 1 session | | |
| | | | |
| Four (4) pre-hearing sessions with the Panel @ $1,400.00/session | | =$ | 5,600.00 |
| Pre-Hearing Conferences: February 4, 2020 | 1 session | | |

| | | | | |
|---|---|---|---|---|
| | February 2, 2021 | 1 session | | |
| | February 11, 2021 | 1 session | | |
| | December 9, 2021 | 1 session | | |
| Eight (8) hearing sessions @ $1,400.00/session | | | =$ | 11,200.00 |
| Hearings: | January 25, 2022 | 2 sessions | | |
| | January 26, 2022 | 2 sessions | | |
| | January 27, 2022 | 2 sessions | | |
| | January 28, 2022 | 2 sessions | | |
| Total Hearing Session Fees | | | =$ | 17,250.00 |

The Panel has assessed the total hearing session fees to JPMS.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| David F. Barrett | - | Public Arbitrator, Presiding Chairperson |
| Linda W. Hester | - | Public Arbitrator |
| John R. Michael, II | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

***David F. Barrett*** — **02/04/2022**

David F. Barrett
Public Arbitrator, Presiding Chairperson — Signature Date

***Linda W. Hester*** — **02/04/2022**

Linda W. Hester
Public Arbitrator — Signature Date

***John R. Michael, II*** — **02/04/2022**

John R. Michael, II
Non-Public Arbitrator — Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

February 04, 2022
Date of Service (For FINRA Dispute Resolution Services use only)

App. 0480

EXHIBIT F

NEWS Industry News

# J.P. Morgan loses $1.4 million defamation case to adviser



The former adviser alleged that J.P. Morgan Securities defamed him on the Form U5 it filed when he was discharged in 2017.

February 11, 2022 *By Bruce Kelly*

A Finra arbitration panel ordered J.P. Morgan Securities to pay $1.4 million in damages to a former financial adviser who sued the firm claiming it had dirtied up his employment history when he was "discharged," meaning fired, almost five years ago.

According *to the arbitration award* by the Financial Industry Regulatory Authority Inc. panel, the adviser, Dustin B. Luckett, alleged in his arbitration claim that the employment form, called *a Form U5,* that J.P. Morgan filed was defamatory.

Luckett asserted the following, according to the award: invasion of privacy, tortious interference with prospective business expectancies and other claims after he stopped working at J.P. Morgan Securities in June 2017.

Firms are required to file registration records with regulators when an adviser stops work. It's widely believed by many in the industry that firms can take advantage of the U5 system to harm advisers' reputations.

According to Luckett's *BrokerCheck profile,* he was fired after asking a co-worker to notarize a document a client had signed without the client being present. J.P. Morgan Securities also claimed Luckett "engaged in conduct it deemed inconsistent with its anti-retaliation policies."

The arbitration hearing took place in Louisville, Kentucky.

A spokesperson for JPMorgan Chase declined to comment on the matter.

"Luckett is very pleased with the award," said his attorney, Michael A. Valenti. "A big part of that is to clear his name, and the arbitration panel's recommendation of full expungement with favorable language is what he's been fighting for for years."

The Finra arbitration panel gave no reasoning for its decision, which was dated Feb. 4. Luckett worked at Chase Investment Services Corp. and J.P. Morgan Securities from 2011 to 2017. The panel also recommended that the company expunge or change the language on his employment history to reflect that the reasoning wasn't related to investments but rather a dispute over the clerical process of notarizing.

"I believe all assertions placed on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing client to remain" with JPMorgan Chase, Luckett wrote on his BrokerCheck report in response to the firm.

Luckett, who's no longer registered with a brokerage firm, originally asked for more than $4.2 million in damages, according to the award. Valenti, his attorney, said he was working at a bank.

[More: *Judge rips Wells, Finra, in decision over arbitration claim*]

Investing IN Change | EP36
What do C-suite execs think about climate change?
00:00 37:22
1X
PRIVACY SHARE SUBSCRIBE

Related Topics: *J.P. Morgan Securities*

Learn more about **reprints and licensing** for this article.

## Newsletters

Subscribe for original insights, commentary and analysis of the issues facing the financial advice community, from the InvestmentNews

## Recent Articles by Author



### Merrill data bungle hits Walmart 401(k) plan

'We're hearing more horror stories' about clients becoming targets after a data breach, one attorney says.



### Starwood latest nontraded REIT with concerns

Nontraded REITs are facing hurdles, higher interest rates, headlines about half-empty office buildings, and investors pulling their money from products.



### Miami advisors fight over book of business

'Handshake' deal goes wrong for two south Florida advisors.



### Wisc. broker facing charges over stealing town's money

In twist, the broker has blamed other members of a town board for allegedly allowing the theft.



### Interactive Brokers latest B-D to report data breach

'Sophisticated hackers for last 10 years have constantly improved their ability to breach systems,' compliance consultant says.

EXHIBIT G

App. 0482

2023 WL 6050230
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

J.P. MORGAN SECURITIES LLC, Plaintiff
v.
Dustin LUCKETT, Defendant

Civil Action No. 3:22-cv-137-RGJ
|
Signed September 14, 2023
|
Filed September 15, 2023

**Attorneys and Law Firms**

Alyson Terrell, Pro Hac Vice, Ulmer & Berne LLP, Columbus, OH, Jeffrey Scott Dunlap, Pro Hac Vice, Ulmer & Berne LLP, Cleveland, OH, Jesse R. Lipcius, Ulmer & Berne LLP, Cincinnati, OH, for Plaintiff.

Hayden A. Holbrook, Michael A. Valenti, Valenti Hanley, PLLC, Louisville, KY, for Defendant.

**MEMORANDUM OPINION & ORDER**

Rebecca Grady Jennings, District Judge

***1** Plaintiff, J.P. Morgan Securities LLC ("JPMS") moved to vacate arbitration award, to stay any proceedings to enforce arbitration award, and requested oral argument. [DE 1; DE 16]. Defendant, Dustin Luckett ("Luckett"), responded [DE 9; DE 21] and JPMS replied [DE 27]. Luckett also moved to confirm the arbitration award. [DE 29]. JPMS responded [DE 30]. These matters are ripe.

The Court exercises diversity jurisdiction in this case. JPMS is a Delaware Limited Liability Company. [DE 1-1 at 3]. Its sole member is J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York, New York. [*Id.*]. Luckett is a citizen of Kentucky. [*Id.*]. The amount in controversy exceeds $75,000, because Luckett was awarded $1.4 million. [DE 1-2 at 9]. Venue is proper in the Western District of Kentucky because the arbitration took place in Louisville, Kentucky and the Federal Arbitration Act requires parties to file a motion to vacate in the "district court wherein the award was ma[de]" 10(a).

For the reasons below, Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED** and Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

## I. BACKGROUND[1]

Defendant Luckett worked as a Private Client Advisor at a J.P. Morgan Chase Bank, N.A. ("Chase") branch in Louisville, Kentucky. [DE 16 at 126]. JPMS and Chase are affiliates. [DE 16 at 126]. JPMS is a member of the Financial Industry Regulatory Authority ("FINRA"). Luckett was employed by Chase, but his securities licenses were held by JPMS. [*Id.* at 128].

On June 19, 2017, Chase terminated Luckett's employment. [*Id.* at 132]. Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5. [*Id.* at 127]. JPMS filed Luckett's Form U5 as required. [DE 9-2]. Under the "Termination Explanation" section, JPMS stated Luckett was terminated for:

> Non-securities related. [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy. In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies.

[DE 16-5 at 297-98]. JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct." [*Id.* at 300].

***2** Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum. [DE 9-1]. He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies. [*Id.* at 69-71]. He also asserted that JPMS breached an implied covenant of good faith and fair dealing by not facilitating his right to rollover funds in his 401(k) account. [*Id.* at 73-76].

The parties engaged in a four-day in-person arbitration in Louisville, Kentucky in January 2022. [DE 1-2 ("Award")].

The Arbitration Panel ("Panel") rendered the Award on February 4, 2022. [*Id.*]. The Award found JPMS liable to Luckett for $1.4 million in compensatory damages. [*Id.*]. The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable." [*Id.*]. The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.' " [*Id.*]. The Award specified that the Panel recommended expungement "based on the defamatory nature of the information" contained in the Form U5. [*Id.*]. Because neither party requested an explained decision, the Panel did not offer explanation of its decision or indicate on which claims the Award was based.

On March 7, 2022, JPMS filed this action requesting that the Court vacate the Award under 9 U.S.C. §§ 6 and 10 and Fed. R. Civ. P. 7(b). [DE 1; DE 16; DE 27]. Luckett opposed the Motion to Vacate and moved to confirm the Award. [DE 9; DE 21; DE 29].

## II. ANALYSIS

JPMS moves to vacate the Award on grounds that the arbitrators exceeded their powers and manifestly disregarded the law. [DE 1]. Luckett contends that JPMS has failed to satisfy the Sixth Circuit standard for vacating arbitration awards and moves to confirm. [DE 29].

### 1. Motion to Vacate Arbitration Award Standard

The Federal Arbitration Act ("FAA") expresses a federal policy in favor of enforcing arbitration awards. *See Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "It is well established that courts should play only a limited role in reviewing the decisions of arbitrators." *Shelby Cnty. Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992). "When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal ... *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Courts should proceed with particular caution when, as here, they are asked to reevaluate the factual basis of an award. *See Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 677 (6th Cir. 2005) ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers*, 484 U.S. at 36).

***3** The FAA sets out only four situations in which an arbitration award may be vacated:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). *See also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding § 10 lists the "exclusive grounds" under the FAA to vacate an arbitration award). The Sixth Circuit recognizes an additional ground for vacating an award where the arbitrators "manifestly disregarded the law." *Samaan*, 835 F.3d at 600 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).[2]

Moreover, where an arbitration panel declines "to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Jaros*, 70 F.3d at 421. "If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.* In other words, vacatur is proper only "where no judge or group of judges could conceivably come to the same determination." *Id.*

### 2. Manifest Disregard of the Law

JPMS argues that the Award should be vacated because it was issued in manifest disregard of the law. [DE 16 at 136-51]. JPMS asserts four reasons why vacatur is warranted on these grounds: (1) Luckett failed to prove the elements of a tortious interference claim. [*Id.* at 149-51]; (2) New York law, which JPMS argues should have applied to Luckett's claims, provides absolute privilege for statements on a Form U5 [*Id.* at 136-39]; (3) Luckett failed to "prove that JPMS published a false statement," which is a required element of a defamation claim [*Id.* at 139]; and (4) false light is not a recognized claim under New York law [*Id.* at 138].

***4** "To constitute a manifest disregard for the law, '[a] mere error in interpretation or application of the law is insufficient. Rather, the decision must fly in the face of clearly established legal precedent.' " *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008) (alteration in original) (quoting *Jaros*, 70 F.3d at 421). "When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Jaros*, 70 F.3d at 421.

This standard is particularly difficult to meet when arbitrators decline to explain the basis for their award. Generally, arbitrators are not required to explain their decisions. *See United Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award"). When an award is unexplained,

> a party seeking to have the award set aside faces a tremendous obstacle. If a court can find any line of argument that is legally plausible and supports the award then it *must* be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrator must the award be set aside.

*Jaros*, 70 F.3d at 421 (emphasis added). Establishing manifest disregard based on an unexplained decision has been described as "all but impossible." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 871 (6th Cir. 1990) (Martin, J., concurring) (describing courts' review of unexplained arbitral decisions as "something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that may or may not have been manifestly disregarded by the arbitrator"). If there is any conceivable basis on which the arbitrators could have based their award, the reviewing court should decline vacatur. *See Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471, 483–485 (6th Cir. 2006) (declining to vacate panel's unexplained decision because plaintiff identified two plausible theories for the decision).

The Award lacks any explanation as to the factual or legal basis for the Panel's decision. Yet this is "precisely the outcome contracted for between the parties." *Questar Cap. Corp. v. Gorter*, 909 F.Supp.2d 789, 821–22 (W.D. Ky. 2012). The parties agreed FINRA rules would govern the arbitration. [DE 16-6 at 320]. FINRA rules provide that parties may request an explained decision. *See* FINRA Rule 13904 (g). Neither party did so in this case. [DE 9 at 46 n.4].

Thus, the Court has before it an unexplained award, four independent possible legal theories, the parties' briefings, and relevant portions of the arbitration record. JPMS asks the Court to review the merits of the Award based on the record, eliminating every possible line of reasoning that could support the Panel's award on each of the Luckett's four legal theories. Yet if any one of the theories could plausibly support the Award, the Court is bound to confirm it. *See Jaros*, 70 F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed."). If a movant presents multiple possible grounds for vacatur, a reviewing court need address only one legally plausible basis for the arbitrators' award. *See Visconsi v. Lehman Bros., Inc.*, 244 F. App'x 708, 714 (6th Cir. 2007).

***5** The Court turns first to Luckett's tortious interference claim. Under New York law,[3] tortious interference requires a party to prove: "(1) the existence of a business relation with a third party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business relationship." *Empire One Telecommunications, Inc. v. Verizon New York, Inc.*, 888 N.Y.S.2d 714, 728-29 (N.Y. Sup. Ct. 2009). The "tort of interference with business relations applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.*, 590 N.Y.S.2d 460, 461 (N. Y App. Div. 1992). To establish the second prong a plaintiff must show some activities directed " 'towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff.' " *Zdenek Marek v. Old Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (quoting *Fonar Corp. v. Magnetic*

*Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)). Further, establishing a defendant acted with dishonest, unfair, or improper means requires their conduct to have "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

As to the first element of a tortious interference claim, Luckett alleged that he had multiple business expectancies with other FINRA firms at the time of the publication of his Form U5 by JPMS. [DE 9-1 at 64-66]. Managers from Merrill Lynch and Raymond James testified during the arbitral proceedings about their firms' recruitment of Luckett. [DE 21-4 at 602-23]. Arthur Rozema ("Rozema"), a former Administration Manager at Merrill Lynch, testified that the firm was actively recruiting Luckett. [*Id.* at 608-18]. Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing. [*Id.* at 604-05]. This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers.

As to the second element, Luckett did not show that JPMS had direct knowledge of his specific job prospects at Merrill Lynch and Raymond James. Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision ... [about] mov[ing] forward." [ DE 21-4 at 617]. JPMS was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. The Court notes that this element may be less supported in the record than the others. However, it is not a situation "where no judge or group of judges could conceivably come to the same determination." *Jaros*, 70 F.3d at 421; *see also Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 677 ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 36). There is thus a plausible basis from which the Panel could have found this element satisfied.

***6** As to the third element of the tortious interference claim, JPMS alleges that Luckett failed to establish that JPMS acted with either the sole purpose of harm means that were dishonest, unfair, or improper. [DE 16 at 150]. This element may be satisfied by a showing that the defendant's actions amounted to an independent tort. *See Carvel Corp.*, 818 N.E.2d at 1103. In this case, Luckett simultaneously alleged defamation and false light, both of which are independent torts. In fact, the Award explicitly finds that the statements in the Form U5 were of a "defamatory nature." [DE 1-2 at 10]. Therefore, plausible grounds exist for the Panel to have found that Luckett satisfied each element of the tortious interference claim.

Even if the Panel did not properly find that JPMS's conduct was independently tortious, it would not constitute a manifest disregard for the law. *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient ... Rather, the decision must fly in the face of clearly established legal precedent."). JPMS has failed to establish the Panel's decision necessarily "flies in the face" of New York law if it was based on Luckett's tortious interference claim. *Id.* After reviewing the record and transcripts, the Court concludes this case is not one "where no judge or group of judges could conceivably come to the same determination as the arbitrator." *Id.*

The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [*Id.* at 604-05]. Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

The tortious interference claim resolves this case because it could have properly formed the basis for the Panel's decision. The Court need not address other possible grounds for the Award. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award."). Nevertheless, the Court has reviewed the defamation and false light claims and has concluded that

one or both claims could have formed an additional valid basis for the award under New York or Kentucky law.

**3. Exceeded Powers**

JPMS argues the Award should be vacated because the Panel exceeded their powers if the Award was based, in whole or in part, on Luckett's claim for breach of the implied covenant of good faith and fair dealing. [DE 16 at 151]. JPMS asserts that the claim is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") because it involves Luckett's right to rollover funds in his 401(k) account.

JPMS points to nothing in the Award that suggests it was based on Luckett's 401(k) claim. As established above in Part II.2, other valid grounds exist on which the Panel could have based their decision. As a result, the Court declines to further review the merits of an award on the claim for breach of the implied covenant of good faith and fair dealing. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award.").

**4. Motion to Confirm Arbitration Award Standard**

***7** Section 9 of the FAA states that when faced with a motion to confirm an arbitration award "the court must grant such an order unless the award is vacated, modifi[ed, or corrected] as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. The Sixth Circuit has held that "the plain language of the Federal Arbitration Act presumes that arbitration awards will be confirmed, and [the Court's] limited role in confirming an arbitration award under the Federal Arbitration Act is well settled." *Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 676. JPMS has failed to establish any grounds on which to vacate the Award, and therefore the plain language of the FAA compels the Court to grant Luckett's Motion to Confirm.

**III. CONCLUSION**

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED**; and

2. Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

3. The Court will enter separate judgment.

**All Citations**

Slip Copy, 2023 WL 6050230

Footnotes

1 The Court recognizes that the parties dispute one another's characterization of the facts that gave rise to Luckett's termination. Additionally, the Arbitration Panel ("Panel") did not issue any findings of fact with its award. Many of the contested characterizations are not relevant given the standard of review for arbitration awards. As a result, the Background includes only those facts agreed upon by the parties.

2 The Court assumes for this Order that "manifest disregard of the law" has survived *Hall Street* as a valid basis for vacatur. As Luckett points out in their Response [DE 9], this remains an "open question" among lower courts. *Samaan*, 835 F.3d at 600; *see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) (declining to decide whether the manifest disregard standard of review survived *Hall Street* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10"); *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp.*, 2023 WL 5002875, at *6 (W.D. Ky. Aug. 4, 2023) ("[T]he Sixth Circuit continues to recognize that an arbitration award may also be vacated where the arbitrator shows a 'manifest disregard of the law.' ") (citation omitted).

3 It is JPMS's position that the Panel should have applied New York law to all of Luckett's claims. [DE 16 at 11-13]. Luckett argues that the Panel was properly tasked with determining which state's law to apply, and that a decision to apply either state's law does not rise to the level of manifest disregard of the law. [DE 21 at 15-27]. The Court declines to speculate about which law was applied by the Panel. The Court applies New York law for the purposes of this analysis only. If,

under New York law, the tortious interference claim could plausibly support the Award, then the Court *Jaros*, 70 F.3d at 421.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT H

App. 0488

**Award**
**FINRA Office of Dispute Resolution**

---

In the Matter of the Arbitration Between:

Claimant
Rose Mascarenhas

vs.

Respondent
J.P. Morgan Securities, LLC

Case Number: 18-01879

Hearing Site: Chicago, Illinois

---

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Rose Mascarenhas ("Claimant"): Marc D. Schifanelli, Esq. and Gordana Schifanelli, Esq., Schifanelli Law, LLP, Annapolis, Maryland.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio and Scott R. Koch, Esq., JPMorgan Chase Bank, NA, Chicago, Illinois.

## CASE INFORMATION

Statement of Claim filed on or about: May 16, 2018.
Claimant signed the Submission Agreement: May 16, 2018.

Statement of Answer filed on or about: August 6, 2018.
Respondent signed the Submission Agreement: July 30, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following cause of action: defamation. The cause of action relate to Claimant's allegation that the statements made by Respondent in Claimant's Form U4 and U5 caused Claimant to suffer great financial loss and to be unable to find comparable employment in the financial industry.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested $740,000.00 in compensatory and punitive damages, reimbursement of costs and attorneys' fees, and expungement and

modification of the Form U5 in Claimant's registration records maintained by the Central Registration Depository ("CRD").

In the Statement of Answer, Respondent requested that the Panel deny Claimant's claims and request for expungement and damages, assess all costs and forum fees against Claimant, and award any other relief that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The Arbitrators have provided an explanation of their decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings and the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The Panel recommends expungement of the Termination Explanation in Section 3 of the Form U5 of Rose Mascarenhas (CRD# 5487635) filed by J.P. Morgan Securities, LLC on April 4, 2018, and maintained by the CRD. The Termination Explanation shall be changed to the following: "Terminated by Affiliate Bank – Not securities related. Reg. rep. as an affiliate bank employee opened two checking accounts for a long-time customer who had previously opened over 70 accounts. To accommodate the customer, and consistent with the branch practice prior to the recent arrival of a new manager, Reg. rep. opened the accounts without customer being present for the entire opening process, other than appearing to execute the account documents, which was contrary to policies of the Bank." The Reason for Termination shall remain the same.

   In addition, the Panel recommends the expungement of the "Yes" answer to question 7F(1) of the foregoing Form U5. The "Yes" answer shall be changed to "No" and the accompanying Termination Disclosure Reporting Page shall be deleted in its entirety.

   The above recommendations also apply to all subsequent disclosures concerning this event.

   The Panel recommends expungement based on the defamatory nature of the information. The Form U5 is not automatically amended to include the changes indicated above. Rose Mascarenhas must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

2. Respondent is liable for and shall pay to Claimant the sum of $28,867.00 in attorneys' fees pursuant to the parties' submission agreements, in which they agreed to "submit the present matter in controversy, as set forth in the attached statement of claim [and] answer." Claimant requested an award of attorneys' fees in her Statement of Claim. Respondent's submission agreement therefore created a de facto arbitration agreement that included the authority for the arbitrators to award attorneys' fees if Claimant should prevail. The Panel further notes that Respondent did not oppose Claimant's request for attorneys' fees, other than to object to certain time entries, which the Panel has overruled.

3. Respondent is liable for and shall pay to Claimant the sum of $974.72 in costs.

4. Respondent shall reimburse Claimant for the non-refundable portion of Claimant's filing fee in the amount of $425.00.

5. Respondent is liable for and shall pay to Claimant the sum of $1.00 in compensatory damages.

6. Any and all claims for relief not specifically addressed herein, including punitive damages, are denied.

## ARBITRATORS' FINDINGS

Relevant Facts

Claimant was a long-time employee of Respondent and the principal banker for a family business which was a very large and active customer of the bank, having opened over 70 accounts over the years. The policies and procedures of the bank provide a 14-part computer process for opening business accounts, the first step of which is to verify at the beginning of the process that the customer is present in the bank in person. If the "in person" button is not pressed, the account opening process cannot proceed.

It is undisputed that under Claimant's prior bank manager (and perhaps more than one prior bank manager), it was generally allowed that for large, well-known customers such as these, the banker (including Claimant) was allowed to perform most of the process with the customer not present, including pressing the "in person" button. This allowed the account opening procedure, which can take as long as 40 minutes for each account, to be completed without the customer having to be present for the entire process, arriving only to sign the account opening documents. Respondent presented testimony that the branch manager who assumed her responsibilities on January 8, 2018 insisted that the account opening procedure no longer occur without the customer present for the entire process of opening the account.

The customers here contacted Claimant and requested that she prepare two new checking accounts on February 3, 2018 for two separate out-of-state branches of their business, and asked that they be required to appear only for so long as necessary to sign documents. Claimant agreed to do that, as she had on prior occasions, and prepared the

materials for their signature. It appeared undisputed that prior to the arrival of the customers, she performed each of the electronic tasks called for in the process with respect to the first account she opened that day, including pressing the “submit” button for that account. She then set aside the signature documents that had been created by the computer in the course of that process, and began the account opening process for the second account. It was not clear whether the “submit” button was pressed for the second account prior to the customers’ arrival. It was further undisputed that the customers appeared that day, sometime after the “submit” button had been pressed for the first account, and signed the account opening documents for both accounts. There was no allegation that there was anything irregular about any aspect of the accounts or the opening procedure, other than the dispute about whether the customer needed to be present for the entire process.

Respondent terminated Claimant on March 16, 2018 as a consequence of her conduct on February 3. Claimant was a licensed banker, holding Series 6 and 63 licenses. As a consequence, the bank submitted a Form U5, which included an answer to Section 3, regarding “Termination Explanation” which Claimant alleged was false and defamatory.

In addition, Claimant alleged that the answer to question 7F(1) was false and defamatory.

NATURE OF THE CLAIM

Claimant contends that the Termination Explanation and the answer to question 7F(1) in the U5 were false and defamatory in that the first implied that the account was opened without customer approval and the second falsely asserts that Claimant was alleged to have violated an investment-related regulation when the offending conduct involved only opening a checking account. Beyond citing the language itself, Claimant presented documentary evidence from a prospective subsequent employer which showed that those bank officials had read the U5 as reporting that Claimant had been terminated for opening an account without customer authorization.

AWARD

a. Termination Explanation

The Panel finds that the explanation contained in the U5 Form is defamatory in that it incompletely and inaccurately describes the reason for termination.

Respondent argued that that the statement was accurate because Respondent considered the account to be “open” at the moment the “submit” button was pressed and it was pressed for the first account before the customer appeared. That is an unfairly literal reading of that language. It omits facts sufficient to give the reader an understanding of what actually occurred, and how it constituted inappropriate conduct. The statement is therefore incomplete and inaccurate and defamatory in allowing the impression that the account was opened without customer approval.

It is notable in this regard that the representative of the registration department testified that the only information in their possession regarding the basis for the termination was the report from the HR department that “Rose opened an account for a customer without them

being present." The representative and her team were therefore unaware of whether the customer knew about the account, was there for part of the time or was there for none of the time. In the context of the long history of the bank with that customer, the description of what occurred was therefore false and defamatory and the individual who prepared and submitted the U5 did so with an incomplete and therefore inaccurate understanding of the basis for the discharge.

