# PLAINTIFF'S APPENDIX IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## VOLUME 4 OF 4

## INDEX


| APP. | DESCRIPTION |
|---|---|
| **0854-0856** | Redacted Client Declaration |
| **0857-0883** | Comparator Materials |
| **0884-0886** | Energy-Sector and Related Economic Records |
| **0887-0895** | State-Agency Inquiry Materials |
| **0896-0908** | Damages and Mitigation Records |
| **0909-0917** | Defendants' Federal Motion-to-Compel / Admission Excerpts |
| **0918-0923** | JPMorgan Chase 2023 Form 10-K Enterprise-Scale Excerpt |
| **0924-0942** | Supplemental Leave and Post-Termination ER-Review Records |
| **0943-0973** | ER Investigation Chronology Supplement |
| **0974-0992** | Global Security Expense Sequence Supplement |


Relied-upon passages are highlighted and bracketed in the margin. Each page carries a consecutive record label at the top right (App. NNNN).

# Redacted Client Declaration

**App. 0855-0856**

Redacted sworn declaration of a client principal documenting lost client relationships within Plaintiff's book following the U5 filing (UMF 111). Public per the redaction applied at marking.

# DECLARATION OF [redacted]

"My name is [redacted] I am over the age of 21 and fully competent to testify and provide this declaration. I have never been convicted of a felony or crime involving moral turpitude.

I have personal knowledge regarding the facts in this declaration as a result of my being a party to the conversations described below, and as further described below. I have personal knowledge of the events that transpired based on what I saw, heard, meetings I attended, and the ordinary course of my work and job duties, or the other bases stated in this declaration.

I am currently the Chief Capital Markets Officer for [redacted]. [redacted] Organization working to empower [redacted] to preserve their profession, create community and build wealth. [redacted] has experienced exceptional growth since its inception, now including 800+ locations.

I first met Joshua Biering in April 2018 while he served as a private banker at JPMorgan Private Bank. I engaged him for both personal banking and investment-advisory services and worked with him directly on investment proposals and account strategies.

At that time, I was Chief Financial Officer of [redacted] and led its 2018 initial public offering. Joshua Biering and his partner, [redacted] represented JPMorgan and acted as the primary financial advisors and bankers to me and other senior [redacted] executives.

In April 2022, I introduced Joshua Biering to executives and shareholders at [redacted] I personally participated in meetings where he discussed personal banking, investment-advisory services, and complex lending solutions with [redacted] leadership.

I have discussed with other [redacted] executives my advisory relationship with Joshua Biering since he moved to Raymond James. [redacted] has expressed repeated concerns that Raymond James could not provide the capacity required to support [redacted] needs or the

needs of the executives' and major investors' personal financial situations. Further during these conversations, [redacted] executives and major shareholders — including the founder of [redacted] and its President — expressed concerns about the circumstances of Joshua Biering's departure from JPMorgan and Raymond James's limited capabilities.

It is clear to me based on these discussions that because of these concerns, [redacted] executives and major shareholders did not transfer their personal banking or investment-advisory relationships to Joshua Biering at Raymond James.

[redacted] has not used Joshua Biering (following his resignation from the JP Morgan Private Bank) or Raymond James for any financial services.

I have served on the board of [redacted] Fort Worth since 2019, alongside Joshua Biering. At the November 11, 2023 Gala, I reviewed the official guest list and confirmed Joshua Biering's table included John [redacted] David [redacted] and Michael Parrelly, who was a financial advisor at Merrill Lynch. My role as Chairman required me to approve table configurations, and Mr. Parrelly introduced himself as Joshua Biering's future partner at Merrill Lynch.

My name is [redacted], my date of birth is [redacted] and my address is [redacted] I declare under penalty of perjury that the foregoing is true and correct."

Executed in Tarrant County, State of Texas, on the 5th day of September, 2025.

[redacted]

9/5/2025

# Comparator Materials

**App. 0858-0883**

BrokerCheck and IAPD comparator records.

# BrokerCheck Report

[redacted]

CRD# [redacted]



| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 8 |
| Registration and Employment History | 10 - 11 |



When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.

**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
-

**Thank you for using FINRA BrokerCheck.**

Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

[redacted]

CRD# [redacted]

**Currently employed by and registered with the following Firm(s):**

IA **J.P. MORGAN SECURITIES LLC**
1900 N. Akard St.
5th and 6th Fl.
Dallas, TX 75201
CRD# 79
Registered with this firm since: 02/27/2024

B **J.P. MORGAN SECURITIES LLC**
1900 N. Akard St.
5th and 6th Fl.
Dallas, TX 75201
CRD# 79
Registered with this firm since: 10/05/2017

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**

- 28 Self-Regulatory Organizations
- 53 U.S. states and territories

**This broker has passed:**

- 2 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 2 State Securities Law Exams

## Registration History

**This broker was previously registered with the following securities firm(s):**

B **FIDELITY INVESTMENTS INSTITUTIONAL SERVICES COMPANY, INC.**
CRD# 17507
WESTLAKE, TX
08/2015 - 09/2017

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker? **No**

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 28 SROs and is licensed in 53 U.S. states and territories through his or her employer.**

### Employment 1 of 1

Firm Name: **J.P. MORGAN SECURITIES LLC**

Main Office Address: **270 PARK AVENUE**
**NEW YORK, NY 10017**

Firm CRD#: **79**

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | 24X National Exchange LLC | General Securities Representative | Approved | 10/31/2025 |
| B | BOX Exchange LLC | General Securities Representative | Approved | 10/05/2017 |
| B | BOX Exchange LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe BYX Exchange, Inc. | General Securities Representative | Approved | 02/05/2025 |
| B | Cboe BZX Exchange, Inc. | General Securities Representative | Approved | 02/05/2025 |
| B | Cboe C2 Exchange, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | Cboe C2 Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe EDGA Exchange, Inc. | General Securities Representative | Approved | 07/24/2023 |
| B | Cboe EDGA Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe EDGX Exchange, Inc. | General Securities Representative | Approved | 07/24/2023 |
| B | Cboe EDGX Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe Exchange, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | Cboe Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | FINRA | General Securities Representative | Approved | 10/05/2017 |
| B | FINRA | General Securities Sales Supervisor | Approved | 09/25/2023 |

�2026 FINRA. All rights reserved. Report about [redacted]

## Employment 1 of 1, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Investors' Exchange LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Long-Term Stock Exchange, Inc. | General Securities Representative | Approved | 04/27/2020 |
| B | MEMX LLC | General Securities Representative | Approved | 02/16/2021 |
| B | MEMX LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | MIAX Emerald, LLC | General Securities Representative | Approved | 03/19/2019 |
| B | MIAX Emerald, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | MIAX PEARL, LLC | General Securities Representative | Approved | 07/24/2023 |
| B | MIAX PEARL, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | MIAX Sapphire | General Securities Representative | Approved | 09/23/2024 |
| B | MIAX Sapphire | General Securities Sales Supervisor | Approved | 09/23/2024 |
| B | Miami International Securities Exchange, LLC | General Securities Representative | Approved | 07/24/2023 |
| B | Miami International Securities Exchange, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | NYSE American LLC | General Securities Representative | Approved | 10/05/2017 |
| B | NYSE American LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | NYSE Arca, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | NYSE Arca, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | NYSE National, Inc. | General Securities Representative | Approved | 05/18/2018 |
| B | NYSE National, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | NYSE Texas, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | NYSE Texas, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq GEMX, LLC | General Securities Representative | Approved | 10/05/2017 |

�2026 FINRA. All rights reserved. Report about [redacted]

## Employment 1 of 1, continued

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | Nasdaq GEMX, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq ISE, LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq ISE, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq MRX, LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq MRX, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq PHLX LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq PHLX LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq Stock Market | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq Stock Market | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq Texas, LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq Texas, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | New York Stock Exchange | General Securities Representative | Approved | 10/05/2017 |
| B | New York Stock Exchange | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Texas Stock Exchange LLC | General Securities Representative | Approved | 07/02/2026 |

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Alabama | Agent | Approved | 10/05/2017 |
| B | Alaska | Agent | Approved | 10/05/2017 |
| B | Arizona | Agent | Approved | 10/05/2017 |
| B | Arkansas | Agent | Approved | 10/05/2017 |
| B | California | Agent | Approved | 10/05/2017 |
| B | Colorado | Agent | Approved | 10/05/2017 |

�2026 FINRA. All rights reserved. Report about [redacted]

## Employment 1 of 1, continued

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Connecticut | Agent | Approved | 10/05/2017 |
| B | Delaware | Agent | Approved | 10/05/2017 |
| B | District of Columbia | Agent | Approved | 10/05/2017 |
| B | Florida | Agent | Approved | 10/05/2017 |
| B | Georgia | Agent | Approved | 10/05/2017 |
| B | Hawaii | Agent | Approved | 10/05/2017 |
| B | Idaho | Agent | Approved | 10/05/2017 |
| B | Illinois | Agent | Approved | 10/05/2017 |
| B | Indiana | Agent | Approved | 10/05/2017 |
| B | Iowa | Agent | Approved | 10/05/2017 |
| B | Kansas | Agent | Approved | 10/05/2017 |
| B | Kentucky | Agent | Approved | 10/05/2017 |
| B | Louisiana | Agent | Approved | 10/05/2017 |
| B | Maine | Agent | Approved | 10/05/2017 |
| B | Maryland | Agent | Approved | 10/05/2017 |
| B | Massachusetts | Agent | Approved | 10/05/2017 |
| B | Michigan | Agent | Approved | 10/05/2017 |
| B | Minnesota | Agent | Approved | 10/05/2017 |
| B | Mississippi | Agent | Approved | 10/05/2017 |
| B | Missouri | Agent | Approved | 10/05/2017 |
| B | Montana | Agent | Approved | 10/05/2017 |

�2026 FINRA. All rights reserved. Report about [redacted]

## Employment 1 of 1, continued

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Nebraska | Agent | Approved | 10/05/2017 |
| B | Nevada | Agent | Approved | 10/05/2017 |
| B | New Hampshire | Agent | Approved | 10/05/2017 |
| B | New Jersey | Agent | Approved | 10/05/2017 |
| B | New Mexico | Agent | Approved | 10/05/2017 |
| B | New York | Agent | Approved | 10/05/2017 |
| B | North Carolina | Agent | Approved | 10/09/2017 |
| B | North Dakota | Agent | Approved | 10/05/2017 |
| B | Ohio | Agent | Approved | 10/06/2017 |
| B | Oklahoma | Agent | Approved | 10/05/2017 |
| B | Oregon | Agent | Approved | 10/05/2017 |
| B | Pennsylvania | Agent | Approved | 10/05/2017 |
| B | Puerto Rico | Agent | Approved | 10/05/2017 |
| B | Rhode Island | Agent | Approved | 10/05/2017 |
| B | South Carolina | Agent | Approved | 10/05/2017 |
| B | South Dakota | Agent | Approved | 10/05/2017 |
| B | Tennessee | Agent | Approved | 10/05/2017 |
| B | Texas | Agent | Approved | 10/05/2017 |
| IA | Texas | Investment Adviser Representative | Approved | 02/27/2024 |
| B | Utah | Agent | Approved | 10/05/2017 |
| B | Vermont | Agent | Approved | 10/05/2017 |

## Employment 1 of 1, continued

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Virgin Islands | Agent | Approved | 10/05/2017 |
| B | Virginia | Agent | Approved | 10/05/2017 |
| B | Washington | Agent | Approved | 10/05/2017 |
| B | West Virginia | Agent | Approved | 10/05/2017 |
| B | Wisconsin | Agent | Approved | 10/05/2017 |
| B | Wyoming | Agent | Approved | 10/05/2017 |

## Branch Office Locations

**J.P. MORGAN SECURITIES LLC**
1900 N. Akard St.
5th and 6th Fl.
Dallas, TX 75201

�2026 FINRA. All rights reserved. Report about [redacted]

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below. A passed exam or exam waiver does not permit a broker to do business without an active SRO or state registration.

**This individual has passed 2 principal/supervisory exams, 2 general industry/product exams, and 2 state securities law exams.**

### Principal/Supervisory Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | General Securities Sales Supervisor - Options Module Examination | Series 9 | 09/25/2023 |
| B | General Securities Sales Supervisor - General Module Examination | Series 10 | 08/24/2023 |

### General Industry/Product Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B | General Securities Representative Examination | Series 7 | 08/12/2015 |

### State Securities Law Exams

| | Exam | Category | Date |
|---|---|---|---|
| IA | Uniform Investment Adviser Law Examination | Series 65 | 02/20/2024 |
| B | Uniform Securities Agent State Law Examination | Series 63 | 08/21/2015 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

�2026 FINRA. All rights reserved. Report about [redacted]

# Broker Qualifications

## Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

Only professional designations listed in Question 8 of the Form U4 will appear in this section if the appropriate box is checked and verified by the issuing organization at the time of the filing. Learn more about eligible designations at IARD and NASAA.

�2026 FINRA. All rights reserved. Report about [redacted]

# Registration and Employment History

## Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
| --- | --- | --- | --- |
| B 08/2015 - 09/2017 | FIDELITY INVESTMENTS INSTITUTIONAL SERVICES COMPANY, INC. | 17507 | WESTLAKE, TX |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
| --- | --- | --- | --- | --- |
| 09/2017 - Present | JPMORGAN CHASE BANK NA | INVESTMENT SPECIALIST | Y | DALLAS, TX, United States |
| 09/2017 - Present | JPMORGAN SECURITIES LLC | INVESTMENT SPECIALIST | Y | DALLAS, TX, United States |
| 07/2015 - 08/2017 | FIDELITY INVESTMENTS INSTITUTIONAL SERVICES COMPANY, INC | INSIDE SALES REPRESENTATIVE | Y | WESTLAKE, TX, United States |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

Entity Name: Saint Philips School and Community Center
Investment related: No
"Address: 1600 Pennsylvania Ave, Dallas TX 75215
https://www.stphilips1600.org/"
Nature of the other business: Nonprofit
Position/Title/Relationship: Board Member
Start Date: 10/01/2024
Approximate # of hours a week: 0-10
Approximate # of hours during securities trading hours: 0
Briefly describe your duties: Sit on finance committee and General Board. I help advise on budget and financing for the organization. I do not sit on the foundation committee.

�2026 FINRA. All rights reserved. Report about [redacted]

# Registration and Employment History

## Other Business Activities, continued

**End of Report**



**This page is intentionally left blank.**

�2026 FINRA. All rights reserved. Report about [redacted]

# IAPD Report

[redacted] [redacted]

CRD# [redacted]


| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Qualifications | 2 - 8 |
| Registration and Employment History | 9 |


When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.

## IAPD Information About Representatives

IAPD offers information on all current-and many former representatives. Investors are strongly encouraged to use IAPD to check the background of representatives before deciding to conduct, or continue to conduct, business with them.

**What is included in a IAPD report?**

IAPD reports for individual representatives include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards.

It is important to note that the information contained in an IAPD report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

**Where did this information come from?**

The information contained in IAPD comes from the Investment Adviser Registration Depository (IARD) and FINRA's Central Registration Depository, or CRD, (see more on CRD below) and is a combination of:

- information the states require representatives and firms to submit as part of the registration and licensing process, and
- information that state regulators report regarding disciplinary actions or allegations against representatives.

**How current is this information?**

Generally, representatives are required to update their professional and disciplinary information in IARD within 30 days.

**Need help interpreting this report?**

For help understanding how to read this report, please consult NASAA's IAPD Tips page http://www.nasaa.org/IAPD/IARReports.cfm

**What if I want to check the background of an Individual Broker or Brokerage Firm?**

To check the background of an Individual Broker or Brokerage firm, you can search for the firm or individual in IAPD. If your search is successful, click on the link provided to view the available licensing and registration information in FINRA's BrokerCheck website.

**Are there other resources I can use to check the background of investment professionals?**

It is recommended that you learn as much as possible about an individual representative or Investment Adviser firm before deciding to work with them. Your state securities regulator can help you research individuals and certain firms doing business in your state. The contact information for state securities regulators can be found on the website of the North American Securities Administrators Association http://www.nasaa.org

# Report Summary

## [redacted] (CRD# [redacted]

The report summary provides an overview of the representative's professional background and conduct. The information contained in this report has been provided by the representative, investment adviser and/or securities firms, and/or securities regulators as part of the states' investment adviser registration and licensing process. The information contained in this report was last updated by the representative, a previous employing firm, or a securities regulator on **11/10/2025**.

## CURRENT EMPLOYERS

| | Firm | CRD# | Registered Since |
|---|---|---|---|
| B | J.P. MORGAN SECURITIES LLC | CRD# 79 | 10/05/2017 |
| IA | J.P. MORGAN SECURITIES LLC | CRD# 79 | 02/27/2024 |

## QUALIFICATIONS

This representative is currently registered in **28** SRO(s) and **53** jurisdiction(s).

Is this representative currently Inactive or Suspended with any regulator? **No**

**Note:** Not all jurisdictions require IAR registration or may have an exemption from registration.
Additional information including this individual's qualification examinations and professional designations is available in the Detailed Report.

## REGISTRATION HISTORY

This representative was previously registered with the following firm(s):

| | FIRM | CRD# | LOCATION | REGISTRATION DATES |
|---|---|---|---|---|
| B | FIDELITY INVESTMENTS INSTITUTIONAL SERVICES COMPANY, INC. | 17507 | WESTLAKE, TX | 08/12/2015 - 09/07/2017 |

For additional registration and employment history details as reported by the individual, refer to the Registration and Employment History section of the Detailed Report.

## DISCLOSURE INFORMATION

Disclosure events include certain criminal charges and convictions, formal investigations and disciplinary actions initiated by regulators, customer disputes and arbitrations, and financial disclosures such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this representative? **No**

©2026 FINRA. All rights reserved. Report about [redacted] 

## Qualifications

### REGISTRATIONS

This section provides the SRO, states and U.S. territories in which the representative is currently registered and licensed, the category of each registration, and the date on which the registration becomes effective. This section also provides, for each firm with which the representative is currently employed, the address of each location where the representative works.
This individual is currently registered with **53** jurisdiction(s) and 28 SRO(s) through his or her employer(s).

### Employment 1 of 1

Firm Name: **J.P. MORGAN SECURITIES LLC**

Main Address: 270 PARK AVENUE
NEW YORK, NY 10017

Firm ID#: 79

| | Regulator | Registration | Status | Date |
|---|---|---|---|---|
| B | 24X National Exchange LLC | General Securities Representative | Approved | 10/31/2025 |
| B | BOX Exchange LLC | General Securities Representative | Approved | 10/05/2017 |
| B | BOX Exchange LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe BYX Exchange, Inc. | General Securities Representative | Approved | 02/05/2025 |
| B | Cboe BZX Exchange, Inc. | General Securities Representative | Approved | 02/05/2025 |
| B | Cboe C2 Exchange, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | Cboe C2 Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe EDGA Exchange, Inc. | General Securities Representative | Approved | 07/24/2023 |
| B | Cboe EDGA Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe EDGX Exchange, Inc. | General Securities Representative | Approved | 07/24/2023 |
| B | Cboe EDGX Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Cboe Exchange, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | Cboe Exchange, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |

©2026 FINRA. All rights reserved. Report about [redacted] [redacted]

## Qualifications

| | Regulator | Registration | Status | Date |
|---|---|---|---|---|
| B | FINRA | General Securities Representative | Approved | 10/05/2017 |
| B | FINRA | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Investors' Exchange LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Long-Term Stock Exchange, Inc. | General Securities Representative | Approved | 04/27/2020 |
| B | MEMX LLC | General Securities Representative | Approved | 02/16/2021 |
| B | MEMX LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | MIAX Emerald, LLC | General Securities Representative | Approved | 03/19/2019 |
| B | MIAX Emerald, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | MIAX PEARL, LLC | General Securities Representative | Approved | 07/24/2023 |
| B | MIAX PEARL, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | MIAX Sapphire | General Securities Representative | Approved | 09/23/2024 |
| B | MIAX Sapphire | General Securities Sales Supervisor | Approved | 09/23/2024 |
| B | Miami International Securities Exchange, LLC | General Securities Representative | Approved | 07/24/2023 |
| B | Miami International Securities Exchange, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | NYSE American LLC | General Securities Representative | Approved | 10/05/2017 |
| B | NYSE American LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | NYSE Arca, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | NYSE Arca, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |

©2026 FINRA. All rights reserved. Report about [redacted] [redacted]

## Qualifications

| | Regulator | Registration | Status | Date |
|---|---|---|---|---|
| B | NYSE National, Inc. | General Securities Representative | Approved | 05/18/2018 |
| B | NYSE National, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | NYSE Texas, Inc. | General Securities Representative | Approved | 10/05/2017 |
| B | NYSE Texas, Inc. | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq GEMX, LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq GEMX, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq ISE, LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq ISE, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq MRX, LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq MRX, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq PHLX LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq PHLX LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq Stock Market | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq Stock Market | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Nasdaq Texas, LLC | General Securities Representative | Approved | 10/05/2017 |
| B | Nasdaq Texas, LLC | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | New York Stock Exchange | General Securities Representative | Approved | 10/05/2017 |
| B | New York Stock Exchange | General Securities Sales Supervisor | Approved | 09/25/2023 |
| B | Texas Stock Exchange LLC | General Securities Representative | Approved | 07/02/2026 |

## Qualifications

| | Regulator | Registration | Status | Date |
|---|---|---|---|---|
| B | Alabama | Agent | Approved | 10/05/2017 |
| B | Alaska | Agent | Approved | 10/05/2017 |
| B | Arizona | Agent | Approved | 10/05/2017 |
| B | Arkansas | Agent | Approved | 10/05/2017 |
| B | California | Agent | Approved | 10/05/2017 |
| B | Colorado | Agent | Approved | 10/05/2017 |
| B | Connecticut | Agent | Approved | 10/05/2017 |
| B | Delaware | Agent | Approved | 10/05/2017 |
| B | District of Columbia | Agent | Approved | 10/05/2017 |
| B | Florida | Agent | Approved | 10/05/2017 |
| B | Georgia | Agent | Approved | 10/05/2017 |
| B | Hawaii | Agent | Approved | 10/05/2017 |
| B | Idaho | Agent | Approved | 10/05/2017 |
| B | Illinois | Agent | Approved | 10/05/2017 |
| B | Indiana | Agent | Approved | 10/05/2017 |
| B | Iowa | Agent | Approved | 10/05/2017 |
| B | Kansas | Agent | Approved | 10/05/2017 |
| B | Kentucky | Agent | Approved | 10/05/2017 |
| B | Louisiana | Agent | Approved | 10/05/2017 |

©2026 FINRA. All rights reserved. Report about [redacted] [redacted]

## Qualifications

| | Regulator | Registration | Status | Date |
|---|---|---|---|---|
| B | Maine | Agent | Approved | 10/05/2017 |
| B | Maryland | Agent | Approved | 10/05/2017 |
| B | Massachusetts | Agent | Approved | 10/05/2017 |
| B | Michigan | Agent | Approved | 10/05/2017 |
| B | Minnesota | Agent | Approved | 10/05/2017 |
| B | Mississippi | Agent | Approved | 10/05/2017 |
| B | Missouri | Agent | Approved | 10/05/2017 |
| B | Montana | Agent | Approved | 10/05/2017 |
| B | Nebraska | Agent | Approved | 10/05/2017 |
| B | Nevada | Agent | Approved | 10/05/2017 |
| B | New Hampshire | Agent | Approved | 10/05/2017 |
| B | New Jersey | Agent | Approved | 10/05/2017 |
| B | New Mexico | Agent | Approved | 10/05/2017 |
| B | New York | Agent | Approved | 10/05/2017 |
| B | North Carolina | Agent | Approved | 10/09/2017 |
| B | North Dakota | Agent | Approved | 10/05/2017 |
| B | Ohio | Agent | Approved | 10/06/2017 |
| B | Oklahoma | Agent | Approved | 10/05/2017 |
| B | Oregon | Agent | Approved | 10/05/2017 |

## Qualifications

| | Regulator | Registration | Status | Date |
|---|---|---|---|---|
| B | Pennsylvania | Agent | Approved | 10/05/2017 |
| B | Puerto Rico | Agent | Approved | 10/05/2017 |
| B | Rhode Island | Agent | Approved | 10/05/2017 |
| B | South Carolina | Agent | Approved | 10/05/2017 |
| B | South Dakota | Agent | Approved | 10/05/2017 |
| B | Tennessee | Agent | Approved | 10/05/2017 |
| B | Texas | Agent | Approved | 10/05/2017 |
| IA | Texas | Investment Adviser Representative | Approved | 02/27/2024 |
| B | Utah | Agent | Approved | 10/05/2017 |
| B | Vermont | Agent | Approved | 10/05/2017 |
| B | Virgin Islands | Agent | Approved | 10/05/2017 |
| B | Virginia | Agent | Approved | 10/05/2017 |
| B | Washington | Agent | Approved | 10/05/2017 |
| B | West Virginia | Agent | Approved | 10/05/2017 |
| B | Wisconsin | Agent | Approved | 10/05/2017 |
| B | Wyoming | Agent | Approved | 10/05/2017 |

### Branch Office Locations

**J.P. MORGAN SECURITIES LLC**
1900 N. Akard St.
5th and 6th Fl.
Dallas, TX 75201

©2026 FINRA. All rights reserved. Report about [redacted]

# Qualifications

## PASSED INDUSTRY EXAMS

This section includes all industry exams that the representative has passed. Under limited circumstances, a representative may attain registration after receiving an exam waiver based on a combination of exams the representative has passed and qualifying work experience. Likewise a new exam requirement may be grandfathered based on a representative's specific qualifying work experience. Exam waivers and grandfathering are not included below.

**This individual has passed 2 principal/supervisory exams, 2 general industry/product exams, and 2 state securities law exams.**

### Principal/Supervisory Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | General Securities Sales Supervisor - Options Module Examination (S9) | Series 9 | 09/25/2023 |
| B | General Securities Sales Supervisor - General Module Examination (S10) | Series 10 | 08/24/2023 |

### General Industry/Product Exams

| | Exam | Category | Date |
|---|---|---|---|
| B | Securities Industry Essentials Examination (SIE) | SIE | 10/01/2018 |
| B | General Securities Representative Examination (S7) | Series 7 | 08/12/2015 |

### State Securities Law Exams

| | Exam | Category | Date |
|---|---|---|---|
| IA | Uniform Investment Adviser Law Examination (S65) | Series 65 | 02/20/2024 |
| B | Uniform Securities Agent State Law Examination (S63) | Series 63 | 08/21/2015 |

## PROFESSIONAL DESIGNATIONS

This section details that the representative has reported **0** professional designation(s).

No information reported.

Only professional designations listed in Question 8 of the Form U4 will appear in this section if the appropriate box is checked and verified by the issuing organization at the time of the filing. Learn more about eligible designations at IARD and NASAA.

# Registration & Employment History

## PREVIOUSLY REGISTERED WITH THE FOLLOWING FIRMS

This representative held registrations with the following firms:

| | Registration Dates | Firm Name | ID# | Branch Location |
|---|---|---|---|---|
| B | 08/12/2015 - 09/07/2017 | FIDELITY INVESTMENTS INSTITUTIONAL SERVICES COMPANY, INC. | CRD# 17507 | WESTLAKE, TX |

## EMPLOYMENT HISTORY

Below is the representative's employment history for up to the last 10 years.

| Employment Dates | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 09/2017 - Present | JPMORGAN CHASE BANK NA | INVESTMENT SPECIALIST | Y | DALLAS, TX, United States |
| 09/2017 - Present | JPMORGAN SECURITIES LLC | INVESTMENT SPECIALIST | Y | DALLAS, TX, United States |
| 07/2015 - 08/2017 | FIDELITY INVESTMENTS INSTITUTIONAL SERVICES COMPANY, INC | INSIDE SALES REPRESENTATIVE | Y | WESTLAKE, TX, United States |

## OTHER BUSINESS ACTIVITIES

This section includes information, if any, as provided by the representative regarding other business activities the representative is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent, or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious, or fraternal and is recognized as tax exempt.

Entity Name: Saint Philips School and Community Center
Investment related: No
"Address: 1600 Pennsylvania Ave, Dallas TX 75215
https://www.stphilips1600.org/"
Nature of the other business: Nonprofit
Position/Title/Relationship: Board Member
Start Date: 10/01/2024
Approximate # of hours a week: 0-10
Approximate # of hours during securities trading hours: 0
Briefly describe your duties: Sit on finance committee and General Board. I help advise on budget and financing for the organization. I do not sit on the foundation committee.

## End of Report

This page is intentionally left blank.

©2026 FINRA. All rights reserved. Report about [redacted] 

# Energy-Sector and Related Economic Records

**App. 0885-0886**

Energy-prospect business-development record.

**App. 0885**

**From:** JRE [redacted]
**To:** Josh Biering
**Subject:** RE: Follow Up- RE Family >> REDACT
**Date:** Friday, February 2, 2024 6:50:37 PM
**Attachments:** [redacted] BalanceSheet_1.1.2024xlsx.pdf

---

Josh,

Thank you for breakfast this morning. It was exciting to hear about your set up. Attached is my personal balance sheet as of yearend. All of my real estate is still pretty well set up from the low interest rate environment. On the trust side, I was able to move all of my [redacted] shares into a 678 Trust that RED ACT and I are Trustees of so that we can control everything once a liquidation event takes place. On the company side, I can disclose that our NTM EBITDA is ~$600mm.