(The expungement recommendation is stated above in the Award section.)

b. Answer to Question 7F(1)

The answer to question 7F(1) should be "no" because the opening of a checking account was not "investment-related." Respondent relies upon FINRA Regulatory Notice 10-39 as requiring that any allegation related to the products of a Bank are drawn within the definition of "investment-related" by the third bullet point of the second page of RN 10-39 where it states as follows:

> A firm should err on the side of interpreting the term "investment-related" in an expansive manner in line with the scope of the term when reporting information on Form U5. The scope of the term pertains to securities, commodities, banking, insurance or real estate (including, but not limited to, acting as or being associated with a broker-dealer, issuer, investment company, investment advisor, futures sponsor, bank or saving association." Accordingly, a firm may be required to provide an affirmative answer to a question even if the matter is not securities related.

The panel concludes that this language is intended to convey to the reporting entity that it should not focus on the nature of the institution at which the alleged misconduct occurs, but rather on the nature of the financial event being addressed. It was undisputed here that a checking account is not an investment. Respondent's witness testified that a checking account was not an investment. The fact that it was opened as part of "banking" cannot logically make it "investment-related."

Respondent was also unable to identify any particular statute, regulation, rule or industry standards of conduct that was violated. Respondent's position appeared to be that Claimant's conduct violated its Code of Conduct, which barred employees from falsifying company records which Respondent argued occurred when Claimant pressed the "in person" button when the customer was in fact not present in person. The panel was persuaded that, because the prior branch manager(s) had accommodated this very large and demanding customer to allow them not to be present for the entire account opening, that the customers were present to complete the process and none of the information submitted to create the accounts was inaccurate, there was no falsified record but rather a technical violation that had theretofore been allowed by management. Critically, the internal investigation performed by Respondent determined that there had been no violation of the Code of Conduct precisely because of the context in which the events occurred.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

**Filing Fees**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 1,725.00 |

**The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 2,475.00 |
| Member Process Fee | =$ 5,075.00 |

**Discovery-Related Motion Fee**
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$ 200.00 |

Respondent submitted one discovery-related motion.

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$ 200.00 |

The Panel has assessed $200.00 of the discovery-related motion fees to Respondent.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) pre-hearing session with the Panel @ $1,300.00/session | | | =$ 1,300.00 |
| Pre-hearing conference: | August 24, 2018 | 1 session | |
| | | | |
| Four (4) hearing sessions @ $1,300.00/session | | | =$ 5,200.00 |
| Hearing Dates: | April 2, 2019 | 2 sessions | |
| | April 3, 2019 | 2 sessions | |
| Total Hearing Session Fees | | | =$ 6,500.00 |

The Panel has assessed $6,500.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

**ARBITRATION PANEL**

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

James J. Stamos
Public Arbitrator, Presiding Chairperson

5-10-19
Signature Date

Victoria Wolf
Public Arbitrator

Signature Date

Nancy L. Hendrickson
Non-Public Arbitrator

Signature Date

May 10, 2019
Date of Service (For FINRA Office of Dispute Resolution office use only)

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

**ARBITRATION PANEL**

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

James J. Stamos
Public Arbitrator, Presiding Chairperson

Signature Date

Victoria U Wolf

Victoria Wolf
Public Arbitrator

5/10/19
Signature Date

Nancy L. Hendrickson
Non-Public Arbitrator

Signature Date

May 10, 2019

Date of Service (For FINRA Office of Dispute Resolution office use only)

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

James J. Stamos
Public Arbitrator, Presiding Chairperson

Signature Date

Victoria Wolf
Public Arbitrator

Signature Date

Nancy L. Hendrickson
Non-Public Arbitrator

May 10, 2019
Signature Date

May 10, 2019
Date of Service (For FINRA Office of Dispute Resolution office use only)

EXHIBIT

I

App. 0497

**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

Claimant
Mark Munizzi

Case Number: 18-02179

vs.

Respondent
UBS Financial Services Inc.

Hearing Site: Chicago, Illinois

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Mark Munizzi ("Claimant"): Steven P. Gomberg, Esq. and Mindy Schwab, Esq., Lynch Thompson LLP, Chicago, Illinois.

For Respondent UBS Financial Services Inc. ("Respondent"): Andrew W. Sidman, Esq., Mark D. Knoll, Esq. and Susan George, Esq., Bressler, Amery & Ross, P.C., New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: June 12, 2018.
Amended Statement of Claim filed on or about: January 7, 2019.
Claimant signed the Submission Agreement: June 8, 2018.

Statement of Answer filed on or about: September 14, 2018.
Statement of Answer to Amended Statement of Claim filed on or about: April 4, 2019.
Respondent signed the Submission Agreement: August 20, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of his registration records maintained by the Central Registration Depository ("CRD"), constituted defamation per se. In the Amended Statement of Claim, Claimant reasserted his claim for defamation per se, in addition to the following causes of action: violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The causes of action relate to Claimant's allegation that Claimant is owed severance from Respondent, and furthermore, that Respondent's inaccurate Form U5 filing will interfere with Claimant's ability to obtain commensurate future employment.

Unless specifically admitted in the Statement of Answer and Statement of Answer to Amended Statement of Claim, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested expungement and modification of the Form U5 filed by Respondent, an award of compensatory damages and punitive damages in an amount to be determined at hearing, and all other appropriate relief. In the Amended Statement of Claim, Claimant requested the same relief as the Statement of Claim, in addition to interest and attorneys' fees.

In the Statement of Answer and Amended Statement of Answer, Respondent requested that Claimant's claims be denied and that Claimant take nothing from this action.

At the hearing, Claimant requested expungement and modification of the Form U5 filed by Respondent; compensatory damages of $3,149,656.00, including $112,500.00 for severance pay; $3,149.00 for interest on the severance pay, with interest accruing at $187.50 per month until paid; attorneys' fees in the amount of $496,753.50; costs in the amount of $23,419.13; punitive damages of ten times the compensatory damages; and that UBS be assessed all FINRA arbitration fees including adjournment fees, hearing session fees and assessments.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On or about January 7, 2019, Claimant filed a Motion to Amend the Statement of Claim ("Motion to Amend"). On or about January 10, 2019, Respondent filed a Response to Claimant's Motion to Amend, in which it stated it did not oppose the motion. After a pre-hearing conference on March 13, 2019, in a written order dated March 14, 2019, the Claimant's Motion to Amend was granted.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $3,149,656.00 in compensatory damages.

2. Respondent is liable for and shall pay to Claimant interest on $112,500.00 of the above-stated compensatory damages award, which represents severance pay, at the rate of 5% per annum from the date of this Award through and

including the date on which that portion of the compensatory damages award is paid in full.

3. Respondent is liable for and shall pay to Claimant the sum of $7,500,000.00 in punitive damages, pursuant to Republic Tobacco Co. v. N. Alt. Trading Co., 381 F.3d 717 (7th Cir. 2004) and Bavarati v. Josephthal, Lyon & Ross, 28 F.3d 704, 710, (7th Cir. 1994).

4. Respondent is liable for and shall pay to Claimant the sum of $496,753.36 in attorneys' fees, pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 1115/14.

5. Respondent is liable for and shall pay to Claimant the sum of $24,381.50 in costs.

6. Respondent is liable for and shall reimburse Claimant $375.00 for the non-refundable portion of Claimant's filing fee previously paid to FINRA Office of Dispute Resolution.

7. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of the Form U5 filed by UBS Financial Services Inc. and maintained by the CRD for Mark Munizzi (CRD Number 1692491) on May 18, 2018. The Reason for Termination shall be changed to "Other" and the Termination Explanation shall read "Terminated without cause."

   In addition, the Panel recommends the expungement of the "Yes" answers to Question 7B and 7F(1) on the above Form U5. The Panel recommends that the answers be changed to "No" and the accompanying disclosure reporting pages be deleted in their entirety.

   These recommendations shall apply to any subsequent disclosures concerning this event including, but not limited to the, the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018 and maintained by the CRD.

   In addition, the Panel recommends the expungement of the "Yes" answer to Question 7F(3) on the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018. The Panel recommends that the answer be changed to "No" and the accompanying disclosure reporting page be deleted in its entirety.

   The Arbitrator recommends expungement based on the defamatory nature of the information. The registration records are not automatically amended to include the changes indicated above. Claimant Mark Munizzi must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

8. Any and all claims for relief not specifically addressed herein are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

**Filing Fees**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 1,575.00 |

**The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 1,900.00 |
| Member Process Fee | =$ 3,750.00 |

**Postponement Fees**
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$ 1,125.00 |
| Total Postponement Fees | =$ 1,125.00 |

The Panel has assessed $1,125.00 of the postponement fees to Respondent.

**Last Minute Cancellation Fees**
Fees apply when a hearing on the merits is postponed or settled within ten calendar days before the start of a scheduled hearing session:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$ 1,800.00 |
| Total Last Minute Cancellation Fees | =$ 1,800.00 |

The Panel has assessed $1,800.00 of the last minute cancellation fees to Respondent.

**Discovery-Related Motion Fee**
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$ 200.00 |
| One (1) decision on a discovery-related motion on the papers with three (3) arbitrators @ $600.00 /decision | =$ 600.00 |

Claimant submitted (2) two discovery-related motions

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$ 800.00 |

The Panel has assessed $400.00 of the discovery-related motion fees to Claimant.

The Panel has assessed $400.00 of the discovery-related motion fees to Respondent.

**Hearing Session Fees and Assessments**

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) pre-hearing session with a single arbitrator @ $450.00/session | | | =$ 450.00 |
| Pre-hearing Conference: | March 13, 2019 | 1 session | |
| | | | |
| One (1) pre-hearing session with the Panel @ $1,125.00/session | | | =$ 1,125.00 |
| Pre-hearing Conference: | October 16, 2018 | 1 session | |
| | | | |
| Twenty-six (26) hearing sessions @ $1,125.00/session | | | =$ 29,250.00 |
| Hearing Dates: | June 11, 2019 | 2 sessions | |
| | June 12, 2019 | 2 sessions | |
| | June 13, 2019 | 2 sessions | |
| | June 14, 2019 | 2 sessions | |
| | June 17, 2019 | 2 sessions | |
| | June 18, 2019 | 2 sessions | |
| | September 24, 2019 | 2 sessions | |
| | September 25, 2019 | 2 sessions | |
| | September 26, 2019 | 2 sessions | |
| | September 27, 2019 | 2 sessions | |
| | November 19, 2019 | 2 sessions | |
| | November 20, 2019 | 2 sessions | |
| | November 21, 2019 | 2 sessions | |
| Total Hearing Session Fees | | | =$ 30,825.00 |

The Panel has assessed $787.50 of the hearing session fees to Claimant.

The Panel has assessed $30,037.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lisa M. Krimen | - | Public Arbitrator, Presiding Chairperson |
| Donald M. Thompson | - | Public Arbitrator |
| Craig D. Cook | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

***Lisa M. Krimen***
Lisa M. Krimen
Public Arbitrator, Presiding Chairperson

12/10/2019
Signature Date

***Donald M. Thompson***
Donald M. Thompson
Public Arbitrator

12/11/2019
Signature Date

***Craig D. Cook***
Craig D. Cook
Non-Public Arbitrator

12/11/2019
Signature Date

December 11, 2019
Date of Service (For FINRA Office of Dispute Resolution office use only)

EXHIBIT J 0503

(https://www.advisorhub.com)

AH All Quiet on the Stock Market Front (https://www.advisorhub.com/resources/all-quiet-on-the-stock-market-front/)

(https://www.advisorhub.com)



NEWS

# UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award

**by Miriam Rozen** April 19, 2022

(/#linkedin) (/#facebook) (/#email)




Submit a Tip (/submittip/)

*JHVEPhoto - stock.adobe.com*

A drawn-out legal dispute that has spanned four years and multiple appeals has concluded with a $14.1 million wire transfer from UBS Wealth Management USA to a former compliance officer in Chicago.

UBS Financial Services paid the total on April 12 to Mark Munizzi, its former regional compliance manager in Chicago, whom it had fired in 2018. Munizzi sued later that year for defamation and won $11.1 million in an arbitration award the following year.

UBS waged lengthy court battles (https://www.advisorhub.com/ubss-appeal-to-vacate-11-mln-finra-award-faces-uphill-battle-lawyers/) that were seen as a message to others who may consider taking on the firm in court, but ultimately failed to vacate the award. On March 31, the Supreme Court of Illinois denied UBS its final appeal without offering an explanation.

Because of the lengthy appeals process, UBS added about $3 million to the amount it ultimately paid Munizzi as interest continued to accrue, as well as attorney fees UBS was required to cover under the terms of the award, according to Munizzi's lawyer Stephen Gomberg of Lynch Thompson in Chicago.

A spokesperson for UBS declined to comment. The firm would have had to petition the U.S. Supreme Court for a hearing to continue with any appeal.

App. 0504

In his arbitration complaint filed in June 2018, Munizzi alleged UBS defamed him on his U5 termination filing, which accused him of failing to supervise employees executing uncovered options strategy in accounts and of giving "varied responses" during the firm's review of his activities.

Munizzi, who had been earning roughly $200,000 a year, according to his lawyer, asserted that he was not properly informed by the firm's central supervision office of margin calls against brokers in UBS's Madison, Wisconsin branch. He had been one of several fired in the wake of a junior broker's naked options trades that were said to have cost $3.7 million in losses in employee-related accounts.

In the December 2019 award, which was the largest employee arbitration penalty that year, the Financial Industry Regulatory Authority arbitration panel had ordered UBS Financial Services to pay Munizzi $7.5 million in punitive damages, $3.1 million in compensatory damages for severance and almost $497,000 of attorneys' fees—a total of about $11.1 million.

In January 2020, a court upheld the award and entered a judgment for $12,177,360, which included an additional $908,965 of statutory interest and attorneys' fees and costs of $97,604, Gomberg said. The judge in that case also did not provide a written explanation, although courts are often deferential to arbitrators and have narrow grounds to overturn awards.

Munizzi was "very much relieved" with UBS's final payment and he "has enough money to retire," but he had been through an ordeal, Gomberg said. The U5 mark-up left him unemployable, according to the lawyer.

"He hasn't gotten a job, or even gotten an interview," Gomberg said.

The favorable outcome could embolden others to bring cases, according to Gomberg, who said he has seen signs of an "uptick" in employment disputes between brokerages and brokers relating to terminations as well as complaints filed with defamation claims.

Since the news of Munizzi's initial win before the Finra panel first surfaced, firms have also begun issuing more "carefully worded" U5s to avoid defamation claims, he added.

**Tags:** *Arbitration (https://www.advisorhub.com/tag/arbitration/)* *Defamation (https://www.advisorhub.com/tag/defamation/)*

**Like this article? Let AdvisorHub come to you!** SIGN UP

## COMMENTS (4)

**on Apr 19 2022, Tired of Large Firm CYA-Hot Potato Game (https://www.advisorhub.com/author/) says:**

I'm very happy to hear the Compliance Officer won this battle. Its terrible how expensive it is in legal costs for the fired employee. I know far too many people who have lost their jobs so that senior executives at large firms could make it look like they took action for the regulators. I'm looking at you JPM.

Reply to Tired of Large Firm CYA-Hot Potato Game

**on Apr 19 2022, So tired of CYA Hot Potato Games! (https://www.advisorhub.com/author/) says:**

you are indeed a kindred spirit!

Reply to So tired of CYA Hot Potato Games!

**on Apr 20 2022, Not a Choosen one (https://www.advisorhub.com/author/) says:**

Happy for this guy. UBS is notorious for trashing employees and mid level mangers while they protect the inner circle choosen few. Sadly for every win like this there are many more who never get their justice due to cost and how like the big bank can fight for…

Reply to Not a Choosen one

**on Apr 20 2022, Arl (https://www.advisorhub.com/author/) says:**

Wow, makes me wonder if I have a case. My former broker dealer made mark on my U5 on my record from email and client said he was wrong and then a very large potential client saw
my U5 before it was removed and didn't hire me and recently had FINRA remove.

Reply to Arl

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

**Name ***

**Email ***

**Website**

**Post Comment**

## Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

---

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

---

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

---

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

## Creating More Scale and Efficiency in Your Practice

(https://www.advisorhub.com)

Search AdvisorHub

**Topics**

**AdvisorHub RIA(/resource_type/ria-resource-center/)**

**Deals & Comp(/deals-comps/)**

**More**

**Breakaway Center(/breakaway-center/)**

**About Us(/about-us/)**

Careers(/careers/)

Contact Us(/contact-us/)

Advertise(/advertise-2nd-level/)

FINRA

**TO:** Joshua J. Iacuone, Esq.

**CC:** Jeffrey S. Dunlap, Esq.

**From:** Aracelly Y. Hernandez
Case Specialist

**Subject:** FINRA Dispute Resolution Services Arbitration Number 24-01208
Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC

**Date:** September 6, 2024

[redacted]

We have received the pre-dispute arbitration agreement attached to Claimant's Statement of Claim filed on June 3, 2024. Upon review, the agreement specifies that statutory employment discrimination claims are to be arbitrated at AAA. Absent a post-dispute agreement to arbitrate or a court order compelling arbitration at FINRA, we do not have jurisdiction over these claims.

[redacted]

Please disregard the arbitrator ranking forms that were sent to the parties on July 24, 2024. These ranking forms were sent in error. New ranking forms will be sent at a later date.

If you have any questions, please do not hesitate to contact me at 212-858-4388 or by email at Aracelly.Hernandez@finra.org.

AXB:axb:LC53A
idr: 02/18/2020

RECIPIENTS:
Joshua J. Iacuone, Esq., Iacuone McAllister Potter PLLC, 4925 Greenville Ave, Suite 700, Dallas, TX 75206
On Behalf Of: Joshua D. Biering

CC:
Jeffrey S. Dunlap, Esq., UB Greensfelder LLP, 1660 West 2nd Street, Suite 1100, Cleveland, OH 44114-1406
On Behalf Of: J.P. Morgan Securities, LLC

UBGreensfelder™

App. 0513

Jeffrey S. Dunlap
Partner

DIRECT 216.583.7026
DIRECT FAX 216.583.7027
EMAIL jdunlap@ubglaw.com

**VIA FINRA DR PORTAL**

August 13, 2024

Aracelly Hernandez
FINRA Dispute Resolution Services
Brookfield Place
200 Liberty Street
New York, New York

**RE:** ***Biering v. J.P. Morgan Securities LLC, et al.,*** **FINRA Case No. 24-01208 Arbitrator Selection**

Dear Aracelly:

The purpose of this letter is to inform FINRA that, pursuant to FINRA Rule 13201, Respondent J.P. Morgan Securities LLC ("Respondent") **does not agree** to arbitrate Claimant's statutory employment discrimination claims in this forum.[1] Accordingly, Respondent respectfully submits that FINRA has incorrectly composed the Arbitrator Selection List for this case.

[redacted]

> [redacted] Such a claim may be arbitrated **only** if the parties have agreed to arbitrate it, either before or after the dispute arose. If the parties agree to arbitrate such a claim, the claim will be administered under Rule 13802. (Emphasis added).

In his Statement of Claim, Claimant pleads two statutory employment discrimination claims. *See* Claimant's Amended Statement of Claim at ¶¶120-134. Respondent has not agreed and does not agree to arbitrate these claims in FINRA.

When he became registered with JPMS, Claimant agreed in his Form U4 to submit claims he may have against JPMS to arbitration in FINRA. It appears that FINRA may have incorrectly assumed that an arbitration panel composed under Rule 13802 is appropriate in this case for two reasons: (1) because Claimant pled two statutory employment discrimination claims in his Statement of Claim, and (2) because of the Binding Arbitration Agreement (the "AAA Agreement") that was appended to Claimant's Statement of Claim at pages 95-105.[2] FINRA's

[1] In addition, JPMorgan Chase Bank, N.A., and JPMorgan Chase & Co., which are not FINRA member firms, do not agree to arbitrate claims against them in FINRA arbitration.

[2] Respondents note that the Agreement was not appended to Claimant's First Amended Statement of Claim filed on August 12, 2024.

UBGreensfelder™





interpretation of both issues is incorrect. First, Respondent has not agreed and does not agree to arbitrate Claimant's statutory employment claims in FINRA. Second, Claimant's AAA Agreement indicates that Claimant and his former employer – which is JPMorgan Chase Bank, N.A. – agreed to arbitrate certain claims before a single arbitrator of the American Arbitration Association. Claimant's Agreement therefore has no bearing on the present FINRA arbitration.

Accordingly, Respondent respectfully requests that FINRA issue a new Arbitrator Selection List pursuant to FINRA Rule 13402(b).[3] Neither Claimant nor Respondent would be prejudiced by the re-issuance of arbitrator selection materials since Claimant filed a First Amended Statement of Claim on August 12, 2024, extending the deadline by which Respondent must file its Statement of Answer in this case to September 5, 2024. *See* FINRA Rule 13310(a).

Notwithstanding the objections it has set forth in this letter, Respondent is prepared to submit arbitrator selection rankings by the end of the day today, August 13, 2024, in response to the original Arbitrator Selection List so that Respondent is not accused of ignoring currently set deadlines. By doing so, however, Respondent is not acquiescing to arbitrate Claimant's claims before a panel composed under FINRA Rule 13802. Moreover, Respondent is not waiving its rights to have a panel composed under FINRA Rule 13402(b), and expressly reserves all of its rights with respect to this issue.

If you have any questions, please do not hesitate to contact me by telephone at 216-583-7026 or by email at Jdunlap@ubglaw.com.

Sincerely,

*/s/ Jeffrey S. Dunlap*

Jeffrey S. Dunlap

cc: Joshua Iacuone, (via FINRA DR Portal)
Anna Richardson (via FINRA DR Portal)
Emma Tomsick

[3] Under FINRA Rule 13401(c), the panel in this case should be composed of three arbitrators. *See* FINRA Rule 13401(c). Under FINRA Rule 13402(b), the three arbitrator panel should be composed of a non-public arbitrator, and two public arbitrators, one of whom shall serve as the chairperson. *See* FINRA Rule 13402(b).

FINRA
Financial Industry Regulatory Authority

Richard W. Berry
Executive Vice President and Director
FINRA Dispute Resolution Services

**App. 0515**

October 3, 2024

Joshua J. Iacuone, Esq.
Iacuone McAllister Potter PLLC
4925 Greenville Ave.
Suite 700
Dallas, Texas 75206

Subject: FINRA Dispute Resolution Number 24-01208
Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC

Dear Mr. Iacuone,

FINRA Dispute Resolution Services ("FINRA DRS") received the Motions for Reconsideration of Jurisdiction ("Motions") for the above referenced matter filed by claimant Joshua David Sappi Biering and Claimant's counsel (together, "Claimant") in FINRA Case No. 24-01208. For the reasons explained herein, the Director of FINRA DRS (the "Director") denies the Motions.

On June 3, 2024, Claimant filed his original statement of claim with FINRA DRS in FINRA Case No. 24-01208 asserting fourteen causes of action, including a claim for discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act (Count 9) and a claim for disability discrimination in violation of the Americans with Disabilities Act and the Texas Commission on Human Rights Act (Count 10).

On July 24, 2024, FINRA DRS sent the parties arbitrator ranking forms under FINRA Rule 13802. On August 12, 2024 and August 13, 2024, Claimant and Respondent J.P. Morgan Securities, LLC ("Respondent"), respectively, submitted ranked arbitrator lists. On August 13, 2024, Respondent also filed correspondence asserting that the pre-dispute arbitration agreement between Claimant and Respondent required statutory employment discrimination claims to be arbitrated at AAA.

On September 6, 2024, FINRA DRS sent a letter to the parties advising them that because the parties' pre-dispute arbitration agreement specifies arbitration of statutory employment discrimination claims at AAA, then absent a post-dispute agreement to arbitrate or a court order compelling arbitration at FINRA, FINRA DRS does not have jurisdiction over the statutory employment discrimination claims. The letter also stated: "Please amend your Statement of Claim by deleting all causes of action or requests for relief based on statutory



Brookfield Place
200 Liberty Street
New York, NY
10281

t 212.858.4307
f 301.527 4828
richard.berry@finra.org

[redacted] On September 27, 2024, the deadline was extended to October 4, 2024.

Claimant filed the Motions on September 6, 7, and 19, 2024.

Under FINRA Rule 13200(a) of the Code of Arbitration Procedure for Industry Disputes ("Code"), all industry disputes arising out of the business activities of a member or an associated person must be arbitrated at FINRA unless an exception applies. One such exception is for statutory employment discrimination claims under FINRA Rule 13201(a), which provides that such claims are not required to be arbitrated under the Code. Instead, such claims may be arbitrated at FINRA or a non-FINRA forum, such as court or another arbitration forum. Member firms and their employees who agree to arbitrate statutory employment discrimination claims may agree to use any arbitration forum. See Exchange Act Release No. 40109 (June 22, 1998), 63 FR 35299, 35301 (June 29, 1998) (Order Approving File No. SR-NASD-97-77).

In this case, the FINRA forum does not have jurisdiction over Claimant's statutory employment discrimination claims because the pre-dispute arbitration agreement provides for arbitration of statutory employment discrimination claims at AAA and the parties have not agreed to arbitrate the statutory employment discrimination claims at the FINRA forum post-dispute. Further, no court of competent jurisdiction has ordered the parties to arbitrate the statutory employment discrimination claims at the FINRA forum.

Claimant's Motions are therefore denied.

This decision pertains solely to FINRA's jurisdiction over the statutory employment discrimination claims. The parties do not dispute FINRA's jurisdiction over the other claims.

[redacted] If this office does not receive the appropriate documentation by October 11, 2024, this case will be closed without prejudice.

If you have any questions, please do not hesitate to contact me directly at 212-858-4307 or by email at richard.berry@finra.org.

Sincerely,

Richard Berry

cc: Jeffrey S. Dunlap, Esq.

# JPMS FINRA Prehearing Brief

**App. 0518-0529**

Respondents' September 16, 2025 prehearing brief.