At this point I'd like to hold off on setting up accounts for anything until I have more insight into a liquidation or distribution event. It's really just a time thing on my end right now given I'm pretty slammed at work. That doesn't mean I don't want to learn more about Raymond James in the meantime. Look forward to touching base on this again soon.

Many Blessings,

JRE [redacted]
REDACTED

[redacted] RE DA [redacted] RED [redacted]
REDACTED

REDACTED [redacted]

---

**From:** Josh Biering <Josh.Biering@RaymondJames.com>
**Sent:** Friday, February 2, 2024 8:55 AM
**To:** JRE DA [redacted] <REDACTED [redacted]
**Subject:** Follow Up- REDA amily >> REDACTED

RE DA -

Great catching up as always and thank you for taking the time. As we discussed- I'd love to continue working with you and your family. I understand there are several moving parts, but I'd be happy to create profiles for you and RED ACT to the extent; a: you care to and b: you want to share with me your onboarding information.

If you want us to take a look and share with you the initial capabilities- I have been very impressed with the client portal/ digital experience.

Furthermore- I'd love to revisit and review the following if you can share?



Exhibit
CX53

- Updated Personal Financial Statement(s)
- Real Estate Schedule in terms of values, mortgage details and rent/tenant info?
- Updated Trust Agreement/terms and any details around the valuation of [redacted]
- The updated financials on [redacted]

Thanks again!

**JOSH D. BIERING**
Senior Vice President, Wealth Management

420 Throckmorton St, Ste 830, Fort Worth, TX 76102
D 817.698.4908 | C 682.218.6738 | TF 800.311.4558 | F 817.332.7297
Josh.Biering@RaymondJames.com | www.threebearadvisory.com

***Click Here** for considerations when transferring your investment portfolio.*

Raymond James & Associates, Inc. member NYSE/SIPC.

Please visit http://raymondjames.com/smrja.htm for Additional Risk and Disclosure Information. Raymond James does not accept private client orders or account instructions by email. This email: (a) is not an official transaction confirmation or account statement; (b) is not an offer, solicitation, or recommendation to transact in any security; (c) is intended only for the addressee; and (d) may not be retransmitted to, or used by, any other party. This email may contain confidential or privileged information; please delete immediately if you are not the intended recipient. Raymond James monitors emails and may be required by law or regulation to disclose emails to third parties.

Investment products are: Not deposits. Not FDIC Insured. Not guaranteed by the financial institution. Subject to risk. May Lose Value.

This may constitute a commercial email message under the CAN-SPAM Act of 2003. If you do not wish to receive marketing or advertising related email messages from us, please reply to this message with “unsubscribe” in your response. You will continue to receive emails from us related to servicing your account(s).

# State-Agency Inquiry Materials

**App. 0888-0895**

Raymond James multi-state registration inquiries.

JAMES C. KIRKPATRICK
STATE INFORMATION CENTER
(573) 751-4936

JOHN R. ASHCROFT
SECRETARY OF STATE
STATE OF MISSOURI

SECURITIES
(573) 751-4136

January 11, 2024

Raymond James & Associates, Inc.
CRD# 705
Attn: Jean Jumet
880 Carillon Parkway
St. Petersburg, FL 33716

**Re: Joshua D. Biering CRD# 6883842**

Dear Sir/Madam:

The application for agent registration for the above-named applicant ("Applicant") has been reviewed and referred to the Registration Section of the Securities Division.

Please provide the following information:

- For each disclosure, disciplinary action, complaint, arbitration, and/or lawsuit listed on Applicant's Central Registration Depository record, a copy of any applicable statement of claim, petition, complaint, and/or settlement, as well as any amended versions of these documents.
- A comprehensive explanation from Applicant addressing each disclosure, disciplinary action, complaint, arbitration, and/or lawsuit listed on Applicant's Central Registration Depository record.
- If Applicant has any financial disclosures, a personal balance sheet. A copy of this balance sheet was forwarded to the Applicant with the summary suspension letter.

This information will be reviewed by the staff of the Securities Division to determine whether Applicant's registration should be granted. The Commissioner reserves the right to request any additional information that may be necessary to evaluate the application and/or the response(s) provided.

The Commissioner requests that this information be **mailed** within **15 working days** of the date on the Summary Suspension to the address below. Documents sent by email will not be accepted. Please be advised that the Applicant is not yet registered to offer or sell securities in the State of Missouri. If you have any questions, feel free to contact me at (573) 751-4136 or email: Christopher.Branstetter@sos.mo.gov.

Sincerely,

Chris Branstetter
Missouri Securities Division

cc: **Joshua D. Biering**

Exhibit
CX86

JOSH GREEN, M.D.
GOVERNOR | KE KIA'ĀINA

SYLVIA LUKE
LIEUTENANT GOVERNOR | KA HOPE KIA'ĀINA

STATE OF HAWAII | KA MOKUʻĀINA ʻO HAWAIʻI
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
KA ʻOIHANA PILI KĀLEPA
BUSINESS REGISTRATION DIVISION
SECURITIES COMPLIANCE BRANCH
335 MERCHANT STREET, ROOM 205, HONOLULU, HAWAII 96813
P.O. BOX 40, HONOLULU, HAWAII 96810
Phone Number: (808) 586-2722
Fax Number: (808) 587-7559
Investing.hawaii.gov

NADINE Y. ANDO
DIRECTOR | KA LUNA HO'OKELE

DEAN I HAZAMA
DEPUTY DIRECTOR | KA HOPE LUNA HO'OKELE

TY Y. NOHARA
COMMISSIONER OF SECURITIES

January 12, 2024

JEAN JUMET,
VP, COMPLIANCE
RAYMOND JAMES & ASSOCIATES, INC.
880 CARILLON PKWY
ST. PETERSBURG, FL 33716

**RE: JOSHUA D. BIERING, CRD #6883842**

Dear Ms. Jumet:

Pursuant to the pending securities salesperson application (via the Web CRD) of the above-mentioned applicant, please be advised;

We are requesting the applicant provide a **detailed comprehensive written explanation** and **"Status"** of the facts and circumstances surrounding the following case(s):

Occurrence: #2204024 – FLOYD THOMAS BRADSHAW (Customer Complaint)

This includes copies of the following:
- ❑ **The actual complaint form**
- ❑ **All correspondence between applicant, case named firm, regulatory organization and claimant {DO NOT send any e-mail correspondence}**

**NOTE: Agent's written explanation letter must be current dated, signed and address to the undersigned and/or the State of Hawaii – Dept. of Commerce & Consumer Affairs/Securities Compliance Branch**

Furthermore, if any **"T_NOREG" or "ABANDONED"** status should appear on the individual's CRD file, the individual will need to provide our office with a written explanation on why it appears. Who filed the U-5(s) and was it effected at the applicable State(s) request? This response shall also include copies of all types of correspondences (withdrawal types and/or those requesting additional information) which the applicable "ABANDONED" State(s) may have sent the firm with regards to the individual's (at the time) pending application. If no correspondence was sent the individual will need to confirm it in writing or his/her response will be deemed insufficient.

We will allow 30 days from the date of this memo to comply with the above request and to submit all of the requested item(s) along with a cover letter from the firm's contact person or in which to voluntarily withdraw the referenced application (please provide our office with a copy of the U-5 as filed with CRD). Should the firm not comply within the given time frame, the referenced application may be terminated by our office and via CRD for noncompliance.

Exhibit
CX87

COLORADO
Department of
Regulatory Agencies
Division of Securities

1560 Broadway, Suite 900, Denver, CO 80202-5150
Tung Chan, Securities Commissioner

Sent By Electronic Mail: JEAN.JUMET@RAYMONDJAMES.COM

January 17, 2024

Raymond James & Associates, Inc.
Compliance, Licensing, and Registrations
Jean Jumet, Vice President Compliance
880 Carillon Parkway
St. Petersburg, FL 33716

To Whom It May Concern:

The staff of the Colorado Division of Securities ("the Division") has received an application filed on the Central Registration Depository/Investment Adviser Registration Depository ("CRD/IARD"), submitted on behalf of **Joshua D. Biering, CRD No. 6883842** ("the applicant"), to become a sales representative, in Colorado, with the firm. The application was received on **January 11, 2024.** Before the staff makes any recommendations regarding this application, we request that you provide the following information:

1. A written description of any special supervisory procedures the applicant will be subject to at the firm. Provide the names and the CRD numbers of his/her supervisor(s). Include a copy of any heightened supervision agreement/plan in place for the applicant. Indicate if the applicant will be working out of a supervised office;
2. Indicate if the applicant is currently under investigation or review by the Financial Industry Regulatory Authority ("FINRA"), including FINRA Rule 8210 inquiries, other federal regulatory authority, or state regulatory authority, if yes, describe the circumstances leading to the investigation or review, and include a copy of all correspondence and/or documentation sent to and from FINRA, other federal regulatory authority, or state regulatory authority and the applicant. Indicate if the applicant is negotiating licensing restrictions and provide a copy of any draft orders or Acceptance, Consent, and Waiver documents. Your response should include, but is not limited to, reportable and unreportable FINRA termination/discharge inquiries, civil, regulatory, and criminal investigations or internal reviews;
3. Indicate if any federal or state regulatory authority, and/or granting authority have placed restrictions and/or conditions on any professional and/or business license/permit and/or certification, held by the applicant, if yes, identify the license, the permit, and/or the certification and describe the restrictions and/or the conditions. Include a copy of any agreement(s) that govern the restrictions and/or the conditions;
4. Provide a written description of the applicant's duties and responsibilities with the firm;
5. Describe the type of clients the applicant will be working with and describe all the services and all the products the applicant will provide to prospective clients. If the applicant has pre-existing relationships with Colorado residents include the approximate number of individuals the applicant wants to provide services to, through your firm;
6. A detailed written statement, signed by the applicant explaining any historical, archived, pending, or outstanding customer complaints, regulatory actions, internal reviews, discharges, terminations, bankruptcies, liens, Form U-5 Filings that state the applicant was permitted to resign, and all other

reportable events. Explain any delay in disclosing the event on CRD. Include all documentation regarding the event from the terminating firm, the party conducting the investigation, FINRA (include STAR #), other regulatory authority, complaining party, lienholder, etc. For liens and judgments, include the current amounts owed and copies of payment agreements;

7. Indicate if the applicant has any unpaid arbitration awards, settlements, and/or judgements, if yes, provide a written statement from the applicant explaining why the amounts are outstanding;
8. Indicate if the applicant has any unpaid state and/or federal regulatory fees and/or fines, if yes, provide a written statement from the applicant explaining why the amounts are outstanding; and
9. Provide the reason the applicant has applied to be licensed in Colorado.

Be advised, pursuant to section 11-51-403(1), C.R.S., the staff deems this application incomplete, and the application will remain incomplete until all additional information required by the securities commissioner has been submitted by the applicant and the firm. All filings submitted to the Division are subject to review by the Division and may bring about additional questions. The requested information should be provided to the Division by **February 16, 2024**.

Please submit materials electronically to the Division at **dora_securities_licensing@state.co.us**. Kindly include the applicant's name and CRD number in the subject line of the email.

You may withdraw this application in lieu of supplying the information requested in this letter. You may contact me directly with questions.

Respectfully,

Annastasia Valencia
Securities Examiner
Colorado Division of Securities

**The Commonwealth of Massachusetts**
William Francis Galvin, Secretary of the Commonwealth
Securities Division

January 19, 2024

Raymond James & Associates, Inc.
Attn: Jean Jumet
880 Carillon Parkway
St. Petersburg, Florida 33716-

**VIA EMAIL TO JEAN.JUMET@RAYMONDJAMES.COM**

Re: Joshua Biering (CRD No. 6883842)

Dear Jean Jumet:

The Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts (the "Division") enforces the Massachusetts Uniform Securities Act, MASS. GEN. LAWS ch. 110A, and the regulations promulgated thereunder, 950 MASS. CODE REGS. 10.00, *et seq*. The application of Joshua Biering (the "Applicant") for registration in Massachusetts as an agent of Raymond James & Associates, Inc. (the "Firm") is currently under review by the Division. The Division requires that the Firm submit the following information:[1]

1. Please broadly describe the type(s) of business the Applicant intends to conduct in Massachusetts including, but not limited to, any securities, investment advisory, and insurance business. Additionally, please answer the following specific questions about the Applicant's intended securities business in Massachusetts:

    a. How many Massachusetts customer accounts does the Applicant expect to service;

---

[1] Based on the information provided on the Central Registration Depository, the Division is not currently able to allow the Applicant's registration as an agent of the Firm. Accordingly, the Division submits this request to gather additional information to further its review of the application. **Merely reiterating what is disclosed in Form U4 will be deemed an insufficient and incomplete response to this letter.**



Exhibit
CX89

b. What percentage of the Applicant's anticipated Massachusetts customer base will be derived from existing customers of the Firm, from customers whom the Applicant has previously serviced, from referrals, from cold-calling, or from other sources;
c. Will the Applicant be allowed or required to cold-call;
d. Will the Firm allow the Applicant to handle accounts on a discretionary basis;
e. Will the Applicant have any supervisory or managerial responsibilities;
f. If applicable, will Applicant be seeking to register as an investment adviser representative;
g. Identify how the Applicant will be compensated (i.e., salary, commissions, bonus); and
h. At what location will the Applicant conduct securities business?

2. Please provide the name, business address, and CRD number of the individual who will be responsible for supervising the Applicant's securities sales practices with respect to Massachusetts customers. **This individual must also be registered as an agent in Massachusetts pursuant to 950 CMR 14.401.**

3. In connection with its review, the Division has noted the following disclosure(s) for which additional information is necessary:

| | Event Date | Date First Disclosed | Occurrence ID | Occurrence Type |
|---|---|---|---|---|
| a. | 04/13/2022 | 05/12/2022 | 2204024 | Customer Complaint |
| b. | 03/09/2018 | 05/03/2018 | 1977589 | Bankruptcy |
| c. | 03/09/2018 | 05/03/2018 | 1977590 | Bankruptcy |
| d. | 03/09/2018 | 05/03/2018 | 1977591 | Bankruptcy |
| e. | 03/09/2018 | 05/03/2018 | 1977592 | Bankruptcy |
| f. | 03/09/2018 | 05/03/2018 | 1977593 | Bankruptcy |

4. For each customer complaint disclosure listed above, please provide:

a. a copy of the complaint and the response of the firm employing the Applicant at the time of the filing of the complaint, if any;

b. a copy of any writing made by the Applicant (submitted to the firm or customer) in response to the complaint, if any;

c. a written statement, signed by the Applicant, explaining the circumstances surrounding the complaint; and

d. if the matter has been resolved, please provide complete details with respect to the resolution of the complaint, including a copies of any releases, settlement agreements, findings of fact, or final decisions. If the matter has not been resolved, please describe its present status.

5. For each bankruptcy/compromise disclosure listed above, provide a written statement, signed by the Applicant, in which the circumstances surrounding the action, are fully described.

6. Provide any and all documents referencing, reflecting or memorializing the settlement or discharge of debts involved in the bankruptcy/compromise explained in response to the paragraph above. If this matter is ongoing, provide an explanation as to the status of the matter. This explanation should include details regarding what agreements were reached regarding repayment and what amounts have been repaid to date.

7. For any disclosure incident that was not disclosed in a timely manner (within 30 days of occurrence) provide an explanation as to why the disclosure was late.

8. Please have Applicant fill out the enclosed financial disclosure form.

9. In regards to the termination J.P. Morgan Securities LLC, please provide a written statement signed by the Applicant, in which the Applicant fully describes the circumstances surrounding the termination.

10. Please provide copies of all documents pertaining to the termination, including, but not limited to, all documents reflecting, referencing or memorializing any findings of fact or final determinations made by the firm or any of its agents investigating the activities of the Applicant regarding the termination. Additionally, provide copies of all correspondence exchanged between the company and the Applicant related to the events leading up to the termination.

11. Please state whether the Applicant has been the subject of any of the following matters. If so, please provide complete details. **Please note**, the Division requires disclosure of each matter **regardless of whether the matter would have to be reported on Form U4 or Form U5**. However, no response is required for any matter which has already been disclosed on Form U4 or Form U5.

    a. An inquiry or investigation by any securities regulatory agency or self-regulatory organization;
    b. Any agreement with, or order entered by, any state securities agency or administrator whereby any conditions or restrictions were placed on the Applicant's registration as an agent, the Applicant's agent application was denied or withdrawn, or the Applicant agreed not to apply for registration for any period of time;
    c. An internal investigation by the Firm or any broker-dealer or investment adviser with which the Applicant was formerly associated; and
    d. A customer complaint, arbitration proceeding, or securities related litigation.

12. Please describe the supervisory procedures that the Firm will employ to monitor the Applicant's sales practices. Please note that the Division is <u>not</u> requesting the Firm's supervisory manual. In addition, identify whether the Applicant is subject to any heightened supervision, enhanced supervision, and/or special supervision.

**Please submit your response by 2/5/2024**

Please send responses by email to **broker.dealer@sec.state.ma.us**. Failure to comply with this request may delay review of the Applicant's application for registration.

If you are unable to file a complete response by the above date, please complete the attached Deferral Request Form by **12:00 p.m. noon, EST on 2/5/2024**. In lieu of responding to this request for information, the Division will accept the withdrawal of the Applicant's application for registration as an agent of the Firm in Massachusetts. If the Firm does withdraw the Applicant's Application, please notify the Division of the withdrawal at broker.dealer@sec.state.ma.us.

The Division will resume its review of the Applicant's application upon receipt of the requested information. Should the Firm have any questions regarding this matter, a representative of the Firm may email broker.dealer@sec.state.ma.us or call Antonio Espinoza, Esq., the individual reviewing this application, at (617) 727-3548.

Res, ectfull, ,

*Amelia Tarallo*

Amelia Tarallo
Registration, Inspections, Compliance and Examinations (RICE) Section

Enclosure

# Damages and Mitigation Records

**App. 0897-0908**

Spindler damages analysis.

## Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.

### Summary of Total Damages

| Joshua Biering | | | |
|---|---|---|---|
| Event | Date | Age at Date | Source |
| DOB | 10/23/1989 | | As per counsel |
| Employment Start Date - JPM | 5/23/2016 | 26.58 | BIERING 917 |
| Employment End Date - JPM | 10/28/2023 | 34.01 | Second Amended Statement of Claim filed October 11, 2024 |
| U5 Date | 12/22/2023 | 34.16 | U5 BIERING 1259-63 |
| Biering Contacts Merrill Lynch After | 12/1/2023 | 34.11 | Second Amended Statement of Claim filed October 11, 2024 |
| Employment Start Date - RJ | 1/11/2024 | 34.22 | Offer Letter BIERING 1289-94 |
| Forecasted Retirement | 10/23/2056 | 67.00 | Retirement age assumed to be 67, see social security guidelines, ssa.gov. |
| Arbitration Date | 9/23/2025 | 35.92 | As per counsel |

| Summary of Damages | | | |
|---|---|---|---|
| Damage Element | Total Net Present Value of Cash Flows - Base Case | Total Net Present Value of Cash Flows - Assuming Additional Investment from Identified Investors | Reference |
| **Lost Earnings** | **$ 22,719,882** | **$ 29,993,659** | *Schedule 2; Schedule 4* |
| **Less: Mitigation** | **$ 12,035,470** | **$ 12,035,470** | *Schedule 3* |
| Total Damages | $ 10,684,413 | $ 17,958,189 | |

Note: Calculations subject to change in anticipation of additional document production.

Exhibit
CX30

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Total Lost Earnings Detail**

| | | Date |
|---|---|---|
| [1] | Date of Birth | 1989 |
| | Date of U5 | 12/22/2023 |
| | Discount Period Start Date | 9/23/2025 |

| | | |
|---|---|---|
| CPI-U and CPI-U Medical for Benefits Growth | 3.00% | [2] |
| Benefits - Other | 1.45% | [2] |
| Discount Rate | 2.6% | [3] |
| Growth Rate | 9.5% | [4] |

| Description | | | | | | Forecasted Period | | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mid-Point for PV and Mortality Factor | 7/1/2020 | 7/2/2021 | 7/2/2022 | 11/29/2022 | 11/25/2023 | 12/27/2023 | 7/1/2024 | 7/2/2025 | 7/2/2026 | 7/2/2027 | 7/1/2028 | 7/2/2029 | 7/2/2030 | 7/2/2031 | 7/1/2032 | 7/2/2033 | 7/2/2034 | |
| Year | 2020 | 2021 | 2022 | 2023 | 2023 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | |
| | 1/1/2020 | 1/1/2021 | 1/1/2022 | 1/1/2022 | 10/29/2023 | 12/23/2023 | 1/1/2024 | 1/1/2025 | 1/1/2026 | 1/1/2027 | 1/1/2028 | 1/1/2029 | 1/1/2030 | 1/1/2031 | 1/1/2032 | 1/1/2033 | 1/1/2034 | Sum of |
| **Description** | 12/31/2020 | 12/31/2021 | 12/31/2022 | 10/28/2023 | 12/22/2023 | 12/31/2023 | 12/31/2024 | 12/31/2025 | 12/31/2026 | 12/31/2027 | 12/31/2028 | 12/31/2029 | 12/31/2030 | 12/31/2031 | 12/31/2032 | 12/31/2033 | 12/31/2034 | Forecasted Period |
| [5] Earnings for Year | 175,157 | 194,434 | 315,098 | 319,491 | - | - | 2,020,764 | 1,765,993 | 1,765,993 | 1,765,993 | 2,838,589 | 1,933,462 | 2,116,813 | 2,317,551 | 2,537,325 | 2,777,940 | 3,041,372 | $ **24,881,793** |
| Portion of Year | | | | | | 0.02 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Total Gross Income for Portion of Year** | | | | | | - | **2,020,764** | **1,765,993** | **1,765,993** | **1,765,993** | **2,838,589** | **1,933,462** | **2,116,813** | **2,317,551** | **2,537,325** | **2,777,940** | **3,041,372** | **24,881,793** |
| [6] Lost Benefits - Health and GTL for Portion of Year | | | | | | - | 6,823 | 7,028 | 7,239 | 7,239 | 14,912 | 15,359 | 15,820 | 16,294 | 16,783 | 17,287 | 17,805 | |
| Lost Benefits - Social Security | | | | $ 9,932 | | | 10,453 | 10,918 | 11,359 | 11,818 | 12,296 | 12,793 | 13,310 | 13,848 | 14,407 | 14,989 | 15,595 | |
| Lost Benefits - Other | | | | | | - | 29,301 | 25,607 | 25,607 | 25,607 | 41,160 | 28,035 | 30,694 | 33,604 | 36,791 | 40,280 | 44,100 | |
| **Total Lost Benefits for Portion of Year** | | | | | | - | **46,577** | **43,553** | **44,205** | **44,664** | **68,367** | **56,187** | **59,823** | **63,746** | **67,981** | **72,556** | **77,500** | **645,160** |
| **Total Earnings (Undiscounted)** **a** | | | | | | **$ -** | **$ 2,067,341** | **$ 1,809,545** | **$ 1,810,197** | **$ 1,810,657** | **$ 2,906,956** | **$ 1,989,649** | **$ 2,176,636** | **$ 2,381,297** | **$ 2,605,306** | **$ 2,850,496** | **$ 3,118,873** | **$ 25,526,953** |
| Discount Rate | | | | | | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | |
| Discount Period (mid-period convention) | | | | | | (1.7413) | (1.2279) | (0.2272) | 0.7721 | 1.7714 | 2.7721 | 3.7728 | 4.7721 | 5.7714 | 6.7721 | 7.7728 | 8.7721 | |
| Present Value Factor **b** | | | | | | 1.0000 | 1.0000 | 1.0000 | 0.9805 | 0.9559 | 0.9318 | 0.9084 | 0.8855 | 0.8633 | 0.8416 | 0.8204 | 0.7998 | |
| [7] Mortality Factor **c** | | | | | | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 0.9979 | 0.9956 | 0.9933 | 0.9909 | 0.9885 | 0.9859 | 0.9833 | 0.9805 | |
| **Present Value of Total Earnings** **d = a * b *c** | | | | | | **$ -** | **$ 2,067,341** | **$ 1,809,545** | **$ 1,774,944** | **$ 1,727,056** | **$ 2,696,943** | **$ 1,795,270** | **$ 1,910,029** | **$ 2,032,049** | **$ 2,161,658** | **$ 2,299,362** | **$ 2,445,684** | **$ 22,719,882** |

[1] Relevant dates as per Schedule 1; discount period start date assumed to be arbitration date.
[2] See Schedule 2.1 for value of benefits as a percentage of income and Schedule 2.2 for CPI-U CAGR for benefits cost increase.
[3] See Schedule 2.2 for Series Rate Data. For the discount rate assumption, we analyzed the average 10-year treasury rate over the last 15 years.
[4] See Schedule 2.1 for wage information and CAGR. CAGR used is the 2021-2023 CAGR for JPM T12 Production.
[5] See Schedule 2.1 for wage information and CAGR. Earnings follow pro-forma calculation in Schedule 2.4 for years one to five, then grown annually (using compensation only from year five and not retention bonus) using growth rate descr bed in note 4.
[6] See Schedule 2.1 for calculation of benefits.
[7] See Schedule 2.3 for life tables used to calculate mortality factor.

Schedule 2.1

**App. 0899**

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Summary of JPM Earnings**

**W2s**

**JPM W2s and Paystub (see chart below)**

| Term Begin | Term End | Year | Years | Gross Pay | GTL (box 12a - C) | 401K (box 12b - D) | Healthcare Costs (box 12c - DD) | Wages, tips other comp (box 1) | Social Security Wages (box 3) | Medicare Wages (box 5) | Gross Pay (Annualized) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/2016 | 12/31/2016 | 2016 | 1 00 | $ 85,307 | $ 21 | $ 1,500 | $ 3,855 | $ 83,807 | $ 85,307 | $ 85,307 | $ 85,307 |
| 1/1/2017 | 12/31/2017 | 2017 | 1 00 | $ 113,362 | $ 36 | $ 4,539 | $ 7,147 | $ 108,824 | $ 113,362 | $ 113,362 | $ 113,362 |
| 1/1/2018 | 12/31/2018 | 2018 | 1 00 | $ 138,624 | $ 36 | $ 6,500 | $ 7,498 | $ 132,124 | $ 128,400 | $ 138,624 | $ 138,624 |
| 1/1/2019 | 12/31/2019 | 2019 | 1 00 | $ 153,016 | $ 48 | $ 6,729 | $ 7,540 | $ 146,286 | $ 153,016 | $ 153,016 | $ 153,016 |
| 1/1/2020 | 12/31/2020 | 2020 | 1 00 | $ 175,157 | $ 48 | $ 9,188 | $ 7,834 | $ 165,969 | $ 137,700 | $ 175,157 | $ 175,157 |
| 1/1/2021 | 12/31/2021 | 2021 | 1 00 | $ 194,434 | $ 48 | $ 10,500 | $ 8,215 | $ 183,934 | $ 142,800 | $ 194,434 | $ 194,434 |
| 1/1/2022 | 12/31/2022 | 2022 | 1 00 | $ 315,098 | $ 48 | $ 13,708 | $ 8,605 | $ 301,390 | $ 147,000 | $ 315,098 | $ 315,098 |
| 1/1/2023 | 10/28/2023 | 2023 | 0 83 | $ 319,491 | $ 46 | $ 14,292 | $ 9,330 | $ 305,199 | $ 160,200 | $ 319,491 | $ 387,262 |
| | | | **7.8** | **$ 1,494,489** | **$ 331** | **$ 66,955** | **$ 60,025** | **$ 1,427,534** | **$ 1,067,785** | **$ 1,494,489** | **$ 1,562,260** |
| | | | | | | | | **CAGR 2016-2023** | **7** | | **25%** |
| | | | | | | | | **CAGR 2016-2022** | **6** | | **24%** |
| | | | | | | | | **CAGR 2019-2023** | **4** | | **27%** |
| | | | | | | | | | | Average | **26%** |

*Source: JPMS 30-41 for 2016-2022 W2s, BIERING 5053-5054 for 2023 W2.*

**Paystubs**

**JPM Paystubs**

| | | | EARNINGS | YTD Amt | Annual Amt | TAXES | YTD Amt | Annual Amt | DEDUCTIONS | YTD Amt | Annual Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Term Begin | | 1/1/2023 | Paid Admin Leave | $ 37,500 | $ 41,033 | FIT Withheld | $ 54,293 | $ 59,409 | 401K Per Pay Contribution | $ 15,008 | $ 16,422 |
| Term End | | 11/30/2023 | Regular Salary | $ 197,760 | $ 216,394 | Social Security Employee Withheld | $ 9,932 | $ 10,868 | Medical | $ 2,046 | $ 2,239 |
| Years | | 0 9 | Annual Cash Incentive Award | $ 104,000 | $ 113,799 | Medicare Employee Withheld | $ 5,898 | $ 6,453 | Dental PPO | $ 751 | $ 822 |
| BASE RATE | $ | 225,000 | SCK Sick Entitlement Payment | $ 6,406 | $ 7,010 | **Taxes Total** | **$ 70,123** | **$ 76,731** | Vision Plan | 222 2 | $ 243 |
| **SUMMARY** | **YTD Amt** | **Annual Amt** | RSU 1 | $ 2,644 | $ 2,893 | | | | CECARE Child Elder Care Act | $ 1,848 | $ 2,022 |
| Gross Pay | $ 331,865 | $ 363,135 | SCK Sick Entitlement Retroactive | $ 2,180 | $ 2,386 | | | | 401K Loan Repayment | $ 8,389 | $ 9,180 |
| Total Taxes | $ 70,123 | $ 76,731 | LTIP Dividends US | $ 1,452 | $ 1,589 | | | | LTD Long Term Disability | $ 584 | $ 639 |
| Total Deductions | $ 31,975 | $ 34,988 | Regular Salary Retroactive | $ (2,180) | $ (2,386) | | | | Group Legal | $ 124 | $ 135 |
| Net Pay | $ 229,766 | $ 251,416 | UPD Unpaid Reduced Payment LOA | $ (17,898) | $ (19,584) | | | | RSU Net Value 1 | $ 1,670 | $ 1,827 |
| *Source: JPMS 814-815* | | | **Earnings Total** | **$ 331,865** | **$ 363,135** | | | | **Deductions Total** | **$ 30,641** | **$ 33,528** |