**BEFORE THE ARBITRATION BOARD**
**OF THE**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | | |
|---|---|---|
| **In the Matter of the Arbitration Between**<br><br>**JOSHUA BIERING,**<br><br>**Claimant,**<br><br>**v.**<br><br>**J.P. MORGAN SECURITIES LLC, JPMORGAN CHASE & CO., AND JPMORGAN CHASE BANK, N.A.,**<br><br>**Respondents.** | X : : : : : : : : : : : X | **FINRA Case No. 24-01208**<br><br>**RESPONDENT J.P. MORGAN SECURITIES LLC'S PREHEARING BRIEF** |

Respondent J.P. Morgan Securities LLC ("JPMS")[1] hereby submits its Prehearing Brief.

## I. Statement of Facts

JPMorgan Chase Bank, N.A. ("JPMorgan") hired Claimant Joshua Biering on February 18, 2016 as a Military Officer Executive Program Associate. Claimant started working for JPMorgan on May 23, 2016. While he was employed by JPMorgan, JPMS held Claimant's securities licenses.

In the fall of 2023, Claimant was working as an Executive Director at the Downtown Fort Worth branch of the JPMorgan Private Bank located in Fort Worth, Texas. [redacted]

[redacted] and JPMorgan Chase Bank, N.A. are not FINRA member firms, and FINRA does not have jurisdiction over them. Accordingly, JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. are not participating in this arbitration.

Ann [redacted] Mr. Hitchcock reported to Human Resources that Ms. [redacted] Ms. [redacted] was hesitant to come forward to Mr. Hitchcock. Mr. Hitchcock could tell that something was bothering Ms. [redacted] and prompted her to open up to him – which she only agreed to do at a coffee shop away from the office. The conversation between Ms. [redacted] and Mr. Hitchcock was very emotional. Upon receiving the report from Mr. Hitchcock, Ms. Stainback immediately escalated the report to JPMorgan's Employee Relations team for further investigation.

On October 27, 2023, Employee Relations investigator Jonathan Jacobs, accompanied by Global Security Investigator Chris Magee, interviewed Ms. [redacted] regarding her concerns. The interview with Ms. [redacted] First, Ms. [redacted] explained to the investigators that she and Claimant had attended a golf outing at a client's (and close friend of Claimant's) home from September 10th to 11th, 2023. When Ms. [redacted]

Second, Ms. [redacted] In September, 2023, near the time of the golf outing, Claimant encouraged Ms. [redacted] to download a cell phone application known as "Signal," which allows users to

send encrypted text messages that automatically delete. Claimant asked Ms. [redacted]

At the conclusion of Ms. [redacted] October 27, 2023 interview, JPMorgan placed Claimant on a paid administrative leave that was effective at the end of day on October 27, 2023. Mr. Jacobs contacted Claimant's manager, Ben Stewart, and directed him to inform Claimant of JPMorgan's decision to place him on paid leave.

On Saturday, October 28, 2023, the day after Claimant was placed on involuntary paid administrative leave, Claimant sent an email to his supervisors providing JPMorgan of notice of his intent to resign his employment. As an Executive Director, Claimant was bound by JPMorgan's Notice Period Policy, which requires certain employees to provide their manager with advance notice of the resignation of their employment. As an Executive Director, Claimant's Notice Period was 60 days. During this time, Claimant remained a JPMorgan employee subject to the JPMorgan Code of Conduct, was paid at his then-current base salary rate, and remained eligible for benefits. Under the Notice Period Policy, Claimant remained an employee at will for 60 days following his resignation, and Claimant was on notice that his employment could be terminated during that period.

On November 7, 2023, Mr. Jacobs and Mr. Magee interviewed Claimant regarding Ms. [redacted] Claimant admitted that he requested that Ms. [redacted] download the Signal application so that Claimant's wife could not read their text messages. Claimant also admitted to asking Ms. [redacted] Claimant

[redacted]

[redacted] during the September golf outing and by messaging Ms. [redacted]

Notably, Claimant was an Executive Director, and Ms. [redacted] was an Analyst. She performed 99% of her daily work on accounts that Claimant serviced. Claimant had substantial influence over Ms. [redacted] career path and success at JPMorgan. Ms. [redacted] job was primarily dedicated to supporting Claimant's book of business; therefore, Claimant had quasi-supervisory authority over her. The inherent power dynamic between Claimant and Ms. [redacted]

[redacted] On December 22, 2023, JPMS filed Claimant's Form U5 Uniform Termination Notice of Securities Industry

[2] On October 20, 2023, JPMorgan also initiated an investigation into Claimant's use of his JPMorgan expense account. JPMorgan initiated this investigation after Claimant's manager, Ben Stewart, raised concerns regarding expenses Claimant submitted that consisted of golf club fees and substantial charges for alcohol. JPMorgan's Global Security Department conducted the investigation. Ultimately, Global Security found that the allegations into Claimant's misuse of company funds were "unsubstantiated." Global Security reached this conclusion because the next step in its investigative process would have required JPMorgan to contact the clients identified in Claimant's expense report. As it is not standard practice to contact clients regarding an internal investigation, and Global Security did not identify any reason to deviate from that practice, Global Security closed the investigation.

Registration. JPMS stated the following accurate explanation of Claimant's termination in Section 3 of the Form U5:

> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

No other sections of the Form U5 were answered in the affirmative, and no other disclosures were made on Claimant's Form U5.

On January 11, 2024, approximately one month after Claimant's termination, Claimant was employed by and registered with Raymond James & Associates, Inc. Claimant remains registered with that firm.

## II. <u>Legal Issues in Dispute</u>

Claimant will be unable to succeed on any of the 12 causes of action asserted in his Second Amended Complaint.

**<u>Defamation</u>**: Claimant alleges that the termination reason of "Discharged" on his Form U5 and the related termination explanation are false and defamatory. Claimant will be unable to succeed on this claim because (1) a qualified privilege bars this claim, and (2) the statements on Claimant's Form U5 are true.

First, JPMS is protected by a qualified privilege that is fatal to Claimant's defamation claim. Public policy mandates that certain statements, while potentially defamatory, are privileged and cannot serve as the basis to establish liability for defamation. *See, e.g., 5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 257 (Tex. App. 2004), *Mattei v. Int'l Conference of Funeral Serv. Examining Bds.*, No. 1-15-CV-139 RP, 2015 U.S. Dist. LEXIS 116009, at *16 (W.D. Tex. Sep. 1, 2015). It is well established that an employer's statements on a Form U5, submitted by a broker-dealer like JPMS, are protected by a qualified privilege and cannot give rise to liability for defamation in the absence of actual malice. *Shanklin v. Columbia Mgmt.*

*Advisors, L.L.C.,* 2008 U.S. Dist. LEXIS 91797 (S.D. Tx. November 12, 2008), *Steinhaus v. Beachside Envtl.*, LLC, 590 S.W.3d 672, 677 (Tex. App. 2019). Claimant cannot succeed in connection with his defamation claim arising from the language JPMS entered on his Form U5 in light of this privilege because he cannot show the actual malice required to overcome it. Claimant's defamation claim therefore fails as a matter of law and should be dismissed.

Second, falsity is an element of a claim for defamation. *Campbell v. Clark*, 471 S.W.3d 615 (Tex. App. 2015), *Van Der Linden v. Khan*, 535 S.W.3d 179, 200 (Tex. App. 2017). Truth is a complete defense to a claim for defamation. *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App. 2003). Question 3 on the Form U5 instructs a FINRA member firm to provide a reason for termination. JPMS truthfully responded that Claimant was discharged. Claimant was subject to the Notice Policy which notified Claimant that his employment could be terminated during the notice period. Additionally, Question 3 requires the member firm to provide a termination explanation. JPMS terminated Claimant's registration (1) after Claimant submitted a notice of intent to resign, (2) before expiration of the notice period, and (3) for inappropriate behavior. Claimant's termination was not related to the sale of securities or any customer complaints. JPMS's termination explanation is true and accurate, thus defeating any claim for defamation.

**Business Disparagement**: Claimant alleges that JPMS made disparaging statements about Claimant's integrity and/or business practices. To prevail this claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that led to special damages to the plaintiff. *Choctaw Constr. Servs. LLC v. Rail-Life R.R. Servs., LLC*, 617 S.W.3d 143, 152 (Tex. App. 2020). Claimant cannot succeed on a claim for business disparagement because, as set forth above, the disclosure on Claimant's Form U5 is true, and JPMS is privileged to provide such information as must in

accordance with FINRA requirements. Additionally, Claimant will be unable to show that JPMS acted with malice as JPMS published the statements on Claimant's Form U5 as FINRA required it to do.

**Tortious Interference**: Claimant alleges that JPMS started a campaign of defamation and disparagement designed to prevent Claimant's clients from transitioning to his new firm. Because there was no defamation or disparagement as a matter of law, Claimant cannot succeed on this claim.

Under Texas law, a claim for tortious interference with a prospective business relationship requires a showing of (1) a reasonable probability that the parties would have entered into a business relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference. *Stout v. Gremillion*, No. 1:18-CV-654-LY-SH, 2019 U.S. Dist. LEXIS 152895, at *20-21 (W.D. Tex. Sep. 6, 2019), quoting *Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 403 (5th Cir. 2008). Because JPMS is required by FINRA to file an accurate Form U5, JPMS acted with justification and privilege, and JPMS did not tortiously interfere with Claimant's prospective business relationships.

**Unfair Competition**: Claimant alleges that JPMS' defamatory statements caused Claimant to lose clients. Under Texas law, a claim for unfair competition requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business. *See Cedra Pharmacy Hous. LLC v. Unitedhealth Grp., Inc.*, No. H-17-3800, 2019 U.S. Dist. LEXIS 55827, at *34-35 (S.D. Tex. Mar. 7, 2019). For the reasons set forth above and because Claimant will be unable to show that JPMS committed any illegal act, his claim for unfair competition cannot succeed.

**Wrongful Discharge**: Claimant alleges that he was forced to leave JPMorgan after months of wrongful treatment, lack of support, and discrimination. Claimant will be unable to prevail on this cause of action because Claimant was not employed by JPMS. Instead, Claimant was employed by J.P. Morgan Chase Bank, N.A. The Bank is not a proper party to this arbitration because it is not a FINRA member firm. Moreover, even if Claimant could proceed on this claim against JPMS, he would not succeed because Claimant was employed "at will," and Texas law does not allow for a wrongful discharge claim by an employee at will. *Peoples v. Dall. Baptist Univ.*, No. 05-95-00583-CV, 1996 Tex. App. LEXIS 1934, at *6-7 (Tex. App. May 14, 1996).

**Weaponization of U5:** Claimant alleges that the false statements on his Form U5 damages Claimant and misled the public. Claimant will be unable to succeed on this claim because he will be able to show that such a cause of action exists under Texas law. Moreover, this claim – even if it were a recognized, stand-alone claim – is duplicative of Claimant's defamation claim and would fail for the reasons Claimant's defamation claim fails.

**Breach of Contract**: Claimant asserts that JPMS failed to pay Claimant's attorneys' fees in connection with a customer expungement matter. Claimant will be unable to succeed on this claim because he has not identified and cannot identify an agreement whereby JPMS agreed to pay Claimant's attorneys' fees in connection with the customer expungement matter.

**Promissory Estoppel**: Claimant asserts that JPMS failed to pay Claimant's attorneys' fees in connection with a customer expungement matter. Claimant will be unable to succeed on this claim because he will be unable to demonstrate a promise by JPMS to pay Claimant's attorneys' fees related to the customer expungement matter.

**Quantum Meruit/Unjust Enrichment**: Claimant alleges that he was instrumental in bringing new business into JPMorgan for which he was not compensated. A claim for unjust

enrichment requires Claimant to show that it is against equity and good conscience to permit JPMS to retain what is sought to be recovered. *Cristobal v. Allen*, No. 01-09-00126-CV, 2010 Tex. App. LEXIS 5829, at *19 (Tex. App. July 22, 2010). Claimant will be unable to make such a showing because the evidence will show that on the date he tendered his notice of intent to resign, Claimant forfeited his right to any further incentive compensation even if that compensation had already been earned.

**Illegal Forfeiture of Earned Compensation**: Claimant alleges that JPMS unilaterally forfeited Claimant's vested right to earned compensation and ignored that Claimant was a "gold" producer. Claimant cannot succeed on this claim because on the date he tendered his notice of intent to resign, Claimant forfeited his right to any further incentive compensation even if that compensation had already been earned.

**Forfeiture of Deferred Compensation**: Claimant alleges that JPMS unilaterally forfeited Claimant's right to deferred compensation in violation of ERISA. However, claims under ERISA are expressly excluded from the arbitration agreement to which Claimant agreed. Therefore this claim is not arbitrable. *Wagner v. Apache Corp.*, 627 S.W.3d 277, 283 (Tex. 2021), *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 282 (5th Cir. 2019). Furthermore, even if this claim were arbitrable, Claimant has not exhausted administrative remedies, of which the failure to do so bars any ERISA claim. *McGowin v. Manpower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004).

**Violation of Texas and/or New York Labor and Wage Laws**: Claimant alleges that JPMS altered commission, deferred compensation and other payments to prevent Claimant from receiving earned income. Claimant will be unable to succeed on this claim because on the date he tendered his notice of intent to resign, Claimant forfeited his right to any further incentive compensation even if that compensation had already been earned.

## III. <u>Non-Expert Witnesses</u>

At a minimum, JPMS plans to have the following witnesses testify at the arbitration.

1. <u>Kyle Hitchcock</u> – Mr. Hitchcock is a Managing Director, Head of Investment and Advice at JPMorgan Private Bank. He will testify about his background, his work with Claimant, and the facts and circumstances surrounding his report to Human Resources related to Claimant's conduct.

2. <u>Stephanie Stainback</u> – Ms. Stainback is a Human Resources Business Advisor at JPMorgan. She will testify about her background, her conversations with Claimant and others regarding Claimant's conduct, and the facts and circumstances surrounding a report she received regarding Claimant's conduct and the investigations related to that conduct.

3. <u>Jonathan Jacobs</u> – Mr. Jacobs is a Vice President Employee Relations at JPMorgan. He will testify about his background and the facts and circumstances surrounding the investigations into Claimant's conduct and termination.

4. <u>Christopher Magee</u> – Mr. Magee is with JPMorgan's Global Security team. He will testify about his background and the facts and circumstances surrounding the investigation into Claimant's conduct and termination.

5. <u>Ben Stewart</u> – Mr. Stewart is a Market Team Lead at the JPMorgan Private Bank. He will testify about his background, his work with Claimant, and the facts and circumstances surrounding the investigations into Claimant's conduct and Claimant's termination.

6. <u>J.T. Aughinbaugh</u> – Mr. Aughinbaugh is a Managing Director and Market Manager who supervises Ben Stewart. He will testify about his interactions with Claimant during Claimant's employment and when Claimant was terminated.

7. Jena Cohen – Ms. Cohen is a Human Resources Business Advisor Lead who was involved in the decision to terminate Claimant. She will testify about termination issues and her interactions with the Claimant.

8. Greg Thompson – Mr. Thompson is a Vice President Employee Conduct Lead. He will testify about the facts and circumstances surrounding completion of Claimant's Form U5.

9. Respondent reserves the right to call Claimant's witnesses either on direct or cross-examination.

## IV. Expert Witnesses

Respondent does not intend to call an expert witness at this time but reserves the right to do so.

Respectfully submitted,

*s/ Jeffrey S. Dunlap*

Jeffrey S. Dunlap (Ohio 0067923)
UB GREENSFELDER LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113
216/583-7000 (phone)
216/583-7001 (fax)
jdunlap@ubglaw.com

*Attorney for Respondent J.P. Morgan Securities LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2025, a true and accurate copy of the foregoing was filed on, and served on counsel for all parties through, FINRA's DR Portal.

*/s/ Jeffrey S. Dunlap*
*Attorney for Respondent J.P. Morgan Securities LLC*

# Compensation Records

App. 0531

November 20, 2023 compensation letter.

App. 0531

JPMORGAN CHASE & CO.

Employment Verification
DE3-2255
4041 Ogletown Rd.
Newark, DE 19713

Monday, November 20, 2023

RE: Joshua D. Biering

In response to your recent request, JPMorgan Chase & Co. records reflect the following employment and compensation information. Any inconsistency between the Original Hire Date and the Most Recent Hire Date is due to prior employment.

Refer to employment pay statements or W-2 for further salary information.

| | |
|---|---|
| Social Security Number: | XXX-XX-7593 |
| Employment Status: | Current |
| Original Hire Date: | 05/23/2016 |
| Most Recent Hire Date: | 05/23/2016 |
| Employment Type: | Full-Time |
| Standard Weekly Hours: | 40 |
| Position: | Executive Director, SC Banker |
| Salary: | 225,000.00 USD |

| Currency for below figures is in USD: | Current YTD | Past Year 2022 | Past Year 2021 |
|---|---|---|---|
| Base Pay: | $204,166.63 | $195,833.26 | $150,000.00 |
| Overtime: | $0.00 | $0.00 | $0.00 |
| Bonus: | $104,000.00 | $120,000.00 | $45,000.00 |
| Commission: | $0.00 | $0.00 | $0.00 |
| Stock: | $2,643.75 | $0.00 | $0.00 |
| Other: | $2,142.76 | $1,588.20 | $1,224.80 |

The Employment Verification letter provides gross wages, and a W-2 provides taxable income. The wages between the two may vary because of pre-tax deductions such as 401K, Medical, Dental and Flexible Spending Accounts.

Exhibit
CX208

Reference Number for This Verification: I662283DESAL152322
For Customer Service Please Call: (877) 576-2427

This is an official document from JPMorgan Chase & Co. verifying the above individual's employment and salary information.
Automated Employment Verification System

# Form W-2 and Payroll Records

**App. 0533-0547**

Form W-2 identifying JPMorgan Chase Bank, N.A. as employer.

App. 0533

Form **W-2 Wage and Tax Statement** 2016

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>[redacted] TX 75039 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 83806.61 |
| 2 Federal income tax withheld | 18006.00 |
| 3 Social security wages | 85306.61 |
| 4 Social security tax withheld | 5289.01 |
| 5 Medicare wages and tips | 85306.61 |
| 6 Medicare tax withheld | 1236.95 |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 21.00 |
| 12b | D 1500.00 |
| 12c | DD 3855.25 |
| 12d | |
| 14 Other | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| GA | 2093284LT | 2692.21 | 147.87 | | | |

**Copy B-To Be Filed With Employee's FEDERAL Tax Return** This information is being furnished to the Internal Revenue Service. OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Form **W-2 Wage and Tax Statement** 2016

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>[redacted] 75039 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 83806.61 |
| 2 Federal income tax withheld | 18006.00 |
| 3 Social security wages | 85306.61 |
| 4 Social security tax withheld | 5289.01 |
| 5 Medicare wages and tips | 85306.61 |
| 6 Medicare tax withheld | 1236.95 |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 21.00 |
| 12b | D 1500.00 |
| 12c | DD 3855.25 |
| 12d | |
| 14 Other | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| GA | 2093284LT | 2692.21 | 147.87 | | | |

**Copy C-For EMPLOYEE'S RECORDS (See *Notice to Employee* on the back of Copy B.)** OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

Form **W-2 Wage and Tax Statement** 2016

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 83806.61 |
| 2 Federal income tax withheld | 18006.00 |
| 3 Social security wages | 85306.61 |
| 4 Social security tax withheld | 5289.01 |
| 5 Medicare wages and tips | 85306.61 |
| 6 Medicare tax withheld | 1236.95 |
| 11 Nonqualified plans | |
| 12a | C 21.00 |
| 12b | D 1500.00 |
| 12c | DD 3855.25 |
| 12d | |
| 14 Other | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| GA | 2093284LT | 2692.21 | 147.87 | | | |

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

Form **W-2 Wage and Tax Statement** 2016

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 83806.61 |
| 2 Federal income tax withheld | 18006.00 |
| 3 Social security wages | 85306.61 |
| 4 Social security tax withheld | 5289.01 |
| 5 Medicare wages and tips | 85306.61 |
| 6 Medicare tax withheld | 1236.95 |
| 11 Nonqualified plans | |
| 12a | C 21.00 |
| 12b | D 1500.00 |
| 12c | DD 3855.25 |
| 12d | |
| 14 Other | |

Exhibit
CX202

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| GA | 2093284LT | 2692.21 | 147.87 | | | |

CONFIDENTIAL JPMS000030

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

44444 | **For Official Use Only ▶** OMB No. 1545-0008 | **Safe, accurate, FAST! Use** IRS e-file | Visit the IRS website at **www.irs.gov.**

**a** Employer's name, address, and ZIP code

JPMORGAN CHASE BANK, NA
500 STANTON CHRISTIANA ROAD
NEWARK DE 19713

**c** Tax year/Form corrected: 2017 / **W-2**

**d** Employee's correct SSN: [redacted]

**e** Corrected SSN and/or name (Check this box and complete boxes f and/or g if incorrect on form previously filed.) ☐

Complete boxes f and/or g only if incorrect on form **previously filed** ▶

**f** Employee's **previously reported** SSN

**b** Employer's Federal EIN: 13-4994650

**g** Employee's **previously reported** name

**h** Employee's first name and initial: JOSHUA D | Last name: BIERING | Suff.

[redacted]

**i** Employee's address and ZIP code

**Note.** Only complete money fields that are being corrected (exception: for corrections involving MQGE, see the General Instructions for Forms W-2 and W-3, under Specific Instructions for Form W-2c, boxes 5 and 6).

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **1** Wages, tips, other compensation 105482.90 | **1** Wages, tips, other compensation 108823.66 | **2** Federal income tax withheld 21692.96 | **2** Federal income tax withheld 22528.15 |
| **3** Social security wages 110021.60 | **3** Social security wages 113362.36 | **4** Social security tax withheld 6821.34 | **4** Social security tax withheld 7028.47 |
| **5** Medicare wages and tips 110021.60 | **5** Medicare wages and tips 113362.36 | **6** Medicare tax withheld 1595.31 | **6** Medicare tax withheld 1643.75 |
| **7** Social security tips | **7** Social security tips | **8** Allocated tips | **8** Allocated tips |
| **9** | **9** | **10** Dependent care benefits | **10** Dependent care benefits |
| **11** Nonqualified plans | **11** Nonqualified plans | **12a** See instructions for box 12 Code | **12a** See instructions for box 12 Code |
| **13** Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | **13** Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | **12b** Code | **12b** Code |
| **14** Other (see instructions) | **14** Other (see instructions) | **12c** Code | **12c** Code |
| | | **12d** Code | **12d** Code |

**State Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **15** State | **15** State | **15** State | **15** State |
| Employer's state ID number | Employer's state ID number | Employer's state ID number | Employer's state ID number |
| **16** State wages, tips, etc. | **16** State wages, tips, etc. | **16** State wages, tips, etc. | **16** State wages, tips, etc. |
| **17** State income tax | **17** State income tax | **17** State income tax | **17** State income tax |

**Locality Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. |
| **19** Local income tax | **19** Local income tax | **19** Local income tax | **19** Local income tax |
| **20** Locality name | **20** Locality name | **20** Locality name | **20** Locality name |

**Copy B—To Be Filed with Employee's FEDERAL Tax Return**

-2014) | **Corrected Wage and Tax Statement** | Department of the Treasury Internal Revenue Service

**App. 0534** NTIAL

**JPMS000031**

**CX202-2**

44444 | **For Official Use Only ▶** OMB No. 1545-0008

**App. 0535**

| | |
|---|---|
| **a** Employer's name, address, and ZIP code<br>JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 | **c** Tax year/Form corrected: 2017 / **W-2**<br>**d** Employee's correct SSN: [redacted]<br>**e** Corrected SSN and/or name (Check this box and complete boxes f and/or g if incorrect on form previously filed.) ☐<br>Complete boxes f and/or g only if incorrect on form **previously filed** ▶<br>**f** Employee's **previously reported** SSN |
| **b** Employer's Federal EIN<br>13-4994650 | **g** Employee's **previously reported** name |
| | **h** Employee's first name and initial: JOSHUA D — Last name: BIERING — Suff. |
| **Note.** Only complete money fields that are being corrected (exception: for corrections involving MQGE, see the General Instructions for W-2 and W-3, under Specific Instructions for Form W-2c, boxes 5 and 6). | [redacted]<br>DALLAS TX 75206<br>**i** Employee's address and ZIP code |

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **1** Wages, tips, other compensation<br>105482.90 | **1** Wages, tips, other compensation<br>108823.66 | **2** Federal income tax withheld<br>21692.96 | **2** Federal income tax withheld<br>22528.15 |
| **3** Social security wages<br>110021.60 | **3** Social security wages<br>113362.36 | **4** Social security tax withheld<br>6821.34 | **4** Social security tax withheld<br>7028.47 |
| **5** Medicare wages and tips<br>110021.60 | **5** Medicare wages and tips<br>113362.36 | **6** Medicare tax withheld<br>1595.31 | **6** Medicare tax withheld<br>1643.75 |
| **7** Social security tips | **7** Social security tips | **8** Allocated tips | **8** Allocated tips |
| **9** | **9** | **10** Dependent care benefits | **10** Dependent care benefits |
| **11** Nonqualified plans | **11** Nonqualified plans | **12a** See instructions for box 12<br>Code | **12a** See instructions for box 12<br>Code |
| **13** Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | **13** Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | **12b** Code | **12b** Code |
| **14** Other (see instructions) | **14** Other (see instructions) | **12c** Code | **12c** Code |
| | | **12d** Code | **12d** Code |

## State Correction Information

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **15** State | **15** State | **15** State | **15** State |
| Employer's state ID number | Employer's state ID number | Employer's state ID number | Employer's state ID number |
| **16** State wages, tips, etc. | **16** State wages, tips, etc. | **16** State wages, tips, etc. | **16** State wages, tips, etc. |
| **17** State income tax | **17** State income tax | **17** State income tax | **17** State income tax |

## Locality Correction Information

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. | **18** Local wages, tips, etc. |
| **19** Local income tax | **19** Local income tax | **19** Local income tax | **19** Local income tax |
| **20** Locality name | **20** Locality name | **20** Locality name | **20** Locality name |

**Copy 2—To Be Filed with Employee's State, City, or Local Income Tax Return**

Form **W-2c** (Rev. 8-2014) **Corrected Wage and Tax Statement** Department of the Treasury Internal Revenue Service

**CONFIDENTIAL** **JPMS000032**

44444 | For Official Use Only ► OMB No. 1545-0008 | Safe, accurate, FAST! Use IRS e-file | Visit the IRS website at **www.irs.gov.**

| | |
|---|---|
| **a** Employer's name, address, and ZIP code<br>JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 | **c** Tax year/Form corrected: 2017 / **W-2**<br>**d** Employee's correct SSN: [redacted]<br>**e** Corrected SSN and/or name (Check this box and complete boxes f and/or g if incorrect on form previously filed.) ☐<br>Complete boxes f and/or g only if incorrect on form **previously filed** ►<br>**f** Employee's **previously reported** SSN |
| **b** Employer's Federal EIN<br>13-4994650 | **g** Employee's **previously reported** name |
| | **h** Employee's first name and initial: JOSHUA D · Last name: BIERING · Suff.<br>[redacted]<br>DALLAS TX 75206<br>**i** Employee's address and ZIP code |

**Note.** Only complete money fields that are being corrected (exception: for corrections involving MQGE, see the General Instructions for Forms W-2 and W-3, under Specific Instructions for Form W-2c, boxes 5 and 6).