**Comp**

**JPM Comp Summaries**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **2022 Compensation** | | **Effective February 1, 2023** | | Source BIERING 917 | 11/20/2023 | 2022 | 2021 | 2023 Annualized | 1/1/2023 |
| Total Comp (Salary + Incentives) | **$ 330,000** | **Recommended Salary** | **$ 225,000** | Base Pay | $ 204,167 | $ 195,833 | $ 150,000 | $ 230,407 | |
| **Salary (as of December 31, 2022)** | $ 200,000 | 2021 | | Overtime | $ - | $ - | $ - | $ - | |
| **Incentive Awards** | **$ 130,000** | **$ 150,000** | | Bonus | $ 104,000 | $ 120,000 | $ 45,000 | $ 117,367 | |
| Cash Incentive | $ 104,000 | $ 120,000 | | Commission | $ - | $ - | $ - | $ - | |
| RSU | $ 26,000 | $ 30,000 | | Stock | $ 2,644 | $ - | $ - | $ 2,984 | |
| | | | | Other | $ 2,143 | $ 1,588 | $ 1,225 | $ 2,418 | |
| *Source: JPMS 821-822, BIERING 1079.* | | | | **TOTAL** | **$ 312,953** | **$ 317,421** | **$ 196,225** | **$ 353,176** | |

**RSU**

**JPM RSUs**

| Award Type | Award Date | # Granted | Number Outstanding | Outstanding Value |
|---|---|---|---|---|
| RSU 90 | 1/17/2023 | 186 | 186 | $ 27,322 |
| RSU 90 | 1/18/2022 | 196 | 196 | $ 28,790 |
| RSU 18-2005 LTIP | 1/19/2021 | 36 | 18 | $ 2,644 |
| RSU 18-2005 LTIP | 1/19/2021 | 1 | - | $ - |
| | | **419** | **400** | **$ 58,756** |

As of 9/13/23

*Source: BIERING 905.*

**XYZ**

**"Hot" Opportunities**

| Name | Amount Rollup | AUM | AUM Potential |
|---|---|---|---|
| XYZ Dental | $ 3,500,000,000 | $ 40,000,000 | $ 250,000,000 |
| XYZ Energy Partners | $ 1,500,000,000 | | $ 400,000,000 |

*Source: Second Amended Statement of Claim filed October 11, 2024, p. 7.*

**Stats**

**JPM Performance**

| Term Begin | Term End | Year | Years | Total Revenue | Annualized Revenue | T12 | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1/1/2020 | 12/31/2020 | 2020 | 1 00 | $ 3,281,500 | $ 3,281,500 | $ 3,281,500 | | | |
| 1/1/2021 | 9/30/2021 | 2021 | 0 75 | $ 2,826,900 | $ 3,783,212 | $ 3,755,700 | | | |
| 1/1/2021 | 12/31/2021 | 2021 | 1 00 | $ 4,262,200 | $ 4,262,200 | $ 4,262,200 | | | |
| 1/1/2022 | 9/30/2022 | 2022 | 0 75 | $ 3,551,300 | $ 4,752,669 | $ 4,726,400 | 11% | | |
| 1/1/2022 | 12/31/2022 | 2022 | 1 00 | $ 4,634,800 | $ 4,634,800 | $ 4,634,800 | -2% | | |
| 1/1/2023 | 9/30/2023 | 2023 | 0 75 | $ 4,011,500 | $ 5,368,550 | $ 5,108,900 | 10% | | |
| | | | | | | | | | |
| 1/1/2020 | 12/31/2020 | 2020 | 1 00 | $ 3,281,500 | YoY Growth | | **T12 Growth** | | |
| 1/1/2021 | 12/31/2021 | 2021 | 1 00 | $ 4,262,200 | 30% | | **T-12 CAGR 2020-2023** | **3** | **16%** |
| 1/1/2022 | 12/31/2022 | 2022 | 1 00 | $ 4,634,800 | 9% | | **T-12 CAGR 2021-2023** | **2** | **9%** |
| 1/1/2023 | 12/31/2023 | 2023 | 1 00 | $ 5,368,550 | 16% | | **T-12 CAGR 2020-2022** | **2** | **19%** |

*Source: JPMS 29293-5.*

**Assets**

**JPM Assets**

| Assets Type ($) | Dec-20 | Dec-21 | Dec-22 | Sep-23 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| AUM | 386,951,603 | 520,536,482 | 476,933,973 | 540,938,510 | | | | | |
| Brkrg | 153,133,403 | 184,055,456 | 209,598,734 | 212,152,421 | | 2020 | | | |
| Dep | 40,312,406 | 60,052,827 | 33,330,731 | 39,410,415 | | 2021 | 39% | 30% | 9% |
| Cust | 0 | 2,662 | 4,616,447 | 4,791,521 | | 2022 | -1% | 9% | -10% |
| T&E Non Mgd | 2,248,671 | 14,542,268 | 13,839,847 | 25,918,145 | | 2023 | 9% | 10% | -1% |
| IRS Annuity Non Mgd | - | - | - | - | | | | | |
| Oth | - | - | - | - | | | | | |
| Lending | 32,573,426 | 64,206,329 | 91,123,619 | 82,307,961 | | | | | |
| Mortg | 21,584,305 | 42,234,945 | 48,704,281 | 53,378,561 | | | | | |
| **Total Assets** | **636,803,814** | **885,630,968** | **878,147,632** | **958,897,535** | | | | | |
| **T-12** | **3,281,500** | **4,262,200** | **4,634,800** | **5,108,900** | Average T-12/Assets | | | | |
| **T-12/Assets** | 0 5% | 0 5% | 0 5% | 0 5% | 0 5% | | | | |
| | | **Assets CAGR 2021-2023** | **2** | **4%** | | | | | |

*Source: JPMS 29293-5.*

**Benefits from W2s**

| **Employer Portion of Benefits** | | |
|---|---|---|
| **Description** | **Employer Portion of Benefits 2020-2023** | |
| Healthcare | $ 25,148 | [1] |
| GTL | $ 190 | |
| | | |
| **Total Employer Portion** | **$ 25,338** | |
| Years | 3 8 | |
| **Total Employer Portion** | **$ 6,624** | |
| | | |
| **Other Benefits** | | |
| Medicare Tax | 1 45% | [2] |
| | | |
| **Total Benefits - Other** | **1.45%** | |

**Social Security Benefits [3]**

| | Growth Factor | Tax Rate | |
|---|---|---|---|
| | 4 04% | 6 2% | |
| Year | Maximum Taxable Earnings | Social Security Tax | |
| 2015 | $ 118,500 | $ 7,347 | |
| 2016 | $ 118,500 | $ 7,347 | |
| 2017 | $ 127,200 | $ 7,886 | |
| 2018 | $ 128,400 | $ 7,961 | |
| 2019 | $ 132,900 | $ 8,240 | |
| 2020 | $ 137,700 | $ 8,537 | |
| 2021 | $ 142,800 | $ 8,854 | |
| 2022 | $ 147,000 | $ 9,114 | |
| 2023 | $ 160,200 | $ 9,932 | |
| 2024 | $ 168,600 | $ 10,453 | 5 24% |
| 2025 | $ 176,100 | $ 10,918 | 4 45% |
| 2026 | $ 183,216 | $ 11,359 | 4 04% |
| 2027 | $ 190,620 | $ 11,818 | 4 04% |
| 2028 | $ 198,322 | $ 12,296 | 4 04% |
| 2029 | $ 206,336 | $ 12,793 | 4 04% |
| 2030 | $ 214,674 | $ 13,310 | 4 04% |
| 2031 | $ 223,349 | $ 13,848 | 4 04% |
| 2032 | $ 232,374 | $ 14,407 | 4 04% |
| 2033 | $ 241,764 | $ 14,989 | 4 04% |
| 2034 | $ 251,534 | $ 15,595 | 4 04% |
| | CAGR for SSA Maximum Taxable Earnings | | |
| 2015 | $ 118,500 | 4 04% | |
| 2025 | $ 176,100 | | |

[1] Employer Portion of Health, Dental, & Vision Insurance is calculated as 74% of the total, see https //www bls gov/news release/pdf/ebs2 pdf, page 13, 500 workers or more

[2] Medicare tax cost to employer is calculated at 1 45% of total wages, see https //www irs gov/taxtopics/tc751# ~ text=The%20current%20tax%20rate%20for,employee%2C%20or%202 9%25%20total

[3] Social Security tax cost to employer is calculated at 6 2% of total wages, see https //www irs gov/taxtopics/tc751# ~ text=The%20current%20tax%20rate%20for,employee%2C%20or%202 9%25%20total; but capped at maximum taxable earnings amount per year, see https //www ssa gov/benefits/retirement/planner/maxtax html Maximum taxable earnings for year 2024 and on are not available yet, and so growth rate of 3 84% (the CAGR for the Maximum Taxable Earnings from 2015 to 2023) is used to project growth out to future

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**
**Market and Industry Research**

**DISCOUNT RATE**

Market yield on U.S. Treasury securities at 10-year constant maturity, quoted on investment basis

| Year | Rate |
|---|---|
| 12/31/2010 | 3.30% |
| 12/31/2011 | 1.89% |
| 12/31/2012 | 1.78% |
| 12/31/2013 | 3.04% |
| 12/31/2014 | 2.17% |
| 12/31/2015 | 2.27% |
| 12/31/2016 | 2.45% |
| 12/31/2017 | 2.40% |
| 12/31/2018 | 2.69% |
| 12/31/2019 | 1.92% |
| 12/31/2020 | 0.93% |
| 12/31/2021 | 1.52% |
| 12/31/2022 | 3.88% |
| 12/31/2023 | 3.88% |
| 12/31/2024 | 4.58% |
| **Average Rate** | **2.58%** |

**Source:**
Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org
DGS10 Market Yield on U.S. Treasury Securities at 10-Year Constant Maturity,
Quoted on an Investment Basis
Frequency: Daily

**CPI-U Medical**

| Year | US |
|---|---|
| 2014 | 464.811 |
| 2015 | 476.178 |
| 2016 | 494.770 |
| 2017 | 506.798 |
| 2018 | 517.802 |
| 2019 | 536.127 |
| 2020 | 562.618 |
| 2021 | 573.060 |
| 2022 | 597.682 |
| 2023 | 595.615 |
| 2024 | 612 |
| **CAGR** | **3%** |

**Source:**
Consumer Price Index for All Urban Consumers: Medical Care Services in U.S. City Average,

Index 1982-1984=100, Annual, Seasonally Adjusted
https://fred.stlouisfed.org/series/CUSR0000SAM2
Series Id: CUSR0000SAM2
Units:
Index 1982-1984=100

**CPI-U**

| Year | US |
|---|---|
| 2014 | 236.736 |
| 2015 | 237.017 |
| 2016 | 240.007 |
| 2017 | 245.120 |
| 2018 | 251.107 |
| 2019 | 255.657 |
| 2020 | 258.811 |
| 2021 | 270.970 |
| 2022 | 292.655 |
| 2023 | 304.702 |
| 2024 | 314 |
| **CAGR** | **3%** |

**Source:**
Consumer Price Index for All Urban Consumers: All Items in U.S. City Average
Index 1982-1984=100,
Seasonally Adjusted
Series Id: CUUR0000SA0
Not Seasonally Adjusted
https://fred.stlouisfed.org/series/CPIAUCSL

Base Period: 1982-84=100
Years: 2014 to 2024

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Life Tables**

https://www.ssa.gov/oact/STATS/table4c6.html

Period Life Table, 2019

| | Male | | | |
|---|---|---|---|---|
| **Exact Age** | **Death Probability** | **Number of Lives** | **Life Expectancy** | |
| 0 | 0.006081 | 100,000 | 76.22 | |
| 1 | 0.000425 | 99,392 | 75.69 | |
| 2 | 0.00026 | 99,350 | 74.72 | |
| 3 | 0.000194 | 99,324 | 73.74 | |
| 4 | 0.000154 | 99,305 | 72.76 | |
| 5 | 0.000142 | 99,289 | 71.77 | |
| 6 | 0.000135 | 99,275 | 70.78 | |
| 7 | 0.000127 | 99,262 | 69.79 | |
| 8 | 0.000116 | 99,249 | 68.79 | |
| 9 | 0.000104 | 99,238 | 67.8 | |
| 10 | 0.000097 | 99,227 | 66.81 | |
| 11 | 0.000106 | 99,218 | 65.82 | |
| 12 | 0.000144 | 99,207 | 64.82 | |
| 13 | 0.00022 | 99,193 | 63.83 | |
| 14 | 0.000323 | 99,171 | 62.85 | |
| 15 | 0.000437 | 99,139 | 61.87 | |
| 16 | 0.000552 | 99,096 | 60.89 | |
| 17 | 0.000675 | 99,041 | 59.93 | |
| 18 | 0.000806 | 98,974 | 58.97 | |
| 19 | 0.000939 | 98,894 | 58.01 | |
| 20 | 0.001079 | 98,802 | 57.07 | |
| 21 | 0.001215 | 98,695 | 56.13 | |
| 22 | 0.001327 | 98,575 | 55.2 | |
| 23 | 0.001406 | 98,444 | 54.27 | |
| 24 | 0.001461 | 98,306 | 53.35 | |
| 25 | 0.001507 | 98,162 | 52.42 | |
| 26 | 0.001557 | 98,014 | 51.5 | |
| 27 | 0.00161 | 97,862 | 50.58 | |
| 28 | 0.001668 | 97,704 | 49.66 | |
| 29 | 0.001732 | 97,541 | 48.74 | |
| 30 | 0.001795 | 97,372 | 47.83 | |
| 31 | 0.001858 | 97,198 | 46.91 | |
| 32 | 0.001923 | 97,017 | 46 | |
| 33 | 0.001992 | 96,830 | 45.09 | |
| 34 | 0.002064 | 96,638 | 44.18 | |
| 35 | 0.002145 | 96,438 | 43.27 | 100.00% |
| 36 | 0.002231 | 96,231 | 42.36 | 99.79% |
| 37 | 0.002316 | 96,017 | 41.45 | 99.56% |
| 38 | 0.002398 | 95,794 | 40.55 | 99.33% |
| 39 | 0.002482 | 95,564 | 39.64 | 99.09% |
| 40 | 0.00258 | 95,327 | 38.74 | 98.85% |
| 41 | 0.002697 | 95,081 | 37.84 | 98.59% |
| 42 | 0.002828 | 94,825 | 36.94 | 98.33% |
| 43 | 0.002976 | 94,557 | 36.04 | 98.05% |
| 44 | 0.003146 | 94,275 | 35.15 | 97.76% |
| 45 | 0.00334 | 93,979 | 34.26 | 97.45% |
| 46 | 0.003567 | 93,665 | 33.37 | 97.12% |
| 47 | 0.003833 | 93,331 | 32.49 | 96.78% |
| 48 | 0.004143 | 92,973 | 31.61 | 96.41% |
| 49 | 0.004499 | 92,588 | 30.74 | 96.01% |
| 50 | 0.00489 | 92,171 | 29.88 | 95.58% |
| 51 | 0.005321 | 91,720 | 29.02 | 95.11% |
| 52 | 0.00581 | 91,232 | 28.18 | 94.60% |
| 53 | 0.006363 | 90,702 | 27.34 | 94.05% |
| 54 | 0.006973 | 90,125 | 26.51 | 93.45% |
| 55 | 0.007629 | 89,497 | 25.69 | 92.80% |
| 56 | 0.008322 | 88,814 | 24.89 | 92.09% |
| 57 | 0.009049 | 88,075 | 24.09 | 91.33% |
| 58 | 0.009806 | 87,278 | 23.31 | 90.50% |
| 59 | 0.010595 | 86,422 | 22.53 | 89.61% |
| 60 | 0.011452 | 85,506 | 21.77 | 88.66% |
| 61 | 0.012358 | 84,527 | 21.01 | 87.65% |
| 62 | 0.013255 | 83,482 | 20.27 | 86.57% |
| 63 | 0.014126 | 82,376 | 19.54 | 85.42% |
| 64 | 0.015006 | 81,212 | 18.81 | 84.21% |
| 65 | 0.016001 | 79,994 | 18.09 | 82.95% |
| 66 | 0.017124 | 78,714 | 17.37 | |
| 67 | 0.018298 | 77,366 | 16.67 | |
| 68 | 0.019519 | 75,950 | 15.97 | |
| 69 | 0.020847 | 74,468 | 15.28 | |
| 70 | 0.022381 | 72,915 | 14.59 | |
| 71 | 0.024185 | 71,283 | 13.91 | |
| 72 | 0.026266 | 69,559 | 13.25 | |
| 73 | 0.02866 | 67,732 | 12.59 | |
| 74 | 0.031401 | 65,791 | 11.95 | |

| | |
|---|---|
| Age at start of discount period | 35.92 |
| Date of Birth | 1989 |
| Discount Period | 9/23/2025 |

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Life Tables**

https://www.ssa.gov/oact/STATS/table4c6.html

Period Life Table, 2019

| | Male | | |
|---|---|---|---|
| **Exact Age** | **Death Probability** | **Number of Lives** | **Life Expectancy** |
| 75 | 0.034618 | 63,725 | 11.32 |
| 76 | 0.038263 | 61,519 | 10.71 |
| 77 | 0.04219 | 59,165 | 10.11 |
| 78 | 0.046367 | 56,669 | 9.54 |
| 79 | 0.050948 | 54,041 | 8.97 |
| 80 | 0.056237 | 51,288 | 8.43 |
| 81 | 0.06236 | 48,404 | 7.9 |
| 82 | 0.069226 | 45,385 | 7.39 |
| 83 | 0.076884 | 42,243 | 6.91 |
| 84 | 0.085452 | 38,996 | 6.44 |
| 85 | 0.095062 | 35,663 | 6 |
| 86 | 0.105829 | 32,273 | 5.57 |
| 87 | 0.117838 | 28,858 | 5.17 |
| 88 | 0.131138 | 25,457 | 4.8 |
| 89 | 0.145751 | 22,119 | 4.45 |
| 90 | 0.161678 | 18,895 | 4.12 |
| 91 | 0.178905 | 15,840 | 3.82 |
| 92 | 0.197408 | 13,006 | 3.54 |
| 93 | 0.217149 | 10,439 | 3.29 |
| 94 | 0.23808 | 8,172 | 3.06 |
| 95 | 0.258821 | 6,226 | 2.86 |
| 96 | 0.278966 | 4,615 | 2.69 |
| 97 | 0.298092 | 3,327 | 2.54 |
| 98 | 0.315762 | 2,336 | 2.4 |
| 99 | 0.33155 | 1,598 | 2.28 |
| 100 | 0.348128 | 1,068 | 2.16 |
| 101 | 0.365534 | 696 | 2.05 |
| 102 | 0.383811 | 442 | 1.94 |
| 103 | 0.403001 | 272 | 1.83 |
| 104 | 0.423151 | 163 | 1.73 |
| 105 | 0.444309 | 94 | 1.63 |
| 106 | 0.466524 | 52 | 1.54 |
| 107 | 0.489851 | 28 | 1.45 |
| 108 | 0.514343 | 14 | 1.37 |
| 109 | 0.54006 | 7 | 1.28 |
| 110 | 0.567063 | 3 | 1.21 |
| 111 | 0.595417 | 1 | 1.13 |
| 112 | 0.625187 | 1 | 1.06 |
| 113 | 0.656447 | 0 | 0.99 |
| 114 | 0.689269 | 0 | 0.92 |
| 115 | 0.723732 | 0 | 0.86 |
| 116 | 0.759919 | 0 | 0.8 |
| 117 | 0.797915 | 0 | 0.74 |
| 118 | 0.837811 | 0 | 0.68 |
| 119 | 0.879701 | 0 | 0.63 |

a Probability of dying within one year.

b Number of survivors out of 100,000 born alive.

Note: The period life expectancy at a given age for 2019 represents the average number of years of life remaining if a group of persons at that age were to experience the mortality rates for 2019 over the course of their remaining life.

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Parrelly ML Pro Forma**
**Source: BIERING 5416**

## Parrelly

### Annual Comp Package

| | | | |
|---|---|---|---|
| **Annual Comp** | a | **$ 2,750,000** | **250% of T-12** |
| $ 33,333 | Salary for months 1-2 | | |
| $ 1,500,000 | In a 5 year Salary | | |
| $ 1,216,667 | in Long Term Cash - Contingent Comp (5 Year Cliff Vest) | | |
| **$ 2,750,000** | | | |
| | b | **$ 78,384** | |
| | | $ 43,870 | Long Term Cash - Contingent Comp (3 Year Annual Vest) |
| | | $ 34,514 | Lump Sum Cash |
| **Retention Award** | c | **$ 330,000** | **30% of T-12** |
| **Total Program Package** | d = a + b + c | **$ 3,158,384** | |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Projected NNAL (%) | 50% | 75% | 100% | 125% | 150% | |
| Projected NNAL ($M) | 100 | 150 | 200 | 250 | 300 | |
| Projected T-12 | $ 550,000 | $ 825,000 | $ 1,100,000 | $ 1,377,500 | $ 1,650,000 | |
| Retention Award (%) | | | | | 0.2 | |
| Retention Award ($) | | | | | $ 330,000 | |
| Salary | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | $ 300,000 | **$ 1,500,000** |
| Long Term Cash | $ 243,333 | $ 243,333 | $ 243,333 | $ 243,333 | $ 243,333 | **$ 1,216,667** |
| Matched Deffered Comp | $ 78,384 | | | | | $ 78,384 |
| Retention Award | | | | | $ 330,000 | $ 330,000 |
| **Yearly Program Compensation** | **$ 621,717** | **$ 543,333** | **$ 543,333** | **$ 543,333** | **$ 873,333** | **$ 3,125,051** |

### Advisor Profile

| | | | |
|---|---|---|---|
| Prior Firm A/L | | $ 200,000,000 | |
| Prior Firm T-12 | | $ 1,100,000 | |
| **Minimum Performanc** | **NNAL (5)** | **NNAL ($)** | **HH** |
| Year 1 | 20% | $ 40,000,000 | 5 |
| Year 2 | 40% | $ 80,000,000 | 5 |
| Year 3 | 60% | $ 120,000,000 | 5 |
| Year 4 | 80% | $ 160,000,000 | 5 |
| Year 5 | 100% | $ 200,000,000 | 5 |

## Parrelly as a % of T-12 (Pro-Forma of the Pro-Forma)

### Annual Comp Package

| | | | |
|---|---|---|---|
| **Annual Comp** | a | **250%** | **250% of T-12** |
| 3% | Salary for months 1-2 | | |
| 136% | In a 5 year Salary | | |
| 111% | in Long Term Cash - Contingent Comp (5 Year Cliff Vest) | | |
| **250%** | | | |
| | b | **7%** | |
| | | **4%** | Long Term Cash - Contingent Comp (3 Year Annual Vest) |
| | | **3%** | Lump Sum Cash |
| **Retention Award** | c | **30%** | **30% of T-12** |
| **Total Program Package** | d = a + b + c | **287%** | |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Projected NNAL (%) | 50% | 75% | 100% | 125% | 150% | |
| Projected NNAL ($M) | 100 | 150 | 200 | 250 | 300 | |
| Projected T-12 | 50% | 75% | 100% | 125% | 150% | |
| Retention Award (%) | | | | | 0.2 | |
| Retention Award ($) | | | | | $ 0 | |
| Salary | 27% | 27% | 27% | 27% | 27% | **136%** |
| Long Term Cash | 22% | 22% | 22% | 22% | 22% | **111%** |
| Matched Deferred Comp | 7% | 0% | 0% | 0% | 0% | **7%** |
| Retention Award | 0% | 0% | 0% | 0% | 30% | **30%** |
| **Yearly Program Compensation** | **57%** | **49%** | **49%** | **49%** | **79%** | **284%** |

### Advisor Profile

| | | | |
|---|---|---|---|
| Prior Firm A/L | | $ 200,000,000 | |
| Prior Firm T-12 | | $ 1,100,000 | |
| **Minimum Perf** | **NNAL (5)** | **NNAL ($)** | **HH** |
| Year 1 | 20% | $ 40,000,000 | 5 |
| Year 2 | 40% | $ 80,000,000 | 5 |
| Year 3 | 60% | $ 120,000,000 | 5 |
| Year 4 | 80% | $ 160,000,000 | 5 |
| Year 5 | 100% | $ 200,000,000 | 5 |

## Biering

### Annual Comp Package

| | | | |
|---|---|---|---|
| **Annual Comp** | a | **$ 8,938,305** | **250% of T-12** |
| $ 108,342 | Salary for months 1-2 | | |
| $ 4,875,439 | In a 5 year Salary | | |
| $ 3,954,524 | in Long Term Cash - Contingent Comp (5 Year Cliff Vest) | | |
| **$ 8,938,305** | | | |
| | b | **$ 254,771** | |
| | | $ 142,590 | Long Term Cash - Contingent Comp (3 Year Annual Vest) |
| | | $ 112,181 | Lump Sum Cash |
| **Retention Award** | c | **$ 1,072,597** | **30% of T-12** |
| **Total Program Package** | d = a + b + c | **$ 10,265,673** | |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Projected NNAL (%) | 50% | 75% | 100% | 125% | 150% | |
| Projected NNAL ($M) | 100 | 150 | 200 | 250 | 300 | |
| Projected T-12 | $ 1,787,661 | $ 2,681,492 | $ 3,575,322 | $ 4,477,278 | $ 5,362,983 | |
| Retention Award (%) | | | | | 0.2 | |
| Retention Award ($) | | | | | $ 1,072,597 | |
| Salary | $ 975,088 | $ 975,088 | $ 975,088 | $ 975,088 | $ 975,088 | **$ 4,875,439** |
| Long Term Cash | $ 790,905 | $ 790,905 | $ 790,905 | $ 790,905 | $ 790,905 | **$ 3,954,524** |
| Matched Deferred Comp | $ 254,771 | | | | | $ 254,771 |
| Retention Award | | | | | $ 1,072,597 | $ 1,072,597 |
| **Yearly Program Compensation** | **$ 2,020,764** | **$ 1,765,993** | **$ 1,765,993** | **$ 1,765,993** | **$ 2,838,589** | **$ 10,157,331** |

### Advisor Profile

| | | | |
|---|---|---|---|
| Prior Firm A/L | | $ 200,000,000 | Assume same as Parrelly |
| Prior Firm T-12 | | **$ 3,575,322** | [1] |
| **Minimum Performanc** | **NNAL (5)** | **NNAL ($)** | **HH** |
| Year 1 | 20% | $ 40,000,000 | 5 |
| Year 2 | 40% | $ 80,000,000 | 5 |
| Year 3 | 60% | $ 120,000,000 | 5 |
| Year 4 | 80% | $ 160,000,000 | 5 |
| Year 5 | 100% | $ 200,000,000 | 5 |

**[1] T-12 ML "But-For":**

| | |
|---|---|
| **a**: Actual JPM T-12 as of 9.30.23 (see Schedule 2.1) | $ 5,108,900 |
| **b** : Actual RJ 2024 Production (see Schedule 3.1) | $ 2,041,744 |
| **c = a - b** | $ 3,067,156 |
| **d = c / 2** | $ 1,533,578 |
| **e = b + d** | **$ 3,575,322** |

## Biering Assuming Additional Investment from Identified Investors

### Annual Comp Package

| | | | |
|---|---|---|---|
| **Annual Comp** | a | **$ -** | **250% of T-12** |
| $ 143,416 | Salary for months 1-2 | | |
| $ 6,453,796 | In a 5 year Salary | | |
| $ 5,234,747 | in Long Term Cash - Contingent Comp (5 Year Cliff Vest) | | |
| **$ 11,831,959** | | | |
| | b | **$ 337,250** | |
| | | $ 188,752 | Long Term Cash - Contingent Comp (3 Year Annual Vest) |
| | | $ 148,498 | Lump Sum Cash |
| **Retention Award** | c | **$ 1,419,835** | **30% of T-12** |
| **Total Program Package** | d = a + b + c | **$ 1,757,085** | |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Projected NNAL (%) | 50% | 75% | 100% | 125% | 150% | |
| Projected NNAL ($M) | 100 | 150 | 200 | 250 | 300 | |
| Projected T-12 | $ 2,366,392 | $ 3,549,588 | $ 4,732,783 | $ 5,926,736 | $ 7,099,175 | |
| Retention Award (%) | | | | | 0.2 | |
| Retention Award ($) | | | | | $ 1,419,835 | |
| Salary | $ 1,290,759 | $ 1,290,759 | $ 1,290,759 | $ 1,290,759 | $ 1,290,759 | **$ 6,453,796** |
| Long Term Cash | $ 1,046,949 | $ 1,046,949 | $ 1,046,949 | $ 1,046,949 | $ 1,046,949 | **$ 5,234,747** |
| Matched Deferred Comp | $ 337,250 | | | | | $ 337,250 |
| Retention Award | | | | | $ 1,419,835 | $ 1,419,835 |
| **Yearly Program Compensation** | **$ 2,674,958** | **$ 2,337,708** | **$ 2,337,708** | **$ 2,337,708** | **$ 3,757,543** | **$ 13,445,627** |