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| 1 Wages, tips, other compensation 105482.90 | 1 Wages, tips, other compensation 108823.66 | 2 Federal income tax withheld 21692.96 | 2 Federal income tax withheld 22528.15 |
| 3 Social security wages 110021.60 | 3 Social security wages 113362.36 | 4 Social security tax withheld 6821.34 | 4 Social security tax withheld 7028.47 |
| 5 Medicare wages and tips 110021.60 | 5 Medicare wages and tips 113362.36 | 6 Medicare tax withheld 1595.31 | 6 Medicare tax withheld 1643.75 |
| 7 Social security tips | 7 Social security tips | 8 Allocated tips | 8 Allocated tips |
| 9 | 9 | 10 Dependent care benefits | 10 Dependent care benefits |
| 11 Nonqualified plans | 11 Nonqualified plans | 12a See instructions for box 12 Code | 12a See instructions for box 12 Code |
| 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b Code | 12b Code |
| 14 Other (see instructions) | 14 Other (see instructions) | 12c Code | 12c Code |
| | | 12d Code | 12d Code |

**State Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| 15 State | 15 State | 15 State | 15 State |
| Employer's state ID number | Employer's state ID number | Employer's state ID number | Employer's state ID number |
| 16 State wages, tips, etc. | 16 State wages, tips, etc. | 16 State wages, tips, etc. | 16 State wages, tips, etc. |
| 17 State income tax | 17 State income tax | 17 State income tax | 17 State income tax |

**Locality Correction Information**

| Previously reported | Correct information | Previously reported | Correct information |
|---|---|---|---|
| 18 Local wages, tips, etc. | 18 Local wages, tips, etc. | 18 Local wages, tips, etc. | 18 Local wages, tips, etc. |
| 19 Local income tax | 19 Local income tax | 19 Local income tax | 19 Local income tax |
| 20 Locality name | 20 Locality name | 20 Locality name | 20 Locality name |

**Copy C—For EMPLOYEE's RECORDS**

-2014) NTIAL

App. 0536

**Corrected Wage and Tax Statement**

Department of the Treasury
Internal Revenue Service

**JPMS000033**

**CX202-4**

Form **W-2 Wage and Tax Statement** 2017

- c Employer's name, address, and ZIP code: JPMORGAN CHASE BANK, NA, 500 STANTON CHRISTIANA ROAD, NEWARK DE 19713
- e Employee's name, address, and ZIP code: JOSHUA D BIERING [redacted]
- 7 Social security tips:
- 8 Allocated tips:
- 9 Verification code:
- 10 Dependent care benefits:
- 13 Statutory employee / Retirement plan: X / Third-party sick pay
- b Employer identification number (EIN): 13-4994650
- a Employee's social security number: [redacted]
- 1 Wages, tips, other compensation: 105482.90
- 2 Federal income tax withheld: 21692.96
- 3 Social security wages: 110021.60
- 4 Social security tax withheld: 6821.34
- 5 Medicare wages and tips: 110021.60
- 6 ...31
- 11 Nonqualified plans:
- 12a See instructions for box 12: C 36.00
- 12b: D 4538.70
- 12c: DD 7147.44
- 12d:
- 14 Other:
- 15 State | Employer's state ID number
- 16 State wages, tips, etc.
- 17 State income tax
- 18 Local wages, tips, etc.
- 19 Local income tax
- 20 Locality name

**Copy B-To Be Filed With Employee's FEDERAL Tax Return** This information is being furnished to the Internal Revenue Service. OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Form **W-2 Wage and Tax Statement** 2017

- c Employer's name, address, and ZIP code: JPMORGAN CHASE BANK, NA, 500 STANTON CHRISTIANA ROAD, NEWARK DE 19713
- e Employee's name, address, and ZIP code: JOSHUA D BIERING [redacted]
- 7 Social security tips:
- 8 Allocated tips:
- 9 Verification code:
- 10 Dependent care benefits:
- 13 Statutory employee / Retirement plan: X / Third-party sick pay
- b Employer identification number (EIN): 13-4994650
- a Employee's social security number: [redacted]
- 1 Wages, tips, other compensation: 105482.90
- 2 Federal income tax withheld: 21692.96
- 3 Social security wages: 110021.60
- 4 Social security tax withheld: 6821.34
- 5 Medicare wages and tips: 110021.60
- 6 Medicare tax withheld: 1595.31
- 11 Nonqualified plans:
- 12a See instructions for box 12: C 36.00
- 12b: D 4538.70
- 12c: DD 7147.44
- 12d:
- 14 Other:
- 15 State | Employer's state ID number
- 16 State wages, tips, etc.
- 17 State income tax
- 18 Local wages, tips, etc.
- 19 Local income tax
- 20 Locality name

**Copy C-For EMPLOYEE'S RECORDS (See** ***Notice to Employee*** **on the back of Copy B.)** OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

Form **W-2 Wage and Tax Statement** 2017

- c Employer's name, address, and ZIP code: JPMORGAN CHASE BANK, NA, 500 STANTON CHRISTIANA ROAD, NEWARK DE 19713
- e Employee's name, address, and ZIP code: JOSHUA D BIERING [redacted]
- 7 Social security tips:
- 8 Allocated tips:
- 9 Verification code:
- 10 Dependent care benefits:
- 13 Statutory employee / Retirement plan: X / Third-party sick pay
- b Employer identification number (EIN): 13-4994650
- a Employee's social security number: [redacted]
- 1 Wages, tips, other compensation: 105482.90
- 2 Federal income tax withheld: 21692.96
- 3 Social security wages: 110021.60
- 4 Social security tax withheld: 6821.34
- 5 Medicare wages and tips: 110021.60
- 6 Medicare tax withheld: 1595.31
- 11 Nonqualified plans:
- 12a: C 36.00
- 12b: D 4538.70
- 12c: DD 7147.44
- 12d:
- 14 Other:
- 15 State | Employer's state ID number
- 16 State wages, tips, etc.
- 17 State income tax
- 18 Local wages, tips, etc.
- 19 Local income tax
- 20 Locality name

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

Form **W-2 Wage and Tax Statement** 2017

- c Employer's name, address, and ZIP code: JPMORGAN CHASE BANK, NA, 500 STANTON CHRISTIANA ROAD, NEWARK DE 19713
- e Employee's name, address, and ZIP code: JOSHUA D BIERING [redacted]
- 7 Social security tips:
- 8 Allocated tips:
- 9 Verification code:
- 10 Dependent care benefits:
- 13 Statutory employee / Retirement plan: X / Third-party sick pay
- b Employer identification number (EIN): 13-4994650
- a Employee's social security number: [redacted]
- 1 Wages, tips, other compensation: 105482.90
- 2 Federal income tax withheld: 21692.96
- 3 Social security wages: 110021.60
- 4 Social security tax withheld: 6821.34
- 5 Medicare wages and tips: 110021.60
- 6 Medicare tax withheld: 1595.31
- 11 Nonqualified plans:
- 12a: C 36.00
- 12b: D 4538.70
- 12c: DD 7147.44
- 12d:
- 14 Other:
- 15 State | Employer's state ID number
- 16 State wages, tips, etc.
- 17 State income tax
- 18 Local wages, tips, etc.
- 19 Local income tax
- 20 Locality name

CONFIDENTIAL

JPMS0000034

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

FORM # LW28700

App. 0538

Form **W-2 Wage and Tax Statement** 2018

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 Verification code | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | [illegible] |
| 2 Federal income tax withheld | 252[illegible]29.88 |
| 3 Social security wages | 128400.00 |
| 4 Social security tax withheld | [illegible]80 |
| 5 Medicare wages and tips | 138624.40 |
| 6 Medicare tax withheld | [illegible]05 |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 36.00 |
| 12b | D 6499.92 |
| 12c | DD 7497.96 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy B-To Be Filed With Employee's FEDERAL Tax Return** This information is being furnished to the Internal Revenue Service. OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Form **W-2 Wage and Tax Statement** 2018

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 Verification code | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 132124.48 |
| 2 Federal income tax withheld | 25229.88 |
| 3 Social security wages | 128400.00 |
| 4 Social security tax withheld | 7960.80 |
| 5 Medicare wages and tips | 138624.40 |
| 6 Medicare tax withheld | 2010.05 |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 36.00 |
| 12b | D 6499.92 |
| 12c | DD 7497.96 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy C-For EMPLOYEE'S RECORDS (See** ***Notice to Employee*** **on the back of Copy B.)** OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

Form **W-2 Wage and Tax Statement** 2018

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 Verification code | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 132124.48 |
| 2 Federal income tax withheld | 25229.88 |
| 3 Social security wages | 128400.00 |
| 4 Social security tax withheld | 7960.80 |
| 5 Medicare wages and tips | 138624.40 |
| 6 Medicare tax withheld | 2010.05 |
| 11 Nonqualified plans | |
| 12a | C 36.00 |
| 12b | D 6499.92 |
| 12c | DD 7497.96 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

Form **W-2 Wage and Tax Statement** 2018

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 Verification code | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 132124.48 |
| 2 Federal income tax withheld | 25229.88 |
| 3 Social security wages | 128400.00 |
| 4 Social security tax withheld | 7960.80 |
| 5 Medicare wages and tips | 138624.40 |
| 6 Medicare tax withheld | 2010.05 |
| 11 Nonqualified plans | |
| 12a | C 36.00 |
| 12b | D 6499.92 |
| 12c | DD 7497.96 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID number | CONFIDENTIAL |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | JPMS000035 |
| 20 Locality name | |

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

FORM # LW28700

App. 0539

Form W-2 Wage and Tax Statement 2019

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 146286.38 |
| 2 Federal income tax withheld | 27971.16 |
| 3 Social security wages | 132900.00 |
| 4 Social security tax withheld | .80 |
| 5 Medicare wages and tips | 153015.54 |
| 6 Medicare tax withheld | 2218.73 |
| 11 Nonqualified plans | |
| 14 Other | |
| 12a See instructions for box 12 | C 48.00 |
| 12b | D 6729.16 |
| 12c | DD 7540.32 |
| 12d | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy B-To Be Filed With Employee's FEDERAL Tax Return** This information is being furnished to the Internal Revenue Service. OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Form W-2 Wage and Tax Statement 2019

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>DALLAS TX 75206 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 146286.38 |
| 2 Federal income tax withheld | 27971.16 |
| 3 Social security wages | 132900.00 |
| 4 Social security tax withheld | 8239.80 |
| 5 Medicare wages and tips | 153015.54 |
| 6 Medicare tax withheld | 2218.73 |
| 11 Nonqualified plans | |
| 14 Other | |
| 12a See instructions for box 12 | C 48.00 |
| 12b | D 6729.16 |
| 12c | DD 7540.32 |
| 12d | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy C-For EMPLOYEE'S RECORDS (See** *Notice to Employee* **on the back of Copy B.)** OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

Form W-2 Wage and Tax Statement 2019

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>DALLAS TX 75206 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 146286.38 |
| 2 Federal income tax withheld | 27971.16 |
| 3 Social security wages | 132900.00 |
| 4 Social security tax withheld | 8239.80 |
| 5 Medicare wages and tips | 153015.54 |
| 6 Medicare tax withheld | 2218.73 |
| 11 Nonqualified plans | |
| 14 Other | |
| 12a | C 48.00 |
| 12b | D 6729.16 |
| 12c | DD 7540.32 |
| 12d | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

Form W-2 Wage and Tax Statement 2019

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>DALLAS TX 75206 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 1 Wages, tips, other compensation | 146286.38 |
| 2 Federal income tax withheld | 27971.16 |
| 3 Social security wages | 132900.00 |
| 4 Social security tax withheld | 8239.80 |
| 5 Medicare wages and tips | 153015.54 |
| 6 Medicare tax withheld | 2218.73 |
| 11 Nonqualified plans | |
| 14 Other | |
| 12a | C 48.00 |
| 12b | D 6729.16 |
| 12c | DD 7540.32 |
| 12d | |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**CONFIDENTIAL**

**JPMS000036**

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

FORM # LW28700

App. 0540

Form **W-2 Wage and Tax Statement** 2020

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>DALLAS TX 75206 |
| 1 Wages, tips, other compensation | ...69.00 |
| 2 Federal income tax withheld | ...00.12 |
| 3 Social security wages | 137700.00 |
| 4 Social security tax withheld | .40 |
| 5 Medicare wages and tips | 175156.50 |
| 6 | ...39.77 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 48.00 |
| 12b | D 9187.50 |
| 12c | DD 7833.96 |
| 12d | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| 14 Other | |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy B-To Be Filed With Employee's FEDERAL Tax Return** This information is being furnished to the Internal Revenue Service. OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Form **W-2 Wage and Tax Statement** 2020

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>DALLAS TX 75206 |
| 1 Wages, tips, other compensation | 165969.00 |
| 2 Federal income tax withheld | 32400.12 |
| 3 Social security wages | 137700.00 |
| 4 Social security tax withheld | 8537.40 |
| 5 Medicare wages and tips | 175156.50 |
| 6 Medicare tax withheld | 2539.77 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 48.00 |
| 12b | D 9187.50 |
| 12c | DD 7833.96 |
| 12d | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| 14 Other | |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy C-For EMPLOYEE'S RECORDS** (See *Notice to Employee* on the back of Copy B.) OMB No. 1545-0008 **Dept. of the Treasury - IRS** Visit the IRS website at *www.irs.gov/efile.*

Form **W-2 Wage and Tax Statement** 2020

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>DALLAS TX 75206 |
| 1 Wages, tips, other compensation | 165969.00 |
| 2 Federal income tax withheld | 32400.12 |
| 3 Social security wages | 137700.00 |
| 4 Social security tax withheld | 8537.40 |
| 5 Medicare wages and tips | 175156.50 |
| 6 Medicare tax withheld | 2539.77 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a | C 48.00 |
| 12b | D 9187.50 |
| 12c | DD 7833.96 |
| 12d | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| 14 Other | |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

Form **W-2 Wage and Tax Statement** 2020

| Box | Value |
|---|---|
| c Employer's name, address, and ZIP code | JPMORGAN CHASE BANK, NA<br>500 STANTON CHRISTIANA ROAD<br>NEWARK DE 19713 |
| e Employee's name, address, and ZIP code | JOSHUA D BIERING<br>[redacted]<br>DALLAS TX 75206 |
| 1 Wages, tips, other compensation | 165969.00 |
| 2 Federal income tax withheld | 32400.12 |
| 3 Social security wages | 137700.00 |
| 4 Social security tax withheld | 8537.40 |
| 5 Medicare wages and tips | 175156.50 |
| 6 Medicare tax withheld | 2539.77 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a | C 48.00 |
| 12b | D 9187.50 |
| 12c | DD 7833.96 |
| 12d | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan: X |
| 14 Other | |
| b Employer identification number (EIN) | 13-4994650 |
| a Employee's social security number | [redacted] |
| 15 State / Employer's state ID number | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

**CONFIDENTIAL** **JPMS000037**

**Copy 2-To Be Filed With Employee's State, City, or Local Income Tax Return** OMB No. 1545-0008 **Dept. of the Treasury - IRS**

FORM # LW28700

App. 0541

**Form W-2 Wage and Tax Statement 2021** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

**Copy B, To Be Filed With Employee's FEDERAL Tax Return**

| | |
|---|---|
| Control number | 40528279111 |
| Employer identification number EIN | 13-4994650 |
| Employer's name, address and ZIP code | JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 |
| Employee's social security number | [redacted] |
| Employee's first name and init / Last name / Suffix | Joshua D / Biering |
| Employee's address and ZIP code | [redacted]<br>Dallas, TX 75206 |
| 1 Wages, tips, other compensation | 183934.17 |
| 2 Federal income tax withheld | |
| 3 Social security wages | 142800.00 |
| 4 Social security tax withheld | 8853.60 |
| 5 Medicare wages and tips | 194434.17 |
| 6 Medicare tax withheld | 2819.30 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a C | 48.00 |
| 12b D | 10500.00 |
| 12c DD | 8214.96 |
| 12d | |
| 13 Statutory Employee | ☐ |
| Retirement Plan | ☒ |
| Third-party sick pay | ☐ |
| 14 Other | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2021** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

**Copy C, For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)**

| | |
|---|---|
| Control number | 40528279111 |
| Employer identification number EIN | 13-4994650 |
| Employer's name, address and ZIP code | JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 |
| Employee's social security number | [redacted] |
| Employee's first name and init / Last name / Suffix | Joshua D / Biering |
| Employee's address and ZIP code | [redacted]<br>Dallas, TX 75206 |
| 1 Wages, tips, other compensation | 183934.17 |
| 2 Federal income tax withheld | 36286.47 |
| 3 Social security wages | 142800.00 |
| 4 Social security tax withheld | 8853.60 |
| 5 Medicare wages and tips | 194434.17 |
| 6 Medicare tax withheld | 2819.30 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a C | 48.00 |
| 12b D | 10500.00 |
| 12c DD | 8214.96 |
| 12d | |
| 13 Statutory Employee | ☐ |
| Retirement Plan | ☒ |
| Third-party sick pay | ☐ |
| 14 Other | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2021** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

**Copy 1, To Be Filed With Employee's State, City, or Local Income Tax Return**

| | |
|---|---|
| Control number | 40528279111 |
| Employer identification number EIN | 13-4994650 |
| Employer's name, address and ZIP code | JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 |
| Employee's social security number | [redacted] |
| Employee's first name and init / Last name / Suffix | Joshua D / Biering |
| Employee's address and ZIP code | [redacted]<br>Dallas, TX 75206 |
| 1 Wages, tips, other compensation | 183934.17 |
| 2 Federal income tax withheld | 36286.47 |
| 3 Social security wages | 142800.00 |
| 4 Social security tax withheld | 8853.60 |
| 5 Medicare wages and tips | 194434.17 |
| 6 Medicare tax withheld | 2819.30 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a C | 48.00 |
| 12b D | 10500.00 |
| 12c DD | 8214.96 |
| 12d | |
| 13 Statutory Employee | ☐ |
| Retirement Plan | ☒ |
| Third-party sick pay | ☐ |
| 14 Other | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2021** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

**Copy 2, To Be Filed With Employee's State, City, or Local Income Tax Return**

| | |
|---|---|
| Control number | 40528279111 |
| Employer identification number EIN | 13-4994650 |
| Employer's name, address and ZIP code | JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 |
| Employee's social security number | [redacted] |
| Employee's first name and init / Last name / Suffix | Joshua D / Biering |
| Employee's address and ZIP code | [redacted]<br>Dallas, TX 75206 |
| 1 Wages, tips, other compensation | 183934.17 |
| 2 Federal income tax withheld | 36286.47 |
| 3 Social security wages | 142800.00 |
| 4 Social security tax withheld | 8853.60 |
| 5 Medicare wages and tips | 194434.17 |
| 6 Medicare tax withheld | 2819.30 |
| 7 Social security tips | |
| 8 Allocated tips | |
| 10 Dependent care benefits | |
| 11 Nonqualified plans | |
| 12a C | 48.00 |
| 12b D | 10500.00 |
| 12c DD | 8214.96 |
| 12d | |
| 13 Statutory Employee | ☐ |
| Retirement Plan | ☒ |
| Third-party sick pay | ☐ |
| 14 Other | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

CONFIDENTIAL JPMS000038

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

## Notice to Employee

**Do you have to file?** Refer to the instructions for Forms 1040 and 1040-SR to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.
**Earned income credit (EIC).** You may be able to take the EIC for 2021 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs).You cannot take the EIC if your investment income is more than the specified amount for 2021 or if income is earned for services provided while you were an inmate at a penal institution. For 2021 income limits and more information, visit www.irs.gov/EITC. See also Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**
**Employee's social security number (SSN).** For your protection, this form may show only the last four digits of your SSN. However, your employer has reported your complete SSN to the IRS and SSA.
**Clergy and religious workers**. If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.
**Corrections**. If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.SSA.gov.
**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in Box 12, using Code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with Code DD is not taxable.**
**Credit for excess taxes.** If you had more than one employer in 2021 and more than $8,853.60 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $5,203.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See the instructions for Form 1040 or Form 1040-SR and Pub. 505, Tax Withholding and Estimated Tax.
(See also *Instructions for Employee* on the back of Copy C.)

## Instructions for Employee (See also *Notice to Employee*, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.
**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.
**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See the instructions for Form 1040 and 1040-SR to determine if you are required to complete Form 8959.
**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.
**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see the instructions for Forms 1040 and 1040-SR.
You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove with adequate records that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. Use Form 4137 to figure the social security and Medicare tax owed on tips you didn't report to your employer. Enter this amount on the wages line of your tax return. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).
**Box 10**. This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over your employer's plan limit is also included in box 1. See Form 2441.
**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.
**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA , BB, and EE) under all plans are generally limited to a total of $19,500 ($13,500 if you only have SIMPLE plans; $22,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $19,500. Deferrals under code H are limited to $7,000.
However, if you were at least age 50 in 2021, your employer may have allowed an additional deferral of up to $6,500 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the instructions for Forms 1040 and 1040-SR.
**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.
**A -** Uncollected social security or RRTA tax on tips. Include this tax on Form 1040 or 1040-SR. See the instructions for Forms 1040 and 1040-SR.
**B -** Uncollected Medicare tax on tips. Include this tax on Form 1040 or 1040-SR. See the instructions for Forms 1040 and 1040-SR.
**C -** Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)
**D -** Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.
**E -** Elective deferrals under a section 403(b) salary reduction agreement
**F -** Elective deferrals under a section 408(k)(6) salary reduction SEP
**G -** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan
**H -** Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See the instructions for Forms 1040 and 1040-SR for how to deduct.
**J -** Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)
**K -** 20% excise tax on excess golden parachute payments. See the instructions for Forms 1040 and 1040-SR.
**L -** Substantiated employee business expense reimbursements (nontaxable)
**M -** Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the instructions for Forms 1040 and 1040-SR.
**N -** Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the instructions for Forms 1040 and 1040-SR.
**P -** Excludable moving expense reimbursements paid directly to a member of the U.S. Armed Forces (not included in boxes 1, 3, or 5)
**Q -** Nontaxable combat pay. See the instructions for Forms 1040 and 1040-SR for details on reporting this amount.
**R -** Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.
**S -** Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)
**T -** Adoption benefits (not included in box 1). Complete form 8839, Qualified Adoption Expenses, to figure any taxable and nontaxable amounts.
**V -** Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.
**W -** Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).
**Y -** Deferrals under a section 409A nonqualified deferred compensation plan
**Z -** Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See the instructions for Forms 1040 and 1040-SR.
**AA -** Designated Roth contributions under a section 401(k) plan
**BB -** Designated Roth contributions under a section 403(b) plan
**DD -** Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**
**EE -** Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.
**FF -** Permitted benefits under a qualified small employer health reimbursement arrangement.
**GG** – Income from qualified equity grants under section 83(i).
**HH** – Aggregate deferrals under section 83(i) elections as of the close of the calendar year.
**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).
**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.
**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits,** keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

**Form W-2 Wage and Tax Statement 2022** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

| | | | |
|---|---|---|---|
| Control number 71526649968 | Employer identification number EIN 13-4994650 | **Copy B, To Be Filed With Employee's FEDERAL Tax Return** | |
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employee's social security number [redacted] | 1 Wages, tips, other compensation 301390.12 | 2 Federal income tax withheld 56106.52 |
| | 7 Social security tips | 3 Social security wages 147000.00 | 4 Social security tax withheld 9114.00 |
| Employee's first name and init Joshua D / Last name Biering / Suffix | 8 Allocated tips | 5 Medicare wages and tips 315098.38 | 6 Medicare tax withheld 5604.81 |
| [redacted]<br>Fort Worth, TX 76109 | | 10 Dependent care benefits | 11 Nonqualified plans |
| | 12a C 48.00<br>12b D 13708.26<br>12c DD 8604.96<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |
| Employee's address and ZIP code | | | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2022** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

| | | | |
|---|---|---|---|
| Control number 71526649968 | Employer identification number EIN 13-4994650 | **Copy C, For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)** | |
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employee's social security number [redacted] | 1 Wages, tips, other compensation 301390.12 | 2 Federal income tax withheld 56106.52 |
| | 7 Social security tips | 3 Social security wages 147000.00 | 4 Social security tax withheld 9114.00 |
| Employee's first name and init Joshua D / Last name Biering / Suffix | 8 Allocated tips | 5 Medicare wages and tips 315098.38 | 6 Medicare tax withheld 5604.81 |
| [redacted]<br>Fort Worth, TX 76109 | | 10 Dependent care benefits | 11 Nonqualified plans |
| | 12a C 48.00<br>12b D 13708.26<br>12c DD 8604.96<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |
| Employee's address and ZIP code | | | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2022** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

| | | | |
|---|---|---|---|
| Control number 71526649968 | Employer identification number EIN 13-4994650 | **Copy 1, To Be Filed With Employee's State, City, or Local Income Tax Return** | |
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employee's social security number [redacted] | 1 Wages, tips, other compensation 301390.12 | 2 Federal income tax withheld 56106.52 |
| | 7 Social security tips | 3 Social security wages 147000.00 | 4 Social security tax withheld 9114.00 |
| Employee's first name and init Joshua D / Last name Biering / Suffix | 8 Allocated tips | 5 Medicare wages and tips 315098.38 | 6 Medicare tax withheld 5604.81 |
| [redacted]<br>Fort Worth, TX 76109 | | 10 Dependent care benefits | 11 Nonqualified plans |
| | 12a C 48.00<br>12b D 13708.26<br>12c DD 8604.96<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |
| Employee's address and ZIP code | | | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2022** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

| | | | |
|---|---|---|---|
| Control number 71526649968 | Employer identification number EIN 13-4994650 | **Copy 2, To Be Filed With Employee's State, City, or Local Income Tax Return** | |
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employee's social security number [redacted] | 1 Wages, tips, other compensation 301390.12 | 2 Federal income tax withheld 56106.52 |
| | 7 Social security tips | 3 Social security wages 147000.00 | 4 Social security tax withheld 9114.00 |
| Employee's first name and init Joshua D / Last name Biering / Suffix | 8 Allocated tips | 5 Medicare wages and tips 315098.38 | 6 Medicare tax withheld 5604.81 |
| [redacted]<br>Fort Worth, TX 76109 | | 10 Dependent care benefits | 11 Nonqualified plans |
| | 12a C 48.00<br>12b D 13708.26<br>12c DD 8604.96<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |
| Employee's address and ZIP code | | | |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and

**Notice to Employee**

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.
**Earned income credit (EIC).** You may be able to take the EIC for 2022 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs).You can't take the EIC if your investment income is more than the specified amount for 2022 or if income is earned for services provided while you were an inmate at a penal institution. For 2022 income limits and more information, visit www.irs.gov/EITC. See also Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**
**Employee's social security number (SSN).** For your protection, this form may show only the last four digits of your SSN. However, your employer has reported your complete SSN to the IRS and the Social Security Administration (SSA).
**Clergy and religious workers**. If you aren't subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.
**Corrections**. If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the SSA to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but aren't the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.SSA.gov.
**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in Box 12, using Code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with Code DD is not taxable.**
**Credit for excess taxes.** If you had more than one employer in 2022 and more than $9,114 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. See the Form 1040 instructions. If you had more than one railroad employer and more than $5,350.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a refund on Form 843. See the instructions for Form 843.
(See also *Instructions for Employee* on the back of Copy C.)