### Advisor Profile

| | | | |
|---|---|---|---|
| Prior Firm A/L | | $ 200,000,000 | Assume same as Parrelly |
| Prior Firm T-12 | | **$ 4,732,783** | [1] |
| **Minimum Performanc** | **NNAL (5)** | **NNAL ($)** | **HH** |
| Year 1 | 20% | $ 40,000,000 | 5 |
| Year 2 | 40% | $ 80,000,000 | 5 |
| Year 3 | 60% | $ 120,000,000 | 5 |
| Year 4 | 80% | $ 160,000,000 | 5 |
| Year 5 | 100% | $ 200,000,000 | 5 |

**[1] T-12 ML "But-For":**

| | |
|---|---|
| **a**: Actual JPM T-12 as of 9.30.23 (see Schedule 2.1) | $ 5,108,900 |
| **b** : Actual RJ 2024 Production (see Schedule 3.1) | $ 2,041,744 |
| **c = a - b** | $ 3,067,156 |
| **d = c / 2** | $ 1,533,578 |
| **e = b + d** | $ 3,575,322 |
| f: Anticipated Additional Production **(see Schedule 4.1)** | $ 1,157,461 |
| **g = e + f** | $ 4,732,783 |

**App. 0904**

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Total Mitigating Earnings Detail**

| | | Date | | |
|---|---|---|---|---|
| [1] | Date of Birth | 1989 | CPI-U and CPI-U Medical for Benefits Growth | 3.00% [2] |
| | Date of Termination | 12/22/2023 | Benefits - Other | 1.45% [2] |
| | Discount Period Start Date | 9/23/2025 | Discount Rate | 2.6% [3] |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mid-Point for PV and Mortality Factor | | 12/27/2023 | 7/1/2024 | 7/2/2025 | 7/2/2026 | 7/2/2027 | 7/1/2028 | 7/2/2029 | 7/2/2030 | 7/2/2031 | 7/1/2032 | 7/2/2033 | 7/2/2034 | |
| | Year | | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | |
| | | | **Forecasted Period** | | | | | | | | | | | | **TOTAL** |
| | | | **12/23/2023** | **1/1/2024** | **1/1/2025** | **1/1/2026** | **1/1/2027** | **1/1/2028** | **1/1/2029** | **1/1/2030** | **1/1/2031** | **1/1/2032** | **1/1/2033** | **1/1/2034** | |
| | **Description** | | **12/31/2023** | **12/31/2024** | **12/31/2025** | **12/31/2026** | **12/31/2027** | **12/31/2028** | **12/31/2029** | **12/31/2030** | **12/31/2031** | **12/31/2032** | **12/31/2033** | **12/31/2034** | **Sum of Forecasted Period** |
| [4] | Earnings for Year | | - | 2,487,376 | 970,112 | 939,329 | 1,058,938 | 1,110,195 | 885,492 | 928,701 | 974,071 | 1,021,710 | 1,071,730 | 1,299,880 | **$ 12,747,534** |
| | Portion of Year | | 0.02 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| | **Total Gross Income for Portion of Year** | | **-** | **2,487,376** | **970,112** | **939,329** | **1,058,938** | **1,110,195** | **885,492** | **928,701** | **974,071** | **1,021,710** | **1,071,730** | **1,299,880** | **12,747,534** |
| [5] | Lost Benefits - Health, GTL, etc for Portion of Year | | - | 7,936 | 8,174 | 8,420 | 8,420 | 17,344 | 17,865 | 18,401 | 18,953 | 19,521 | 20,107 | 20,710 | |
| | Lost Benefits - Social Security | | | 10,453 | 10,918 | 11,359 | 11,818 | 12,296 | 12,793 | 13,310 | 13,848 | 14,407 | 14,989 | 15,595 | |
| | Lost Benefits - Other | | - | 36,067 | 14,067 | 13,620 | 15,355 | 16,098 | 12,840 | 13,466 | 14,124 | 14,815 | 15,540 | 18,848 | |
| | **Total Lost Benefits for Portion of Year** | | **-** | **54,456** | **33,159** | **33,399** | **35,593** | **45,738** | **43,497** | **45,177** | **46,924** | **48,743** | **50,636** | **55,153** | **492,476** |
| | **Total Earnings (Undiscounted)** | **a** | **$ -** | **$ 2,541,832** | **$ 1,003,271** | **$ 972,728** | **$ 1,094,530** | **$ 1,155,933** | **$ 928,989** | **$ 973,877** | **$ 1,020,995** | **$ 1,070,453** | **$ 1,122,367** | **$ 1,355,033** | **$ 13,240,010** |
| | Discount Rate | | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | |
| | Discount Period (mid-period convention) | | (1.7413) | (1.2279) | (0.2272) | 0.7721 | 1.7714 | 2.7721 | 3.7728 | 4.7721 | 5.7714 | 6.7721 | 7.7728 | 8.7721 | |
| | Present Value Factor | **b** | 1.0000 | 1.0000 | 1.0000 | 0.9805 | 0.9559 | 0.9318 | 0.9084 | 0.8855 | 0.8633 | 0.8416 | 0.8204 | 0.7998 | |
| [6] | Mortality Factor | **c** | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 0.9979 | 0.9956 | 0.9933 | 0.9909 | 0.9885 | 0.9859 | 0.9833 | 0.9805 | |
| | **Present Value of Total Earnings** | **d = a * b *c** | **$ -** | **$ 2,541,832** | **$ 1,003,271** | **$ 953,785** | **$ 1,043,995** | **$ 1,072,422** | **$ 838,231** | **$ 854,591** | **$ 871,253** | **$ 888,169** | **$ 905,361** | **$ 1,062,558** | **$ 12,035,470** |

[1] Relevant dates as per Schedule 1; discount period start date assumed to be arbitration date.
[2] See Schedule 2.1 for value of benefits as a percentage of income and Schedule 2.2 for CPI-U CAGR for benefits cost increase.
[3] See Schedule 2.2 for Series Rate Data. For the discount rate assumption, we analyzed the average 10-year treasury rate over the last 15 years.
[4] See Schedule 3.2 for RJ Pro-forma with actual production from 3.1.
[5] See Schedule 2.1 and 3.1 for calculation of benefits.
[6] See Schedule 2.3 for life tables used to calculate mortality factor.

Privileged and Confidential

**App. 0905**

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Summary of Post-Termination Earnings - Mitigation**

**W2s**

**Raymond James W2s**

| Term Begin | Term End | Year | Years | Gross Pay | GTL (box 12a - C) | 401K (box 12b - D) | Healthcare Costs (box 12c - DD) | Wages, tips other comp (box 1) | Social Security Wages (box 3) | Medicare Wages (box 5) | Gross Pay (Annualized) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/11/2024 | 12/31/2024 | 2024 | 0.97 | $ 1,070,841 | $ 108 | $ 23,000 | $ 7,409 | $ 1,070,949 | $ 168,600 | $ 1,093,949 | $ 1,101,437 |

*Source: BIERING 5055.*

**Paystub**

**Raymond James Paystub (7.31.25)**

| | | EARNINGS | YTD Amt | Annual Amt | Employer Paid Benefits | YTD Amt | Annual Amt |
|---|---|---|---|---|---|---|---|
| Term Begin | 1/1/2025 | Bonus- Retail | $ 96,624 | $ 165,640 | Basic AD&D | $ 11 | $ 18 |
| Term End | 7/31/2025 | Bonus- Retail 2 | $ 45,730 | $ 78,394 | Dental Plan | $ 84 | $ 144 |
| Years | 0.6 | Bonus- Retail 3 | $ 10,586 | $ 18,147 | Employer Funding | $ 146 | $ 250 |
| | | Commission 06/21/2025 - 07/18/2025 | $ 336,380 | $ 576,652 | GTL | $ 81 | $ 139 |
| | | FA Salary 07/16/2025 - 07/31/2025 | $ 70,000 | $ 120,000 | Health - Base Before Tax | $ 4,308 | $ 7,385 |
| | | GTL-Taxable Port 07/16/2025 - 07/31/2025 | $ 63 | $ 108 | | | |
| | | **Earnings Total** | **$ 559,382** | **$ 958,941** | **Employer Paid Benefits Total** | **$ 4,629** | **$ 7,936** |

*Source: BIERING 5057.*

**Stats**

**RJ Performance Stats**

| Term Begin | Term End | Year | Years | YTD Gross Production | Gross Pay (Annualized) | Last 12 Months Production | Assets |
|---|---|---|---|---|---|---|---|
| 1/2/2024 | 12/6/2024 | 2024 | 0.93 | $ 2,027,119 | $ 2,169,791 | $ 2,027,119 | $ 90,875,351 |
| 1/2/2025 | 1/3/2025 | 2025 | 0.00 | $ 14,625 | $ 1,779,375 | $ 2,157,514 | $ 88,770,425 |
| 1/2/2025 | 8/1/2025 | 2025 | 0.58 | $ 822,959 | $ 1,410,235 | $ 1,846,915 | $ 85,585,747 |
| 1/1/2024 | 8/15/2025 | 2025 | 1.62 | $ 2,977,786 | $ 1,835,622 | | $ 86,677,904 |
| | | | 2024 Production | $ 2,041,744 | | | |
| | | | Jan 4 - Aug 15 2025 Production | $ 936,042 | | | |
| | | | 2025 Production | $ 1,504,353 | | | |

*Source: RJA-Biering 000001-000067.*





**CX30-9**

**App. 0906**

## Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.

**Raymond James Pro-forma**
**Source: BIERING 1314-1328**

**RJ Pro-forma from BIERING 1314-1328**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | -25% | 5% | 5% | 5% | 5% | 26% | |
| | | 12% | 11% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | |
| **Year** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **TOTAL** |
| **Revenue** | | | | | | | | | | | | |
| Gross Production | $ 1,062,500 | $ 1,187,500 | $ 1,312,500 | $ 1,375,000 | $ 1,443,750 | $ 1,515,938 | $ 1,591,734 | $ 1,671,321 | $ 1,754,887 | $ 1,842,632 | $ 1,934,763 | **$ 16,692,525** |
| 45% Grid Payout | $ 472,813 | $ 528,438 | $ 584,063 | $ 611,875 | $ 642,469 | $ 682,172 | $ 716,280 | $ 752,094 | $ 789,699 | $ 829,184 | $ 870,643 | **$ 7,479,730** |
| Payout Rate | 44.5% | 44.5% | 44.5% | 44.5% | 44.5% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% | **44.8%** |
| **Additional Compensation** | | | | | | | | | | | | |
| Transition Assistance (Loan) | $ 1,437,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | **$ 1,437,500** |
| Transition Assistance (AUM Backend Loan) | $ - | $ 159,375 | $ 178,125 | $ 262,500 | $ 275,000 | $ - | $ - | $ - | $ - | $ - | $ - | **$ 875,000** |
| Salary | $ 120,000 | $ 120,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | **$ 240,000** |
| RJ Retention Bonus | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 175,628 | **$ 175,628** |
| 401 K Match/PSP/ESOP | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | **$ 234,300** |
| **Additional Compensation Total** | **$ 1,578,800** | **$ 300,675** | **$ 199,425** | **$ 283,800** | **$ 296,300** | **$ 21,300** | **$ 21,300** | **$ 21,300** | **$ 21,300** | **$ 21,300** | **$ 196,928** | **$ 2,962,428** |
| **TOTAL COMPENSATION** | **$ 2,051,613** | **$ 829,113** | **$ 783,488** | **$ 895,675** | **$ 938,769** | **$ 703,472** | **$ 737,580** | **$ 773,394** | **$ 810,999** | **$ 850,484** | **$ 1,067,571** | **$ 10,442,158** |
| **Total Compensation as a % of Revenue** | 193.1% | 69.8% | 59.7% | 65.1% | 65.0% | 46.4% | 46.3% | 46.3% | 46.2% | 46.2% | 55.2% | |
| **TOTAL AGGREGATE COMPENSATION** | **$ 2,051,613** | **$ 2,880,725** | **$ 3,664,213** | **$ 4,559,888** | **$ 5,498,656** | **$ 6,202,128** | **$ 6,939,709** | **$ 7,713,103** | **$ 8,524,102** | **$ 9,374,587** | **$ 10,442,158** | |
| Club Level | **$ -** | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | |
| Marketing Allowance | $ 25,000 | $ 11,875 | $ 13,125 | $ 13,750 | $ 14,438 | $ 15,159 | $ 15,917 | $ 16,713 | $ 17,549 | $ 18,426 | $ 19,348 | **$ 181,300** |
| Marketing Allowance as a % of Revenue | 2.4% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | **1.1%** |

TA Backend: Each backend earned will have its own 10 year note. Bonuses are calculated using prior year production. Backend o/os are 15%115%/20%/20%
- Marketing Allowance: Year 1 is a % o f T 1 2 @ Hire.
-Anytime in first 12 months, if Josh hits 50% AUM, he would be paid 55% T12@Hire - no reduction for salary paid. Anytime in first 12 months, if he hits 75% AUM he would be paid 60% of T12@Hire - no reduction for salary paid.

**RJ Pro-forma with actual RJ 2024 and 2025 (annualized) production from Schedule 3.1**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | -26% | 11% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | |
| **Year** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **TOTAL** |
| **Revenue** | | | | | | | | | | | | |
| Gross Production | $ 2,041,744 | $ 1,504,353 | $ 1,662,706 | $ 1,741,883 | $ 1,828,977 | $ 1,920,426 | $ 2,016,446 | $ 2,117,269 | $ 2,223,133 | $ 2,334,290 | $ 2,451,004 | **$ 21,842,231** |
| 45% Grid Payout | $ 908,576 | $ 669,437 | $ 739,904 | $ 775,138 | $ 813,895 | $ 864,192 | $ 907,401 | $ 952,771 | $ 1,000,410 | $ 1,050,430 | $ 1,102,952 | **$ 9,785,106** |
| Payout Rate | 44.5% | 44.5% | 44.5% | 44.5% | 44.5% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% | **44.8%** |
| **Additional Compensation** | | | | | | | | | | | | |
| Transition Assistance (Loan) | $ 1,437,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | **$ 1,437,500** |
| Transition Assistance (AUM Backend Loan) | $ - | $ 159,375 | $ 178,125 | $ 262,500 | $ 275,000 | $ - | $ - | $ - | $ - | $ - | $ - | **$ 875,000** |
| Salary | $ 120,000 | $ 120,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | **$ 240,000** |
| RJ Retention Bonus | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 175,628 | **$ 175,628** |
| 401 K Match/PSP/ESOP | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | $ 21,300 | **$ 234,300** |
| **Additional Compensation Total** | **$ 1,578,800** | **$ 300,675** | **$ 199,425** | **$ 283,800** | **$ 296,300** | **$ 21,300** | **$ 21,300** | **$ 21,300** | **$ 21,300** | **$ 21,300** | **$ 196,928** | **$ 2,962,428** |
| **TOTAL COMPENSATION** | **$ 2,487,376** | **$ 970,112** | **$ 939,329** | **$ 1,058,938** | **$ 1,110,195** | **$ 885,492** | **$ 928,701** | **$ 974,071** | **$ 1,021,710** | **$ 1,071,730** | **$ 1,299,880** | **$ 12,747,534** |
| **Total Compensation as a % of Revenue** | 121.8% | 64.5% | 56.5% | 60.8% | 60.7% | 46.1% | 46.1% | 46.0% | 46.0% | 45.9% | 53.0% | |
| **TOTAL AGGREGATE COMPENSATION** | **$ 2,487,376** | **$ 3,457,488** | **$ 4,396,818** | **$ 5,455,755** | **$ 6,565,950** | **$ 7,451,442** | **$ 8,380,143** | **$ 9,354,214** | **$ 10,375,923** | **$ 11,447,654** | **$ 12,747,534** | |
| Club Level | **$ -** | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | LC 2 | |
| Marketing Allowance | $ 25,000 | $ 11,875 | $ 13,125 | $ 13,750 | $ 14,438 | $ 15,159 | $ 15,917 | $ 16,713 | $ 17,549 | $ 18,426 | $ 19,348 | **$ 181,300** |
| Marketing Allowance as a % of Revenue | 1.2% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | **0.8%** |

TA Backend: Each backend earned will have its own 10 year note. Bonuses are calculated using prior year production. Backend o/os are 15%115%/20%/20%
- Marketing Allowance: Year 1 is a % o f T 1 2 @ Hire.
-Anytime in first 12 months, if Josh hits 50% AUM, he would be paid 55% T12@Hire - no reduction for salary paid. Anytime in first 12 months, if he hits 75% AUM he would be paid 60% of T12@Hire - no reduction for salary paid.

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Total Lost Earnings Detail - Assuming Additional Investment from Identified Investors**

| | | Date |
|---|---|---|
| [1] | Date of Birth | 1989 |
| | Date of Termination | 12/22/2023 |
| | Discount Period Start Date | 9/23/2025 |

| | | |
|---|---|---|
| CPI-U and CPI-U Medical for Benefits Growth | 3.00% | [2] |
| Benefits - Other | 1.45% | [2] |
| Discount Rate | 2.6% | [3] |
| Growth Rate | 9.5% | [4] |

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mid-Point for PV and Mortality Factor | | 7/1/2020 | 7/2/2021 | 7/2/2022 | 11/29/2022 | 11/25/2023 | 12/27/2023 | 7/1/2024 | 7/2/2025 | 7/2/2026 | 7/2/2027 | 7/1/2028 | 7/2/2029 | 7/2/2030 | 7/2/2031 | 7/1/2032 | 7/2/2033 | 7/2/2034 | |
| Year | | 2020 | 2021 | 2022 | 2023 | 2023 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | |
| | | | | | | | Forecasted Period | | | | | | | | | | | | TOTAL |
| | | **1/1/2020** | **1/1/2021** | **1/1/2022** | **1/1/2022** | **10/29/2023** | **12/23/2023** | **1/1/2024** | **1/1/2025** | **1/1/2026** | **1/1/2027** | **1/1/2028** | **1/1/2029** | **1/1/2030** | **1/1/2031** | **1/1/2032** | **1/1/2033** | **1/1/2034** | **Sum of Forecasted Period** |
| **Description** | | **12/31/2020** | **12/31/2021** | **12/31/2022** | **10/28/2023** | **12/22/2023** | **12/31/2023** | **12/31/2024** | **12/31/2025** | **12/31/2026** | **12/31/2027** | **12/31/2028** | **12/31/2029** | **12/31/2030** | **12/31/2031** | **12/31/2032** | **12/31/2033** | **12/31/2034** | |
| [5] Earnings for Year | | 175,157 | 194,434 | 315,098 | 319,491 | - | - | 2,674,958 | 2,337,708 | 2,337,708 | 2,337,708 | 3,757,543 | 2,559,394 | 2,802,102 | 3,067,826 | 3,358,749 | 3,677,260 | 4,025,975 | **$ 32,936,932** |
| Portion of Year | | | | | | | 0.02 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Total Gross Income for Portion of Year** | | | | | | | **-** | **2,674,958** | **2,337,708** | **2,337,708** | **2,337,708** | **3,757,543** | **2,559,394** | **2,802,102** | **3,067,826** | **3,358,749** | **3,677,260** | **4,025,975** | **32,936,932** |
| [6] Lost Benefits - Health and GTL for Portion of Year | | | | | | | - | 6,823 | 7,028 | 7,239 | 7,239 | 14,912 | 15,359 | 15,820 | 16,294 | 16,783 | 17,287 | 17,805 | |
| Lost Benefits - Social Security | | | | | $ 9,932 | | | 10,453 | 10,918 | 11,359 | 11,818 | 12,296 | 12,793 | 13,310 | 13,848 | 14,407 | 14,989 | 15,595 | |
| Lost Benefits - Other | | | | | | | - | 38,787 | 33,897 | 33,897 | 33,897 | 54,484 | 37,111 | 40,630 | 44,483 | 48,702 | 53,320 | 58,377 | |
| **Total Lost Benefits for Portion of Year** | | | | | | | **-** | **56,063** | **51,843** | **52,495** | **52,954** | **81,692** | **65,263** | **69,760** | **74,625** | **79,892** | **85,596** | **91,777** | **761,960** |
| **Total Earnings (Undiscounted)** | **a** | | | | | | **$ -** | **$ 2,731,021** | **$ 2,389,551** | **$ 2,390,203** | **$ 2,390,662** | **$ 3,839,235** | **$ 2,624,657** | **$ 2,871,862** | **$ 3,142,451** | **$ 3,438,641** | **$ 3,762,856** | **$ 4,117,752** | **$ 33,698,892** |
| Discount Rate | | | | | | | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | |
| Discount Period (mid-period convention) | | | | | | | (1.7413) | (1.2279) | (0.2272) | 0.7721 | 1.7714 | 2.7721 | 3.7728 | 4.7721 | 5.7714 | 6.7721 | 7.7728 | 8.7721 | |
| Present Value Factor | **b** | | | | | | 1.0000 | 1.0000 | 1.0000 | 0.9805 | 0.9559 | 0.9318 | 0.9084 | 0.8855 | 0.8633 | 0.8416 | 0.8204 | 0.7998 | |
| [7] Mortality Factor | **c** | | | | | | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 0.9979 | 0.9956 | 0.9933 | 0.9909 | 0.9885 | 0.9859 | 0.9833 | 0.9805 | |
| **Present Value of Total Earnings** | **d = a * b *c** | | | | | | **$ -** | **$ 2,731,021** | **$ 2,389,551** | **$ 2,343,655** | **$ 2,280,283** | **$ 3,561,870** | **$ 2,368,240** | **$ 2,520,099** | **$ 2,681,570** | **$ 2,853,087** | **$ 3,035,321** | **$ 3,228,962** | **$ 29,993,659** |

[1] Relevant dates as per Schedule 1; discount period start date assumed to be arbitration date.
[2] See Schedule 2.1 for value of benefits as a percentage of income and Schedule 2.2 for CPI-U CAGR for benefits cost increase.
[3] See Schedule 2.2 for Series Rate Data. For the discount rate assumption, we analyzed the average 10-year treasury rate over the last 15 years.
[4] See Schedule 2.1 for wage information and CAGR. CAGR used is the 2021-2023 CAGR for JPM T12 Production.
[5] See Schedule 2.1 for wage information and CAGR. Earnings follow pro-forma calculation in Schedule 2.4 for years one to five, then grown annually (using compensation only from year five and not retention bonus) using growth rate descr bed in note 4.
[6] See Schedule 2.1 for calculation of benefits.
[7] See Schedule 2.3 for life tables used to calculate mortality factor.

Privileged and Confidential

**Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A.**

**Additional Investment from Identified Investors**

ce: BIERING 5109-5117

[redacted] Cap Table

$2.50 shareprice

| Investor | Email | E[redacted]omain (Y/N) | Class A-1 Units | Capital Contribution | Units | % Shares | F/D Units | % F/D | Estimated CMV |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | N | 283,166,758.33 | $ 283,166,758.33 | 283,166,758.33 | 45.4% | 283,166,758.33 | 39.0% | $ 707,916,895.83 |
| | | N | 22,672,891.48 | $ 22,672,891.48 | 22,672,891.48 | 3.6% | 22,672,891.48 | 3.1% | $ 56,682,228.70 |
| | | N | 1,000,000.00 | $ 1,000,000.00 | 1,000,000.00 | 0.2% | 1,000,000.00 | 0.1% | $ 2,500,000.00 |
| | | N | 300,000.00 | $ 300,000.00 | 300,000.00 | 0.0% | 300,000.00 | 0.0% | $ 750,000.00 |
| | | N | 200,000.00 | $ 200,000.00 | 200,000.00 | 0.0% | 200,000.00 | 0.0% | $ 500,000.00 |
| | | Y | 74,709,083.00 | $ 74,709,083.00 | 74,709,083.00 | 12.0% | 114,528,523.63 | 15.8% | $ 286,321,309.08 |
| | | Y | 5,290,917.00 | $ 5,290,917.00 | 5,290,917.00 | 0.8% | 5,290,917.00 | 0.7% | $ 13,227,292.50 |
| | | Y | - | $ 2,443,271.00 | 2,443,271.00 | 0.4% | 14,057,274.52 | 1.9% | $ 35,143,186.30 |
| | | Y | - | $ 2,429,314.00 | 2,429,314.00 | 0.4% | 14,043,317.52 | 1.9% | $ 35,108,293.80 |
| | | Y | - | $ (5,000.00) | (5,000.00) | 0.0% | (5,000.00) | 0.0% | $ (12,500.00) |
| | | Y | - | $ 5,000.00 | 5,000.00 | 0.0% | 3,323,286.72 | 0.5% | $ 8,308,216.80 |
| | | Y | - | $ 1,181,666.00 | 1,181,666.00 | 0.2% | 7,818,239.44 | 1.1% | $ 19,545,598.60 |
| | | Y | - | $ 590,833.00 | 590,833.00 | 0.1% | 3,909,119.72 | 0.5% | $ 9,772,799.30 |
| | | Y | - | $ 555,939.00 | 555,939.00 | 0.1% | 3,874,225.72 | 0.5% | $ 9,685,564.30 |
| | | Y | - | $ 426,168.00 | 426,168.00 | 0.1% | 3,744,454.72 | 0.5% | $ 9,361,136.80 |
| | | Y | - | $ 201,676.00 | 201,676.00 | 0.0% | 533,504.67 | 0.1% | $ 1,333,761.68 |
| | | Y | - | $ - | - | 0.0% | 331,828.67 | 0.0% | $ 829,571.68 |
| | | Y | - | $ - | - | 0.0% | 331,828.67 | 0.0% | $ 829,571.68 |
| | | N | - | $ - | - | 0.0% | 3,484,199.00 | 0.5% | $ 8,710,497.50 |
| | | N | - | $ - | - | 0.0% | 5,043,795.84 | 0.7% | $ 12,609,489.60 |
| | | N | - | $ - | - | 0.0% | 879,346.06 | 0.1% | $ 2,198,365.15 |
| | | N | - | $ - | - | 0.0% | 1,239,571.35 | 0.2% | $ 3,098,928.38 |
| | | Y | - | $ - | - | 0.0% | 4,949,035.34 | 0.7% | $ 12,372,588.35 |
| | | Y | - | $ - | - | 0.0% | 3,318,286.72 | 0.5% | $ 8,295,716.80 |
| | | N | - | $ 283,349,001.99 | 228,818,282.38 | 36.7% | 228,818,282.38 | 31.5% | $ 572,045,705.95 |
| | | | **387,339,649.81** | **$ 678,517,518.80** | **623,986,799.19** | **100.0%** | **726,853,687.50** | **100.0%** | **$ 1,817,134,218.75** |

| | | |
|---|---|---|
| [redacted] Email Domain Total Estimated CMV | $ | 450,122,108 |
| 50% [redacted] Email Domain Total Estimated CMV | $ | 225,061,054 |
| Average JPM T-12/ Assets Ratio | | 0.5% |
| Add'l T-12 from Add'l Investment | $ | 1,157,461 |

# Defendants' Federal Motion-to-Compel / Admission Excerpts

**App. 0910-0917**

Dkt. 21-1 MTC admissions excerpts.

- Whether a November 2023 Scorecard for Biering exists and, if so, whe produced.
- JPM's explanation for why it has been unable to locate Biering's 360 Peer Review Feedback for 2021, 2022, and 2023.

13. With respect to the first item, right before filing this Motion, Biering's counsel received confirmation that JPM has located and will produce Biering's November 2023 Scorecard on November 12, 2025. Thus, Biering expects that item to be resolved (though he reserves the right to raise it at the hearing on this Motion if need be).

14. With respect to the second item, as part of the parties' prior meet-and-confer communications, JPM agreed to produce Biering's 360 Peer Review Feedback for the entirety of his tenure with JPM. Prior to the hearing on Biering's Second Motion to Compel (which occurred on August 27, 2025), JPM produced the 360 Peer Review Feedback for 2018, 2019, and 2020. However, JPM did not produce Biering's 360 Peer Review Feedback for more recent years because JPM could not locate it. While JPM outlined the efforts it made to find Biering's 360 Peer Review Feedback, JPM did not provide any explanation as to why this feedback was lost.

15. In August 2025, counsel for the parties went back and forth repeatedly on this issue. Specifically, Biering was able to access his recent 360 Peer Review Feedback up until the date of his resignation, so it was entirely unclear why JPM could no longer access it. Thus, at the hearing on Biering's Second Motion Compel, Biering's counsel briefly raised this issue. In response, JPM's counsel stated that JPM would either produce the recent 360 Peer Review Feedback or provide a response as to why JPM could not locate such feedback.

16. Right before filing this Motion, Biering's counsel received the following explanation from JPM's counsel—with no supporting evidence—regarding JPM's inability to

locate and produce Biering's 360 Peer Review Feedback for 2021, 2022, and 2023:

> Feedback data retention changed when the company moved to a new system at the end of 2020. Before that, feedback was managed using a system called Insight 360. After the transition to Oracle HCM, items like feedback, goals, and check-ins were treated as transitory and were not kept beyond their active use. Only finalized annual reviews are retained for a longer period. Please let me know if you need any additional clarification.

17. Biering is still analyzing this explanation but, at this time, does not believe it resolves the issue.

## MOTION TO COMPEL

18. Biering seeks an order compelling JPM's compliance with the Chairperson's May 8, 2025 and August 28, 2025 Orders with respect to two limited items as outlined herein. Biering's counsel has conferred for weeks (if not months) with JPM's counsel on these issues. While JPM's counsel has endeavored to provide clarity, Biering is still without critical documents and information needed for him to present his case during the Final Hearing.