**Instructions for Employee** (See also *Notice to Employee*, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.
**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.
**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See the From 1040 instructions to determine if you are required to complete Form 8959.
**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.
**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see the Form 1040 instructions.
You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove with adequate records that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. Use Form 4137 to figure the social security and Medicare tax owed on tips you didn't report to your employer. Enter this amount on the wages line of your tax return. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).
**Box 10**. This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over your employer's plan limit is also included in box 1. See Form 2441.
**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.
**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA **,** BB, and EE) under all plans are generally limited to a total of $20,500 ($14,000 if you only have SIMPLE plans; $23,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $20,500. Deferrals under code H are limited to $7,000.
However, if you were at least age 50 in 2022, your employer may have allowed an additional deferral of up to $6,500 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the Form 1040 instructions.
**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.
**A -** Uncollected social security or RRTA tax on tips. Include this tax on Form 1040 or 1040-SR. See the Form 1040 instructions.
**B -** Uncollected Medicare tax on tips. Include this tax on Form 1040 or 1040-SR. See the Form 1040 instructions.
**C -** Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)
**D -** Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.
**E -** Elective deferrals under a section 403(b) salary reduction agreement
**F -** Elective deferrals under a section 408(k)(6) salary reduction SEP
**G -** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan
**H -** Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See the Form 1040 instructions for how to deduct.
**J -** Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)
**K -** 20% excise tax on excess golden parachute payments. See the Form 1040 instructions.
**L -** Substantiated employee business expense reimbursements (nontaxable)
**M -** Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.
**N -** Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.
**P -** Excludable moving expense reimbursements paid directly to a member of the U.S. Armed Forces (not included in boxes 1, 3, or 5)
**Q -** Nontaxable combat pay. See the Form 1040 instructions for details on reporting this amount.
**R -** Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.
**S -** Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)
**T -** Adoption benefits (not included in box 1). Complete form 8839, Qualified Adoption Expenses, to figure any taxable and nontaxable amounts.
**V -** Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.
**W -** Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).
**Y -** Deferrals under a section 409A nonqualified deferred compensation plan
**Z -** Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See the Form 1040 instructions.
**AA -** Designated Roth contributions under a section 401(k) plan
**BB -** Designated Roth contributions under a section 403(b) plan
**DD -** Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**
**EE -** Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.
**FF -** Permitted benefits under a qualified small employer health reimbursement arrangement.
**GG** – Income from qualified equity grants under section 83(i).
**HH** – Aggregate deferrals under section 83(i) elections as of the close of the calendar year.
**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).
**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.
**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits,** keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

**Form W-2 Wage and Tax Statement 2023** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

[redacted]

| | | | |
|---|---|---|---|
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employer identification number EIN [redacted]<br>Employee's social security number [redacted] | **Copy B, To Be Filed With Employee's FEDERAL Tax Return** | |
| | 7 Social security tips | 1 Wages, tips, other compensation 305199.47 | 2 Federal income tax withheld 52546.01 |
| Employee's first name and init Joshua D / Last name Biering / Suffix<br>[redacted]<br>Employee's address and ZIP code | 8 Allocated tips | 3 Social security wages 160200.00 | 4 Social security tax withheld 9932.40 |
| | | 5 Medicare wages and tips 319491.13 | 6 Medicare tax withheld 5708.04 |
| | | 10 Dependent care benefits 1847.68 | 11 Nonqualified plans |
| | 12a C 46.00<br>12b D 14291.66<br>12c DD 9330.12<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2023** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

[redacted]

| | | | |
|---|---|---|---|
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employer identification number EIN [redacted]<br>Employee's social security number [redacted] | **Copy C, For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)** | |
| | 7 Social security tips | 1 Wages, tips, other compensation 305199.47 | 2 Federal income tax withheld 52546.01 |
| Employee's first name and init Joshua D / Last name Biering / Suffix<br>[redacted]<br>Employee's address and ZIP code | 8 Allocated tips | 3 Social security wages 160200.00 | 4 Social security tax withheld 9932.40 |
| | | 5 Medicare wages and tips 319491.13 | 6 Medicare tax withheld 5708.04 |
| | | 10 Dependent care benefits 1847.68 | 11 Nonqualified plans |
| | 12a C 46.00<br>12b D 14291.66<br>12c DD 9330.12<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2023** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

Control number [redacted]

| | | | |
|---|---|---|---|
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employer identification number EIN [redacted]<br>Employee's social security number [redacted] | **Copy 1, To Be Filed With Employee's State, City, or Local Income Tax Return** | |
| | 7 Social security tips | 1 Wages, tips, other compensation 305199.47 | 2 Federal income tax withheld 52546.01 |
| Employee's first name and init Joshua D / Last name Biering / Suffix<br>[redacted]<br>Employee's address and ZIP code | 8 Allocated tips | 3 Social security wages 160200.00 | 4 Social security tax withheld 9932.40 |
| | | 5 Medicare wages and tips 319491.13 | 6 Medicare tax withheld 5708.04 |
| | | 10 Dependent care benefits 1847.68 | 11 Nonqualified plans |
| | 12a C 46.00<br>12b D 14291.66<br>12c DD 9330.12<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

**Form W-2 Wage and Tax Statement 2023** OMB No. 1545-0008 Department of the Treasury - Internal Revenue Service

Control number [redacted]

| | | | |
|---|---|---|---|
| Employer's name, address and ZIP code<br>JPMorgan Chase Bank, National Association<br>1111 Polaris Parkway<br>Columbus, OH 43240 | Employer identification number EIN [redacted]<br>Employee's social security number [redacted] | **Copy 2, To Be Filed With Employee's State, City, or Local Income Tax Return** | |
| | 7 Social security tips | 1 Wages, tips, other compensation 305199.47 | 2 Federal income tax withheld 52546.01 |
| Employee's first name and init Joshua D / Last name Biering / Suffix<br>[redacted]<br>Employee's address and ZIP code | 8 Allocated tips | 3 Social security wages 160200.00 | 4 Social security tax withheld 9932.40 |
| | | 5 Medicare wages and tips 319491.13 | 6 Medicare tax withheld 5708.04 |
| | | 10 Dependent care benefits 1847.68 | 11 Nonqualified plans |
| | 12a C 46.00<br>12b D 14291.66<br>12c DD 9330.12<br>12d | 13 Statutory Employee ☐<br>Retirement Plan ☒<br>Third-party sick pay ☐ | 14 Other |

| 15 State | Employer's state ID number | 16 State wages, tips etc. | 17 State income tax | 18 Local wages, tips etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

App. 0545

CONFIDENTIAL

BIERING_0005053

## Notice to Employee

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.
**Earned income credit (EIC).** You may be able to take the EIC for 2023 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs).You can't take the EIC if your investment income is more than the specified amount for 2023 or if income is earned for services provided while you were an inmate at a penal institution. For 2023 income limits and more information, visit www.irs.gov/EITC. See also Pub. 596. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**
**Employee's social security number (SSN).** For your protection, this form may show only the last four digits of your SSN. However, your employer has reported your complete SSN to the IRS and the Social Security Administration (SSA).
**Clergy and religious workers**. If you aren't subject to social security and Medicare taxes, see Pub. 517.
**Corrections**. If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the SSA to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but aren't the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.SSA.gov.
**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in Box 12, using Code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with Code DD is not taxable.**
**Credit for excess taxes.** If you had more than one employer in 2023 and more than $9,932.40 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. See the Form 1040 instructions. If you had more than one railroad employer and more than $5,821.20 in Tier 2 RRTA tax was withheld, you also may be able to claim a refund on Form 843. See the instructions for Form 843.
(See also *Instructions for Employee* on the back of Copy C.)

## Instructions for Employee (See also *Notice to Employee*, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.
**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.
**Box 5.** You may be required to report this amount on Form 8959. See the From 1040 instructions to determine if you are required to complete Form 8959.
**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.
**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see the Form 1040 instructions.
You must file Form 4137 with your income tax return to report at least the allocated tip amount unless you can prove with adequate records that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. Use Form 4137 to figure the social security and Medicare tax owed on tips you didn't report to your employer. Enter this amount on the wages line of your tax return. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).
**Box 10**. This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over your employer's plan limit is also included in box 1. See Form 2441.
**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.
**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA **,** BB, and EE) under all plans are generally limited to a total of $22,500 ($15,500 if you only have SIMPLE plans; $25,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $22,500. Deferrals under code H are limited to $7,000.
However, if you were at least age 50 in 2023, your employer may have allowed an additional deferral of up to $7,500 ($3,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the Form 1040 instructions.
**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.
**A -** Uncollected social security or RRTA tax on tips. Include this tax on Form 1040 or 1040-SR. See the Form 1040 instructions.
**B -** Uncollected Medicare tax on tips. Include this tax on Form 1040 or 1040-SR. See the Form 1040 instructions.
**C -** Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)
**D -** Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.
**E -** Elective deferrals under a section 403(b) salary reduction agreement
**F -** Elective deferrals under a section 408(k)(6) salary reduction SEP
**G -** Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan
**H -** Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See the Form 1040 instructions for how to deduct.
**J -** Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)
**K -** 20% excise tax on excess golden parachute payments. See the Form 1040 instructions.
**L -** Substantiated employee business expense reimbursements (nontaxable)
**M -** Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.
**N -** Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.
**P -** Excludable moving expense reimbursements paid directly to a member of the U.S. Armed Forces (not included in boxes 1, 3, or 5)
**Q -** Nontaxable combat pay. See the Form 1040 instructions for details on reporting this amount.
**R -** Employer contributions to your Archer MSA. Report on Form 8853.
**S -** Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)
**T -** Adoption benefits (not included in box 1). Complete form 8839 to figure any taxable and nontaxable amounts.
**V -** Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 for reporting requirements.
**W -** Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889.
**Y -** Deferrals under a section 409A nonqualified deferred compensation plan
**Z -** Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See the Form 1040 instructions.
**AA -** Designated Roth contributions under a section 401(k) plan
**BB -** Designated Roth contributions under a section 403(b) plan
**DD -** Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**
**EE -** Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.
**FF -** Permitted benefits under a qualified small employer health reimbursement arrangement.
**GG** – Income from qualified equity grants under section 83(i).
**HH** – Aggregate deferrals under section 83(i) elections as of the close of the calendar year.
**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A.
**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.
**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits,** keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

## Form W-2 Wage and Tax Statement 2024

| Box | Content |
|---|---|
| c Employer's name, address, and ZIP code | RAYMOND JAMES & ASSOCIATES INC<br>880 CARILLON PARKWAY<br>SAINT PETERSBURG FL 33716 |
| e Employee's name, address, and ZIP code | JOSHUA BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan ✓ |
| b Employer identification number (EIN) | [redacted] |
| a Employee's social security no. | [redacted] |
| 1 Wages, tips, other comp. | [illegible] |
| 2 Federal income tax withheld | [illegible]907.46 |
| 3 Social security wages | 168600.00 |
| 4 Social security tax withheld | 10453.20 |
| 5 Medicare wages and tips | 1093949.20 |
| 6 Medicare tax withheld | 23907.80 |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 108.00 |
| 12b | D 23000.00 |
| 12c | DD 7409.26 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID no. | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Copy B To Be Filed With Employee's FEDERAL Tax Return

This information is being furnished to the Internal Revenue Service.

OMB No. 1545-0008

Dept. of the Treasury - IRS

Visit the IRS Web Site at www.irs.gov/efile

This information is being furnished to the Internal Revenue Service. [illegible]

## Form W-2 Wage and Tax Statement 2024

| Box | Content |
|---|---|
| c Employer's name, address, and ZIP code | RAYMOND JAMES & ASSOCIATES INC<br>880 CARILLON PARKWAY<br>SAINT PETERSBURG FL 33716 |
| e Employee's name, address, and ZIP code | JOSHUA BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | |
| b Employer identification number (EIN) | [redacted] |
| a Employee's social security no. | [redacted] |
| 1 Wages, tips, other comp. | 1070949.20 |
| 2 Federal income tax withheld | 234907.46 |
| 3 Social security wages | 168600.00 |
| 4 Social security tax withheld | 10453.20 |
| 5 Medicare wages and tips | 1093949.20 |
| 6 Medicare tax withheld | 23907.80 |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | C 108.00 |
| 12b | D 23000.00 |
| 12c | DD 7409.26 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID no. | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Copy C For EMPLOYEE'S RECORDS (See *Notice to Employee* on back of Copy B)

OMB No. 1545-0008

Dept. of the Treasury - IRS

## Form W-2 Wage and Tax Statement 2024

| Box | Content |
|---|---|
| c Employer's name, address, and ZIP code | RAYMOND JAMES & ASSOCIATES INC<br>880 CARILLON PARKWAY<br>SAINT PETERSBURG FL 33716 |
| e Employee's name, address, and ZIP code | JOSHUA BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Statutory employee / Retirement plan / Third-party sick pay | Retirement plan ✓ |
| b Employer identification number (EIN) | [redacted] |
| a Employee's social security no. | [redacted] |
| 1 Wages, tips, other comp. | 1070949.20 |
| 2 Federal income tax withheld | 234907.46 |
| 3 Social security wages | 168600.00 |
| 4 Social security tax withheld | 10453.20 |
| 5 Medicare wages and tips | 1093949.20 |
| 6 Medicare tax withheld | 23907.80 |
| 11 Nonqualified plans | |
| 12a | C 108.00 |
| 12b | D 23000.00 |
| 12c | DD 7409.26 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID no. | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Copy 2 To Be Filed With Employee's State, City, or Local Income Tax Return

OMB No. 1545-0008

Dept. of the Treasury - IRS

## Form W-2 Wage and Tax Statement 2024

| Box | Content |
|---|---|
| c Employer's name, address, and ZIP code | RAYMOND JAMES & ASSOCIATES INC<br>880 CARILLON PARKWAY<br>SAINT PETERSBURG FL 33716 |
| e Employee's name, address, and ZIP code | JOSHUA BIERING<br>[redacted] |
| 7 Social security tips | |
| 8 Allocated tips | |
| 9 | |
| 10 Dependent care benefits | |
| 13 Retirement plan / Third-party sick pay | |
| b Employer identification number (EIN) | [redacted] |
| a Employee's social security no. | [redacted] |
| 1 Wages, tips, other comp. | 1070949.20 |
| 2 Federal income tax withheld | 234907.46 |
| 3 Social security wages | 168600.00 |
| 4 Social security tax withheld | 10453.20 |
| 5 Medicare wages and tips | 1093949.20 |
| 6 Medicare tax withheld | 23907.80 |
| 11 Nonqualified plans | |
| 12a | C 108.00 |
| 12b | D 23000.00 |
| 12c | DD 7409.26 |
| 12d | |
| 14 Other | |
| 15 State / Employer's state ID no. | |
| 16 State wages, tips, etc. | |
| 17 State income tax | |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Copy 2 To Be Filed With Employee's State, City, or Local Income Tax Return

OMB No. 1545-0008

Dept. of the Treasury - IRS



BIERING 0005055

CONFIDENTIAL

# Personnel and Employment Records

**App. 0549-0566**

Plaintiff's JPMorgan personnel file.

JPMORGAN CHASE

App. 0549

November 16, 2023

Joshua Biering
[redacted]

**Re: Request for Personnel Records**

Dear Joshua Biering:

Per your request, please find enclosed your personnel file .

Sincerely,

JPMorgan Chase, Employee Records Department
4041 Ogletown Road
Newark, DE 19713

Enclosure

Exhibit
CX11

App. 0550

JPMorganChase

# Onboarding NewHire Record

## Hiring Job Info

| | |
|---|---|
| Recruiter Name | Reggie Brown |
| Hiring Manager Name | Jeffrey Hassman |
| New Hire SID | I662283 |
| New Hire Job Title | MOEDP Associate - 602 |
| Anticipated Start Date | April 25, 2016 |
| Employee Class | X - Standard Employee |
| Work Location | 14201 North Dallas Parkway<br>Dallas, TX, 752542916<br>USA |
| Full Time/Part Time Status | Full Time |
| Probation Period | |
| Contract End Date | |

## Personal Profile

| | |
|---|---|
| Name | Joshua D. Biering |
| Current Address | [redacted]<br>USA |
| Permanent Address | |
| National ID | [redacted] ocialSecurityNumber) |
| Other Surnames Used | |
| Preferred First Name | |
| Birth Date | [redacted] |
| Gender | Male |

## Job History

| | |
|---|---|
| Job #1 Employer | United States Army |
| Assignment Type | Full Time |
| Dates | March 15, 2014 To March 22, 2016 |
| Address | [redacted]<br>USA |
| Title/Position | Chief of Logistics |
| Job #2 Employer | United States Army |

App. 0551

| | |
|---|---|
| | Full Time |
| Dates | April 15, 2013 To March 15, 2014 |
| Address | [redacted]<br>USA |
| Title/Position | Executive Officer |
| Job #3 Employer | United States Army |
| Assignment Type | Full Time |
| Dates | May 15, 2011 To April 15, 2013 |
| Address | [redacted]<br>USA |
| Title/Position | Platoon Leader |

## Education History

| | |
|---|---|
| School #1 Name | United States Military Academy |
| School Address | 606 Thayer Road<br>West Point, New York, 10996<br>USA |
| Dates | June 07, 2007 To May 21, 2011 |
| Graduated | |
| Program | Full Time |
| Degree | |
| Degree Type | Bachelor's Degree (?16 years) |
| Graduation Date | |
| Subject Major | Civil Engineering |

## Legal Questions

| | |
|---|---|
| Question #1: | Have you ever been convicted of, or plead guilty to, an offense other than a minor traffic violation? Include offenses for which you pled no contest or received probation; you may exclude convictions which have been ordered fully expunged (i.e. removed from your criminal record by a specific court order) or sealed by a court of law. (Offenses involving the possession or use of false identification for underage drinking and similar offenses should be disclosed. Offenses for driving under the influence, and driving while impaired DO NOT need to be disclosed unless the position for which you are applying requires driving as a routine job duty.) |
| Answer: | No |
| Question #2: | Have you entered on or after November 29, 1990, any program of court supervision or deferred prosecution or some other pre-trial diversion or similar program for an offense involving theft, breach of trust, dishonesty, money laundering, or the illegal manufacture, sale, distribution or trafficking of drugs? |
| Answer: | No |

| | |
|---|---|
| **Question #3:** | Are you currently under indictment for, or do you curr criminal charge for any offense, including but not limited to, offenses involving theft, breach of trust, dishonesty, money laundering or the illegal manufacture, sale, distribution or trafficking of drugs? |
| **Answer:** | **No** |

## Acknowledgments

| | |
|---|---|
| **Acknowledgement** | USA |
| **Initials** | JB |

Welcome to Chase!

This is an exciting time to join the firm. We are committed to hiring the very best people and growing our business by building lasting relationships with our customers.

You are joining the best team in the industry and we are pleased you are here. At Chase, we are committed to providing a great customer and employee experience, and we know you will play an important role in our success. We hire people who do the right thing, raise issues as they see them and help make Chase an exceptional firm for our colleagues and customers.

You have chosen a great company that can offer you the opportunity to shape what?s next ? for you and for us. I hope you love it as much as I do and I look forward to having you as a part of our company for many years to come.

[redacted]
CEO, Consumer & Community Banking

February 18, 2016

Joshua Biering
[redacted]

Dear Joshua:

We are very pleased to formally present our employment offer. In this letter we have included the details of your position, your compensation and the terms and conditions of your offer. You will also find information about your next steps. You will join us as a Military Officer Executive Development Program Associate - Dallas, TX at Chase Bank USA, NA, which we'll refer to as "Chase". Your manager will be Jeffrey T Hassman, whom you can reach at [redacted]

We're planning to have you start on April 25, 2016. Whenever we mention start date in this letter, we are referring to the date of the first day you actually start working for us. Touch base with your manager before you start to make sure you have everything you need to know for your first day.

**Your pay**
Your annual base salary as of your start date is $100,000.00 (less applicable taxes). While your hours will vary based on business needs, your salary covers all hours you work during any week. You are not eligible for any overtime payments in this position. You will be paid consistent with Chase's payroll practices.

**Special cash award**

February 18, 2016

Joshua Biering
[redacted]

Dear Joshua:

We are very pleased to formally present our employment offer. In this letter we have included the details of your position, your compensation and the terms and conditions of your offer. You will also find information about your next steps. You will join us as a Military Officer Executive Development Program Associate - Dallas, TX at Chase Bank USA, NA, which we'll refer to as "Chase". Your manager will be Jeffrey T Hassman, whom you can reach at [redacted]

We're planning to have you start on April 25, 2016. Whenever we mention start date in this letter, we are referring to the date of the first day you actually start working for us. Touch base with your manager before you start to make sure you have everything you need to know for your first day.

**Your pay**
Your annual base salary as of your start date is $100,000.00 (less applicable taxes). While your hours will vary based on business needs, your salary covers all hours you work during any week. You are not eligible for any overtime payments in this position. You will be paid consistent with Chase's payroll practices.

**Special cash award**
You will be paid a one-time sign-on award of $25,000. This award is subject to applicable taxes. We'll make this payment within 30 days after your start date. If your employment with Chase ends for any reason other than job elimination within a year after your start date, you would need to repay this sign-on award. The repayment is due within ten days of our request for repayment. You agree that Chase may withhold all or part of the repayment amount as allowed by law from any remaining salary or other payments owed to you at the time you leave. Chase will also be entitled to any costs and attorneys' fees associated with enforcing your repayment obligations.

**Other benefits**
We offer a comprehensive benefits program to our U.S. benefits-eligible employees, including health care and insurance plans, a cash balance pension plan, a 401(k) plan, and discounted Chase products. In addition, you will be eligible for paid time off, including vacation, based on your role and time working for us.

We provide some of our benefits materials electronically - by e-mail or on the company Intranet, which is accessible from work or from home. When you accept this offer, you agree to receive documents for the JPMorgan Chase Benefits Program electronically. This includes the summary plan descriptions, plan prospectuses and other documents. You may request a paper copy for a benefit plan at any time. The contact information you will need for each benefits plan is available in the Highlights of the JPMorgan Chase U.S. Benefits Program under a section called Benefits at a Glance. After completion of the Onboarding process, we will make this information available to you on our My Welcome site which is covered in more detail in the Next Steps section of this offer letter.

**Terms & Conditions**

In this section, we will cover the terms and conditions of this employment offer.

We need you to review all the information in this letter to check that it reflects our discussions to date. That's because this document will legally supersede anything we've communicated previously verbally or in writing. If anything needs to change, we'll need a new document that refers to this offer and both you and Chase will need to sign it.

This offer of employment is subject to all the terms, conditions and attachments included in this document, the Binding Arbitration Agreement and all Chase policies and procedures, including but not limited to the JPMorgan Chase Code of Conduct.

**Introductory period and "at-will" employment**
Your first 90 days on the job are an introductory period. It lets us evaluate how you're adjusting to your new job and our organization. Plus it's the time during which we can make sure that you understand your role and responsibilities and our performance standards and policies. You are an "at-will" employee both during and after this introductory period, which means that either you or Chase can end your employment at any time, for any or no reason.