19. First, with respect to the Skype Messages, it is without question that JPM has access to information regarding the specific dates on which each message was sent.[4] Biering has repeatedly tried to make sense of the Skype Messages, especially given that certain of the items discussed therein are (from Biering's experience) issues that would have been discussed weeks prior. Given the unusual formatting and lack of date stamps, it is impossible for Biering to make sense of the Skype conversation(s). As such, Biering requested the individual Skype Messages in JPMS 21519 (*i.e.*, not simply an e-mail summary of same). In light of JPM's confusing

[4] Indeed, despite that JPM represented that it is not withholding metadata or message-level details for the Skype Messages, JPM nonetheless recently told its counsel that at least some of the messages were exchanged on November 7, 2023 (though it initially said they all were exchanged that day), and that the rest of the messages were exchanged in early November 2023. Even if JPM is not withholding metadata for the e-mail summary reflected in JPMS 21519, JPM nonetheless has access to information reflecting the exact dates of each of the Skype Messages.

**BEFORE THE ARBITRATION BOARD**
**OF THE**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | | |
|---|---|---|
| **In the Matter of the Arbitration Between** | X | **FINRA Case No. 24-01208** |
| **JOSHUA BIERING,** | : | |
| **Claimant,** | : | |
| **v.** | : | |
| **J.P. MORGAN SECURITIES LLC, JPMORGAN CHASE & CO., AND JPMORGAN CHASE BANK, N.A.,** | : | |
| **Respondents.** | X | |

**RESPONDENTS' RESPONSE IN OPPOSITION TO CLAIMANT'S THIRD MOTION TO COMPEL**

## I. INTRODUCTION

Claimant's Third Motion to Compel raises issues that were either previously addressed or fall outside the agreed scope of discovery. JPMorgan has complied with all prior orders and has acted in good faith throughout the process. The relief sought is neither warranted nor proportional under FINRA Rule 13505. Discovery should have concluded months ago, yet Claimant continues to raise issues that were explained or resolved before this motion was filed, while introducing new demands at the eleventh hour.

The timing and nature of this motion underscore its lack of merit. Claimant first requested production of native Skype messages on November 4, 2025, just four business days before filing this motion on a federal holiday, despite knowing that JPMorgan's lead counsel was out of office two of those days. When asked for an additional day to confer because the bank was closed for Veteran's Day, Claimant refused. Claimant was also notified *the day before filing* that the

November 2023 Scorecard had been located and would be produced the next day. Indeed, JPMorgan produced the November 2023 Scorecard on November 12, 2025. Likewise, Claimant had already received a detailed explanation regarding the 360 Peer Review Feedback. While JPMorgan initially believed feedback for 2021–2023 was unavailable due to system limitations, JPMorgan has since identified additional data and produced it. The issue was the result of access issues for Employe Records after a system migration, not bad faith. Despite these facts, Claimant rushed to file the instant motion, unnecessarily burdening the Panel Chair and manufacturing disputes to create the appearance of discovery misconduct.

## II. RELEVANT BACKGROUND FACTS

### 1. Discovery Timeline and Scope

a. On December 6, 2024, Claimant served 133 Requests for Production and 27 Requests for Information.

b. JPMorgan served written responses on February 4, 2025, and produced documents on March 10, May 7, and July 7, 2025, totaling approximately 29,000 pages.

c. On May 8, 2025, following Claimant's First Motion to Compel, the Chair ordered JPMorgan to produce (and JPMorgan produced) broad categories of documents by July 7, 2025, including:

   i. All documents relating to Claimant's departure, JPMorgan's investigation, the basis for U5 statements, Claimant's employment and job performance, and JPMorgan's U5 policies.

   ii. Documents regarding Claimant's expungement fee request and all materials intended for use at the final hearing.

b. Peer Review Feedback (2021–2023): JPMorgan previously explained that feedback for 2021–2023 was not visible in the Employee Records system following JPMorgan's migration from Insight 360 to Oracle HCM in 2020 because peer feedback was treated as transitory and stopped feeding into official records. Recently, JPMorgan discovered that the data still exists but was inaccessible due to a missing access component. JPMorgan expedited collection and processing and produced Peer Review Feedback on November 21, 2025. JPMorgan is also implementing remediation to resolve the access issue permanently. This explains why the records were not located earlier despite good faith searches.

4. **Good Faith Efforts and Cooperation**

a. JPMorgan expanded instant message collection beyond the original scope to include four custodians (Stewart, Aughinbaugh, Stainback, Jacobs) and produced Teams messages on September 17, 2025.

b. JPMorgan provided technical explanations for the Skype summary format and clarified date ranges for messages.

c. JPMorgan located and produced Claimant's November 2023 Scorecard on November 12, 2025, despite its minimal relevance.

d. JPMorgan provided a privilege log for Form U5-related communications and complied with all prior Panel orders.

e. JPMorgan is expediting processing and production of additional 360 feedback.

Claimant's continuing to include the November scorecard issue in their motion, filed on Veteran's Day when the bank and vendors were closed, and knowing Respondent was producing the scorecard the following day, demonstrates an effort to create the appearance of discovery misconduct rather than to obtain relevant evidence. The Panel Chair should reject opposing counsel's attempt to use this issue as a basis for sanctions.

**D. The 360 Peer Review Feedback Is a Non-Issue.**

Claimant's motion raises JPMorgan's prior inability to locate Claimant's 360 Peer Review Feedback for 2021, 2022, and 2023. JPMorgan initially explained that, following the transition from Insight 360 to Oracle HCM at the end of 2020, peer feedback stopped feeding into official Employee Records and was treated as transitory data. As a result, the Employee Records team could not access these items and believed they were unavailable.

Recently, JPMorgan discovered that the feedback data still exists but was inaccessible due to a missing access component in Oracle HCM. As the Employee Records team explained:

> The access to see them is not available to the Employee Records team. Today we met with the Exec Director of the application and she has full access and was able to see them and identify that we were missing an access component. She is working on identifying what access we will need to see these going forward. She is the one who retrieved the records just sent.

The Executive Director retrieved the records, and JPMorgan producedthe Peer Review Feedback for 2021–2023 on November 21, 2025. JPMorgan is also implementing remediation to correct the access issue permanently. This explains why the records were not located earlier despite good faith searches and demonstrates JPMorgan's ongoing efforts to comply fully with discovery obligations.

### C. The November 2023 Scorecard

In the Response, JPM contends that "[o]pposing counsel devoted significant attention in the motion to compel to the November 2023 Scorecard[.]" *See* Resp. at 8. Biering's counsel is confused. Biering included one short paragraph regarding the November 2023 Scorecard in the Motion, and he explicitly told the Chair that he expected this item to be resolved. *See* Mot. ¶ 13. In addition, Biering's counsel repeatedly told JPM's counsel that they would make sure to file an updated Certificate of Conference if any items in the Motion were resolved but that they were simply out of time to continue going back and forth on unresolved items. *See* Ex. A, at 4, 6. Based on this, it is entirely unclear why JPM felt the need to highlight this item in its Response.

In any event, Biering's JPM Scorecards clearly relate to his job performance at JPM, and Biering appreciates JPM finally producing the November 2023 Scorecard (albeit two months after JPM was told that this document was missing from its production).[9]

---

pushed their client *again*, and at least twice, for this explanation and then were forthcoming with information as to why JPM did not locate the missing documents previously. Nonetheless, that does not excuse *JPM* for (1) its failure to ensure adequate internal document collection procedures for basic documents regarding a former employee's job performance, and (2) its refusal to truly "run the 360 Peer Review Feedback search to the ground" until Biering formally, via the Motion, raised spoliation concerns. Accordingly, sanctions against JPM in the form of paying Biering's attorney's fees for these issues are warranted.

[9] Because Biering tried not to be unnecessarily combative in the Motion, Biering did not mention the fact that JPM said it produced this document back in September but, instead, produced two copies of the October 2023 Scorecard (notably, JPM had already produced a different version of the October 2023 Scorecard, which Biering noted in his Second Motion to Compel appeared to have been altered because an entire section regarding new clients was removed). Given JPM's incomplete recitation of the timeline at issue with respect to the production of the November 2023 Scorecard, what actually occurred is as follows: Biering's counsel informed JPM's counsel of this deficiency that same week. Then, Biering's counsel had to remind JPM's counsel for the next two months to locate and produce this document. *See* Ex. D at 1 (acknowledging, on September 12, 2025, that JPM failed to produce the November 2023 Scorecard and would do so "as promptly as possible"). Given this extensive length of time, Biering had to reserve the right to raise this issue at the hearing on the Motion. Though JPM finally produced this document on November 12, 2025, it then produced a redacted version on November 21, 2025, requiring Biering to re-print this document in all of his exhibit binders.

**From:** Dorland, Sara
**To:** Anna Richardson
**Cc:** Joshua Iacuone; Dunlap, Jeffrey; Henderson, Sarah; Dorland, Sara
**Subject:** RE: Biering/JPM - Summary of Meet-and-Confer - Recent Production
**Date:** Thursday, August 21, 2025 10:13:13 AM
**Attachments:** image001.png
JPMS_0029151-JPMS_0029284.pdf
JPMS_00029150.pdf
JPMS_0029285-JPMS_0029292.pdf

Hi Anna, Respondent's supplemental document production is attached. This production includes the follow up to JPMS 29129 that you requested below. We have run the 360 Peer Review Feedback search to ground and there simply are no more responsive records to produce. We will be providing the September scorecards shortly.

Thank you,
Sara

------
Sara Dorland
Associate
UB Greensfelder LLP
D 216.583.7364
M 216.347.0688

**From:** Anna Richardson <anna@imcplaw.com>
**Sent:** Monday, August 18, 2025 3:31 PM
**To:** Henderson, Sarah <shenderson@ubglaw.com>; Dorland, Sara <sdorland@ubglaw.com>
**Cc:** Joshua Iacuone <josh@imcplaw.com>; Dunlap, Jeffrey <jdunlap@ubglaw.com>
**Subject:** RE: Biering/JPM - Summary of Meet-and-Confer - Recent Production

Hi Sarah,

I appreciate you looking into the 360 Peer Review Feedback issue. Something is not adding up, though. Up until his resignation (when he lost access to JPM's system), our client was able to access all his Peer Review Feedback completed up until that date (*i.e.*, including 2021, 2022, and through October 2023) via the "me@JPMC" platform, and he received email notifications with links taking him directly to that feedback. We also know that current JPMC employees can access their Peer Review Feedback up until the present via the same platform. We're therefore having trouble understanding how the feedback for these recent years now can't be located, at least at a minimum through me@JPMC. It's possible JPM's switch to a new HR platform in 2020 is causing the confusion. In any event, can you follow up again with this additional information re: me@JPMC? We'd prefer to not have to raise this issue with the Chair.

Also, let us know when you have an update on the third item below.

We are also still waiting for the complete Scorecards for the three months we specifically requested

# JPMorgan Chase 2023 Form 10-K Enterprise-Scale Excerpt

**App. 0919-0923**

Enterprise-scale excerpt from the 2023 Form 10-K.

# Powering Growth with Curiosity and Heart

# Annual Report 2023

JPMorgan Chase & Co.

App. 0920

# Financial Highlights

| As of or for the year ended December 31, (in millions, except per share, ratio data and employees) | 2023 | 2022 | 2021 |
|---|---|---|---|
| **Selected income statement data** | | | |
| Total net revenue | $ 158,104 | $ 128,695 | $ 121,649 |
| Total noninterest expense | 87,172 | 76,140 | 71,343 |
| Pre-provision profit[a] | 70,932 | 52,555 | 50,306 |
| Provision for credit losses | 9,320 | 6,389 | (9,256) |
| Net income | $ 49,552 | $ 37,676 | $ 48,334 |
| **Per common share data** | | | |
| Net income per share: | | | |
| Basic | $ 16.25 | $ 12.10 | $ 15.39 |
| Diluted | 16.23 | 12.09 | 15.36 |
| Book value per share | 104.45 | 90.29 | 88.07 |
| Tangible book value per share (TBVPS)[a] | 86.08 | 73.12 | 71.53 |
| Cash dividends declared per share | 4.10 | 4.00 | 3.80 |
| **Selected ratios** | | | |
| Return on common equity | 17% | 14% | 19% |
| Return on tangible common equity (ROTCE)[a] | 21 | 18 | 23 |
| Liquidity coverage ratio (average)[b] | 113 | 112 | 111 |
| Common equity Tier 1 capital ratio[c] | 15.0 | 13.2 | 13.1 |
| Tier 1 capital ratio[c] | 16.6 | 14.9 | 15.0 |
| Total capital ratio[c] | 18.5 | 16.8 | 16.8 |
| **Selected balance sheet data** (period-end) | | | |
| Loans | $1,323,706 | $1,135,647 | $1,077,714 |
| Total assets | 3,875,393 | 3,665,743 | 3,743,567 |
| Deposits | 2,400,688 | 2,340,179 | 2,462,303 |
| Common stockholders' equity | 300,474 | 264,928 | 259,289 |
| Total stockholders' equity | 327,878 | 292,332 | 294,127 |
| **Market data** | | | |
| Closing share price | $ 170.10 | $ 134.10 | $ 158.35 |
| Market capitalization | 489,320 | 393,484 | 466,206 |
| Common shares at period-end | 2,876.6 | 2,934.2 | 2,944.1 |
| **Employees**[d] | 309,926[e] | 293,723 | 271,025 |

As of and for the period ended December 31, 2023, the results of the Firm include the impact of First Republic. Refer to Business Segment Results on page 67 and Note 34 for additional information.

(a) Pre-provision profit, TBVPS and ROTCE are each non-GAAP financial measures. Refer to Explanation and Reconciliation of the Firm's Use of Non-GAAP Financial Measures on pages 62–64 for a discussion of these measures.
(b) Refer to Liquidity Risk Management on pages 102-109 for additional information on this measure.
(c) Refer to Capital Risk Management on pages 91-101 for additional information on these measures.
(d) This metric, which was formerly Headcount, has been renamed Employees but is otherwise unchanged.
(e) Included approximately 4,500 individuals associated with First Republic who became employees effective July 2, 2023.

JPMorgan Chase & Co. (NYSE: JPM) is a leading financial services firm with assets of $3.9 trillion and operations worldwide. The firm is a leader in investment banking, financial services for consumers and small businesses, commercial banking, financial transaction processing and asset management. Under the J.P. Morgan and Chase brands, the firm serves millions of customers, predominantly in the U.S., and many of the world's most prominent corporate, institutional and government clients globally.

Information about J.P. Morgan's capabilities can be found at jpmorgan.com and about Chase's capabilities at chase.com. Information about JPMorgan Chase & Co. is available at jpmorganchase.com.

Case 4:26-cv-00950-P-BJ Document 15-6 Filed 08/18/26 Page 69 of 140 PageID 1145

*The following is Management's discussion and analysis of the financial condition and results of operations ("MD&A") of JPMorgan Chase for the year ended December 31, 2023. The MD&A is included in both JPMorgan Chase's Annual Report for the year ended December 31, 2023 ("Annual Report") and its Annual Report on Form 10-K for the year ended December 31, 2023 ("2023 Form 10-K" or "Form 10-K") filed with the Securities and Exchange Commission ("SEC"). Refer to the Glossary of terms and acronyms on pages 315-321 for definitions of terms and acronyms used throughout the Annual Report and the 2023 Form 10-K.*

*This Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on the current beliefs and expectations of JPMorgan Chase's management, speak only as of the date of this Form 10-K and are subject to significant risks and uncertainties. Refer to Forward-looking Statements on page 161 and Part 1, Item 1A: Risk factors in this Form 10-K on pages 9-33 for a discussion of certain of those risks and uncertainties and the factors that could cause JPMorgan Chase's actual results to differ materially because of those risks and uncertainties. There is no assurance that actual results will be in line with any outlook information set forth herein, and the Firm does not undertake to update any forward-looking statements.*

## INTRODUCTION

JPMorgan Chase & Co. (NYSE: JPM), a financial holding company incorporated under Delaware law in 1968, is a leading financial services firm based in the United States of America ("U.S."), with operations worldwide. JPMorgan Chase had $3.9 trillion in assets and $327.9 billion in stockholders' equity as of December 31, 2023. The Firm is a leader in investment banking, financial services for consumers and small businesses, commercial banking, financial transaction processing and asset management. Under the J.P. Morgan and Chase brands, the Firm serves millions of customers, predominantly in the U.S., and many of the world's most prominent corporate, institutional and government clients globally.

JPMorgan Chase's principal bank subsidiary is JPMorgan Chase Bank, National Association ("JPMorgan Chase Bank, N.A."), a national banking association with U.S. branches in 48 states and Washington, D.C. JPMorgan Chase's principal non-bank subsidiary is J.P. Morgan Securities LLC ("J.P. Morgan Securities"), a U.S. broker-dealer. The bank and non-bank subsidiaries of JPMorgan Chase operate nationally as well as through overseas branches and subsidiaries, representative offices and subsidiary foreign banks. The Firm's principal operating subsidiaries outside the U.S. are J.P. Morgan Securities plc and J.P. Morgan SE ("JPMSE"), which are subsidiaries of JPMorgan Chase Bank, N.A. and are based in the United Kingdom ("U.K.") and Germany, respectively.

For management reporting purposes, the Firm's activities are organized into four major reportable business segments, as well as a Corporate segment. The Firm's consumer business is the Consumer & Community Banking ("CCB") segment. The Firm's wholesale businesses are the Corporate & Investment Bank ("CIB"), Commercial Banking ("CB"), and Asset & Wealth Management ("AWM") segments. Refer to Business Segment Results on pages 65–85, and Note 32 for a description of the Firm's business segments, and the products and services they provide to their respective client bases. On May 1, 2023, JPMorgan Chase acquired certain assets and assumed certain liabilities of First Republic Bank (the "First Republic acquisition") from the Federal Deposit Insurance Corporation ("FDIC"). All references in this Form 10-K to "excluding First Republic," "including First Republic," "associated with First Republic" or "attributable to First Republic" refer to excluding or including the relevant effects of the First Republic acquisition, as well as subsequent related business and activities, as applicable. Refer to Note 34 for additional information.

The Firm's website is www.jpmorganchase.com. JPMorgan Chase makes available on its website, free of charge, annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as soon as reasonably practicable after it electronically files or furnishes such material to the U.S. Securities and Exchange Commission (the "SEC") at www.sec.gov. JPMorgan Chase makes new and important information about the Firm available on its website at https://www.jpmorganchase.com, including on the Investor Relations section of its website at https://www.jpmorganchase.com/ir. Information on the Firm's website, including documents on the website that are referenced in this Form 10-K, is not incorporated by reference into this 2023 Form 10-K or the Firm's other filings with the SEC.

App. 0921

## BUSINESS SEGMENT RESULTS

The Firm is managed on an LOB basis. There are four major reportable business segments – Consumer & Community Banking, Corporate & Investment Bank, Commercial Banking and Asset & Wealth Management. In addition, there is a Corporate segment.

The business segments are determined based on the products and services provided, or the type of customer served, and they reflect the manner in which financial information is evaluated by the Firm's Operating Committee. Segment results are presented on a managed basis. Refer to Explanation and Reconciliation of the Firm's use of Non-GAAP Financial Measures, on pages 62–64 for a definition of managed basis.

**JPMorgan Chase** (a)

| Consumer Businesses | | | Wholesale Businesses | | | |
|---|---|---|---|---|---|---|
| **Consumer & Community Banking** | | | **Corporate & Investment Bank** | | **Commercial Banking** | **Asset & Wealth Management** |
| Banking & Wealth Management | Home Lending | Card Services & Auto | Banking | Markets & Securities Services | | |
| • Consumer Banking<br>• J.P. Morgan Wealth Management<br>• Business Banking | • Home Lending Production<br>• Home Lending Servicing<br>• Real Estate Portfolios | • Card Services<br>• Auto | • Investment Banking<br>• Payments<br>• Lending | • Fixed Income Markets<br>• Equity Markets<br>• Securities Services<br>• Credit Adjustments & Other | • Middle Market Banking<br>• Corporate Client Banking<br>• Commercial Real Estate Banking | • Asset Management<br>• Global Private Bank |

(a) As a result of the organizational changes that were announced on January 25, 2024, the Firm will be reorganizing its business segments to reflect the manner in which the segments will be managed. The reorganization of the business segments is expected to be effective in the second quarter of 2024. Refer to Recent events on page 52 for additional information.

### Description of business segment reporting methodology

Results of the business segments are intended to present each segment as if it were a stand-alone business. The management reporting process that derives business segment results includes the allocation of certain income and expense items. The Firm periodically assesses the assumptions, methodologies and reporting classifications used for segment reporting, and therefore further refinements may be implemented in future periods. The Firm also assesses the level of capital required for each LOB on at least an annual basis. The Firm's LOBs also provide various business metrics which are utilized by the Firm and its investors and analysts in assessing performance.

*Revenue sharing*

When business segments join efforts to sell products and services to the Firm's clients and customers, the participating business segments may agree to share revenue from those transactions. Revenue is generally recognized in the segment responsible for the related product or service, with allocations to the other segment(s) involved in the transaction. The segment results reflect these revenue-sharing agreements.

*Expense allocation*

Where business segments use services provided by corporate support units, or another business segment, the costs of those services are allocated to the respective business segments. The expense is generally allocated based on the actual cost and use of services provided. In contrast, certain costs and investments related to corporate support units, technology and operations that are not currently utilized by any LOB are not allocated to the business segments and are retained in Corporate. Expense retained in Corporate generally includes costs that would not be incurred if the segments were stand-alone businesses, and other items not solely aligned with a particular business segment.

*Funds transfer pricing*

Funds transfer pricing ("FTP") is the process by which the Firm allocates interest income and expense to the LOBs and Other Corporate and transfers the primary interest rate risk and liquidity risk to Treasury and CIO.

The funds transfer pricing process considers the interest rate and liquidity risk characteristics of assets and liabilities and off-balance sheet products. Periodically, the methodology and assumptions utilized in the FTP process are adjusted to reflect economic conditions and other factors, which may impact the allocation of net interest income to the segments.

As a result of the higher interest rate environment, the cost of funds for assets and the credits earned for liabilities have generally increased, impacting the business segments' net interest income. During the period ended December 31, 2023, this has resulted in higher cost of funds for loans and

## Selected Firmwide Metrics

The following tables present key metrics for Wealth Management, which consists of the Global Private Ban[k in AWM and J.P.] Morgan Wealth Management in CCB; and total revenue and key metrics for J.P. Morgan Payments, which consists of payments activities in CIB and CB. This presentation is intended to provide investors with additional information concerning Wealth Management and J.P. Morgan Payments, each of which consists of similar business activities conducted across LOBs to serve different types of clients and customers.

### Selected metrics - Wealth Management

| Year ended December 31, | 2023 | 2022 | 2021 |
|---|---|---|---|
| Client assets (in billions)[a] | $ 3,177 [b] | $ 2,438 | $ 2,456 |
| Number of client advisors | 8,971 | 8,166 | 7,463 |

(a) Consists of Global Private Bank in AWM and client investment assets in J.P. Morgan Wealth Management in CCB.
(b) At December 31, 2023, included $144.6 billion of client investment assets associated with First Republic.

### Selected metrics - J.P. Morgan Payments

| (in millions, except where otherwise noted) Year ended December 31, | 2023 | 2022 | 2021 |
|---|---|---|---|
| Total net revenue[a] | $18,248 | $13,909 | $ 9,861 |
| Merchant processing volume (in billions) | 2,408 | 2,158 | 1,887 |
| Average deposits (in billions) | 715 | 779 | 800 |

(a) Includes certain revenues that are reported as investment banking product revenue in CB, and excludes the net impact of equity investments.

### Segment information related to First Republic

The following table presents selected impacts to CCB, CB, AWM and Corporate associated with First Republic from the acquisition date of May 1, 2023.

| | As of or for the year ended December 31, 2023 | | | | |
|---|---|---|---|---|---|
| (in millions) | Consumer & Community Banking | Commercial Banking | Asset & Wealth Management | Corporate | Total |
| **Selected Income Statement Data** | | | | | |
| **Revenue** | | | | | |
| Asset management fees | $ 387 | $ – | $ – | $ – | $ 387 |
| All other income | 489 | 201 | 503 | 2,862 [b] | 4,055 |
| **Noninterest revenue** | 876 | 201 | 503 | 2,862 | 4,442 |
| Net interest income | 2,401 | 704 | 668 | (55) | 3,718 |
| **Total net revenue** | 3,277 | 905 | 1,171 | 2,807 | 8,160 |
| Provision for credit losses | 421 | 731 | 128 | – | 1,280 |
| Noninterest expense | 1,219 | 45 | 50 | 1,033 [c] | 2,347 |
| **Net income** | 1,244 | 98 | 753 | 2,015 | 4,110 |
| **Selected Balance Sheet Data (period-end)** | | | | | |
| Loans | $ 94,671 | $ 38,495 | $ 11,436 | $ – | $ 144,602 [d] |
| Deposits [a] | 42,710 | 6,163 | 12,098 | – | 60,971 [d] |

(a) In the fourth quarter of 2023, CCB transferred certain deposits associated with First Republic to AWM, CB and CIB.
(b) Included the preliminary estimated bargain purchase gain of $2.7 billion recorded in other income. For the year ended December 31, 2023, reflects measurement period adjustments of $63 million, resulting in an estimated bargain purchase gain of $2.8 billion for the year ended December 31, 2023. Refer to Note 34 for additional information.
(c) Included $360 million of restructuring and integration costs.
(d) Excluded $1.9 billion of loans and $508 million of deposits allocated to CIB.

The following sections provide a comparative discussion of the Firm’s results by segment as of or for the years ended December 31, 2023 and 2022, unless otherwise specified.

# Supplemental Leave and Post-Termination ER-Review Records

**App. 0925-0942**

CX020 October 26 PTO/personal-sick notice (28:50 interval) and Sanchez/U.5 review materials.

Message

**From:** Biering, Josh [josh.biering@jpmorgan.com]
**Sent:** 10/27/2023 1:13:38 PM
**To:** Stewart, Ben [ben.stewart@jpmorgan.com]
**Subject:** Re: JB OOO sick

Thank you Ben- and sorry for the confusion- I'm taking a personal day. Which I'll make sure is reflected properly.

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**

**From:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Sent:** Friday, October 27, 2023 8:11:59 AM
**To:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Subject:** Re: JB OOO sick

Thank you for letting me know Josh.

Given [redacted] is out please let me and Blaze know how we can assist with client requests.

Thanks

**Ben Stewart Jr.**, CFP® | Executive Director | Market Team Lead | **J.P. Morgan Private Bank** | 420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4003 | M: 817 845 9676 | ben.stewart@jpmorgan.com | privatebank.jpmorgan.com

**Client Service Team:** 877 576 2874

Click here to see the JPMorgan Chase Privacy Policy: https://www.jpmorgan.com/pages/privacy

Exhibit
CX20

App. 0926

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT AND INSURANCE PRODUCTS: • NOT A DEPOSIT • NOT FDIC INSURED • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • MAY LOSE VALUE**

**JPMorgan Chase Bank, N.A.** and its affiliates (collectively "JPMCB") offer investment products, which may include bank-managed accounts and custody, as part of its trust and fiduciary services. Other investment products and services, such as brokerage and advisory accounts, are offered through **J.P. Morgan Securities LLC** ("JPMS"), a member of FINRA and SIPC. Annuities and insurance products are made available through Chase Insurance Agency, Inc. ("CIA"), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS and CIA are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states.

---

**From:** Biering, Josh (WM, USA) <josh.biering@jpmorgan.com>
**Sent:** Thursday, October 26, 2023 1:05:56 PM
**To:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Subject:** JB OOO sick

Ben-

I am hopeful to take a personal/sick day tomorrow. I will update my time away in GAT. Please let me know if this causes a problem or if you have any questions.

---

**Josh Biering** | Executive Director | Banker | **J.P. Morgan Private Bank** | 420 Throckmorton St, Suite 300 | Fort Worth, TX 76102 | T: 817 212 3096 | work Mobile: 817 798 7654 | josh.biering@jpmorgan.com | privatebank.jpmorgan.com

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk**

considerations for certain investment products and asset classes can be found HERE.