**Other conditions**
When you accept this offer, you're confirming that there's nothing restricting you from accepting employment or performing any duties with Chase, whether by contract (express or implied) or otherwise. You confirm you are not restricted from soliciting customers or from hiring employees of your former employer or any other party.

You're also acknowledging that you understand and agree that if you have any obligations with your former or current employers that they can enforce, Chase doesn't seek to violate those obligations.

You are affirming that you won't disclose to Chase or use in connection with your employment at Chase any protected trade secrets or protected confidential or proprietary materials of another entity, including any prior employer.

**Non-solicitation**
During your employment and for one year after you leave Chase, you agree you won't solicit, induce or encourage any current Chase employee to apply for employment elsewhere or to leave Chase. You confirm that you will not hire any employee who was working at Chase on the day you left unless that person left Chase more than six months before you wish to hire him or her, or because Chase eliminated his or her job.

Additionally, during your employment and for one year after you leave Chase, you agree you won't interfere with current Chase customers, suppliers, or other persons or entities that do business with Chase. By interfere we mean attempt to or actually solicit, induce to leave Chase, divert from doing business with Chase, or otherwise interfere with the business relationship any party has with Chase. This includes parties you directly worked with while employed at Chase or whose names you know because you worked at Chase. If required to be enforceable under any applicable law, your obligations in this paragraph will be interpreted to apply only when you use our confidential or proprietary information or any of our trade secrets.

You agree not to conduct these activities personally or on behalf of anyone else, directly or indirectly. If you do not meet or threaten not to meet the non-solicitation agreements mentioned above, Chase may seek monetary damages or equitable relief as appropriate.

**Next Steps**

**Pre-employment requirements to complete**
We have a number of pre-employment processes you'll need to start shortly. They include various background checks, fingerprint processing and drug screening, as well as several onboarding forms. For example, you will need to establish your identity and valid employment eligibility by completing Form I-9 on My Welcome and presenting your ID and employment eligibility documents on or before your start date. We'll use the E-Verify Program to electronically compare your Form I-9 information against Social Security Administration and Department of Homeland Security records. We'll keep you updated about all the steps you need to take throughout the pre-employment process.

This offer and continued employment is based on you successfully completing all pre-employme

**Before your first day**
As a new hire, learning how to find resources and information is critical to your success. To help you get started, we've created a new hire website called My Welcome. On this site you will find more information about our pre-employment requirements and the benefits of joining Chase. After you start you'll continue to have access to the site to get you settled.

**On your first day**
Your manager will provide your ID badge and your employee Standard ID number that will be used to access the information and resources that are available to you.

If you have any questions, please contact our Pre-Employment team at [redacted]

With the formalities covered, let us say again that we look forward to having you join us.

Sincerely,
[redacted]

**Appendix: Systems Monitoring Activities and Cross-Border Transfers**

The following provides a summary of how JPMorgan Chase & Co., its affiliates and its subsidiaries and the entity that employs you, or for which you provide services (collectively, ?JPMC?), conducts Systems monitoring. JPMC may conduct monitoring to the extent permitted by applicable law.

JPMC conducts monitoring of JPMC?s physical facilities and its equipment and systems (collectively, the ?Systems?). System monitoring applies to your JPMC equipment, your personal equipment when accessing the Systems, and the communications, information, and materials conveyed or accessed using the Systems. Monitoring activities may include the monitoring and logging of traffic and usage data of all electronic communications; monitoring of telephone calls to or from JPMC work telephones as permitted by applicable laws and subject to any required notices; monitoring of the contents of electronic communications, files, databases, applications, and internet usage; and logging hours worked and physical presence at JPMC?s facilities if applicable. JPMC may at all times monitor, access, retrieve, record and review information obtained from the monitoring activities for various purposes, such as preventing and investigating activities that may violate JPMC?s policies and ensuring compliance with legal or regulatory obligations. While conducting monitoring activities, JPMC may obtain and process personal information about you and others that may reside on the Systems.

The monitoring activities (including JPMC?s collection and processing of personal or other information) are required for purposes of your employment or work assignment to promote adherence to applicable policies and regulations. Subject to applicable laws and regulations, if you object to this processing, JPMC may prohibit you from using the Systems; terminate offers of employment or work assignment; and, for employees, take disciplinary action against you, up to and including termination of your employment with JPMC.

JPMC may disclose the information it obtains in connection with monitoring activities to JPMC affiliates and to third parties, service providers, regulators, supervisory bodies, law enforcement and other government agencies. Information obtained from the monitoring activities may be used as the basis to take disciplinary actions, up to and including termination or other legal action, for violations of JPMC?s policies or applicable laws.

In addition to the monitoring activities discussed above, JPMC may obtain and store other information related to your employment or other working relationship, such as your compensation information, performance information, benefits information and other workplace-related data. JPMC may transfer such information, and the information it obtains in

connection with monitoring activities, to countries other than the country in which the information c collected, including to the United States.

**Understanding Obligations under the Firm?s Personal Account Dealing Policy (PAD):**

**New hires NOT subject to PAD at joining:**

Employees are expected to understand the firm?s Personal Account Dealing (PAD) Policy, which helps to protect the firm's reputation and maintain the highest standards of integrity when employees conduct personal investment activities. Details of the Policy can be reviewed here.

**Hires Subject to PAD at time of joining:**

Employees are expected to understand the firm?s Personal Account Dealing (PAD) Policy, which helps to protect the firm?s reputation and maintain the highest standards of integrity when employees conduct personal investment activities. Details of the Policy can be reviewed here.

The position you are being offered is considered to be subject to the Personal Account Dealing Policy and, as such, you, your covered family members and anyone with an associated account* will need to be familiar with the obligations set forth in this policy, including, but not limited to, the requirements, once you are employed here, to disclose personal trading accounts and private investments, to pre-clear trades, to limit investment strategies to those approved within this policy and to maintain trading accounts at JPMorgan Chase Approved Brokers. Please note that all trading restrictions that apply to you, including but not limited to the prohibition against day trading, also apply to your spouse/domestic partner, covered family members and anyone with an associated account*.

**Seasonal Worker model for individuals joining in formal seasonal/Short term programs:**

JPMorgan Chase requires that seasonal workers refrain from trading in any personal or ?associated*? accounts for the time period that you are employed in a short term training program. Please verify that you will comply with the following personal trading requirements:

1. For the duration of the short term program I am joining I will not trade in any of my personal or ?associated? accounts.
2. I understand that the Firm has the right to request account information for any of my accounts or ?associated? accounts.
3. If there is an extenuating circumstance that would compel me to place a trade in my personal or ?associated? account, I will obtain pre-approval of the trade by the Personal Account Dealing Group and I would be responsible for supplying all confirmations and statements to the Personal Account Dealing Group for that trade.

**The term ?associated accounts? refers to any securities accounts no matter where they are located and includes, but is not limited to, those accounts that are established, maintained or controlled (either directly or indirectly) by you, your spouse, domestic partner or minor children (even if financially independent), anyone to whom you provide significant financial support, and in which the employee has a direct or indirect financial interest.*

**Acceptance and Code Affirmation:**

Upon signing this letter I accept the terms described above. I also affirm that I have read and understand the JPMorgan Chase Code of Conduct, and agree as a condition of employment to comply with the Code as amended and revised from time to time.

- I understand that I can access the Code via the Internet at http://www.jpmorganchase.com/ >About Us>Governance>Code of Conduct prior to joining the firm, and through the firm's intranet once I begin employment.

- I acknowledge that the Code requires that certain outside activities be approved in writing [illegible] employment, and I agree that, if any such required approval is denied, I will cease the relev[illegible] immediately.
- As a JPMorgan Chase employee I understand that the Code requires me to report any known or suspected violation of the Code, of internal firm policies, or of laws or regulations applicable to the firm's business. I understand that failure to do so can result in disciplinary action up to and including termination of employment.
- I understand that all employees have post-employment responsibilities regarding confidential information.
- I acknowledge that the Code also requires that I safeguard confidential information, including anything that I created while working for my previous employer(s). I understand that I am not allowed to bring any of this with me to use at JPMorgan Chase or disclose any confidential information from a prior employer unless it has already been made public through no action of my own.
- I understand my offer of employment is contingent upon a determination by JPMorgan Chase that neither the offer nor my employment would violate, or create the appearance of violating, the firm's Code of Conduct, Anti-Corruption Policy, or Human Resources policies and practices, or any applicable laws or regulations
- I understand further if I am a Senior-Level Employee*, that Senior-Level Employees have certain additional responsibilities that continue after their employment with the firm terminates, including restrictions on solicitation and hiring of the firm's employees and solicitation of certain customers. I understand that I am responsible for knowing which post-employment responsibilities apply to me and I agree to comply with all applicable requirements.

** The term "Senior-Level Employee" is currently defined as any employee whose (a) annual base salary rate is US$150,000 (or the local currency equivalent) or higher, OR (b) annual total cash compensation is US$250,000 (or the local currency equivalent) or higher.*

**Independent Auditor Tax Services to Employees of JPMorgan Chase and its Affiliates:**

To be in compliance with the Public Company Accounting Oversight Board (PCAOB) Rule 3523 it is JPMorgan Chase's (JPMC) policy that PricewaterhouseCoopers (PwC) cannot provide any tax services to employees of JPMC or any of its controlled entities (hereafter referred to as JPMC employee). This restriction is regardless of whether the individual is in a financial reporting oversight role or not, and whether PwC is engaged by the individual or by JPMC. PwC is also prohibited from providing any tax services to a spouse of a JPMC employee if the work is related to a joint tax return. Exceptions to this policy will be reviewed on a case-by-case basis and will require the approval of the JPMC Controller.

Signature: *Joshua Biering* Date: **18-Feb-2016**

I understand my employment is subject to my and JPMorgan Chase's agreement to submit employment-related disputes that cannot be resolved internally to binding arbitration, as set forth in the Binding Arbitration Agreement detailed below. By signing below I acknowledge and agree that I have read and understand the Binding Arbitration Agreement, have accepted its terms and understand that it is a condition of my employment with JPMorgan Chase.

**BINDING ARBITRATION AGREEMENT**:

JPMorgan Chase believes that if a dispute related to an employee's or former employee's employment arises, it is in the best interests of both the individual and JPMorgan Chase to resolve the dispute without litigation. Most such disputes are resolved internally through the Firm's Open Communication Policy. When such disputes are not resolved internally, JPMorgan Chase provides for their resolution by binding arbitration as described in this Binding Arbitration Agreement ("Agreement"). "JPMorgan Chase" and the "Firm" as used

in this Agreement mean JPMorgan Chase & Co. and all of its direct and indirect subsidiaries.

This Agreement will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. ? 1 et seq

As a condition of and in consideration of my employment with JPMorgan Chase & Co. or any of its direct or indirect subsidiaries, I agree with JPMorgan Chase as follows:

1. **SCOPE:** Any and all "Covered Claims" (as defined below) between me and JPMorgan Chase (collectively "Covered Parties" or "Parties", individually each a "Covered Party" or "Party") shall be submitted to and resolved by final and binding arbitration in accordance with this Agreement.

2. **COVERED CLAIMS:** "Covered Claims" include all legally protected employment-related claims, excluding those set forth below in Paragraphs 3 and 4 of this Agreement, that I now have or in the future may have against JPMorgan Chase or its officers, directors, shareholders, employees or agents which arise out of or relate to my employment or separation from employment with JPMorgan Chase and all legally protected employment-related claims that JPMorgan Chase has or in the future may have against me, including, but not limited to, claims of employment discrimination or harassment if protected by applicable federal, state or local law, and retaliation for raising discrimination or harassment claims, failure to pay wages, bonuses or other compensation, tortious acts, wrongful, retaliatory and/or constructive discharge, breach of an express or implied contract, promissory estoppel, unjust enrichment, and violations of any other common law, federal, state, or local statute, ordinance, regulation or public policy, including, but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866 and 1991, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act of 1990, the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Family and Medical Leave Act of 1993, the Fair Labor Standards Act of 1938, the Equal Pay Act of 1963, Section 1981 of the Civil Rights Act, and the Worker Adjustment and Retraining Notification Act.

3. **EXCLUDED CLAIMS:** This Agreement does not cover, and the following claims are not subject to arbitration under this Agreement: (a) any criminal complaint or proceeding, (b) any claims covered by state unemployment insurance, state or federal disability insurance, and/or state workers' compensation benefit laws, except that claims for retaliation pursuant to these laws shall be subject to arbitration under this Agreement, (c) any claim under the National Labor Relations Act, and (d) claims for benefits under a plan that is governed by Employee Retirement Income Security Act of 1974 ("ERISA").

Further, this Agreement also does not cover any action seeking only declaratory and/or emergency, temporary or preliminary injunctive relief (including a temporary restraining order) in a court of competent jurisdiction in accordance with applicable law, so long as that action is brought on an individual basis and not on a consolidated basis or as part of a collective or class action, and subject to the following:

- In the event such relief is sought by a Covered Party, who is not otherwise subject to the arbitration requirements of the Financial Industry Regulatory Authority ("FINRA"), after the court issues a ruling concerning emergency, temporary or preliminary injunctive relief, the parties must submit such claim if otherwise considered a Covered Claim to arbitration pursuant to this Agreement, and

- In connection with any such action related to post-employment restrictions (e.g., actions to enforce rights to trade secrets, or agreements not to compete or solicit customers or employees) on a Covered Party who is otherwise subject to the arbitration requirements of FINRA (absent this Agreement), in order for the Covered Parties to have available to them the expedited arbitration procedures provided by FINRA, after the court issues a ruling concerning emergency, temporary or preliminary injunctive relief, the parties must submit such claim if otherwise considered a Covered

Claim to arbitration before FINRA in accordance with its expedited arbitration proce **App. 0560** A Rule 13804.

**4. CLASS ACTION/COLLECTIVE ACTION WAIVER:** All Covered Claims under this Agreement must be submitted on an individual basis. No claims may be arbitrated on a class or collective basis unless required by applicable law. Covered Parties expressly waive any right with respect to any Covered Claims to submit, initiate, or participate in a representative capacity or as a plaintiff, claimant or member in a class action, collective action, or other representative or joint action, regardless of whether the action is filed in arbitration or in court. Furthermore, if a court orders that a class, collective, or other representative or joint action should proceed, in no event will such action proceed in the arbitration forum, subject to applicable law. Claims may not be joined or consolidated in arbitration with disputes brought by other individual(s), unless agreed to in writing by all parties or required by applicable law. To the extent there is a question of enforceability of class or collective arbitration, it shall be decided only by a court, not an arbitrator.

The arbitrator's authority to resolve disputes and make awards under this Agreement is limited to disputes between: (i) an individual and JPMorgan Chase; and (ii) the individual and any current or former officers, directors, employees and agents, if such individual is sued for conduct within the scope of their employment. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.

I retain the right to challenge the validity of this Agreement upon grounds that may exist at law or equity and will not be subject to any form of retaliation for asserting such rights.

**5. ADMINISTRATIVE AGENCIES:** I understand that this Agreement does not preclude me from filing an administrative claim or charge with the Equal Employment Opportunity Commission ("EEOC") and/or state and local human rights agencies to investigate alleged violations of laws enforced by the EEOC or those agencies. However, I understand that I am not required to initiate an administrative proceeding before pursuing a Covered Claim under this Agreement. In the event I file such an administrative proceeding, I understand that I cannot pursue Covered Claims under this Agreement without first exhausting all required administrative remedies, such as obtaining a right to sue notice from the EEOC in order to arbitrate federal discrimination claims that require such a notice. By responding to administrative agencies, JPMorgan Chase does not waive its right to enforce this Agreement and the arbitrator shall treat a decision of an administrative agency in the same manner as it would be treated by a court of law.

**6. INITIATING ARBITRATION:** Arbitration under this Agreement shall be conducted before a single neutral arbitrator of the American Arbitration Association ("AAA")(unless the Parties agree upon another mutually acceptable arbitrator, in which case the arbitration will be conducted before such mutually acceptable arbitrator) in accordance with and selected pursuant to the rules and procedures of the Employment Arbitration Rules of the AAA ("AAA Rules") to the extent the AAA Rules do not conflict with the terms of this Agreement or applicable law. The AAA Rules will govern issues not explicitly addressed by this Agreement. Where there is a conflict between this Agreement and the AAA Rules, this Agreement will govern. Where there is a conflict between applicable law and the AAA rules and/or this Agreement, the applicable law will govern. I understand that arbitration under this Agreement will occur in the state where I am currently or was most recently employed by the Firm, unless otherwise agreed by the Parties. Information about AAA is available from its website www.adr.org. A Covered Party may contact them directly at [redacted] A Covered Party who is otherwise subject to the arbitration requirements of FINRA who wishes to pursue arbitration of a Covered Claim, must file such Covered Claim with AAA (or other mutually acceptable arbitrator), except as otherwise provide in Paragraph 3 of this Agreement.

To initiate arbitration:

- A Covered Party must send a written demand for arbitration to any office of the mutually acceptable arbitrator has been agreed to by the Parties, to the offices of such other arbitrator). The Covered Party submitting the demand for arbitration must also simultaneously send a copy of the written demand for arbitration to the other Party (if being sent to JPMorgan Chase, the copy should be sent to the following address:JPMorgan Chase & Co. Legal Department, c/o Legal Papers Served, 4 Chase Metrotech Center, Floor 18, Brooklyn, NY 11245).
- Both of the following must be included in the demand for arbitration:

(a) A statement of the nature of the dispute, including the alleged act or omission at issue, the names of the parties involved in the dispute, the amount in controversy, if any, the remedy sought to resolve the issue (including the dollar amount, if any), the mailing address for future correspondence and the legal counsel, if any, and

(b) Any required filing fee. If a Covered Claim is filed by me, the filing fee is $100 payable by check, money order or any other method of payment permitted by the AAA (or another mutually acceptable arbitrator agreed to by the parties). In the event the filing fee required by the state or federal court in which the Covered Claim could have been brought is less than $100, JPMorgan Chase agrees to refund to me the difference between $100 and such state or federal court filing fee within 30 days of receiving notice of payment. Any demand received by the AAA (or another mutually acceptable arbitrator agreed to by the Parties) that is not accompanied by the required filing fee will be returned.

Nothing in this Agreement releases a Covered Party from any obligation to comply with timely filing requirements and statutes of limitations under applicable law, statutes, or regulations. Thus, whether or not a Covered Party chooses to file with administrative agencies, his/her arbitration must still be initiated as an arbitration within the applicable administrative, statutory or judicial filing time frame, as required by law, and the demand for arbitration must be received at the address above within the time period allowed pursuant to the statute, regulation or other law applicable to the alleged act or omission giving rise to the dispute. Nothing in this Agreement is intended or should be construed to shorten or extend the statute(s) of limitations and/or filing periods that exist under applicable law.

The submission and timing of any response to an arbitration demand shall be in accordance with AAA's Rules, which currently provides that a response be filed within 15 days after the date of the letter from the AAA (or other mutually agreed to arbitrator) acknowledging receipt of the demand for arbitration.

7. **ARBITRATION PROCEEDINGS:** The arbitrator will conduct the hearing as expeditiously as possible, while ensuring that all Parties have the opportunity to present evidence and arguments and ensuring that the Agreement is followed. The arbitrator will set the date, time, and place of the hearing, and AAA (or other arbitration provider mutually agreed to by the parties) will notify the Parties at least 30 calendar days in advance, unless the Parties otherwise agree. In the event the hearing cannot reasonably be completed in one day, the arbitrator will schedule the hearing to be continued on a date or dates that is/are convenient to both Parties. The arbitrator will make every effort to select a reasonably convenient location for the continued arbitration, without incurring additional expense, if possible.

**(a)** **Fees:** All ordinary and reasonable administrative expenses of the arbitration, including fees for a single arbitrator, hearing room expenses, travel expenses of the arbitrator, the AAA representatives (if applicable), and any witnesses produced at the arbitrator's specific request and not otherwise called by a party, will be paid completely by JPMorgan Chase. The fees and expenses of any witness, expert, consultant, interpreter and others retained or consulted by a party shall be paid by the party requiring the presence of such persons, subject to applicable law. JPMorgan Chase will not pay for fees or costs incurred as a result of deliberate and inappropriate delay or absence caused by employees or their counsel, as

determined by the arbitrator and permitted by applicable law. Except as otherwise provi... attorney's fees shall be paid by the party that incurs them. Nothing in this Agreement is ... be construed to require employees to bear any type of expense that they would not otherwise bear if the Parties were to litigate a Covered Claim in a court of law.

(b) **Legal Representation and Language Interpreter:** The Parties (if desired) may use the services of legal counsel and/or a language interpreter. The Parties utilizing such services are responsible for making and paying all fee and other arrangements directly with the legal counsel and/or interpreter, subject to applicable law. Nothing in this Agreement is intended or should be construed to require employees to bear any type of expense that they would not otherwise bear if the Parties were to litigate a Covered Claim in a court of law.

(c) **Attendance at and Confidentiality of Arbitration Hearing:** The Covered Party, a JPMorgan Chase corporate representative of its choosing, and the arbitrator must be present at the hearing. In addition, an official recorder and legal counsel (for any party) also may attend the hearing. Further, the Parties may call witnesses to testify at the arbitration. Unless the parties agree otherwise, the arbitrator shall exclude witnesses (other than the represented Parties) from the hearing during the testimony of any other witness. The arbitrator, the Parties and their representatives must maintain the confidentiality of the hearings unless the law provides otherwise.

(d) **Discovery:** Discovery requests and the provision of discovery must be consistent with this Agreement, general standards of due process, the Rules of AAA and the expedited nature of arbitration. The guidelines below are only guidelines, do not establish a minimum or maximum of discovery, and will be applied subject to these principles. Thus, there may be cases which warrant more or less discovery than that outlined below.

- At least 20 days before the arbitration hearing, the Parties must submit the names and addresses of the witnesses each party intends to produce and any documents each party intends to present. The Parties may add to such information up to 10 days before the hearing. All such submissions are final after that point absent a finding of good cause by the arbitrator.

- In general, the Parties may take the depositions of all expert witnesses and up to 3 other individuals. Any individual who certifies he/she has no direct knowledge of the facts should not be deposed as a fact witness. At least 10 days' prior notice should be given by the party requesting a deposition and advance efforts should be made to mutually agree on deposition dates, including the time and place for any depositions to be taken. The party requesting the deposition is responsible for all related costs for that deposition. Discovery must be completed at least 20 days before the hearing. The arbitrator may alter the timing and scope of discovery as necessary or upon request of the Parties.

- The arbitrator will resolve discovery disputes and may expand or restrict the scope of discovery within his or her reasonable discretion, and the rules of AAA consistent with the expedited nature of arbitration.

(e) **Prehearing Motions**: The arbitrator is authorized to consider and rule on prehearing motions, including discovery motions, motions to dismiss and summary judgment on the claims, provided that the other party has reasonable notice and time to respond to any such prehearing motions. Any dispute which fails to state a claim upon which relief may be granted under applicable law (including, but not limited to claims that are barred by the applicable statute of limitations or mandated timeframe for filing such claim, or that are barred by an enforceable release, or involve a claim against someone who was not associated with the conduct at issue) is subject to dismissal without an evidentiary hearing. Any ruling regarding such motion

shall be made consistent with the Form of Decision and Scope of Relief sections in this Agr



(f) **Time of Decision:** The arbitrator will make the decision within 30 days of the close of the hearing or as soon as possible thereafter, unless otherwise agreed to by the Parties or otherwise specified by law.

(g) **Form of Decision:** The decision will be in writing and signed by the arbitrator. Unless otherwise agreed to by the Parties, the decision will include a summary of claims arbitrated and decided, a reasoned opinion setting forth any findings of fact or conclusions of law, and damages and other relief (if any) granted. All decisions shall be executed in the manner required by law. The decision will be final and binding upon the Parties, and appeal of the decision to a court shall be limited as provided by the FAA.

(h) **Scope of Relief:** The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court, including the award of monetary damages and the imposition of requirements on the Parties (including injunctive relief), as permitted by applicable law. The arbitrator may award only such relief as may be granted for a Covered Claim brought in court on an individual basis under applicable law. The arbitrator may award punitive or exemplary damages or attorneys' fees as provided or limited by applicable law. Nothing in this Agreement is intended or should be construed to limit the remedies that otherwise would be available to the Parties in a court of law.

(i) **Enforcement of Arbitration Decision/Judicial Procedure:** The decision of the arbitrator may be enforced under the terms of the FAA to the maximum extent possible. Either party may have an arbitration decision enforced in a court of law in accordance with applicable the FAA. If this occurs, neither the arbitrator nor AAA will be involved in the court proceedings.

If a court determines that the decision is not completely enforceable, it will be enforced and binding on both parties to the maximum extent permitted by law.

8. **SEVERABILITY:** If any part of this Agreement is held to be void or unenforceable, the remainder of the Agreement will be enforceable and any part may be severed from the remainder as appropriate, to the extent permitted by law. For example, if a court determines that a particular provision of this Agreement is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its use of arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this Agreement is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class, collective, or representative or joint action waiver provided in Paragraph 4 of this Agreement must be decided by a court with jurisdiction over the Parties, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class, collective, or representative or joint action waiver is found to be unenforceable, the class, collective, or representative or joint action may only be heard in court and may not be arbitrated under this Agreement

9. **AMENDMENT OR TERMINATION OF AGREEMENT:** JPMorgan Chase reserves the right to amend, modify or discontinue this Agreement at any time in its sole discretion to the extent permitted by applicable law. Such amendments may be made by publishing them on the JPMorgan Chase Intranet or by separate notification to me and shall be effective 30 calendar days after such amendments are provided to me and will apply on a going-forward basis only. Amendment, modification or discontinuation of the Agreement will not affect pending arbitration proceedings. Continuation of my employment after receiving such amendments or modifications will be considered my acceptance of the amended terms.