INVESTMENT PRODUCTS: NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE

App. 0928

**Interviewed Party**
Rachel Tidwell-Neal (Relevant Partner)

**Interview Date**
Dec 20,2023

**Interview Id**
INTVW_NA_1220235330

**Interview Summary**
On 12/20, ERP Julie Sanchez and Rachel Ti [redacted]

---

**Interviewed Party**
Jonathan Jacobs (Relevant Partner)

**Interview Date**
Dec 21,2023

**Interview Id**
INTVW_NA_1221235547

**Interview Summary**
Jonathan Jacobs shared the following on 12/21 at 11:30am CT -He was assigned the case on 10/27, he and Global Security spoke to ERC [redacted] that day, and he worked with Ben Stewart to place Joshua on a paid administrative leave that day. The following day, Joshua submitted his resignation. -Other than being Joshua's managers, Ben and John Aughinbaugh did not have any influence and did not share their own opinions on the investigation or outcome. HRBA Stephanie Stainback reported the allegations to ER after Kyle Hitchcock told Stephanie about it. Kyle is Kelly's mentor and noticed she seemed withdrawn, and Kelly eventually confided in Kyle [redacted] Jonathan vaguely remembers Joshua mentioning something about texts that both he and [redacted] exchanged [redacted] -The main issue is even if [redacted] texted Joshua, there was a [redacted] did not technically [redacted] Joshua, the [redacted] direct manager does not have day-to-day interaction with Kelly [redacted]

---

**Interview Summary**
Joshua (goes by Josh) Biering shared the following on 1/9 at 4:29pm CT (Julie called Josh on his cell phone and the call lasted for 21 minutes) -ERP Julie Sanchez let Josh know that

**Interviewed Party**
Joshua Biering (Employee Raising Complaint)

she will be looking into the concerns he raised. Josh confirmed that he does not agree with his ter[...] he did not act inappropriately, and that the t[...]n was because of retaliation due to concerns he raised about the work environment, inclusive of compensation and asking for more help/coverage/support. He stated that Jonathan Jacobs investigation was inadequate as it is clear through the texts Josh sent to Jena that it was consensual and he did not act inappropriately. -Josh further stated that he was retaliated and humiliated by many not just by J.T. Aughinbaug. Josh said Ben used to be his champion, but J.T. had told Ben to not speak to Josh without J.T.'s knowledge/presence. When ERP Julie asked Josh for examples and if other employees witnessed that, Josh stated that he already sent a detailed timeline with examples. Julie let Josh know that she had reviewed most of the information he sent, but that it would be helpful for him to describe to her as they were speaking today. Josh proceeded to share that in 2022, the Private Bank in Fort Worth had the worst Employee Opinion Survey results and as a result, they blamed management and pulled Scott Lidek out and put Kyle Hitchcock in. They also pulled [redacted] and is no longer at the firm. So, in 2022, Kyle was an investor and Josh was a banker; they shared a client who raised a complaint. Josh stated that it went on Josh's U4 even though it did not need to, but Josh wanted to be a team player. He was told that it would be expunged a year later. In April 2022, Kyle and Josh had a pre-call, and Josh asked Kyle if they should look into better investment recommendations. [redacted] When ERP Julie asked Josh to spell the last names of the witnesses, Josh asked Julie what was the point and what really is going to be the outcome of all of this. Julie explained to Josh what her role is: that she is gathering information from Josh in order to look into his concerns, and that she does not have an outcome to share with him at this time. Julie asked Josh what outcome is he ideally looking for, and Josh stated: •He wants a written apology, and acknowledgement from all the wrong doers: J.T., Ben, Kyle, Jena Cohen, Elaine Agather, Peter Chilian, and Rachel Tidwell-Neal (please note that Joshua did not provide any details or examples how Jena Cohen or Rachel Tidwell-Neal are wrong doers/inappropriate behavior by them). •An admission by Nadia Muraira that the investigation into the expenses was bogus •He wants to review Jonathan Jacobs' investigative notes, and be told exactly what conduct led to an involuntary termination. Josh wants to know exactly how he violated the Code of Conduct •He wants the U5 expunged -Josh then asked Julie if they could reschedule their call because he was getting charged up, and wanted the opportunity to speak to his attorney. He said he needs to talk to his attorney about what to do moving forward. When Julie asked Josh when he would like to reschedule to, he said tomorrow. Julie explained that she will not be available tomorrow due to an offsite meeting. Josh then said Thursday morning, and that he would like the call recorded or have a 3rd person join the call. Julie told Josh

that she does not record calls, and does not consent to having a call recorded. Julie explained that she does not receive requests for that or for a 3rd party to join. Julie asked Josh why he was asking that, and who he was requesting to have on the call with them. Josh stated that he already knows what is going to happen; nothing. He then said he wanted to have Jonathan Jacobs on the call. -Julie told Josh that she understands from an email that Josh sent to Jena that he has a recording of Peter Chilian. Julie asked Josh what did Peter say, and Josh responded that he will not tell Julie. He said that will be for the lawsuit. He said just look at all of his calendar requests in which Peter's assistant delayed meetings. When Julie asked Josh if he sent the calendar requests to ER or Jena, Josh said no. Josh then stated that he has a documented library of information that he will only selectively provide from at this time. His legal action will show how the findings of Jonathan's investigation was based on bogus facts. Josh then stated that: "this is not about money; this is about you guys fucked up."

**Interview Date**
Jan 09,2024

**Interview Id**
INTVW_NA_0109246742

---

**Interview Summary**
Kyle Hitchcock shared the following on 1/12 at 8:30am CT - [redacted] is an Analyst in the office who he has mentored. He had noticed [redacted] being distracted and not herself. - On 10/23/23, Joshua had sent Kyle an email asking to meet in person the next day. Joshua felt that Kyle was not paying attention to him in work related ways/clients. When they spoke in person on Tuesday, 10/24, Joshua told Kyle he was frustrated, but almost immediately said he was ok based on the initial response Kyle had (which was that he was not ignoring Joshua). Joshua proceeded to talk to Kyle about personal issues he was going through, and had gotten emotional (Joshua cried). Prior to Joshua getting emotional, he did tell Kyle that he was frustrated with work and management in what he felt was a lack of support/resources. He had told Kyle that he was planning to meet with John and Ben later that day (which Kyle did not know about before Joshua told him), and that Joshua may need a hard re-set. Kyle does not remember Joshua using the words resigning or quitting. -Kyle knew that [redacted] worked closely with Joshua as she was Joshua's analyst support. After Kyle spoke to Joshua, Kyle began to think that [redacted] not being herself could be related to Joshua. Kyle thought that because he noticed that Joshua seemed to be paranoid and had told Kyle he was experiencing difficulty with personal issues and with work. Kyle did not know if that was affecting [redacted] in any way. So, Kyle stated that after he spoke to Joshua, he touched base with [redacted] (the same day). He asked her if everything was ok, and how she was doing. Kyle stated that [redacted] just stared at Kyle which is not like her. A couple of days later on Thursday, [redacted] asked Kyle if she could speak to him the following day but not at work. He agreed, and met her for coffee on Friday.

**Interviewed Party**
Kyle Hitchcock (Subject)

Kyle later learned that [redacted] had taken the days (Wednesday and Thursday) off as personal days. On Friday, [redacted] told Kyle that she had taken time to think and she had concerns of inappropriate behavior by Joshua. She told Kyle that she appreciated Kyle's open door policy, and his words rang through to her. Kyle explained that about a week prior, there was an employee death in the office in which he addressed the entire group of employees about. He had told them about company resources, and that if anyone ever wanted to talk about anything he and the firm are here to listen. Kyle then told his HRBA Stephanie Stainback about the concerns [redacted] had. -The large prospective business client who Joshua is referring to is a company called [redacted] Kyle was not unsupportive, and they did become a client. Kyle explained that there were challenges during the vetting process as things were flagged about the client. However, the firm has to go through the due diligence /vetting process with each and every prospective client. Joshua expressed that it was taking too long and that we were not supportive. It was explained to Joshua that it is nothing personal to him or the client, but the necessary process in which they have to go through and Joshua called them roadblocks. One example is that the firm's loan team could not do a loan, but again that was based on the vetting process and not because Kyle, John or Ben were not supportive. When Joshua refers to big liquidity; what that means is that there is more money for the banker(s) (this client was in Joshua's name). This client is going through liquidity. The firm is required to notify clients if there is banker coverage changes, and they did so with this client but only after Joshua was no longer with the firm. They let the client know that Joshua was no longer with the firm, not that he was discharged. -Kyle denied ever ridiculing Joshua. Kyle stated he may have made a comment such as: "let's be thoughtful about how we approach investment recommendations," but not that Joshua didn't know what he was doing. He has not been condescending or retaliatory towards Joshua.

**Interview Date**
Jan 12,2024

**Interview Id**
INTVW_NA_0112247171

---

**Interview Summary**
[redacted]

**Interviewed Party**
[redacted]

stood out as being inappropriate. Graham did not observe any tension between Kyle and Joshua.

**Interview Date**
Jan 12,2024

**Interview Id**
INTVW_NA_0112247090

---

**Interviewed Party**
[redacted]

**Interview Summary**
[redacted]

**Interview Date**
Jan 12,2024

**Interview Id**
INTVW_NA_0112247178

---

**Interview Summary**
Ben Stewart shared the following on 1/16 at 2:45pm CT and again at 5pm CT (ERP Julie Sanchez had to schedule more time at 5pm as she did not get through all of her questions for Ben at 2:45pm CT) due to another meeting she had scheduled at 3:30pm CT -There was never a time where Ben didn't support a large prospective business pro Joshua wanted to onboard. Joshua had a client [redacted] who had challenges during the due diligence a process. Ben tried to help Joshua throughout the process, so is not sure why Joshua would think Ben was not supportive of Joshua. When Joshua resigned (as with any banker leaving the firm), the firm is obligated to notify clients of reassignment. The firm notifying [redacted] or any of Joshua's clients did not have anything to do with the investigation being conducted on Joshua or involuntary termination. [redacted] was notified on 11/15. -There were no fraudulent expenses related to happy hours at Buff Bros, and Ben has not heard [redacted] -From what Ben can recall, Joshua began expressing concerns that John (J.T.) and Kyle did not like him around July 2023. Ben spent time trying to ensure Joshua that JT and Kyle did like him, and set up meetings with J.T., Joshua and himself where J.T. told Joshua that he is a valued member of the team. Ben had also heard Kyle tell

Joshua that as well. Joshua kept insisting that they did not. Joshua never expressed concerns with compensation and/or not having enough coverage/support to Ben. Joshua had more support than his peers; he had [redacted] for over 90% of his work that nobody else had. Joshua did tell Ben that he had personal problems (with his wife) around May 2023, and when Joshua did, Ben informed Joshua about firm resources (such as the Employee Assistance Program (EAP), and Leave Management). Joshua did not want to utilize the firm' s resources. Ben remembers encouraging Joshua to utilize the firm's resources several times between then and the end of his employment as well. There were no other employees who expressed concerns about J.T. or Kyle to Ben. -Joshua was one to always seem to get frustrated about the firm's process of doing things, and thought it took too long. Ben is not aware of Joshua being told that he has plenty of coverage /support and should be more efficient with his time, resources, and tasks. Ben is aware that there was a customer complaint that went on Joshua's U4 in 2022, but nobody at the firm has a choice on what goes on the U4. The customer complained to the Federal Industry Regulatory Authority (FINRA) that the customer lost money based on recommendations made by Kyle and Joshua. The firm informed FINRA that upon an internal review, there was nothing wrong with what Kyle and Joshua did. Joshua had told Ben that Joshua consulted with attorneys who said that the firm can ask FINRA to expunge the language on his U4. However, Ben helped Joshua by escalating that request internally, and Ben was informed that it is not within the firm's procedures and that the firm already informed FINRA about our viewpoint on it. Ben is not aware of anyone telling Joshua to cease and desist, but Ben told Joshua that the language on the U4 does not limit Joshua and that Ben had escalated it to the appropriate parties within the firm. Ben also told Joshua that we see similar disclosures on prospective employee candidates, and that does not prevent us from hiring them. Joshua did not tell Ben that he was told that it would be expunged after 1 year. -Ben received a text from Joshua on 3/30/2023 asking why J.T. gets annoyed when people ask him for help. Ben believes Joshua was waiting for a response from J.T., and Ben spoke to Joshua to let him know that J.T. can get busy in meetings, so there may be a delay in his reply. Joshua was one who thought if he had something that needed to get approved for instance, he could walk up to the person and get it done quickly. -Ben does not remember Joshua having a mental breakdown on 5 /25/23, but does remember Joshua telling Ben that he was having problems with his spouse involving their newborn. Ben does not remember Joshua crying, but Joshua was definitely upset. Joshua texted Ben on 5/24/23 to thank him for cookies Ben gave him to cheer Joshua up. That is also when Ben provided Joshua with information about firm resources (EAP, leave management). -Joshua sent Ben a text on 8/9/23 with a picture of a building with the words Anger Management, and Joshua said something like this is fitting laugh out loud (LOL), as Joshua was taking a licensing exam. What Ben remembers happened prior to that text is that J.T. told Joshua that the Private Bank (PB) does not bank government entities. Joshua was trying to persist, and J. T. had told Ben that they will need to have a sit down with Joshua as Joshua may be promising clients something we

can't do. J.T. did not tell Ben that Ben had to inform/include J.T. about anything Joshua does, but there w[...] this where Joshua seemed to not understand/not want to follow firm procedures. -Joshua told Ben that a senior managing director named [redacted] told Joshua that if Joshua isn't getting what he wants, then Joshua should just go to Peter and Elaine who are senior managers (Peter is J.T.'s manager and Elaine is Peter's manager). Ben told Joshua that there is business protocol, and that neither Peter, Elaine, or J.T. would be happy if Joshua began to bypass Ben and J. T. on business matters. Ben explained to Joshua that Peter and Elaine expect J.T. to be in the loop on matters. Ben did not tell J.T. about what Joshua told Ben. Ben does not remember the specific date of the conversation he had with Joshua about that; it may have been in August 2023. -Ben does remember Josh texting him on Friday, 8/25 at 8:46 pm saying: "I quit and I am out." Ben asked what happened, and Josh responds with: "send me whatever form I need to fill out to quit." Ben tries to call Joshua but there is no response. Ben then texted Joshua on Saturday morning, and Joshua tells Ben that he is trying. Ben asked what is he trying, and that he will call Joshua. Joshua tells Ben that everything is fine. Ben calls Joshua around 10am because he was worried about Joshua. Joshua explains that he was meeting with J.T. and things were going well until J.T. told Joshua that it would not be good if Joshua was circumventing J.T. (going around/above him to his managers) or something of that nature. Joshua told Ben that Joshua told J.T. to stop fucking with his top producers and walked away. Joshua said J.T. had a personal vendetta and that Joshua cussed J.T. out and left. When asked by ERP Julie Sanchez whether Joshua mentioned J.T. talking about [redacted] and Joshua and an insurgency, Ben stated Joshua mentioned [redacted] name to Ben, but not about an insurgency or anything of that nature. Ben does not remember what exactly Joshua told Ben about [redacted] though. The following Monday, he did not know where Joshua was. Later that week, Joshua and J.T. spoke and Joshua told Ben that Joshua overreacted over the weekend. -On 9/7/23, Joshua texted Ben about meeting the next day as Joshua does not like the emotional state he is in as he doesn't think this is the right place for him. Ben responded of course they could talk, and that Ben had tried to call Joshua after reading the text but Joshua didn't answer. The situation that led to this was that a client expressed that the assigned investor may not be right for the client. When Joshua told Ben about the client's request, Ben told Joshua that honest feedback needs to be provided to the investor and Ben/Joshua needed to get Kyle Hitchcock involved because he leads the investor team. Joshua told Ben that he did not want to and that Joshua will just speak to the client. Ben gave Kyle a heads up about it, and left a message with Joshua. That night, Joshua returned Ben's call, and with slurred speech told Ben that he told the client that they can get a better looking (attractive female) banker to be assigned to the client but that the investment performance won't change. Both Kyle and Ben told Joshua that was not appropriate to ever say to a client. -Ben did reach to HRBA Stephanie Stainback to talk about Joshua's behavior as well as what Joshua had shared (personal issues). Stephanie did reach out to Joshua to remind him of firm resources as Ben had been trying to encourage Joshua to use as well. -On

**Interviewed Party**
Ben Stewart Jr. (Subject)

Sunday, 9/10 at 11:30, Joshua texted Ben and asked if he could take time off and unofficially say it is a delayed paternity leave even though it is not. Ben told Joshua that he did not know if that was possible since it had been over 16 weeks after the event (birth of his child). Ben circled back to Joshua to let him know that he could not go on a paternity leave at that time, but encouraged and reiterated the firm's resources (Leave Management team). -Ben remembers that Joshua eventually does contact EAP which he tells Ben about sometime in September 2023. Joshua didn't show up to work, and called Ben later in the day to let him know that he contacted EAP. -Joshua did not share a draft of his year-end performance review to Ben with a bullet point of: "Per 9 /22/2023 Business Management Dashboard; $3.62MM risk adjusted revenue growth accounts for 21.34% of the 17-Advisor Fort Worth Single Coverage Team's overall revenue growth." Ben stated that is not an accurate statement even if Joshua had brought that up to Ben. What Joshua did tell Ben during a 1:1 meeting is that Joshua would have been a Gold performer as opposed to a Silver performer. Joshua was part of the Prism trade which recognizes employees for revenue, but not flows. Joshua had asked Ben in the past why Joshua didn't get flows, and Ben had even escalated his question. After internal review, they were informed that the firm does not give flows to any employee for the Prism trade (not just Joshua). So, during the 1:1, Joshua had made a comment to the effect of he knows he's Silver but that is because Ben could not get Joshua flow credit on Prism trade. Ben reminded Joshua that his question had been escalated and answered. There was no other discussion about compensation. -Joshua did express concerns to Ben about known increase in workload expected in Q2 2024, and did not ask for more coverage/support. What Joshua had asked Ben for was more of [redacted] time to support Joshua, even though Ben had offered to have another Associate partner with Joshua. -Ben did not have any advanced knowledge of a meeting Joshua wanted to schedule with Peter Chilian. Joshua told Ben that Joshua met with Peter after the meeting. Joshua did not tell Ben that Peter was running later to their meeting. -On 10/24/23, Ben tried to contact Joshua because he was being unresponsive to clients and employees. Joshua texted Ben at 12:47pm and asked to speak to J.T. and Ben at 1pm. Joshua had walked into the Client Service Center and asked to speak to JT and Ben . They all sit down at 1pm and Joshua told them that he knows they don't want him here, that he wanted them to figure out what to do, and that he knew the firm pays for employees to go away. J.T. and Ben told Joshua that they don't have anything to discuss with him that day. Joshua asked them if he should resign, and Ben said if that is what Joshua wants to do he can process that. Joshua then said he has to think about that. However, there was no discussion or comments about insubordination. -Joshua did not request in advance or tell Ben that he was taking personal days on 10/25, 10/26 or 10/27. Ben was not aware that Joshua had on his work calendar that he was going to meet with Merrill Lynch on 10 /27. Ben did call Joshua in the afternoon on 10/27 upon guidance from ERP Jonathan Jacobs to place Joshua on an administrative leave pending Jonathan's investigation which Ben was not involved in other than being Joshua's manager. Ben left Joshua a message and Joshua returned Ben's call

about 2 hours after he left the message.



**Interview Date**
Jan 16,2024

**Interview Id**
INTVW_NA_0117247372

---

**Interviewed Party**
[redacted] (Witness)

**Interview Summary**

[redacted] He had said that he thought that the workplace was toxic; that he was looking for another job but wasn't sure he wanted to make any moves until bonus season. Since about August, he had told her and other employees that he thinks management was going to fire him and that people were out to get him. Joshua did not provide any details to her on why he thought that. She had not heard him complain about the workplace before August. She had told him that he should resign if he was not happy and he had been complaining for about 3 months, but he did not tell her he was going to resign that day and she didn't think he was going to at that time based on what he was saying about bonus season. She absolutely did not tell him that management or anyone coerced her into planning his exit because that is not true and nobody did. -She is a Christian and Kyle is a Christian and in a leadership position, so she considers him a mentor in that way. Kyle had asked her if she was ok and that she seemed off for about 2 months. She had not told anyone at work about what had happened, and had gone back-and-forth about whether she should. Her friend group encouraged her to do so as she shared it with them, so she finally asked Kyle to meet her at a Starbuck's and told him. Her husband was aware that she was going to report the behavior as well, so had driven her to the Starbuck's so she could tell Kyle. She then told ERP Jonathan Jacobs about the specifics of her concerns. Prior to speaking to Kyle and Jonathan, she had not shared anything she went through to any employee. [redacted] think that there are concerns with Keith's behavior.

**Interview Date**
Jan 16,2024

**Interview Id**
INTVW_NA_0116247322

---

**Interview Summary**
[redacted]

**Interviewed Party**
[redacted]

**Interview Date**
Jan 16,2024

**Interview Id**
INTVW_NA_0116247366

---

**Interview Summary**
[redacted]

**Interviewed Party**
[redacted]

**Interview Date**
Jan 16,2024

**Interview Id**
INTVW_NA_0116247360

---

**Interview Summary**

John (goes by J.T.) Aughinbaugh shared the following on 1/17 at 11:30am CT and at 3:30pm CT (ERP Julie scheduled additional time at 3:30pm as she had not finished asking all of the questions she planned to ask as J.T. had a hard stop at 12:30pm CT). -Joshua never told J.T. about personal problems he was having. J.T. began to notice a change in Joshua in August/September 2023 timeframe. Joshua seemed to be paranoid and acting more unprofessionally; in an erratic /intense/aggressive manner. His communication and interaction with others began to become more unprofessional and not respectful. J.T. is not aware of Joshua requesting to take a leave or absence or accommodations; however, J.T. and Ben had provided Joshua with information about the firm's resources (Employee Assistance Program EAP and Leave Management) and had over time encouraged Joshua to utilize the resources when noticing the change in Joshua's behavior. Josh ined. -J.T. was supportive of Joshua's t [redacted] who is the founder of a company called [redacted] J aware of Joshua's business efforts and they did become a client. What Joshua was looking for was to go outside policy and not follow appropriate procedures. So, if Joshua considers J.T. describing why they could not do that as unsupportive, then that is unfortunate but that is what happened. The firm does notify clients of who will be the client's new contact when an employee leaves the firm. In Joshua's situation, he resigned and they did notify clients. The notification had nothing to do with the investigation or outcome (involuntary resignation), and they did not disclose to clients that Joshua was terminated. -He did not chastise Joshua, but does remember providing Joshua with constructive feedback in March 2023. There was a pre-call that Joshua came unprepared for. The call was not just between Joshua and J.T. but other employees as well. J.T. told Joshua that he needed to come prepared to meetings in order to utilize time efficiently. J.T. did not tell Joshua that the pre-call was a waste of time or not needed. J.T. coached Joshua as J.T. would any employee who came unprepared. -There is a Market Leadership Team budget that is used to enhance the firm's impact on communities. J.T. remembers at least 3 events in which Joshua received some of the budget (which is more than Joshua's peers received), but J.T. does not remember ever denying any from Joshua. J.T. does not remember anything specific to 4/2/23 and a Southlake concert). J.T. did not consider Joshua a troublemaker as a result. -Regarding the National Medal of Honor Museum, [redacted] vetted Joshua's request for $1 million and when Joshua learned of Adam's decision of not pursuing,

Joshua did not like Adam's decision. J.T. does not agree that the way in which Joshua went about it was p Joshua tried to persist with Adam, but did not present Adam with any new information other than trying to tell Adam to change his mind. J.T. coached Joshua to come up with a business plan or provide additional information to Adam rather than just stomping his feet because he didn't get his way type of approach. -J.T. does not remember specifics about May 2023 whether Joshua wad told that he has plenty of coverage and support. However, J.T. shared that he has had that conversation with every employee at some point and likely Joshua as well. Each employee has at some point expressed being under sourced and needing more help. J.T. would tell each that there is equitable but not necessarily equal distribution of resources. He is transparent about each employee understanding that it depends on how much work they are doing and contributions each is making. Recommendations to be efficient with time and resources would not be specific to Joshua. -There was a lunch both he and Joshua attended on 8/8 with the Arlington Tomorrow Foundation. The Foundation was not asking, but Joshua wanted to pursue as a client. The firm declined his request, and Joshua wanted to persist, and basically wanted to evade the firm's controls and policies since the decision was already made. J.T. told Joshua that they would not be presenting to the Client Review Forum as a result. Joshua did not make any comments to J.T. about J.T. serving as an informal transfer agent for public company/prospectus sale and transaction, and that is not accurate regardless. J.T. did not tell Joshua that Joshua did not prepare J.T. for the meeting, and if any meeting requests for a pre-call were declined it would have been because there were already other meetings on the calendar. J.T. described how Joshua would often times send meeting requests for times that were already booked on J.T.'s calendar. Joshua did not seem to care that the times he proposed were not available; Joshua seemed to want to set up meetings at times that were convenient to him without regard to time conflicts /unavailable times that would have already appeared on J.T.'s Outlook calendar. J.T. did not view pre-calls a waste of time and did not tell Joshua to use his time more efficiently. -J.T. never told Peter or Peter's assistant to delay any request from Joshua to meet with Peter. -J.T. is not sure about exact date of 8/25/23, but he does remember having a constructive and enjoyable conversation with Joshua after hours. J.T. remembers he was with Ben, and Joshua was with [redacted] at the same place. [redacted] had left, so Joshua joined Ben and J.T. After Ben left, J.T. and Joshua stayed, but at no time did J.T. tell Joshua that Joshua and [redacted] were planning an insurgency and/or that Joshua doesn't want to be a part of it. J.T. never alluded to or was planning an exit plan for [redacted] or Joshua. What J.T. did mention to Joshua was that he saw Joshua and [redacted] go to lunch, and asked what they were working on/what that was about. Joshua then began to raise his voice, became visibly upset, and told J.T. something to the effect that J.T. better stop fucking with the top producers and see what happens and best of luck to J.T. if he continues to do that. Joshua was yelling in a public place in front of people they did not know, and then Joshua stormed out. From what he said, J.T. gathered that Joshua considers himself and [redacted] as top producers, but J.T. did

**Interviewed Party**
John Aughinbaugh (Subject)

not understand what Joshua meant by J.T. messing with the top producers. J.T. stated that he did not tell [Joshua he] should not go to Peter or Elaine or that it would not be good for Joshua to go above J.T. or anything of that nature. J.T. shared with ERP Julie Sanchez that he later became aware of [redacted] telling Joshua that from a development perspective, it is sometimes good to get visibility so reaching out to senior management like Peter and Elaine is one way to do so. J.T. stated that [redacted] told J.T. that. -J.T. did call Joshua to speak to him about his behavior and walking out the way he did the following week. J.T. does not remember if it was 8 /28/23, and if it was and Joshua was out-of-office, J.T. would not have known that Joshua had a scheduled day off at that time. When they spoke, J.T. did tell Joshua that he was not going to fire him because there were rumors that J. T. heard about that Joshua was telling employees that he was going to get fired. However, J.T. did not tell Joshua that :"I would have figured as a man you would have called me by now apologizing for your behavior" or that he has to come in and we need to settle this/bury this today. -J.T. never told Joshua that he does not think that a leave of absence is the right move for Joshua. J.T. had encouraged Joshua to utilize the firm resources including leaves, and he knows Ben encouraged Joshua as well. -He did not tell Joshua "What the fuck; we agreed we were going to keep the disagreement over beers between us." However, he did tell Joshua that there are rumors spreading, that J.T. had not started them, and told Joshua that if he is telling employees about him cussing and storming out or that J.T. was going to fire him, that would not be productive. He did not tell Joshua that he doesn't know what he's going to do with Joshua yet, or Joshua talking about an insurgency or toxic work environment. -J.T. did not talk to Peter about Joshua before Joshua met with Peter in October 2023. J.T. remembers Peter had given J.T. a heads up that someone on his team (Joshua) had scheduled time to speak to Peter. J.T. did have a reminder on his own calendar to follow up with Joshua after to see how it went. When asked by ERP Julie, J.T. indicated that he does not remember when exactly Peter told him but it would have been verbally and likely in passing when speaking about something else; a professional courtesy. J.T. stated that he meets with Elaine regularly, so a meeting with her on the same day had nothing to do with Joshua. He did not have any pre-calls with Peter about how to deal with Joshua, and did not tell Peter anything about Joshua prior to Joshua meeting with Peter that day. J.T. was unaware that Keith Wiley had met with Peter, so did not have a reminder on his calendar for that. If J.T. was aware, he would have also done the same (reminder in order to follow up to see how things went). -He remembers the meeting with Joshua and Ben on 10/24. Joshua did not say it was a toxic/hostile work environment or talk about his mental health. What he did say were things like: "Be a man, do I need to resign?" "Be a man, should I resign?" From J.T.' s perspective, it felt like Joshua was fishing with his questions and comments and was looking for the firm to pay him to quit and/or for them to tell him to resign. Joshua made a comment during that meeting that he is a veteran with a disability of anxiety. It was the first time J.T. heard of that, and neither he or Ben asked for more information especially in light of the attempts they had made previously

to encourage Joshua to utilize firm resources. At the time of the meeting, there was already an investigation Security) underway, and perhaps Joshua sensed that. However, J.T. did not become hostile or accusatory. J.T. did not tell Joshua that he has a pattern of insubordination or about Joshua's behavior. J.T. spoke as little as possible as it felt more like a trap: like Joshua trying to get them to say or do something. J.T. indicated that they were not in a position to advise him to resign or not, so did not say too much. Joshua did not say he wanted to resign but could not because of his divorce and having mouths to feed. -J.T. was not aware that Joshua took personal days off subsequent to that meeting, and did not know that Joshua had an interview /appointment with Merrill Lynch on 10/27. -J.T. has never heard Keith Wiley make comments like: "she can suck a bowling ball out of a garden hose," was not aware of Keith or anyone getting females to black ball Joshua, and J.T. does not have weekly outings to Buffalo Bros and/or expense any happy hours fraudulently.