This Agreement does not alter the voluntary ("at will") nature of my employment relationship with the Firm, nor does it afford any rights or remedies not otherwise available under applicable law. Of course, this Agreement does not require that JPMorgan Chase initiate arbitration before taking corrective action of any

App. 0564

ki ation of employment.

Signature: Joshua Biering Date: 18-Feb-2016

# Employment Eligibility Verification

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

OMB No. 1615-0047
Expires 03/31/2016

**▶START HERE.** **Read instructions carefully before completing this form. The instructions must be available during completion of this form.**

**ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Attestation** *(Employees must complete and sign Section 1 of Form I-9 no later than the first day of employment, but not before accepting a job offer.)*

| Last Name *(Family Name)* | First Name *(Given Name)* | Middle Initial | Other Names Used *(if any)* |
|---|---|---|---|
| Biering | Joshua | D | Josh |

| Address *(Street Number and Name)* | Apt. Number | City or Town | State | Zip Code |
|---|---|---|---|---|
| [redacted] Hwy | [redacted] | [redacted] | [redacted] | [redacted] |

| Date of Birth *(mm/dd/yyyy)* | U.S. Social Security Number | E-mail Address | Telephone Number |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |

**I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.**

**I attest, under penalty of perjury, that I am (check one of the following):**

- [x] A citizen of the United States
- [ ] A noncitizen national of the United States *(See instructions)*
- [ ] A lawful permanent resident (Alien Registration Number/USCIS Number): ____________
- [ ] An alien authorized to work until (expiration date, if applicable, mm/dd/yyyy) ____________. Some aliens may write "N/A" in this field. *(See instructions)*

*For aliens authorized to work, provide your Alien Registration Number/USCIS Number* ***OR*** *Form I-94 Admission Number:*

1. Alien Registration Number/USCIS Number: ____________

**OR**

2. Form I-94 Admission Number: ____________

If you obtained your admission number from CBP in connection with your arrival in the United States, include the following:

Foreign Passport Number: ____________

Country of Issuance: ____________

Some aliens may write "N/A" on the Foreign Passport Number and Country of Issuance fields. *(See instructions)*

**3-D Barcode**
**Do Not Write in This Space**

| Signature of Employee: | Date *(mm/dd/yyyy)*: 05/16/2016 |
|---|---|

**Preparer and/or Translator Certification** *(To be completed and signed if Section 1 is prepared by a person other than the employee.)*

**I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.**

| Signature of Preparer or Translator: | Date *(mm/dd/yyyy)*: |
|---|---|
| Last Name *(Family Name)* | First Name *(Given Name)* |

| Address *(Street Number and Name)* | City or Town | State | Zip Code |
|---|---|---|---|
| | | | |

***Employer Completes Next Page***

App. 0566

## Section 2. Employer or Authorized Representative Review and Verification

*(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR examine a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents" on the next page of this form. For each document you review, record the following information: document title, issuing authority, document number, and expiration date, if any.)*

**Employee Last Name, First Name and Middle Initial from Section 1:**

| List A<br>Identity and Employment Authorization | OR | List B<br>Identity | AND | List C<br>Employment Authorization |
|---|---|---|---|---|
| Document Title: US PASSPORT | | Document Title: | | Document Title: |
| Issuing Authority: USA | | Issuing Authority: | | Issuing Authority: |
| [redacted] | | Document Number: | | Document Number: |
| Expiration Date (if any)(mm/dd/yyyy): 10/07/2018 | | Expiration Date (if any)(mm/dd/yyyy): | | Expiration Date (if any)(mm/dd/yyyy): |
| Document Title: | | | | |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | |
| Document Title: | | | | 3-D Barcode<br>Do Not Write in This Space |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date (if any)(mm/dd/yyyy): | | | | |

### Certification

**I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.**

**The employee's first day of employment *(mm/dd/yyyy)*:** 5/23/2016 ***(See instructions for exemptions.)***

| | | |
|---|---|---|
| Signature of Employer or Authorized Representative: [redacted] | Date (mm/dd/yyyy) | Title of Employer or Authorized Representative: RELATIONSHIP BANKER |
| Last Name (Family Name): KHWAJA | First Name (Given Name): [redacted] | Employer's Business or Organization Name: CHASE BANK |

AFFAN KHWAJA My Commission Expires 2018 STATE OF TEXAS

| Employer's Business or Organization Address (Street Number and Name) | City or Town | State | Zip Code |
|---|---|---|---|
| 4313 W NW HWY STE 350 | DALLAS | TX | 75220 |

## Section 3. Reverification and Rehires *(To be completed and signed by employer or authorized representative.)*

| A. New Name (if applicable) Last Name (Family Name) | First Name (Given Name) | Middle Initial | B. Date of Rehire (if applicable) (mm/dd/yyyy): |
|---|---|---|---|
| | | | |

C. If employee's previous grant of employment authorization has expired, provide the information for the document from List A or List C the employee presented that establishes current employment authorization in the space provided below.

| Document Title: | Document Number: | Expiration Date (if any)(mm/dd/yyyy): |
|---|---|---|
| | | |

**I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.**

| Signature of Employer or Authorized Representative: | Date (mm/dd/yyyy): | Print Name of Employer or Authorized Representative: |
|---|---|---|
| | | |

# Complaint-Routing, BOLO, Security, and Closure Records

**App. 0568-0594**

December 21 disability/FMLA complaint; "unhinged"/BOLO forwards; "lunatic" escalation; closure records.

Message

**From:** Cohen, Jena B [jena.b.cohen@jpmorgan.com]
**Sent:** 12/22/2023 4:28:04 AM
**To:** Frame, David R. [david.frame@jpmorgan.com]
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS - Friday Docs

Yes - I can give you a ring in the AM

---

**From:** Frame, David R. <david.frame@jpmorgan.com>
**Date:** Thursday, Dec 21, 2023 at 11:27 PM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS - Friday Docs

Let’s chat tomorrow
Thanks

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Date:** Thursday, Dec 21, 2023 at 11:08 PM
**To:** Tyler, Lauren M <lauren.m.tyler@jpmorgan.com>, Frame, David R. <david.frame@jpmorgan.com>, Geller, Jeremy R (WM, USA) <jeremy.r.geller@jpmorgan.com>
**Cc:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>, Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>, Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Subject:** FW: [EXTERNAL]Re: Biering/JPMS - Friday Docs

Hi team,

Putting the below on your radar - you all have basic context on the case but call me tomorrow on my cell if you want any other information.

Josh is unhinged and uses threatening language below - we are going to work with security to put out a BOLO with Josh's photo, [redacted] may also want to consider other personal safety measures if she is concerned.

Josh makes several new allegations in the below which ER will review - Nancy is going to circle back.

**Redacted - Privilege**

This is the first case of this severity/nauture that most of these leaders have been involved in - please check in on them.

Thank you
Jena

---

**From:** Josh Biering <josh.biering@gmail.com>
**Date:** Thursday, Dec 21, 2023 at 8:47 PM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>, Josh Iacuone <iacuone@roggedunngroup.com>, Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>

**Cc:** Agather, Elaine (WM, USA) <Elaine.Agather@jpmorgan.com>, Chilian, Peter C (WM, USA) <peter.c.chilian@jpmorgan.com>, Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>, Aughinbaugh, USA) <john.t.aughinbaugh@jpmorgan.com>, Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS - Friday Docs

+ all of the guilty parties.

Exhibit A will be the series of events in which my 1:1 with Pete Chilian (recorded) was rescheduled so he could game plan with JT/Ben/Elaine prior to my in person meeting.

I will not fall victim to this.

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, December 21, 2023 6:06:04 PM
**To:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>; Josh Iacuone <iacuone@roggedunngroup.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS - Friday Docs

It has been relayed.

You all have profited off a person who has nothing else to lose. And you all knew that. YOU KNEW. I trusted you.

I gave my literal heart, soul, blood, sweat and TEARS to this company as documented by my 14% revenue growth vs a down market of 6%. I asked for resources. NOTHING.

I asked for HELP! NOTHING!!!

I didn't take paternity leave. I was on a phone call with Dave Frame the morning of my child's birth to PLEAD with him to onboard my large prospect. The same prospect JT, Ben and Kyle did not support. The same prospect YOU ALL KNEW had a big liquidity event in 2024. The same prospect that the JPMorgan bus of "replacements" went to visit at their office 24 HOURS before the alleged "close out of the investigation and findings" to then terminate me? After you checked the box that the metaphorical "back door" is protected?!

You give a former market manager 1 year severance and he signs an NDA after 3 sexual harrasment claims. But I- do the right thing- escalate concerns to management- multiple times- try to leave- try to take FMLA- try to request REASONABLE accommodations.

I didn't care about the money. I didn't care about sticking around until January for my EARNED incentive compensation because it was that TOXIC. This will all come out in my well documented library.

You don't think [redacted] told me the morning of the 10/24 that management COERCED her into planning my exit? It's all documented. It's all going to come out. That KEITH WILEY tried to coerce females into black balling me? The same KEITH WILEY that uses terminology like "she can suck a bowling ball out of a garden hose?!" When he shares that with JT and Ben over beers during their weekly Buff Bros happy hours that are fraudently expensed?

You do not get to claim you all are this place of diversity and inclusion that promotes "being your genuine true self." How self fulfilling.

I came to you all- in confidence- as a "trusted" source and leadership conveying my problems both personally and professionally since January 2023. You all ignored them. You brushed them under the rug.

I requested FMLA leave on TWO OCCASIONS. I AM A DOCUMENTED 100% SERVICE CONNECTED DISABLED veteran due to PTSD/stress/anxiety and you all ORCHESTRATED my demise. ON A MONTH YOU ALL CLAIMED TO BE MENTAL HEALTH AWARENESS MONTH.

This is cruel. I hoped I would not have to disclose the materials I had because I was incorrectly hopeful that JPMorgan was an organization that stood for the right values and integrity.

How I was very wrong. Clients will see this. Stakeholders will see this. You facilitated this.

Regards,

JB

---

**From:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Sent:** Thursday, December 21, 2023 5:48:26 PM
**To:** Josh Biering <josh.biering@gmail.com>; Josh Iacuone <iacuone@roggedunngroup.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS - Friday Docs

Josh, please connect with your counsel - he has been in dialogue with Rachel. I'm not sure if that's not being cascaded, she has relayed amended language.

---

**From:** Josh Biering <josh.biering@gmail.com>
**Date:** Thursday, Dec 21, 2023 at 6:39 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>, Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Subject:** [EXTERNAL]Re: Biering/JPMS - Friday Docs

This is 100% a planned and strategic move. This is MALICIOUS and CRUEL.

Cannot wait to have my recorded phone calls with magegemt. and documented meetings/ text messages presented in a forum that is not incorrigible.

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, December 21, 2023 3:31:52 AM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Subject:** Re: Biering/JPMS - Friday Docs

Anxiously standing by.

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, December 19, 2023 4:57:21 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Subject:** Re: Biering/JPMS - Friday Docs

I just checked my FinPro and got off the phone with FINRA- they have not received any disclosures or reports yet.

They also were kind enough to remind me that FINRA's operating schedule is closed Monday, December 25th and closes early on Friday, December 29th at 1pm CST.

The contact I spoke with informed me that any filings must be filed before 5pm CST on Tuesday, 12/26 for licenses, disclosures, forms, etc and they reopen this department on Tuesday, Jan 2nd.

I think JPM is aware of this window and also the time it takes to interview and diligence prospective employers... as well as transfer licenses assuming it is not marked in a defamatory or false manner... This leaves me without an income through December and the Holidays- which I find to be a little unethical and cruel... and arguably, contradicts the JPM Code of Conduct and How "we" do Business.

---

**From:** Josh Iacuone <iacuone@roggedunngroup.com>
**Sent:** Tuesday, December 19, 2023 12:25 PM
**To:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** 'Josh Biering' <josh.biering@gmail.com>; Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Subject:** RE: Biering/JPMS - Friday Docs

Rachel:

Did I miss something? Did you intend to respond to my 2 letters re: U5 and appropriate marking?

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

---

**From:** Josh Iacuone
**Sent:** Tuesday, December 19, 2023 8:26 AM
**To:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** 'Josh Biering' <josh.biering@gmail.com>; Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Subject:** Biering/JPMS - Friday Docs

Rachel:



Attached is all I received, which is the Notice Period Policy.

I didn't get a response to my letters re: U5 correct marking.

Joshua J. Iacuone
**Rogge Dunn Group, P.C.**
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Fax: 214-220-3833
Tel: 214-888-5000
DD: 214-239-2763
Cell: 214-274-8393

BOARD CERTIFIED
Texas Board of Legal Specialization
LABOR AND EMPLOYMENT LAW

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Message



**From:** Cohen, Jena B [jena.b.cohen@jpmorgan.com]
**Sent:** 12/22/2023 3:44:16 AM
**To:** Stainback, Stephanie [Stephanie.Stainback@jpmorgan.com]; Tidwell-Neal, Rachel L [rachel.l.tidwell-neal@jpmchase.com]; Sebastian, Nancy R [nancy.r.sebastian@jpmorgan.com]; Sanchez, Julie [julie.sanchez@jpmchase.com]
**Subject:** RE: Josh Biering

Thank you - Rachel and I received a separate email from Josh as well. Pete should be working with the local security in Fort Worth to post a BOLO with his picture and ensure he isn't able to enter the building. Can security also speak with [redacted] about a protective order if she has significant concern.

---

**From:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Date:** Thursday, Dec 21, 2023 at 8:49 PM
**To:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>, Sebastian, Nancy R (HR, USA) <nancy.r.sebastian@jpmorgan.com>, Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Subject:** FW: Josh Biering

I wanted to make you aware of the text messages below. I have alerted Chris Magee in Threat Management as he was part of the initial conversation with [redacted] and Jonathon Jacobs (ER).

---

**From:** Chilian, Peter C (WM, USA) <peter.c.chilian@jpmorgan.com>
**Sent:** Thursday, December 21, 2023 7:16 PM
**To:** Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>; Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>; Agather, Elaine (WM, USA) <Elaine.Agather@jpmorgan.com>
**Cc:** Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>; Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Subject:** RE: Josh Biering

This is very serious. Outright threats. Stephanie, so you know who in security I can notify?

Thank you for escalating, JT.

---

**Pete Chilian** | Managing Director | South Region Head | **J.P. Morgan** | 1900 N. Akard St. - Floor 5 | Dallas, TX 75201 | T: 214 965 3198 | peter.c.chilian@jpmorgan.com | privatebank.jpmorgan.com

**Alternative Contact**: Evette Campbell | T: 214 965 3471 | evette.campbell@jpmorgan.com

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail)**. For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**Swap related material subject to the Swap Dealer Associated Persons Disclosurehas been prepared by a Swap Dealer Associated Person of JPMorgan**

INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE



**From:** Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>
**Date:** Thursday, Dec 21, 2023 at 7:03 PM
**To:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>, Chilian, Peter C (WM, USA) <peter.c.chilian@jpmorgan.com>, Agather, Elaine (WM, USA) <Elaine.Agather@jpmorgan.com>
**Cc:** Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>, Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Subject:** Josh Biering

Not sure if there is anything to do about it, but wanted to circulate text messages sent by Josh Biering to [redacted] Ben, and myself tonight. Redacted - Privilege Redacted - Privilege Available to discuss further at your convenience. Please let us know if there is any additional action to take. Thank you.

App. 0575

KK

Kelly Ann

Hi Kyle, I hope you all are having a wonderful evening. I hate to interrupt it, but I would just ask for prayers from you and Tasha; I unfortunately received a text from Josh that really freaked me out. I am not sure what next steps are and feel a little afraid to be back in downtown Fort Worth at this time- but I did just want to share this in the case I end up taking an extra day or two of vacation time; although that may not be necessary.



App. 0576

6:32

JB BS

2 People >

New photo available from Josh Update

and happy to make myself available should anything come up.

Josh

Tue, Oct 24 at 12:23 PM

Josh Biering

Any chance we could meet off site or in a different location at 1?

If not- I can come to client center no problem

Nvm. I'm in client center whenever free

Today 5:41 PM

Josh Biering

You all are malicious. Cruel. And you will be seeing me again.

---

**J.T. Aughinbaugh** | Managing Director | **J.P. Morgan** | 420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4463 | john.t.aughinbaugh@jpmorgan.com | jpmorgan.com/privatebank

**J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.**

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

Message

App. 0577

**From:** Aughinbaugh, John T [john.t.aughinbaugh@jpmorgan.com]
**Sent:** 1/25/2024 1:36:16 PM
**To:** Magee, Christopher J [christopher.j.magee@jpmorgan.com]; Stainback, Stephanie [Stephanie.Stainback@jpmorgan.com]; Sanchez, Julie [julie.sanchez@jpmchase.com]
**CC:** Agather, Elaine [Elaine.Agather@jpmorgan.com]; Chilian, Peter C [peter.c.chilian@jpmorgan.com]; Warren, Clinton S [clinton.s.warren@jpmorgan.com]; Hitchcock, Kyle E [kyle.e.hitchcock@jpmorgan.com]; Stewart, Ben [ben.stewart@jpmorgan.com]
**Subject:** FW: Call follow up BIERING

I hate that this has turned into a daily update, but felt I should escalate this note as well.

Redacted - Privilege

J.T. Aughinbaugh | Managing Director | J.P. Morgan | 420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4463 | john.t.aughinbaugh@jpmorgan.com | jpmorgan.com/privatebank

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

**From:** Barr, Austin M (WM, USA) <austin.m.barr@jpmorgan.com>
**Sent:** Wednesday, January 24, 2024 5:01 PM
**To:** Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>
**Subject:** Call follow up

J.T.

I'm upset the way this whole thing was handled. I trust y'all, but it's hard not to feel like I'm a sacrificial lamb in this mess. I was threatened, I thought I did the right thing to escalate my concern, Redacted - Privilege Redacted - Privilege Anna Kate is worried this lunatic is going to do something rash.

Will you call me with what you find out from legal? I understand it may take some time.

Exhibit CX194

Austin M. Barr | Vice President | J.P. Morgan Private Bank | 420 Throckmorton St, Floor 3 | Fort Worth, TX 76102 | T: 817 212 2298 | austin.m.barr@jpmorgan.com | privatebank.jpmorgan.com

App. 0578

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

Message

**From:** Stainback, Stephanie [Stephanie.Stainback@jpmorgan.com]
**Sent:** 1/12/2024 10:56:46 PM
**To:** Cohen, Jena B [jena.b.cohen@jpmorgan.com]
**Subject:** FW: Fort Worth Security

You will need to approve Chris Magee's access since you are the site owner. I submitted it and you should have a pending request for Tuesday.

---

**From:** Stainback, Stephanie (WM, USA)
**Sent:** Friday, January 12, 2024 4:34 PM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: Fort Worth Security

**Redacted - Privilege**

---

**From:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Sent:** Friday, January 12, 2024 4:29 PM
**To:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: Fort Worth Security

**Redacted - Privilege**

---

**From:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Date:** Friday, Jan 12, 2024 at 5:21 PM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>, Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** FW: Fort Worth Security

**Redacted - Privilege**

---

**From:** Stainback, Stephanie (WM, USA)
**Sent:** Friday, January 12, 2024 1:50 PM
**To:** Magee, Christopher J <christopher.j.magee@jpmorgan.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Fort Worth Security

Hello Christopher. I am the HR Business Advisor for the Private Bank office in Fort Worth. You assisted early on with a situation related to now former employee, Joshua Biering (I662283). I need to speak with you or someone on your team related to a new development. Due to safety concerns, Global Security put a BOLO in place when Joshua was placed on administrative leave and again when he left the firm and began sending communications which were of concern. Some of these emails were shared with the Global Security mailbox in December but there have been others since that time.

We learned today that Joshua has joined Raymond James in their Fort Worth office. This office is in the same building as the Private Bank where he worked previously. We want to make sure our employees are safe and this complicates matters since he will now have access to the building. The Private Bank is on the 3rd floor and Raymond James occupies the 8th floor. Redacted - Privilege

**Redacted - Privilege**

Thank you for your guidance.

Stephanie

**Stephanie Stainback** | Executive Director | HR Business Partner | **J.P. Morgan Private Bank** |
712 Main St, Floor 15N | Houston, TX 77002 | T: 713 216 8773 | Stephanie.Stainback@jpmorgan.com |
privatebank.jpmorgan.com

**JPMorgan Chase Bank, N.A.**

Message

**From:** Agather, Elaine [Elaine.Agather@jpmorgan.com]
**Sent:** 1/15/2024 5:14:21 AM
**To:** Stainback, Stephanie [Stephanie.Stainback@jpmorgan.com]
**Subject:** Fwd: [EXTERNAL]Re: Your concerns

Unhinged

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Sunday, January 14, 2024 9:50:15 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>; Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>; Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>; Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>; Josh Iacuone <iacuone@roggedunngroup.com>; Agather, Elaine (WM, USA) <Elaine.Agather@jpmorgan.com>; Chilian, Peter C (WM, USA) <peter.c.chilian@jpmorgan.com>; Muraira, Nadia <nadia.muraira@jpmchase.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>; dave.frame@jpmorgan.com <dave.frame@jpmorgan.com>; Dimon, Jamie <jamie.dimon@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

Let me guess. The findings will be inconclusive.

I am very glad  that JPMorgan reports record earnings.

"Our game plan. We get rid of top producers right before we need to compensate them accordingly. Too easy "

The Fort Worth office is nothing but TOXIC.

Terribly inconsistent and very contradictory to your own policies.

Regards,

JB

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Thursday, January 11, 2024 5:25:18 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Joshua,
I have had the chance to review the attachments you sent to me, and do not need to call you again as the information you provided answers the questions I had asked you when we spoke a couple of days ago.  Thank you for sending the details.

I will look into the concerns you raised, and will circle back to you soon.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Sanchez, Julie (HR, USA)
**Sent:** Thursday, January 11, 2024 8:52 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

As you requested, I am confirming receipt of this email and the one you sent with several attachments (the date stamp on that email is 6:22pm which is 1 minute before the one you sent below).

As mentioned in my email yesterday (below), I will email you after I have had the chance to read through the attachments in your email.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, January 10, 2024 6:23 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

I just sent you an email with attachments- and I appreciate your "email of record" below.

Can you please confirm receipt of the email with several attachments as I have had trouble sending out attachments when the files are too large.

Many thanks,

Josh

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Wednesday, January 10, 2024 6:12 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Joshua,
As follow up to our call yesterday, you had mentioned that you had written a detailed timeline and would email it to me. You also requested to reschedule our conversation to another day, that you would like the call to be recorded and/or have a 3rd person join, and that you wanted to speak to your attorney to discuss how you wanted to proceed. I let you know that I do not record my calls, that I do not consent to being recorded, and that I do not typically receive requests to have a 3rd person join.

You and I also spoke about me calling you tomorrow (Thursday, 1/11) at 7:30am CT. At this point, I have not received the timeline from you and do not know if you have had time to speak to your attorney about next steps. As such, I will not call you tomorrow; however, please email me the timeline and after I have had a chance to read through that I will email you to reschedule.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com

For HR help and resources, visit me@jpmc



**From:** Sanchez, Julie (HR, USA)
**Sent:** Tuesday, January 09, 2024 4:28 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Great; I can call you right now.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, January 09, 2024 4:08 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

yes, I am.

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 9, 2024 3:48 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

I am available at 4:30CT this afternoon; does that work?

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, January 09, 2024 3:01 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** [EXTERNAL]Re: Your concerns

Thank you for reaching out. Are you available at 4:15pm CST?

Regards,

JB

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 9, 2024 1:52:55 PM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** Your concerns

Joshua,
I work on the Employee Relations team at JPMorgan Chase. I am contacting you regarding concerns you have raised.

Please let me know which day(s)/time(s) work best for you to speak. I tried to call you at the number we have on file (912-308-5781); however, I was unable to reach you.

Best regards,
Julie Sanchez

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Message

App. 0585

**From**: Stainback, Stephanie [Stephanie.Stainback@jpmorgan.com]
**Sent**: 1/12/2024 10:21:55 PM
**To**: Cohen, Jena B [jena.b.cohen@jpmorgan.com]; Tidwell-Neal, Rachel L [rachel.l.tidwell-neal@jpmchase.com]
**Subject**: FW: Fort Worth Security

I spoke with Christopher in GS today. He's asked to see all communications from Josh so he can assess the threat level. Is it ok if I add him to the Teams site? He was part of the original conversations and on the case notes from Jonathan Jacobs in ER. Christopher would also like to set up a call to discuss next steps, if they are needed, and I will coordinate a call on Wednesday as Tuesday will be tough. Also, he is removing the BOLO today so JPM in no way prevents Josh from accessing the office of his new employer.

---

**From:** Stainback, Stephanie (WM, USA)
**Sent:** Friday, January 12, 2024 1:50 PM
**To:** Magee, Christopher J <christopher.j.magee@jpmorgan.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Fort Worth Security

Hello Christopher. I am the HR Business Advisor for the Private Bank office in Fort Worth. You assisted early on with a situation related to now former employee, Joshua Biering (I662283). I need to speak with you or someone on your team related to a new development. Due to safety concerns, Global Security put a BOLO in place when Joshua was placed on administrative leave and again when he left the firm and began sending communications which were of concern. Some of these emails were shared with the Global Security mailbox in December but there have been others since that time.

We learned today that Joshua has joined Raymond James in their Fort Worth office. This office is in the same building as the Private Bank where he worked previously. We want to make sure our employees are safe and this complicates matters since he will now have access to the building. The Private Bank is on the 3rd floor and Raymond James occupies the 8th floor. Please let us know your thoughts and when you have time to discuss. I have included Jena Cohen, who is the Senior HR Business Advisor for the business as well as Rachel Tidwell-Neal in Legal. Redacted-Privileged
Redacted-Privileged

Thank you for your guidance.