**Interview Date**
Jan 17,2024

**Interview Id**
INTVW_NA_0117247510

---

**Interviewed Party**
Elaine Agather (Subject)

**Interview Summary**
Elaine Agather shared the following on 1/17 at 9am CT -She didn't have much interaction with Joshua. [redacted] He started calling them and she tried to help him. The Commercial Bank (CB) had told Joshua that they were not ale to do what Joshua was asking; that CB could not onboard his new business opportunity. He began to plead in a demanding and persistent way. Elaine shared that her viewpoint is always that maybe we can find a way, but in this case CB could not give the line of credit he was pushing for. Other employees also do the same in the sense of trying to get business done; however, the difference with Joshua was that most other bankers know when to stop and Joshua's tone was like you have to do this. She tried to explain to him the why and tried to help him see that it was not something to continue to pursue, but she did not pressure him or the prior Market Manager; there was no pressuring on her part. -She does remember the specific prospective business prospect or specific date when Joshua met with her in 2022, but she does remember that there was issues with the client at that time that were being flagged during the due diligence process and that the lending team could not proceed when Joshua wanted them to. The process was not something she or anyone could bypass. She does not know the details of a liquidity event and/or when that client would have been notified of a replacement; however, they do let clients know when an employee is no longer at the firm and who the replacement will be. That is not specific to Joshua, but to any employee who leaves. In 2023, they would not have told the client the reason Joshua is no longer at the firm (if it was a discharge or not). -She did not know that Joshua met with Peter Chilian until after they met in October. She did have a

meeting with John (J.T.) on 10/18/23 at 2:15pm CT as Elaine looked at her Outlook calendar. How[illegible] speak to Peter before he spoke to Joshua. Her Outlook calendar is accessible to any employee. She does remember that Joshua's managers were noticing behavior from him that was not typical, but she does not remember if she learned that before or after Joshua met with Peter. Again, she did not speak to Peter before Joshua met with Peter, but did after they met.

**Interview Date**
Jan 17,2024

**Interview Id**
INTVW_NA_0117247420

---

**Interviewed Party**
[redacted]

**Interview Summary**
[redacted]

**Interview Date**
Jan 18,2024

**Interview Id**
INTVW_NA_0118247545

---

Disposition

---

**Ben Stewart Jr.** **Disposition ID: DSPN_NA_0130241547**

**Status: SUBMITTED**

Disposition

---

**Primary Allegation**
**ALLG_NA_1208231454**
ERC is a former employee Joshua Biering who disagrees with his involuntary termination. He claims that

# ER Investigation Chronology Supplement

**App. 0944-0973**

Targeted ER chronology supplement (CX152, CX155, CX156, CX157, CX159, CX160, CX162, CX164, CX171): first outreach, scheduling, interview, November 8 conclusion, and every produced status/review-rights follow-up through November 30. Supplements App. 0082-0111.

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| Plaintiff, *Pro Se,* | § | **Case No.** 4:26-cv-00950-P |
| v. | § | Related Case No. 4:26-cv-00381-O |
| **JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., and J.P. MORGAN SECURITIES LLC,** | § | FINRA Case No. 24-01208<br>EEOC Charge No. 450-2024-04743 |
| Defendants. | § | AAA Case No. 01-26-0000-7215 |

**PLAINTIFF'S WORKING APPENDIX SUPPLEMENT — TAB 44**

WORKING v14.08 — CLEAN MARKED SUCCESSOR

LIMITED CONTENTS: CX152, CX155, CX156, CX157, CX159, CX160, CX162, CX164, and CX171, in that exact chronological/source sequence.

SCOPE: The marked passages concern the November 2–30, 2023 ER-investigation communication and status sequence. This v14.08 successor changes only the cover/package version; the nine v14.06 marked components, 29 pages, permanent marks, and order are unchanged from v14.07.

Speaker characterizations remain assertions where identified as such. Source-native Bates/exhibit labels are preserved; no globally stamped appendix-page pins are applied or represented.

Appointment



**From:** Jacobs, Jonathan (HR, USA) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DA06F12967A49D88BF7186AAF76FD60-764AC4D3-47]
**Sent:** 11/2/2023 8:13:16 PM
**To:** josh.biering@gmail.com
**Subject:** Confidential Investigation
**Location:** https://jpmchase.zoom.us/j/3277583727

**Start:** 11/6/2023 3:30:00 PM
**End:** 11/6/2023 4:00:00 PM
**Show Time As:** Tentative

**Required Attendees:** josh.biering@gmail.com

When: Monday, November 06, 2023 10:30 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
Where: https://jpmchase.zoom.us/j/3277583727

Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*~*

Hello Josh,

I'm an employee relations partner with ER's Investigations and Conduct group. ER works on a variety of workplace issues affecting employees. I would like to have a confidential meeting with you about an investigation.

This is time sensitive. Please use the accept option at the top of this invitation to let me know you're attending. If you can't make it at the time I've suggested please reply and give me some other options for when you can meet.

1. Using the Zoom app on a computer or smart device (for video & audio). To join by app, launch Zoom and press "join" then enter my meeting ID: 327 758 3727.
2. Calling in by phone (for audio only). Dial 888-475-4499, then enter my meeting ID: 327 758 3727 and #. There is no participant ID needed.

When you join, please be in a private location where you can talk without being overheard.

This invitation is marked as private; please do not forward this invitation or discuss it with others.

Thank you in advance for your cooperation. I look forward to talking with you.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

Message

**From:** Jacobs, Jonathan (HR, USA) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DA06F12967A49D88BF7186AAF76FD60-764AC4D3-47]
**Sent:** 11/6/2023 2:24:21 PM
**To:** Josh Biering [josh.biering@gmail.com]
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

**Sensitivity:** Private

Hi Josh,

Yes, the meeting will take place over Zoom. As noted in the calendar invitation, you can join the Zoom or dial-in for audio only. Please let me know if you have any further questions.

Regards,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, November 06, 2023 9:22 AM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Excellent- thank you. Likewise- talk tomorrow.

Confirming will this be audio or visual.

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Monday, November 6, 2023 8:17:05 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

Thank you for letting me know. I moved the meeting time to 230 p.m. eastern/130 pm central, given your email. I look forward to speaking with you tomorrow.

Regards,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, November 06, 2023 9:03 AM

Exhibit
CX155

**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private



Jonathan-

My Tuesday afternoon opened up so I'm available anytime after 1:00pm CST if you'd like to schedule earlier.

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 3, 2023 2:55:26 PM
**To:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

I can do 2:30pm cst or later? Alternatively- Wednesday?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Friday, November 3, 2023 2:49:05 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

I do not have availability after 3:30 p.m. CST (the parameter you mentioned in your earlier email). I could meet on Wednesday, November 8, if you have time that day. I am available anytime after 11 am CST. Please let me know if that works better than Tuesday for you.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 03, 2023 3:46 PM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Can you do the afternoon?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Friday, November 3, 2023 2:40:39 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

Would Tuesday, November 7, 2023 at 10:00 a.m. Central (11:00 a.m. Eastern) be convenient for you? If so, I will update my previously-sent calendar invitation.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 03, 2023 3:28 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Jonathan-

I tried calling you to confirm a time but did not have an option to leave a voicemail. Please let me know your availability for Tuesday.

Many thanks,

Josh B.

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 5:49:56 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: Biering/JPMS. RE: Confidential Investigation

Correction- can we please look to Tuesday, 11/7 before 11:00am CST or after 3:30pm CST?

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 5:03:35 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: Biering/JPMS. RE: Confidential Investigation

Thank you- I welcome the opportunity to visit as soon as possible and will make myself available.

Please let me know about availability this Friday.

Thanks all,



JB

Get Outlook for iOS

**From:** Josh Iacuone <iacuone@roggedunngroup.com>
**Sent:** Thursday, November 2, 2023 3:43:14 PM
**To:** Josh Biering <josh.biering@gmail.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Biering/JPMS. RE: Confidential Investigation

Copying Rachel

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 3:40 PM
**To:** jonathan.jacobs@jpmchase.com
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>
**Subject:** Re: Confidential Investigation
**Sensitivity:** Private

Jonathan,

I am copying my attorney and legal representation who I have retained, Josh Iacuone. Mr. Iacuone has also briefly connected with JPMorgan Counsel- Rachel Tidwell Neal.

I'd like to confirm with Counsel regarding his availability as well. Secondly- do you have any availability Friday, 11/3?

Get Outlook for iOS

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Thursday, November 2, 2023 3:13:16 PM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** Confidential Investigation
**When:** Monday, November 6, 2023 9:30 AM-10:00 AM.
**Where:** https://jpmchase.zoom.us/j/3277583727

When: Monday, November 06, 2023 10:30 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
Where: https://jpmchase.zoom.us/j/3277583727

Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*~*

Hello Josh,

I'm an employee relations partner with ER's Investigations and Conduct group. ER works on a variety of workplace issues affecting employees. I would like to have a confidential meeting with you about an investigation.

This is time sensitive. Please use the accept option at the top of this invitation to let me know you're attending. If you can't make it at the time I've suggested please reply and give me some other options for when you can meet.

1. Using the Zoom app on a computer or smart device (for video & audio). To join by app, launch Zoom and press "join" then enter my meeting ID: 327 758 3727.
2. Calling in by phone (for audio only). Dial 888-475-4499, then enter my meeting ID: 327 758 3727 and #. There is no participant ID needed.

When you join, please be in a private location where you can talk without being overheard.

This invitation is marked as private; please do not forward this invitation or discuss it with others.

Thank you in advance for your cooperation. I look forward to talking with you.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Message

App. 0951

**From:** Jacobs, Jonathan (HR, USA) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DA06F12967A49D88BF7186AAF76FD60-764AC4D3-47]
**Sent:** 11/8/2023 5:45:09 PM
**To:** Muraira, Nadia [nadia.muraira@jpmchase.com]
**Subject:** RE: Josh Biering

Hi Nadia,

Yes, I spoke with him yesterday from 2:30 p.m. – 3:20 p.m.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

**From:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Sent:** Wednesday, November 08, 2023 12:45 PM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** RE: Josh Biering

Hello Jonathan,

Were you able to get him to speak with you about the matter?

**From:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Sent:** Wednesday, November 08, 2023 11:44 AM
**To:** Muraira, Nadia <nadia.muraira@jpmchase.com>; Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Subject:** RE: Josh Biering

Hi Nadia,

The ER investigation into the sexual harassment allegation is concluded, and I am working on closing up to the point of disposition. I just wanted to check in to see the status of your investigation, so that we can disposition simultaneously.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

Exhibit
CX156

**From:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Sent:** Tuesday, October 31, 2023 1:57 PM
**To:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>

**Cc:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Subject:** RE: Josh Biering



Hello Jacob,

Redacted

---

**From:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Sent:** Tuesday, October 31, 2023 12:34 PM
**To:** Muraira, Nadia <nadia.muraira@jpmchase.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Cc:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Subject:** Josh Biering

Hi,

Redacted

Thanks,
Rachel

Privileged/confidential

**Rachel Tidwell-Neal** | Assistant General Counsel | **JPMorgan Chase** | 10 S. Dearborn, 6th Floor, Chicago, IL 60603 | P: (312) 732-6517 | rachel.l.tidwell-neal@jpmchase.com

Message

**From:** Jacobs, Jonathan (HR, USA) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DA06F12967A49D88BF7186AAF76FD60-764AC4D3-47]
**Sent:** 11/13/2023 3:46:15 PM
**To:** Josh Biering [josh.biering@gmail.com]
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

**Sensitivity:** Private

Good morning, Josh,

Thank you for your email. The investigation remains open. We will surely be in contact to let you know once it has closed, as well as a determination.

Thank you,

Jonathan

Jonathan A. Jacobs | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, November 13, 2023 10:38 AM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Good Morning Jonathan-

Just wanted to check in on a status of the investigation? As you can imagine- with the holidays coming up- I have several administrative items I need to prepare for- including a new potential employer so I can sure I have income to support my family. Employers will not entertain my inquiries with this pending.

Thank you for your assistance and response-

Josh

Many thanks,

Josh Biering

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Monday, November 6, 2023 8:17:05 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

Thank you for letting me know. I moved the meeting time to 230 p.m. eastern/130 pm central, given your email. I look forward to speaking with you tomorrow.

Regards,

Exhibit
CX157

Jonathan



**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, November 06, 2023 9:03 AM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Jonathan-

My Tuesday afternoon opened up so I'm available anytime after 1:00pm CST if you'd like to schedule earlier.

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 3, 2023 2:55:26 PM
**To:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

I can do 2:30pm cst or later? Alternatively- Wednesday?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Friday, November 3, 2023 2:49:05 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

I do not have availability after 3:30 p.m. CST (the parameter you mentioned in your earlier email). I could meet on Wednesday, November 8, if you have time that day. I am available anytime after 11 am CST. Please let me know if that works better than Tuesday for you.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 03, 2023 3:46 PM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Can you do the afternoon?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Friday, November 3, 2023 2:40:39 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

Would Tuesday, November 7, 2023 at 10:00 a.m. Central (11:00 a.m. Eastern) be convenient for you? If so, I will update my previously-sent calendar invitation.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 03, 2023 3:28 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Jonathan-

I tried calling you to confirm a time but did not have an option to leave a voicemail. Please let me know your availability for Tuesday.

Many thanks,

Josh B.

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 5:49:56 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: Biering/JPMS. RE: Confidential Investigation

Correction- can we please look to Tuesday, 11/7 before 11:00am CST or after 3:30pm CST?

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 5:03:35 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; jonathan.jacobs@jpmchase.com

<jonathan.jacobs@jpmchase.com>

**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: Biering/JPMS. RE: Confidential Investigation

Thank you- I welcome the opportunity to visit as soon as possible and will make myself available.

Please let me know about availability this Friday.

Thanks all,

JB

Get Outlook for iOS

---

**From:** Josh Iacuone <iacuone@roggedunngroup.com>
**Sent:** Thursday, November 2, 2023 3:43:14 PM
**To:** Josh Biering <josh.biering@gmail.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Biering/JPMS. RE: Confidential Investigation

Copying Rachel

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 3:40 PM
**To:** jonathan.jacobs@jpmchase.com
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>
**Subject:** Re: Confidential Investigation
**Sensitivity:** Private

Jonathan,

I am copying my attorney and legal representation who I have retained, Josh Iacuone. Mr. Iacuone has also briefly connected with JPMorgan Counsel- Rachel Tidwell Neal.

I'd like to confirm with Counsel regarding his availability as well. Secondly- do you have any availability Friday, 11/3?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Thursday, November 2, 2023 3:13:16 PM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** Confidential Investigation
**When:** Monday, November 6, 2023 9:30 AM-10:00 AM.
**Where:** https://jpmchase.zoom.us/j/3277583727

When: Monday, November 06, 2023 10:30 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).

Where: https://jpmchase.zoom.us/j/3277583727



Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*~*

Hello Josh,

I'm an employee relations partner with ER's Investigations and Conduct group. ER works on a variety of workplace issues affecting employees. I would like to have a confidential meeting with you about an investigation.

This is time sensitive. Please use the accept option at the top of this invitation to let me know you're attending. If you can't make it at the time I've suggested please reply and give me some other options for when you can meet.

1. Using the Zoom app on a computer or smart device (for video & audio). To join by app, launch Zoom and press "join" then enter my meeting ID: 327 758 3727.
2. Calling in by phone (for audio only). Dial 888-475-4499, then enter my meeting ID: 327 758 3727 and #. There is no participant ID needed.

When you join, please be in a private location where you can talk without being overheard.

This invitation is marked as private; please do not forward this invitation or discuss it with others.

Thank you in advance for your cooperation. I look forward to talking with you.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If

you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Message



**From:** Jacobs, Jonathan (HR, USA) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0DA06F12967A49D88BF7186AAF76FD60-764AC4D3-47]
**Sent:** 11/21/2023 5:03:47 PM
**To:** Josh Biering [josh.biering@gmail.com]
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

**Sensitivity:** Private

Hello Josh,

Thank you for your email. The investigation continues to remain open. I will surely be in contact to let you know as soon as it has closed, as well as a determination.

Regards,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, November 21, 2023 11:59 AM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Good Morning-

Any update or idea of expected timing of any communications?

Many thanks,

Josh Biering

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Monday, November 13, 2023 9:46:15 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Good morning, Josh,

Thank you for your email. The investigation remains open. We will surely be in contact to let you know once it has closed, as well as a determination.

Thank you,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

Exhibit
CX159

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, November 13, 2023 10:38 AM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Good Morning Jonathan-

Just wanted to check in on a status of the investigation? As you can imagine- with the holidays coming up- I have several administrative items I need to prepare for- including a new potential employer so I can sure I have income to support my family. Employers will not entertain my inquiries with this pending.

Thank you for your assistance and response-

Josh

Many thanks,

Josh Biering

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Monday, November 6, 2023 8:17:05 AM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

Thank you for letting me know. I moved the meeting time to 230 p.m. eastern/130 pm central, given your email. I look forward to speaking with you tomorrow.

Regards,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, November 06, 2023 9:03 AM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Jonathan-

My Tuesday afternoon opened up so I'm available anytime after 1:00pm CST if you'd like to schedule earlier.

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 3, 2023 2:55:26 PM

**To:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation



I can do 2:30pm cst or later? Alternatively- Wednesday?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Friday, November 3, 2023 2:49:05 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

I do not have availability after 3:30 p.m. CST (the parameter you mentioned in your earlier email). I could meet on Wednesday, November 8, if you have time that day. I am available anytime after 11 am CST. Please let me know if that works better than Tuesday for you.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 03, 2023 3:46 PM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Can you do the afternoon?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Friday, November 3, 2023 2:40:39 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation

Hi Josh,

Would Tuesday, November 7, 2023 at 10:00 a.m. Central (11:00 a.m. Eastern) be convenient for you? If so, I will update my previously-sent calendar invitation.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 03, 2023 3:28 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** [EXTERNAL]Re: Biering/JPMS. RE: Confidential Investigation
**Sensitivity:** Private

Jonathan-

I tried calling you to confirm a time but did not have an option to leave a voicemail. Please let me know your availability for Tuesday.

Many thanks,

Josh B.

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 5:49:56 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: Biering/JPMS. RE: Confidential Investigation

Correction- can we please look to Tuesday, 11/7 before 11:00am CST or after 3:30pm CST?

Get Outlook for iOS

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 5:03:35 PM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: Biering/JPMS. RE: Confidential Investigation

Thank you- I welcome the opportunity to visit as soon as possible and will make myself available.

Please let me know about availability this Friday.

Thanks all,

JB

Get Outlook for iOS

---

**From:** Josh Iacuone <iacuone@roggedunngroup.com>
**Sent:** Thursday, November 2, 2023 3:43:14 PM
**To:** Josh Biering <josh.biering@gmail.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Biering/JPMS. RE: Confidential Investigation

Copying Rachel



Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Thursday, November 2, 2023 3:40 PM
**To:** jonathan.jacobs@jpmchase.com
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>
**Subject:** Re: Confidential Investigation
**Sensitivity:** Private

Jonathan,

I am copying my attorney and legal representation who I have retained, Josh Iacuone. Mr. Iacuone has also briefly connected with JPMorgan Counsel- Rachel Tidwell Neal.

I'd like to confirm with Counsel regarding his availability as well. Secondly- do you have any availability Friday, 11/3?

Get Outlook for iOS

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Thursday, November 2, 2023 3:13:16 PM
**To:** josh.biering@gmail.com <josh.biering@gmail.com>
**Subject:** Confidential Investigation
**When:** Monday, November 6, 2023 9:30 AM-10:00 AM.
**Where:** https://jpmchase.zoom.us/j/3277583727

When: Monday, November 06, 2023 10:30 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
Where: https://jpmchase.zoom.us/j/3277583727

Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*~*

Hello Josh,

I'm an employee relations partner with ER's Investigations and Conduct group. ER works on a variety of workplace issues affecting employees. I would like to have a confidential meeting with you about an investigation.

This is time sensitive. Please use the accept option at the top of this invitation to let me know you're attending. If you can't make it at the time I've suggested please reply and give me some other options for when you can meet.

1. Using the Zoom app on a computer or smart device (for video & audio). To join by app, launch Zoom and press "join" then enter my meeting ID: 327 758 3727.
2. Calling in by phone (for audio only). Dial 888-475-4499, then enter my meeting ID: 327 758 3727 and #. There is no participant ID needed.

When you join, please be in a private location where you can talk without being overheard.

This invitation is marked as private; please do not forward this invitation or discuss it with others.



Thank you in advance for your cooperation. I look forward to talking with you.

Best,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Message

App. 0965

**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 11/24/2023 11:20:43 PM
**To:** Muraira, Nadia [nadia.muraira@jpmchase.com]; Jacobs, Jonathan (HR, USA) [jonathan.jacobs@jpmchase.com]
**CC:** Josh Iacuone [iacuone@roggedunngroup.com]; Tidwell-Neal, Rachel L (Legal, USA) [rachel.l.tidwell-neal@jpmchase.com]
**Subject:** [EXTERNAL]Re: J. Biering- JPMorgan - SID I662283

Good Evening All-

I just wanted to follow up and share that I received another call this afternoon- which appears to be a call that was intended for my former JPmorgan mobile # via Movius. I instructed the caller that I should not be receiving calls from that number any longer.

I just wanted to follow up to see if you had any guidance and could pass along the privacy agreement? Naturally I'm concerned as I'm trying to learn how my manager(s) knew I was visiting and interviewing with a competitor on Friday, 10/27/2023 - right before I received notice I was being placed on an administrative leave.

Thank you in advance and I am anxiously standing by for any additional information or guidance as my prospective employers are beginning to withdraw or reconsider pending job offers with my Garden Leave expiring 12/26 and with FINRAs closure during the Holidays- could hinder any transfers of my securities licenses.

Many thanks,

Josh Biering

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Monday, November 20, 2023 11:47:18 AM
**To:** nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>; jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** J. Biering- JPMorgan - SID I662283

Good Morning-

I just received a phone call from a "JPMC Multiuse #" and I answered the call. When I answered - it was a "former client" calling me on my work cell phone number (Movius).

I immediately shared I resigned and I cannot share much more information but to call my work line directly.

I'm concerned as I was under the impression that my access was blocked to all systems- including Movius. I wanted to share this immediately as to avoid any further accusations or implications.

Can you also please provide me with the data privacy policy as to ensure my personal data is not cross pollinated?

Many thanks,

Josh

Exhibit
CX160

Many thanks,



Josh Biering

Message



**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 11/29/2023 5:47:28 PM
**To:** Jacobs, Jonathan (HR, USA) [jonathan.jacobs@jpmchase.com]
**Subject:** [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Jonathan-

This is very concerning to me. I feel as if JPMorgan is holding me hostage in this state of limbo and I feel I have the right to receive a detailed update rather than "an ongoing investigation. "

It appears to me that JPmorgan is trying to unethically buy time to try and contact several clients and protect their back door while using an investigation(or more than one investigation?) as a tool to buy time.

Can you please provide me an update or status that is more detailed than "ongoing"?

- who initiated this?
- What facts are there supporting the claim?
- Have initial findings been submitted to management for review?
- What are next milestones?

I have sent multiple email requests for updates and follow ups and have not heard a proper update. This is not right.

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, November 28, 2023 2:40:28 PM
**To:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>; nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Good Afternoon Jonathan and Rachel-

Can you please provide me with an update at your convenience? Today marks 30 days from my resignation submission, and I was hopeful to hear from you following the Thanksgiving Holiday.

Additionally- can you please advise on how I should approach my 2023 Year End-Self Assessment? After logging into the non-employee, me@jpmc portal this morning, I saw a reminder to submit my 2023 Year End Review, due by October 31st. I clicked on the link but was not able to access the site due to restrictions in place.

If memory serves me correctly, I emailed a word document draft of my completed assessment to my direct manager, Ben Stewart, on/or before 9/28/2023- right before our scheduled 1:1 meeting/discussion. I just wanted to make sure I do not forfeit any earned incentives for my nationally recognized "Gold Performance" for the 2023 Metric Year that ended 9/30/2023. I acknowledge year end reviews must be officially submitted

Exhibit
CX162

through the "Career Portal", but since my access has been restricted, I have not had access and would hope that my email submission to my manager on 9/28/2023 would suffice.



Thank you and I am eagerly standing by for next steps.

Josh B.



Message

App. 0969

**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 11/29/2023 7:41:38 PM
**To:** Jacobs, Jonathan (HR, USA) [jonathan.jacobs@jpmchase.com]
**Subject:** Re: [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Does within the next week imply by end of this week?

At what point will I be within my employee rights to review any of the information?

Regards,

JB

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Wednesday, November 29, 2023 1:26:26 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Good afternoon, Josh,

Thank you for your email. Employee Relations investigations are confidential, and so I would not be able to provide responsive answers to some of your bullet points. Regarding next milestones/time table, I would hope that an outcome may be communicated within the next week.

Regards,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, November 29, 2023 12:47 PM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Jonathan-

This is very concerning to me. I feel as if JPMorgan is holding me hostage in this state of limbo and I feel I have the right to receive a detailed update rather than "an ongoing investigation. "

It appears to me that JPmorgan is trying to unethically buy time to try and contact several clients and protect their back door while using an investigation(or more than one investigation?) as a tool to buy time.

Can you please provide me an update or status that is more detailed than "ongoing"?

- who initiated this?
- What facts are there supporting the claim?
- Have initial findings been submitted to management for review?
- What are next milestones?

I have sent multiple email requests for updates and follow ups and have not heard a proper update. This is not right.

Exhibit
CX164

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, November 28, 2023 2:40:28 PM
**To:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>; nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Good Afternoon Jonathan and Rachel-

Can you please provide me with an update at your convenience? Today marks 30 days from my resignation submission, and I was hopeful to hear from you following the Thanksgiving Holiday.

Additionally- can you please advise on how I should approach my 2023 Year End-Self Assessment? After logging into the non-employee, me@jpmc portal this morning, I saw a reminder to submit my 2023 Year End Review, due by October 31st. I clicked on the link but was not able to access the site due to restrictions in place.

If memory serves me correctly, I emailed a word document draft of my completed assessment to my direct manager, Ben Stewart, on/or before 9/28/2023- right before our scheduled 1:1 meeting/discussion. I just wanted to make sure I do not forfeit any earned incentives for my nationally recognized "Gold Performance" for the 2023 Metric Year that ended 9/30/2023. I acknowledge year end reviews must be officially submitted through the "Career Portal", but since my access has been restricted, I have not had access and would hope that my email submission to my manager on 9/28/2023 would suffice.

Thank you and I am eagerly standing by for next steps.

Josh B.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

Message

**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 11/30/2023 3:23:22 PM
**To:** Jacobs, Jonathan (HR, USA) [jonathan.jacobs@jpmchase.com]
**Subject:** Re: [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Sorry for all the follow ups- given the limited communication you can imagine I have so many questions.

Assuming findings are reported in a timely fashion- will my rights be communicated to me in terms of my rights to respond and review the facts, evidence and findings?

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, November 29, 2023 1:41:38 PM
**To:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Subject:** Re: [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Does within the next week imply by end of this week?

At what point will I be within my employee rights to review any of the information?

Regards,

JB

---

**From:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>
**Sent:** Wednesday, November 29, 2023 1:26:26 PM
**To:** Josh Biering <josh.biering@gmail.com>
**Subject:** RE: [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Good afternoon, Josh,

Thank you for your email. Employee Relations investigations are confidential, and so I would not be able to provide responsive answers to some of your bullet points. Regarding next milestones/time table, I would hope that an outcome may be communicated within the next week.

Regards,

Jonathan

**Jonathan A. Jacobs** | Vice President | Employee Relations, HR Special Investigations | JPMorgan Chase & Co. | 545 Washington Blvd, Floor 12, Jersey City, New Jersey 07310|
(t) 551-205-4056| jonathan.jacobs@jpmchase.com | Pronouns: he/him/his

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, November 29, 2023 12:47 PM
**To:** Jacobs, Jonathan (HR, USA) <jonathan.jacobs@jpmchase.com>
**Subject:** [EXTERNAL]Fwd: J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Exhibit
CX171

Jonathan-



This is very concerning to me. I feel as if JPMorgan is holding me hostage in this state of limbo and I feel I have the right to receive a detailed update rather than "an ongoing investigation. "

It appears to me that JPmorgan is trying to unethically buy time to try and contact several clients and protect their back door while using an investigation(or more than one investigation?) as a tool to buy time.

Can you please provide me an update or status that is more detailed than "ongoing"?

- who initiated this?
- What facts are there supporting the claim?
- Have initial findings been submitted to management for review?
- What are next milestones?

I have sent multiple email requests for updates and follow ups and have not heard a proper update. This is not right.

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Tuesday, November 28, 2023 2:40:28 PM
**To:** jonathan.jacobs@jpmchase.com <jonathan.jacobs@jpmchase.com>; Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>; nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** J. Biering - SID I662283- JPMorgan- Garden Leave- 2023 Self Assessment?

Good Afternoon Jonathan and Rachel-

Can you please provide me with an update at your convenience? Today marks 30 days from my resignation submission, and I was hopeful to hear from you following the Thanksgiving Holiday.

Additionally- can you please advise on how I should approach my 2023 Year End-Self Assessment? After logging into the non-employee, me@jpmc portal this morning, I saw a reminder to submit my 2023 Year End Review, due by October 31st. I clicked on the link but was not able to access the site due to restrictions in place.

If memory serves me correctly, I emailed a word document draft of my completed assessment to my direct manager, Ben Stewart, on/or before 9/28/2023- right before our scheduled 1:1 meeting/discussion. I just wanted to make sure I do not forfeit any earned incentives for my nationally recognized "Gold Performance" for the 2023 Metric Year that ended 9/30/2023. I acknowledge year end reviews must be officially submitted through the "Career Portal", but since my access has been restricted, I have not had access and would hope that my email submission to my manager on 9/28/2023 would suffice.

Thank you and I am eagerly standing by for next steps.

Josh B.