Stephanie

---

**Stephanie Stainback** | Executive Director | HR Business Partner | **J.P. Morgan Private Bank** |
712 Main St, Floor 15N | Houston, TX 77002 | T: 713 216 8773 | Stephanie.Stainback@jpmorgan.com |
privatebank.jpmorgan.com

**JPMorgan Chase Bank, N.A.**

Message

App. 0586

**From**: Stainback, Stephanie [Stephanie.Stainback@jpmorgan.com]
**Sent**: 1/12/2024 10:34:12 PM
**To**: Cohen, Jena B [jena.b.cohen@jpmorgan.com]; Tidwell-Neal, Rachel L [rachel.l.tidwell-neal@jpmchase.com]
**Subject**: RE: Fort Worth Security

Will do – I have the texts he sent the team and will forward separately.

---

**From:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Sent:** Friday, January 12, 2024 4:29 PM
**To:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: Fort Worth Security

Ugh - that explains why I haven't heard from him in a few days. Yes - he can be added to the teams but you should relay the texts to all employees as those aren't on teams

---

**From:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Date:** Friday, Jan 12, 2024 at 5:21 PM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>, Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** FW: Fort Worth Security

I spoke with Christopher in GS today. He's asked to see all communications from Josh so he can assess the threat level. Is it ok if I add him to the Teams site? He was part of the original conversations and on the case notes from Jonathan Jacobs in ER. Christopher would also like to set up a call to discuss next steps, if they are needed, and I will coordinate a call on Wednesday as Tuesday will be tough. Also, he is removing the BOLO today so JPM in no way prevents Josh from accessing the office of his new employer.

---

**From:** Stainback, Stephanie (WM, USA)
**Sent:** Friday, January 12, 2024 1:50 PM
**To:** Magee, Christopher J <christopher.j.magee@jpmorgan.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Fort Worth Security

Hello Christopher. I am the HR Business Advisor for the Private Bank office in Fort Worth. You assisted early on with a situation related to now former employee, Joshua Biering (I662283). I need to speak with you or someone on your team related to a new development. Due to safety concerns, Global Security put a BOLO in place when Joshua was placed on administrative leave and again when he left the firm and began sending communications which were of concern. Some of these emails were shared with the Global Security mailbox in December but there have been others since that time.

We learned today that Joshua has joined Raymond James in their Fort Worth office. This office is in the same building as the Private Bank where he worked previously. We want to make sure our employees are safe and this complicates matters since he will now have access to the building. The Private Bank is on the 3rd floor and Raymond James occupies the 8th floor. Please let us know your thoughts and when you have time to discuss. I have included Jena Cohen, who is the Senior HR Business Advisor for the business as well as Rachel Tidwell-Neal in Legal. Both have worked closely on this situation.

Thank you for your guidance.

Stephanie

---

**Stephanie Stainback** | Executive Director | HR Business Partner | **J.P. Morgan Private Bank** |
712 Main St, Floor 15N | Houston, TX 77002 | T: 713 216 8773 | Stephanie.Stainback@jpmorgan.com |
privatebank.jpmorgan.com

**JPMorgan Chase Bank, N.A.**

Message

**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 1/30/2024 3:10:18 PM
**To:** Sanchez, Julie [julie.sanchez@jpmchase.com]
**CC:** Josh Iacuone [iacuone@roggedunngroup.com]; Chase Potter [potter@imcplaw.com]
**Subject:** Re: [EXTERNAL]Re: Your concerns- Josh Biering

Confirming receipt of your email and most likely will coordinate with my Counsel directly going forward.

Thanks,

JB

Regards,

JB

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 30, 2024 9:02:46 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns- Josh Biering

Joshua,

As promised, I am circling back to you regarding the concerns you reported to Employee Relations regarding your termination. Based on a review of information gathered, the involuntary termination outcome will stay.

Also, after careful review of additional concerns you reported, I did not find information that would support your claims.

Lastly, based on your request, you asked for more information as to the conduct that violated the firm's Code of Conduct. It was determined that, as an Executive Director, your interactions with an Analyst who primarily supported your book of business was not appropriate. Such conduct did not meet the firm's expectations with regard to personal and professional conduct.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, January 22, 2024 8:54 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>; Rogge Dunn <dunn@roggedunngroup.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>; Muraira, Nadia <nadia.muraira@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns- Josh Biering

And will that also include the release of the inadequate and biased investigation used to weaponize my form u5?

Regards,

Exhibit
CX199

JB



**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Monday, January 22, 2024 7:58:01 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Cc:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>; Rogge Dunn <dunn@roggedunngroup.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns- Josh Biering

Joshua,
My review into your concerns is still pending, but as previously mentioned I will be circling back to you as soon as possible once complete.

As for what you designated as #2 through 4 in your email below, please have your legal contacts discuss directly with our legal team.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Sunday, January 21, 2024 9:29 AM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>; Rogge Dunn <dunn@roggedunngroup.com>; josh@imcplaw.com; greg@imcplaw.com
**Subject:** Re: [EXTERNAL]Re: Your concerns- Josh Biering

Julie-

Few things:

1. I wanted to check back in with you to see if there were any new developments regarding my claim that I was unfairly treated by JPMorgan on multiple occasions?
2. I have also copied my legal team's updated contact information so that the broader group has their information.
3. I'm concerned now, more than evert, that JPMorgan continues to interfere and implement questionable business practices as very dear friends and clients of mine have expressed their desire to transition their business to me at my new firm. It's a long shot, but I implore JPMorgan to cease and desist this practice as it will have significant undue economical harm on my clients- which you will certainly see in a follow up email addressed to the parties involved.
4. As you may or may not be aware- the U4 disclosure that contains a Customer Complaint that I VOLUNTEERED to be a party to as I very naively thought I was being a team player to Kyle Hitchcock (Fort Worth Head of Investments and Advice), has yet to be addressed by JPMorgan. For your reference: the Arbitration # is 23-03445 Joshua D. Biering vs. JPMorgan Securities. The claim was initiated on 12/5/2023 and JPMorgan was served on 12/11/2023 but has until January 30, 2024 to submit a response, but in the spirit of the JPMorgan Code of Conduct and "How We Do Business Principles" that I was opaquely graded against, would implore your contact to "act quickly on tough issues and have the courage to fight for what you believe in" and "be rigorous and detailed, with continuous follow up". It appears that Heather Emmert is the contact assigned to the case but has yet to open or address the items I included.

Respectfully,

Josh Biering

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 16, 2024 8:10:35 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Cc:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>; Aughinbaugh, John T <john.t.aughinbaugh@jpmorgan.com>; Stewart, Ben <ben.stewart@jpmorgan.com>; Hitchcock, Kyle E <kyle.e.hitchcock@jpmorgan.com>; Josh Iacuone <iacuone@roggedunngroup.com>; Agather, Elaine <Elaine.Agather@jpmorgan.com>; Chilian, Peter C <peter.c.chilian@jpmorgan.com>; Muraira, Nadia <nadia.muraira@jpmchase.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>; dave.frame@jpmorgan.com <dave.frame@jpmorgan.com>; Dimon, Jamie <jamie.dimon@jpmchase.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Joshua,
As promised, I will circle back to you as soon as possible when the review into your concerns is complete.
Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Sunday, January 14, 2024 9:50 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Cc:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>; Aughinbaugh, John T (WM, USA) <john.t.aughinbaugh@jpmorgan.com>; Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>; Hitchcock, Kyle E (WM, USA) <kyle.e.hitchcock@jpmorgan.com>; Josh Iacuone <iacuone@roggedunngroup.com>; Agather, Elaine (WM, USA) <Elaine.Agather@jpmorgan.com>; Chilian, Peter C (WM, USA) <peter.c.chilian@jpmorgan.com>; Muraira, Nadia <nadia.muraira@jpmchase.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>; dave.frame@jpmorgan.com; Dimon, Jamie <jamie.dimon@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

Let me guess. The findings will be inconclusive.

I am very glad  that JPMorgan reports record earnings.

“Our game plan. We get rid of top producers right before we need to compensate them accordingly. Too easy “

The Fort Worth office is nothing but TOXIC.

Terribly inconsistent and very contradictory to your own policies.

Regards,

JB

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Thursday, January 11, 2024 5:25:18 PM

**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns



Joshua,
I have had the chance to review the attachments you sent to me, and do not need to call you again as the information you provided answers the questions I had asked you when we spoke a couple of days ago. Thank you for sending the details.

I will look into the concerns you raised, and will circle back to you soon.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Sanchez, Julie (HR, USA)
**Sent:** Thursday, January 11, 2024 8:52 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

As you requested, I am confirming receipt of this email and the one you sent with several attachments (the date stamp on that email is 6:22pm which is 1 minute before the one you sent below).

As mentioned in my email yesterday (below), I will email you after I have had the chance to read through the attachments in your email.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, January 10, 2024 6:23 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

I just sent you an email with attachments- and I appreciate your "email of record" below.

Can you please confirm receipt of the email with several attachments as I have had trouble sending out attachments when the files are too large.

Many thanks,

Josh

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Wednesday, January 10, 2024 6:12 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Joshua,
As follow up to our call yesterday, you had mentioned that you had written a detailed timeline and wo
You also requested to reschedule our conversation to another day, that you would like the call to be recorded and/or have a 3rd person join, and that you wanted to speak to your attorney to discuss how you wanted to proceed. I let you know that I do not record my calls, that I do not consent to being recorded, and that I do not typically receive requests to have a 3rd person join.

You and I also spoke about me calling you tomorrow (Thursday, 1/11) at 7:30am CT. At this point, I have not received the timeline from you and do not know if you have had time to speak to your attorney about next steps. As such, I will not call you tomorrow; however, please email me the timeline and after I have had a chance to read through that I will email you to reschedule.

Best regards,
Julie

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Sanchez, Julie (HR, USA)
**Sent:** Tuesday, January 09, 2024 4:28 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

Great; I can call you right now.

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, January 09, 2024 4:08 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Your concerns

yes, I am.

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 9, 2024 3:48 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Your concerns

I am available at 4:30CT this afternoon; does that work?

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, January 09, 2024 3:01 PM
**To:** Sanchez, Julie (HR, USA) <julie.sanchez@jpmchase.com>
**Subject:** [EXTERNAL]Re: Your concerns

Thank you for reaching out. Are you available at 4:15pm CST?

Regards,

JB

---

**From:** Sanchez, Julie <julie.sanchez@jpmchase.com>
**Sent:** Tuesday, January 9, 2024 1:52:55 PM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** Your concerns

Joshua,
I work on the Employee Relations team at JPMorgan Chase. I am contacting you regarding concerns you have raised.

Please let me know which day(s)/time(s) work best for you to speak. I tried to call you at the number we have on file (912-308-5781); however, I was unable to reach you.

Best regards,
Julie Sanchez

Julie Sanchez | Employee Relations | Human Resources | Julie.sanchez@jpmchase.com
For HR help and resources, visit me@jpmc

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If

you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# Third-Party and Client Communications

**App. 0596-0603**

November 28 "going to get canned" / "all your peeps" and November 29 "meeting your replacement" messages.

App. 0596




Exhibit
CX113

10/2/2023 2:08:08 PM

Sweet

10/25/2023 2:33:03 PM

Do y'all do 1 year out puts on btc ?

10/25/2023 4:04:52 PM

Negative

10/30/2023 5:13:45 PM

Dude. You bounced and left us hanging. Lol. Classic

10/30/2023 7:32:09 PM

I assure you that's not the case. Call me tomorrow

10/30/2023 7:33:10 PM

Aight. I will

10/31/2023 11:20:09 AM

Call me

10/31/2023 11:20:56 AM

I will. On phone. You good?

10/31/2023 11:21:50 AM

Yeah good jsut want to catch up and see what up

11/28/2023 3:54:18 PM

When are we going skiing

11/28/2023 4:18:28 PM

lol. When you gonna tell us where you moving and why you were going to get canned ? 😃

11/28/2023 4:19:07 PM

Canned?!

11/28/2023 4:19:13 PM

Canned !

11/28/2023 4:19:20 PM

Whattt. Who said that?!

11/28/2023 4:19:44 PM

All your peeps man. What you mean? Is it not true ?

11/28/2023 4:20:00 PM

My peeps?! Like JPMorgan people?

11/28/2023 4:20:59 PM

Emphasized “My peeps?! Like JPMorgan people?”

11/28/2023 4:21:10 PM

You’re messing with me

11/28/2023 4:21:25 PM

CANNED!!!

11/28/2023 4:21:32 PM

Lol

11/28/2023 4:21:39 PM

I’m messing around

11/28/2023 4:22:31 PM



11/28/2023 4:22:47 PM

Are you tho 😈

11/28/2023 4:23:00 PM

Laughed at “Are you tho 😈”

11/28/2023 4:23:27 PM

Fosho. Your new place gonna let you use the PJ so we can ski ?

11/28/2023 4:24:15 PM

Pfft. Now how am I supposed to know that you’re not a cop now? You sound like a cop.

11/28/2023 4:26:32 PM

lol. A cop?

11/28/2023 4:40:39 PM

Nvm

11/28/2023 4:40:53 PM

It was a joke. Questioning who has infiltrated you!

11/28/2023 4:55:15 PM

lol. I'm messing around

11/29/2023 8:19:05 AM




11/29/2023 8:20:52 AM

Laughed at an image

11/29/2023 8:21:06 AM

Meeting your replacement today

11/29/2023 8:21:32 AM

You too?!?

11/29/2023 8:21:39 AM

Ya. At [redacted]

11/29/2023 8:21:47 AM

[redacted] amd me I Think

11/29/2023 8:22:27 AM

Damn. I thought we had something special

11/29/2023 8:23:43 AM

Take good notes.

11/29/2023 8:23:52 AM

App. 0600

Laughed at “Damn. I thought we had something special ”

11/29/2023 8:24:50 AM

What time talk meeting

11/29/2023 9:03:58 AM

Do we have access to business lawyers at jpm that can review docs / deals for us ?

11/29/2023 9:04:19 AM

I’m spring a deal but need somebody that has my back to Review docs

11/29/2023 9:04:22 AM

You should ask your new banker that you love so much

11/29/2023 9:04:35 AM

But long story short. They won’t review those

11/29/2023 9:04:41 AM

Dang it

11/29/2023 9:04:48 AM

Do you know any good lawyers ?

11/29/2023 9:05:21 AM

What you need to do is what spot of my clients do. They find an attorney they like and they stick with them and treat them like a “pseudo family office” counsel

11/29/2023 9:05:28 AM

I have a few attorneys I can introduce you to.

11/29/2023 2:16:33 PM



11/30/2023 9:38:26 AM

That good huh?

11/30/2023 9:51:06 AM

Good dude for sure. Not sure where this goes tho

11/30/2023 6:34:44 PM

Loved “Good dude for sure. Not sure where this goes tho ”

1/11/2024 7:13:05 AM

When I call you later today. I need you to try your damnest to answer it.

1/11/2024 7:20:51 PM

What’s your email?

Josh.Biering@raymondjames.com

1/11/2024 7:58:45 PM

[redacted]

1/17/2024 7:17:19 AM

Do you want uncle Josh to get you set up ?

1/17/2024 9:52:56 AM

lol. Set me up with what ?

1/17/2024 9:53:14 AM

The JB special

1/17/2024 9:54:10 AM

If that involves free rides on a pj then I’m down

1/17/2024 9:56:38 AM

You’re so transactional. Breaks my heart. lol

1/17/2024 9:58:24 AM

lol

1/23/2024 5:51:28 AM



2/2/2024 5:36:48 AM

App. 0602

Holla at your boy later

2/29/2024 9:29:10 PM

Remember when I ran through brick walls for you guys? That was cool

3/1/2024 7:31:21 AM

lol. Wish you didn't leave

3/1/2024 7:32:38 AM

It was for the best man. I hate that I had to. But I did. I was in a dark place. So much happier now.

I'm confident I can go above and beyond for you guys at my new firm. Even do all your family office stuff like bill pay etc that you don't want to do. And I do have team that review legal docs for your direct deals now

3/1/2024 7:33:08 AM

I was a little shocked to be honest how hesitant you guys would be… but I get it

3/1/2024 7:58:43 AM

Yeah , don't take it personal man …too much of a whip to be bouncing around. I only needed banking. I'm not looking for anybody to manage my money

3/1/2024 7:59:01 AM

Fair enough

3/1/2024 8:03:31 AM

But I do take it just a tad personally 😘

3/1/2024 8:04:10 AM

lol. Don't,  we boys

3/1/2024 8:04:39 AM

Haha. I'll tell you the full story exactly why here in the near future when we get together next. How about that

3/1/2024 8:05:05 AM

Sounds good

3/1/2024 8:05:22 AM

You around next week for breakfast or lunch?

3/1/2024 8:06:03 AM

Yeah

3/1/2024 8:07:30 AM

How about Wednesday lunch or Thursday breakfast? You pick

3/1/2024 9:06:46 PM

No worries. We can link up later when it makes sense.

3/1/2024 9:14:48 PM

lol. Oh shoot man. I missed that last text

3/1/2024 9:15:15 PM

Let me look at my calendar ....

3/1/2024 9:16:02 PM

Wednesday lunch in Fairview works

3/2/2024 10:42:37 AM

Let's do it

3/5/2024 6:40:10 PM

Good for lunch in Fairview tomorrow still?

3/5/2024 6:46:33 PM

Yeah

3/5/2024 6:46:56 PM

Tight

3/5/2024 6:53:51 PM

Any good spots you recommend?

3/5/2024 10:08:10 PM

Sorry was at a town council meeting and just getting home

3/5/2024 10:08:28 PM

What time you wanna grub ?  Let's do Fairview farmers

3/6/2024 5:28:35 AM

11:30am?

3/6/2024 5:37:36 AM

Sure

# Client-Book Allocation and Fort Worth Finance Records

**App. 0605-0609**

Wang book-split proposal; November 2 team run-rate table; November 30 pre-termination recipient list.

Message

**From:** Wang, Lan X [lan.x.wang@jpmorgan.com]
**Sent:** 10/30/2023 8:21:27 PM
**To:** Stewart, Ben [ben.stewart@jpmorgan.com]
**Subject:** RE: Urgent Request: Josh Biering Book
**Attachments:** Biering Book Analysis.xlsx

Hi Ben,

I've split Josh's book into 3 categories:

- Investable Asset < $25MM (Keep): I believe SC should keep these clients as they are within the target population for our business. In the group, the YoY delta is +$135K.
- Investable Asset between $25MM and $100MM (Tier 1): This group has YoY delta of -$169K. One client is from Ohio which I think we should consider moving to local coverage. For the rest I think we should consider moving to PC as the wallet share is pretty high among this group.
- Investable Asset > $25MM (Tier 2): We should keep A[redacted] P[redacted] in SC since the total TCP is less than $10MM. The rest can be moved to PC when the timing is right.

Let me know if you need anything else.

Thank you!
Lan

---

**Lan Wang** | Associate | Business Finance Manager | **J.P. Morgan Private Bank** | T: 972 324 6968 | lan.x.wang@jpmorgan.com | jpmorgan.com/privatebank

**J.P. Morgan Securities LLC** | **JPMorgan Chase Bank, N.A.**

JPMC Internal Use Only

---

**From:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Sent:** Sunday, October 29, 2023 2:07 PM
**To:** Wang, Lan X (WM, USA) <lan.x.wang@jpmorgan.com>
**Subject:** Urgent Request: Josh Biering Book
**Importance:** High

Lan,

Can you help me generate some sort of excel file with every client relationship that is in Josh Biering's book? Josh resigned over the weekend and we need to immediately start working on who will take over. Given the book he has, we need to look at who the current investor is as well.

Separately, I'd like for you and I to work through the revenue benefits and drags in his book as we have the opportunity to move some of these back to Partner Coverage.

Exhibit
CX144

Thanks,

App. 0606

**Ben Stewart Jr.**, CFP® | Executive Director | Market Team Lead | **J.P. Morgan Private Bank** |
420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4003 | M: 817 845 9676 |
ben.stewart@jpmorgan.com | privatebank.jpmorgan.com

**Client Service Team**: 877 576 2874

Click here to see the JPMorgan Chase Privacy Policy: https://www.jpmorgan.com/pages/privacy

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail)**. For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT AND INSURANCE PRODUCTS: • NOT A DEPOSIT • NOT FDIC INSURED • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • MAY LOSE VALUE**

**JPMorgan Chase Bank, N.A.** and its affiliates (collectively "JPMCB") offer investment products, which may include bank-managed accounts and custody, as part of its trust and fiduciary services. Other investment products and services, such as brokerage and advisory accounts, are offered through **J.P. Morgan Securities LLC** ("JPMS"), a member of FINRA and SIPC. Annuities and insurance products are made available through Chase Insurance Agency, Inc. ("CIA"), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS and CIA are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states.

Message



**From:** ben.stewart@jpmorgan.com [Teams:ben.stewart@jpmorgan.com]
**Sent:** 11/2/2023 1:19:33 PM
**To:** lan.x.wang@jpmorgan.com [Teams:lan.x.wang@jpmorgan.com]
**Subject:** DIRECT_CHAT-ben.stewart@jpmorgan.com,lan.x.wang@jpmorgan.com

# Details: DIRECT_CHAT-ben.stewart@jpmorgan.com,lan.x.wang@jpmorgan.com

**Network:** Teams
**Cluster:** teams
**Start-Time:** Nov 02 2023 13:19:33.290 +0000
**Full Meta Data:** See Attachment: snapshot-meta.html
**Channel:** Chat
**Participants:** 2
**End-Time:** Nov 02 2023 17:57:52.260 +0000

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Nov 02 2023 13:19:33 **ID 313695176_43290559**
Just to confirm, we don't have a finance plan for revenue for 2024 SC right?

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Nov 02 2023 13:39:34 **ID 313695182_43290559**

Also, given its comp planning time, are you able to help me with run rate revenues for our incumben advisors across the floor?

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 02 2023 14:19:37 **ID 313694313_43290559**

No we do not have plan for 2024 revenue but I can give you the estimate of how it will look like with the flow plan

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 02 2023 14:19:43 **ID 313694314_43290559**

yes running the run-rate now

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 02 2023 14:36:21 **ID 313694315_43290559**

| Banker | 2022 FY | 2023 Run Rate | YoY |
|---|---|---|---|
| Allison M Westmoreland | 2,718,397 | 2,895,519 | 7% |
| Andrew D Lewis | 178,701 | 255,466 | 43% |
| Ben Stewart Jr. | 3,062,052 | 2,943,646 | -4% |
| Jason McMillan | 3,326,520 | 3,458,838 | 4% |
| Jeremiah M MacNamara | 1,007,877 | 1,103,380 | 9% |
| John M Bator | 145,277 | 255,668 | 76% |
| Joseph Monty | 2,976,888 | 3,056,318 | 3% |
| Joshua D Biering | 4,634,827 | 5,348,613 | 15% |
| Keith Wiley | 2,257,137 | 2,565,112 | 14% |
| Patrick Browning | - | 201 | N/A |
| Regan M Hasley | 288,554 | 407,548 | 41% |
| Samuel W Perry | - | 733 | N/A |

Exhibit
CX218

| | | | |
|---|---|---|---|
| Shay Boitmann | 96,214 | 140,272 | 46% |
| William L Brawley | 2,986,057 | 2,786,481 | [illegible] |
| Grand Total | 23,678,501 | 25,217,794 | 7% |

ian.x.wang@jpmorgan.com (ian.x.wang@jpmorgan.com) Nov 02 2023 14:36:26 **ID 313694316_43290559**

here you go

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Nov 02 2023 17:57:18 **ID 320787821_43290559**

Got another question, you have a second?

ian.x.wang@jpmorgan.com (ian.x.wang@jpmorgan.com) Nov 02 2023 17:57:39 **ID 320787820_43290559**

Sure

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Nov 02 2023 17:57:45 **ID 320787823_43290559**

office line?

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Nov 02 2023 17:57:52 **ID 320787832_43290559**

or you can call me 817 884 4442

Message

App. 0609

**From:** lan.x.wang@jpmorgan.com [Teams:lan.x.wang@jpmorgan.com]
**Sent:** 11/30/2023 4:09:11 PM
**To:** ben.stewart@jpmorgan.com [Teams:ben.stewart@jpmorgan.com]
**Subject:** DIRECT_CHAT-ben.stewart@jpmorgan.com,lan.x.wang@jpmorgan.com

# Details: DIRECT_CHAT-ben.stewart@jpmorgan.com,lan.x.wang@jpmorgan.com

**Network:** Teams
**Cluster:** teams
**Start-Time:** Nov 30 2023 16:09:11.199 +0000
**Full Meta Data:** See Attachment: snapshot-meta.html

**Channel:** Chat
**Participants:** 2
**End-Time:** Dec 01 2023 02:34:13.684 +0000

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 30 2023 16:09:11 **ID 401125071_69319324**

**99258836691**

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 30 2023 17:48:09 **ID 402874200_69319324**

SC Flows $50MM+: Keith, Will, Joe

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 30 2023 17:49:02 **ID 402874197_69319324**

PC Flows $200MM+: Tye, Marcus, Jake

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 30 2023 17:49:35 **ID 402874199_69319324**

New Hire Tier 5+: Regan

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Nov 30 2023 20:56:21 **ID 403952933_69319324**
Can we connect in the morning just to triple look at all the josh transitions

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 30 2023 20:56:44 **ID 403952928_69319324**
Of course!

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Nov 30 2023 20:57:34 **ID 403952929_69319324**
Would you be open to zoom at 830 or 9?

lan.x.wang@jpmorgan.com (lan.x.wang@jpmorgan.com) Nov 30 2023 21:48:51 **ID 403952927_69319324**
Can we do 830?

ben.stewart@jpmorgan.com (ben.stewart@jpmorgan.com) Dec 01 2023 02:34:13 **ID 404496132_69319324**
Perfrvt