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# Global Security Expense Sequence Supplement

**App. 0975-0992**

Targeted Global Security supplement: CX183 October 20 referral/opening and October 23 assignment metadata; CX184 ?vague weekly expense report? request; CX187 ranked allegations; Plaintiff's November 17 response; and the later disconnected-number assertion. Supplements App. 0113-0127.

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,**<br><br>Plaintiff, *Pro Se*,<br>v.<br><br>**JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., and J.P. MORGAN SECURITIES LLC,**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No.** 4:26-cv-00950-P<br>Related Case No. 4:26-cv-00381-O<br>FINRA Case No. 24-01208<br>EEOC Charge No. 450-2024-04743<br>AAA Case No. 01-26-0000-7215 |

**PLAINTIFF'S WORKING APPENDIX SUPPLEMENT — TAB 45**

WORKING v14.08.01 — CORRECTED LIMITED CLEAN MARKED SUCCESSOR

LIMITED CONTENTS: CX183-1–2 (JPMS000836–37); JPMS00024862; JPMS00024867–68; JPMS00024878–80; CX184-1 (JPMS00024952); CX187-1–3 (JPMS00025211–13); JPMS00025331; CX044; CX045; and JPMS00024148 — only. CX183-1 carries opening/assignment metadata; CX183-2 carries the October 20 web-referral case note used for UMF 23.

ASSERTION LIMIT: The disconnected-number language in CX044, CX045, and JPMS00024148 is Biering's later assertion. Its inclusion does not independently prove that the line was disconnected.

EXCLUSIONS: Interview, peer/comparator, no-found-violation, and formal-close records remain outside this supplement in Tab 9. Source-native Bates/exhibit labels and permanent relied-passage marks are preserved; no globally stamped appendix-page pins are applied or represented.

# Integrated Case Manager

Exported Date: 11/01/2023, 13:53:23

Item Id: EC_NA_1020239740

**Workflow Status**
Investigation in Process

**Date Open**
10/20/2023, 19:11:59

**Investigation Owner**
Muraira, Nadia

**Assigned Date**
10/23/2023, 10:26:25

**Created By**
NAVEX

**Disposition Owner**

**Subject**
Biering,Joshua(I662283)

**Tags**

## Item Details

**Workgroup**
GS Investigations 5

**Type**
Theft from Firm

**Subtype**
Expense Reimbursement

**LOB**
ASSET & WEALTH MANAGEMENT

**Sub-LOB**
GLOBAL PRIVATE BANK

**Legal Entity**
0802 JPMORGAN CHASE BANK, N. A.

**Country**
US

**Region**
NA

## Incident Information

**Incident Date**

**Incident Location**
US

**Aware of Incident Date**

**Incident Description**
I am an HR Business Advisor. One of the managers who I support, Ben Stewart, reported to me that he thinks his employee, Joshua Biering, has been repeatedly charging and expensing personal charges to JPM. The manager became concerned after he received details on prior expense report(s) with no known reason for these charges. The repeated charges are at a country club and include alcohol, golf fees and meals and total approximately $3500.

**Is a Customer Involved?**

## Referring & Submitting Party Information

**Referring Party**
Stephanie Stainback

**Anonymous Request**
N

**Referral ID & Source**
100032022 NAVEX

**Referral Channel**
NAVEX

Exhibit
CX183

**Submitting Party** **Submitting Party Phone Number**

App. 0977

**Alternate**
713-216-8773

Notes

**Recent Notes**

10/31/2023, 18:36:55 Updated by Muraira, Nadia

original -10/31/2023, 18:36:55

Notified Legal-Jody Gilzene about matter due to EE retaining attorney who is persistent in speaking with JPMC

10/31/2023, 18:36:29 Updated by Muraira, Nadia

original -10/31/2023, 18:36:29

Contacted via email from LOB HR-Jonathan Jacobs about EE resigned and has retained counsel. Scheduled meeting with Jacobs for Wednesday 11/01/2023.

10/23/2023, 17:32:13 Updated by Muraira, Nadia

original -10/23/2023, 17:28:34

Vendor: River Crest Country Club (aggregate of $8,061.36) 06/02/2023 @ $1,040.08 06/07/2023 @ $518.97 06/20/2023 @ $5.86 06/30/2023 @ $132.65 08/11/2023 @ $382.44 08/30/2023 @ $311.56 08/31 /2023 @ $551.45 09/04/2023 @ $754 09/07/2023 @ $1,242.18 09/08/2023 @ $226.36 09/13/2023 @ $580.35 09/17/2023 @ $664.46 09/22/2023 @ $1,651.00

10/23/2023, 17:27:58 Updated by Muraira, Nadia

original -10/23/2023, 17:27:58

ED provided receipts between June 2, 2023 to September 22, 2023. Aggregate amount: $8,061.36

10/20/2023, 20:29:24 Updated by Butsko, Melissa C

original -10/20/2023, 20:29:24

On 10/20/2023, Global Security Investigations received a web referral involving a potential internal matter. Transferring to the region for further Investigation.

10/20/2023, 19:11:59 Updated by NAVEX

original -10/20/2023, 19:11:59

CaseNote = Primary Issue Type:Fraud Date Submitted = Org Name = JPMorgan Chase Bank Date Opened = 2023-10-20T11:55:25 EthicsPoint Case ID = 7135488 Participant[0]: Participant First Name = Stephanie Participant Last Name = Stainback Participant Role = Reporter Intake Question[0]: Question Text = SID#: Answer Provided = u729056 Intake Question[1]: Question Text = What is your relationship to JPMorgan Chase? Answer Provided = Employee Intake Question[2]: Question Text = First Name Answer Provided = Joshua Intake Question[3]: Question Text = Last Name Answer Provided = Biering Intake Question[4]: Question Text = Title Answer Provided = Executive Director Intake Question[17]: Question Text = What is the SID of the employee you are reporting about (if known)? Answer Provided = I662283

Tags

Message

**From:** Muraira, Nadia [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9AF9C792477A47E9AB8A7A07534D73E0-I780946]
**Sent:** 10/23/2023 12:26:33 PM
**To:** Stewart, Ben (WM, USA) [ben.stewart@jpmorgan.com]
**Subject:** Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL

Hello Ben,

I am working an investigation involving Joshua D. Biering (I662283) and I would like to discuss this matter with you. Please let me know when works best for you so we can schedule a time to talk.

Additionally, Joshua D. Biering (I662283) does not need to be made aware that they are the subject of an investigation at this time. I have found that people who know ahead of time, tend to overly stress.

Thank you for your time and attention to this matter. I look forward to hearing from you.

**Nadia Muraira** | Investigator VP | Global Security | JP Morgan Chase & Co. | 712 Main Street, Houston, TX 77002 | T: 713-216-7247 | nadia.muraira@jpmchase.com

**Learn more at** go/besecure

Be secure

Message

App. 0979

| | |
|---|---|
| **From:** | Muraira, Nadia [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9AF9C792477A47E9AB8A7A07534D73E0-I780946] |
| **Sent:** | 10/23/2023 12:37:43 PM |
| **To:** | Stewart, Ben (WM, USA) [ben.stewart@jpmorgan.com] |
| **Subject:** | RE: Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL |

Hi Ben,

Invite sent for today at 12:30 to 1PM CST. Please accept invite and call me then, thank you.

Also, please forward any research (invoice, corporate card information, date and time of transaction, etc.) Thanks in advance.

---

**From:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Sent:** Monday, October 23, 2023 7:31 AM
**To:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Subject:** Re: Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL

Hi Nadia,

I am open today from 1045 to 3pm and tomorrow 930am to 1pm.

Any chance somewhere in there works?

Thanks

---

**Ben Stewart Jr.**, CFP® | Executive Director | Market Team Lead | **J.P. Morgan Private Bank** |
420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4003 | M: 817 845 9676 |
ben.stewart@jpmorgan.com | privatebank.jpmorgan.com

**Client Service Team:** 877 576 2874

Click here to see the JPMorgan Chase Privacy Policy: https://www.jpmorgan.com/pages/privacy

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT AND INSURANCE PRODUCTS: • NOT A DEPOSIT • NOT FDIC INSURED • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • MAY LOSE VALUE**

**JPMorgan Chase Bank, N.A.** and its affiliates (collectively "JPMCB") offer investment products, which ma[...] managed accounts and custody, as part of its trust and fiduciary services. Other investment products and s[...] brokerage and advisory accounts, are offered through **J.P. Morgan Securities LLC** ("JPMS"), a member of FINRA and SIPC. Annuities and insurance products are made available through Chase Insurance Agency, Inc. ("CIA"), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS and CIA are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states.

---

**From:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Sent:** Monday, October 23, 2023 7:26:33 AM
**To:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Subject:** Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL

Hello Ben,

I am working an investigation involving Joshua D. Biering (I662283) and I would like to discuss this matter with you. Please let me know when works best for you so we can schedule a time to talk.

Additionally, Joshua D. Biering (I662283) does not need to be made aware that they are the subject of an investigation at this time. I have found that people who know ahead of time, tend to overly stress.

Thank you for your time and attention to this matter. I look forward to hearing from you.

**Nadia Muraira** | Investigator VP | Global Security | JP Morgan Chase & Co. | 712 Main Street, Houston, TX 77002 | T: 713-216-7247 | nadia.muraira@jpmchase.com

**Learn more at** go/besecure
Be secure

Message

**From:** Stewart, Ben (WM, USA) [ben.stewart@jpmorgan.com]
**Sent:** 10/23/2023 4:15:53 PM
**To:** Muraira, Nadia [nadia.muraira@jpmchase.com]
**Subject:** RE: Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL
**Attachments:** Receipts RCCC4.pdf; Receipts RCCC1.pdf; Receipts RCCC2.pdf; Receipts RCCC3.pdf

Hi Nadia,

The attached reimbursements are what I'm most concerned with.

Thanks,

---

**Ben Stewart Jr.**, CFP® | Executive Director | Market Team Lead | **J.P. Morgan Private Bank** |
420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4003 | M: 817 845 9676 |
ben.stewart@jpmorgan.com | privatebank.jpmorgan.com

**Client Service Team:** 877 576 2874

Click here to see the JPMorgan Chase Privacy Policy: https://www.jpmorgan.com/pages/privacy

J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT AND INSURANCE PRODUCTS: • NOT A DEPOSIT • NOT FDIC INSURED • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • MAY LOSE VALUE**

**JPMorgan Chase Bank, N.A.** and its affiliates (collectively " JPMCB" ) offer investment products, which may include bank-managed accounts and custody, as part of its trust and fiduciary services. Other investment products and services, such as brokerage and advisory accounts, are offered through **J.P. Morgan Securities LLC** (" JPMS" ), a member of FINRA and SIPC. Annuities and insurance products are made available through Chase Insurance Agency, Inc. (" CIA" ), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS and CIA are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states.

---

**From:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Sent:** Monday, October 23, 2023 7:38 AM
**To:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Subject:** RE: Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL

Hi Ben,

Invite sent for today at 12:30 to 1PM CST. Please accept invite and call me then, thank you.

Also, please forward any research (invoice, corporate card information, date and time of transaction, etc.) Thanks in advance.



**From:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Sent:** Monday, October 23, 2023 7:31 AM
**To:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Subject:** Re: Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL

Hi Nadia,

I am open today from 1045 to 3pm and tomorrow 930am to 1pm.

Any chance somewhere in there works?

Thanks

---

**Ben Stewart Jr.**, CFP® | Executive Director | Market Team Lead | **J.P. Morgan Private Bank** |
420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4003 | M: 817 845 9676 |
ben.stewart@jpmorgan.com | privatebank.jpmorgan.com

**Client Service Team:** 877 576 2874

Click here to see the JPMorgan Chase Privacy Policy: https://www.jpmorgan.com/pages/privacy



J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT AND INSURANCE PRODUCTS: • NOT A DEPOSIT • NOT FDIC INSURED • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • MAY LOSE VALUE**

**JPMorgan Chase Bank, N.A.** and its affiliates (collectively "JPMCB") offer investment products, which may include bank-managed accounts and custody, as part of its trust and fiduciary services. Other investment products and services, such as brokerage and advisory accounts, are offered through **J.P. Morgan Securities LLC** ("JPMS"), a member of FINRA and SIPC. Annuities and insurance products are made available through Chase Insurance Agency, Inc. ("CIA"), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS and CIA are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states.

---

**From:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Sent:** Monday, October 23, 2023 7:26:33 AM

**To:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Subject:** Global Security Investigation-Joshua D. Biering (I662283)-CONFIDENTIAL



Hello Ben,

I am working an investigation involving Joshua D. Biering (I662283) and I would like to discuss this matter with you. Please let me know when works best for you so we can schedule a time to talk.

Additionally, Joshua D. Biering (I662283) does not need to be made aware that they are the subject of an investigation at this time. I have found that people who know ahead of time, tend to overly stress.

Thank you for your time and attention to this matter. I look forward to hearing from you.

**Nadia Muraira** | Investigator VP | Global Security | JP Morgan Chase & Co. | 712 Main Street, Houston, TX 77002 | T: 713-216-7247 |
nadia.muraira@jpmchase.com

**Learn more at** go/besecure

Be secure

Message



**From**: Muraira, Nadia [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=9AF9C792477A47E9AB8A7A07534D73E0-I780946]
**Sent**: 10/23/2023 7:03:55 PM
**To**: Huynh, Van T. [Van.T.Huynh@chase.com]
**Subject**: Global Security Investigation-EC_NA_1020239740-CONFIDENTIAL

Hello Van,

I am currently investigating a matter regarding Joshua Biering (I662283). There are allegations of theft as it pertained to personal charges expensed and approved through the employee's corporate issued card.

I spoke to his direct supervisor (Ben Stewart/N682989) who provided me a vague weekly expense reported that had "approved purchases"; however, Ben believed these are personal charges to his corporate card. It is alleged that between June 2023 and September 2023, he has accrued over $8,000 in personal charges that were paid back to the employee.

Can you assist me with detailed data (receipts/invoices, expense reports, authorized purchases, etc.)? Any and all information that could assist my investigation would greatly be appreciated. If we need to connect, I have availability. Let me know when works best for you. Thanks in advance.

**Nadia Muraira** | Investigator VP | Global Security | JP Morgan Chase & Co. | 712 Main Street, Houston, TX 77002 | T: 713-216-7247 |
nadia.muraira@jpmchase.com

**Learn more at** go/besecure
Be secure

Exhibit
CX184

Message

**From**: Stainback, Stephanie (WM, USA) [Stephanie.Stainback@jpmorgan.com]
**Sent**: 10/25/2023 7:43:30 PM
**To**: Stewart, Ben (WM, USA) [ben.stewart@jpmorgan.com]; Muraira, Nadia [nadia.muraira@jpmchase.com]
**Subject**: RE: Expense Report Concerns: I662283
**Attachments**: J. B. Report of 10.10.pdf; Receipts RCCC1.pdf; RCCC 8.30 8.31.pdf; J. B. Report of 10.2b.pdf

Thank you, Ben. I've added the attachments referenced below.

---

**From:** Stewart, Ben (WM, USA) <ben.stewart@jpmorgan.com>
**Sent:** Wednesday, October 25, 2023 2:31 PM
**To:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Cc:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Subject:** Expense Report Concerns: I662283

Nadia,

Below are the expenses that have brought the most concern after my review with explanations included. I'd appreciate further investigation into these matters so that we can assure no abuse of company funds is taking place. I have ordered the below from most concerning to lesser but still worth understanding further.

1. 9/17: Location of charges : Rivercrest Country Club "RCCC" (club fees/charges that Josh submitted as company expenses and received repayment for)
   a. Receipt attached for reference is titled "J.B. Report of 10.10" and pictures of receipts entitled "Receipts RCCC1"
   b. Within the report, please reference all five charges listed for 9/17.
      i. Amounts: $664.46 in total comprised of entries for $98.73, $98.71, $298.78, $72.74, $95.50
   c. All charges list attendees of J[redacted], K[redacted] W[redacted] (ED Banker), and Prospective Client J[redacted] M[redacted]
   d. When discussing this outing with K[redacted] W[redacted], he confirmed that there were no clients present and this was just a team member outing to his knowledge. As a non-member K[redacted] forwardly told Josh that he would be happy to pay his nonmember fee to which josh told K[redacted], "ive got it covered". K[redacted] was not under the assumption that the firm paid for this and he confirmed that J[redacted] M[redacted] was seen in passing but they did not sit down and meet or share meals and drinks as the expense report outlines. To K[redacted] knowledge, Josh had paid for everything as a personal expense given there were no clients present for this outing and only internal team members. In addition, J[redacted] M[redacted] is a prospective client of K[redacted] W[redacted]
   e. This is not a meeting that was listed on Josh's calendar either which is not typical for this type of entertainment that would have been preplanned if legitimate.
2. 9/4 : Location of charges : Rivercrest Country Club "RCCC" (club fees/charges that Josh submitted as company expenses and received repayment for)
   a. Receipt attached for reference is titled "J.B. Report of 10.10" and pictures of receipts entitled "Receipts RCCC1"
   b. Within the report, please reference all five charges listed for 9/4.
      i. Amounts: $1,207.58 in total comprised of entries for $16.25, $453.58, $453.58, $99.03, $101.99, $83.15
   c. All charges are listed with two attorneys that the firm works with in the Fort Worth area, Ryan Heah and Chris Baker.
   d. The reason this charge and receipts have raised concern is due to the fact this was on a bank holiday where we typically don't see clients or centers of influence.
   e. Given the nature of the charges, "Jr Mac and Cheese" and excessive amounts of alcohol this appears to be a personal outing with friends that was then submitted to the firm to pay him back for.
   f. The amount of the transactions and the fact that they were broken into separate charges (assumingly to stay under the cost per head) is reflective of potential abuse of the company limitations.

   g. This meeting is not listed on Josh's calendar and that day in general is marked as "off/away" for Josh given the holiday.
   h. I believe this is a personal expense in nature that Josh has charged to the firm after the fact.
3. 8/30 : Location of charges : Rivercrest Country Club "RCCC" (club fees/charges that Josh submitted as company expenses and received repayment for)
   a. Receipt attached for reference is titled "J.B. Report of 10.2b" and pictures of receipts entitled "RCCC8.30 8.31"
   b. Within the report for 8/30 Josh lists the attendees as himself, Clients: D[redacted] L[redacted], C[redacted] L[redacted], and B[redacted] L[redacted]
   c. The issue here is that they did not visit the country club on two separate occasions that week.
   d. The concern I have is that the charges for 8/30 totaling $311.38. The charges include one guest fee even though the 3 nonmembers listed on the expense report would account for 3 nonmember fees. I am confused how 3 people can only be charged for 1 nonmember fee. This leads me to believe Josh listed attendees for personal expenses on the 30 and business related on the 31st.
   e. Also concerning on this report is the time of the charges as they range from 2pm in the afternoon to 7:05pm which feels like an unlikely time to be meeting with clients.
   f. This meeting is also not on Josh's calendar as a pre scheduled meeting as per his usual activity.
   g. I believe that this is a personal expense that Josh listed clients as attendees which produced personal gain.
4. 8/31: 30 : Location of charges : Rivercrest Country Club "RCCC" (club fees/charges that Josh submitted as company expenses and received repayment for)
   a. Receipt attached for reference is titled "J.B. Report of 10.2b" and pictures of receipts entitled "RCCC8.30 8.31"
   b. Within the report for 8/31 Josh again lists the attendees as himself, Clients: D[redacted] L[redacted] C[redacted] L[redacted], and B[redacted] L[redacted] (TWO DAYS IN A ROW IS EXTREMELY UNLIKELY)
   c. The concern I have specific to this date is that the charges for this date would appropriately reflect charges for 2 nonmembers. Josh still listed 3 nonmembers which leads me to believe it is to keep charges under the allowable amount per person.
   d. I believe Josh listed clients for two separate dates in order to cover up a personal outing on 8/30.

I appreciate all the help you have been as we look into this matter. Please let me know if you have any other questions as I am happy to discuss.

Thanks,

**Ben Stewart Jr.**, CFP® | Executive Director | Market Team Lead | **J.P. Morgan Private Bank** |
420 Throckmorton St, Floor 03 | Fort Worth, TX 76102 | T: 817 884 4003 | M: 817 845 9676 |
ben.stewart@jpmorgan.com | privatebank.jpmorgan.com

**Client Service Team**: 877 576 2874

Click here to see the JPMorgan Chase Privacy Policy: https://www.jpmorgan.com/pages/privacy



J.P. Morgan Securities LLC | JPMorgan Chase Bank, N.A.

Our *Form CRS* (Client Relationship Summary) and *Guide to Investment Services and Brokerage Products* contain important information about the ways we can serve you, the different investment products and services we offer, their fees and costs, how we are compensated and potential conflicts of interest we may have.

**NOT AN OFFICIAL CONFIRMATION OR VALUATION OF ANY TRANSACTION. Trade instructions will not be accepted through Electronic Mail (E-mail).** For informational purposes only. This does not represent an official account of the holdings, balances, or transactions made in your account. Please refer to your monthly account statement for the official

record of all of your account activities. For questions, please call your J.P. Morgan representative. JPMorgan Chase & Co. and its affiliates and employees do not provide tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any financial transactions. Please submit personal information to J.P. Morgan through a secure manner (e.g., Secure Message Center, Client Exchange, postal mail, fax or in person). **Important risk considerations for certain investment products and asset classes can be found HERE.**

**INVESTMENT AND INSURANCE PRODUCTS: • NOT A DEPOSIT • NOT FDIC INSURED • NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY • NO BANK GUARANTEE • MAY LOSE VALUE**

**JPMorgan Chase Bank, N.A.** and its affiliates (collectively JPMCB) offer investment products, which may include bank-managed accounts and custody, as part of its trust and fiduciary services. Other investment products and services, such as brokerage and advisory accounts, are offered through **J.P. Morgan Securities LLC** (JPMS), a member of FINRA and SIPC. Annuities and insurance products are made available through Chase Insurance Agency, Inc. (CIA), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS and CIA are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states.

Message

**From**: Josh Biering [josh.biering@gmail.com]
**Sent**: 11/17/2023 10:02:33 PM
**To**: Muraira, Nadia [nadia.muraira@jpmchase.com]
**Subject**: [EXTERNAL]Re: Validate External Sender- Garden Leave - SID I662283
**Attachments**: J. Biering - JPMorgan Background Info - Expenses- 11.16.2023.pdf

Nadia-

I apologize for the delay. Please see the attached write up I prepared that may be helpful in highlighting the SOPs I have grown to learn and operate under pertaining to Expense Reports.

I look forward to discussing and clarifying any additional questions you might have on Monday.

Have a wonderful weekend,

Josh
912-308-5781
josh.biering@gmail.com

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, November 15, 2023 1:28 PM
**To:** nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** Validate External Sender- Garden Leave - SID I662283

Validate external sender

Many thanks,

Josh Biering

App. 0989

Message

**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 12/25/2023 2:30:08 AM
**To:** Tidwell-Neal, Rachel L (Legal, USA) [rachel.l.tidwell-neal@jpmchase.com]; Cohen, Jena B (WM, USA) [jena.b.cohen@jpmorgan.com]
**CC:** Josh Iacuone [iacuone@roggedunngroup.com]; Stewart, Ben (WM, USA) [ben.stewart@jpmorgan.com]; Aughinbaugh, John T (WM, USA) [john.t.aughinbaugh@jpmorgan.com]; Muraira, Nadia [nadia.muraira@jpmchase.com]; Hitchcock, Kyle E (WM, USA) [kyle.e.hitchcock@jpmorgan.com]
**Subject:** [EXTERNAL]Fwd: Validate External Sender- Garden Leave - SID I662283
**Attachments:** J. Biering - JPMorgan Background Info - Expenses- 11.16.2023.pdf

I never heard back regarding this bogus investigation- did you have enough to frame me with the other one as to unethically try and retain assets or business?

Weird that Nadia's number was "disconnected" when I tried following up with her.

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 17, 2023 4:02 PM
**To:** nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** Re: Validate External Sender- Garden Leave - SID I662283

Nadia-

I apologize for the delay. Please see the attached write up I prepared that may be helpful in highlighting the SOPs I have grown to learn and operate under pertaining to Expense Reports.

I look forward to discussing and clarifying any additional questions you might have on Monday.

Have a wonderful weekend,

Josh
912-308-5781
josh.biering@gmail.com

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, November 15, 2023 1:28 PM
**To:** nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** Validate External Sender- Garden Leave - SID I662283

Validate external sender

Many thanks,

Josh Biering

Exhibit
CX44

Message



**From:** Josh Biering [josh.biering@gmail.com]
**Sent:** 12/25/2023 3:16:06 AM
**To:** Tidwell-Neal, Rachel L [rachel.l.tidwell-neal@jpmchase.com]; Cohen, Jena B [jena.b.cohen@jpmorgan.com]
**CC:** Josh Iacuone [iacuone@roggedunngroup.com]; Stewart, Ben [ben.stewart@jpmorgan.com]; Aughinbaugh, John T [john.t.aughinbaugh@jpmorgan.com]; nadia.muraira@jpmchase.com; Hitchcock, Kyle E [kyle.e.hitchcock@jpmorgan.com]; jonathan.jacobs@jpmchase.com
**Subject:** Re: Validate External Sender- Garden Leave - SID I662283
**Attachments:** Messages - Kelly Ann Ann Kimball (Martin).pdf; original-E5C5D260-2F26-4CD1-B192-0CA48B1814EB.jpeg; original-4F0E7F66-9D1F-4148-986B-7C62FC2DDD25.jpeg; Termination Call 12.1.2023.m4a

Excuse me, + Jonathan,

I would only hope that their investigation reports/findings were thorough and unbiased… but we all know know the outcome was premeditated. Everyone knew I was getting discharged before I did apparently….

You should probably consider interviewing all material witnesses and facts before throwing out bold accusations such as "harassment".

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Sunday, December 24, 2023 8:30:08 PM
**To:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>; Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Cc:** Josh Iacuone <iacuone@roggedunngroup.com>; Stewart, Ben <ben.stewart@jpmorgan.com>; Aughinbaugh, John T <john.t.aughinbaugh@jpmorgan.com>; nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>; Hitchcock, Kyle E <kyle.e.hitchcock@jpmorgan.com>
**Subject:** Fwd: Validate External Sender- Garden Leave - SID I662283

I never heard back regarding this bogus investigation- did you have enough to frame me with the other one as to unethically try and retain assets or business?

Weird that Nadia's number was "disconnected" when I tried following up with her.

Regards,

JB

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Friday, November 17, 2023 4:02 PM
**To:** nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** Re: Validate External Sender- Garden Leave - SID I662283

Nadia-

I apologize for the delay. Please see the attached write up I prepared that may be helpful in highlighting the SOPs I have grown to learn and operate under pertaining to Expense Reports.

I look forward to discussing and clarifying any additional questions you might have on Monday.

Exhibit
CX45

Have a wonderful weekend,



Josh
912-308-5781
josh.biering@gmail.com

---

**From:** Josh Biering <josh.biering@gmail.com>
**Sent:** Wednesday, November 15, 2023 1:28 PM
**To:** nadia.muraira@jpmchase.com <nadia.muraira@jpmchase.com>
**Subject:** Validate External Sender- Garden Leave - SID I662283

Validate external sender

Many thanks,

Josh Biering

culture. Complainant asks for specific examples on how to improve but Market Manager does not share any examples.

- Complainant distinctly expresses desire to resign but cannot since going through a contested divorce and "I still have mouths to feed. So what do we do?" Market Manager responds, "Business as usual."

- **10/27/2023**-
    - 8:30am CST- Complainant emails Manager regarding Personal Day
    - 2:35pm CST- Manager texts Complainant to "call me at the office as soon as possible"
    - 3:00pm CST- Complainant meets with Merrill Lynch regarding new employment. Meeting is on Complainant's calendar as a "private" meeting.
    - 4:36pm CST- Complainant calls Manager following meeting with Merrill Lynch Market Executive and new, prospective business partner. Manager states, "effective immediately, you are being placed on an involuntary, paid administrative leave without access to client or JPMorgan systems until further notice." No additional explanation or detail was provided, nor was a tentative timeline provided.
- **10/28/2023**- Complainant submits formal resignation to JPMorgan, initiating 'clock' for 60 day Garden Leave, estimated to expire 12/26/2023.
- **11/1/2023**- Complainant Counsel connects with JPMorgan Counsel via phone call. JPMorgan Counsel communicates two internal investigations initiated regarding Harassment and Expense Policy violation.
- **11/7/2023**- JPMorgan Investigator/ Employee Relations, Jonathan Jacobs, and a separate Global Securities representative, interview Complainant regarding alleged Harassment complaint.
- **11/15/2023**- Separate JPMorgan Investigator, Nadia Muraira, interviews Complainant regarding two expense reports that were submitted and approved by JPMorgan. JPMorgan randomly selected the two expense reports for a bespoke and targeted audit- no others included to Complainant's knowledge.
    - **11/17/2023**- I email Nadi Muraira, at her request, the highlights and SOPs pertaining to expense report submissions. I also highlight the suspicious nature and impetus of the decision to 'audit' and single out my approved/submitted expense reports.
    - **11/20/2023**- I tried calling Nadia, as we agreed to reconnect on Monday (11/20)- but her number was no longer active/in service. **Very suspect, since I shared specific examples of leadership violating policies**.
- **11/28/2023-** I emailed Jonathan Jacobs (Employee Relations) and Rachel Tidwell-Neal (JPM Counsel) for an update on investigation- no response
    - **11/29/2023**- Requested another update from Jonathan
    - **11/29/2023**- JPMorgan sends new advisors to the large client/prospects I won for the Bank (M[redacted]. Prior to the meeting, the prospect asks "why was I canned?!"